IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| YOLANDA M. BOSWELL,<br><br>   Plaintiff,<br><br>v.<br><br>JAMARLO K. GUMBAYTAY,<br>DBA/THE ELITE REAL ESTATE<br>CONSULTING GROUP<br><br>AND,<br><br>MATTHEW W. BAHR<br><br>   Defendants. | Civil Case No. 2:07-cv-135-WKW<br><br><br>**MOTION FOR SANCTIONS AND<br>EXPEDITED<br>MODIFICATION/ENFORCEMENT<br>OF PRELIMINARY INJUNCTION** |

  COMES NOW, Plaintiff, YOLANDA M. BOSWELL, by and through undersigned Counsel, and files this Motion for Sanctions against Defendant Jamarlo K. GumBayTay and for Expedited Enforcement and Modification of the Preliminary Injunction, and in support of said Motion states the following:

1. The Plaintiff filed this action on February 14, 2007, against Defendants GumBayTay, the manager of the Plaintiff's rental apartment located at 964 North Gap Loop, Montgomery, Alabama, and Matthew Bahr, the property owner who employs Defendant GumBayTay as his management agent. In said action the Plaintiff filed a complaint and a petition for injunctive relief, to enforce the provisions of Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, et seq. (hereinafter "the FHA").

2. The Plaintiff alleged in her complaint and petition for a preliminary injunction that the Defendants have violated the FHA by discriminating against the Plaintiff on the basis of sex in connection with the rental of a property.

3. This Court held a hearing on the Plaintiff's Motion for a Preliminary Injunction on February 22, 2007. The Court, after hearing the evidence presented, granted the Plaintiff a preliminary injunction in this cause. The Court's Order of February 23, 2007 provides:

> [T]he court finds that a preliminary injunction is due to be entered against the Defendants and in favor of the Plaintiff as follows: 1) Defendants are restrained and enjoined from instituting eviction proceedings against the Plaintiff, or from directly or indirectly threatening eviction proceedings against the plaintiff, until further order of the court; 2) Defendant Jamarlo K. Gumbaytay is restrained and enjoined from threatening, harassing, or communicating with Plaintiff or any of her immediate family who resides at 964 North Gap Loop, Montgomery, Alabama until further order of this court; 3) Defendants are restrained and enjoined from interfering with Plaintiff's possession of the premises located at 964 North Gap Loop, Montgomery, Alabama until further order of this court.

4. Since the entry of the Court's Order the Defendant, Jamarlo K. Gumbaytay, has violated the terms and conditions of the Preliminary Injunction in numerous ways and on numerous occasions.

5. First, Defendant GumBayTay has retaliated against the Plaintiff by refusing to make necessary repairs to her home that he is bound to make under the terms of the lease in retaliation for her exercise of her rights under the FHA.

6. To date, the Plaintiff has experienced the following problems with her rental unit since she complained to Defendant GumBayTay about harassment (all of which are outlined in more detail in Exhibit 1):

    a. The Plaintiff has had an overflowing toilet and leaky pipes in the bathroom sink that have caused carpet damage and high water bills. The leaking water from the sink required the plaintiff to turn the water off, and she has not been able to use that sink to this day;

    b. The Plaintiff's air conditioner has not worked in over three months. Because of the extreme heat in Alabama, she was forced at first to borrow a window air conditioning unit from a friend and later to purchase a unit from a friend for $50. She has also been forced to relocate her children to her grandmother's place during the hottest days;

    c. The kitchen sink was stopped up for a lengthy time, making it completely unusable. Eventually the Plaintiff paid $50 to a friend to un-stop it. The faucet on this same sink has been broken for over 3 months, and causes water to spray in all directions when used.

7. Around May 14, the Plaintiff's counsel wrote a letter to Defendant GumBayTay asking that he remedy the leaking water pipes, correct the flooding from the front bathroom, repair or replace the damp carpet, and fix the air conditioner, but there was no response. On May 31 and again around June 4, the Plaintiff called Defendant GumBayTay and described all the problems detailed above. He responded that the best thing for her to do would be to move out. At the same time, either he or Defendant Bahr listed the Plaintiff's apartment as available, and in response to an inquiry by a friend of the Plaintiff about the apartment, he responded that the Plaintiff would be moving out soon.

8. As a result of the refusal to make required repairs, the Plaintiff was forced to pay someone to make repairs that the Defendants should have made, and the Plaintiff has no additional funds to fix the other repair problems.

9. Because of Defendant GumBayTay's refusal and failure to make repairs, the Plaintiff has been constructively evicted from the premises. *Senteny v. United Embroidery Company,* 159 So. 252 (Ala. 1935). *See also* Ala. Code § 35-9A-427

3

(new law demonstrating public policy against constructive eviction by landlords).[1]

10. By constructively evicting the Plaintiff and retaliating against her by refusing to make repairs, Defendant GumBayTay has violated the Court's Order, state law, and federal law.

11. The retaliation violates several provisions of this Court's Order, specifically the provisions that the Defendants are restrained from indirectly threatening eviction proceedings and/or interfering with the Plaintiff's possession of the premises.

12. With regard to state law, laws like Ala. Code § 35-9A-501 demonstrate that such retaliatory conduct is considered contrary to public policy.  Defendant GumBayTay has also breached his contract with the Plaintiff, as the Plaintiff's lease states in Paragraph 10 that the "Landlord shall (a) Comply with the requirements of applicable building and housing codes materially affecting health and safety; (b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease …"

13. With regard to federal law, section 3617 of the FHA and HUD regulations 24 C.F.R. §§ 100.400(c)(4) and (5) provide:  "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  As

---

[1] Ala. Code § 35-9A-427 states that "[a] landlord may not recover or take possession of the dwelling unit by action or otherwise, including willful diminution of services to the tenant by interrupting or causing the interruption of heat, running water, hot water, electric, gas, or other essential service to the tenant, except in case of abandonment, surrender, or as permitted in this chapter."

4

examples of actions violating § 3617, the HUD regulations describe "intimidating or threatening any person because that person is ... encouraging ... other persons to exercise, rights granted or protected by this part," 24 C.F.R. § 100.400(c)(4), and "retaliating against any person because that person has made a complaint ... under the Fair Housing Act."  24 C.F.R. § 100.400(c)(5) (emphasis added).

14. In addition to retaliating against the Plaintiff by refusing to make repairs, Defendant GumBayTay has harassed and intimidated and threatened the Plaintiff in violation of the Court's Order as well as applicable federal law.

15. Since the time of the entry of the Preliminary Injunction, Defendant GumBayTay has been following her.  She has seen him drive by her home constantly, even though he manages no other rental property on her street and even though her street is a dead end.  Based on the times he has been seen, he appears to know when she is leaving the house, arriving home, and even going to the mailbox.  In mid-March, a neighbor, Greg Lytes, told the Plaintiff that he had seen Defendant GumBayTay parked in his car across the street from her house for approximately an hour while she was not home.  In early June, the Plaintiff was also informed by witnesses that Defendant GumBayTay was driving by her house.

16. The stalking activities described above and also in Exhibit 1 are in clear contravention of the provisions of the Court's Order prohibiting the Defendants from threatening or harassing the Plaintiff.  Moreover, coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights is prohibited under Section 818 of the FHA, 42 U.S.C. § 3617.

17. Around May 30, Defendant GumBayTay visited the Plaintiff's house in person regarding rent and sought to speak with her. This action was in direct violation of the Court's Order, which prohibited the Defendants from communicating with the Plaintiff.

18. Finally, Defendant GumBayTay has threatened to institute eviction proceedings against the Plaintiff and terminated her lease, both of which violate the Court's Order. On June 12, 2007 Defendant GumBayTay delivered to the Montgomery offices of Legal Services Alabama a lease termination notice addressed to the Plaintiff. He also left a notice at the Plaintiff's home, and sent her a similar notice on June 5, 2007. These actions violate the Court's prohibition against eviction threats.

19. As a result of all of the Defendants' conduct described above, including the refusal to make necessary repairs, the retaliation, and the harassment amounting to constructive eviction, the Plaintiff and her family cannot safely reside any longer at the Defendants' property. She therefore seeks expedited amendment of that portion of the Court's order requiring her to continue to pay monthly rent to Defendants until further notice, so that she may relocate and afford to pay for a new rental property. The Plaintiff also requests that the Court terminate her lease as an appropriate sanction for Defendant GumBayTay's egregious behavior.

20. Based on all the conduct described above, the Plaintiff is also entitled to other sanctions for Defendant GumBayTay's willful violations of the Court's order and of state and federal law. "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. This may

entail the doing of a variety of acts …." *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir.1987) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949). When fashioning a sanction to secure compliance, a district court should consider "'the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *EEOC*, 828 F.2d at 1515 (quoting *United States v. United Mine Workers*, 330 U.S. 330 U.S. 258, 304 (1947)). Among the options available to a court are a coercive daily fine, a compensatory fine, attorney's fees and expenses, and coercive incarceration. *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991).[2]

21. "Civil contempt sanctions may be imposed for either or both of two distinct purposes: to coerce compliance with a court order, and to compensate the complainant for actual losses sustained by him as the result of the defendants' contumacy." *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400-401 (11th Cir. 1989). "If the fine is compensatory, it is payable to the complainant and must be based on proof of the complainant's actual loss … If the fine is coercive it is paid into the court registry, not to the complainant." *Id.*

22. Defendant GumBayTay has threatened, harassed and intimidated the Plaintiff;

---

[2] See also 18 U.S.C. § 401, which states that "[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

7

constructively evicted her; retaliated against her through attempts at eviction and reduction of services by failing to make repairs; and terminated her lease without court approval. All of these acts constitute a violation of the Court's order as well as state and federal law, and sanctions are appropriate.

WHEREFORE PREMISES CONSIDERED, the Plaintiff prays that the Court will grant her motion for sanctions and enforcement of this Court's Order, including the sanction of terminating her lease, and will amend the Order to permit her to relocate from Defendants' property.

Dated: July 6, 2007

                                        RESPECTFULLY SUBMITTED:

                                  /s/
                              Emily J. Martin (EM-2924)
                              Lenora M. Lapidus (LL-6592)
                              Women's Rights Project
                              American Civil Liberties Union Foundation
                              125 Broad Street, 18th Floor
                              New York, NY 10004
                              Tel: 212-519-7816
                              Fax: 212-549-2580

                              Kenneth J. Lay
                              Legal Services Alabama, Inc.
                              P.O. BOX 11765
                              Birmingham, Alabama 35202
                              (205) 397-6540 EXT. 102

                              Allison E. Neal (NEA008)
                              American Civil Liberties Union of Alabama
                              207 Montgomery Street, Suite 910
                              Montgomery, AL 36106
                              Tel: 334-265-2754
                              Fax: 334-269-5666

                              ATTORNEYS FOR THE PLAINTIFF

### CERTIFICATE OF SERVICE

I hereby certify that on this the 6th day of July, 2007, I have served the above foregoing Motion upon the following parties by placing copies of same in the U.S. Mail, postage prepaid, properly addressed as follows:

Jamario K. GumBayTay                     Matthew W. Bahr

4013 Tiffany Drive                       1569 Amaryllis Circle

Montgomery, AL  36110-3003               Orlando Florida  32825


    /s/
Emily J. Martin (EM-2924)
Women's Rights Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-549-2615
Fax: 212-549-2580

9

**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| YOLANDA M. BOSWELL,<br><br>        Plaintiff,<br><br>v.<br><br>JAMARLO K. GUMBAYTAY,<br>DBA/THE ELITE REAL ESTATE<br>CONSULTING GROUP<br><br>AND,<br><br>MATTHEW W. BAHR<br><br>        Defendants. | Civil Case No. 2:07-cv-135-WKW<br><br><br>DECLARATION OF YOLANDA M.<br>BOSWELL IN SUPPORT OF<br>DAMAGES SOUGHT FOR DEFAULT<br>JUDGMENT AS WELL AS<br>SANCTIONS |

I, Yolanda Boswell, do declare the following:

1. I live at 964 North Gap Loop, Montgomery, Alabama 36110. I have lived there for over nine months.

2. When I found the North Gap Loop house, I explained to Mr. Jamarlo K. GumBayTay, the manager of the property, that I could only afford to pay $450/month for the house, owing to how much I earned and the fact that I have 4 children and a sick mother. He said that he would accept $450 because of my difficult situation.

3. In October 2006, I agreed to sign a lease for $450/month for my place on North Gap Loop. The lease, which is attached as Exhibit 8, mistakenly stated that the rent was $550/month, and when I pointed this out while in the Elite Real Estate Consulting Group

office, Lynn, an employee of Elite, hand-changed the amount to $450 and initialed the change "LHN". I then signed the lease.

4. I moved in during the first week of October 2006. Since then, I have been pressured in a number of ways to have sex with Mr. GumBayTay. This harassment has caused me great pain and suffering. I continue to experience pain and suffering to the present day.

5. At the time I moved in, there were several problems with my unit. For instance, the toilet in my back bathroom was stopped up and there was a broken windowpane in one room. However, Mr. GumBayTay was at first quick to respond to my repair requests, and in October he sent three separate repairmen to try to fix the toilet. On the third try, the toilet was replaced and the windowpane was fixed.

6. Around October 11, 2006, Mr. GumBayTay called and asked me to sign a new lease stating that my monthly rent would be $550 a month. GumBaytay told me that while the $450 lease reflected the actual agreement between us, he needed a $550 lease to send to Mr. Bahr, the owner of the property. I did not want to sign a lease stating that I owed $550 a month, and I never did so. During this conversation, Mr. GumBayTay pressured me to have sex with him, telling me that we needed to get together soon and have lunch, dinner, or cocktails. He also invited me on a weekend trip with him, and indicated that he was interested in having sex with me.

7. In or around mid-October, GumBayTay called me and let me know that he had modified the original lease to $550 a month, and sent it to Bahr. He reiterated that the $450 lease agreement was still controlling, but during this conversation, he urged me to visit him the next week. A copy of the modified lease is attached as Exhibit 9. It shows that the

amount of rent typed into the lease, which is $450, was scratched out, replaced with "$550" and initialed "JKG".

8. On or around October 14, Mr. GumBayTay stopped by my house without any notice. He walked in without knocking at a time when I had a number of friends over. He said he was just checking to make sure everything was ok.

9. On or around October 16, I called Mr. GumBayTay to tell him that the toilet in my bedroom was stopped up and so was not working. During this conversation, he asked me when I wanted to "work on my sugar daddy account."

10. On or around October 17, 2006, Mr. GumBayTay called and asked me when I was going to start "working on" his portion of the rent, meaning the $100 difference between $450 and $550. He insisted that I visit him sometime before the end of the month. I did not really understand what he was asking. I reminded him that he had just seen me because he had shown up at my house around October 14. At this time, Mr. GumBayTay indicated that he was not interested in just seeing me, but in having sexual relations with me. He asked me whether "Sugar Daddy" meant anything to me. I thought he was just trying to help me out by giving me a discounted rent, and I told him that. I was shocked and horrified by what I was hearing, because I hadn't given him any reason to believe I would participate in something like this. I asked GumBayTay if he was saying that he would only accept $450 in rent if I had sex with him. He indicated that this was the case, but refused to put it in those terms because he said that to say so "is borderline harassment." I refused. I was humiliated. This was not my understanding of our agreement. I really thought he was just trying to help me.

11. During this same conversation, Mr. GumBayTay said that since I had not understood the situation, he would continue to let me pay $450 for the months of November and December. However, in January, unless I agreed to have sex with him, the rent would be raised to $550 a month.

12. At some point in December, Mr. GumBayTay came to my unit to collect the rent and my boyfriend answered the door. Mr. GumBayTay later asked who the person was that answered the door, and I answered that it was my boyfriend. At that point, Mr. GumBayTay began to harass me about the placement of my car on the property and other such things.

13. On or around January 17, I told him that I would continue to pay $450 per month, but I refused to pay an additional $100 per month. I told him that if he did not abide by the terms of the original lease, I would file sexual harassment charges against him. By this point, I was completely stressed out and started missing days of work due to being worried and stressed about this situation. I continue to miss days of work because of this situation even now. I also began crying often whenever I talked to people about what was going on.

14. Immediately after I complained to GumBayTay about his harassment, he sent me a threatening document on January 19, 2007 and another on February 6, 2007, along with a threatening phone call on this date. All of these communications from Mr. GumBayTay either directly or indirectly threatened eviction if I did not give in to his sexual demands or at least meet with him by myself. At the time, I was constantly afraid that my family would not have a place to live if I did not meet his demands.

15. After complaining to GumBayTay about his harassment, I began having problems in my unit that needed repair, and it was impossible to get him to act on any of these requests, which was in contrast to his quick response right after I moved in. I have had to use what little money I have to deal with some of these problems myself, which has made it very difficult for me to pay the rent and increased my stress even more.

16. In January 2006, I began having problems in my front bathroom. Specifically, the toilet in the front bathroom began overflowing, and the sink in the front bathroom was leaking at the bottom, causing carpet damage. Also, the area below the sink had collapsed. A man named Roger, who was an inspector with Elite Real Estate Consulting Group, came by my house this same month and inspected the front bathroom. My mother was there at the time, and pointed out the problems in the front bathroom.

17. About a month after this inspection, the front bathroom problems remained. Around February 7, 2007, one of my attorneys, Connie Baker, sent a letter to Mr. GumBayTay and the owner of the property, Matthew Bahr, requesting that they fix the malfunctioning toilet, as this was the most serious problem.

18. GumBayTay finally sent someone to look at the front bathroom in March. The person who arrived, whose name I believe was Leon, had a work order that only told him to replace the front bathroom sink. He replaced the front bathroom sink itself, but would not fix the front bathroom toilet or the damage to the bottom of the front bathroom sink because it was not on his work order.

19. My front bathroom sink continued to leak from the bottom even after it was replaced. I had my boyfriend turn off the water because it was leaking through the walls and

damaging the carpet in my back bedroom. I have not been able to use the front bathroom sink since then, which is nearly 4 months ago.

20. Because the front bathroom toilet was still constantly running, my water bill was very high. For example, in January of 2007, my water bill was approximately $165, whereas prior to that it had been $73. I finally had my neighbor Tim fix the front bathroom toilet for me in March free of charge, at which point the bill went back down to $88.

21. Since May 2007, the kitchen sink has been stopped up, making it completely unusable. I had to pay my neighbor Tim $50 to unstop it. The faucet on the kitchen sink is also broken, causing water to spray in all directions when it is turned on.

22. My air conditioner has not worked since April 2007. Without the air conditioning and because it is a brick house, the temperature in the house is about 90 degrees without cooling. I have had a friend lend me one window unit and purchased a second one for approximately $50. But even with the window units, it is too hot for my children to be able to stay there all week long. I have had to have my children stay at my grandmother's apartment some of the time because of the heat, and have had to pay money to my grandmother to help her with the additional expense.

23. Around May 14, one of my attorneys wrote a letter to Mr. GumBayTay on my behalf asking that he fix the leaking water pipes, correct the flooding from the front bathroom, repair or replace the damp carpet, and fix my air conditioner. These repairs have not been made.

24. My house has become unlivable. I worry constantly for the health and safety of my family living in such an environment. I feel like GumBayTay is not repairing the house in retaliation for my lawsuit against him.

6

25. On May 31, I called Mr. GumBayTay and told him all the problems detailed above. He said that he told the owner, Matthew Bahr, and was waiting on Mr. Bahr to give him money to fix the problems. I called Mr. GumBayTay again around June 4th and he told me that Mr. Bahr had not been paying the mortgage on the house that I am living in, so the best thing for me to do would be to just move out.

26. My house has been listed for rent on a flyer at the section 8 office a number of times. I had my friend Nataska Scott call Mr. GumBayTay to inquire into the house's availability after the May 31, 2007, conversation mentioned above. Ms. Scott identified herself as someone interested in renting the property. GumBayTay told her that someone was currently living in the house, but that the occupant was probably going to be moving out soon. He advised Ms. Scott to call him back early the following week, and he would let her know if the resident intended to move out.

27. Since I filed a complaint, I have felt like GumBayTay has been following me. I have seen see him drive by constantly. It seems like he knows when I am leaving the house, arriving home, and even going to the mailbox. My mother, Jennette Boswell, and I have seen him drive by the house numerous times.

28. In mid-March, my neighbor, Greg Lytes, told me that he saw Mr. GumBayTay parked in his car across the street from my house for approximately an hour while I was not home.

29. In early July, one of my friends witnessed him driving by my house. Mr. GumBayTay's constant surveillance makes me fear for the safety of myself and my children.

30. These sightings of GumBayTay are disturbing because he does not own any other rental properties on my street. Also, my house is located on a dead end street.

31. On May 30, GumBayTay stopped by my apartment in person to deliver a notice about paying rent. I was not home at the time, but he spoke to my mother-in-law and asked for "the lady of the house." It was my understanding that the Court ordered him not to communicate with me at all.

32. I continue to fear that GumBayTay will try to harm me and my children. I believe that by harassing me and not repairing my house, he has acted in complete disregard of my right to be treated as a full human being. Since this harassment began, I have not been able to eat regularly, and feel extremely frustrated and tired. My children are not comfortable because of all the heat and other problems in the house, and so I am forced to keep them elsewhere and be separated from them.

I declare under penalty of perjury that the above information is true and correct.

Date: 7/6/07

Yolanda M. Boswell