<u>**EXHIBIT 1**</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| YOLANDA M. BOSWELL, | Civil Case No. 2:07-cv-135-WKW |
| Plaintiff, | |
| v. | |
| JAMARLO K. GUMBAYTAY, DBA/THE ELITE REAL ESTATE CONSULTING GROUP | **DECLARATION OF YOLANDA M. BOSWELL IN SUPPORT OF DAMAGES SOUGHT FOR DEFAULT JUDGMENT AS WELL AS SANCTIONS** |
| AND, | |
| MATTHEW W. BAHR | |
| Defendants. | |

I, Yolanda Boswell, do declare the following:

1. I live at 964 North Gap Loop, Montgomery, Alabama 36110.  I have lived there for over nine months.

2. When I found the North Gap Loop house, I explained to Mr. Jamarlo K. GumBayTay, the manager of the property, that I could only afford to pay $450/month for the house, owing to how much I earned and the fact that I have 4 children and a sick mother.  He said that he would accept $450 because of my difficult situation.

3. In October 2006, I agreed to sign a lease for $450/month for my place on North Gap Loop.  The lease, which is attached as Exhibit 8, mistakenly stated that the rent was $550/month, and when I pointed this out while in the Elite Real Estate Consulting Group

office, Lynn, an employee of Elite, hand-changed the amount to $450 and initialed the change "LHN". I then signed the lease.

4. I moved in during the first week of October 2006. Since then, I have been pressured in a number of ways to have sex with Mr. GumBayTay. This harassment has caused me great pain and suffering. I continue to experience pain and suffering to the present day.

5. At the time I moved in, there were several problems with my unit. For instance, the toilet in my back bathroom was stopped up and there was a broken windowpane in one room. However, Mr. GumBayTay was at first quick to respond to my repair requests, and in October he sent three separate repairmen to try to fix the toilet. On the third try, the toilet was replaced and the windowpane was fixed.

6. Around October 11, 2006, Mr. GumBayTay called and asked me to sign a new lease stating that my monthly rent would be $550 a month. GumBaytay told me that while the $450 lease reflected the actual agreement between us, he needed a $550 lease to send to Mr. Bahr, the owner of the property. I did not want to sign a lease stating that I owed $550 a month, and I never did so. During this conversation, Mr. GumBayTay pressured me to have sex with him, telling me that we needed to get together soon and have lunch, dinner, or cocktails. He also invited me on a weekend trip with him, and indicated that he was interested in having sex with me.

7. In or around mid-October, GumBayTay called me and let me know that he had modified the original lease to $550 a month, and sent it to Bahr. He reiterated that the $450 lease agreement was still controlling, but during this conversation, he urged me to visit him the next week. A copy of the modified lease is attached as Exhibit 9. It shows that the

2.

amount of rent typed into the lease, which is $450, was scratched out, replaced with "$550" and initialed "JKG".

8. On or around October 14, Mr. GumBayTay stopped by my house without any notice. He walked in without knocking at a time when I had a number of friends over. He said he was just checking to make sure everything was ok.

9. On or around October 16, I called Mr. GumBayTay to tell him that the toilet in my bedroom was stopped up and so was not working. During this conversation, he asked me when I wanted to "work on my sugar daddy account."

10. On or around October 17, 2006, Mr. GumBayTay called and asked me when I was going to start "working on" his portion of the rent, meaning the $100 difference between $450 and $550. He insisted that I visit him sometime before the end of the month. I did not really understand what he was asking. I reminded him that he had just seen me because he had shown up at my house around October 14. At this time, Mr. GumBayTay indicated that he was not interested in just seeing me, but in having sexual relations with me. He asked me whether "Sugar Daddy" meant anything to me. I thought he was just trying to help me out by giving me a discounted rent, and I told him that. I was shocked and horrified by what I was hearing, because I hadn't given him any reason to believe I would participate in something like this. I asked GumBayTay if he was saying that he would only accept $450 in rent if I had sex with him. He indicated that this was the case, but refused to put it in those terms because he said that to say so "is borderline harassment." I refused. I was humiliated. This was not my understanding of our agreement. I really thought he was just trying to help me.

11. During this same conversation, Mr. GumBayTay said that since I had not understood the situation, he would continue to let me pay $450 for the months of November and December. However, in January, unless I agreed to have sex with him, the rent would be raised to $550 a month.

12. At some point in December, Mr. GumBayTay came to my unit to collect the rent and my boyfriend answered the door. Mr. GumBayTay later asked who the person was that answered the door, and I answered that it was my boyfriend. At that point, Mr. GumBayTay began to harass me about the placement of my car on the property and other such things.

13. On or around January 17, I told him that I would continue to pay $450 per month, but I refused to pay an additional $100 per month. I told him that if he did not abide by the terms of the original lease, I would file sexual harassment charges against him. By this point, I was completely stressed out and started missing days of work due to being worried and stressed about this situation. I continue to miss days of work because of this situation even now. I also began crying often whenever I talked to people about what was going on.

14. Immediately after I complained to GumBayTay about his harassment, he sent me a threatening document on January 19, 2007 and another on February 6, 2007, along with a threatening phone call on this date. All of these communications from Mr. GumBayTay either directly or indirectly threatened eviction if I did not give in to his sexual demands or at least meet with him by myself. At the time, I was constantly afraid that my family would not have a place to live if I did not meet his demands.

15. After complaining to GumBayTay about his harassment, I began having problems in my unit that needed repair, and it was impossible to get him to act on any of these requests, which was in contrast to his quick response right after I moved in. I have had to use what little money I have to deal with some of these problems myself, which has made it very difficult for me to pay the rent and increased my stress even more.

16. In January 2006, I began having problems in my front bathroom. Specifically, the toilet in the front bathroom began overflowing, and the sink in the front bathroom was leaking at the bottom, causing carpet damage. Also, the area below the sink had collapsed. A man named Roger, who was an inspector with Elite Real Estate Consulting Group, came by my house this same month and inspected the front bathroom. My mother was there at the time, and pointed out the problems in the front bathroom.

17. About a month after this inspection, the front bathroom problems remained. Around February 7, 2007, one of my attorneys, Connie Baker, sent a letter to Mr. GumBayTay and the owner of the property, Matthew Bahr, requesting that they fix the malfunctioning toilet, as this was the most serious problem.

18. GumBayTay finally sent someone to look at the front bathroom in March. The person who arrived, whose name I believe was Leon, had a work order that only told him to replace the front bathroom sink. He replaced the front bathroom sink itself, but would not fix the front bathroom toilet or the damage to the bottom of the front bathroom sink because it was not on his work order.

19. My front bathroom sink continued to leak from the bottom even after it was replaced. I had my boyfriend turn off the water because it was leaking through the walls and

damaging the carpet in my back bedroom. I have not been able to use the front bathroom sink since then, which is nearly 4 months ago.

20. Because the front bathroom toilet was still constantly running, my water bill was very high. For example, in January of 2007, my water bill was approximately $165, whereas prior to that it had been $73. I finally had my neighbor Tim fix the front bathroom toilet for me in March free of charge, at which point the bill went back down to $88.

21. Since May 2007, the kitchen sink has been stopped up, making it completely unusable. I had to pay my neighbor Tim $50 to unstop it. The faucet on the kitchen sink is also broken, causing water to spray in all directions when it is turned on.

22. My air conditioner has not worked since April 2007. Without the air conditioning and because it is a brick house, the temperature in the house is about 90 degrees without cooling. I have had a friend lend me one window unit and purchased a second one for approximately $50. But even with the window units, it is too hot for my children to be able to stay there all week long. I have had to have my children stay at my grandmother's apartment some of the time because of the heat, and have had to pay money to my grandmother to help her with the additional expense.

23. Around May 14, one of my attorneys wrote a letter to Mr. GumBayTay on my behalf asking that he fix the leaking water pipes, correct the flooding from the front bathroom, repair or replace the damp carpet, and fix my air conditioner. These repairs have not been made.

24. My house has become unlivable. I worry constantly for the health and safety of my family living in such an environment. I feel like GumBayTay is not repairing the house in retaliation for my lawsuit against him.

25. On May 31, I called Mr. GumBayTay and told him all the problems detailed above. He said that he told the owner, Matthew Bahr, and was waiting on Mr. Bahr to give him money to fix the problems. I called Mr. GumBayTay again around June 4th and he told me that Mr. Bahr had not been paying the mortgage on the house that I am living in, so the best thing for me to do would be to just move out.

26. My house has been listed for rent on a flyer at the section 8 office a number of times. I had my friend Nataska Scott call Mr. GumBayTay to inquire into the house's availability after the May 31, 2007, conversation mentioned above. Ms. Scott identified herself as someone interested in renting the property. GumBayTay told her that someone was currently living in the house, but that the occupant was probably going to be moving out soon. He advised Ms. Scott to call him back early the following week, and he would let her know if the resident intended to move out.

27. Since I filed a complaint, I have felt like GumBayTay has been following me. I have seen see him drive by constantly. It seems like he knows when I am leaving the house, arriving home, and even going to the mailbox. My mother, Jennette Boswell, and I have seen him drive by the house numerous times.

28. In mid-March, my neighbor, Greg Lytes, told me that he saw Mr. GumBayTay parked in his car across the street from my house for approximately an hour while I was not home.

29. In early July, one of my friends witnessed him driving by my house. Mr. GumBayTay's constant surveillance makes me fear for the safety of myself and my children.

30. These sightings of GumBayTay are disturbing because he does not own any other rental properties on my street. Also, my house is located on a dead end street.

31. On May 30, GumBayTay stopped by my apartment in person to deliver a notice about paying rent. I was not home at the time, but he spoke to my mother-in-law and asked for "the lady of the house." It was my understanding that the Court ordered him not to communicate with me at all.

32. I continue to fear that GumBayTay will try to harm me and my children. I believe that by harassing me and not repairing my house, he has acted in complete disregard of my right to be treated as a full human being. Since this harassment began, I have not been able to eat regularly, and feel extremely frustrated and tired. My children are not comfortable because of all the heat and other problems in the house, and so I am forced to keep them elsewhere and be separated from them.


I declare under penalty of perjury that the above information is true and correct.

Date: 7/6/07

Yolanda M. Boswell

<u>**EXHIBIT 1A**</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| YOLANDA M. BOSWELL, <br><br> Plaintiff, <br><br> v. <br><br> JAMARLO K. GUMBAYTAY, <br>DBA/THE ELITE REAL ESTATE <br>CONSULTING GROUP <br><br> AND, <br><br> MATTHEW W. BAHR <br><br><br> Defendants. | Civil Case No. 2:07-cv-135-WKW <br><br><br> **DECLARATION OF ALLISON NEAL <br> IN SUPPORT OF MOTION FOR <br> DEFAULT JUDGMENT** |

ALLISON E. NEAL, Esq., declares and states the following:

1. I am staff attorney for the American Civil Liberties Union of Alabama, co-counsel for Plaintiff Yolanda M. Boswell in the above-captioned matter.

2. I make this declaration, based upon my personal knowledge and review of the relevant documents, in support of Plaintiffs' motion for default judgment against defendants Jamarlo K. GumBayTay, d/b/a The Elite Real Estate Consulting Group, and Matthew W. Bahr pursuant to Federal Rule of Civil Procedure 55(a).

3. On February 14, 2007, Plaintiff commenced this action by filing a Complaint against defendants Jamarlo K. GumBayTay, d/b/a/ The Elite Real Estate Consulting Group, and Matthew W. Bahr seeking injunctive relief, monetary damages, and attorneys' fees and costs for violation of the Fair Housing Act by discriminating against the Plaintiff on the basis of sex in connection with the rental of the subject property.

4. On February 14, 2007, service of the Summons, Complaint, and Civil Cover Sheet was effectuated with respect to defendants Jamarlo K. GumBayTay and The Elite Real Estate Consulting Group by placing copies of the same in the U.S. Mail, postage prepaid, and properly addressed to Jamarlo K. GumBayTay, d/b/a The Elite Real Estate Consulting Group 4013 Tiffany Drive Montgomery, AL 36110.

5. On February 14, 2007, service of the Summons, Complaint, and Civil Cover Sheet was effectuated with respect to defendant Matthew K. Bahr by placing copies of the same in the U.S. Mail, postage prepaid, and properly address to Matthew K. Bahr, 1569 Amaryllis Circle Orlando, FL 32825.

6. The twenty days within which defendants Jamarlo K. GumBayTay, The Elite Real Estate Consulting Group, and Matthew W. Bahr were required to file an answer or other responsive pleading passed and said defendants did not file an answer or responsive pleading.

7. On May 4, 2007, service of the First Amended Complaint was effectuated with respect to defendants Jamarlo K. GumBayTay, The Elite Real Estate Consulting Group, and Matthew W. Bahr by placing copies of the same in the U.S. Mail, postage prepaid, and properly addressed.

8. The twenty days within which defendants Jamarlo K. GumBayTay, The Elite Real Estate Consulting Group, and Matthew W. Bahr were required to file an answer or other responsive pleading passed and neither defendant timely filed an answer or responsive pleading.

9. On or about May 10, 2005, I received a message from Defendant Bahr indicating that he received a copy of the complaint. My co-counsel, Emily Martin, and I returned his call

and instructed him that if he did not appear in the case, he would be subject to default judgment.

10. On or about May 17, 2005, an attorney with whom Defendant GumBayTay had spoken, Tiffany McCord, contacted my former co-counsel, Connie Baker, and indicated that he had received the complaint.

11. To this date, Defendant Bahr has not filed any responsive pleading with the Court. The Clerk of the Court entered default against Defendant Bahr on June 29, 2007. Defendant GumBayTay filed an untimely Answer on June 27, 2007, 54 days after the Plaintiff's amended complaint was served and filed. However, his Answer does not seek leave to file out-of-time, or set out any cause for his failure to appear or answer within the time limits required by the Federal Rules of Civil Procedure. Moreover, his "Answer" is almost entirely unresponsive to the allegations contained within the Plaintiff's complaint, and instead seeks to involve the Court in a separate breach-of-contract claim. For these reasons, the Plaintiff seeks to strike Defendant GumBayTay's Answer as untimely and unresponsive.

12. In accordance with Federal Rule of Civil Procedure 55(a), default judgment should be entered against defendants Jamarlo K. GumBayTay, The Elite Real Estate Consulting Group, and Matthew W. Bahr.


Allison Neal (NEA008)
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104

3

Tel: 334-265-2754, ext. 203
Fax: 334-269-5666
Attorney for Plaintiffs

**EXHIBIT 2**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| YOLANDA M. BOSWELL,<br><br>Plaintiff,<br><br>v.<br><br>JAMARLO K. GUMBAYTAY,<br>DBA/THE ELITE REAL ESTATE<br>CONSULTING GROUP<br><br>AND,<br><br>MATTHEW W. BAHR<br><br><br>Defendants. | Civil Case No. 2:07-cv-135-WKW<br><br><br><br>**DECLARATION OF ALLISON E.<br>NEAL IN SUPPORT OF AWARD OF<br>ATTORNEYS' FEES AND COSTS** |

ALLISON E. NEAL, Esq., declares and states the following:

1. I am the staff attorney for the American Civil Liberties Union of Alabama (ACLU-AL) and co-counsel for Plaintiff in the above-captioned case. I submit this Declaration in support of Plaintiff's Motion for Attorneys' Fees and Costs, made pursuant to 42 U.S.C. § 3613(c)(2).

2. My relevant educational and employment background is set out more fully in my resume, which I attach as Exhibit 4. This declaration discusses some of that background.

3. I was admitted to practice law in the State of Alabama in 2005. In addition, I am a member of the bar of the United States District Court for the Middle District of Alabama and the United States District Court for the Northern District of Alabama. I am also a member of the bar of the State of Texas.

4.  I graduated cum laude from Southern Methodist University in 1998 with a B.A. in Political Science and a minor in Philosophy.  I received Political Science Departmental Distinction and Honors in the Liberal Arts Program, as well.  While in college, I presented my thesis on women's rights at the Southwest Political Science Association's annual meeting.

5.  In 2005, I graduated from Emory University School of Law.  I worked on civil rights cases and discrimination issues as a summer legal intern at the ACLU National Legal Department in New York City and Lambda Legal Defense and Education Fund South Central Regional Office in Dallas, Texas.  During law school, I interned for a semester at the ACLU-GA and worked on a number of civil rights cases and constitutional issues.

6.  I became a staff attorney at the ACLU-AL in March 2005.

7.  The ACLU is a non-profit, non-partisan, private organization with 53 affiliates throughout the nation. The ACLU's work is devoted exclusively to the defense and promotion of individual rights guaranteed to every person in this country by the Constitution and laws of the United States.  The ACLU-AL, established in 1965, is the state affiliate of the national ACLU. Through education, litigation, and community outreach ACLU-AL works to preserve and strengthen the individual rights and liberties of every person in Alabama.

8.  As a staff attorney at the ACLU-AL, I participate in a wide variety of litigation and advocacy efforts addressing civil rights and civil liberties.

9.  In the instant case, I participated in multiple aspects of the litigation.  I divided primary responsibility for drafting documents in this case with former Legal Services attorney Connie Baker.  For example, Ms. Baker and I worked together in drafting the initial complaint. Since the departure of Connie Baker from Legal Services in May of this year, I have assumed primary responsibility for client contact and day-to-day management of the case.  I spoke with

the Plaintiff and her family multiple times to develop the factual background of the case. I drafted the amended complaint, the motion seeking default judgment, and the supporting declarations. I have actively participated in strategy calls with co-counsel and reviewed and edited draft documents.

10. This case was appropriately staffed. Counsel had specific, non-duplicative assignments. As I described above, I divided primary responsibility for drafting documents in the case with former Legal Services attorney Connie Baker until her departure in May. With each litigation task, counsel for Plaintiff divided responsibility so as to avoid duplication of effort. For example, in the instant default judgment motions, I assumed responsibility for preparing supporting declarations and the motion seeking default judgment, Emily Martin, Deputy Director of the American Civil Liberties Union's Women's Rights Project (ACLU-WRP) undertook research and drafting of our memorandum in support of default and damages, and Legal Services attorney Kenneth Lay prepared and filed the application for entry of default against Defendant Bahr.

11. Attached as Exhibit 3 is my statement of hours. This statement accurately reflects the time I spent participating in the above-captioned case. This statement is based on time records that I maintained contemporaneously by hand. I respectfully submit that in compiling these hours I have exercised ordinary billing judgment and that excessive, duplicative, or otherwise unnecessary hours have been excluded from the records.

12. ACLU-AL is not seeking to recover the costs expended by ACLU-AL for telephone, fax, copying, or electronic research in the instant case.

13. I have spent 27.14 hours on this case. The hours I have spent have been multiplied by a reasonable local rate of $150 per hour. This rate is reasonable in light of my qualifications and experience. The total fee sought for my services is $4071.00.

I declare under penalty of perjury that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

DATED: June 27, 2007

ALLISON E. NEAL

**EXHIBIT 3**

**Hours Worked by Attorney Allison Neal**

| Dates and Times Description | Units | Rate | Value |
|---|---|---|---|
| 1/29/2007<br><br>Interview with client<br>to establish facts of the case | 1.3 | 150.00 | 195.00 |
| 1/29/2007<br>E-mail correspondence with Emily Martin<br>regarding facts of the case and how best to<br>proceed. | .33 | 150.00 | 49.50 |
| 2/1/2007<br>meeting with legal committee to discuss the<br>scope of involvement and obtain litigation<br>approval | .25 | 150.00 | 37.50 |
| 2/2/2007<br>Conference call with ACLU-WRP, Legal Services,<br>and Central Alabama Fair Housing regarding the<br>facts of the case, case strategy, schedule for filing,<br>and division of responsibilities. | 1.00 | 150.00 | 150.00 |
| 2/2/2007<br>Reviewed and edited draft complaint prepared<br>by Legal Services. | .33 | 150.00 | 49.50 |
| 2/5/2007<br>Telephone conversation with Emily Martin<br>regarding GumBayTay bankruptcy, procedural<br>requirements for filing, revision of complaint. | .33 | 150.00 | 49.50 |
| 2/5/2007<br>Reviewed and prepared redraft of initial complaint | 1.5 | 150.00 | 225.00 |
| 2/6/2007<br>Telephone conversation with Emily Martin, Connie<br>Baker, and Kenneth Lay regarding necessary<br>revisions to complaint, papers required to move | 1.0 | 150.00 | 150.00 |

for TRO, next steps and division of duties pre-filing.

| | | | |
|---|---|---|---|
| 2/7/2007 | .5 | 150.00 | 75.00 |
| Edited redraft of initial complaint | | | |
| | | | |
| 2/12/2007 | .33 | 150.00 | 49.50 |
| E-mail correspondence with Emily Martin concerning the redraft of the initial complaint | | | |
| | | | |
| 2/13/2007 | .5 | 150.00 | 75.00 |
| Reviewed redraft of the initial complaint and provided comments. | | | |
| | | | |
| 2/15/2007 | .5 | 150.00 | 75.00 |
| Telephone call with co-counsel regarding factual developments, TRO. | | | |
| | | | |
| 2/16/2007 | .5 | 150.00 | 75.00 |
| Conference call with co-counsel regarding preparation for TRO hearing. | | | |
| | | | |
| 2/20/2007 | 1.0 | 150.00 | 150.00 |
| Researched and revised draft of sexual harassment in housing memo. | | | |
| | | | |
| 2/21/2007 | .5 | 150.00 | 75.00 |
| Conference call with co-counsel regarding TRO hearing preparation. | | | |
| | | | |
| 2/22/2007 | .5 | 150.00 | 75.00 |
| Attended preliminary injunction. | | | |
| | | | |
| 2/27/2007 | .25 | 150.00 | 37.50 |
| Reviewed and revised retainer agreement for client. | | | |
| | | | |
| 3/7/2007 | 1.33 | 150.00 | 199.50 |
| Interview with two potential witnesses. | | | |
| | | | |
| 3/13/2007 | .25 | 150.00 | 37.50 |
| E-mail correspondence with co-counsel concerning factual developments and potential witnesses. | | | |
| | | | |
| 3/14/2007 | .17 | 150.00 | 25.50 |
| E-mail correspondence with co-counsel | | | |

concerning factual development, motion for
enforcement of Preliminary Injunction, possibility
of default by defendants, next steps.

3/14/2007                                            .17        150.00        25.50
Telephone conversation with client
concerning violation of the Preliminary Injunction.

3/30/2007                                            .33        150.00        49.50
Telephone conversation with Emily Martin
regarding amending complaint and collecting
supporting evidence to demonstrate violation
of Preliminary Injunction.

4/1/2007                                             .5         150.00        75.00
Drafted amended complaint.

5/7/2007                                             .17        150.00        25.50
E-mail correspondence with co-counsel
Concerning updates, sanctions.

5/9/2007                                             1.0        150.00        150.00
Conference call with co-counsel regarding
factual development, motion for enforcement of
the Preliminary Injunction, possibility of default
by the Defendants, next steps.

5/11/2007                                            .17        150.00        25.50
Telephone conversation with Connie Baker about
new developments.

5/17/2007                                            .17        150.00        25.50
Telephone conversation with Emily Martin,
returned phone message from Bahr; spoke to him
briefly about his duty to appear in the case and
his risk of default judgment if he does not.

5/17/2007                                            .17        150.00        25.50
Conversation with attorney GumBayTay had
spoken with, Tiffany McCord on repairs letter
and complaint.

5/17/2007                                            .17        150.00        25.50
Trip to interview possible witnesses.

5/22/2007                                            1.17       150.00        175.50

Drafted motion for entry of default judgment
and notice of motion for default

| | | | |
|---|---|---|---|
| 5/22/2007<br>Drafted declaration supporting motion for default<br>and sanctions. | 1.33 | 150.00 | 199.5 |
| 5/23/2007<br>Conference call with co-counsel regarding<br>Connie's departure from Legal Services,<br>reassignment of duties, default judgment, and<br>motion to enforce Preliminary Injunction. | .67 | 150.00 | 100.50 |
| 6/4/2007<br>Interview with Boswell concerning updates on<br>factual developments. | .5 | 150.00 | 75.00 |
| 6/6/2007<br>Interview with client on declaration in support<br>of retaliation/motion to enforce Preliminary Injunction | .67 | 150.00 | 100.50 |
| 6/6/2007<br>Returned a phone message from Bahr;<br>spoke to him briefly about whether he had paid<br>the mortgage on the house and his duty<br>to appear in the case and his risk of default judgment<br>if he does not; updated co-counsel of factual developments. | .33 | 150.00 | 49.50 |
| 6/11/2007<br>Drafted and edited client's declaration. | .5 | 150.00 | 75.00 |
| 6/12/2007<br>Drafted and edited client's declaration. | .5 | 150.00 | 75.00 |
| 6/12/2007<br>Drafted my affidavit in support of motion for default | .5 | 150.00 | 75.00 |
| 6/20/2007<br>Conference call with co-counsel regarding finalizing<br>default judgments and motion for enforcement papers. | .75 | 150.00 | 112.50 |
| 6/20/2007<br>Telephone conversation with client<br>updating her on the case and asking about new<br>factual developments. | .17 | 150.00 | 25.50 |

| | | | |
|---|---|---|---|
| 6/27/2007<br>Telephone conversation with co-counsel regarding<br>GumBayTay answer and attempt to evict client,<br>next steps given these developments. | .83 | 150.00 | 124.5 |
| 6/27/2007<br>Follow-up conversation with co-counsel<br>Regarding moving to strike GumBayTay's answer,<br>Proceeding against him and Bahr separately. | .67 | 150.00 | 100.50 |
| 6/27/2007<br>Revised and rewrote declaration in support<br>of sanctions/motion for enforcement of the<br>preliminary injunction. | 2.0 | 150.00 | 300.00 |
| 7/2/2007<br>Revise and rewrote declaration in support of<br>default judgment. | 1.0 | 150.00 | 150.00 |
| 7/2/2007<br>Reviewed and revised memo in support of<br>damages and motion to enforce Preliminary Injunction. | .33 | 150.00 | 49.50 |

Grand Total

| | | |
|---|---|---|
| Billable | 27.14 | |
| Unbillable | 0.00 | |
| Total | 27.14 | 4071.00 |

## EXHIBIT 4

## ALLISON E. NEAL

American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, Alabama 36104
334 265 2754 x 203
anaclual@bellsouth.net

## EXPERIENCE

### AMERICAN CIVIL LIBERTIES UNION OF ALABAMA
(Montgomery, AL; 2006 to Present)
*Staff Attorney*. Administer and coordinate all aspects of the ACLU of Alabama's legal program, including the identification of civil liberties violations in the state and the development of strategies to respond to them. Serve as co-counsel on cases with volunteer attorneys or national ACLU attorneys. Review legal requests and complaints. Research civil liberties issues and prepare legal memoranda, demand letters, advocacy letters, complaints and briefs. Conduct media outreach about the affiliate's legal program, including the preparation of press releases and speaking to the press. Speak at public forums, meetings and events on various civil liberties topics. Analyze legislation and provide testimony at legislative hearings.

### LAMBDA LEGAL DEFENSE AND EDUCATION FUND
(South Central Regional Office Dallas, TX; Summer 2004)
*Legal Intern*. Wrote legal memoranda on topics including adoption and marriage. Analyzed applicable federal and state laws. Researched constitutional issues such as the right to travel, the equal protection clause, and the privileges and immunities clause.

### AMERICAN CIVIL LIBERTIES UNION OF GEORGIA
(Atlanta, GA; Spring 2004)
*Legal Intern*. Drafted internal memoranda on issues ranging from parental visitation rights to the first amendment right to protest. Attended inter-office strategy sessions. Assisted in drafting a complaint.

### NATIONAL LEGAL DEPARTMENT, AMERICAN CIVIL LIBERTIES UNION
(New York, NY; Summer 2003)
*Legal Intern*. Analyzed constitutional issues such as the right to privacy and the first amendment. Wrote memoranda on a range of state procedural issues. Advised attorneys on arguments to be utilized in upcoming cases.

Admitted to practice in Alabama and Texas.

## EDUCATION

**EMORY UNIVERSITY SCHOOL OF LAW**, J.D., August 2005
Activities:     Emory Public Interest Committee, Chair of the Loan Repayment Assistance
                Program and Special Events
                Legal Association of Women Students, Co-Chair of Race Judicata

**SOUTHERN METHODIST UNIVERSITY**, B.A. in Political Science, May 2002
Honors:         *cum laude*
                Honors Liberal Arts Program
                Political Science Departmental Distinction
                Political Science Honors Society
                Presented thesis at Southwest Political Science Association's annual
                meeting
Activities:     American Civil Liberties Union—SMU Chapter, President and Founder
                Political Science Symposium, Vice-Chair of Publicity
                American Civil Liberties Union—Dallas Chapter

<u>EXHIBIT 5</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| YOLANDA M. BOSWELL, | Civil Case No. 2:07-cv-135-WKW |
| Plaintiff, | |
| v. | |
| JAMARLO K. GUMBAYTAY, DBA/THE ELITE REAL ESTATE CONSULTING GROUP | **DECLARATION OF EMILY J. MARTIN IN SUPPORT OF AWARD OF ATTORNEYS' FEES AND COSTS** |
| AND, | |
| MATTHEW W. BAHR | |
| Defendants. | |

EMILY J. MARTIN, Esq., declares and states the following:

1.  I am Deputy Director of the American Civil Liberties Union's Women's Rights Project (ACLU-WRP) and co-counsel for Plaintiff in the above-captioned case.  I submit this Declaration in support of Plaintiff's Motion for Attorneys' Fees and Costs, made pursuant to 42 U.S.C. § 3613(c)(2).

2.  My relevant educational and employment background is set out more fully in my resume, which I attach as Exhibit 7.  This declaration discusses some of that background.

3.  I was admitted to practice law in the State of New York in 2000.  In addition, I am a member of the bar of the United States District Court for the Eastern District of New York, the United States District Court for the Southern District of New York, and the Tenth Circuit Court of Appeals.  My admission to the United States District Court for the Eastern District of Michigan is currently pending.  I have also been admitted *pro hac vice* in numerous federal and

state courts including but not limited to this Court, the United States District Court for the Middle District of Louisiana, the United States District Court of Oregon, and the United States District Court of New Jersey.

4.   I received a B.A. with highest distinction in English Literature with a minor in Women's Studies from the University of Virginia in 1995.  While in college, as an employee of the West Virginia Women's Commission, I wrote several other articles and pamphlets on women's rights that were published and distributed by the West Virginia Women's Commission.

5.   In 1998, I graduated from Yale Law School, where I was an Editor for the Yale Journal of Law and Feminism.  During law school, I was also a student director and a member of the student board of directors of the Community Legal Services Clinic at the Jerome N. Frank Legal Services Organization, where I supervised students representing indigent clients in a wide variety of cases, including housing cases.  I also was a teaching assistant for Professor Jed Rubenfeld's Constitutional Law class.  In addition, I worked on civil rights cases and sex discrimination issues as a summer legal intern at the ACLU National Legal Department in New York City and the National Women's Law Center in Washington, D.C.

6.   After law school, I served as a law clerk for The Honorable T.S. Ellis, III, of the United States District Court for the Eastern District of Virginia from 1998 through 1999.

7.   In 1999, I received the Georgetown Women's Law and Public Policy Fellowship. From 1999 through 2000, I served the term of my fellowship at the National Women's Law Center, where I undertook legal and policy research and analysis on women's employment rights and multiple issues affecting women's family economic security.

8.   I worked as a law clerk for The Honorable Wilfred Feinberg of the United States Court of Appeals for the Second Circuit from 2000 through 2001.

9.    I became a staff attorney at the ACLU-WRP in September 2001.  In July 2005, I became Acting Deputy Director of the ACLU-WRP, and in April 2006 became Deputy Director of the ACLU-WRP.

10. The ACLU-WRP, founded in 1971 by Ruth Bader Ginsburg, has been a leader in the legal battles to ensure women's full equality in American society.  The WRP is dedicated to the advancement of the rights and interests of women, with a particular emphasis on issues affecting low-income women and women of color.  It has overall responsibility for implementing ACLU policy in the area of gender discrimination.  The WRP conducts direct litigation, files *amicus curiae* briefs, provides support for ACLU affiliate litigation, serves as a resource for ACLU legislative work on women's rights, and seeks to advance ACLU policy goals through public education, organizing and participating in coalitions.  The WRP has participated in virtually all of the major gender discrimination litigation in the Supreme Court.  To highlight only a few examples, the WRP has served as direct counsel or *amicus* in the following cases: *Jackson  v. Birmingham Board of Education*, 544 U.S. 167 (2005) (Title IX retaliation claim against girls' basketball coach for complaining of gender discrimination against team); *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) (Title IX claim for school's failure to prevent sexual harassment of one student by another); *United States v. Virginia*, 518 U.S. 515 (1996) (Equal Protection challenge to VMI's exclusion of women); *Califano v. Goldfarb*, 430 U.S. 199 (1977) (striking down discriminatory Social Security regulations under Equal Protection Clause); *Craig v. Boren*, 429 U.S. 190 (1976) (establishing heightened scrutiny for sex-based classifications under the Fourteenth Amendment); and *Reed v. Reed*, 404 U.S. 71 (1971) (the first case in which the Supreme Court held that a sex-based classification was unconstitutional).

11. As a staff attorney and Deputy Director at the ACLU-WRP, I direct and participate in a wide variety of litigation and advocacy efforts addressing gender discrimination and women's rights, with a primary focus on sex discrimination in housing. I have brought and successfully litigated and/or settled multiple cases involving women's rights under the Fair Housing Act, acting as lead counsel in these cases. For example, I am currently litigating a Fair Housing Act sex discrimination case in federal district court in Michigan on behalf of a victim of domestic violence who was evicted from her apartment as the result of her non-tenant abuser's violence against her and am representing multiple women who were sexually harassed by their building superintendent in Queens, New York, in an investigation and negotiation being undertaken in cooperation with the Civil Rights Bureau of the New York State Attorney General. As a further example, I appeared first as amicus counsel and then as plaintiff co-counsel in *Bouley v. Young-Sabourin*, 394 F. Supp. 2d 675 (D. Vt. 2005), the first case in which a federal court held that discrimination against an individual because of her status as a victim of domestic violence could constitute sex discrimination under the Fair Housing Act.

12. In addition to undertaking such litigation tasks as drafting briefs, arguing motions, and conducting discovery in fair housing litigation advancing sex discrimination claims, in my work at the ACLU-WRP I also have published multiple articles on women's fair housing rights and have been a frequent speaker on these topics around the country. These articles and speaking engagements are set out in further detail on my attached resume.

13. I also have undertaken significant legislative and policy work to advance women's fair housing rights. For example, I drafted portions of the Violence Against Women Act of 2005 that were ultimately enacted into law and that explicitly prohibit the eviction of victims of domestic violence from public or subsidized housing on the basis of the violence against them. I

have worked closely with the U.S. Department of Housing and Urban Development to implement these provisions since their enactment.

14. Since April 2007, I have served as President on the Board of the Fair Housing Justice Center of New York, New York.  I am also a member of the Social Welfare Committee of the New York City Bar Association.

15. In the instant case, I have primarily played the role of consultant, providing legal expertise on the Fair Housing Act and the scope of its prohibition of discrimination on the basis of sex and on federal court practice.  My participation was sought out in this case because of the experience that I offered in bringing sex discrimination claims under the Fair Housing Act and in litigating civil rights actions in federal court more generally.  In this role, I have actively participated in strategy calls with co-counsel and reviewed and edited draft documents.  I also have assisted in drafting papers in support of Plaintiff's Motions for Default Judgment.

16. This case was appropriately staffed.  Counsel had specific, non-duplicative assignments.  As described above, my role has primarily one of strategist and advisor and thus I have participated in all strategy discussions and decisions and have reviewed and edited legal filings.  ACLU of Alabama attorney Allison Neal has divided primary responsibility for drafting documents in this case with former Legal Services attorney Connie Baker.  For example, Ms. Baker and Ms. Neal worked together in drafting the initial complaint, while Ms. Neal drafted the amended complaint.  Since the departure of Connie Baker from Legal Services in May of this year, Ms. Neal has also assumed primary responsibility for client contact and day-to-day management of the case.  With each litigation task, counsel for Plaintiff divided responsibility so as to avoid duplication of effort.  For example, in the instant default judgment motions, I undertook research and drafting of our memorandum in support of default judgment and

damages, Ms. Neal assumed responsibility for preparing supporting declarations and the motion seeking default judgment, and Legal Services attorney Ken Lay prepared and filed the application for entry of default against Defendant Bahr.

17. Attached as Exhibit 6 is my statement of hours.  This statement accurately reflects the time I spent participating in the above-captioned case.  This statement is based on time records that I maintained by computer using a program called Timeslips.  I respectfully submit that in compiling these hours I have exercised ordinary billing judgment and that excessive, duplicative, or otherwise unnecessary hours have been excluded from the records.

18. ACLU-WRP is not seeking to recover the time spent by our paralegal in preparing and filing pro hac vice motions on behalf of ACLU-WRP director Lenora Lapidus and myself.  I am also not seeking to recover the costs expended by ACLU-WRP for telephone, fax, copying, or electronic research in the instant case.

19. I have spent 19.23 hours on this case.  The hours I have spent have been multiplied by a rate reasonable for New York City attorneys at my qualifications and experience level of $350 per hour.  This rate is reasonable in light of my qualifications and experience, and quite conservative compared to the rates charged by private attorneys in New York with similar qualifications and experience.  In private practice at major New York law firms, the billing rate for an attorney with equivalent years of experience and specialization to my own would be approximately $515.  Applying a New York rate is appropriate in this instance, given that I was brought into this case as an advisor and co-counsel precisely because local counsel with equivalent expertise could not be located.  The total fee sought for my services is $6,730.50.

I declare under penalty of perjury that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.


DATED: July 9, 2007                         _____/s/_____
                                                                    EMILY J. MARTIN

**EXHIBIT 3**

## Hours Worked By Attorney Emily Martin

6/27/2007                                      ACLU
8:08 PM                                    Slip Listing                                      Page      1

---

Selection Criteria

---

Slip.Classification          Open
Clie.Selection               Include: Boswell
Atto.Selection               Include: Emily Martin

---

Rate Info - identifies rate source and level

| Slip ID Dates and Time Posting Status Description | Attorney Activity Client Reference | Units DNB Time Est. Time Variance | Rate Rate Info Bill Status | Slip Value |
|---|---|---|---|---|
| 28903      TIME<br>1/29/2007<br>WIP<br>Email correspondence with Olivia Turner and Allison Neal regarding facts of the case, how best to proceed in initiating proceedings. | Emily Martin<br>E-mail corr.<br>Boswell | 0.33<br>0.00<br>0.00<br>0.00 | 350.00<br>T@1 | 115.50 |
| 28904      TIME<br>2/2/2007<br>WIP<br>Reviewed draft complaint prepared by Legal Services. | Emily Martin<br>review<br>Boswell | 0.50<br>0.00<br>0.00<br>0.00 | 350.00<br>T@1 | 175.00 |
| 28905      TIME<br>2/2/2007<br>WIP<br>Telephone call with Olivia Turner regarding appropriate scope of ACLU involvement in case. | Emily Martin<br>Telephone<br>Boswell | 0.33<br>0.00<br>0.00<br>0.00 | 350.00<br>T@1 | 115.50 |
| 28906      TIME<br>2/2/2007<br>WIP<br>Conference call with ACLU of Alabama, Legal Services, and Central Alabama Fair Housing Center regarding facts of the case, case strategy, schedule for filing, division of responsibilities. | Emily Martin<br>Telephone<br>Boswell | 1.00<br>0.00<br>0.00<br>0.00 | 350.00<br>T@1 | 350.00 |
| 28907      TIME<br>2/5/2007<br>WIP<br>Telephone conversation with Allison Neal regarding GumBayTay bankruptcy, procedural requirements for filing, revision of complaint. | Emily Martin<br>Telephone<br>Boswell | 0.33<br>0.00<br>0.00<br>0.00 | 350.00<br>T@1 | 115.50 |

6/27/2007                                    ACLU
8:08 PM                                   Slip Listing                                    Page    2

| Slip ID | | Attorney | Units | Rate | Slip Value |
|---|---|---|---|---|---|
| Dates and Time | | Activity | DNB Time | Rate Info | |
| Posting Status | | Client | Est. Time | Bill Status | |
| Description | | Reference | Variance | | |

| 28908 | TIME | Emily Martin | 0.75 | 350.00 | 262.50 |
|---|---|---|---|---|---|
| 2/6/2007 | | review | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Reviewed and edited redraft of the complaint | | | 0.00 | | |

| 28909 | TIME | Emily Martin | 1.00 | 350.00 | 350.00 |
|---|---|---|---|---|---|
| 2/6/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Telephone conversation with Allison Neal, Connie | | | 0.00 | | |
| Baker, and Ken Lay regarding necessary | | | | | |
| revisions to complaint, papers required to move for | | | | | |
| TRO, next steps and division of duties pre-filing. | | | | | |

| 28910 | TIME | Emily Martin | 0.83 | 350.00 | 290.50 |
|---|---|---|---|---|---|
| 2/7/2007 | | Edit | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Edited revised version of complaint. | | | 0.00 | | |

| 28911 | TIME | Emily Martin | 0.50 | 350.00 | 175.00 |
|---|---|---|---|---|---|
| 2/13/2007 | | E-mail corr. | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Reviewed redraft of complaint and provided | | | 0.00 | | |
| comments via email. | | | | | |

| 28912 | TIME | Emily Martin | 0.25 | 350.00 | 87.50 |
|---|---|---|---|---|---|
| 2/14/2007 | | review | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Final review and edit of complaint. | | | 0.00 | | |

| 28913 | TIME | Emily Martin | 0.50 | 350.00 | 175.00 |
|---|---|---|---|---|---|
| 2/15/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Telephone call with co-counsel regarding factual | | | 0.00 | | |
| developments, TRO. | | | | | |

| 28914 | TIME | Emily Martin | 0.50 | 350.00 | 175.00 |
|---|---|---|---|---|---|
| 2/16/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Conference call with co-counsel regarding | | | 0.00 | | |
| preparation for TRO hearing. | | | | | |

| 6/27/2007 | ACLU | | |
|---|---|---|---|
| 8:08 PM | Slip Listing | | Page    3 |

| Slip ID | Attorney | Units | Rate | Slip Value |
|---|---|---|---|---|
| Dates and Time | Activity | DNB Time | Rate Info | |
| Posting Status | Client | Est. Time | Bill Status | |
| Description | Reference | Variance | | |

| 28915 | TIME | Emily Martin | 0.50 | 350.00 | 175.00 |
|---|---|---|---|---|---|
| 2/21/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Conference call with co-counsel regarding TRO hearing preparation. | | | 0.00 | | |

| 28916 | TIME | Emily Martin | 0.33 | 350.00 | 115.50 |
|---|---|---|---|---|---|
| 2/27/2007 | | Drafting | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Prepared ACLU retainer for client. | | | 0.00 | | |

| 28917 | TIME | Emily Martin | 0.17 | 350.00 | 59.50 |
|---|---|---|---|---|---|
| 3/14/2007 | | E-mail corr. | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Email correspondence with Allison Neal concerning factual developments, GumBayTay's apparent violation of Preliminary injunction, appropriate next steps. | | | 0.00 | | |

| 28918 | TIME | Emily Martin | 0.33 | 350.00 | 115.50 |
|---|---|---|---|---|---|
| 3/30/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Telephone conversation with Allison Neal regarding amending complaint and collecting supporting evidence to demonstrate violation of Preliminary injunction. | | | 0.00 | | |

| 28919 | TIME | Emily Martin | 0.33 | 350.00 | 115.50 |
|---|---|---|---|---|---|
| 4/4/2007 | | review | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Reviewed and edited amended complaint. | | | 0.00 | | |

| 28920 | TIME | Emily Martin | 1.00 | 350.00 | 350.00 |
|---|---|---|---|---|---|
| 5/9/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Conference call with co-counsel regarding factual development, motion for enforcement of Preliminary injunction, possibility of default by defendants, next steps. | | | 0.00 | | |

| 28921 | TIME | Emily Martin | 0.17 | 350.00 | 59.50 |
|---|---|---|---|---|---|
| 5/17/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |

6/27/2007                                ACLU
8:08 PM                               Slip Listing                                          Page        4

| Slip ID | Attorney | Units | Rate | Slip Value |
|---|---|---|---|---|
| Dates and Time | Activity | DNB Time | Rate Info | |
| Posting Status | Client | Est. Time | Bill Status | |
| Description | Reference | Variance | | |
| With Allison Neal, returned phone message from Bahr; spoke to him briefly about his duty to appear in the case and his risk of default judgment if he does not. | | 0.00 | | |
| 28922             TIME | Emily Martin | 0.67 | 350.00 | 234.50 |
| 5/23/2007 | Telephone | 0.00 | T@1 | |
| WIP | Boswell | 0.00 | | |
| Conference call with co-counsel regarding Connie's departure from Legal Services, reassignment of duties, default judgment, and motion to enforce Preliminary injunction. | | 0.00 | | |
| 28923             TIME | Emily Martin | 0.33 | 350.00 | 115.50 |
| 6/7/2007 | review | 0.00 | T@1 | |
| WIP | Boswell | 0.00 | | |
| Review and edited motion for default. | | 0.00 | | |
| 28924             TIME | Emily Martin | 0.75 | 350.00 | 262.50 |
| 6/20/2007 | Telephone | 0.00 | T@1 | |
| WIP | Boswell | 0.00 | | |
| Conference call with co-counsel regarding finalizing default judgment and motion for enforcement papers. | | 0.00 | | |
| 28925             TIME | Emily Martin | 1.00 | 350.00 | 350.00 |
| 6/22/2007 | Drafting | 0.00 | T@1 | |
| WIP | Boswell | 0.00 | | |
| Began drafting memorandum in support of damages for entry of default judgment. | | 0.00 | | |
| 28926             TIME | Emily Martin | 3.33 | 350.00 | 1165.50 |
| 6/25/2007 | Drafting | 0.00 | T@1 | |
| WIP | Boswell | 0.00 | | |
| Researching jury awards in comparable cases, 11th circuit standards regarding emotional distress and punitive damages.  Drafting of mem in support of default judgment damages award. | | 0.00 | | |
| 28927             TIME | Emily Martin | 2.00 | 350.00 | 700.00 |
| 6/26/2007 | Drafting | 0.00 | T@1 | |
| WIP | Boswell | 0.00 | | |
| Research and drafting memo in support of | | 0.00 | | |

6/27/2007                                  ACLU
8:08 PM                                 Slip Listing                                       Page        5

| Slip ID | | Attorney | Units | Rate | Slip Value |
|---|---|---|---|---|---|
| Dates and Time | | Activity | DNB Time | Rate Info | |
| Posting Status | | Client | Est. Time | Bill Status | |
| Description | | Reference | Variance | | |

damages.

| 28928 | TIME | Emily Martin | 0.83 | 350.00 | 290.50 |
|---|---|---|---|---|---|
| 6/27/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Telephone conversation with co-counsel regarding | | | 0.00 | | |
| GumBayTay answer and attempt to evict client, | | | | | |
| next steps given these developments | | | | | |

| 28929 | TIME | Emily Martin | 0.67 | 350.00 | 234.50 |
|---|---|---|---|---|---|
| 6/27/2007 | | Telephone | 0.00 | T@1 | |
| WIP | | Boswell | 0.00 | | |
| Follow-up conversation with co-counsel regarding | | | 0.00 | | |
| moving to strike GumBayTay's answer, | | | | | |
| proceeding against him and Bahr separately. | | | | | |

| Grand Total | | | | | |
|---|---|---|---|---|---|
| | | Billable | 19.23 | | 6730.50 |
| | | Unbillable | 0.00 | | 0.00 |
| | | Total | 19.23 | | 6730.50 |

# <u>EXHIBIT 7</u>

## Emily J. Martin

ACLU Women's Rights Project • 125 Broad Street • New York, NY 10004 • 212/549-2615 • emartin@aclu.org

# Experience

**Women's Rights Project, American Civil Liberties Union** *(New York, NY; 2001 to Present)*
*Deputy Director (2005 to Present); Staff Attorney (2001 to 2005).* Supervise and coordinate all aspects of litigation and advocacy addressing equal opportunity for women in housing, employment, education, welfare administration, public accommodations, and athletics, with a special emphasis on the needs of low-income women and women of color. Write and review briefs, motion papers, and affidavits; argue motions; participate in mediation; prepare witnesses; take and defend depositions; work with experts; undertake administrative and legislative advocacy; provide technical assistance and advice to ACLU affiliates and private attorneys; screen potential cases; craft communications strategies; research and draft public education materials; author articles; present at conferences; draft grant proposals and otherwise assist with project development; supervise staff attorneys, fellows, interns, and administrative staff. Co-author of *The Rights of Women* (4th Ed.) (forthcoming), the authoritative ACLU guide to women's rights.

**Senior Judge Wilfred Feinberg, U.S. Court of Appeals, Second Circuit** *(New York, NY; 2000 to 2001)*
*Law Clerk.* Researched and drafted judicial opinions and bench memoranda.

**National Women's Law Center** *(Washington, DC; 1999 to 2000)*
*Counsel.* As a recipient of the Georgetown Women's Law and Public Policy Fellowship, undertook policy research and analysis; drafting of reports, congressional testimony, comments on proposed regulations, and issue papers; lobbying; *amicus* work; and coalition building on issues affecting low-income women, including child care, child support enforcement, equal pay, welfare reform, family tax policy, and Social Security. Co-author of *Be All That We Can Be: Lessons from the Military for Improving Our Nation's Child Care System*; credited contributor to *The Little Engine That Hasn't: The Poor Performance of Employer Tax Credits for Child Care*.

**Judge T.S. Ellis, III, U.S. District Court, Eastern District of Virginia** *(Alexandria, VA; 1998 to 1999)*
*Law Clerk.* Researched and drafted judicial opinions and bench memoranda.

**Simpson Thacher & Bartlett** *(New York, NY; Summer 1998)*
*Summer Associate.* Researched and drafted legal memoranda and briefs for Litigation Department on issues ranging from patent law to the Americans with Disabilities Act to sexual harassment policies. Assisted in *pro bono* death penalty appeal.

**Professor Jed Rubenfeld, Yale Law School** *(New Haven, CT; Fall 1997)*
*Constitutional Law Teaching Assistant.* Instructed first-year students in legal writing and research.

**National Women's Law Center** *(Washington, DC; Summer 1997)*
*Summer Intern.* Assisted with policy and legislative work on topics including childcare; child support; and women in the military. Updated and revised factsheets and publications; performed legal research and drafted memoranda; participated in coalition meetings.

**Community Legal Services Clinic, Jerome Frank Legal Services Organization** *(New Haven, CT; 1996 to 1997)*
*Student Director.* Served on Student Board of Directors; performed client intake interviews; coordinated outreach programs; planned curriculum; supervised student-client contacts in a wide range of work undertaken for indigent clients, including defending against evictions, appealing SSI and other benefits determinations, and permanency planning for HIV+ individuals.

**National Legal Department, American Civil Liberties Union** *(New York, NY; Summer 1996)*
*Legal Intern.* Performed research and drafted memoranda on civil rights and civil liberties questions involving state and federal constitutions and federal statutes; assisted in drafting brief challenging restrictions on Legal Services Corporation activities.

**West Virginia Women's Commission** *(Charleston, WV; Summers 1993 to 1995)*
*Publications and Outreach Specialist.* Developed, wrote, and edited series of outreach publications for West Virginia women on law, domestic violence, political activism, health, and finances.

Admitted to practice in New York.

# Education

**Yale Law School** *(New Haven, CT; J.D., June 1998)*
Honors and Activities:     Coker Fellow; Editor, *Yale Journal of Law and Feminism*; Battered Women Temporary Restraining Order Project
Third-Year Paper:     "Organizing Privacy: Waged Homework and Its Possibilities for Unionization"

**University of Virginia** *(Charlottesville, VA; B.A. with Highest Distinction, English Literature, May 1995)*
Minor:     Women's Studies
Honors and Activities:     Phi Beta Kappa; Wagenheim Award for Best Undergraduate Essay of Literary Criticism; Dean's List (all semesters); Sherri Gayle Richman Scholarship; Student Council Scholarship; Literary Editor and Managing Board Member, *The Declaration*; Hotline Volunteer, Sexual Assault Resource Agency; Day Care Volunteer, Salvation Army Shelter
Thesis:     "Embodying Fictions: Jane Austen's Explorations of Illness and Health"

# Recent Speeches and Presentations

*New Protections: Fair Housing Case Law for Service Providers*, Project Sentinel Second Annual Fair Housing Symposium (Mountain View, CA), April 2007.

*Sex Discrimination and Violence Against Women*, Housing Justice Network National Meeting (Washington, D.C.), October 2006.

*Fair Housing for Battered Women*, National Organization for Victim Assistance Annual Conference (Orlando, FL), August 2006.

*VAWA 2005 and Fair Housing for Domestic Violence Victims*, Tenants' Advocacy Project, Community Service Society of New York (New York, NY), July 2006.

*Testimony In Opposition to Mich. H.B. 4264 (Sex Segregation in Public Schools)*, Michigan House Education Committee (Lansing, MI), July 2006.

*Fair Housing for Battered Women: Litigation Strategies*, National Fair Housing Month and National Victims and National Victims Rights Week: Strength Through Unity, Alianza for Fair Housing (Orlando, FL), April 2006.

*Victims of Domestic Violence & the Law*, 7th Annual Housing Rights Summit, Housing Rights Center (Los Angeles, CA) April 2006.

*The Supreme Court's Rollback of the Civil Rights of Battered Women*, Women's History Month Event, Brooklyn YMCA (Brooklyn, NY) March 2006.

*Police Accountability to Victims of Domestic Violence*, Castle Rock v. Gonzales Police Accountability Conference, Denver University Law School (Denver, CO) March 2006.

*VAWA 2005 and Fair Housing for Domestic Violence Victims*, New York City Bar Association, Domestic Violence Committee (New York, NY) March 2006.

*Fair Housing for Battered Women*; *Pre/Post Trial Strategic Decisions for Attorneys*; *Case Updates,* Fair Housing Laws and Litigation Conference, Fair Housing Council of San Diego (San Diego, CA) February 2006.

*Current Issues in Preventing Homelessness:  Improving Access to Housing for Domestic Violence Survivors and Their Families*, National Legal Aid and Defender Association Annual Conference (Orlando, FL) November 2005.

*Domestic Violence and Women's Housing Rights*, U.N. North American Consultation on Women and Housing hosted by the U.N. Special Rapporteur on Adequate Housing, George Washington University Law School (Washington, D.C.) October 2005.

*The Fair Housing Obligations of Domestic Violence Shelters*, Battered Women's Justice Project Fair Housing and Domestic Violence Working Group (Washington, D.C.) October 2005.

*Litigation Strategies for Ensuring Police Accountability in the Wake of Castle Rock v. Gonzales*, Mandatory Arrest: Original Intentions, Outcomes for Our Communities, and Future Directions, Manhattan Borough President's Office (New York, NY) June 2005.

*Fair Housing for Battered Women*, New York City Housing Preservation Department Fair Housing Forum (New York, NY) May 2005.

*Housing Discrimination Against Victims of Domestic Violence: Legal and Policy Responses*, CORT Substantive Law Training (Ann Arbor, MI) April 2005.

# Publications

Emily J. Martin, *Venus and Mars in Separate Classrooms?  The Rise of Single-Sex Education*, Florida Ass'n of Women Lawyers Journal, Spring 2007, at 3.

Emily J. Martin & Deborah A. Widiss, *Fair Housing for Victims of Domestic Violence: Using Federal and State Laws to Promote Secure Housing for Survivors*, ABA Domestic Violence Commission Newsletter, Feb. 2007.

Emily Martin & Katie Schwartzmann, *Bad for Both Boys and Girls* (guest editorial re: single-sex education), USA Today, Aug. 17, 2006, at 10A.

Emily J. Martin, *Fair Housing for Battered Women: Preventing Homelessness Through Civil Rights Laws*, Cornerstone (National Legal Aid & Defender Association), Winter 2005/2006, at 6.

Emily J. Martin, *Housing Mobility as a Women's Rights Issue*, *in* Keeping the Promise: Preserving and Enhancing Housing Mobility in the Section 8 Housing Choice Voucher Program, Conference Report of the Third National Conference on Housing Mobility 129 (Philip Tegeler *et al*. *eds*., 2005)

Emily J. Martin & Caroline Bettinger-Lopez, *Castle Rock v. Gonzales and the Future of Police Protection for Victims of Domestic Violence*, Domestic Violence Report, Oct.-Nov. 2005, at 1.

Emily J. Martin, *Making a Federal Case out of Women's Concerns: The Supreme Court's Hostility to Civil Rights for Battered Women*, *in* Awakening from the Dream: Civil Rights Under Siege and the New Struggle for Equal Justice 79 (Denise C. Morgan *et al. eds.* 2005).

Emily J. Martin & Naomi S. Stern, *Domestic Violence and Public and Subsidized Housing: Addressing the Needs of Battered Tenants Through Local Housing Policy*, 38 Clearinghouse Rev. 553 (2005).

Nancy Duff Campbell, Judy Appelbaum, Karen Martinson, & Emily Martin, *Be All That We Can Be: Lessons from the Military for Improving Our Nation's Child Care System* (2000).

*Exhibit 8*

# ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st day of October ,20 06 , by and between the Lessor: Matthew W. Bahr , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell All Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

**1. GRANT OF LEASE:** Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property: N/A

**2. NATURE OF OCCUPANCY:** As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

**3. TERM OF LEASE:** This Lease shall commence on the 1st day of October ,20 06 ,and extend until its expiration on the 30th day of September , 20 06 , unless renewed or extended pursuant to the terms herein.

**4. SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit the sum of $350.00 to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

**5. RENT PAYMENTS:** Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $~~550.00~~ 450.°° *LHN*, said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October , 2006

Tenant agrees that if rent is not paid in full on or before the 5th day of the month, Tenant will pay a late charge of $ 50.00 as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A , which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply): ⊠ cash, ☐ personal check, ⊠ money order, ⊠ cashier's check, ⊠ other__deposit to Wachovia Bank__ Rent payments shall be made payable to _Jamarlo K. GumBayTay, Agent_____ and mailed or delivered to the following address: _800 Madison Avenue, Montgomery, AL 36104 (Wachovia Bank)_____ All notices from Tenant to Landlord under this Lease and applicable Alabama law shall be delivered. to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered paid, and rent will be considered unpaid until actual receipt thereof

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other Tenants.

**6. CONSEQUENCES OF BREACH BY TENANT:** If Tenant, by any act or omission, or by the act or omission of any of Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other ddocuments made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this 'Lease, the entire remaining balance of unpaid rent for the remaining term of this Lease shall **ACCELERATE,** whereby the entire sum shall become immediately due, payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated rent.

**7. DELIVERY OF NOTICES:** Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

**8. UTILITIES:** Tenant will provide and pay for the following utilities (indicate those that apply): ⊠ Electric, ⊠ Gas, ⊠ Telephone, ⊠ Cable Television, ⊠ Water, ⊠ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply): ☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the leased premises back unto Landlord upon termination or expiration of this Lease.

**9. NOTICE OF INTENT TO SURRENDER:** Any other provision of this lease to the contrary notwithstanding, at least thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above, Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term. If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law, Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

I 1. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste m a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent    • upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

12. NO ASSIGNMENT: Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.

13. TENANT INSURANCE: Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from. any and all damages.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon -which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

premises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. **EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. *LANDLORD ENTRY AND LIEN.* In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. GOVERNING LAW: This Lease is governed by the statutory and case law of the State of Alabama.

35. **LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

36. **ADDITIONAL PROVISIONS:**

_____

_____

_____

_____

* * *

**WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:**

LANDLORD   Matthew W. Bahr, Lessor

Sign: _Jamarlo K. GumBayTay_   Print: Jamarlo K. GumBayTay, Agent   Date: _10/1/06_

TENANT

Sign: _____   Print: Yolanda Boswell, Lessee   Date: _10/1/06_

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

☐    Lawn should be kept cut, raked and edged

☐    No junked or abandoned vehicles on property

☐    No trash/paper/debris in yard or on lawn

☐    No automobiles parked on lawn

☐    Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
Yolanda Boswell, Lessee

Date: _____

# ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st  day of October ,2006 , by and between the Lessor: Matthew W. Bahr , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell  All Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

**1. GRANT OF LEASE:** Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery  County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property: N/A

**2. NATURE OF OCCUPANCY:** As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

**3. TERM OF LEASE:** This Lease shall commence on the 1st  day of October ,2006 ,and extend until its expiration on the 30th  day of September ,2006  unless renewed or extended pursuant to the terms herein. *Expired short term Lease for DHR purpose.*

**4. SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit the sum of $350.00  to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

**5. RENT PAYMENTS:** Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $550.00 , said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October , 2006

Tenant agrees that if rent is not paid in full on or before the 5th  day of the month, Tenant will pay a late charge of $50.00  as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A , which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):
☒ cash, ☐ personal check, ☒ money order, ☒ cashier's check, ☒ other deposit to Wachovia Bank
Rent payments shall be made payable to Jamarlo K. GumBayTay, Agent                    and mailed or delivered to the
following address: 800 Madison Avenue, Montgomery, AL 36104 (Wachovia Bank)                    All notices from
Tenant to Landlord under this Lease and applicable Alabama law shall be delivered. to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either
by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered
paid, and rent will be considered unpaid until actual receipt thereof

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable
under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other
Tenants.

**6. CONSEQUENCES OF BREACH BY TENANT:** If Tenant, by any act or omission, or by the act or omission of any of
Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other
ddocuments made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one
tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease
and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease
and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not
be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this Lease, the entire remaining balance of unpaid
rent for the remaining term of this Lease shall **ACCELERATE**, whereby the entire sum shall become immediately due,
payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and
repairs as a partial offset to satisfaction of the accelerated rent.

**7. DELIVERY OF NOTICES:** Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant
in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or
registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or
Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in
the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed
in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

**8. UTILITIES:** Tenant will provide and pay for the following utilities (indicate those that apply):
☒ Electric, ☒ Gas, ☒ Telephone, ☒ Cable Television, ☒ Water, ☒ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply):
☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any
utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the
leased premises back unto Landlord upon termination or expiration of this Lease.

**9. NOTICE OF INTENT TO SURRENDER:** Any other provision of this lease to the contrary notwithstanding, at least
thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above,
Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term.
If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama
law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific
term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law, Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

I 1. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste m a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the promises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;.

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent   • upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

12. NO ASSIGNMENT: Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.

13. TENANT INSURANCE: Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from. any and all damages.

14. **CONDITION OF LEASED PREMISES:** Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. **ALTERATIONS:** Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. **NO ILLEGAL USE:** Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. **NOTICE OF INJURIES:** In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. **LANDLORD'S RIGHT TO MORTGAGE:** Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. **DELAY IN REPAIRS:** Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. **ABANDONMENT:** Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. **NOTICE OF ABSENCE FROM PREMISES:** If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here:  N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.



24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon which Tenant may rely upon if contrary to the terms and conditions of this Lease.



29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

**32. EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

**33. LANDLORD ENTRY AND LIEN.** In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

**34. GOVERNING LAW:** This Lease is governed by the statutory and case law of the State of Alabama.

**35. LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

**36. ADDITIONAL PROVISIONS:**

_____

_____

_____

_____

_____

\* \* \*

**WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:**

LANDLORD    Matthew W. Bahr, Lessor

Sign: _____ Print: Jamario K. GumBayTay, Agent    Date: 10/1/06

TENANT

Sign: _____ Print: Yolanda Boswell, Lessee    Date: 10/1/06

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

- ☐ Lawn should be kept cut, raked and edged
- ☐ No junked or abandoned vehicles on property
- ☐ No trash/paper/debris in yard or on lawn
- ☐ No automobiles parked on lawn
- ☐ Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
Yolanda Boswell, Lessee

Date: _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| YOLANDA M. BOSWELL,<br><br>Plaintiff,<br><br>v.<br><br>JAMARLO K. GUMBAYTAY,<br>D/B/A THE ELITE REAL ESTATE<br>CONSULTING GROUP,<br><br>AND<br><br>MATTHEW W. BAHR<br><br>Defendants. | Civil Case No. 2:07-cv-135-WKW<br><br><br><br>**MEMORANDUM OF LAW IN**<br>**SUPPORT OF ENTRY OF DEFAULT**<br>**JUDGMENT AND DAMAGES** |

## PROCEDURAL HISTORY AND SUMMARY OF ARGUMENT

The Plaintiff, Yolanda Boswell, filed her Fair Housing Act (hereinafter "FHA") complaint in this matter on February 14, 2007, and served it on Defendants Jamarlo K. GumBayTay and Matthew Bahr by U.S. Mail. They did not appear or respond. The Plaintiff filed and served her amended complaint on May 4, 2007. Defendants subsequently contacted Plaintiff's counsel, making it clear that they received service and actual notice of this action, but nonetheless, Defendants again did not appear, respond, or seek an extension of time within the 20-day period required under Rule 12(a), Fed. R. Civ. P.

To date, Defendant Bahr has still not appeared or answered. Defendant GumBayTay filed an untimely Answer on June 27, 2007, 54 days after the Plaintiff's amended complaint was served and filed. However, his Answer does not seek leave to file an untimely Answer, or set out any cause for his failure to appear or answer within the time limits required by the Federal

Rules of Civil Procedure.  Moreover, his "Answer" is almost entirely unresponsive to the allegations contained within the Plaintiff's complaint, and instead seeks to involve the Court in a separate breach-of-contract claim.  For these reasons, the Plaintiff seeks to strike Defendant GumBayTay's Answer as untimely and unresponsive and seeks entry of default judgment against both Defendant Bahr and Defendant GumBayTay.

The Plaintiff submits this memorandum of law in support of damages for such default judgment.  The Plaintiff seeks compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief for violation of federal anti-discrimination law.  Due to the egregiousness of the harassment and retaliation suffered by the Plaintiff at the hands of Defendants, she seeks a compensatory and punitive damage award of $125,000.  As outlined below, such an award would be supported by the outrageousness of the Defendants' conduct and by past jury awards in FHA discrimination and retaliation cases.  In addition, counsel for the Plaintiff submit a request for attorneys' fees and costs in the amount of $10,801.50.

## ARGUMENT

### I. The Plaintiff Is Entitled to Compensatory and Punitive Damages.

The Plaintiff seeks both compensatory and punitive damages for her claims of discrimination and retaliation under the FHA.  The FHA is clear that victims of housing discrimination are entitled to actual/compensatory damages.  42 U.S.C. § 3613(c)(1).  "[A]nger, embarrassment, and emotional distress are clearly compensable injuries under this standard." *Banai v. Secretary, U.S. Dep't of Housing & Urban Dev.*, 102 F.3d 1203, 1207 (11th Cir. 1997). That such damages cannot be measured exactly does not bar recovery, as "[t]he plaintiff need not prove a specific loss to recover general, compensatory damages …" *Marable v. Walker*, 704 F.2d

1219, 1220-21 (11th Cir. 1983).  The plaintiff's own testimony suffices as evidence to support an award of pain and suffering damages in FHA cases.  *E.g.*, *id.*

In addition, punitive damages are available under 42 U.S.C. § 3613(c)(1) of the FHA when a defendant's conduct is "motivated by evil motive or intent" or shows a "reckless or callous disregard of or indifference" to the plaintiff's rights.  *Smith v. Wade*, 461 U.S. 30, 56 (1983) (setting out standard in § 1983 case); *see also, e.g.*, *Badami v. Flood*, 214 F.3d 994, 997 (8th Cir. 2000) (applying *Smith* standard in FHA case); *Alexander v. Riga*, 208 F.3d 419, 430-32 (3d Cir. 2000) (same); *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1239 (D.C. Cir. 1997) (same).  The purpose of such an award is "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  *Smith*, 461 U.S. at 37.

In analyzing the permissible ratio between the amounts awarded for punitive and compensatory damages, the Eleventh Circuit has recently upheld a punitive damages verdict with a 9-to-1 ratio to compensatory damages not including attorney fees and a 5-to-1 ratio including such fees.  *Action Marine, Inc. v. Continental Carbon Inc.*, 481 F.3d 1302, 1321-22 (11th Cir. 2007); *see also Bogle v. McClure*, 332 F.3d 1347, 1361-62 (11th Cir. 2003) (upholding punitive damages award with an approximately 4-to-1 ratio to compensatory damages).  Plaintiffs in the present case seek only a 1.5-to-1 punitive to compensatory damages ratio not taking into account attorney fees, or a 1.25-to-1 ratio when attorney fees are taken into account.

As demonstrated below and in the affidavit of the Plaintiff attached as Exhibit 1, the Defendants — specifically, Defendant GumBayTay acting as the agent of Defendant Bahr — engaged in egregious sexual harassment of and retaliation against the Plaintiff that caused her

great emotional distress.  She is therefore entitled to an award of compensatory and punitive

damages as a result.

### II. Defendants GumBayTay and Bahr Are Both Liable for the Egregious Actions of Defendant GumBayTay.

The Plaintiff seeks to recover against Defendant GumBayTay, the property manager who

directly engaged in the unlawful sexual harassment, and Defendant Bahr, the owner of the

property who hired Defendant GumBayTay to be his management agent.  The FHA provides for

vicarious liability, which "make[s] principals … vicariously liable for the acts of their agents in

the scope of their authority or employment."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003)

(generally addressing vicarious liability for damages in FHA context); *cf. Burlington Industries,

Inc., v. Ellerth*, 524 U.S. 742, 765 (1998) (finding employers vicariously liable for the actions of

those supervisory employees creating a hostile, sexually harassing environment under Title VII);

*Faragher v. City of Boca Raton*, 524 U.S. 775, 808-10 (1998) (same).  Such liability is not

dependent on the principal explicitly authorizing or ratifying the discrimination engaged in by

his agent.  *Meyer*, 537 U.S. at 285-86 (approvingly citing *New Orleans, M & C R Co. v.

Hanning*, 15 Wall 647, 649 (1873), for this principle).  When an agent is employed in a

managerial capacity, as is the case here, the principal's vicarious liability extends to punitive

damages in the absence of evidence that a principal has made good-faith efforts to prevent his

agent's discriminatory behavior.  *Alexander v. Riga*, 208 F.3d 419, 432-34 (3d Cir. 2000) (citing

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 546 (1999) (applying this rule under Title VII);

*United States v. Habersham Properties, Inc.*, 319 F. Supp. 2d 1366, 1376 (N.D. Ga. 2003)

(same).

Defendant Bahr is liable for both compensatory and punitive damages for the conduct of

his agent, Defendant GumBayTay, as at the time Defendant GumBayTay used the power of his

authority as property manager to harass the Plaintiff, he was acting in a managerial capacity and within the scope of his employment.  As manager of Defendant Bahr's rental property, Defendant GumBayTay was presumably empowered by Defendant Bahr to set and collect rent, maintain properties, and undertake evictions of tenants when appropriate.  In raising the rent when the Plaintiff refused to provide sexual favors, implicitly conditioning necessary repairs to her apartment on the provision of sexual favors, and threatening her and her children with eviction and homelessness on the basis of such refusal, Defendant GumBayTay was acting within the scope of his managerial authority.  Nor is there any evidence that Defendant Bahr made good faith efforts to prevent Defendant GumBayTay from discriminating.  Defendant Bahr is thus vicariously liable for both compensatory and punitive damages based on the actions of his agent, Defendant GumBayTay.

### III. The Amount of Compensatory and Punitive Damages Sought by the Plaintiff are Appropriate and Reasonable Given the Circumstances.

On or about October 1, 2006, the Plaintiff entered into a one-year residential lease agreement.[1]  The lease was signed by the Plaintiff and Defendant GumBayTay, d/b/a Elite Real Estate Consulting Group, who was acting as agent of the lessor Defendant Bahr.  The lease indicated that the monthly rent for the property, located at 964 North Gap Loop, Montgomery, Alabama, would be $450.  On or about October 7, 2006, the Plaintiff, her mother Jennette Boswell, and the Plaintiff's four children moved into the house she had rented from Defendants.

From the beginning of her tenancy, Defendant GumBayTay repeatedly made unwelcome sexual advances toward the Plaintiff, all of which she refused.  On multiple occasions he threatened to increase her rent if she did not have sex with him and repeatedly invited her to take trips or go on dates with him.  He asked her when she would come see him to begin "working

---

[1] The following factual recitation is drawn from the attached Declaration of Yolanda Boswell and/or the Amended Complaint.

on" her portion of the rent and asked her what the words "Sugar Daddy" meant to her.  On another occasion, he asked her when she would begin "work on [her] sugar daddy account." Defendant GumBayTay also implicitly conditioned repairs to the Plaintiff's home upon her provision of sexual favors.  After moving into the house, the Plaintiff spoke to other previous tenants and learned that they had been subjected to the same or similar behavior by Defendant GumBayTay.

On January 19, 2007, when the Plaintiff had refused his advances over a period of several months, and shortly after the Plaintiff had threatened to bring sexual harassment charges against him, Defendant GumBayTay left five handwritten pages on her door that indicated his intent to evict her from the subject property.  Attached to these handwritten pages was a modified lease agreement.  Defendant GumBayTay had changed the section marked "rent payments" to require the Plaintiff to pay $550 in rent per month, and had initialed next to the change.  This unilateral change in the rental agreement was made after the Plaintiff repeatedly refused his sexual advances.  The Plaintiff refused to sign this new lease.  The repeated suggestion that the Plaintiff barter sex for lower rent caused the Plaintiff great distress, horror and humiliation, especially given that she had originally understood Defendant GumBayTay to have provided her a reasonable rent based on his sympathy for her situation as a single mother struggling to make ends meet.

On February 2, 2007, the Plaintiff received a three-page document from Defendant GumBayTay pledging to address the concerns of tenants in a more timely manner, with the caveat that "you must keep in touch with me if you expect this type of response."  While the document highlighted the tenants' responsibility to pay rent on time, it noted that there was always a solution to late rental payments or nonpayment of rent if the tenant contacted Mr.

GumBayTay.  The Plaintiff understood this document to mean that Defendant GumBayTay would take steps to evict her if she did not either pay the increased rent or reach out to Defendant GumBayTay socially and acquiesce to his sexual advances.  She feared that she and her family might soon be faced with homelessness as a result of Defendant GumBayTay's retaliatory actions.

During the Plaintiff's tenancy, Defendant GumBayTay repeatedly refused to make essential repairs to the Plaintiff's apartment, apparently in retaliation for her refusal to succumb to his advances.  For instance, he did not repair leaking or overflowing toilets and sinks, causing excessive water bills, property damage, and great inconvenience.   Furthermore, her air conditioning has not worked for many months, and she was eventually forced to purchase a window unit from a friend for $50 and to relocate her children to a family member's apartment during the hottest days.  As a result, she has borne child care costs as well as separation from her children.  Defendant GumBayTay's only response to requests to make the repairs that he was obligated to make under the lease was to suggest that the Plaintiff should move out.

After filing this action, Defendant GumBayTay began to stalk the Plaintiff in a way that further increased her emotional distress.  She has seen him drive by her house constantly, and he appeared to know when she was home.  Her friends told her on several occasions that he was parked across the street from her house for a lengthy period of time, even though her street is a dead-end street and Defendant GumBayTay does not, to the Plaintiff's knowledge, manage any other properties on that street.  Moreover, either Defendant Bahr or Defendant GumBayTay caused the Plaintiff's apartment to be listed as an available apartment on the Montgomery Housing Authority's Section 8 apartment list, and when a friend of the Plaintiff contacted

Defendant GumBayTay and professed interest in the apartment, he told the friend that the current occupant would probably be moving out soon.

In summary, through his persistent sexually harassing behavior, by his attempts to evict the Plaintiff, and by his refusal to undertake necessary maintenance of her home when she refused his advances and asserted her rights to housing free from such harassment, Defendant GumBayTay repeatedly and egregiously discriminated and retaliated against the Plaintiff. Moreover, these actions were undertaken by Defendant GumBayTay with reckless disregard for the Plaintiff's rights under the law and with malicious intent. These activities caused the Plaintiff, a single mother of limited financial means, great emotional distress, humiliation, and trauma. The stress from the situation led her to miss time from work. She was unable to speak about the harassment and retaliation without crying. She feared that her continued refusal to give into his sexual demands would result in homelessness for herself and her children. She has been forced to live in deplorable conditions as a result of his retaliatory refusal to undertake repairs. She has had difficulty eating and has felt continually exhausted and frustrated as a result of these actions. As set out above, Defendant Bahr is vicariously liable for these actions of his agent.

For these reasons, the Plaintiff is entitled to an entry of judgment against Defendants for compensatory damages for emotional distress in the amount of $50,000 and punitive damages in the amount of $75,000, for a total of $125,000.

**IV. Recent Jury Awards and Confessions of Judgment Support the Amount of Damages Sought by the Plaintiff.**

The following brief outline of recent jury awards and confessions of judgment in comparable housing discrimination cases demonstrates the reasonableness of the compensatory and punitive damages sought by the Plaintiff.[2]

In *Dep't of Fair Housing and Employment v. The 2001 California Street Partnership*, 49 Trials Digest 9th 1, 2005 WL 5061523 (November 1, 2005), a disability discrimination case, the defendant, over a period of years, repeatedly refused to provide a disabled tenant a parking place on the same level as her unit. The jury issued a verdict for plaintiff, awarding **$252,269** in compensatory damages: $33,269 in economic damages and $219,000 in noneconomic damages. The jury also found plaintiff entitled to punitive damages, but did not assess the punitive damages amount.

In *United States v. Cail*, JAS MI Ref. No. 216162WL, 2005 WL 2148404 (E.D. Mich. Feb. 18, 2005), the defendants were found liable for discrimination on the basis of disability under the FHA based on their refusal of a bipolar tenant's request for a waiver of the apartment's no-pet policy so that she could have an emotional assistance dog. The jury awarded plaintiff **$314,209**: $14,209 in compensatory damages and $300,000 in punitive damages.

In *SternJohn v. Kreisler*, 2004 WL 3152970 (D. Minn. 2004), the plaintiffs, African-American tenants in an apartment complex, alleged that from October 1998 (when defendant Kreisler took over managerial duties at the complex), until July 1999 (when they moved out of the complex as a result of Kreisler's actions), they experienced ongoing racial harassment and retaliation, including threatened evictions, refusals to make repairs, racially inflammatory language, and threats against the plaintiffs and other African-American tenants. The court entered a confession of judgment for **$1,050,000**.

---

[2] In fact, several of these cases involved single incidents of discrimination, in comparison to the ongoing harassment and retaliation experienced by the Plaintiff over a period of months.

In *United States v. Veal*, 365 F. Supp. 2d 1034 (W.D. Mo. 2004), the United States alleged the defendant landlord sexually harassed multiple female tenants, including verbal sexual advances, unwanted touching, demands of sex in exchange for tenancy, and eviction of female tenants who did not provide sexual favors.  The jury awarded **$1,102,804** in compensatory and punitive damages to eleven female tenants, with individual awards ranging from $10,001 to $310,000.

In *Hall v. Lowder Realty*, 263 F. Supp. 2d 1352 (M.D. Ala. 2003), the plaintiff, a black real estate agent, alleged that her referred only black clients and listings in predominantly black listings to her.  The jury found for plaintiff on the discriminatory referral claim, awarding **$100,000**: $72,000 in compensatory damages and $28,000 in punitive damages.

In *Graham v. Jackson*, 17 Nat. J.V.R.A. 9:32, 2002 WL 31684731 (S.D. Miss. Mar. 28, 2002), twenty-two female plaintiffs alleged that the defendant landlord had sexually harassed them, including sexual advances and offers of improved living conditions in exchange for sexual favors.  The jury returned a verdict of **$451,000** for plaintiffs.

In *Mitchell v. Soleyman*, 49 Trials Digest 5th 2, 2002 WL 31911041 (C.D. Cal. Feb. 22, 2002), the plaintiffs, a family of two white parents, their white biological son, and their adopted African-American son, alleged that defendant refused to rent an apartment to them on the basis of race.  The jury found for plaintiffs, awarding each of the four plaintiffs **$125,000**: $50,000 in compensatory damages and $75,000 in statutory damages.

Lastly, in *Szwast v. Carlton Apartments*, 102 F. Supp. 2d 777 (E.D. Mich. 2000), the defendants denied the rental application of plaintiffs — a mother and her two children — because of the presence of children in the household.  The plaintiffs were awarded **$403,000**: $3,000 in compensatory damages and $400,000 in punitive damages.

## DAMAGES AND ATTORNEY FEES REQUESTED

In light of the legal standard for awarding compensatory and punitive damages, the extent of Defendants' harassment of and retaliation against the Plaintiff, the above-listed recent jury awards, and the attached declarations in support of an award of attorneys' fees and costs, the damages set forth below are requested for the discrimination and retaliation set out in the Amended Complaint and described above.

Compensatory damages

    Humiliation, embarrassment, and emotional distress    $50,000.00

Punitive damages    $75,000.00

Attorney costs and fees    $10,801.50

_____

**TOTAL:**    **$135,801.50**

## IV. Conclusion

Based on the foregoing, the Plaintiff seeks entry of judgment against Defendants in the amount of $125,000 in damages and $10,801.50 for fees and costs for the discrimination and retaliation described above and set out in the Amended Complaint.

Date: July 9, 2007                    Respectfully submitted,

                                      _____/s/_____

                                      Allison E. Neal (NEA008)
                                      American Civil Liberties Union of Alabama
                                      207 Montgomery Street, Suite 910
                                      Montgomery, AL  36106
                                      Tel: 334-265-2754
                                      Fax: 334-269-5666

                                      Emily Martin (EM-2924)
                                      Lenora M. Lapidus (LL-6592)
                                      Women's Rights Project
                                      American Civil Liberties Union Foundation
                                      125 Broad Street, 18th Floor
                                      New York, NY 10004
                                      Tel: 212-519-7816
                                      Fax: 212-549-2580

                                      Kenneth J. Lay
                                      Legal Services Alabama, Inc.
                                      PO Box 11765
                                      Birmingham, AL  35202
                                      Tel: 205-397-6540, ext. 102

                                      **Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of July, 2007, I have served the above foregoing pleading and associated exhibits upon the Defendants by placing copies of the same in the U.S. mail, postage prepaid, properly addressed as follows:


Jamarlo K. GumBayTay                    Matthew W. Bahr

4013 Tiffany Drive                            1569 Amaryllis Circle

Montgomery, AL  36110-3003          Orlando, Florida  32825



                                                      Signed electronically
                                                      /s EMILY J. MARTIN_____
                                                      EMILY J. MARTIN
                                                      ATTORNEY FOR THE PLAINTIFF