**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

RECEIVED

2008 JUL 28 P 4: 27

| | |
|---|---|
| YOLANDA M. BOSWELL, | Civil Action No. 2:07-CV-135-WKW-TFM |
| Plaintiff, | Honorable W. Keith Watkins, U.S.D.J. |
| v. | |
| JAMARLO K. GUMBAYTAY, D/B/ATHE ELITE REAL ESTATE CONSULTING GROUP | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| AND | |
| MATTHEW W. BAHR, | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 56(b), Plaintiff Yolanda Boswell respectfully submits this memorandum of law in support of her motion for summary judgment.

## PRELIMINARY STATEMENT

This case, in which Ms. Boswell challenges the Defendants' discrimination against her on the basis of sex in connection with the rental of property, presents no genuine issue of material fact. Relying on the undisputed material facts set forth below, which were largely adduced from the deposition testimony of Defendants GumBayTay and Bahr, recorded conversations between Ms. Boswell and Defendant GumBayTay, and Ms. Boswell's Declaration in Support of Motion for Summary Judgment, Ms. Boswell clearly establishes sex discrimination in violation of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.* (hereinafter "the FHA"). Accordingly, she is

entitled to judgment as a matter of law against both Defendants, and the Court should order the relief requested in the First Amended Complaint.

## STATEMENT OF FACTS

At some point prior to October 1, 2006, Defendant Bahr, the owner of the subject property at 964 North Gap Loop in Montgomery, Alabama, began utilizing the property management services of Defendant GumBayTay for a number of properties, including the subject property. Ex. A, Bahr Dep, 25:8 – 26:5. These services included leasing, maintenance, repairs, and evictions. Ex. B, GumBayTay Dep., 65:2-9; 65:13-20; 126: 1-22; 127:21-23. As soon as Defendant GumBayTay had begun managing rental properties, he had retained Lynn Norsworthy to assist him with a number of administrative tasks, including the drafting of rental contracts. Ex. B, GumBayTay Dep. 76:18-20, 77:15-16, 81:21-23, 82: 14-15.

On or about October 1, 2006, Ms. Boswell entered into a residential lease between herself as lessee and Defendant Bahr as lessor for the house at 964 North Gap Loop. Prior to Ms. Boswell signing the lease, Defendant GumBayTay had told Ms. Boswell that although the property normally rented for $550, she would only be charged $450 because he understood that she could not afford to pay $550 a month. *See* Ex. C, Declaration of Yolanda Boswell in Support of Motion for Summary Judgment, ¶ 2; Ex. B, GumBayTay Dep. 150: 4-6. On Ms. Boswell's lease, Ms. Norsworthy signed Mr. GumBayTay's name in the space marked "LANDLORD Matthew W. Bahr, Lessor", next to which was typed "Jamarlo K. GumBayTay, Agent." *See* Ex. D. It was not uncommon for Ms. Norsworthy, with GumBayTay's authorization, to sign the lease on his behalf. Ex. B, GumBayTay Dep. 82: 14-23, 83: 1-22.

Before signing the lease, Ms. Boswell noticed that $550 was typed in as the rental amount. She informed Ms. Norsworthy that based on Ms. Boswell's previous conversation with Mr. GumBayTay, the rent was supposed to be $450. Ms. Norsworthy crossed out the $550

2

amount and wrote in $450. She then initialed the change, at which point Ms. Boswell signed the lease. *See* Ex. C, ¶ 3; Ex. E, Norsworthy Dep., 96: 14-17. During the first week of October 2006, Ms. Boswell, her mother Jennette Boswell, and Ms. Boswell's four children moved into the house. *See* Ex. C, ¶ 5.

On October 11, 2006, Defendant GumBayTay called Ms. Boswell and told her he intended to give a lease to Defendant Bahr that would suggest the rent was $550 because "I can't . . . tell him I'm renting that house for no $450." Ex. F, Transcript of Recorded Conversation Between Boswell and GumBayTay on October 11, 2006, 2:17-19;[1] Ex. G, Audio Recording of Conversations Between Boswell and GumBayTay, media file "Call 6."[2] He then followed this up by telling her that he expected her to "come and see me" and "come and spend a little time with me." Ex. F, 4:12-15; Ex. G, "Call 6." He said she needed to tell him when they could "go out to lunch ... You know or go to dinner, go to a movie or something ... have cocktails." Ex. F, 6:14-15; Ex. G, "Call 6." He stated that if she did not need his "favors", she would need to bring him $550 for the rent, Ex. F, 6:24-7:2; Ex. G, "Call 6," and added that "sometimes a woman has to do what a woman has to do in order to feed her family and live a comfortable lifestyle for her and her family." Ex. F, 7:22-24; Ex. G, "Call 6." He then reiterated his desire to take her out to lunch or dinner, added that "one weekend a month we can go out of town and do some things girl. We don't just have to come over there and just get up under me all the time," and stated that he would love for her to go with him to Mississippi. Ex. F, 8:5-11; 9:15-18; Ex. G, "Call 6."

On October 16, 2006, Defendant GumBayTay again called Ms. Boswell on the phone. In response to her complaint about a nonfunctional toilet, he stated that he wanted to "get this

---

[1] A copy of the transcript for the October 11, 2006 call is included as Exhibit F. The original transcript will be submitted as soon as it is made available to Plaintiff.

[2] Exhibit G will be hand-delivered to the Court on July 28, 2008.

[toilet] situation taken care of." Ex. H, Transcript of Recorded Conversation Between Boswell

and GumBayTay on October 16, 2006, 2:25-3:1; Ex. G, "Call 2." He immediately followed this

assertion by stating, "And you're gonna start trying to work on your next month rent this month

…You gonna work on that sugar daddy account this week or next week be good for you?" Ex.

H, 3:1-3; 3:13-15; Ex. G, "Call 2."

On October 17, 2006, Defendant GumBayTay called Ms. Boswell yet again. He said that

her rent would be $450 and that "rent won't be $550 it'll be $450. I'll take care of $550 … I'll

take care of $100 of that … if I could see you every once in a while." Ex. I, Transcript of

Recorded Conversation Between Boswell and GumBayTay on October 17, 2006 3:1-7;[3] Ex. G,

"Call 3." He asked her when he could start "working on my rent part of [the rent] for next

month", Ex. I, 2:7-8; Ex. G, "Call 3," and when she asked what he meant, he responded, "I want

to see you sometime … this month." Ex. I, 2:11-12; Ex. G, "Call 3." He then said her rent would

be $550 if she did not want to go along with this arrangement. Ex. I, 7:14-15; Ex. G, "Call 3."

He also added that "I know you need a sugar daddy," Ex. I, 18:3-4; Ex. G, "Call 3," and that it

"was a real sincere offer because you a nice lookin' lady." Ex. I, 20:2-3; Ex. G, "Call 3." He

said he was "extending the invitation to you to be more than just a friend and acquaintance …"

Ex. I, 8:15-17; Ex. G, "Call 3." He stated that he had "helped [her] out[,] and at the same time[,]

just come and see me every once and a while[,] okay[?]" Ex. I, 15: 1-3; Ex. G, "Call 3." When

Ms. Boswell asked him whether he was saying that she had to have sex with him or else pay

$550 in rent, he did not deny it, but instead responded he didn't want to "put it that blunt,"

because it "sound[ed] like harassment." Ex. I, 10:1-3; Ex. G, "Call 3." He added that she should

"let [her] conscience be [her] guide." Ex. I, 10:9-10; Ex. G, "Call 3."

4

Ms. Boswell did not respond to any of Mr. GumBayTay's sexual advances. *See* Ex. C, ¶ 11. On or around December 14, 2006, Defendant GumBayTay went by Ms. Boswell's residence and left a notice that she owed $550 in rent for the month of December. *See* Ex. J. On or about December 24, 2006, Defendant GumBayTay again visited Ms. Boswell's residence and left her a document threatening to charge her $20 for parking her car on the grass. *See* Ex. K. In or around early January 2007, Defendant GumBayTay visited Ms. Boswell's residence and left her a note reminding her that her rent would now be $550. *See* Ex. L.

On or around January 17, 2007, Ms. Boswell told Defendant GumBayTay that she would continue to pay the $450 reflected in the lease agreement. *See* Ex. C, ¶ 16. Boswell then told him that if he did not abide by the terms of the original lease, she would file sexual harassment charges against him. *Id*. On or around January 18, 2007, GumBayTay went by Ms. Boswell's residence and left her three documents: two documents threatening to terminate her lease and evict her for allegedly not paying the rent and one document threatening to terminate her lease if she did not pay a fine for parking her car on the land before the next month's rent. *See* Ex. M, Ex. N, and Ex. O.

On or around January 19, 2007, Defendant GumBayTay left two additional letters threatening termination and attached a modified lease. *See* Ex. P, Ex. Q, and Ex. R. The modified lease appeared to be a photocopy of at least part of the original lease, as the signature page already had signatures for Ms. Boswell and Defendant GumBayTay that exactly matched the signatures on the original lease, as well as signing dates exactly the same as those as the original lease. *See* Ex. R. However, in the modified version of the lease, the $450 rental amount was typed in, but Defendant GumBayTay had handwritten a "5" over the "4" and initialed it. *See*

---

[3] A copy of the transcript for the October 17, 2006 call is included as Exhibit I. The original transcript will be submitted as soon as it is made available to Plaintiff.

Ex. R and Ex. B, GumBayTay Dep. 236:18 – 237:4. On February 6, 2007, Defendant

GumBayTay left a "final notice" to pay the $550 rent or quit the premises, *see* Ex. S, and made a

threatening phone call to Ms. Boswell, *see* Ex. C, ¶ 17.

After Ms. Boswell complained to Defendant GumBayTay about the sexual harassment in

January 2007, she began having severe and continuous repair problems in her residence that

Defendant GumBayTay refused to address. *Id.* at ¶ 18-27. Furthermore, after the complaint in

this action was filed and before the July 17, 2007, hearing wherein this Court allowed her to

vacate her residence, Ms. Boswell and her neighbors reported seeing Defendant GumBayTay

driving by or parking in front of her residence frequently, despite the fact that he had no other

known business on the street where her house was located. *Id.* at ¶ 29-33. In June 2007,

Defendant GumBayTay served Ms. Boswell's attorneys with an eviction notice for Ms. Boswell,

in violation of this Court's February 22, 2007 Order prohibiting the Defendants from interfering

with her use of the property. *See* Ex. T.

## PROCEDURAL HISTORY

Ms. Boswell filed a Complaint and a Petition for Preliminary Injunctive Relief in this

matter on February 14, 2007. On February 22, 2007, a hearing on her request for preliminary

injunctive relief was held, and by Order on that same date, the Court granted her request. The

Order stated, in relevant part, that: "1) Defendants are restrained and enjoined from instituting

eviction proceedings against the plaintiff, or from directly or indirectly threatening eviction

proceedings against the plaintiff, until further order of the court; 2) Defendant Jamarlo K.

GumBayTay is restrained and enjoined from threatening, harassing, or communicating with

Plaintiff or any of her immediate family members who resides at 964 North Gap Loop,

Montgomery, Alabama until further order of this court; 3) Defendants are restrained and enjoined

from interfering with Plaintiff's possession of the premises located at 964 North Gap Loop, Montgomery, Alabama until further order of this court."

Ms. Boswell filed an Amended Complaint on May 4, 2007. On June 27, 2007, because Defendant Bahr had filed no Answer to either the Complaint or the Amended Complaint within the time allotted by the federal rules, Ms. Boswell filed an application for the clerk to enter default against Defendant Bahr. Entry of default was granted on June 29, 2007. On July 9, 2007, Ms. Boswell filed a motion for an entry of default judgment against Defendant Bahr, and on July 17, 2007, Defendant Bahr filed a motion to set aside entry of default. By Order dated October 12, 2007, this Court denied Bahr's motion to set aside entry of default, but also denied Ms. Boswell's motion for default judgment against Defendant Bahr. The Court noted that default judgment against Defendant Bahr was inappropriate at that time because his vicarious liability was contingent upon Defendant GumBayTay's liability, and that "entry of judgment . . . should await an adjudication of the liability of the nondefaulting defendant[]," Order of October 12, 2007, at 11, but the Court also held that Defendant Bahr had lost the right to appear or defend himself in this matter.

On July 6, 2007, Ms. Boswell filed a motion for sanctions and expedited modification and enforcement of the preliminary injunction order, asserting that Defendant GumBayTay had left eviction papers at her house, stalked her, and constructively evicted her from the premises by refusing to make repairs in retaliation for filing a complaint against him. A hearing on this motion was held on July 17, 2007, wherein the parties agreed for the lease to be terminated and for Ms. Boswell to move out. She did not argue her motion for sanctions at this time, but the court ordered her to give written notice as to whether she intended to pursue her sanctions motion in a hearing. On October 25, 2007, Ms. Boswell filed a motion for hearing on sanctions, and on

7

January 18, 2008, the Court granted the request for hearing to take place in conjunction with the jury trial, outside the presence of the jury.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), a court should grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 1008) (citation omitted). "A motion for judgment as a matter of law will be denied only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (citation omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Baldwin County v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992) (emphasis in original, citation omitted). This requires the court to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1273 (11th Cir. 2007) (citation omitted).

While evidence is viewed in a light most favorable to the non-moving party, "this ... does not mean that [the court is] constrained to accept all the nonmovant's factual characterizations and legal arguments. If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir. 1994). "The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, and answers to

interrogatories or other evidence to demonstrate that a material fact issue remains to be tried."

*Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000). This requires the movant

to do more than "simply show that there is some metaphysical doubt as to the material facts."

*Johnson v. Health Cent. Hosp.*, 208 Fed. Appx. 797, 799 (11th Cir. 2006) (citation omitted).

"The mere existence of a scintilla of evidence in support of the [the nonmovant's] position will

be insufficient." *Shotz v. City of Plantation*, 344 F.3d 1161, 1184 (11th Cir. 2003) (citation

omitted).

## ARGUMENT

### I.  DEFENDANT GUMBAYTAY ENGAGED IN *QUID PRO QUO* SEXUAL HARASSMENT IN VIOLATION OF § 3604(b) OF THE FAIR HOUSING ACT.

#### A.  Section 3604(b) of the FHA Prohibits *Quid Pro Quo* Sexual Harassment.

The FHA provides, in relevant part, that it is unlawful "to discriminate against any person

in the terms, conditions, or privileges of ... rental of a dwelling, or in the provision of services or

facilities in connection therewith, because of . . . sex." 42 U.S.C. § 3604(b). Every court to

address the issue has recognized that sexual harassment is a form of sex discrimination in

violation of § 3604(b) of the FHA. *See DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996);

*Honce v. Vigil*, 1 F.3d 1085 (10th Cir. 1993); *Richards v. Bono*, 2005 WL 1065141, at *2, 2005

U.S. Dist. LEXIS 43585 at *8 (M.D. Fla. 2005) (unpublished decision) ("[S]exual harassment

claims under the Fair Housing Act have been recognized by every court considering the issue,

including the Tenth and Seventh Circuits[.]"); *Beliveau v. Caras*, 873 F.Supp. 1393, 1397 (C.D.

Cal. 1995) ("[I]t is beyond question that sexual harassment is a form of discrimination[.]"); *New

York ex rel Abrams v. Merlino*, 694 F.Supp. 1101 (S.D.N.Y. 1988); *Grieger v. Sheets*, 689

F.Supp. 835 (N.D. Ill. 1988); *Shellhammer v. Lewallen*, Fair Housing-Fair Lending Rptr. ¶ 15,

472 (W.D. Ohio 1983), *aff'd*, 770 F.2d 167 (6th Cir. 1985) (unpublished decision).

Following Title VII case law,[4] courts considering § 3604(b) sexual harassment claims have recognized two distinct categories of harassment: "*quid pro quo*" harassment and "hostile environment" harassment. *Richards*, 2005 WL 1065141 at *5, 2005 U.S. Dist LEXIS 43585 at *19-20 (*quid pro quo* and hostile environment); *Honce*, 1 F.3d at 1089 (*quid pro quo* and hostile environment); *Krueger v. Cuomo*, 115 F.3d 487, 491 (7th Cir. 1997) (*quid pro quo*); *Shellhammer*, Fair Housing-Fair Lending Rptr. ¶ 15, 472 (hostile environment); *DiCenso*, 96 F.3d at 1008 (hostile environment); *Beliveau*, 873 F. Supp. at 1397 (hostile environment).[5] This case presents a classic *quid pro quo* scenario.

To succeed under the *quid pro quo* theory of sexual harassment, a plaintiff must demonstrate that "housing benefits are explicitly or implicitly conditioned on sexual favors." *Honce*, 1 F.3d at 1089. "[W]here the terms and conditions of a rental, including continued occupation, rent, and the provision of repairs, are conditioned upon compliance with the sexual demands of a landlord, then sexual activity has become part of the terms and conditions of the

---

[4] Courts examining discrimination under the FHA have typically followed Title VII in defining actionable discrimination, *Richards*, 2005 WL 1065141 at *5, U.S. Dist. LEXIS 43585 at *19 ("In defining the contours of an action under the Fair Housing Act it is appropriate to look to Title VII standards."); *DiCenso*, 96 F.3d at 1004 (applying Title VII standards to hostile housing environment claim); *Honce*, 1 F.3d at 1089 (same); *Beliveau*, 873 F. Supp. at 397 ("the purposes underlying Titles VII and VIII are sufficiently similar so as to support discrimination claims based on sexual harassment regardless of context. Indeed, it is the behavior that the law seeks to eradicate. The basic principles thus apply as strongly in the housing situation as in the workplace."), though some courts have questioned whether it is appropriate to apply such the stringent Title VII standard to hostile environment sexual harassment under the FHA, given the additional severity of harassment as experienced in the home as compared to the workplace, *Williams v. Poretsky Mgmt.*, 955 F. Supp. 490, 497 (D. Md. 1996); *Beliveau v. Caras*, 873 F. Supp. at 1393, 1397 n.1 (C.D. Cal. 1995).

[5] In *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751-52 (1998), the Supreme Court expressed skepticism as to the usefulness of the terms "quid pro quo" and "hostile environment" as they relate to vicarious liability. However, it added that "To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Id.* at 753-54. The terms "quid pro quo" and "tangible employment action" have been treated as functionally similar by post-*Burlington* courts addressing Title VIII. *See e.g. Richards*, 2005 WL 1065141, at *5, U.S. Dist. LEXIS 43585 at *22 () ("The Plaintiff has properly alleged facts stating a claim under *§ 3604(b)* for sexual harassment of both the tangible action (*quid pro quo*) and no-tangible action (hostile environment) types described above.")

rental, and the landlord is liable for sex discrimination under § 3604(b)." *Richards*, 2005 WL 1065141 at *5, 2005 U.S. Dist LEXIS 43585 at *20; *see also Shellhammer*, Fair Housing-Fair Lending Rptr. at ¶16, 129 (*quid pro quo* established when plaintiff demonstrates that her "reaction to the request affected one or more tangible terms, conditions, or privileges of tenancy, in that she was denied or deprived of tenancy or a substantial benefit thereof as a result of her response to the … demand for sexual favors").

The Eleventh Circuit has elaborated that in the Title VII context, when a tangible action results from a refusal to submit to sexual demands, that tangible action is by definition a change in the terms and conditions of employment, and therefore is actionable *quid pro quo* harassment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). The standard established by the U.S. Supreme Court for Title VII requires only a single tangible action. *Burlington Indus.*, 524 U.S. at 760 (plaintiff need only prove "a tangible employment action"). See also *Krueger*, 115 F.3d at 491 (upholding ALJ decision in *quid pro quo* FHA case based on the "adverse consequence" of eviction).

While FHA cases are ordinarily subjected to the *McDonnell Douglas* burden-shifting approach[6], that approach is inapplicable if the movant presents direct evidence of discrimination. *Massaro v. Mainlands Section 1 & 2 Civic Ass'n*, 3 F.3d 1472, 1476 n. 6 (11th Cir. 1993). "Direct evidence" is defined as "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of …" *Mathis v. Wachovia Bank*, 255 Fed. Appx. 425, 429 (11th Cir. 2007) (unpublished decision) (citation omitted). It is also defined

---

[6] Articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the *McDonnell Douglas* approach is a three-part test utilized in most FHA cases. "First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its action. Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext." *Id.* at 802.

as "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or

presumption." *Richardson v. Dougherty County*, 185 Fed. Appx. 785, 789 (11th Cir. 2006)

(unpublished decision) (citations omitted).

As set out below, reams of undisputed and material facts and direct evidence demonstrate

that Ms. Boswell's housing benefits were "explicitly or implicitly conditioned on sexual favors,"

*Honce*, 1 F.3d at 1089, and that she suffered tangible actions by refusing to grant such sexual

favors to Defendant GumBayTay.  Consequently, the *McDonnell Douglas* burden-shifting analysis

is inapplicable, and Ms. Boswell is entitled to summary judgment on her claim of *quid pro quo*

harassment in violation of § 3604(b).

### B. There Is No Dispute that Defendant GumBayTay Clearly and Frequently Articulated Requests for Sexual Favors to Ms. Boswell.

Defendant GumBayTay made unambiguous demands for sexual favors from Ms. Boswell

soon after Ms. Boswell and her family moved into the property he managed, as evidenced by the

statements he has conceded he made in phone calls to her.[7] Ex. B, GumBayTay Dep., 368:8-12;

376:21-23; 381:18-21; 384: 17-385: 2; 387: 9-388: 1; 389: 20-390: 1; 393: 7-14; 395: 16-23; 401:

1-13; 405: 16-18; 411: 2-7; 452: 11-19.  In the first recorded conversation on October 11, 2006,

Defendant GumBayTay told Ms. Boswell to "just come and see me . . . next week sometime you

know come and spend a little time with me." Ex. F, 4:12-15; Ex. G, "Call 6."  In this same

conversation he asked her to "go to dinner, go to a movie or...to [have] cocktails." Ex. F, 6:14-

15; Ex. G, "Call 6."  Although Defendant GumBayTay in his deposition initially denied making

such requests, Ex. B, GumBayTay Dep. 188:1-6, he later admitted to them after hearing the

recordings during the deposition, *id.* at 394:1 - 395:23. He also admitted he said, "You know one weekend a month we can go out of town and do some things[,] girl. You ain't just got to come over there and just get up under me all the time." *Id.* at 405:7-18.

The recorded conversation on October 17, 2006, between Defendant GumBayTay and Ms. Boswell contains further uncontested and undisputed evidence of Defendant GumBayTay's pressure on Ms. Boswell for sexual favors. He told her that he "want[ed] to see [her] sometime . . . this month." Ex. I, 2:11-12; Ex. G, "Call 3." He asked her if "the word [']sugar daddy[']" meant anything to her, Ex. I, 3:16-17; Ex. G, "Call 3." He has admitted that this conversation took place, and that he called himself her "sugar daddy." Ex. B, GumBayTay Dep. 367:13 - 368:12. In his deposition, Defendant GumBayTay initially maintained that he never asked Ms. Boswell to go to Mississippi with him, Ex. B, GumBayTay Dep. 188: 7 - 190:17, but when confronted with the recording of his voice saying precisely that, he admitted that it was his voice and he had spoken those words. Ex. B, GumBayTay Dep. 392:16 - 393:14.

**C. There Is No Dispute that Defendant GumBayTay Linked Ms. Boswell's Response to his Requests for Sexual Favors to Housing Benefits.**

Uncontroverted facts demonstrate that GumBayTay implicitly and at times explicitly linked Ms. Boswell's responses to his sexual demands to a specific housing benefit: namely his acceptance of $450 per month in rent, as set out in the lease, rather than demanding a monthly payment of $550. During the October 11 phone call, he stated that the lease properly showing $450 was her lease "for you and I for, uh, to what we had talked about, uh, we had worked, we're gonna work with okay?" Ex. F, 3:1-3; Ex. G, "Call 6." He stated that if she did not need his

---

[7] While Defendant GumBayTay asserts that he never called Ms. Boswell unless she called him first (Ex. B, GumBayTay Dep., 185: 7-22), her phone bill reveals that after Ms. Boswell moved in on October 1, Defendant GumBayTay called Ms. Boswell six times in a row without her having called first, and five of those calls were made within a span of 3 days. Exhibit U. (Exhibit U has been redacted to remove all personal information, including telephone calls received or placed by Ms. Boswell not relevant to this case). Overall, Defendant GumBayTay called

"favors," she would need to pay $550 for the rent. Ex. F, 6:24-7:2; Ex. G, "Call 6." He also has admitted that he said to Ms. Boswell that "sometimes a woman has to do what a woman has to do in order to feed her family and live a comfortable lifestyle," Ex. B, GumBayTay Dep. 400: 20-401: 13; Ex. F, 7:22-24; Ex. G, "Call 6," thus at least implicitly demanding that she acquiesce to his sexual demands in order to avoid an increase in rent.

Defendant GumBayTay continued to link Ms. Boswell's acceptance or denial of his request for sexual favors to rental terms and conditions in their conversation on October 16. Ex. H; Ex. G, "Call 2." On that date, she called to complain that her toilet had still not been repaired. He stated that he wanted to "get this [toilet] situation taken care of," but immediately thereafter added, "And you're gonna start trying to work on your next month rent this month …You gonna work on that sugar daddy account this week or next week be good for you?" Ex. H, 2:25-3:15; Ex. G, "Call 2." His request that she "work on that sugar daddy account" immediately after her request for repairs at least implicitly linked his willingness to make repairs to her acquiescence to his sexual demands.

In a call on October 17, Defendant GumBayTay again established a clear link between Ms. Boswell's responses to his requests for sex and her rent amount. Ex. I, Ex. G, "Call 3." He told her, "Your rent won't be $550[,] it'll be $450 … *if* I could see you every once in a while." Ex. I, 3:1-7 (emphasis added); Ex. G, "Call 3." Although he initially denied in his deposition that he offered to pay a portion of her rent, Ex. B, GumBayTay Dep. 208:13-23; 210:12-20; 212:1-4, when confronted with the recording he admitted that he did ask her "you want to start and try to work on your next month's rent this month?" Ex. B, GumBayTay Dep. 366:14-368:12; Ex. H, 3:1-15; Ex. G, "Call 2." When Ms. Boswell asked him what he meant by "working on

---

Ms. Boswell nine times between October 5, 2006 and October 18, 2006, while Ms. Boswell called him only once. *Id.*

14

his part of the rent," he answered, "I want to see you sometime . . . this month." Ex. I, 2:7-8; 2:

11-12, Ex. G, "Call 3."When Ms. Boswell asked him whether he was saying that she had to have

sex with him or else pay $550 in rent, he did not deny it, but instead responded he didn't want to

"put it that blunt," because it "sound[s] like harassment," Ex. I, 10: 1-3; Ex. G, "Call 3," and

instead she should "let [her] conscience be [her] guide," Ex. I, 10: 9-10; Ex. G, "Call 3." He also

responded to her question about the rent being $550 unless she slept with him by saying, "You're

a very attractive African-American female that's all I got to say," as he admitted in his

deposition. Ex. I, 9:17-19; Ex. G, "Call 3;" Ex. B, GumBayTay Dep. 387:4 - 388:1.

GumBayTay also stated that in his belief it is not sexual harassment if a property manager offers

to lower a tenant's rent in exchange for sex. *Id*. at 398:12-17.

### D. There is No Dispute that Defendant GumBayTay Took Tangible Actions Against Ms. Boswell Due to her Refusal to Provide Sexual Favors.

There is undisputed, material, and direct evidence that when it became clear to Defendant

GumBayTay that Ms. Boswell would not accede to his sexual demands, he took tangible housing

actions against her. The first tangible action related to the rent amount. When Ms. Boswell

indicated in the October 17 call that she did not want to have sex with him, he told her that her

rent would then be $550. Ex. I, 7:14-15; Ex. G, "Call 3.". He then left a notice at her house on

December 14, 2006, informing her that the rent was $550 for December. Ex. J. This tangible

action of increasing her rent constituted *quid pro quo* harassment as a matter of law. *Richards*,

2005 WL at *5, 2005 U.S. Dist. LEXIS at *21 (holding that complaint stated *quid pro quo* claim

because it "contains allegations inferring that when it became clear that the Plaintiff was not

going to acquiesce to [defendant's[ sexual demands, [defendant] raised her rent").

Defendant GumBayTay also took the tangible action of attempting to evict Ms. Boswell

when she refused to acquiesce to his sexual demands or pay the additional $100 per month in

rent.  When Ms. Boswell informed Defendant GumBayTay that she would pursue a sexual

harassment claim against him if he did not cease his attempts to increase the rent, Ex. C, ¶ 16,

Defendant GumBayTay left a document for her on January 18, 2007, entitled "Eviction Notice

for Non-Payments of Rent and Late Fees," which stated he would proceed with an eviction by

February 1, 2007, due to her refusal to pay $550.  Ex. M.  He also left her a note on January 19,

2007, that said he would be filing an eviction notice within seven days due to her refusal to pay

$550 instead of $450.  Ex. P.  Defendant GumBayTay also served Ms. Boswell's counsel with an

eviction notice in June 2007, in violation of this Court's February 22, 2007 Order prohibiting

him from interfering with her possession of her home.  Ex. T.  Like the rent increase, these

eviction steps also constituted the completion of *quid pro quo* harassment as a matter of law.

*Shellhammer*, Fair Housing-Fair Lending Rptr. at ¶16, 129 (finding quid pro quo harassment

occurred when landlord asked tenant to pose for nude pictures and offered her money for sex; she

refused; and landlord evicted her three months later).

  Finally, Defendant GumBayTay took other tangible actions against Ms. Boswell once he

realized she would not satisfy his sexual demands.  Although she had parked her car in the same

location since she had moved in, Ex. C, ¶ 13, he left her a note on December 24, 2006,

threatening to fine her $20 for parking her car on the lawn, and left another notice about her

parked car on January 18, 2007, stating she was being fined $15.  Ex. K and Ex. O.  He also

ceased responding to repair requests, in contrast with his earlier rapid response when he believed

she might have sex with him.  Ex. C, ¶ 18-27.  These tangible actions also constitute *quid pro*

*quo* harassment as a matter of law.  *Grieger v. Sheets,* No. 87-C-6567, 1989 U.S. Dist. LEXIS

3906 at *12-13 (N.D.Ill.1989) (holding *quid pro quo* claim survived summary judgment where

landlord refused to make repairs after tenant rejected explicit demands for sex, because this

refusal to make repairs affected a "term of tenancy").

**E.** **Defendant GumBayTay's Position that the Contract Rent Was Always Supposed to Be $550, and that Ms. Boswell Was Simply Trying to Avoid Paying the Proper Rent Amount, Has No Support in the Record.**

In an attempt to assert that $550 was the proper rent amount for Ms. Boswell, Defendant GumBayTay filed a letter to the court from Ms. Norsworthy on August 9, 2007. Ex. V. The letter, which is dated July 17, 2007, states that Ms. Boswell originally was supposed to rent a house on Lake Street for $450 and that Ms. Norsworthy prepared a lease for that property that specified Lake Street as the address of the property and $450 as the rental amount. *Id.* The letter further alleges that when Ms. Boswell decided to rent the property at 964 North Gap Loop instead, Ms. Norsworthy re-used the Lake Street lease by changing the property address at the top but "neglected to change the amount of the monthly rent from $450 to $550." *Id.* The letter goes on to say that Defendant GumBayTay made Ms. Norsworthy aware of the "error" and Ms. Norsworthy then changed the amount to $550 and asked Ms. Boswell to return to sign a new lease, but Ms. Boswell never came back. *Id.* The letter concludes that Ms. Boswell "understood that the rent was $550 instead of $450 because she paid $550 on her rent." *Id.* Ms. Norsworthy's version of events described in the letter is substantially the same story that Defendant GumBayTay initially presented in his deposition, Ex. B, GumBayTay Dep. 143:20-144:1; 150:12-151:3; 154:11-155:10, and in his Answers filed on August 9, 2007, and August 22, 2007, with this Court.[8]

This version of events is belied by the lease itself. If the story presented by Ms. Norsworthy and Defendant GumBayTay were accurate, the lease would show an amount of $450 typed in and then subsequently crossed out and changed to $550 once Ms. Norsworthy realized

17

her "mistake". Instead, it shows precisely the opposite: the amount of $550 is typed in, crossed out, changed to $450, and initialed by Ms. Norsworthy. Ex. D. This supports Ms. Boswell's version of events, not Defendant GumBayTay's. In addition, contrary to Ms. Norsworthy's assertion, Ms. Boswell's rent receipts show that Ms. Boswell never paid $550 in rent. Ex. W.

Moreover, after being confronted at her June 20, 2008, deposition with the literal impossibility of the allegations in her letter, Ms. Norsworthy completely recanted the story presented in that letter. Ex. E, Norsworthy Dep. 89:23 – 90:1.[9] Ms. Norsworthy also admitted that she spoke with Defendant GumBayTay prior to writing the letter submitted to the Court, that at that time she spoke with Defendant GumBayTay she could not remember _any_ of the details as to what had happened with respect to Ms. Boswell's lease signing, that Defendant GumBayTay had "refreshed" her memory, and that Defendant GumBayTay had effectively told her what to put in the letter. _Id._ at 91:6 – 92:6, 93:15-94:23, 95:10-16. Defendant GumBayTay also admitted that he "refreshed" Ms. Norsworthy's memory prior to her deposition. Ex. B, GumBayTay Dep. 284: 8 – 285:2. Given her sworn testimony contradicting the statements in the letter submitted to the Court, Ms. Norsworthy's submission to the Court is without evidentiary weight.

Defendant GumBayTay provided a rental report prepared by Ms. Norsworthy as evidence that Ms. Boswell's rent was $550. However, this report does little to support this assertion. Although Ms. Norsworthy typed this document, all the information contained therein, including

---

[8] Defendant GumBayTay also insisted in his deposition that Ms. Boswell had signed the lease prepared for Lake Street. Ex. B, GumBayTay Dep. 334:21 – 335:2. However, no lease for Lake Street was produced in response to Ms. Boswell's discovery requests. Defendant GumBayTay claimed he had "no idea" where the Lake Street lease had gone, _id._ at 339:7-19, but said moments later that he had produced it to Ms. Boswell's counsel, _id._ 340:1-22, then changed his answer and said he was not sure if he had turned it over. _Id._ at 340:20 – 342:6.

the rental amount, was provided to her by GumBayTay. Ex. E,  Norsworthy Dep. 44:21 - 45:5;

Ex. B, GumBayTay Dep. 321: 6-21.  Ms. Norsworthy also admitted that the information in the

rental reports about the amount paid by individual tenants was not information that she had

personal knowledge of; ,rather  Defendant GumBayTay reported these amounts.  Ex. E,

Norsworthy Dep. 36: 7-11; 47:18 – 48:4.

Finally, Defendant GumBayTay's position that the rent was always $550 (as articulated in

his Answer filed on August 9, 2007) is contradicted by his own recorded words.  In the phone

call on October 17, 2006, he stated that the rent would be $450 and that "rent won't be $550 it'll

be $450.  I'll take care of $550 … he would "take care of $550 … I'll take care of $100 of that …

if I could see you every once in a while." Ex. I, 3:1-7; Ex. G, "Call 3." He later said that "I'll pay

your rent for you, you know pay part of your rent." Ex. I, 18: 7-9; Ex. G, "Call 3." Defendant

GumBayTay has admitted that he did say these things.  Ex. B, GumBayTay Dep. 380:1 - 382:6;

389:15-390:1.  He also said at in the October 11 call that he would create a lease that said $550

because "I can't rent that house and tell him I'm renting that house for no 450". Ex. F, 2:17-19;

Ex. G, "Call 6."

Though Defendant GumBayTay is the nonmovant in this summary judgment motion, the

Court is not obligated to accept bald factual characterizations by Defendant GumBayTay that are

completely unsupported by the record. *Beal*, 20 F.3d at 458-59.   Defendant GumBayTay cannot

simply "rest on the pleadings", but must actually demonstrate "a material fact issue" remains to

be tried." *Continental Cas.,* 205 F.3d at 1261.  Defendant GumBayTay does not even present a

"scintilla" of evidence in support of his position, *Shotz,* 344 F.3d at 1184, and he consequently

---

[9] Defendant GumBayTay also changed his story during his deposition, and now claims that Ms. Boswell signed a original lease for $550 and that Ms. Norsworthy afterward changed it to $450 at Ms. Boswell's request.  However, he admits that he has produced no copy of the lease that shows Ms. Boswell signed the lease when the amount specified was $550. Ex. B, GumBayTay Dep. 350:14-18.

does not raise a *genuine* dispute of material fact. *Baldwin County*, 971 F.2d at 1563.

Conversely, Ms. Boswell has presented the only evidence supported by the record and

documents, and as such, the evidence is "so one-sided" that Ms. Boswell must prevail as a matter

of law. *Dadeland Depot*, 483 F.3d at 1273.[10]

## II.     DEFENDANT GUMBAYTAY'S CONDUCT VIOLATED § 3604(c)'s PROHIBITION ON DISCRIMINATORY STATEMENTS.

Section 3604(c) of the FHA provides that it is unlawful to "make ... or cause to be made

... any ..., statement ... with respect to the ... rental of a dwelling that indicates any preference,

limitation, or discrimination based on ... sex ... or an intention to make any such preference,

limitation, or discrimination." *See, e.g., Richards*, 2005 WL at *7, 2005 U.S. Dist. LEXIS at *29

(holding that plaintiff stated claim under § 3604(c) based on fact that defendant "orally expressed

that submission to his sexual advances was a condition of continued occupancy"); *United States

v. Koch*, 352 F. Supp. 2d 970 (D. Neb. 2004) (finding that allegations that landlord asked for oral

sex and offered to reduce rent in exchange, and that he made sexual overtures towards other

tenant during application process, stated claim for violation of § 3604).

In this case, numerous statements by GumBayTay, set out above, indicated on their face

his intent to discriminate against Ms. Boswell if she failed to yield to his demands for sex.

Moreover his statements were coupled with a specific discriminatory action-- namely the

---

[10] Defendant GumBayTay also continues to state his legal assertion that his admitted statements and actions do not violate the FHA. For instance, in response to a question about connecting Ms. Boswell's rent amount to her response to his sexual demands, he stated, "I said that [about] the rent jokingly ...It's not against the law to flirt and tease and joke with someone". *Id.* at 381:22 - 382:3; 382:18-19. He stated that in his belief it is not sexual harassment if a property manager offers to lower a tenant's rent in exchange for sex, *Id.* at 398:12-17, or to ask a tenant to be "more than an acquaintance'. *Id.* at 383:18 - 384:19. At one point he stated that if a woman turned down requests for lunch or dinner dates, "you have an option to move on *or you have an option to continue to ask if you have – if you have a friendly interest in the young lady.*" 397:7-14 (emphasis added). He admitted to asking Ms. Boswell to "get up under me", to "go out of town and do some things", and to engage in sexual intercourse, *Id.* at 399:3-400:1, 405:4-18, but stated that all of this was not sexual harassment. *Id.* at 396:5-7. At the same time Defendant GumBayTay has made these assertions, he has also stated that he does not even know what sexual harassment is. *Id.* at 245:23 - 246:1; 396:9-17; 403:1-5.

adjustment to her rent.  Just as in *Richards v. Bono*, Defendant GumBayTay orally communicated

to Ms. Boswell that acquiescence to sexual demands was a condition of continued occupancy at

the amount specified in the lease ($450).  As such, his statements constituted a facial violation of

§ 3604(c) as a matter of law, and Ms. Boswell is entitled to summary judgment as to this claim as

well.

### III.    DEFENDANT GUMBAYTAY'S CONDUCT VIOLATED § 3617's PROHIBITION ON RETALIATION.

Section 3617 of the FHA states in relevant part that "It shall be unlawful to coerce,

intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of

his having exercised or enjoyed, or on account of his having aided or encouraged any other

person in the exercise or enjoyment of, any right granted or protected by [§ 3604] ... of this

title."[11]  To state a claim under § 3617, plaintiffs must show that "(1) [they] are members of a

protected class under the Fair Housing Act; (2) [they] exercised or enjoyed a right protected by

the FHAA; (3) [defendant's] conduct was at least in part intentional discrimination; and (4)

[defendant's] conduct constituted coercion, intimidation, a threat, or interference involving

[plaintiffs'] exercise of the right protected by the FHAA."  *Baggett v. Baird*, 1997 WL 15154 at

*37, U.S. Dist. LEXIS 5825 at *111-112 (N.D. Ga. 1997) (unpublished decision).

Typically, if the court finds a violation of § 3604, it will also find a violation of § 3617.

*Secretary of HUD v. Blackwell*, 908 F.2d 864, 872 (11th Cir. 1990) (finding § 3604 violation for

race-based refusal to sell house, and adding that "by interfering with the Herrons' exercise and

---

[11] According to HUD regulations, a "broad range of activities" can constitute violations of § 3617.  HUD Preamble II, 24 C.F.R. ch. 1, subch. A, ap. I, 54 Fed. Reg. 3257 (Jan. 23, 1989).  These can include "[c]oercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the ... rental of a dwelling ... because of ... sex", 24 CFR 100.400(c)(1), "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the ... sex ... of such persons", 24 CFR 100.400(c)(2), or "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act."  24 CFR 100.400(c)(5).

enjoyment of their rights under 42 U.S.C.A. § 3604, Blackwell violated 42 U.S.C.A. § 3617");

*Jackson v. Comberg*, 2007 WL 2774178 at *6, 2006 U.S. Dist. LEXIS 66405 at *17 (M.D. Fla.

2007) (finding § 3617 violation where defendant landlords made derogatory comments about

plaintiff couple's mixed-race status, refused to accept rent, and failed to provide proper

maintenance, all in violation of § 3604); *Grieger*, 689 F. Supp. at 840-41 (N.D. Ill. 1988) ("to the

extent that the complaint alleges that, following Sheets' direct discrimination (the sexual

harassment) and because of Grieger's refusal to succumb to the sexual demands of Sheets, she

was intimidated, threatened or interfered with by Sheets, we conclude she had adequately stated

an additional claim under § 3617"); *Dunn v. Midwestern Indem. Mid-American Fire & Casualty

Co.*, 472 F. Supp. 1106, 1111 (S.D. Ohio 1979) (because defendant's conduct found to have

violated § 3604, "defendant's alleged conduct also violates § 3617"); *Children's Alliance v. City

of Bellevue*, 950 F. Supp. 1491, 1501 (W.D. Wash. 1997) ("plaintiffs' demonstration that the

Ordinance violates section 3604 supports the same result under section 3617"); *HUD v. Kogut*,

Fair Housing – Fair Lending Rptr. ¶ 25,100 at p. 25,904 (HUD ALJ 1995) (sexual harassment

violates § 3604(a), § 3604(b), and § 3617).[12]

    As described above, Defendant GumBayTay's intentional attempts to raise Ms. Boswell's

rent and evict her for not acquiescing to his sexual demands constituted a direct attempt to

interfere with her right under § 3604(b) to be free of discrimination in her rental terms and

conditions.  It also constituted an intentional attempt to coerce her into accepting his sexual

demands.  Such intentional actions are violations of § 3617 as a matter of law.  *HUD v.*

---

[12] It is also clear both from the plain language of the regulations as well as the case law that a violation of § 3617 does not require proof of violent conduct if there has been a violation of § 3604.  *Lawrence v. Courtyards at Deerwood Ass'n*, 318 F. Supp. 2d 1133, 1145 (S.D. Fla. 2004) (plaintiff must show actions were threatening and violent only "in the absence of a violation of sections 3603-3606"); *Jackson*, 2007 WL 2774178 at *6, 2006 U.S. Dist. LEXIS 66405 at *17 (M.D. Fla. 2006) (citing *Lawrence*) and finding § 3617 violation where defendant landlords made derogatory comments about plaintiff couple's mixed-race status, refused to accept rent, and failed to provide proper maintenance).

*Blackwell*, 908 F.2d at 872.  His constant demands for sex also violated her right under § 3604(c) to not be subjected to discriminatory statements, and thus also violated § 3617.  *Id*. Accordingly, Ms. Boswell is entitled to summary judgment as a matter of law on her § 3617 claim.

Additionally, Defendant GumBayTay's counterclaim for defamation, as well as his attorney's communications and filings threatening Ms. Boswell and her counsel with jail (the subject of Ms. Boswell's July 18, 2008, Motion for Attorney Disqualification and Other Sanctions) constitute retaliation against Ms. Boswell for her exercise of her § 3604 rights and an attempt to coerce or intimidate her into not exercising those rights.  *Xiangyuan Zhu v. Countrywide Realty, Co.*, 165 F. Supp. 2d 1181, 1198 (D. Kan. 2001) (rejecting defendant's motion for summary judgment on § 3617 claim when defendant's counsel sent letter threatening criminal prosecution after plaintiff filed HUD complaint and noting, "The threat of legal action can be a "powerful instrument of coercion.");  *Schroeder v. De Bertolo*, 879 F. Supp. 173, 178 (D. P.R. 1995) ("By bringing groundless civil claims against decedent and threatening to bring criminal actions, defendants' actions could arguably have intimidated decedent in such a way that she refrained from exercising her right to use the lobby and other common areas of the Condominium whenever she wished.").  Consequently, these facts also form the basis of Ms. Boswell's § 3617 claim to which she is entitled to summary judgment as a matter of law.

## IV.     DEFENDANTS GUMBAYTAY AND BAHR ARE BOTH LIABLE FOR THE EGREGIOUS ACTIONS OF DEFENDANT GUMBAYTAY.

Ms. Boswell seeks to recover against both Defendant GumBayTay, the property manager who directly engaged in the unlawful sexual harassment, and Defendant Bahr, the owner of the property who hired Defendant GumBayTay to be his management agent.  Defendant GumBayTay is directly liable for engaging in sexual harassment as detailed above.  Defendant Bahr is also

liable under the theory of vicarious liability. "It is clear that under the FHA, owners of real estate may be held vicariously liable for discriminatory acts by their agents and employees." *Glover v. Jones*, 522 F. Supp. 2d 496, 506 (W.D.N.Y. 2007).

### A. Defendant GumBayTay Was Defendant Bahr's Agent.

"The question of whether [an agency] relationship exists for Fair Housing Act purposes is a question to be determined by reference to federal law." *Northside Realty Associates, Inc. v. United States*, 605 F.2d 1348, 1354 n. 13 (5th Cir. 1979), *superseded by statute on other grounds*, *U.S. v. City of Jackson, Mississippi*, 318 F.Supp.2d 395, 410 n. 8 (S.D. Miss. 2002). The Supreme Court recently held that "traditional agency principles" applied to determinations of agency under the FHA. *Meyer v. Holley*, 537 U.S. 280, 291 (2003). Such principles dictate that an agency relationship is established by "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *United States v. Habersham Props., Inc.*, 319 F. Supp. 2d 1366, 1375 (N.D. Ga. 2003) (quoting Restatement (Second) of Agency § 1 (1958)).[13] Utilizing this basic structure, courts have typically found property managers to be the agents of owners for purposes of vicarious

---

[13] *Meyer* also held that HUD regulations interpreting the FHA are entitled to deference, citing to *,Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-845 (1984). HUD regulations broadly define "agent" as "any person authorized to perform an action on behalf of another person regarding any matter related to the ... rental of dwellings, including ... any residential real estate-related transactions." 24 C.F.R. § 100.20.

liability under the FHA.[14]

It is clear that Defendant GumBayTay acted as Defendant Bahr's agent with respect to rental management, including locating tenants, handling of repairs, collection of rent, signing of leases, and handling of evictions. Ex. B, GumBayTay Dep. 65:12-9; 65:13-20, 83:6-22, 127:17-23; 143:5-15; Ex. A, Bahr Dep. 50:5-16; 106:15-18, 116:7-15. GumBayTay stated that he was the "eyes and ears" of landlords in Montgomery like Bahr. Ex. B, GumBayTay Dep. 435:4-10. In fact, the tenants did not have Defendant Bahr's phone number, and so were required to work through Bahr's agent, Defendant GumBayTay. *Id.* at 460:1-19; Ex. A, Bahr Dep. 60:11-20. Even when Defendant GumBayTay was associated with Guest Properties, he testified that he was not an employee of Guest Properties but instead worked for the owners like Defendant Bahr. Ex. B, GumBayTay Dep. 46:16-23; 47:3-9.

Additionally, Defendant GumBayTay held himself out as Bahr's agent. *See Cabrera v. Jakabovitz*, 24 F.3d 372, 387 (2d Cir. 1994) (finding such representations relevant to a finding of agency). For instance, GumBayTay signed Ms. Boswell's lease under the portion reserved for "LANDLORD," next to the words "Jamarlo K. GumBayTay, Agent". Ex. D and Ex. R. In rental notices sent to Ms. Boswell, "ELITE ENTERPRISES" is stamped in the space reserved for "Landlord". Ex. J, Ex. N, and Ex. S. In his letter to tenants, Mr. GumBayTay makes promises regarding handling of repairs "on behalf of your landlord". Ex. X. In the Section 8 HAP

---

[14] *See, e.g., United States v. Habersham Props., Inc.*, 319 F. Supp. 2d at 1375 ("Habersham, as the management company of Crescent Court, is clearly the agent of [owner] PB Investors. Habersham manages the complex on behalf of PB Investors and submits to the control of PB Investors, even if PB Investors did not often exercise this control."); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522-23 (2d Cir. 2006) (denying owner's motion for summary judgment on the question of vicarious liability when contract between owner and property management company stated that management company would "'perform all reasonable services requested by [owner] in regards to maintaining, servicing and leasing the property," indicating owner's control of manager); *Glover*, 522 F. Supp. 2D at 500 (denying owner's motion for summary judgment in case alleging sexual harassment by property manager when owner initially admitted in answer that property manager, who dealt directly with tenants, negotiated leases, set rents, and made repairs, was her agent); *Marya v. Slakey*, 190 F. Supp. 2d 95, 102-03 (D. Mass. 2001) (denying owner's motion for summary judgment where owner relied on tenant, who was not formally employed as property manager,

Program form filled out by Defendant Bahr, Defendant GumBayTay's name is listed under "AGENT INFORMATION", and Defendant GumBayTay is listed as the "payee/agent" on the Housing Authority's Direct Deposit form. Ex. Y.

At the same time, both Defendants Bahr and GumBayTay understood that his most significant actions were subject to Defendant Bahr's control. Ex. B, GumBayTay Dep. 146: 8-147:3. For instance, Defendant GumBayTay testified he would not change the rent without talking to the landlord first because he lacked the authority to make such changes, and Bahr testified that GumBayTay needed such authorization. *Id.* at 133:9-16;-Ex. A, Bahr Dep. 65:4 – 66:7. GumBayTay needed to seek authorization from Bahr for repairs costing over $75 to $100,Ex. B, GumBayTay Dep. 136:2-19; Ex. A, Bahr Dep. 96:19-22, and at one point testified that the landlord would have to approve *all* repairs. Ex. B, GumBayTay Dep. 136: 20-22. Defendant GumBayTay also understood that Defendant Bahr could cease using his services at any time if he so desired. *Id.* 332:13-15.

For his part, Defendant Bahr testified that he spoke to Defendant GumBayTay at least every few weeks, and sometimes twice a week, Ex. A, Bahr Dep. 36:5-11, and that he had the power to instruct GumBayTay as to which repairs to make, what rent to charge, how to handle deposits, and whether to evict or not evict someone. Ex. A, Bahr Dep. 112:4-11; 146:2-10, 146:18-21; 147:9 - 148:8; 155:22- 156:9. At times he would instruct Defendant GumBayTay to hold off on an eviction. *Id.* at 110:6-19. He testified that sometimes he did talk to GumBayTay about specific tenants to evict if the tenant was not paying rent. *Id.* at85:2-7. He also testified that GumBayTay had no authority to lower the rent for anyone. *Id.* at 65:7. Defendant Bahr testified he expected to be contacted if the cost of repairs was significant. *Id.* at 96:8-22.

---

to select new tenants for residence, when evidence supported the allegation that tenant exercised this authority discriminatorily).

These uncontested facts establish as a matter of law that Defendant GumBayTay was the

agent of Defendant Bahr for purposes of vicarious liability.

### B. Defendant Bahr is Strictly Liable for the Actions of his Agent, Defendant GumBayTay, Because Defendant GumBayTay Took Tangible Housing Actions Against Ms. Boswell.

Under Title VII, employers are strictly liable without fault for sexual harassment carried

out by managerial employees when the harassed employee suffers a tangible employment action

at the hands of the managerial employee. *Burlington*, 524 U.S. at 760. The *Burlington* decision,

which relied on "agency principles" for its ruling, *id.* at 754, controls here given that the Supreme

Court recently held that "traditional vicarious liability rules" also apply to the FHA, *Meyer* 537

U.S. at 285 , and because courts in FHA cases typically follow Title VII jurisprudence. *See* FN

2, *supra*.

In *Burlington*, the Court held that a master could be liable for a servant's torts when the

servant was "aided in accomplishing the tort by the existence of the agency relation." 524 U.S. at

759. It found that "[w]hen a supervisor makes a tangible employment decision, there is

assurance the injury could not have been inflicted absent the agency relation" and that it is

appropriate to hold an employer vicariously liable for such injuries as a result. *Id.* at 761-62.

Thus, under *Burlington*, when an employee is harassed by a supervisor and suffers a

tangible action (such as firing or refusing to promote), the employer will be held liable regardless

of whether they knew or should have known of the harassment. In such situations, it is reasonable

to hold the employer strictly liable because "only a supervisor, or other person acting with the

authority of the company, can cause this sort of injury." and because "[t]he decision in most

cases is documented in official company records, and may be subject to review by higher level

supervisors." *Id*. at 762. [15]

In examining the property manager-tenant relationship, courts in FHA cases have held that property managers exercise significant power over tenants as the result of their agency relation with property owners, just as supervisors exercise significant power over employees as a result of their agency relation with employers. As in the supervisor-employee relationship, such power can aid the property manager in accomplishing the harassment. *See Richards*, 2005 WL 1065141 at *7, U.S. Dist. LEXIS 43585 at *30 (finding that property manager's agency relationship with owner facilitated acts of sexual harassment, including using threat of eviction); *Glover*, 522 F. Supp. 2d at 507 (finding triable issue of fact when agent "used his position as the *de facto* landlord" to visit Plaintiff's apartment when he wanted and control her rent, and noted that "[his] position gave him the opportunity to visit the apartment when he wanted.")[16]

In this case, the undisputed facts demonstrate that Defendant GumBayTay's position as property manager for Defendant Bahr placed him in a position of power over Ms. Boswell, as is often the case for property managers. He had the power to carry out evictions, Ex. B, GumBayTay Dep. 65:13-17, 301:12-15; Ex. A, Bahr Dep. 85:2-14, and used this power against Ms. Boswell multiple times to try to remove her from her home. He was able to decide when to address repairs to her unit, when to delay repairs, when to charge for repairs, and when not to

---

[15] The Court also held that while an employer could assert an affirmative defense that it had exercised reasonable care to avoid the harassment or address it if the alleged harassment was hostile environment only, "[n]o affirmative defense is available ... when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id*. at 765.

respond at all. Ex. B, GumBayTay Dep. 305:1-18, 306:12-20; Ex. A, Bahr Dep. 96:4-97:8. Ms. Boswell did not even have a way to contact Defendant Bahr, as Defendant Bahr did not give out his phone number to tenants. Ex. B, GumBayTay Dep. 460:1-19; Ex. A, Bahr Dep. 60:11-20. She was thus required to turn to Defendant GumBayTay in regard to all issues related to her home. As with an employment manager, the tangible actions taken by GumBayTay (such as evictions and rent increases) were "documented in official company records, and ... subject to review", *Burlington*, because Defendant GumBayTay sent executive spreadsheets to Defendant Bahr. Ex. Z. Among other things, these reports would also show late fees and fines assessed to tenants. Ex. A., Bahr Dep. 88:6-9. In short, Defendant GumBayTay exerted considerable control over Ms. Boswell's life, and was in every real sense her *de facto* landlord. As in *Richards v. Bono*, Defendant GumBayTay used this power to "aid[] in the perpetration of his unlawful conduct" by refusing repairs, raising the rent, and bringing an eviction as consequences for Ms. Boswell's refusal to provide sexual favors. 2005 WL at *7, 2005 U.S. Dist. LEXIS at *31. The *Burlington* rule therefore controls, and, Defendant Bahr should be found strictly liable for the tangible actions that his relationship with Defendant GumBayTay empowered Defendant GumBayTay to take against Ms. Boswell.

### C. Defendant Bahr Is Vicariously Liable for Punitive Damages.

In *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 541 (1999), a Title VII case, the Supreme Court held that "agency principles" controlled in determining vicarious liability for punitive

---

[16]Moreover, courts have recognized that such harassment in the home is even worse than employment-based harassment, making the property manager's power over the tenant all the more effective at aiding in the harassment. In *Beliveau*, the court noted that sexual harassment by a property manager in particular is especially serious, given that the harassment is committed "(1) in plaintiff's own home, where she should feel (and be) less vulnerable, and (2) by one whose very role was to provide that safe environment ..." 873 F.Supp. at 1398. *Beliveau* also cited to a treatise for the principle that harassment at work ends when the workday ends, and employees have the option of resigning, but "when the harassment occurs in a woman's home, it is a complete invasion in her life. Ideally, home is the haven from the troubles of the day. When home is not a safe place, a woman may feel distressed and, often,

damages. Relying on the Restatement (Second) of Agency, the Court held that a principal could be vicariously liable for punitive damages if "the agent was employed in a managerial capacity and was acting in the scope of employment ..." *Id.* at 542. The Court added that an employer would not be liable for managerial decisions "where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545 (citation omitted). The *Kolstad* Court also noted:

> [E]ven intentional torts are within the scope of an agent's employment if the conduct is "the kind [the employee] is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve the" employer. Restatement (Second) of Agency, supra, § 228(1), at 504. According to the Restatement, so long as these rules are satisfied, an employee may be said to act within the scope of employment even if the employee engages in acts "specifically forbidden' by the employer and uses 'forbidden means of accomplishing results."

*Id.* at 543-44. The same principles should control in determining vicarious liability for punitive damages under the FHA. *See, e.g., Glover,* 522 F. Supp. 2d at 508 (applying *Kolstad* and allowing vicarious liability in FHA case for punitive damages against landlord for sexual harassment by property manager,; defendant landlord did not show that she had "personnel policies or written employment guidelines" evidencing good-faith attempts to comply with FHA).

Here, Defendant GumBayTay was concededly not actuated by a purpose to serve Defendant Bahr when he rented  the subject property for $450 (and not the $550 Defendant Bahr expected) in order to gain leverage so as to exert sexual pressure on Ms. Boswell.  However, his subsequent attempts to force Ms. Boswell to pay $550 (once he realized she would not supply sexual favors in exchange for lower rent) and to evict her when she would not pay $550 *were* done at least in part to benefit Defendant Bahr, as Defendant Bahr expected to receive $550 for

---

immobile." *Id.* at 1397 n.1. See also *Richards,* 2005 U.S. Dist. LEXIS 43585 at *22 (sexual harassment was "all the more egregious in that it was committed in the Plaintiff's own home").

30

the rented unit and Defendant Bahr would have been the beneficiary if Ms. Boswell could have

been made to pay more than her lease specified.   Moreover, GumBayTay was authorized by

Defendant Bahr to collect rent, Ex. A, Bahr Dep. 18:7-12; Ex. B, GumBayTay Dep. 128: 23, and

to carry out evictions, Ex. A, Bahr Dep. 83:5-8; Ex. B, GumBayTay Dep. 65:17, and so these

actions were "of the kind he was employed to perform." *Kolstad*, 527 U.S. at 543.

Consequently, Defendant Bahr should be liable as a matter of law for any punitive damages

related to the tangible actions carried out by Defendant GumBayTay, since Defendant

GumBayTay was acting in a managerial capacity within the scope of his employment with

respect to these particular actions.

The *Kolstad* Court also held that vicarious liability for punitive damages was appropriate

where "the agent was unfit and the principal was reckless in employing him." *Id.* at 542 (citation

omitted).  While Defendant Bahr may not have been aware that Defendant GumBayTay was unfit

to be property manager prior to the instant suit being filed, he certainly was on notice afterwards,

and there are undisputed facts that he recklessly took no corrective action.  Defendant

GumBayTay continued to work for Defendant Bahr and to manage Ms. Boswell's property after

this lawsuit was filed, during which time, as set out above, he exercised his power as property

manager to unlawfully retaliate against Ms. Boswell for bringing claims against him.  Defendant

Bahr continued to employ Defendant GumBayTay until Defendant GumBayTay was ordered to

cease and desist his real estate practice, in [March?] 2008.   Ex. B, GumBayTay Dep. 63:3-19;,

294:7-10.  Defendant Bahr admitted that after learning of the suit he did not instruct Defendant

GumBayTay as to the proper behavior around Ms. Boswell or other tenants and did not ask him

if there were any outstanding repair issues at Ms. Boswell's property.  Ex. A, Bahr Dep. 126:23 –

127:9; 130:20 – 131:5.  Defendant Bahr could not even say for certain if he instructed Defendant

GumBayTay not to evict Ms. Boswell, even after the preliminary injunction was issued.  *Id.* at

31

135:2-6. For the same reasons, even if this Court were to hold that Defendant Bahr should only be liable for punitive damages at the point where he knew or should have known of Defendant GumBayTay's unlawful behavior, Defendant Bahr should be liable for punitive damages for Defendant GumBayTay's retaliation after the filing of this lawsuit.

For these reasons, Defendant Bahr should be held vicariously liable for punitive damages.

## CONCLUSION

For the reasons set out above, Plaintiff respectfully requests that this Court grant her Motion for Summary Judgment as to Defendants GumBayTay and Bahr. Therefore, we ask the Court to enter judgment against the Defendants in the amount of $125,000, an appropriate damages amount for the reasons set out in Plaintiff's Brief in Support of Motion for Default Judgment, filed on July 9, 2007. We also ask the Court to award attorney's fees.

Date: July 28, 2008

Respectfully submitted,

Allison E. Neal (NEA008)
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104
Tel: 334-265-2754
Fax: 334-269-5666

Kenneth J. Lay
Legal Services Alabama, Inc.
1820 7th Ave. North
Birmingham, AL 35203
Tel: 205-397-6540, ext. 102

Faith R. Cooper
Central Alabama Fair Housing Center
1817 West Second Street
Montgomery, AL 36106
(334) 263-4663

Lenora M. Lapidus (LL-6592)
Emily Martin (EM-2924)
Women's Rights Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-519-7816
Fax: 212-549-2580

**Attorneys for Plaintiff Yolanda M. Boswell**

33

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of July, 2008, I have served the foregoing by placing copies of the same in the U.S. mail, postage prepaid, and properly addressed to the following:

Benjamin E. Schoettker (SCH091)
Charles W. Barfoot (BAR123)
Barfoot & Schoettker, L.L.C.
608 South Hull Street
Montgomery, AL  36104

Alfred Newell
Attorney At Law
P.O. Box 101432
Birmingham, AL 35210

Allison Neal
Attorney for Plaintiff
Yolanda M. Boswell

3927 07-14-08 Bahr Matthew.txt

1

1         IN THE UNITED STATES DISTRICT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

YOLANDA M. BOSWELL,

5        Plaintiff,

6

vs.                    CASE NO. 2:07-cv-135

7

JAMARLO K. GUMBAYTAY,

8  d/b/a THE ELITE REAL ESTATE
   CONSULTING GROUP,

9

and

10

MATTHEW W. BAHR,

11        Defendants.

12

13          * * * * * * * * * * *

14      DEPOSITION OF MATTHEW W. BAHR, taken

15  pursuant to stipulation and agreement before Dee

16  Coker, Registered Professional Reporter and

17  Commissioner for the State of Alabama at Large,

18  in the Offices of Legal Services of Alabama, 207

19  Montgomery Street, Suite 1100, Montgomery,

20  Alabama, on Monday, July 14, 2008, commencing at

21  approximately 10:51 a.m.

22          * * * * * * * * * * *

23


                        2

1               APPEARANCES

2  FOR THE PLAINTIFF:

3  Ms. Allison Neal
   Attorney at Law
4  AMERICAN CIVIL LIBERTIES UNION
   207 Montgomery Street
5  Suite 910
   Montgomery, Alabama  36104

6
   Mr. John Pollock

3927 07-14-08 Bahr Matthew.txt

```
 7  Attorney at Law
    CENTRAL ALABAMA FAIR HOUSING CENTER
 8  1817 West 2nd Street
    Montgomery, Alabama  36106
 9
    Mr. Kenneth Lay
10  Attorney at Law
    LEGAL SERVICES OF ALABAMA
11  207 Montgomery Street
    Suite 1100
12  Montgomery, Alabama  36104

13  FOR DEFENDANT MATTHEW W. BAHR:

14  Mr. Benjamin E. Schoettker
    BARFOOT & SCHOETTKER
15  Attorneys at Law
    608 South Hull Street
16  Montgomery, Alabama  36104

17  ALSO PRESENT:

18  Mr. Edward Smith, CAFHC Intern
    Ms. Jewel Bahr
19

20              * * * * * * * * * *

21              EXAMINATION INDEX

22  MATTHEW W. BAHR
        BY MS. NEAL                      4
23
```

```
                        3

 1              EXHIBIT INDEX

 2  PLAINTIFF'S EXHIBIT NO.:

 3  1  10/06-3/07 Executive          42,74,83,88
       Summaries to Matthew Bahr     90,94,95,131
 4

 5  2  HAP Contract for Tenant       57,58,71
       Lois Webb, Unit, 3661         74,78
       whiting Avenue
 6

 7  3  2/16/07 note to Montgomery    76
       County District Court
    with attached complaint,
 8     Jamarlo K. Gumbaytay vs.
       Lois Webb and attachments
 9

10  4  Elite Enterprise Memorandum   97,98
       to all tenants new and old,
       re: Goals and objective
11     (My pledge to you)

12  5  9/25/06 Elite Real Estate     101,102
       Consulting Group Memorandum/
13     FYI to all tenants; subject,
       maintenance & upkeep; pets &
```

                                        Page 2

3927 07-14-08 Bahr Matthew.txt

14     community assistance available

15  6   10/1/06 Alabama Residential    116-119
        Lease/Purchase Agreement
16     between Matthew W. Bahr and
        Yolanda Boswell
17

    7   10/1/06 Alabama Residential    118,120
18     Lease/Purchase Agreement        132
        between Matthew W. Bahr and
19     Yolanda Boswell with
        handwritten notes
20

    8   2/7/07 letter to Jamarlo     121
21     Gumbaytay and Matthew Bahr
        from Connie Baker, re:
22     Tenant Complaint, Sexual
        Harassment/Repair Request
23     Ignored, Yolanda Boswell

4

1  PLAINTIFF'S EXHIBITS:

2  9   Order Granting Injunctive    127,134
        Relief
3

   10  5/14/07 letter to Jamarlo     135
4     Gumbaytay from Connie Baker,
        re:  Yolanda Boswell
5

   11  Proof of Delivery with      136
6     attached 7-Day Notice of
        Termination of Residential
7     Lease

8  12  12/01/06 Non-negotiable      44
        instrument
9

   13  HAP Contract for Tenant      73
10    Rita Julian, Unit 105
        Stuart Street
11

   14  W-9 Request for Taxpayer      78
12    Identification Number and
        Certification
13

   15  The Housing Authority of     152
14    the City of Montgomery,
        Alabama Authorization
15    Agreement for Direct Deposit

16  16  Email to Matthew Bahr       --
        from Lynn at Letter Perfect,
17    re: December Exec. Summary

18       * * * * * * * * * *

19          STIPULATIONS

20     It is hereby stipulated and agreed by

Page 3

3927 07-14-08 Bahr Matthew.txt

21  and between counsel representing the parties that

22  the deposition of MATTHEW W. BAHR is taken

23  pursuant to the Federal Rules of Civil Procedure

5

1   and that said deposition may be taken before Dee

2   Coker, Registered Professional Reporter and

3   Commissioner for the State of Alabama at Large,

4   without the formality of a commission; that

5   objections to questions other than objections as

6   to the form of the questions need not be made at

7   this time but may be reserved for a ruling at

8   such time as the deposition may be offered in

9   evidence or used for any other purpose as

10  provided for by the Federal Rules of Civil

11  Procedure.

12      It is further stipulated and agreed by

13  and between counsel representing the parties in

14  this case that said deposition may be introduced

15  at the trial of this case or used in any manner

16  by either party hereto provided for by the

17  Federal Rules of Civil Procedure.

18      *  *  *  *  *  *  *  *  *  *  *

19      MR. SCHOETTKER:  I want one

20          thing on the record, though, before

21          we start.  As you know, we filed a

22          motion to stay this deposition and

23          the production of documents.  And as

6

1           you know, the Judge ordered that he

2           give his deposition and that he

3           produce documents; however, the

Page 4

3927 07-14-08 Bahr Matthew.txt

4       Judge's order indicated -- my reading
5       of the Judge's order was that if a
6       question was asked in this deposition
7       that we felt was pertinent or
8       pertaining to the same types of
9       subjects that the federal government
10      was investigating Mr. Bahr for, that
11      we could raise that objection on a
12      question-by-question basis and on a
13      document-by-document basis.
14              If the questions today
15      relate simply to Mr. Boswell -- I
16      mean Mr. Gumbaytay and Mr. Bahr's
17      relationship or what they did and --
18      I don't see that we'll have an
19      issue.  That investigation is mainly,
20      or as far as I'm aware, 100 percent
21      focused on the transactions involving
22      the purchasing and selling of the
23      homes, including Ms. Boswell's home.

                        7
1               So any questions that relate
2       to that, we will be objecting to as
3       to having actual purchase of that
4       home by Mr. Bahr and the
5       circumstances or the facts relating
6       to the purchasing and selling of that
7       home.
8           MR. LAY:  The home that she
9       lived in?
10          MR. SCHOETTKER:  That's right.
                        Page 5

3927 07-14-08 Bahr Matthew.txt

11          MR. LAY:  Okay.

12          MS. NEAL:  We'll have to --

13          MR. SCHOETTKER:  And if a

14      question like that comes up, then

15      I'll say, hey, we're not going to

16      answer that.  We'll deal with it at

17      that point.  But I just wanted to

18      give you a general description that's

19      what the federal investigation is

20      about and those are the kind of

21      things that he won't be answering,

22      but I think this lawsuit and the

23      questions y'all need to ask to do

                        8

1       what you need to do, I think we can

2       do that.

3                  MATTHEW W. BAHR

4          The witness, having first been sworn to

5   speak the truth, the whole truth and nothing but

6   the truth, testified as follows:

7                  EXAMINATION

8   BY MS. NEAL:

9   Q.  Good morning, Mr. Bahr.

10  A.  Good morning.

11  Q.  My name is Allison Neal, and I'm the attorney

12      for the ACLU of Alabama, and I'm going to be

13      taking your deposition in this case this

14      morning.  To my left is John Pollock with the

15      Central Alabama Fair Housing Center; Ken Lay

16      with Legal Services of Alabama; Edward Smith,

17      who is an intern with Central Alabama Fair

                        Page 6

3927 07-14-08 Bahr Matthew.txt

18    Housing Center.  Have you ever been deposed

19    before?

20  A.  No.

21  Q.  Okay.  Well, in a deposition, I'm just going

22    to ask you questions.  And my questions and

23    your answers are going to be recorded by

9

1    Ms. Dee Coker, who is the court reporter

2    sitting at the end of the table.  And you

3    understand that you need to speak up and

4    answer questions yes or no as opposed to

5    shaking your head, because she can't record

6    that.

7  A.  Okay.

8  Q.  Also, if you're describing something to me in

9    response to a question, you know, please

10    describe it orally as opposed to making hand

11    gestures so that she can make sure that she

12    can record everything.

13       On occasion, I may ask a question that I

14    don't state very well.  If for some reason

15    you don't understand what I'm getting to and

16    if that happens, you know, please just let me

17    know.  And I'll rephrase it and try to make

18    it clearer.

19  A.  Okay.

20  Q.  I want to start with just getting some

21    background information about you.  What is

22    your -- what is your full name?

23  A.  Matthew W. Bahr.

3927 07-14-08 Bahr Matthew.txt
10

1  Q.  And what is your date of birth?

2  A.  9/8/71.

3  Q.  And where were you born?

4  A.  St. Louis, Missouri.

5  Q.  And are you married?

6  A.  Yes.

7  Q.  To whom?

8  A.  My wife, Jewel, down there.

9  Q.  What is her last name?

10  A.  Manahan, slash, Bahr.

11  Q.  How long have you guys been married?

12  A.  Just over three years.

13  Q.  Have you been married before that?

14  A.  Yes.

15  Q.  Who were you married to previously?

16  A.  Dawn Bahr.

17  Q.  Dawn Bahr.  And when were you married to her?

18  A.  1996.

19  Q.  For how long?

20  A.  Officially divorced in I believe 2004.

21  Q.  Okay.  And do you have any children?

22  A.  No.

23  Q.  What is your address?

11

1  A.  1569 Amaryllis Circle in Orlando, Florida,

2     36825.

3  Q.  Does anybody else live there with you?

4  A.  Yes.

5  Q.  Who?

6  A.  My wife, Jewel.  My wife and her son.

3927 07-14-08 Bahr Matthew.txt

7   Q.   What is the name of her son?

8   A.   Alexander Manahan.

9   Q.   And how old is he?

10  A.   15.

11  Q.   What is your telephone number?

12  A.   407-249-7948.

13  Q.   Do you have any other numbers that you can be

14       reached at?

15  A.   334-342-4918.

16  Q.   No office number or anything?

17  A.   No.

18  Q.   Okay.  What is your social security number?

19  A.   ████████████

20  Q.   Have you ever used a different social

21       security number?

22  A.   No.

23  Q.   What is your educational background?

                        12

1   A.   High school graduate.

2   Q.   Where did you graduate from high school?

3   A.   Westerville, Ohio.

4   Q.   Wester?

5   A.   Ohio.

6   Q.   Ohio.  Okay.  Approximately when did you

7        graduate?

8   A.   '89.

9   Q.   Okay.  Did you ever attend college, any

10       portion of college?

11  A.   I did a couple of courses at Ohio State.  No

12       degree.

13  Q.   Okay.  Let's talk about your employment

3927 07-14-08 Bahr Matthew.txt

```
14    history a little bit.  What was your -- what
15    was your first job?
16  A.  First job, such as like 15 or 16 or --
17  Q.  Sure.
18  A.  -- first real job?
19  Q.  I guess first real job, yeah.
20  A.  Retail sales -- actually, no.  Outside sales
21    with a -- Thermomaster was the name of the
22    company in Ohio.  It was like outside window
23    sales, roofing, siding.
```

                          13

```
 1  Q.  Okay.  And when was that?
 2  A.  1990.
 3  Q.  How long did you work there?
 4  A.  Approximately one year.
 5  Q.  And how did your job there end?
 6  A.  Just wasn't making money, I guess.
 7  Q.  You just quit?
 8  A.  Yeah.
 9  Q.  Yeah.  And how much did you make per year at
10    that point?
11  A.  I think I wasn't even there quite a full
12    year.  Ten, 15 thousand dollars.  It's been a
13    long time.  I don't remember exactly.  Still
14    in Ohio, Columbus Ohio, a retail company
15    called Sun TV & Appliances.
16  Q.  And you were a retail associate?
17  A.  Yes.
18  Q.  How long did you work there?
19  A.  Approximately five years.
20  Q.  And why did your job there end?
```

3927 07-14-08 Bahr Matthew.txt

21  A.  I moved out of state.

22  Q.  Where did you move to?

23  A.  Orlando, Florida, where I currently reside.

14

1   Q.  How much did you make per year at that job?

2   A.  It varied.  I was there five years, so it

3       varied.  Anywhere between 20 to 40 thousand

4       dollars.

5   Q.  Okay.  And what about once you got to

6       Orlando, what did you start doing then?

7   A.  The same profession.  I would just say retail

8       sales.  Circuit City.

9   Q.  And how long did you work there?

10  A.  Let's see.  Let me do the math here.  I think

11      about -- I could be off a little bit here,

12      but about six to seven years.

13  Q.  Okay.  And how did your job there end?

14  A.  Actually, the company changed positions to

15      where it was no longer commission, so I was

16      basically laid off.

17  Q.  And how much did you make per year in that

18      time period starting -- just give me the pay

19      range.

20  A.  I would say somewhere between 50 to 85

21      thousand.

22  Q.  And what did you do after your position with

23      Circuit City ended?

15

1   A.  In Orlando still, a company called Cain's

2       Furniture.  Same thing, retail.

3   Q.  Okay.  How long did you work there?

Page 11

3927 07-14-08 Bahr Matthew.txt

```
 4  A.  Almost three years.
 5  Q.  And why did your -- how did your job there
 6      end?
 7  A.  Just differences with the company, just left
 8      the company.
 9  Q.  Okay.  So you quit the position?
10  A.  Right.
11  Q.  And how much did you make per year,
12      approximately, at that time?
13  A.  Anywhere between -- I can't even remember the
14      first year.  85 to 110 thousand dollars.
15  Q.  And what job did you have after that?
16  A.  Mill road job.
17  Q.  Is that when you started owning properties?
18  A.  I started owning properties or buying
19      properties in June of '05 while still being
20      employed at Cain's Furniture.
21  Q.  Okay.
22  A.  And that's --
23  Q.  And that's how you -- that's your income
```

                                16
```
 1      basically?
 2  A.  That's -- when I left that company, that was
 3      my income base.
 4  Q.  Okay.  And where did you -- where did you
 5      purchase these properties?  In Montgomery?
 6  A.  Yes.
 7  Q.  Anywhere else?
 8  A.  No.
 9  Q.  Okay.  How many homes did you -- did you
10      purchase in 2005?
```
                            Page 12

3927 07-14-08 Bahr Matthew.txt

11  A.  I believe I had a closing in 2006.  It's 15
12      or 16.
13  Q.  And that's -- how long did you own 15 or 16
14      properties?
15  A.  Own meaning -- I didn't -- I mean, what do
16      you mean by the question?  They've all been
17      foreclosed on.
18  Q.  Okay.  When were they foreclosed on?
19  A.  To the best my knowledge, somewhere between
20      September of '07 to early 2008.
21  Q.  Okay.
22  A.  To the best of my knowledge.  I mean, I got
23      foreclosure letters in the mail, so I don't

                        17

 1      know exact dates.
 2  Q.  So at the -- the most property you ever owned
 3      was 15 or 16 properties?
 4  A.  The most was 16 properties in addition to my
 5      own residence home.
 6  Q.  Okay.  And when did you -- when did you own
 7      964 North Gap Loop?
 8  A.  I don't know the exact date, but it should be
 9      somewhere in some of these documents.  If you
10      don't have it, I can get that date.
11  Q.  Okay.  So prior to your -- did you contact --
12      prior to your involvement with Mr. Gumbaytay,
13      did you ever rent out any properties?
14  A.  No.
15  Q.  And when did you hire Mr. Gumbaytay to work
16      for you?
17  A.  I -- I mean I never hired him to work for
                        Page 13

3927 07-14-08 Bahr Matthew.txt

18    me.  I was purchasing property through -- I
19    mean, Guest Properties.  And I was just told
20    from day one -- I mean, I thought he was an
21    employee of them, this guy that they had up
22    here, you know, to manage the property.  I
23    was doing some investment.  I was under the

                          18

1     impression that he was their employee.
2  Q. But at some point, his relationship with
3     Guest Property ended, and I guess your
4     relationship with Guest Property ended, and
5     then he continued to manage your homes?  Is
6     that --
7  A. Well, at -- I'm trying to think.  The thing
8     with Guest Property, that pretty much ended
9     in January of '07.  And, yeah, he was still
10    collecting the rent for me for a few months.
11    Of course, and then the foreclosure, so not
12    very long after that.
13 Q. How much income did you receive from these
14    rental properties?
15 A. You just want an average or -- I mean, after
16    I pay the mortgage payment -- obviously, I
17    paid the mortgage payment and then I got rent
18    from the Montgomery Housing Authority.  You
19    got the numbers there.  I mean -- I mean, the
20    mortgage payment was anywhere between --
21    there was adjustable loans.  They're anywhere
22    between 280 up to, at the end, $500 a month.
23    And you can see I was making from the Housing

                    Page 14

3927 07-14-08 Bahr Matthew.txt
19

1     Authority 550 to I think the highest was 750.

2  Q.  Okay.

3  A.  So a couple of hundred dollars on average.

4     Sometimes less than a couple hundred dollars

5     per property.

6         MR. LAY:  Per month.

7         THE WITNESS:  Per month, yeah.

8  A.  So sometimes less than that.  And, of course,

9     as you can see from the reports there,

10    always -- there was always vacancies.  I

11    mean, there was never everything rented out.

12    So you can't really say per month per

13    property.

14  Q.  Well, on average, how much would you say that

15    you made from -- from all of the rental

16    properties on just a regular month?

17  A.  Well, in what year?  Because everything was

18    running smooth with Guest Properties

19    initially; and then in like 2006, I was

20    basically almost losing money.  And that's --

21    at the end of 2006 -- actually, the summer of

22    2007, at which point, I quit paying the

23    mortgages because there was no income.  There

20

1     was vacancies.  I mean there was over half of

2     them were vacant.  There was vandalism,

3     copier being stolen.  I mean, break-ins.

4  Q.  So at the -- I guess how about in the

5     beginning of 2006?

6  A.  The question again was?

Page 15

3927 07-14-08 Bahr Matthew.txt

7  Q.  Oh, I'm sorry.  How much would you say on an

8      average month, you would get from all of the

9      rental properties together at the beginning

10     of 2006?

11 A.  I would say approximately between 25 to 3,000

12     dollars.

13 Q.  And what --

14 A.  After paying the mortgages.

15 Q.  Right.  Okay.  And how about at the end of

16     2007?

17 A.  2007.  Not -- to the best my knowledge -- I

18     mean, I don't have the exact numbers.  A

19     thousand, 1500 dollars.  That's when it

20     started being a problem.

21 Q.  Okay.  What is -- what is your understanding

22     of what sexual harassment means?

23 A.  Improper behavior.  I mean, saying something

                              21

1      wrong.

2  Q.  Okay.  And your understanding, would it be

3      sexual harassment for a property manager to

4      offer to lower the rent in exchange for sex?

5  A.  Yes.

6  Q.  And would it be sexual harassment for a

7      property manager to raise the rent in

8      exchange for sex?

9  A.  Yes.  To raise the rent.

10 Q.  To raise the rent in -- to threaten to raise

11     the rent --

12 A.  Well, yes.

13 Q.  -- if they don't engage in sex.

                              Page 16

3927 07-14-08 Bahr Matthew.txt

14  A.  Yes.

15  Q.  Would it be sexual harassment for a property

16      manager to ask tenants out on dates?

17  A.  Yes.

18  Q.  Or to comment on their physical appearance?

19  A.  Yes.

20  Q.  To your knowledge, did any company or

21      business you ever worked for ever receive any

22      complaints relating to sexual harassment by

23      anyone that worked there?

                          22

1   A.  No, not to the best of my knowledge.

2   Q.  Okay.  To your knowledge, besides

3       Ms. Boswell, has any tenant to whom you've

4       rented ever complained about sexual

5       harassment?

6   A.  To the best of my knowledge, since Boswell,

7       there's -- since then, I guess this is

8       actually --

9           THE WITNESS:  I think you've got

10          the document on that.

11  A.  There's another tenant that was a tenant of

12      mine, one other tenant.

13  Q.  What other tenant?

14  A.  Rita Julian.

15  Q.  Anyone else to your knowledge?

16  A.  Not that I can think of right now.

17  Q.  Okay.  And did they ever complain about the

18      sexual harassment to you?

19  A.  I've never spoken to any of these tenants on

20      the phone directly, never met them, have

                      Page 17

3927 07-14-08 Bahr Matthew.txt

21    never really even seen half of these houses.

22    Been in Montgomery, Alabama -- this is my

23    fourth time here in my life.  So I've had no

23

1    contact with the tenants.

2  Q.  So as of today, do you own any properties in

3    Montgomery?

4  A.  To the best of my knowledge, every single

5    property has been foreclosed on.  So, no.

6  Q.  And do you own any properties in Orlando?

7  A.  No.  Other than the one I live in.

8  Q.  Okay.  What properties did you own as of

9    February of 2007, to the best of your

10    knowledge?

11  A.  Well, the -- assuming 2007 there was nothing

12    foreclosed on, so all 16 properties.

13  Q.  Okay.  So for the property that you no longer

14    owned between -- that you lost somehow

15    between February of 2007 and today, how has

16    that property been disposed of?  All through

17    foreclosures?

18  A.  Yes.

19  Q.  How did you come to own the property at 964

20    North Gap Loop?

21  A.  Purchased the property.  I don't know.

22    Purchased the property through Guest

23    Properties as an investor.

24

1  Q.  And you don't remember when that was?

2  A.  I don't know the exact date.  It should be

3    somewhere in documents, or I can get that for

3927 07-14-08 Bahr Matthew.txt

 4     you.
 5  Q.  Okay.  Do you have any bank accounts?
 6  A.  Yes.
 7  Q.  How much do you have saved in those accounts?
 8  A.  Well, considering it's like a home equity
 9      account, zero.
10  Q.  I'm sorry?
11  A.  Home equity account deposited into it, so
12      zero.
13  Q.  Any other accounts?  Checking?
14  A.  No.
15  Q.  Savings?  Okay.  How much was in the home
16      equity account as of February of 2007?
17  A.  February 2007.  Well, the home equity account
18      that at the time I had, I put it into the
19      checking account.
20  Q.  Okay.
21  A.  But it was like a negative.  Because there
22      was more owed on the home equity line than
23      what was there, if that makes any sense.

                              25
 1  Q.  Okay.  So did all of your rental income go to
 2      expenses?
 3  A.  Living expenses, yes.
 4  Q.  Okay.  Have you ever had any IRAs or 401(k)s?
 5  A.  No.
 6  Q.  Do you own any stock?
 7  A.  No.
 8  Q.  When did you first encounter Mr. Gumbaytay?
 9  A.  Again, just from when I first started buying
10      property, he was supposedly the person, you

3927 07-14-08 Bahr Matthew.txt

11    know, that worked for Guest Properties that

12    I'm investing with, that was going to take

13    care of the properties here.  So I didn't

14    really encounter him at all.

15  Q.  I mean, did you meet him in person at any

16    point?

17  A.  I met him in person.  Before I started buying

18    properties, I did make one trip here.  I

19    didn't just go on a whim and start buying

20    houses here.  I came up with Guest

21    Properties, looked at four properties and

22    decided to buy them, was introduced to him

23    I'd say for about 20 to 30 minutes.  Just,

                        26

1    again, introduced, This is the guy that works

2    for us that will be picking up your, you

3    know, whatever up there.

4  Q.  Okay.  And that was in 2005?

5  A.  That would have been in 2005.

6  Q.  Okay.  And when did you -- I believe you told

7    me this already, but you said it was January

8    that Mr. Gumbaytay began working for you

9    outside of Guest Properties; is that --

10  A.  Well, I don't know if you want to say working

11    for me.  He just continued to -- you know,

12    whatever rent was not being paid by the

13    Housing Authority, he would collect it and

14    send it to me.

15  Q.  Okay.  But that was around January of 2007

16    that he did -- that he did that?

17  A.  Yes.  I've never considered myself an

3927 07-14-08 Bahr Matthew.txt

18      employer of him.

19  Q.  Okay.  Well, when -- when Mr. Gumbaytay began

20      managing your properties, did you do any sort

21      of background check on him?

22  A.  No.

23  Q.  Or check his references?

                        27

1   A.  No.  I just took Guest Properties' word for

2       it.

3   Q.  Did you read his resume?

4   A.  No.

5   Q.  Or talk about any of his property management

6       experience?

7   A.  No.  I was told at the time whatever he

8       wasn't able to collect for me, that Guest

9       Properties would cover it.  So it was really

10      no risk.

11  Q.  And after your relationship with Guest

12      Properties ended, did you -- you didn't do

13      any other checking up on Mr. Gumbaytay after

14      that?

15  A.  Checking up meaning?

16  Q.  Meaning checking his references.

17  A.  No.

18  Q.  Doing a background check.

19  A.  No.

20  Q.  Okay.  What did Mister -- you said -- you

21      mentioned earlier that -- that you, you know,

22      took Guest Properties' word on

23      Mr. Gumbaytay.  What did they say about him?

3927 07-14-08 Bahr Matthew.txt
28

1  A.  Just that he was the person in place up here
2      that, you know, I was under the assumption
3      worked for them, would be taking care of your
4      properties.  Buy these properties from us;
5      you're going to make positive cash flow.
6  Q.  What did "take care of the properties" mean
7      to you?
8  A.  Take care of -- collect the rent.  Like if
9      Section 8 paid -- the Montgomery Housing
10     Authority, if they paid, you know, 90 percent
11     of it -- like say a rent was 600.  If they
12     paid 550, he would go pick up the other $50
13     and send it to me.  That was basically my
14     impression.
15 Q.  Okay.  Did you have any sort of written
16     contract with Mr. Gumbaytay?
17 A.  No.
18 Q.  Did -- did he ever send you a -- a written
19     contract?
20 A.  Yes.  I just didn't sign it because I didn't
21     feel like -- you know, I wasn't hiring
22     anybody, so I wasn't going to sign it.
23 Q.  Do you remember approximately when he sent

29

1      you the contract?
2  A.  To be honest, no.
3  Q.  Do you still have a copy of it?
4          THE WITNESS:  Was that in the
5      paperwork?
6  A.  I gave him all the paper that I have and I --

Page 22

3927 07-14-08 Bahr Matthew.txt

```
 7   so, no.  No, I --
 8  Q.  Well, did you have a written contract with
 9      Guest Properties?
10  A.  No.
11  Q.  Did you have any sort of -- any sort of
12      agreement with either Guest Properties or
13      with Gumbaytay, any sort of oral agreement
14      with him?
15  A.  I mean, I had an oral agreement with Guest
16      Properties.
17  Q.  Okay.  What did the document that
18      Mr. Gumbaytay sent you -- what did it say?
19  A.  To be honest, I don't know.
20  Q.  What was your oral agreement with Guest
21      Properties?
22  A.  Just that from day one that you buy a
23      property here, we'll get a tenant into the
```

                            30

```
 1      property immediately or within a reasonable
 2      amount of time; and if the tenant is not put
 3      in there by the time your mortgage payment is
 4      due, we'll cover the mortgage payment for you
 5      until we get a tenant in there.  And it was
 6      done in a timely, efficient manner for the
 7      most part, at least from -- for the first
 8      year.  Then it fell apart.
 9  Q.  Did you -- so did you ever have any sort of
10      oral agreement with Gumbaytay after your
11      relationship with Guest Property ended?
12  A.  Can you -- what do you mean by oral
13      agreement?
```

                            Page 23

3927 07-14-08 Bahr Matthew.txt

14  Q.  Did you ever -- I mean, did you talk with

15      Mr. Gumbaytay and, say, ask him to continue

16      to manage your properties?

17  A.  Yes.  He could still -- I told him he could

18      still collect the rent; I'll still get your

19      portion of what Guest Properties had already,

20      I guess, set up for you.

21  Q.  What portion or percentage was that?  Do

22      you know?

23  A.  Ten percent.

                          31

1   Q.  10 percent.  And did you guys ever talk about

2       repair issues or --

3   A.  Yes.

4   Q.  Okay.  What was your --

5   A.  Vandalism, slash, repairs.

6   Q.  How many of your properties did Mr. Gumbaytay

7       manage?

8   A.  Oh, I believe it -- manage meaning they were

9       never all rented out.  But in terms of trying

10      to get them all rented out, all of them.  And

11      for part of that period -- then, actually, I

12      overheard a conversation with the owner of

13      Guest Properties one day.  He fired

14      Gumbaytay, and then there was a new person in

15      place that was then -- I think for about six

16      months or so, he was the one collecting the

17      rent; he was the one getting the tenants.

18      And then I believe somehow Guest rehired

19      Gumbaytay instead of this other guy.

20  Q.  When was that?  Do you remember?

3927 07-14-08 Bahr Matthew.txt

21  A.  That was definitely in -- I believe in 2006

22      somewhere in 2006.

23  Q.  Do you remember --

                           32

1   A.  And then at some point, they were kind of

2       working together to where he would -- this

3       gentleman would, you know, pick up the rent

4       on part of them and then Gumbaytay was

5       picking up the rent on part of them.

6   Q.  Do you remember who that person's name was?

7   A.  Yes.  Eric -- Eric Cruz.

8   Q.  Okay.  So did you ever work with Eric Cruz?

9   A.  No.

10  Q.  Was -- but when Mister -- the time period

11      that Mr. Gumbaytay was not employed with

12      Guest Properties, did Eric Cruz take care of

13      your properties for that however many months

14      that was that he was no longer employed?

15  A.  He was more or less -- again, I'm in

16      Orlando -- informing me over the phone,

17      sending me whatever amount of money that he

18      collected, letting me know about the

19      vandalism, you know, letting me know that he

20      went by a property and saw that it needed to

21      be repaired.  Really the same thing.

22  Q.  Okay.  And do you have -- do you have any

23      contact information for Eric Cruz?

                           33

1   A.  I probably have a -- I don't -- I've not

2       talked to him in forever, but I probably

3       still have his cell number in my phone.

3927 07-14-08 Bahr Matthew.txt

```
 4    Don't know if it's the right number.
 5  Q. Okay.  Did you know that Mr. Gumbaytay had no
 6     license to practice real estate?
 7  A. No.
 8  Q. Do you know why Gumbaytay was fired?
 9  A. Well, I didn't hear the whole conversation,
10     so let me think for a second.  No.
11  Q. Okay.
12  A. I just overheard him on the phone getting
13     fired.
14  Q. What did you -- what did you hear in the
15     conversation?
16  A. Probably you're fired.  I was working out at
17     the gym with Guest at the time in Orlando.  I
18     overheard you're fired and that Eric
19     didn't -- after he hung up, he said Eric
20     would be, you know, taking over and -- or he
21     was going to set it up himself to where he
22     would be going.
23  Q. Did you ever give Mr. Gumbaytay any
```

                          34

```
 1     instructions as to how to manage your
 2     properties?
 3  A. No.  Well, other than -- I'll take that
 4     back -- try to get as many Section 8
 5     tenants.  Because that's what I was told from
 6     day one, we want Section 8 tenants because
 7     then your rent is guaranteed, you know.  I
 8     don't know if that was instruction; but
 9     that's from day one.  I thought that's what
10     the whole program was, Section 8, Montgomery
```
                          Page 26

3927 07-14-08 Bahr Matthew.txt

11    Housing Authority.

12  Q.  Did you tell him how to go about trying to

13      get Section 8 tenants?

14  A.  No.  He was already working for Guest doing

15      that.  I mean, I wasn't the first investor

16      with this company.

17  Q.  Did you give him any instruction as to where

18      to advertise or anything like that?

19  A.  No.

20  Q.  Okay.  Did you -- did he make any promises to

21      you or tell you anything about how he

22      would -- he would manage your properties?

23  A.  No.

                           35

 1  Q.  What was your understanding about the

 2      business that -- that Mr. Gumbaytay had,

 3      Elite Real Estate Consulting Group?  Did

 4      you -- did you know anything about how it was

 5      structured?

 6  A.  He would send out a summary every month just

 7      showing the tenant's name with what he

 8      collected and what the Housing Authority paid

 9      me, which would -- I would get a separate

10      non-negotiable, which I think was in that

11      paperwork, that the Housing Authority would

12      send me every month that showed me what they

13      collected for me.

14  Q.  Okay.  Who at Elite did you work with?

15  A.  I didn't really work with anyone at Elite.  I

16      mean, the person that printed the report --

17      the person that would send me the report, his

                      Page 27

3927 07-14-08 Bahr Matthew.txt

18    name was Lynn.  I don't --

19  Q.  Lynn Norsworthy?

20  A.  Yes.

21  Q.  Okay.  Did you ever talk with Eric Cruz?

22  A.  Yes.

23  Q.  After he was working as a property

36

1    maintenance manager for Mr. Gumbaytay?

2  A.  I didn't know that he was doing that.

3  Q.  Okay.

4  A.  I thought he was working for Guest.

5  Q.  How often would you say that you spoke with

6    Mr. Gumbaytay?

7  A.  It just varied, but I don't -- once --

8  Q.  Once a month?

9  A.  Once every couple of weeks.  I mean,

10    sometimes not once every couple of weeks,

11    sometimes twice a week.

12  Q.  On the phone?

13  A.  Yes.

14  Q.  Ever via email or letter?

15  A.  Email or letter.  Yeah.  I emailed him.

16  Q.  What would -- what would your conversations

17    be about?

18  A.  Typically, after the report came out, which I

19    never know until the end of the month, you

20    know, what's rented out, what's not rented

21    out until you get the report showing, well,

22    this person moved out, this person didn't

23    move out, I'm not getting any rent for this,

3927 07-14-08 Bahr Matthew.txt
37

1      I'm still paying the mortgage on it, you

2      know, what's going on, Guest told me that you

3      were going to take care of this -- that would

4      be the typical conversation.

5   Q.  Okay.  Did you -- did you give us in the

6      documents all the emails that you and

7      Mr. Gumbaytay exchanged?

8   A.  Anything that -- again, this has been

9      foreclosed on for a year, so anything I had

10     left.  I went on my computer and printed out

11     everything I have for you.

12  Q.  Okay.  And did you ever hear Mr. Gumbaytay

13     use the -- use the term "sugar daddy"?

14  A.  No.

15  Q.  Or "cake daddy"?

16  A.  No.

17  Q.  Did you ever hear him or see him compliment

18     any women?

19  A.  No.

20  Q.  Did you ever see him interacting with any

21     women?

22  A.  No.  I've only seen him twice in my life.  I

23     can't really --

38

1   Q.  And when did you see him?

2   A.  For the first time, I already told you, 15 or

3      20 minutes when I initially -- actually,

4      before I even bought my first property, I

5      came up here; and they said this is the guy

6      working for me -- that's what Guest was

Page 29

3927 07-14-08 Bahr Matthew.txt

```
 7      telling me -- that will make sure you get
 8      your rent.
 9           And the other time was last summer.  I'd
10      say approximately May to June.
11  Q.  of 2007?
12  A.  Yes.
13  Q.  And what was the -- why did you see him in
14      May to June?
15  A.  That was the -- I think the third time I had
16      been to Montgomery.  Everything was falling
17      apart.  There was houses that had been
18      vandalized.  Decided to make a trip up here,
19      just saw -- went and looked at the houses,
20      just saw what was going on and just said
21      let's -- you know, I'm basically out of
22      this.  I mean, I can't afford to make these
23      payments; I'm losing money every month.
```

                              39

```
 1  Q.  So did you stop your relationship with him at
 2      that point?
 3  A.  He may -- I think he may have sent me
 4      something a couple of months more, but that's
 5      about it.  I mean once you -- it's going into
 6      the foreclosure process, then they quit
 7      sending you the money.  So there was nothing
 8      for him to collect.
 9  Q.  So in May -- in May or June of 2007, after
10      you visited with him, then at that time is
11      approximately when all your properties were
12      foreclosed upon?
13  A.  Yes.  I'd say starting in July.  Well,
```

                          Page 30

3927 07-14-08 Bahr Matthew.txt

14    starting.  That means no more payment.

15    Right.

16  Q.  Okay.  So you mentioned that you knew Lynn

17     Norsworthy because she sent you the papers

18     every month.

19  A.  Yes.

20  Q.  Did you have any other sort of interaction

21     with her?

22  A.  No.

23  Q.  Did you ever --

                  40

1  A.  If the report didn't come on time, I would

2     call her and say where's the report.  That

3     was it.

4  Q.  So you never had any other contact with her

5     by phone or by email?

6  A.  I believe I might have emailed her a couple

7     of times saying Jamarlo -- have Jamarlo call

8     me; you know, I can't get a hold of this

9     guy.  I mean, she was the one doing the

10    reports.  That was really the only paperwork

11    I had to see what was going on.

12  Q.  Did you ever complain to her that you

13     weren't -- you didn't feel like you were

14     getting your report or your -- or the rent on

15     time?

16  A.  I did complain I wasn't getting the report on

17     time.

18  Q.  But did you ever complain to her about not

19     getting the rent on time?

20  A.  No.

3927 07-14-08 Bahr Matthew.txt

21  Q.  Or you felt like -- or you thought that maybe

22      you weren't getting as much rent as you

23      should have been -- as you should have

                        41

1       gotten?

2   A.  No.  I mean from day one, I knew the rents

3       would vary on these.  There was no guarantee

4       that it's going to be 700 or 600 or 500.

5       It's whatever the Housing Authority decided

6       to approve.

7   Q.  So other than, then, the executive summaries,

8       did -- did Ms. Norsworthy ever send you any

9       other documents?

10  A.  I think the only other thing she might have

11      sent me, to the best of my knowledge, is that

12      contract which I never signed.

13  Q.  Did you ever send Ms. Norsworthy a copy of

14      the HAP contract?

15  A.  What's that?

16  Q.  The contract you have with the Housing

17      Authority.

18  A.  No.  That was sent directly to Kathy Harris

19      with the Montgomery Housing Authority.  She

20      would send it to me, or Ms. Ellis there.

21      They would send me the contract; and then I,

22      you know, would send it back to the Housing

23      Authority.

                        42

1   Q.  Did you ever send any documents of any kind

2       to Ms. Norsworthy?

3   A.  Send any documents?  No, not to the best of

                    Page 32

3927 07-14-08 Bahr Matthew.txt

 4    my knowledge.

 5  Q.  Okay.  I want to show you what's marked as

 6      Plaintiff's Exhibit #1.  And this is -- do

 7      you recognize this document?

 8  A.  Yeah.  This is the summary from Lynn

 9      Norsworthy.

10  Q.  So this is -- this is what the monthly

11      statements looked like?

12  A.  Yes.

13  Q.  Okay.  So for Section 8 tenants, explain the

14      process that you went through with the

15      Housing Authority.

16  A.  They would send me a contract just showing

17      the tenant.  They would send out someone to

18      inspect the property.  It had to meet

19      inspection, and then they would move the

20      tenant in.  And then, as you can see here, I

21      mean, they varied in terms of item two, you

22      know, rent amount, 600; Section 8 paid 600.

23      Number one, rent amount 700; Section 8 paid

                        43

 1      680, so the tenant was supposed to pay $20.

 2      So they would decide how much -- I guess

 3      based on the financial situation of the

 4      tenant, how much they would pay and how much

 5      they would not pay.

 6  Q.  Who prepared the information for the housing

 7      assistance payment contracts?

 8  A.  Who prepared it?  I guess the Housing

 9      Authority.  I believe it was sent from Kathy

10      Harris.  I mean, it had her signature on it.

3927 07-14-08 Bahr Matthew.txt

11  Q.  And what portion of it did you have to fill

12      in?

13  A.  I would just sign right above her name.  I

14      was told to send it back; and then the tenant

15      would move in at that point, after an

16      inspection.

17  Q.  So you signed the HAP contracts?

18  A.  With the Housing Authority, yes.

19  Q.  Okay.  Who did the Montgomery Housing

20      Authority give the payments to?  Was it to

21      you directly?

22  A.  Yes.  Yes.

23  Q.  Did they ever give it to Mr. Gumbaytay or

                            44

1       somebody else to give to you?

2   A.  No.  I mean, not to my knowledge.  That's why

3       that non-negotiable would come every month.

4       So I really was -- I guess other than this

5       report, it was a report from them showing

6       exactly what I was getting, that I would

7       verify that it was the same on this report.

8   Q.  So did Lynn ever sign -- so Lynn never signed

9       any HAP contracts?

10  A.  No, not that I'm aware of.

11              MS. NEAL:  Could we look at the

12          non-negotiable sheets?

13              Can we go off the record for

14          just a minute?

15              (Off-the-record discussion)

16              (Brief recess)

17  Q.  I'm going to show you what I've marked as

                        Page 34

3927 07-14-08 Bahr Matthew.txt

18    Plaintiff's Exhibit #12.  I'm sorry for the
19    misnumbering, but I prenumbered my other
20    exhibits, and then I got the new documents
21    that's coming in.  This is a document that
22    you just gave to us.  who produced that
23    document?

                          45

1  A.  This is from the Montgomery Housing
2      Authority.
3  Q.  The Montgomery Housing Authority sent you --
4  A.  This, yes.
5  Q.  Okay.  Approximately -- did they send you
6      that every month, or how often did they send
7      you --
8  A.  Every month.
9  Q.  And what does non-negotiable mean?
10  A.  I never asked the question; but to the best
11      of my knowledge, this is what they decide
12      they will pay or won't pay after looking at
13      the person's financial situation, I guess.
14  Q.  Okay.  So that -- the amount that's listed in
15      the amount column, that is the amount that
16      the Housing Authority was going to pay -- was
17      going to pay you?
18  A.  This is the amount they paid me.
19  Q.  Okay.
20  A.  And these are my -- the tenants that they
21      had, I guess the unit number was something
22      they used and the address.
23  Q.  Okay.  To your knowledge, did the Montgomery

3927 07-14-08 Bahr Matthew.txt
46

1  Housing Authority ever receive any complaints

2  about Mr. Gumbaytay from any of your tenants?

3  A.  No.

4  Q.  Sexual harassment?

5  A.  No, other than what I got in the mail.  It

6  was never from the Housing Authority.  At

7  least, I don't believe it was.

8  Q.  You say what you got in the mail.  What are

9  you referring to?

10  A.  Well, the one for -- the Rita Julian that

11  happened, you know, well after this and I

12  guess what I'm here for today with Boswell.

13  Q.  What kind of documents did you receive about

14  Ms. Boswell?

15  A.  Well, I guess that's what we're here about

16  today.  I mean, what is the document?  That

17  she was saying that he harassed her.

18  Q.  I mean, did you receive any documents about

19  Ms. Boswell that was not from Legal Services

20  of Alabama or ACLU or Central Alabama Fair

21  Housing Center?

22  A.  To the best of my knowledge, no.

23  Q.  Okay.  So when you say that -- that

47

1  Montgomery Housing Authority never

2  received -- that you -- that Montgomery

3  Housing Authority, you never heard about any

4  complaints to them about -- from various

5  tenants, do you mean that you don't -- you

6  don't know if they ever received any

Page 36

3927 07-14-08 Bahr Matthew.txt

```
 7    complaints, or you know that they did not
 8    receive any complaints?
 9  A.  I never heard of any complaints.  I don't
10    know if they received any or not.
11  Q.  About -- what about repair issues?  Did you
12    ever hear Montgomery Housing Authority had
13    any complaints about Mr. Gumbaytay about
14    repair issues?
15  A.  No.  They would do an inspection once every
16    three months.  They would send me personally
17    a document saying you need to fix this, we're
18    going to send a rate inspection out.  And
19    that was between me and the Housing
20    Authority.
21  Q.  So did anyone at the Montgomery Housing
22    Authority ever call you to talk to you about
23    Mr. Gumbaytay?
```

                              48

```
 1  A.  No.
 2  Q.  Did -- but they -- so they would send you a
 3    notice if you needed to fix something in one
 4    of the units?
 5  A.  Yes.
 6  Q.  How often would they send you a notice, once
 7    a month with the non-negotiables?
 8  A.  No.  It was not too often at all.  I mean,
 9    there wasn't really too many repairs.  There
10    was more vandalism than -- that was State
11    Farm issues.  I would file the deal with
12    State Farm; and they would, you know, take
13    care of it.
```

                              Page 37

3927 07-14-08 Bahr Matthew.txt

14  Q.  Where are these notices?

15  A.  Through?

16  Q.  Do you -- I mean, do you still have copies of

17      the notices they gave you?

18  A.  No.

19  Q.  Okay.  What did you -- what did you do

20      with -- you mentioned that you don't have a

21      copy of the contract between you and -- you

22      and Mr. Gumbaytay that he sent you.  When did

23      you destroy that, that contract?

                          49

1   A.  I don't -- I think he sent it to me from the

2       very beginning of this whole thing.  And I

3       think I contacted Guest and he said, no,

4       don't sign that, you don't -- you don't sign

5       a contract with him.

6   Q.  Okay.

7   A.  I mean, I questioned Guest.  I said, I

8       thought this guy works for you.

9   Q.  Uh-huh.  Who is Brittany Young?

10  A.  That's my wife's daughter.  That's what I was

11      actually going to -- the question earlier, I

12      don't think it's really pertinent to this;

13      but you said do I have any kids.  No, I

14      don't.  I don't have any kids of my own

15      blood, but I do have three children on my tax

16      every year, and that would be my wife's three

17      children.  Only one still lives at the home.

18      The other two are in college, but they're

19      still dependents.  Brittany Young is my

20      wife's daughter.

                          Page 38

3927 07-14-08 Bahr Matthew.txt

21  Q.  Okay.  So how did -- how were new tenants

22      found?

23  A.  It was my understanding that there's a need

                        50

1       for this in Montgomery, that there's a

2       waiting list for people that qualify for this

3       program.  And the Housing Authority would

4       approve a tenant.

5   Q.  So did you -- I mean, did you advertise

6       for -- to get new tenants?

7   A.  No.

8   Q.  Okay.  Did you establish any qualification

9       for new tenants?

10  A.  It wasn't up to me.  It was up to the Housing

11      Authority.  So, no.

12  Q.  Well, for tenants that weren't Section 8,

13      that you didn't get through the Housing

14      Authority, did you ever set up

15      any qualifications for them?

16  A.  No.

17  Q.  No credit check, background check?

18  A.  No.  There was so much vandalism that it -- I

19      mean, it was almost better to have someone

20      there that says they're going to pay than

21      leave it vacant and someone steals something.

22  Q.  Did you personally make a decision for each

23      tenant applicant that wasn't Section 8 as to

                        51

1       whether you would accept them or not?

2   A.  That's a tough question.  I mean, I guess --

3       I mean, a couple of times, I guess Lynn would

                    Page 39

3927 07-14-08 Bahr Matthew.txt

4    call me and say will you accept 550 rent; you

5    know, is that going to be enough.  So I

6    didn't make the decision.  I just said don't

7    leave the property vacant.  So, no, I didn't

8    make the decision.

9  Q.  So you would accept lower rent just to

10    prevent the property from being vacant?

11  A.  It was someone that had an offer to move in

12    that just didn't qualify for Section 8.  I

13    didn't really care if the rent was just to

14    cover the mortgage note.  I mean, these are

15    all different size house notes.

16  Q.  Do you remember whether you made a

17    decision -- specific decision about whether

18    to accept Ms. Boswell as a tenant or not?

19  A.  No.

20  Q.  Did you -- what kind of information did you

21    get about folks before approving them as a

22    rental?

23  A.  No -- no information.

52

1  Q.  Okay.  Do you know if Gumbaytay ever did

2    background checks on new tenants --

3  A.  No, I don't.

4  Q.  -- or credit checks?

5  A.  No.

6  Q.  Did you ever ask him to do any of those sorts

7    of things?

8  A.  No.

9  Q.  Okay.  Did you ever sign a lease yourself?

10  A.  Sign a lease myself?  No.

Page 40

3927 07-14-08 Bahr Matthew.txt

11  Q.  So Mr. Gumbaytay signed leases on your

12      behalf?

13  A.  He may or may not.  It was definitely not on

14      my behalf and definitely not with my

15      permission.

16  Q.  So how did you expect the leases to get

17      signed?

18  A.  A lot of times there just wasn't a lease,

19      period.  It was just taking someone's word

20      for they were going to pay the rent.

21  Q.  But there were times when there was a paper

22      lease, right?

23  A.  Actually, I saw one that I think I gave you

                          53

1       guys today that has my name on the front; and

2       then I think that the signature page has him

3       signing his name above my name, which I would

4       never give someone permission to do that.

5              MR. LAY:  You understand --

6   A.  It's one signed by Boswell.  She signed it

7       and it has my name above it and then he signs

8       his name.

9              MR. LAY:  You understand that to

10             participate in the Section 8 program,

11             there has to be a signed lease?

12             THE WITNESS:  Yes.

13             MR. LAY:  Okay.  You understood

14             that.

15             THE WITNESS:  Yeah.  The Section

16             8 program, yes.  I didn't even know

17             that Boswell was a Section 8 tenant.

                          Page 41

3927 07-14-08 Bahr Matthew.txt

18          It shows on here that Section 8 is

19          not giving me any rent from her.  So

20          I thought she was just an outside

21          person.

22              MR. LAY:  So if he wasn't

23          signing any leases on your behalf, I

                          54

1           mean, if you think there wasn't any

2           leases, how did you expect for all of

3           these other tenants to be in the

4           Section 8 program if you understood

5           that the Housing Authority

6           required --

7               THE WITNESS:  Well, to my

8           understanding, that was up to

9           Section 8.  They would go down there

10          and apply.  And I guess Section 8

11          would do whatever check they had to

12          do.

13              MR. LAY:  Right.  But you

14          understand you as owner have to enter

15          into a lease with the tenant.  How

16          did you understand that to happen if

17          you weren't going to sign it and

18          Mr. Gumbaytay was not going to sign

19          it on your behalf?

20              THE WITNESS:  Don't know.

21  Q.  Did Mr. Gumbaytay ever provide you with a

22      copy of a tenant's lease after it was signed?

23  A.  Well, I had copies.  So, yes, I guess so.

                          Page 42

3927 07-14-08 Bahr Matthew.txt
                            55
1  Q.  You had a copy of what?

2  A.  The one I gave you today that I just found

3      out he signed.  I just looked at it today.

4      He signed it above my name.  I didn't think

5      that was legal to sign someone's name above

6      your name.

7              MR. LAY:  I don't think you gave

8          us that.

9              MR. SCHOETTKER:  Maybe I didn't.

10             MR. LAY:  Or, at least, I

11         haven't seen it.  You haven't seen

12         it?

13             MS. NEAL:  No.

14             MR. SCHOETTKER:  Well, and the

15         reason for that is because, actually,

16         I don't know that -- the reason I

17         have this in my possession is because

18         it was filed as an exhibit in this

19         case.  So -- and I showed that to

20         Mr. Bahr.  So I'm not sure Mr. Bahr

21         ever received this document either.

22             MR. LAY:  The one that we have.

23             THE WITNESS:  That's right.  I

                            56
1          just saw it today at your office.

2              MR. SCHOETTKER:  So he doesn't

3          have the document.

4              THE WITNESS:  I had never seen

5          that before today.

6              MR. SCHOETTKER:  That's why I

                        Page 43

3927 07-14-08 Bahr Matthew.txt

```
 7        didn't give it to you, because
 8        obviously, you already have it.
 9   Q.   Do you remember if -- do you remember if you
10        ever did have a copy of a tenant's lease sent
11        to you by Mr. Gumbaytay?
12   A.   No.
13   Q.   Did the Housing Authority ever send you a
14        copy of the signed lease?
15   A.   They would send me leases for me to sign
16        quite regularly.
17   Q.   Did they ever send you leases that were --
18        that were -- that already were signed?
19   A.   The only signature on them, it would have the
20        tenant's name, who was going to live there.
21        You know, five or six other people might be
22        living there.  And then Kathy Harris would
23        have it signed.  It was a signature.  And
```

57

```
 1        then I was instructed to sign it and send it
 2        back.
 3   Q.   I have what is marked as Plaintiff's Exhibit
 4        #2.  Is this what you're referring to?
 5   A.   Yes.  That's exactly what it was.
 6   Q.   Okay.  Is there any -- you know, that's the
 7        housing assistance payment contract.  Was
 8        there ever a copy of a lease that was -- that
 9        was given to you?
10   A.   No.  This is the contract.  I mean, I just --
11        it shows who's living there, the dates.  I
12        mean, actually, it says initial lease term;
13        so I assume that is the lease.
```

Page 44

3927 07-14-08 Bahr Matthew.txt
14        MR. LAY:  Do you understand the
15    difference between your relationship
16    with the Housing Authority and your
17    relationship with the Section 8
18    tenant?
19        THE WITNESS:  I guess the
20    Housing Authority would get the
21    tenant, would qualify the tenant to
22    live in the project.  I've never
23    talked to any of these tenants ever.

                    58
1         MR. LAY:  Well, basically, what
2     you have in the Section 8 process is
3     you have a triangle with three
4     parties that are all intertwined.
5     You have the Housing Authority as one
6     party, you as an owner as another
7     party, and the tenant as another
8     party.  There are two contracts
9     involved.  There is the contract
10    between the owner and the Housing
11    Authority, which has been marked as
12    Plaintiff's Exhibit #2.  It's also
13    called a HAP contract for short,
14    which is a housing assistance payment
15    contract.  That's what you keep
16    saying you've seen.
17        THE WITNESS:  Yeah.
18        MR. LAY:  Okay.  That's your
19    contract between you and the Housing
20    Authority that that house will be in

                    Page 45

3927 07-14-08 Bahr Matthew.txt
21    the Section 8 program and that they

22    will pay a portion up to all of the

23    rent.

59

1        THE WITNESS:  Yes.

2        MR. LAY:  That you agree that

3    you will not charge in excess of X

4    dollars what they've approved for the

5    rent on that particular place.

6        THE WITNESS:  Yes.

7        MR. LAY:  Then you enter into a

8    contract with the tenant that is the

9    lease the tenant gets.  So what we're

10    asking about is not the Housing

11    Authority contract, but the contract

12    between you and the tenant as

13    landlord of tenant.

14        THE WITNESS:  Oh, I never --

15        MR. LAY:  Which is called a

16    lease.

17        THE WITNESS:  I never had any of

18    those.  I just looked at this piece

19    of paper where it says initial lease

20    term.

21        MR. LAY:  Is it your position

22    and are you stating under oath that

23    you did not have any knowledge that

60

1    Mr. Gumbaytay was executing and

2    signing these leases on your behalf?

3        THE WITNESS:  No.  I was signing

3927 07-14-08 Bahr Matthew.txt

4       them myself.  I was signing them

5       myself.

6           MR. LAY:  No.  I said a lease.

7       A lease, not the HAP contract.

8           THE WITNESS:  No, I had no

9       knowledge.  No.  I didn't even know

10      there was another contract.

11  Q.  At any point in your experience as a

12      landlord, did you ever have any direct

13      contact with your tenants?

14  A.  No.

15  Q.  Okay.  Did tenants have any way of getting in

16      touch with you?

17  A.  To the best of my knowledge, no.

18  Q.  So they were never told your phone number or

19      your address?

20  A.  No.

21  Q.  Did you instruct Mr. Gumbaytay not to give

22      the tenants your phone number or address?

23  A.  No.  The only time -- now I'm thinking back,

                        61

1       someone sent me -- one of the tenants sent me

2       a picture of the property that needed to be

3       fixed.  So someone at the Housing Authority

4       must have gave him or her my address.  And I

5       don't know who may have done that.

6   Q.  Do you remember who it was that sent you the

7       picture?

8   A.  No.

9   Q.  When did you -- when did you receive the

10      picture, approximately?

                        Page 47

3927 07-14-08 Bahr Matthew.txt

11  A.  I mean, a couple of years ago.

12  Q.  And it was sent to you directly from the

13      tenant?

14  A.  Right.  But that's something the Housing

15      Authority would go out every three months and

16      inspect and tell me to fix anyway.

17  Q.  So, and you -- you don't have any knowledge

18      as to how that tenant got your address,

19      whether it was through Mr. Gumbaytay or the

20      Housing Authority?

21  A.  No.

22  Q.  So you never received any complaints from any

23      tenants about anything, about Mr. Gumbaytay's

                          62

1       behavior, about any repair issues?

2   A.  I never spoke to a tenant ever.

3   Q.  Okay.  How did you determine how much to

4       charge for rent on a particular house or

5       apartment?

6   A.  I didn't determine it.

7   Q.  Well --

8              MR. LAY:  Who did?

9              THE WITNESS:  The Housing

10          Authority, from what I was told,

11          based on --

12             MR. LAY:  So it is your

13          understanding that they set the

14          rent?

15             THE WITNESS:  Yes.

16             MR. LAY:  Okay.

17  Q.  What about for houses or apartments that are

3927 07-14-08 Bahr Matthew.txt

18     not section -- that are not rented to Section

19     8 tenants?  What about -- what about those?

20     How was the rent determined for those?

21  A.  I mean, I really had nothing to do with

22     determining the rent.  I mean, these are all

23     pretty much, within a hundred dollars, the

63

1     same amount of rent.  So it would always just

2     fall on the same amount of money.

3         MR. LAY:  Did you let

4         Mr. Gumbaytay set the rents, then, on

5         the non-Section 8 properties?

6         THE WITNESS:  Let him set the

7         rent?  Well, I guess you could say

8         yes.  I mean, he would call and say

9         this is going to be the rent on this

10        one and then send me a report.

11        MR. LAY:  So if he told us that

12        he would call you up and say, you

13        know, I have somebody here -- because

14        you mentioned several times that you

15        were encouraging him to get people in

16        the units.  And if he called --

17        THE WITNESS:  Section 8 people.

18        MR. LAY:  Yeah.  But if he

19        didn't have a Section 8 and say, hey,

20        I've got somebody; you know, they're

21        not Section 8; but they can pay, you

22        know, 500; you know, will you take

23        them -- is that something that may

3927 07-14-08 Bahr Matthew.txt

64

1       have happened in some of these

2       cases?

3            THE WITNESS:  Yes.  Rather than

4       leave it vacant, yes.

5   Q.  Did you --

6            MR. LAY:  Do you know if that's

7       what happened in Ms. Boswell's case,

8       since she wasn't a Section 8?

9            THE WITNESS:  To my memory, no.

10      Other than what I can look at on the

11      report, and it looks like she's not a

12      Section 8 tenant.

13  Q.  Did you ever ask for less than $550 for an

14      apartment or house?

15  A.  That I believe was about the lowest that I

16      can remember that was ever on a property just

17      to cover the mortgage.

18  Q.  But so that includes --

19  A.  I don't remember ever agreeing to under $550.

20  Q.  Okay.  Was there ever a time that you're

21      aware of where the Montgomery Housing

22      Authority said that the rent you were asking

23      was too high?

65

1   A.  No.  It was up to them.  They established the

2       rent.

3   Q.  So they never -- they never -- so who -- so

4       did Mr. Gumbaytay have the authority to lower

5       the rent you were asking for, or did he have

6       to talk to you?

3927 07-14-08 Bahr Matthew.txt

7  A.  He had no authority to lower the rent, no.

8  Q.  He had no authority to lower the rent for

9      Section 8 tenants or he had no authority to

10     lower the rent at all?

11 A.  He had no authority to lower the rent at all.

12 Q.  But you testified that he's the -- he kind of

13     set the rent amount for the people that

14     weren't Section 8 tenants; is that correct?

15 A.  Yes.

16 Q.  So I guess he did have the authority to raise

17     or lower the rent if you had no control over

18     what was being charged.

19 A.  Well, if he called and said I've got a tenant

20     for 550 and I say no, then that means no.  If

21     I say yes, that means yes.  That doesn't mean

22     he can lower the rent after I confirm 550; or

23     if I confirm 600, he can't go any lower than

                        66

1      that.

2  Q.  So he would call you after he set the rental

3      amount for properties and ask you?

4  A.  The ones who were not Section 8, yes.

5  Q.  Could he have set the initial rent to

6      anything if he wanted to?

7  A.  Well, not without my approval, no.  I mean,

8      below 550 is not going to make any money.  So

9      I'm not -- you can already see on these

10     reports, half the people don't even pay

11     anything.  They just don't pay.

12 Q.  Did Mr. Gumbaytay ever contact you to ask if

13     the rent on a house could be lowered?

                    Page 51

3927 07-14-08 Bahr Matthew.txt

14  A.  No.

15  Q.  Did he ever talk to you about the rent that

16      he was going to charge for Ms. Renee

17      Williams?

18  A.  I believe that was -- what he told me was an

19      employee of his, if I'm not mistaken.  And I

20      believe that she was going to pay $600.  He

21      told me it was going to be a tenant that I

22      believe, if I'm not mistaken, worked for him;

23      and so she would have the job to pay the

                          67

1       rent.  I believe it was $600.  I'm not for

2       sure.  It might have been 550.

3   Q.  Did he ask to lower the rent for Ms. Williams

4       because she was an employee?

5   A.  No.  That seemed -- I think that house was

6       609 Boise, varied -- the rent on that from

7       day one -- that was the first house I

8       bought -- varied, you know, four or five

9       different times.

10  Q.  Has Mr. Gumbaytay ever talked to you about

11      the rent to be charged for Ms. Boswell's

12      house?

13  A.  Well, she was a tenant that moved in.  So,

14      initially, I'm sure he called and said I have

15      a tenant; you know, is 550 okay?  And I said

16      yes.  That would be the only time that he

17      talked to me about it.

18  Q.  Okay.

19  A.  There was no conversation about lowering it

20      or raising it or --

                     Page 52

3927 07-14-08 Bahr Matthew.txt

21  Q.  To your knowledge.

22  A.  To my knowledge.

23  Q.  For Section 8 tenants, I believe you

68

1       testified the Montgomery Housing Authority

2       paid that portion to you?

3   A.  Right.

4   Q.  Did they pay by cash or check or some other

5       method?

6   A.  This was -- this was sent to me.  And it

7       would just be -- for the most part, it would

8       just be a direct deposit.  I believe the

9       first month they might have sent me some

10      checks, but these were all direct deposits.

11  Q.  And the checks were made out to you?

12  A.  Well, it was just -- this was all I would

13      get; and then like the 5th of the month, it

14      would just show up in my account.

15  Q.  You said there were a few occasions when they

16      would send you checks.  And on occasions when

17      they would send you check, they were made out

18      to you?

19  A.  If there was ever a check sent by them, to

20      the best of my knowledge, it would have been

21      the first month only that I bought these

22      properties.  And I don't know even if they

23      sent me a check.  And this went on for a

69

1       couple of years.  It was always just direct

2       deposit.  This is all they would send me was

3       the non-negotiable.

                              Page 53

3927 07-14-08 Bahr Matthew.txt

4  Q.  How did -- who collected the tenant's portion

5      of the rent?

6  A.  Either Jamarlo or Eric Cruz.

7  Q.  Okay.  And how did the -- how did the tenant

8      portion of the rent get to you?

9  A.  By way of this report here.

10 Q.  They would send you the executive summary and

11     then a check?

12 A.  Yes.

13 Q.  Okay.  How -- when did you approximately get

14     the check?

15 A.  Oh, at first, I would get it the first couple

16     of days of the month and then, as things fell

17     apart, the last day of the month from the

18     previous month.

19 Q.  Did you ever receive less from Mr. Gumbaytay

20     for a tenant than you were expecting?

21 A.  Meaning he would not collect as much?

22 Q.  You just received less.  I don't know if it

23     was because he didn't collect it or what

                              70

1      happened, but did you ever receive a check

2      for less money than you were expecting?

3  A.  Yes.  I mean, you can see that on the report

4      here, that, you know, some of the tenants

5      just said, I guess, they had a bad month and

6      couldn't come up with all the money, so they

7      paid zero or they paid part of it.

8  Q.  And did you guys talk about that?

9  A.  Sure.  If someone doesn't pay anything for a

10     couple of months, then we need to start an

                         Page 54

3927 07-14-08 Bahr Matthew.txt

11      eviction process.  I mean, they can't live

12      there for free.  I'm making the mortgage

13      payments.

14   Q.   Who made out -- who made out the check that

15      went to you?  Was it Gumbaytay or the tenant?

16   A.   Gumbaytay.

17   Q.   Okay.

18   A.   Or Elite.  It would say Elite on it.

19   Q.   The check was all in one lump sum?

20   A.   Yes.

21   Q.   So you didn't really know which tenant paid

22      the amount that was -- you don't know really

23      whether a tenant paid zero and another tenant

71

1      paid $50 except for outside of the executive

2      summary?

3   A.   Right.  I mean, they could have paid 500 and

4      he just decided to give me zero.  And I'm

5      supposed to take the word of the report.

6      That was just -- unfortunately, I'm not up

7      here and I couldn't supervise that.  Or he

8      might have been honest and collected the

9      whole thing.  I don't know.

10   Q.   Do you recall a tenant named Lois Webb who

11      lived at 3661 Whiting Avenue?

12   A.   I know the name from the report.  That's it.

13   Q.   Okay.  This is Plaintiff's Exhibit #2, the --

14      let's turn back to that for a second.  Can

15      you read the amount in line 6 that says

16      initial rent to owner?

17   A.   550.

3927 07-14-08 Bahr Matthew.txt

18  Q.  Do you understand that that's the total

19      amount of rent that the owner can receive for

20      the unit?

21  A.  Yes.  That means Section 8 will pay 550, and

22      that's it.

23  Q.  You believe that that's the amount that

                        72

1       Section 8 is going to pay?

2   A.  Yes.

3   Q.  Not that -- do you -- let's look at line 7.

4       Can you read the amount on line 7?

5   A.  $550.

6   Q.  So do you understand that that's the portion

7       of the total rent that will be paid by the

8       Housing Authority is 550?

9   A.  Yeah.  I mean, this is the contract.

10      That's -- it looks like that's what it is.

11          MR. LAY:  Let me ask you this.

12      Do you understand that you can't

13      charge any more than that regardless

14      of what the Housing Authority pays,

15      that you can't charge the tenant any

16      more than 550?

17          THE WITNESS:  If it's a Section

18      8 tenant, I believe that that would

19      be the amount.  I only have one

20      contract here.  So, I mean, I can't

21      really compare it with some other

22      ones, but I think that would be the

23      full amount.

                        Page 56

3927 07-14-08 Bahr Matthew.txt
73

1  Q.  I have here what we're going to mark as --

2        MR. LAY:  Let me put it a --

3  Q.  -- #13.  It's a different HAP contract for a

4      different client so that you can look at the

5      numbers.

6  A.  All right.  This house is 105 Stewart.  I

7      think that was the second house I bought.

8      The rent was 750, but -- and this is back in

9      2005.  Section 8 at that time would only pay

10     375 and then the tenant would pay 375.  I

11     don't remember what the contract said.  I

12     don't remember if it said 375 or if it said

13     750, but that -- this -- this property rings

14     a bell because I remember it was 375, 375.

15 Q.  Can you -- can you look at line 6?

16 A.  Yes.

17 Q.  Where it says initial rent to owner?

18 A.  Yes.

19 Q.  And what does it say the -- the amount is?

20 A.  700.

21 Q.  Okay.  And can you look at line number 7 that

22     says Initial Housing Assistance Payment?

23 A.  670.

74

1  Q.  Okay.  And so?

2  A.  For some reason, this says 680.  That means

3      she was responsible for $20, which she didn't

4      pay.

5  Q.  But so -- but looking at these, you notice

6      that -- that -- in this Plaintiff's Exhibit

Page 57

3927 07-14-08 Bahr Matthew.txt

7   #13 that 700 -- there's 700 in line 6 and 670

8   in line 7?

9  A.  Uh-huh.

10  Q.  So is it your understanding that the tenant

11      would have to pay $30 --

12  A.  Yes.

13  Q.  -- a month?  So let's go back to Plaintiff's

14      Exhibit #2, where the line 6 -- line 6

15      indicates $550 and line 7 indicates $550.  So

16      is it your understanding from the document

17      that Lois Webb was meant to pay zero?

18  A.  From the document, yes.

19  Q.  And is this the -- let's look at Plaintiff's

20      Exhibit #1, the executive summary exhibit.

21      And so this is typically -- this is the kind

22      of -- the kind of executive summary that you

23      would receive from Elite every month; is that

75

1      correct?

2  A.  Yes.

3  Q.  So did you look at -- you looked at this

4      spreadsheet when it came in?

5  A.  Yes.

6  Q.  And I believe you were noticed -- you were

7      mentioning something about this to me a

8      second ago, but can you look at line eight

9      and see how much is specified for the rent

10      for Lois Webb?

11  A.  600.

12  Q.  Did you authorize that amount?

13  A.  No.  I mean, I guess this showed up on the

3927 07-14-08 Bahr Matthew.txt

14     report.  You can see the numbers here are not

15     accurate, 680, 670.  I mean, this person,

16     Lynn Norsworthy, was managing -- doing the

17     paperwork, whatever you want to call it, for

18     like 150 properties.  So I can't expect

19     everything to be 100 percent accurate.

20  Q.  So when you got the executive summary, did

21     you ever compare it to the HAP contracts that

22     you had?

23  A.  No.

76

1  Q.  So you just took Mr. Gumbaytay's word for all

2     the numbers that were on Ms. Norsworthy's --

3  A.  Well, I would try to keep track of, you know,

4     whatever it said here, 700, and what it said

5     here, 700.  I was trying to keep track of 32

6     properties, though.  So --

7  Q.  Did you authorize Mr. Gumbaytay to sue Lois

8     Webb for the $50 above the Section 8 contract

9     amount?

10  A.  To the best of my knowledge, no.

11  Q.  I'm going to have you now look at what we

12     have marked as Plaintiff's Exhibit #3.  Do

13     you recognize this paperwork?

14  A.  I don't recognize it; but, I mean, I had so

15     much paperwork to look at.

16  Q.  Well, can you describe what the document is

17     for the court reporter?

18  A.  Apparently, it says that tenant did not pay

19     $50 on a lease from August 5th, '05.  The

20     cover sheet says, $50 times 18 months, $900,

3927 07-14-08 Bahr Matthew.txt
21    does not include late fees, court costs,
22    personal loan for utilities.  And then it's
23    got a promissory note attached to it.

                            77

1  Q.    Okay.  So you do understand that you were not
2        allowed to charge $600 to Ms. Webb because of
3        the HAP contract you had that said you could
4        only charge 550?
5  A.    Not really.  I mean, if I had the first one
6        from day one, I could probably give you a
7        little better answer on that.  Because was
8        the one that said 375 from the tenant.  She
9        always paid it.  375 from the Housing
10       Authority.  I don't know what that contract
11       said.  So I --
12              MR. LAY:  We're on Lois Webb.
13              THE WITNESS:  Right.  I don't
14          know the answer to that.
15              MR. LAY:  But if the contract
16          said 550, you understand that you
17          couldn't charge 600?
18              MR. SCHOETTKER:  I'm going to
19          object to the form as far as what
20          contract you're talking about unless
21          you just tell me what contract you're
22          talking about.
23              MS. NEAL:  The HAP contract

                            78

1           that --
2              MR. LAY:  The HAP contract.
3              MS. NEAL:  -- that is marked as
                      Page 60

3927 07-14-08 Bahr Matthew.txt

4      Plaintiff's Exhibit #2.

5         MR. SCHOETTKER:  Let me take a

6      break for a second, one minute.

7         MR. LAY:  Okay.

8         (Lunch recess)

9  Q.  Right before we had our lunch recess, you had

10    gone to speak with your attorney for a

11    minute.  Is there anything that you wanted to

12    clarify?

13  A.  I just wasn't understanding the question I

14    was asked.

15  Q.  Okay.

16        MR. SCHOETTKER:  There's nothing

17      we want to clarify at this point.

18  Q.  Okay.  So I'm going to show you what I've

19    marked as Plaintiff's Exhibit #14.  Can you

20    please describe for us what that is?

21  A.  Looks like a W-9.

22  Q.  Okay.  And if you look at the portion below

23    part 2 certification, it says sign here?

79

1  A.  Uh-huh.

2  Q.  And what does it say, signature of?

3  A.  Well, it's not my signature.  It says by

4    LHN.  That's obviously Lynn Norsworthy.

5  Q.  So did Ms. -- did you know that

6    Ms. Norsworthy signed this document on your

7    behalf?

8  A.  No.

9  Q.  Did you ever authorize her to sign any

10    documents on your behalf?

3927 07-14-08 Bahr Matthew.txt

11  A.  To the best of my knowledge, no.

12  Q.  Did you ever authorize Mr. Gumbaytay to sign

13      anything on your behalf?

14  A.  To the best of my knowledge, no.  This looks

15      like part of his contract I refused to sign.

16      I haven't seen it in a long time, but what he

17      mailed me.

18  Q.  He included a W-9 as part of his contract he

19      sent to you?

20  A.  He sent me -- it was a whole -- I don't know

21      if the W-9 was in there.  I mean --

22  Q.  What -- what do you remember about what was

23      sent to you?  I mean, do -- what -- were

                          80

1       there any -- did it list out his duties?

2   A.  It just -- I mean, it was not short, but it

3       said that it was a contract between him and

4       him or me and Elite that he would be -- I

5       don't even remember the X amount of time, the

6       only one that could, you know, be doing this

7       for me.  I mean, he was trying to lock in his

8       fee, I guess, that I couldn't go outside the

9       bounds and look for someone else if I was

10      unhappy.

11  Q.  It said that you weren't allowed to fire him?

12  A.  Well, I think -- if I remember correctly --

13      you can always fire someone, I guess; but,

14      you know, I wasn't really hiring him; so

15      that's why I never signed the contract.  You

16      know, I thought that he was with Guest

17      Properties.  I thought that these were an

3927 07-14-08 Bahr Matthew.txt

18  employee of them, so why would he be sending
19  that to me.  And I showed it to Chip Guest;
20  and he said, no, don't sign that.
21  Q.  Did he ever send you anything after your
22      relationship with Guest Properties had
23      stopped, like a second contract similar to

                        81

1   the one he sent you initially?
2   A.  To the best of my knowledge, no.
3   Q.  Okay.  When you say that to the best of your
4       knowledge, you never asked or never told
5       Ms. Norsworthy or Mr. Gumbaytay that they
6       could sign your name on your behalf, did you
7       ever tell -- I mean, have you ever told
8       anyone that they could sign your name on your
9       behalf?
10  A.  I never told anyone they could sign my name.
11  Q.  Okay.  Do you remember anything else about
12      the contract that you -- that Mr. Gumbaytay
13      sent you?  Did it say anything about what --
14      you know, when he told you he was going to
15      get rent to you by?
16  A.  No.
17  Q.  Did it say anything about --
18  A.  I would think he would have a copy of it
19      himself, though, because I believe he was
20      sending it to every investor that he was
21      representing for Guest Properties.
22  Q.  Did it say anything about how repairs were to
23      be handled?

                    Page 63

3927 07-14-08 Bahr Matthew.txt
82

1   A.  I don't remember really what it said,

2       period.  I just saw a contract; well, I'm not

3       signing this; and I didn't even read it.

4   Q.  Okay.  I'm going to show you what's marked as

5       Plaintiff's Exhibit #15.  Is this a form that

6       you recognize?

7   A.  Yes.

8   Q.  Did you fill this out?

9   A.  Yes.

10  Q.  Okay.  And if you look under payee, slash,

11      agent name, it says Jamarlo K. Gumbaytay,

12      does it not?

13  A.  Yes.

14  Q.  Okay.  And is that your signature at the

15      bottom?

16  A.  This is my signature, yes.

17  Q.  And is that the correct date?  I mean, do you

18      remember?

19  A.  That doesn't look like my -- someone filled

20      that in.  It's my signature, but that's not

21      how I write numbers.  I mean, you can see up

22      there how I write numbers.  And this right

23      here is not my handwriting.


                        83

1   Q.  Can you please state the date for the

2       record.

3   A.  The date someone has written on the form is

4       6/5/06.

5   Q.  Okay.  When Mr. Gumbaytay would do an

6       eviction proceeding, did he talk to you about

                        Page 64

3927 07-14-08 Bahr Matthew.txt

```
 7      it first?
 8   A.  Most of the time, yeah.  I mean, he would
 9      take the money out of my -- you could see
10      here when he was taking money out, he would
11      charge me for it in most cases.  Some cases,
12      maybe he didn't; but you can see when I was
13      being charged and when I wasn't charged.
14   Q.  Okay.  I'm looking at Plaintiff's Exhibit
15      #1.
16   A.  Okay.  I don't think there's an eviction on
17      this one.
18   Q.  Okay.  So it would say in the comment
19      section?
20   A.  Court cost or something like that, fee, court
21      fee, something like that.
22   Q.  Did he have to -- did he talk with you
23      before -- did he have to talk with you before
```

                              84

```
 1      he did eviction proceedings, or was he
 2      authorized to start those without you?
 3   A.  He wasn't authorized, but I -- I'm not going
 4      to say he didn't start some without me.
 5   Q.  But when you -- so you -- there have been
 6      times when you got an executive -- executive
 7      summary that said that eviction proceedings
 8      had started?
 9   A.  And that -- some of those were done before
10      anyone told me they were being done.
11   Q.  And did you ever talk with him about it at
12      that point?
13   A.  Not -- I mean not every time; but, I mean,
```

                         Page 65

3927 07-14-08 Bahr Matthew.txt

14    it -- it would typically be on someone that's

15    not paying any rent.

16  Q.  I mean, when --

17  A.  I mean, this was -- I mean, Guest Properties

18        was just supposed to be doing all this for

19        me.  I was told I'm a passive investor that's

20        out of town; you know, we do this.  You know,

21        is this one going to be a good credit?  Yes.

22        Okay, you don't even need to come here

23        because we're going to do all this for you.

                                85

1    So, I mean --

2  Q.  So if you -- if you noticed that there was an

3        eviction proceeding that was started against

4        a tenant in the executive summary, you would

5        sometimes call Mr. Gumbaytay and ask him

6        about it or -- or always call or never call?

7  A.  I'd say sometimes.

8  Q.  Okay.  What would -- what would make you call

9        him in those instances as opposed to others?

10  A.  I don't know.  Just -- if it was a tenant

11        that I was -- there was always a problem with

12        that wasn't paying the rent, then I would

13        understand why there was an eviction going

14        on; so I probably wouldn't call.  But if it

15        was someone paying the rent on time and all

16        of a sudden one time, one month, I'd say give

17        them a chance; don't evict them after one

18        month.

19  Q.  Do you remember anybody that that ever

20        happened to, that they started eviction

                                Page 66

3927 07-14-08 Bahr Matthew.txt

21    proceedings after a month or sometime after

22    you thought was necessary?

23  A.  No.

86

1  Q.  But you think it did happen at some point

2      because you did contact him on some

3      occasion.

4  A.  Probably just to discuss it.  I mean, he

5      would get promissory notes that we were

6      trying to work with some of these tenants,

7      to, you know, work with them if they're

8      behind, lost a job or whatever.

9  Q.  Do you remember any of the tenants that you

10      received promissory notes for?

11  A.  I don't.  I mean, this is so long ago.  I

12      mean, I don't know specific tenants.

13  Q.  Did you ever do anything to start eviction

14      proceedings?

15  A.  No.

16  Q.  So you never started them yourself?

17  A.  No.

18  Q.  Did you have an understanding with

19      Mr. Gumbaytay about fines that were to be

20      issued against tenants for things like cars

21      parked on the lawn?

22  A.  No.

23  Q.  Okay.  Did he -- did you ever talk to him

87

1      about collecting late fees?

2  A.  I never did, but he -- that's just something

3      I think he decided to do on his own.

3927 07-14-08 Bahr Matthew.txt

4   Q.   How did you -- how did you know that he

5        decided to do -- collect late fees?

6   A.   Well, some of the statements would actually

7        say late fee on there.

8   Q.   So you didn't have any kind of understanding

9        that tenants would be charged a late fee if

10       they were late on rent?  That was not -- it

11       was not part of your understanding of your

12       agreement with tenants?

13  A.   No.  I didn't have an agreement with the

14       tenants, so --

15  Q.   Well, for the non -- I understand what you

16       said previously about the -- the tenants that

17       you got through the Housing Authority.  But

18       if it was not a Section 8 tenant, it was a

19       person that, you know, was not being assisted

20       in any way by the Housing Authority, wouldn't

21       you have to have a relationship of some sort

22       with those tenants?

23  A.   I never had a relationship with them.  I

                        88

1        mean, that's -- it was all Guest Properties

2        talking to the individuals, getting them in

3        the houses.  I was a passive investor, I

4        mean.  And obviously lost all my houses and

5        all my credit because of this.

6   Q.   Okay.  Did Mr. Gumbaytay ever give you money

7        for -- from tenants' fines or late fees?

8   A.   If so, it would show up on the report.  I

9        don't know.  Look at the reports.

10  Q.   Okay.  Let's look at Plaintiff's Exhibit #1

                     Page 68

3927 07-14-08 Bahr Matthew.txt

11    real quick.  Here you go.  I have a copy of
12    it somewhere.  So I'm looking through to see
13    for late fees.
14  A.  This one says late fee, $30.
15  Q.  And what page are you looking at?
16  A.  Number 2.
17  Q.  Number 2.  And so since it says -- and --
18  A.  Looks like this -- this one says late fee,
19    $50.
20  Q.  Is that page 3?
21  A.  Page 4.
22  Q.  Page 4.  Okay.  So if it -- if it reflects
23    late -- if it says late fees on the notes

                          89

1    here underneath the executive summary, then
2    you were being -- being given some money for
3    late fees?
4  A.  Right.
5  Q.  Did you ever ask any questions about the late
6    fees?
7  A.  No.
8  Q.  Just if he told you he was giving you money
9    for late fees, you just took the money, no
10    questions asked?
11  A.  He wouldn't really tell me.  It would just
12    show up on the report.  So I don't know how
13    he did that.
14  Q.  Okay.  So there was no policy as to how much
15    to charge for a late fee or when to collect
16    it or anything like that?
17  A.  I mean, not that I'm aware of.

                    Page 69

3927 07-14-08 Bahr Matthew.txt

18  Q.  No policy of yours?

19  A.  No.

20  Q.  Okay.  How were deposits handled?

21  A.  Sometimes there was a deposit.  Most of the

22      time there wasn't.

23  Q.  I mean, would the deposits be placed in your

                              90

1       bank account or Gumbaytay's?

2   A.  No.  He gave me most of the deposits.  I

3       think on that one page, it shows that.

4   Q.  We're looking at Plaintiff's Exhibit #1

5       again?

6   A.  Yeah.  Back to #1.  That's Boswell's, paid

7       security deposit of 310.  I think that's when

8       she was moving in, so he took $17 off for

9       carpet.

10  Q.  So --

11  A.  And --

12  Q.  So what you're saying is that Ms. Boswell

13      paid the $310 to Mr. Gumbaytay, and then that

14      was part of the lump sum that he would send

15      you a check of at the end of the month?

16  A.  That's what I was kind of looking at here, to

17      see if he even sent that to me.

18  Q.  Okay.

19  A.  Well, doing -- the only thing it shows here

20      is the four circles the tenant paid 1,006.

21      So it doesn't see anything down here that

22      shows he paid anything additional.  So it

23      looks like he kept the deposit.

                          Page 70

3927 07-14-08 Bahr Matthew.txt

91

1  Q.  Was that a policy that you had, that the

2      manager of the property could keep the

3      deposit?

4  A.  No.

5  Q.  So if you had -- if you had caught this

6      mistake when you got the executive summary,

7      you would have notified him about it and

8      asked for the $310?

9  A.  Most likely.  At least asked him about it.

10 Q.  But assuming that you -- if -- if you were to

11     have gotten the money from the security --

12     you normally got the money from the security

13     deposit?

14 A.  No.  I normally did not.  There was normally

15     no security deposit.

16 Q.  For --

17 A.  It was to my understanding from -- and this

18     has been a long, long time.  This is back

19     when I first got involved.  But since Guest

20     was doing the remodeling, that if there was a

21     deposit, he would just keep it.  It was part

22     of a privilege to be part of his company.  We

23     don't get the deposit.

92

1  Q.  So were you -- so there was -- was there, to

2      your recollection, any -- any tenant that you

3      ever received a deposit from?

4  A.  To the best of my memory, no, but I don't

5      know that for sure.

6  Q.  Okay.

Page 71

3927 07-14-08 Bahr Matthew.txt

7  A.  I only know about what's -- it would be on

8     one of the reports if that happened.

9  Q.  Okay.  But if he -- if you were to have

10     received money from a tenant, it would have

11     been in that one lump sum check that

12     Mr. Gumbaytay sent you at the end of the

13     month?

14  A.  I'm pretty sure that would have been the

15     case.

16  Q.  You wouldn't have gotten a deposit put

17     directly into your bank account from a

18     tenant?

19  A.  Not that I remember.  I mean, there might

20     have been one case with Eric Cruz that he got

21     someone in and it wasn't a Section 8 tenant.

22     And I think he collected a deposit and sent

23     the deposit.

93

1  Q.  That was something Eric Cruz sent to you; the

2     tenants didn't send it.

3  A.  Right.  Eric Cruz didn't really -- he didn't

4     have anything like this.  There was no nice

5     paperwork like this, organized.  He would

6     just send you something on scrap paper.

7  Q.  So in terms of, you know, determining whether

8     a tenant should get their deposit back at the

9     end of --

10  A.  It had nothing to do with me.  I'm sorry to

11     cut you off.  It had nothing to do with me.

12  Q.  You didn't make any determination about

13     whether a deposit should be returned?

Page 72

3927 07-14-08 Bahr Matthew.txt

14  A.  No.

15  Q.  So I guess you never discussed anything about

16      the handling of the deposit with

17      Mr. Gumbaytay.

18  A.  No.

19  Q.  If repairs needed to be done to any of your

20      units, how was that handled?

21  A.  Well, it depended on the size of the repair.

22      He would -- some of these reports probably

23      show that -- these are some of the earlier

94

1       ones.  This --

2   Q.  We're looking at Plaintiff's Exhibit #1.

3   A.  Okay.  The reason you don't really see any

4       repairs here, this is when Guest was up and

5       running, you know, strong; and he would

6       basically just do all the repairs.  He would

7       just -- I guess that's part of keeping the

8       deposit.  He would do all the repairs.  So

9       you don't see anything really taking anything

10      out for repairs.

11          Now, some of these I gave you today that

12      go into 2007, then you're going to see Guest

13      quitting doing that.  And that's when you see

14      at the bottom -- I don't see any on these,

15      but it actually was itemized what was coming

16      out for what repair.

17  Q.  Well, let's look at the --

18  A.  It's not on any of these.

19  Q.  Look at Plaintiff's Exhibit #1, the bottom of

20      the page, where it has the note section.  And

Page 73

3927 07-14-08 Bahr Matthew.txt

21   I'm reading the note that says, Note number

22   three, Yolanda Boswell, paid security deposit

23   minus cost of cleaning carpets.

<div align="center">95</div>

1  A.  Yes.

2  Q.  So did that mean that -- that the cost of

3      cleaning carpets was deducted from the

4      security deposit?

5  A.  I guess.  That's what it looks like.

6  Q.  And so did you receive less money as a result

7      of her having cleaned the carpets?

8  A.  I'm still trying to look at this.  I don't

9      see that I received a deposit on this.

10  Q.  Okay.  Where would it be shown if you --

11  A.  Wait a minute.  Let's see.  1,006.  Okay.

12      Here it does show that he sent the deposit,

13      the remainder of the deposit.

14  Q.  Is that the net security deposit, 232?

15  A.  Yes.

16  Q.  And so that's added with the -- the -- okay.

17  A.  430.

18  Q.  Okay.  So this is October 2006 when -- when

19      Mr. Gumbaytay was still working for Guest

20      Properties.  Is that your --

21  A.  I believe so.

22  Q.  So there were times when the amount was

23      deducted for repairs that were being made.

<div align="center">96</div>

1      And for example, you got less money because

2      she cleaned the carpet.

3  A.  Yes.

<div align="right">Page 74</div>

3927 07-14-08 Bahr Matthew.txt

4   Q.   Okay.  Would he ever contact you when repairs

5        needed to be made to the property?

6   A.   Yes.  He would contact me some of the time or

7        sometimes just take it out.

8   Q.   Okay.  Do you know when he would contact

9        you?  Is that -- I mean, why he would contact

10       you for some repair issues and not for

11       others?

12  A.   If it was something minor, he would

13       probably in a lot of cases take care of it,

14       then take it out of here.  I mean, you don't

15       see that here, because this is when Guest was

16       taking care of the repairs.  But when Guest

17       started not making money, I mean, as an

18       investor, we started getting charged for the

19       repairs.  And if it was a minor repair,

20       Jamarlo would just do it and invoice us on

21       this.  If it was major, that's when he might

22       contact me.

23  Q.   Okay.  Did you guys ever discuss when he was

                           97

1        to contact you for repairs?  I mean, did you

2        guys ever spell out what a major repair was?

3   A.   No, not really.  I mean --

4   Q.   Did you ever hear directly from tenants about

5        the need for repairs?

6   A.   No, I did not.  To the best of my knowledge,

7        they would contact him or the Housing

8        Authority.

9   Q.   Okay.  What would -- what would you consider

10       to be a major repair?

                           Page 75

3927 07-14-08 Bahr Matthew.txt

11  A.  You mean a dollar amount?

12  Q.  Sure.

13  A.  If it's -- I mean, if it's something like --

14      just throw the number out -- $400, I would

15      say that's, you know, a fairly major repair.

16  Q.  Okay.  I'm going to show you what I have

17      marked as Plaintiff's Exhibit #4.  Do you

18      recognize this letter?

19  A.  I don't -- I don't recognize it, no.

20  Q.  Okay.  Plaintiff's Exhibit #4.  And it says

21      that, you know, it's a letter from

22      Mr. Gumbaytay to, All tenant new and old.  I

23      want you to look at page 1, the paragraph

                        98

1       that starts, On behalf of all your

2       landlords.  Can you -- can you read that --

3       this sentence, the first two sentences for

4       me?

5   A.  On behalf of all your landlords, I pledge to

6       address all service calls within 48 hours of

7       received.  Depending on the nature of the

8       call, I pledge to have all work completed

9       within five business days.

10  Q.  So did you ever see this letter?

11  A.  I don't recognize it.

12  Q.  Did you ever -- so you never approved it?

13  A.  No.

14  Q.  Okay.  Was this your -- was this your

15      understanding of Mr. Gumbaytay's obligation

16      as -- as the manager of your properties, that

17      you needed to address service calls within 48

3927 07-14-08 Bahr Matthew.txt

18     hours of receipt?

19  A.  That was, no, never my understanding.

20  Q.  Okay.  Let's flip to page 2 of Exhibit #4 and

21     look at the second full paragraph that starts

22     last but not least.  Can you read the first

23     sentence?

                    99

1  A.  Last but not least, I pledge to notify your

2     landlord within 72 hours of a service call if

3     work has not been completed as discussed.

4  Q.  So did Mr. Gumbaytay ever notify you within

5     72 hours of a service call as provided?

6  A.  I -- I can't recall him doing that, no.

7  Q.  So he would only call you about a repair

8     issue if it was a major repair as opposed to

9     if it had not been completed within a certain

10     amount of time?

11  A.  More or less.  I mean, if it's small dollar

12     amount, he would just do it, not even call

13     me.  If it was something major, he would

14     call, you know, basically to make me more

15     aware so it's not surprise.  That's in most

16     cases, not in all cases.

17  Q.  Did you ever authorize Mr. Gumbaytay to

18     charge for repairs?

19  A.  To?

20  Q.  To charge tenants for repairs.

21  A.  Never to charge a tenant for a repair.  He --

22     again, this is kind of late.  This is after

23     Guest kind of moved out.  He would have

3927 07-14-08 Bahr Matthew.txt
100

1    someone come in and possibly make an

2    agreement.  A couple of times this happened

3    where he would say, look, there's no deposit

4    because a couple of the tenants have agreed

5    to do the clean-up themselves.  So I was not

6    the one charging them; but I guess he was

7    waiving the charge, if that makes any sense,

8    waiving the deposit if -- in a couple of

9    cases, you know, a couple of tenants might

10   have known a handyman, that -- you know,

11   rather than me myself going in and doing a

12   clean-up.

13   Q.  Do you remember what tenants had that

14       agreement?

15   A.  I don't remember.

16   Q.  Okay.  But he told you about those agreements

17       before, before he started them?

18   A.  Yes.

19   Q.  So did you -- did you approve of that?

20   A.  If it kept from, you know, being vacant, most

21       of the time I think I approved it.  I mean,

22       it's -- it was the tenants volunteering that

23       as opposed to paying the deposit.

101

1    Q.  But he would contact -- yeah.  Okay.  Let's

2        look at what I have marked as Plaintiff's

3        Exhibit #5.  Do you recognize this letter?

4        And take a second to look it over.

5    A.  Okay.  I don't really recognize it; but, you

6        know, I had so much paperwork.

Page 78

3927 07-14-08 Bahr Matthew.txt
7  Q.  Okay.  Well, let's look at the paragraph that

8      starts, Also, prior to make -- I'm just going

9      to read it.  And you tell me if I state

10     something incorrectly and I'll -- we'll

11     rephrase it.

12         It says, Also, prior to making a

13     maintenance call to us, please see if you or

14     someone you know can handle the problem first

15     at little or no cost to you.  Here lately, we

16     have been called out for an air conditioning

17     problem when all that was needed was a fuse.

18     Always check your breaker box and/or other

19     electrical resources prior to calling us.  In

20     the future, you will be billed if we have to

21     take time out of our business schedule to

22     visit with you on very minor things that you

23     could have handled yourself.

                    102
1          Is that what -- is that what Plaintiff's

2      Exhibit #5 says?

3  A.  Yes, that's what it says.

4  Q.  Okay.  So were you aware of this letter?

5  A.  I wasn't aware of the letter nor aware of

6      that paragraph.

7  Q.  Okay.  If you look at page 2 of Exhibit #5,

8      at the bottom, you are listed as one of the

9      people that was cc'd.  Do you know if you

10     ever received a copy of it?

11 A.  I don't recognize it.

12 Q.  So earlier you testified that you weren't in

13     charge of deposits; is that correct?

                                    Page 79

3927 07-14-08 Bahr Matthew.txt

14  A.  I wasn't in charge of the deposits, no.

15  Q.  And that you didn't determine how much was to

16      be charged for a security deposit.

17  A.  No.

18  Q.  Okay.  But you -- but you -- you were

19      contacted if they -- if Mr. Gumbaytay wanted

20      to waive the security deposit; is that

21      correct?

22  A.  That would usually be the case where he would

23      let me know I'm not going -- I can't get a

                          103

1       Section 8 tenant.  Your house is vacant.  You

2       know, it's going to be get vandalized

3       possibly.  Do you want me to let this person

4       move in?

5           At the time, we didn't have any money to

6       maintenance the houses, wasn't making any

7       money; so we were having to leave them

8       vacant.  So a couple of times he would call

9       me and say, I found this potential tenant for

10      you.  I know you don't have any money for the

11      repairs.  So, you know, is it okay if I just

12      waive the deposit?  They've agreed to do the

13      repair themselves.

14          That's more or less how our conversation

15      would go.

16  Q.  So if it was a non-Section 8 tenant, then you

17      would set the amount for the security

18      deposit?

19  A.  I wouldn't set it.  That was something he

20      came up with.

                        Page 80

3927 07-14-08 Bahr Matthew.txt

21  Q.  So he came up with the amount for the

22      deposit, but he would still have to ask your

23      approval before he waived it.

                        104

1   A.  Before he waived it, but he wouldn't tell me

2       the amount of the deposit.  He would just say

3       I'm waiving the deposit.  I wouldn't know how

4       much was being waived.

5   Q.  But you would approve -- you would approve or

6       disapprove of that decision?

7   A.  I think I made that decision a couple of

8       times.  It wasn't -- again, that was at the

9       end when we didn't have any money to repair

10      the houses.

11  Q.  Okay.  Did anybody from the Housing Authority

12      ever call you about charging rent for

13      repairs?

14  A.  Charging rent for repairs?

15  Q.  I'm so sorry.  Charging money for repairs?

16  A.  Housing Authority.  No.  They would send out

17      the -- the maintenance saying this is what

18      needs to be done, but not charging people for

19      repairs.  It was my -- said you're the owner;

20      it's your responsibility.

21  Q.  So they never called you about Gumbaytay

22      charging a tenant for repairs that needed to

23      be made?

                        105

1   A.  No.

2   Q.  Okay.  So let's say that Gumbaytay contacted

3       you about a repair that needed to be done,

                     Page 81

3927 07-14-08 Bahr Matthew.txt

```
 4    what you would consider to be a major
 5    repair.  What would be the process at that
 6    point?
 7  A. No official process.  If it's four or
 8    whatever, even more than four, call up here,
 9    get a couple of estimates.  Other cases, he
10    would get the estimates for me, possibly
11    recommend someone; and then I would be the
12    one charged for it out of my summary report
13    if I approved it.
14  Q. So you would let him know whether the repair
15    could be made or not?
16  A. Or whether or not I'm satisfied with his
17    estimate or should I just get some myself.
18  Q. Okay.  What if the repair was for $100?
19    Would he contact you for that, or was it only
20    over?
21  A. There was no set amount; but typically, he
22    would not contact me if it was something like
23    that.  I'm not saying he never did, but a lot
```

106

```
 1    of times he wouldn't.
 2  Q. Okay.  Who decided if a tenant should be
 3    evicted?
 4  A. Pretty much I would -- if it's showing up not
 5    getting paid for two or three months, I'm
 6    going to call him and say, hey, what's going
 7    on with this?  You know, are they -- can --
 8    it's a promissory note.  Can you contact them
 9    and see if -- what the problem is, did they
10    lose their job, or should we work with them,
```

3927 07-14-08 Bahr Matthew.txt

11      or are they just going to say they're not

12      going to pay anymore?  And if it's a case

13      where they're just not going to pay anymore,

14      then we would do the eviction process.

15  Q.  So -- so sometimes you decided that the

16      eviction process needed to be started?

17  A.  And sometimes he did -- would just do it.  I

18      mean, I never really decided.  It was more or

19      less a discussion that I got the information,

20      is this tenant going to start paying or are

21      they not.  I'm not up there in Montgomery

22      to -- I'm not going to call them.  I've never

23      called them.

                            107

1   Q.  So if you noticed in the -- so you're saying

2       if you noticed in the executive summary that

3       they hadn't paid in a while, you would call

4       Mr. Gumbaytay to see if you needed to start

5       the eviction proceedings?

6   A.  To see the individual circumstance, kind of

7       like I just stated, you know, is this person

8       just saying they're not going to pay ever,

9       are they dodging you, or are they saying they

10      will sign a promissory note or start paying

11      next week or something like that.

12  Q.  So to get his advice on what the situation

13      was?

14  A.  Right.  So it was never -- there was no

15      general consensus on it.

16  Q.  And if he said that the person was dodging

17      him and, you know, that he didn't think was

                    Page 83

3927 07-14-08 Bahr Matthew.txt

18    going to pay, then at that point, would you

19    tell him to start the eviction proceedings?

20 A.  I don't know.  We would come to the

21    conclusion that's what should happen.

22 Q.  Yeah.  I think --

23        MS. NEAL:  Can we take just a

                          108

1    quick five-minute break.

2        MR. SCHOETTKER:  Sure.

3        (Brief recess)

4 Q.  I believe we were talking about eviction

5    proceedings.  So did Mr. Gumbaytay need your

6    permission to evict somebody?

7 A.  Not always.

8 Q.  What do you mean by not always?  Like when

9    would he need your permission?

10 A.  From whatever reason, he would just do it on

11    his own sometimes and sometimes not.  I mean,

12    this was supposed to be a whole, you know, A

13    to Z, you know, system up here with Guest

14    Properties.  So I don't know.  I just thought

15    it was in my best interest, whatever action

16    he was taking.

17 Q.  What about after you were no longer working

18    with Guest Properties and it was just

19    Gumbaytay managing your properties?  Would he

20    ever evict somebody without notifying you

21    first then?

22 A.  That was like the tail end of it.  So that

23    was around January or February of 2007.  And

                          Page 84

3927 07-14-08 Bahr Matthew.txt
109

1    at that point, at least half the properties,

2    I believe, had no one in them; so -- and I

3    mean, and a couple months later, I couldn't

4    make the payments.  So really -- I don't

5    think there really was any evictions

6    because -- I don't know exactly.  That's hard

7    to remember without looking at all -- I guess

8    the reports from then, the time where we

9    couldn't afford the payments anymore.

10   Q.  So you're saying that between the time that

11       Mr. Gumbaytay began renting your properties

12       in January and the time that your properties

13       were all foreclosed upon, he didn't start any

14       eviction action against anyone?

15   A.  I can't remember without looking at the

16       reports.  It would probably have it on it.

17   Q.  Let's see how far this executive summary is.

18       When you noticed that someone was being

19       evicted, would you contact him and ask why

20       that person was being evicted?

21   A.  Not always.

22   Q.  You would sometimes contact him?

23   A.  That's hard to answer that.  I mean, he

                        110

1    would -- sometimes had already brought it up

2    in a prior discussion; I mean, I have to

3    start an eviction or do an eviction because,

4    as you can see on the report, the person is

5    not paying their rent.

6    Q.  Did you ever instruct him to wait a few

                                        Page 85

3927 07-14-08 Bahr Matthew.txt

```
 7    months before he started an eviction
 8    proceeding?
 9  A.  If he could contact them and they were
10      willing to work something out, I would say,
11      you know, if they sign a promissory note, you
12      know, and have a job that they're starting or
13      something, just haven't got their paycheck
14      yet.
15  Q.  So you would ask him to hold off on eviction
16      proceedings sometimes?
17  A.  If the person -- well, if he felt the person,
18      in his opinion, was going to be able to pay
19      some rent.
20  Q.  Could you have asked him to stop eviction
21      proceedings?
22  A.  To stop?
23  Q.  Yeah.  Could you have asked him to stop
```

111

```
 1    eviction proceedings?
 2  A.  Oh, I had no contact with the tenants, so I
 3      don't see why I would have.
 4  Q.  Well, I -- regardless of whether you would
 5      have or not, did you have the power to stop
 6      him from evicting somebody if you wanted to,
 7      or did you have the -- or did you have the
 8      power to start eviction proceedings against a
 9      tenant?
10  A.  Oh.  I guess by power, I mean, I could tell
11      him I think that's what we need to do; but I
12      don't know about the power to stop.  I mean,
13      he would just do it on his own.  I don't know
```

Page 86

3927 07-14-08 Bahr Matthew.txt

14    that I have the power to stop someone that's

15    just making that decision.

16  Q.  Did you have the authority to instruct him to

17    engage in eviction proceedings?

18  A.  Yeah, I guess so.  I mean, if you own the

19    property.

20  Q.  So you probably could tell them to stop

21    eviction proceedings if you had the -- if you

22    owned the property.

23  A.  I would think.  I don't know actually how the

112

1    court system works, when you start one, if

2    you're able to stop.  If that is the case, I

3    guess I could, I mean --

4  Q.  Okay.  Did he have to -- did he have to

5    listen to you if you told him to stop the

6    eviction proceedings or to start the eviction

7    proceedings against somebody?

8  A.  I mean, I don't guess he had to, but --

9  Q.  Well, if he wanted it continue to manage your

10    properties, he did.

11  A.  Right.  Right.

12  Q.  So right around the time Ms. Boswell moved

13    into 964 North Gap Loop, did you ever discuss

14    her with Mr. Gumbaytay?

15  A.  No.

16  Q.  Did he ever discuss her -- discuss her with

17    you?

18  A.  Other than -- I mean, he may have said I've

19    got a new tenant for this property.  That was

20    it.  And her name pops up on the report.

Page 87

3927 07-14-08 Bahr Matthew.txt

21  Q.  So do you remember any conversations that you

22      had?

23  A.  No.

                        113

1   Q.  Did he ever tell you how much rent

2       Ms. Boswell said she could afford?

3   A.  Not specifically, no.

4   Q.  When you say not specifically, what do you

5       mean?

6   A.  With me, it came up that, I have a tenant

7       that can move in here, she can pay $550.  And

8       I most likely said, well, that's fine.

9   Q.  Did he contact you to get approval for the

10      lease for North Gap Loop?

11  A.  Not that I remember.

12  Q.  Okay.  Did he -- did he ask you for approval

13      to sign the lease at North Gap Loop?

14  A.  No.

15  Q.  How much rent did you want to receive for 964

16      North Gap Loop?

17  A.  As you can see, 550 is fine.  I've got that

18      on several units.  550 was the least amount

19      that I would accept.  I don't recall

20      accepting less than that, unless I'm

21      mistaken.

22  Q.  Well, what did -- I mean --

23  A.  That's just the determination.  After -- you

                        114

1       know, you have a $350 mortgage payment.  He's

2       going to get 10 percent.  You know, what's

3       going to be left on that.  You can't get down

                    Page 88

3927 07-14-08 Bahr Matthew.txt

4    to too low a rent because you're not going to

5    make any money, let alone if they don't pay

6    it.

7  Q.  So at some point, you determined that you

8      would accept $550 --

9  A.  I believe so.

10 Q.  -- at least for 964?

11 A.  Right.

12 Q.  Did you ever -- did you ever lower the amount

13     that you were --

14 A.  No.

15 Q.  -- receiving?

16 A.  No.

17 Q.  For no -- you didn't for any properties?

18 A.  Lower it myself.  Most of them are Section 8,

19     so I can't remember other than that.

20 Q.  Okay.  Did you ever raise the amount of money

21     that you were looking for at a place?

22 A.  Raise the amount?  No.  It was pretty much

23     already determined.

                        115

1      Can we have a time out for a second?

2          MR. SCHOETTKER:  Yeah.

3          (Brief recess)

4  Q.  So we were talking about the rent for the

5      North Gap Loop house, I believe.  So if

6      it's -- if it's non-Section 8 property like

7      the 964 North Gap Loop was, because

8      Ms. Boswell was a non-Section 8 tenant, why

9      didn't you charge, you know, $600 or $650 if

10     you had the option to do so?

                                    Page 89

3927 07-14-08 Bahr Matthew.txt

11  A.  Well, I've always told Jamarlo try to get --
12      I don't want anything under 550.  And it's
13      not easy to get someone in some of these
14      properties, because they can't afford it.  I
15      don't know if he was making this job easy by
16      making it 550, but I just left it in his
17      hands.
18  Q.  Why did you leave it up to him if you thought
19      you could get more money for a property?
20  A.  I'm not up here.  So he was up here doing
21      that.  So I'm not.
22  Q.  So you left --
23  A.  And also another question or answer to that

                    116

1       is if you can get 550 rather than waiting
2       another month or two to find someone that
3       pays 650 and it's vacant for a couple of
4       months, that defeats the whole purpose.  So
5       if someone could pay 550, go ahead and let
6       them move in, is what I would tell him.
7               MR. LAY:  So is it fair to say,
8           then, that --
9               THE WITNESS:  That's why there's
10          a lot of 550s.
11              MR. LAY:  -- that you kind of
12          let him run things for you because
13          you weren't here?
14              THE WITNESS:  Yeah, you could
15          say that.
16  Q.  But you told him that it couldn't be less
17      than 550?

                            Page 90

3927 07-14-08 Bahr Matthew.txt

18  A.  Right.  I told him that 550 was the minimum.

19  Q.  That you would accept?

20  A.  Exactly.

21  Q.  Okay.  Let's look at what I have marked as

22      Plaintiff's Exhibit #6.  And I believe that

23      you might have -- you might have seen this

                          117

1       before since you -- could you describe the

2       exhibit?

3   A.  It looks -- this looks like a lease agreement

4       for 964 North Gap Loop.

5   Q.  Okay.  Have you ever -- have you ever seen

6       this lease before?

7   A.  Today was when I saw it.

8   Q.  Okay.

9               THE WITNESS:  This is the one

10          you showed me.

11  A.  I've seen it before.

12  Q.  So this lease was not sent to you at the time

13      it was executed or shortly thereafter?

14  A.  To the best of my knowledge, no.  I don't

15      recognize it.

16  Q.  Okay.  Can you read under number five, where

17      it says rent payments, what amount is -- is

18      in there?

19  A.  Tenant agrees to remit on to landlord during

20      the term of this lease in equal monthly

21      installments, 550.  It's got a line through

22      it and then handwritten 450.  And again the

23      LHN initials are there.

                     Page 91

3927 07-14-08 Bahr Matthew.txt
118

1   Q.   Okay.  Let's look at what is marked as

2        Plaintiff's Exhibit #7?

3             MR. LAY:  Before we leave #6,

4        can I ask?

5             MS. NEAL:  Oh, sure.  Yes.

6                  I'm sorry.  We're going to

7        turn our attention back to Exhibit #6

8        for a minute.

9             MR. LAY:  At the top of Exhibit

10       #6, do you see where your name

11       appears?

12            THE WITNESS:  Yes.

13            MR. LAY:  And that you are the

14       lessor, or the landlord, and the

15       lessee, Yolanda Boswell?

16            THE WITNESS:  Yes, I see that.

17            MR. LAY:  And did you know

18       anything about this lease?

19            THE WITNESS:  No.

20            MR. LAY:  Did he have the

21       authority to execute leases for you?

22            THE WITNESS:  As long as I

23       approved the 550.  I mean, I'm

119

1        looking at this -- I first saw this

2        today.  And I would never agree to

3        the drop of any rent to $450.

4             MR. LAY:  So other than the

5        amount, he had the authority to act

6        on your behalf and enter these leases

Page 92

3927 07-14-08 Bahr Matthew.txt

```
7        in your name?
8            THE WITNESS:  Again, I've never
9        seen these.
10           MR. LAY:  That's not what I'm
11       asking you.  Other than you mentioned
12       the rent amount, did he have the
13       authority to enter these leases in
14       your name in order to effectuate your
15       business?
16           THE WITNESS:  I never really
17       gave him the okay to do that.  And
18       that's why I was baffled today that
19       he signed his signatures over my
20       name.
21           MR. LAY:  Okay.  And you do see
22       on the last page where it says
23       landlord by agent, Jamarlo
```

                            120

```
1        Gumbaytay?
2            THE WITNESS:  Yes.
3            MR. LAY:  Okay.
4    Q.  (Ms. Neal continuing:)  Okay.  Let's turn to
5        what's marked as Plaintiff's Exhibit #7.
6        And, again, I think this looks like a lease
7        for 964 North Gap Loop, correct?
8    A.  Yes.
9    Q.  And you are listed at the top as the lessor,
10       Matthew W. Bahr?
11   A.  Yes.
12   Q.  If you look at the bottom of the first page,
13       number five, rent payments, what amount is
```

                        Page 93

3927 07-14-08 Bahr Matthew.txt

14      written in for equal monthly installments?

15  A.  Both.  You can see it looks like it says

16      550.  The five is handwritten.  And that's

17      probably his initials.

18  Q.  Okay.  By him, you mean Mr. Gumbaytay?

19  A.  Yes.

20  Q.  And if you look on the last page -- second to

21      last page, you again notice it says Jamarlo

22      Gumbaytay, agent, correct?

23  A.  Yes, that's what it says.

121

1   Q.  Okay.  Have you seen this lease before?

2   A.  No.

3   Q.  Were there any problems with the unit at 964

4       North Gap Loop when Ms. Boswell moved in?

5   A.  To the best of my knowledge, no.

6   Q.  Okay.  Were there any problems with the unit

7       communicated to you at any point while

8       Ms. Boswell was living there?

9   A.  I don't know.  I mean, I don't know that for

10      sure just because of the time period.

11  Q.  Okay.  We know that she had a problem with

12      her -- with her front bedroom, there being a

13      malfunctioning toilet leaking.  Do you ever

14      remember him calling -- Mr. Gumbaytay calling

15      you or anybody else calling you and notifying

16      you that a repair needed to be made?

17  A.  No, I do not.

18  Q.  Okay.  Let's look at what I have marked as

19      Plaintiff's Exhibit #8.  And this is a copy

20      of a letter that was sent around February 12

Page 94

3927 07-14-08 Bahr Matthew.txt

21    from Connie Baker from Legal Services of

22    Alabama to you and Mr. Gumbaytay.  Do you

23    recall receiving this letter?

122

1  A.  I don't remember seeing this, no.

2  Q.  Okay.  But it is -- it is -- your name is

3      listed at the top as one of the recipients,

4      correct?

5  A.  Yes.

6  Q.  And the letter is addressed to you and

7      Mr. Gumbaytay, correct?

8  A.  Yes.

9  Q.  Is that your correct mailing address?

10  A.  Yes, it is.

11  Q.  Okay.  And if you read along -- read along

12      with me the last few sentences of the

13      paragraph and, you know, let me know if I

14      read something incorrectly; but it says,

15      Promptly cease the above-referenced offensive

16      behavior and repair Ms. Boswell's toilet at

17      once.  The malfunctioning toilet complaint is

18      over a month delinquent.  Your prompt

19      attention to this matter is appreciated.

20          So you don't recall receiving this

21      letter?

22  A.  I don't recall receiving this.  And even

23      based on what we said earlier, if it's a

123

1      malfunctioning toilet, that would be

2      something that I would guess would be within

3      a minor repair that he would typically have

Page 95

3927 07-14-08 Bahr Matthew.txt

 4       fixed.

 5   Q.  Well, you got this -- if you got this notice,

 6       then it's clear that he wasn't fixing the

 7       problem.

 8   A.  That's apparently what it says, but I have

 9       not seen this notice before.

10   Q.  If you had seen it, what would you have done?

11   A.  Call him and tell him to get the repair done.

12   Q.  Okay.  Did you -- so you never -- but to your

13       recollection, you never spoke to

14       Mr. Gumbaytay about the -- the malfunctioning

15       toilet?

16   A.  Yeah.  I don't remember him telling me about

17       it.

18   Q.  But you would have -- if you had heard about

19       it, you would have instructed him to fix the

20       problem?

21   A.  Yes.

22   Q.  Okay.  When was the first time you were made

23       aware of the sexual harassment allegations

                          124

 1       against Mr. Gumbaytay?

 2   A.  I cannot remember what day it was.  I mean,

 3       it's been a long time.  But something in the

 4       mail came.

 5   Q.  Did you know anything about it prior to the

 6       filing of the lawsuit?

 7   A.  No.

 8   Q.  Okay.  What did you do once you learned of

 9       the lawsuit?

10   A.  I think called him and asked him what was

                          Page 96

3927 07-14-08 Bahr Matthew.txt

11    going on, you know, because he -- I mean,

12    between myself, my daughter, and -- or my

13    wife's daughter and herself, we had at the

14    time 32 properties.  And, you know, it had

15    been a couple of years.  I'd never -- I

16    didn't want to -- never heard of anyone

17    complaining, so I was just kind surprised.

18  Q.  What did you -- when approximately was this?

19    Do you remember?  Was it the same month that

20    the lawsuit was filed?

21  A.  I think it's when I -- when it was filed is

22    when I received the paperwork.  So I'm just

23    trying to remember, which I can't; but that's

125

1    most likely when I would have called him.

2  Q.  Okay.  But you said that you had never heard

3    of any complaint about sexual harassment

4    before this.  Isn't it true that the tenants

5    really couldn't complain to you?

6  A.  Well, that's -- I never heard anyone

7    complaining, right.

8  Q.  Right.  And they didn't have your address or

9    telephone number or any real way to complain

10    to you.

11  A.  No, not unless he gave it to them.

12  Q.  Okay.  So let's talk about your conversation

13    with Mr. Gumbaytay after the -- the lawsuit

14    was filed.  What did -- I mean, what -- what

15    did you say, what did he say in, as close to

16    actual phrasings and words that you can

17    remember?

3927 07-14-08 Bahr Matthew.txt

18  A.  I probably said something, you know, what's

19      going on with this?  I mean, you've managed

20      all my properties for a long time now and

21      there's never been a problem before.  So, you

22      know, what is this case that -- what's this

23      all about?  And I believe his response was

                        126

1       that the tenant didn't -- couldn't pay the

2       rent and was lying and was lying because she

3       couldn't pay the rent.

4   Q.  Okay.  Did you ever ask him any more

5       questions about the lawsuit?

6   A.  No, not that --

7   Q.  And so he was still managing your properties?

8   A.  Yeah.  He -- I think he said something about

9       a -- he was going to file a countersuit or

10      something like that.

11  Q.  Okay.

12  A.  That's all I can really remember of the

13      conversation.

14  Q.  Do you remember what the countersuit was

15      going to be claiming?

16  A.  I don't remember.  I believe just that that

17      was put in his company name, you know, a bad

18      name for his company for future business

19      because the tenant was making everything up.

20  Q.  Did you plan on joining him in the

21      countersuit?

22  A.  No.

23  Q.  Okay.  At that time, did you tell anything --

                        Page 98

3927_07-14-08 Bahr Matthew.txt
127

1    did you say anything to Mr. Gumbaytay about

2    what you considered to be proper and improper

3    behavior?

4    A.   I did not.  He just denied the whole thing.

5    Q.   So you didn't -- you didn't say anything

6    about, you know, your opinion about sexual

7    harassment or that he should not sexually

8    harass his clients?

9    A.   I didn't give him an opinion, no.

10    Q.   I'm going to show you what is marked as

11    Plaintiff's Exhibit #9.  Do you recognize

12    this document?

13    A.   I definitely recognize the layout of it, but

14    I can't say I recognize this exact document.

15    Q.   Okay.  Well, it purports to be an order --

16    Plaintiff's Exhibit #9, an order granting

17    injunctive relief.  And as you see on the

18    second page, it was issued by Judge Keith

19    Watkins.  And I believe that a copy of this

20    was mailed to you by the Court.  Do you

21    recall ever receiving a copy of the

22    injunction?

23    A.   It looks familiar, like I say.  I can't say I

128

1    remember seeing this exact document, but --

2    Q.   Let's see.  Do you see where it says on the

3    second paragraph of the first page, Based

4    upon clear and convincing evidence heard in

5    open court, the Court finds that a

6    preliminary injunction is due to be entered

Page 99

3927 07-14-08 Bahr Matthew.txt

7    against the defendants in favor of the

8    plaintiff as follows.  And it says number

9    one, Defendants are retrained and enjoined

10    from instituting eviction proceedings against

11    the defendant or from directly or indirectly

12    threatening eviction proceedings against the

13    plaintiff until further order of the Court.

14         Is that what it says?

15  A.  Yes.

16  Q.  And then it says on the next page, number

17    three, Defendants are restrained and enjoined

18    from interfering with plaintiff's possession

19    of the premises located at 964 North Gap

20    Loop, Montgomery, Alabama, until further

21    order of this Court.  Is that what it says as

22    well?

23  A.  Yes.


                    129

1  Q.  Okay.  And you'll note that at the top of the

2    first page, that you are listed as one of the

3    defendants in the lawsuit; is that correct?

4  A.  Yes, it is.

5  Q.  And after this preliminary injunction --

6    well, at the time the preliminary injunction

7    was issued, which you can see on the second

8    page was the 23rd day of January, 2007,

9    Mr. Gumbaytay still worked for you at this

10    time?

11  A.  Well, I never really considered that he

12    worked for me.

13  Q.  Well, he continued to manage your properties

                    Page 100

3927 07-14-08 Bahr Matthew.txt

14    at that point?

15  A.  Yes.

16  Q.  And after this was -- injunction was issued

17      and you were aware of this case, he still --

18      you still continued to employ him as a -- as

19      a manager of your properties?

20  A.  Yeah.  He still collected the rent.

21  Q.  Okay.  Do you know what the phrase on the

22      page where it says -- where defendants are

23      restrained and enjoined from instituting

130

1     eviction proceedings against the plaintiff,

2     do you -- do you know what that means?

3   A.  Yes.

4   Q.  Okay.  And you understand from reading in

5       that, there was at least some evidence as to

6       the validity of the sexual harassment charge?

7              MR. SCHOETTKER:  I'm going to

8           object to the form of that question.

9   Q.  Can you read the first sentence in the second

10      paragraph, where it says, Based upon clear

11      and convincing evidence heard in open court,

12      the Court finds that a preliminary injunction

13      is due to be entered against the defendants?

14      Do you understand what the phrase "clear and

15      convincing evidence" means?

16  A.  Reading that, think that he went to court and

17      there was evidence.

18  Q.  There was evidence against him?

19  A.  Right.  It says that the Court found that.

20  Q.  After this preliminary injunction was issued

Page 101

3927 07-14-08 Bahr Matthew.txt

21    and you were aware of this case, did you talk

22    to Mr. Gumbaytay about his role in managing

23    Ms. Boswell's property from that point on?

131

1  A.  You're talking about the date of this letter

2      or --

3  Q.  From the date that the order was issued in

4      February 2007.

5  A.  I don't remember talking to him about it, no.

6  Q.  Did you talk with him about the collection of

7      rent for Boswell's property?

8  A.  I'd have to look back at the reports.  I

9      mean, I don't know what happened in those

10     months.  I think --

11 Q.  At Plaintiff's Exhibit #1?

12 A.  Yeah.

13 Q.  Yeah.

14 A.  Like the month of February '07.

15 Q.  Yeah.  February 2007.  Let's go ahead and

16     look at Plaintiff's Exhibit #1.  I believe

17     February.

18         MR. LAY:  February.  It may have

19         been after, so let's start with

20         March.

21         MS. NEAL:  Okay.

22 A.  Yeah.  I don't see February.  I mean, it's

23     got to be in here.  Here it is, number 5.

132

1          MS. NEAL:  Should we start with

2          March.  Is that what with you're

3          saying, Ken?

Page 102

3927 07-14-08 Bahr Matthew.txt

4          MR. LAY:  Yeah.

5  Q.  Can we look at March instead?  Or we can look

6      at February.  Is there anything in there that

7      refreshes your recollection about a

8      conversation you might have had with

9      Mr. Gumbaytay regarding the collection of

10     rent for Ms. Boswell's property?

11  A.  On this report, no.

12  Q.  Let's look at March of 2007 in Plaintiff's

13     Exhibit #1.

14  A.  What was the question?

15  Q.  Does this refresh your recollection at all

16     about whether you had any type of

17     conversation with Mr. Gumbaytay with regards

18     to collecting rent from Ms. Boswell?

19  A.  I believe this is when this tenant was not

20     paying for a while.  We could flip back two

21     or three months, maybe.  I don't know.  And I

22     probably had -- don't know for sure, but I

23     probably had the same conversation with --

133

1     you know, was this tenant going to be able to

2     pay or is this someone that needs to be

3     evicted.  And I believe he said that -- I

4     don't know if there was a promissory note

5     or -- he gave me the impression that.  Let

6     her just stay in the property; and he said he

7     was so confident that she would be a tenant.

8       Because I think at this point, I was

9     like, look, this person paid the rent one

10    month and starting months two, three, four,

3927 07-14-08 Bahr Matthew.txt

11     five, was paying -- I think the second month

12     paid a couple hundred and then was paying

13     nothing.  And I would probably have a

14     conversation, like I would with anyone, you

15     know, why is this tenant living there for

16     free.  I'm sitting there paying the mortgage

17     every month.  And per his comment there, I

18     think what he told me was, you know, don't

19     want to evict her, I believe is what he said,

20     and he was confident that -- you know, that

21     she was going to be okay and that's why he

22     actually paid -- I believe paid the rent.

23          Because at that point I was like, look,

134

1      I'm not going to have someone live here for

2      free.

3   Q.  Well, let's look back at Plaintiff's Exhibit

4      #9, the preliminary injunction.  Again, where

5      it says, Defendants are restrained and

6      enjoined from interfering with plaintiff's

7      possession of the premises located at 964

8      North Gap Loop.  Is it your understanding --

9      what is your understanding of that sentence?

10  A.  That the -- the tenant cannot be evicted, I

11      guess.  And possibly per our conversation,

12      that's why he decided to -- I don't know why

13      he decided to pay the rent rather than evict

14      the tenant.

15  Q.  Okay.  Did you guys talk -- you guys did have

16      some sort of conversation after the

17      preliminary injunction was -- was issued,

Page 104

3927 07-14-08 Bahr Matthew.txt

18      right?

19  A.  Some sort of discussion?

20  Q.  Yes.

21  A.  I don't remember having a discussion.  From

22      day one, he just said that he's innocent.  I

23      mean, that -- that's -- there was no

                          135

1       extensive conversation or nothing like that.

2   Q.  So you didn't talk about -- you didn't

3       instruct him not -- not to instigate eviction

4       proceedings against her because of the

5       preliminary injunction?

6   A.  I believe I told him not to.  I believe so.

7       And that's why he said -- he knew I was

8       struggling to make payments and he just said

9       he would cover it.

10  Q.  So let's look at what I have marked as

11      Plaintiff's Exhibit #10.  And this is another

12      letter from Ms. Baker from Legal Services of

13      Alabama.  And as you can see, it's a -- it's

14      a letter to Mr. Gumbaytay asking that he make

15      a number of repairs to Ms. Boswell's

16      property, including leaking water pipes,

17      flooding in the front bathroom, damp carpet,

18      and a malfunctioning air conditioning unit.

19      Did you ever see a copy of this letter?

20  A.  I don't recall seeing this, no.

21  Q.  Did you ever hear about this letter?

22  A.  No.

23  Q.  Okay.  If you -- if you had have seen the

                      Page 105

3927 07-14-08 Bahr Matthew.txt
136

1    letter, would you have instructed

2    Mr. Gumbaytay to make those repairs?

3  A.  If I had seen the letter and these were

4    legitimate things that needed to be done,

5    yes.

6  Q.  But he was still working for you at that

7    point?

8  A.  The same answer, was still collecting rent,

9    yes.

10  Q.  Okay.

11  A.  So in this case, maybe --

12  Q.  Okay.  Let's look at what we have marked as

13    Plaintiff's Exhibit #11.  And this is a

14    notice that was delivered on June 12th,

15    2007.  Do you recognize the handwriting on

16    the -- on the proof of delivery as being

17    Mr. Gumbaytay's?

18  A.  I've never really -- I guess really looked at

19    that signature that close.

20  Q.  So you don't -- you don't know whether it's

21    his writing or not?

22  A.  No.  No.

23  Q.  Okay.  Well, let's look at -- but you do

137

1    know -- you do notice that on the first page,

2    it says, Notice delivered mail posted by

3    Jamarlo K. Gumbaytay, right?

4  A.  Yes.

5  Q.  Let's look at page 2.  It says that it's a

6    seven-day notice of termination from --

Page 106

3927 07-14-08 Bahr Matthew.txt

```
 7      seven -- excuse me -- seven-day notice of
 8      termination of residential lease.  And if you
 9      look at from -- the "from" section, it says
10      that it's from landlord Matthew Bahr; is that
11      correct?
12  A.  I don't recall seeing this document, but it
13      does have my name there, yeah.
14  Q.  It does say that you were one of the people
15      that it was from, correct?
16  A.  Oh, it wasn't sent from me.  I guess he sent
17      it with my name on it.
18  Q.  So did you instruct him to do this?
19  A.  No.
20  Q.  Were you aware that he did this?
21  A.  No.
22  Q.  If you look at the bottom of page 2 of the
23      exhibit, it is signed by Mr. Gumbaytay.  And
```

138

```
 1      it says it is signed as authorized agent; is
 2      that correct?
 3  A.  That is what it says.
 4  Q.  Okay.
 5  A.  If that's his signature.
 6  Q.  And was he still working for you at that
 7      point, June 12th, 2007?
 8  A.  That would have been -- I can't remember 100
 9      percent; but that was probably like the last
10      month, if that was even a month when he was
11      still collecting anything for me.
12  Q.  But he was probably still working for you at
13      that point?
```

Page 107

3927 07-14-08 Bahr Matthew.txt

14  A.  I can't -- I don't know.  It was like May or

15      June.  So I don't -- I don't know if June

16      12th he was, if that's when -- you know,

17      yeah, I don't know.

18  Q.  So besides the conversation that we already

19      talked about right after you learned of the

20      lawsuit, what other conversations have you

21      had with Mr. Gumbaytay since the litigation

22      started in February of 2007?

23  A.  February 2007?

                       139

1  Q.  Yeah.

2  A.  I would say between that March -- February

3      2007 and then like May when there was no

4      more -- when I don't think he was really

5      collecting anything anymore, just normal, I

6      guess, business as usual.  If a repair was

7      minor, he would do it.  If --

8  Q.  Did you ever talk about Ms. Gumbaytay or this

9      lawsuit in any of these conversations?  I'm

10     sorry.  Ms. Boswell.

11 A.  From that point, no, I don't recall talking

12     to him about it.

13 Q.  Not after that initial conversation?

14 A.  Right.

15 Q.  Was anyone else present for that

16     conversation?

17 A.  No.  That would have probably been on the

18     phone.  I mean a phone call.  I don't see

19     him.  I'm not up here.

20 Q.  Did you ever give Mr. Gumbaytay any

                              Page 108

3927 07-14-08 Bahr Matthew.txt

21    documents?

22  A.  What do you mean by documents?

23  Q.  After the -- after the filing of the lawsuit,

                          140

1        did you ever give him any documents about --

2   A.  No, not that I remember.

3   Q.  At some point, Mr. Gumbaytay was given a

4        cease and desist letter by Alabama Real

5        Estate Commission and he, as a result,

6        destroyed a number of documents.  Did he ever

7        ask you to send him any documents to be

8        destroyed?

9   A.  No, he did not.

10  Q.  Did he give you any documents?

11  A.  Just my normal -- my normal document.

12  Q.  Normal executive summary?

13  A.  Right.

14  Q.  Nothing -- nothing else, to your

15       recollection?

16  A.  No.

17  Q.  Did you at some point ask him whether the

18       allegations of sexual harassment were true?

19  A.  Just like the initial conversation when --

20       and his reply was the same, that it was not

21       true.

22  Q.  So Mr. Gumbaytay says -- excuse me.  So I

23       guess when Mr. Gumbaytay told you that --

                          141

1        that he didn't do anything wrong, he didn't

2        harass the woman, you believed him?

3   A.  Based on, you know, a three-year relationship

                     Page 109

3927 07-14-08 Bahr Matthew.txt

```
 4      with 32 different tenants, actually more than
 5      32 because people move in and out -- probably
 6      about 60 tenants -- yeah, I believed him.
 7   Q. Did you have the power to stop using
 8      Gumbaytay or Elite Real Estate Consulting
 9      Group for your properties if their work was
10      unsatisfactory?
11   A. You mean, get somebody else to do the same
12      thing, get a tenant and collect the rent?
13   Q. Yeah.  If you wanted to fire Mr. Gumbaytay,
14      could you have?
15   A. I couldn't really fire him; but that's --
16      Eric Cruz, I would say that decision was made
17      with Guest Properties.
18   Q. Well, after Guest properties was no longer
19      managing your unit, you could have fired
20      Mr. Gumbaytay and asked him not to manage
21      your properties anymore, correct?
22   A. Yeah.  I -- between February and May, yes.
23   Q. When did your -- when did your business
```

                                   142

```
 1      relationship with Gumbaytay cease?
 2   A. I -- I believe somewhere around the summer of
 3      '07.
 4   Q. And why was that again?
 5   A. The foreclosure process was, you know,
 6      going -- starting.
 7   Q. Okay.  Did you have the powers to fire Guest
 8      Properties if they were managing your
 9      properties in a way that wasn't satisfactory
10      to you?
```
                              Page 110

3927 07-14-08 Bahr Matthew.txt

11  A.  To fire Guest Properties?

12  Q.  To ask them to no longer manage your

13      properties for you?

14  A.  I guess I had the power to do that, but they

15      were always doing a good job when Guest was

16      doing all the repairs and taking care of

17      everything with the maintenance.

18  Q.  So why didn't you terminate your business

19      relationship with Mr. Gumbaytay after

20      learning about this lawsuit?

21  A.  I guess just based on the -- kind of the same

22      answer, the three-year relationship with 50,

23      60 tenants, and he said he was innocent.


                            143

 1  Q.  So other than the times we've already talked

 2      about, did you and Mr. Gumbaytay ever talk

 3      about Ms. Boswell or did he ever make any

 4      comments about her?

 5  A.  Other than that he was innocent and the

 6      allegation.  That was about it.

 7  Q.  I want to ask you one more question about a

 8      follow-up on Brittany Young.  How old is

 9      Ms. Young?

10  A.  I believe 23 on Thursday.

11  Q.  And did you ever -- did you ever give any

12      properties to any of your children,

13      biological or through marriage?

14  A.  Give any properties?  No.

15  Q.  Okay.  When you went through your emails to

16      produce documents for us in response to our

17      request, did you produce all the emails
                            Page 111

3927 07-14-08 Bahr Matthew.txt

18    between you and Mr. Gumbaytay or just emails

19    that you thought were related to this case?

20  A.  Everything that I had not deleted from two

21    years ago before this was even going on, I

22    brought up here, made copies of.

23  Q.  Anything between you and Mr. Gumbaytay?

144

1  A.  Yes.

2  Q.  Okay.  You mentioned before that you didn't

3    send -- you didn't give your contact

4    information out to tenants, correct?

5  A.  Right.  I never contacted a tenant.

6  Q.  Right.  So if your tenants had problems with

7    Mr. Gumbaytay or Guest Properties, who did

8    you expect for them to contact?

9  A.  Possibly the Housing Authority that most of

10    them were already going through to get the

11    name of the owner.

12  Q.  What if it was a non-Section 8 tenant?

13  A.  I would expect them to, you know, call

14    Jamarlo and get my address.

15  Q.  To your knowledge, that never happened?

16  A.  No.

17         MR. LAY:  Were you aware after

18        January 1, '07, that Alabama law

19        required you to disclose your

20        information to tenants?

21        THE WITNESS:  No, I wasn't.

22  Q.  So, related to the production, is it a

23    complete coincidence that the only two emails

Page 112

3927 07-14-08 Bahr Matthew.txt
145

1    you turned over were related to Ms. Boswell

2    and her property?

3  A.  What do you mean?

4  Q.  In the stack of documents that you turned

5    over to us today, there were only two

6    emails.  And one of them had to do with

7    property at 964 North Gap Loop, and the other

8    had to do with Ms. Boswell specifically.  And

9    there were no other emails at all.  And so

10    it's just a complete coincidence that those

11    were the only two emails that you received?

12  A.  Well, possibly because this investigation was

13    going on even though he said he was innocent,

14    those were ones I probably would have saved

15    just if I had to produce them, which I did.

16  Q.  So I know we've talked a lot about how you

17    left certain things for Mr. Gumbaytay to do

18    like figuring out the rates for rents and

19    perhaps -- as long as it wasn't less than

20    $550 and some of the repair issues if they

21    were minor.  However, you do understand that

22    you are the landlord and not Guest Properties

23    or Mr. Gumbaytay, right?

146

1  A.  Yes.

2  Q.  And as far as setting rent for non-Section 8

3    tenants, you realize that you could have

4    ordered Mr. Gumbaytay that the rent should be

5    a certain amount, right?

6  A.  You mean more than 550?

Page 113

3927 07-14-08 Bahr Matthew.txt

7   Q.   Yeah.  You realize that you could have set

8        the rent for over $550 for a non-Section 8

9        tenant if you wanted to?

10  A.   Sure.  You could set it for I guess whatever

11       you wanted to set it for; but if it's not

12       something affordable, it's going to take

13       longer to get someone in the property.

14  Q.   But you had the power to set it for 600 or

15       whatever you wanted to?

16  A.   Yeah.  You can set it for anything, a

17       thousand or --

18  Q.   So after Guest Properties was out of the

19       picture, you could have instructed Gumbaytay

20       how to handle deposits, right?

21  A.   I'd say yes.

22  Q.   And how much the deposit --

23  A.   I don't know that after they were out of the

147

1        picture, there was any new tenants, though.

2        So there wouldn't have been any new

3        deposits.  It never came up, I don't think.

4   Q.   But if a property had become vacant and you

5        could have -- you know, during the time Guest

6        Properties left, you could have asked him to

7        charge a certain amount for deposits?

8   A.   Sure, I could have asked him.

9   Q.   Okay.  And could you have told Mr. Gumbaytay

10       how much was authorized for repairs?

11  A.   Yes.

12  Q.   And could you have refused to authorize

13       Mr. Gumbaytay to make repairs?

Page 114

3927 07-14-08 Bahr Matthew.txt

14  A.  If I felt like it wasn't -- I mean, doing

15      this for a couple of years, I know kind of

16      what a repair costs.  If it's not reasonable,

17      I would go out on my own and call and get

18      estimates.

19  Q.  So yes?

20  A.  So, yes, I could.

21  Q.  Could you have refused to let Mr. Gumbaytay

22      waive the deposit?

23  A.  Waive the deposit?

                         148

1   Q.  You testified earlier --

2   A.  Yes, I could have, because of the repair, the

3       clean-up, yes.

4   Q.  And if you, you know, gave him instructions

5       on any of those things, then he would have to

6       follow your orders, correct?

7   A.  I would say so if he's -- wants to continue

8       to collect rent and manage property for me.

9   Q.  Right.  Okay.  We have --

10          MR. LAY:  Before we get to that,

11      I have a couple, quickly.

12          MS. NEAL:  Okay.

13          MR. LAY:  What is your

14      relationship to Eric Cruz?

15          THE WITNESS:  Just someone that

16      was introduced to me by -- through

17      Guest Properties.

18          MR. LAY:  Okay.  And what is

19      your relationship with Guest

20      Properties?

                         Page 115

3927 07-14-08 Bahr Matthew.txt

21          THE WITNESS:  That's the

22     investment company that I started

23     buying these properties with.


                    149

1          MR. LAY:  I mean, who is -- is

2      there somebody named Guest?

3          THE WITNESS:  Robert Guest.

4          MR. LAY:  Is that a friend of

5      yours or how do you know him?

6          THE WITNESS:  I knew him for

7      basically about three months,

8      something like that, before we got

9      married.  He's known my wife for

10     several years, so --

11         MR. LAY:  So this is an

12     acquaintance of your wife?

13         THE WITNESS:  Right.  And an

14     acquaintance of mine.

15         MR. LAY:  Then became your

16     business partner?

17         THE WITNESS:  Right.  He

18     approached me with a business

19     opportunity.

20         MR. LAY:  And that's your

21     connection to Montgomery was him

22     having already been in business up

23     here in Montgomery?


                    150

1          THE WITNESS:  Right.  He just

2      said he was looking for a passive

3      investor that has good credit; that

                    Page 116

3927 07-14-08 Bahr Matthew.txt

4      he has this system already worked
5      out; you know, if I'm interested in
6      being an investor, that I don't want
7      to do anything.
8          MR. LAY:  What is your
9      relationship with him now?
10         THE WITNESS:  I haven't spoken
11     to him even by phone since I'd say
12     last November.
13         MR. LAY:  Has your wife spoken
14     to him?
15         THE WITNESS:  No, not that I'm
16     aware of.  So there is no
17     relationship right now.
18         MR. LAY:  All right.  And what
19     brought about the end of the
20     relationship?
21         THE WITNESS:  The end of the
22     relationship?  He moved out of town
23     and --

                151

1          MR. LAY:  No.  I mean the
2      business arrangement.
3          THE WITNESS:  The business
4      arrangement with him?  Is that what
5      you're asking me?  His company got
6      shut down around January of '07,
7      so --
8          MR. LAY:  Who shut it down?  Him
9      or someone forced him to?
10         THE WITNESS:  I don't know that
                Page 117

3927 07-14-08 Bahr Matthew.txt

11          for sure.  Someone may have forced
12          him to.  I don't have an answer.
13              MR. LAY:  Well, do you have any
14          thoughts on that or have information
15          on whether or not someone forced him
16          to shut it down?
17              THE WITNESS:  I don't know,
18          because one of the -- he might have
19          just ran out of money.  I was
20          forced to go --
21              MR. LAY:  Did y'all have --
22              THE WITNESS:  -- forced to go
23          out of business.

                        152
1               MR. LAY:  Did y'all have a
2           written agreement?
3               THE WITNESS:  No.
4               MR. LAY:  So there was no
5           business arrangement in writing; this
6           was all verbal?
7               THE WITNESS:  It was a verbal
8           agreement.
9               MR. LAY:  That's all.
10              MS. NEAL:  I just realized --
11          what plaintiff's exhibit number are
12          we on?
13              MR. LAY:  #14, which would now
14          be #15.
15  Q.  I have here what I'm marking as Plaintiff's
16      Exhibit #15.  And this was something that you
17      presented to us today.  Could you read that
                        Page 118

3927 07-14-08 Bahr Matthew.txt

18      paragraph -- the email for us?

19  A.  Matt, your December executive summary will be

20      arriving tomorrow.  Yolanda Boswell moved

21      from 3399 Tuskegee Circle and took the stove

22      and the refrigerator with her.  We have a

23      tenant for that unit, Brenda Waites, and will

                            153

1       need another stove and refrigerator.

2   Q.  That's actually all I need.  So what is the

3       date of that?

4   A.  January 3, 2008.

5   Q.  And is it -- who is it from?

6   A.  Lynn Norsworthy.

7   Q.  And just to you?

8   A.  Yes.

9   Q.  What is that email about?  To our knowledge,

10      Ms. Boswell wasn't in any of your properties

11      in January 3rd, 2008.

12  A.  To my knowledge, she wasn't either.

13  Q.  Okay.  So you -- yeah.  So you don't know

14      anything -- anything else about that

15      document?

16  A.  No.  I don't believe this is even -- I guess

17      I can check.  I don't know if that's even my

18      property.

19  Q.  So you continued to use Ms. Norsworthy's

20      services after your relationship with

21      Gumbaytay ended?

22  A.  She still would send the documents, yes.

23  Q.  What do you mean?  She would still send you

                        Page 119

3927 07-14-08 Bahr Matthew.txt
154

1    executive summaries?

2  A.  Right, or notifications like this.  I don't

3      know the exact -- I just know when my

4      foreclosures started.  I don't know the exact

5      date that, I mean, Jamarlo was doing

6      nothing.  He knew I was in foreclosure, so

7      really wasn't interested in doing anything

8      for me anymore because half of them were

9      vacant.  It wasn't worth his time.  I don't

10     have an exact date on that.

11 Q.  So --

12 A.  And I went into foreclosure quite a bit

13     sooner than my wife.  And I believe that's

14     her property.  You can verify that, but I

15     believe Tuskegee is her property.

16 Q.  So this -- so you --

17 A.  She's still -- again, I'm talking about me.

18     But they were still taking care of some of

19     these properties that were not mine that were

20     not in foreclosure.

21        MR. LAY:  When you say your

22     wife, do you mean your former wife or

23     your current wife?

155

1        THE WITNESS:  My current wife.

2  Q.  And so your wife and your daughter still had

3      homes that were being managed by

4      Mr. Gumbaytay and Elite Real Estate

5      Consulting after your homes were in

6      foreclosure?  Is that what you're saying?

Page 120

3927 07-14-08 Bahr Matthew.txt

7   A.   Yes.  My foreclosures started quite a bit

8        earlier.

9   Q.   Okay.  So you think this email was in

10       relation to one of their properties and Lynn

11       was sending you the executive summary?

12  A.   I'm almost positive that Tuskegee is not my

13       property.

14  Q.   Did Lynn or Mr. Gumbaytay often send

15       executive summaries for your wife and your

16       daughter's property to you?

17  A.   Well, to our address.  It wasn't to -- you

18       know, it wasn't --

19  Q.   Well, this one is to your email address.

20  A.   Right.  We use -- at the time, we used the

21       same email address quite frequently.

22  Q.   Okay.  So as far as -- as far as setting

23       rents and authorizing repairs, et cetera,

                        156

1        you -- you could have ordered Guest

2        Properties on how to do these things as well,

3        correct?

4   A.   Could have ordered them on --

5   Q.   You could have told them that you wouldn't

6        accept a rent below $550?

7   A.   Could have told them that?  Well, that's

8        pretty much what I did tell them, I don't

9        expect to accept anything under $550.

10            MR. LAY:  And Mr. Gumbaytay and

11            Elite Real Estate managed property

12            not only for you but your wife and

13            daughter; is that correct?

                        Page 121

3927 07-14-08 Bahr Matthew.txt

14          THE WITNESS:  Yes.  And as far

15      as I know, about 15 other people.

16  Q.  Okay.  We're going to play a portion of a

17      recording that we have and see if you -- see

18      if you recognize the voice.

19          MR. LAY:  And if you could

20      transcribe the recording.

21          MS. NEAL:  Call six.

22          (Media file played as

23              followed:)

                        157

1           MR. GUMBAYTAY:  And that's why

2       they trying to catch up with you.  I

3       know when you get settled down over

4       there, you're going to come and see

5       me.

6           MS. BOSWELL:  Yeah.

7           MR. GUMBAYTAY:  So, you know,

8       just come and see me when you get

9       yourself settled down, focused, and

10      rest.  So I say at this time next

11      week sometime, you know, come

12      spending a little time with me.

13          (Media file stopped)

14  Q.  Do you recognize that voice?

15  A.  That was Gumbaytay's voice.

16  Q.  Do you recognize the woman's voice?

17  A.  No.  It was so quick, I didn't even -- I

18      don't recognize it.

19  Q.  Okay.

20          (Media file played as

                        Page 122

3927 07-14-08 Bahr Matthew.txt

```
21              follows:)
22         MR. GUMBAYTAY:  When you catch
23      up with us, you can get started on
```

                              158

```
1       something; but I want you to come see
2       me next week so we can go out to
3       lunch or something first and just sit
4       down and get your plans, get your
5       game together, what you want out of
6       life.
7          MS. BOSWELL:  Oh, okay.
8          MR. GUMBAYTAY:  See how
9       Gumbaytay can take and help you do
10      that.  So when you get off from work
11      serving other folks at work, you
12      know, just let me know Monday when we
13      can sit down and go to lunch.
14         MS. BOSWELL:  Oh, okay.
15         MR. GUMBAYTAY:  You know, or go
16      to dinner, go together, go to a movie
17      of something.  We just need to -- or
18      have some cocktails.
19             (Media file stopped)
20  Q.  Okay.  Again, do you recognize that voice?
21  A.  Gumbaytay.
22  Q.  And did you -- did you hear what he was
23      saying?  Could you understand what he was
```

                              159

```
1       saying?  Did he ask her to go to dinner or to
2       a movie or to have cocktails?
3   A.  I heard that.
```
                         Page 123

3927 07-14-08 Bahr Matthew.txt

4  Q.   Is that what you heard?

5  A.   That's what I heard.

6           MS. NEAL:  Okay.

7              (Media file played as

8              follows:)

9           MR. GUMBAYTAY:  Get our act

10          together.  You know, sometimes a

11          woman have to do what a woman have to

12          do in order to feed her family and

13          live a comfortable lifestyle if you

14          hear and understand me.  So I just

15          saw the opportunity to extend that

16          invitation to you.

17          MS. BOSWELL:  Yeah.

18          MR. GUMBAYTAY:  Especially when

19          I'm in a position to do something.

20          MS. BOSWELL:  Yeah.  (Laughs)

21          Yeah.

22          MR. GUMBAYTAY:  You understand

23          what I'm saying?  So I'll take you to

                    160

1           lunch, we can go to dinner, or we can

2           go out of town some weekend, you

3           know, one weekend a month.  We can go

4           out of town and do some things

5           together.  We ain't just got to come

6           over there and just get up under me

7           all the time.  You know, you can come

8           up over there and we can sit down and

9           have a conversation.

10             (Media filed stopped)
                    Page 124

3927 07-14-08 Bahr Matthew.txt

11  Q.  So, again, do you recognize that as

12      Mr. Gumbaytay's voice?

13  A.  Yes.

14  Q.  And did you -- did you hear him say again

15      that he's going to take her out -- that he'll

16      take her out to lunch or we can go to dinner,

17      we can go out of town some weekends?

18  A.  Yes.

19  Q.  Did you hear him say, We don't just have to

20      come over there and just get up under me all

21      the time?

22  A.  Yeah, I believe I heard that

23          MS. NEAL:  And we're going to do

                        161

1           one more from call three.

2               (Media file played as

3                follows:)

4           MR. GUMBAYTAY:  You must have

5       misunderstood me.

6           MS. BOSWELL:  Yeah.  Or I --

7           MR. GUMBAYTAY:  I said I was

8       going to -- I said I was going to

9       help you as much as I possibly could

10      over there if you needed my help.

11      Your rent won't be 550, it will be

12      450.  I'll take care of the 550.

13      That -- that wasn't clear?  I will

14      take care of a hundred of that if I

15      could see you --

16          MS. BOSWELL:  I mean, yeah, but

17      I --

                    Page 125

3927 07-14-08 Bahr Matthew.txt

18          MR. GUMBAYTAY:  If I could see

19      you every once in a while.

20              (Media file stopped)

21  Q.  Okay.  Again, was that Mr. -- Mr. Gumbaytay's

22      voice?

23  A.  Yes.


                     162

1  Q.  Okay.  Did you -- did you understand what he

2      said?

3  A.  Yes.

4  Q.  Did it sound to you like he was saying that

5      he was going to charge $450 for the rent to

6      the tenant?

7  A.  It sounds like that -- sounded like he was

8      going to pay the hundred himself.

9          MS. NEAL:  Okay.

10              (Media filed played as

11                follows:)

12          MR. GUMBAYTAY:  Every once in a

13      while, let me know.

14          MS. BOSWELL:  Yeah.

15          MR. GUMBAYTAY:  Like I say, I

16      want to make sure you live a

17      comfortable lifestyle over there.  So

18      I was extending the invitation to you

19      to be more than just a friend and

20      acquaintance if you don't have a

21      problem with that.

22          MS. BOSWELL:  So what you're

23      saying is if I came over there -- I

                                        Page 126

3927 07-14-08 Bahr Matthew.txt
163

1      mean both us grown -- you'll take the
2      hundred dollars off the rent.
3           MR. GUMBAYTAY:  If you come over
4      here and -- let me put it this way.
5           MS. BOSWELL:  Yeah.  I
6      understand what you saying.
7           MR. GUMBAYTAY:  The law -- I
8      don't want to put it that bluntly,
9      but -- God would do -- God and
10     Gumbaytay going do anything we
11     possibly can to help you out over
12     there.  That's all I got.  I say, if
13     you pay your lights -- you's a very
14     attractive African-American female.
15     That's all I got to say.
16              (Media file stopped)
17  Q.  Do you recognize the voice as Mr. Gumbaytay?
18  A.  Yes.
19  Q.  And you recognize him as saying that she's a
20      very attractive American-African female?
21  A.  Yes.
22  Q.  And that is --
23              (Media file played as

               164
1              follows:)
2           MS. BOSWELL:  (Unintelligible)
3      -- you know.
4           MR. GUMBAYTAY:  That's really
5      strong there.  Girlfriend, you fine.
6      Looks like you ain't got no business
                              Page 127

3927 07-14-08 Bahr Matthew.txt

7      struggling.  Let a brother help a

8      sister out.  Okay?  And I said, you

9      know (untelligible), you got -- at

10     the rate you going, I know you need a

11     sugar daddy.  And I said I'll let

12     you -- I'll let you -- I'll pay your

13     rent for you.

14              (Media file stopped)

15 Q.  So, again, you recognize that as -- as

16     Mr. Gumbaytay?

17 A.  Yes.

18 Q.  And did you hear him say that he would be her

19     sugar daddy?

20 A.  Yes.

21 Q.  And that he would pay her rent for her?

22 A.  Yes.

23          MS. NEAL:  I don't think we have

                       165

1      any --

2          MR. LAY:  Do you -- after having

3      heard that, do you feel that is

4      inappropriate comments that he's made

5      to a tenant?

6          THE WITNESS:  That's

7      inappropriate.

8          MR. LAY:  You would agree that's

9      a problem?

10         THE WITNESS:  Yeah.  I'm --

11     yeah, that's --

12         MR. LAY:  Okay.

13         MS. NEAL:  I don't think we have

                  Page 128

3927 07-14-08 Bahr Matthew.txt

14    any more questions.

15       MR. LAY:  That's all we have

16    unless you have any.

17       MR. SCHOETTKER:  I have none.

18         (The deposition concluded at

19         3:05 p.m.)

20      *  *  *  *  *  *  *  *  *  *  *

21     FURTHER DEPONENT SAITH NOT

22      *  *  *  *  *  *  *  *  *  *  *

23


166

1     REPORTER'S CERTIFICATE

2  STATE OF ALABAMA

3  ELMORE COUNTY

4    I, Dee Coker, Registered Professional

5  Reporter and Commissioner for the State of

6  Alabama at Large, hereby certify that on Monday,

7  July 14, 2008, I reported the deposition of

8  MATTHEW W. BAHR, who was first duly sworn or

9  affirmed to speak the truth in the matter of the

10  foregoing cause, and that pages 4 through 165

11  contain a true and accurate transcription of the

12  examination of said witness by counsel for the

13  parties set out herein.

14    I further certify that I am neither of kin

15  nor of counsel to any of the parties to said

16  cause, nor in any manner interested in the

17  results thereof.

18    This 24th day of July, 2008.

19

20

_____

Page 129

```
                     3927 07-14-08 Bahr Matthew.txt
21                   DEE COKER, CSR, RPR
                     Commissioner for the
22                   State of Alabama at Large
                     CCR LICENSE NO.: 85
23
                     MY COMMISSION EXPIRES: 1/25/09
```



PLAINTIFF'S EXHIBIT

OK'd 10/16/06 JKE

Boswell

# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
### 1569 Amaryllis Circle
### Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
### October 2006 FUNDS COLLECTED (Rental only)

| | Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|---|
| 1. | Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Section 8 Tenant |
| 2. | Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. | Yolanda Boswell<br>964 North Cap Loop<br>Montgomery, AL 36110 | 550.00 | 0 | 225.00 | 202.50 | 22.50 | Paid Security Deposit $310.00—79.00 carpet cleaning |
| 4. | Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. | Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. | VACANT<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | VACANT |
| 7. | Loretta Hall<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Paid-October w/postdated check for $55.00 Section 8 |
| 8. | Lois Webb<br>3681 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | 3 months in arrears Section 8 Tenant |
| 9. | Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 585.00 | 65.00 | New Tenant |
| 10. | Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. | Jamie Bibb<br>513 4th Street<br>Montgomery, AL | 600.00 | 524.00 | 76.00 | 540.00 | 60.00 | Started 7/17/06. Full payment starts 1 Oct 06 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 6,150.00 | | | | | Highlighted properties not included in totals |
| October Rent Collected | 5,755.00 | 4,749.00 | 1,006.00 | 5,179.50 | 575.50 | |
| October Rent Uncollected | 395.00 | | | | | |

NOTE:  October Rents collected          $ 5,755.00          Collections for Oct.          $1,006.00
        Montg. Housing Auth. Paid      - 4,749.00          Elite Commission              - 575.50
        Lessees Paid f/October         $ 1,006.00          Owner's Gross Return for Oct.  $  430.50

NOTE:  #3 Yolanda Boswell paid security deposit -          $310.00
        Minus cost of cleaning carpets  (invoice will be faxed)    - 78.00
        Net Security Deposit                                    $  232.00
        Net Due Investor for October                            $  662.50     ✓OK



# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
November 2006 FUNDS COLLECTED (Rental only)



| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian 105 Stuart Street Montgomery, AL 36105 | 700.00 | 680.00 | Late fee 30.00 20.00 | 27.00 630.00 | 3.00 70.00 | Pd. 11/7/06 New Lease 12/1/06 Section 8 Tenant |
| 2. Carla Henry 2029 Merrily Drive Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell 964 North Gap Loop Montgomery, AL 36110 | 550.00 | 0 | 550.00 | 495.00 | 55.00 | Pd. 11/18/06 |
| 4. Linda Dixon 1805 Rigsby Street Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | 550.00 | | 48.94* | 44.05 | 4.89 | Pd. 11/20/06 Moved in on 11/20/06 Prorated 11 days. |
| 7. VACANT 609 Boyce Street Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to 2233 East 4th Street Section 8 |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | 4 months in arrears Section 8 Tenant |
| 9. Wanda Johnson 507 5th Street Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Military check was not processed; will pay 12/1/06 |
| 10. Sharice Vaughn 2017 Stella Street Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall 2233 E. 4th Street Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Pd. 11/7/06 Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 6,100.00 | | | | | Highlighted properties not included in totals |
| November Rents Collected | 4,898.94 | 4,225.00 | 673.94 | 4,409.05 | 489.89 | |
| Past Due Payments Collected | 30.00 | | 30.00 | 27.00 | 3.00 | |
| Total Rents Collected | 4,928.94 | 4,225.00 | 703.94 | 4,436.05 | 492.89 | |

NOTE 1:
| November Rents collected | $ 4,898.94 | | Collections for Nov. | $ 703.94 |
|---|---|---|---|---|
| Late Fees | 30.00 | | Elite Commission | -492.89 |
| Montg. Housing Auth. Paid | - 4,225.00 | | **Investor's Net Return** | **$ 211.05** |
| Lessees Paid f/November | $ 703.94 | | | |

NOTE 2:
| 105 Stuart St. Past due amount | $147.00 |
|---|---|
| Payment | 30.00 |
| Remainder | $117.00 |

NOTE 3:
| 817 North Pass Prorated Rent | $ 198.90 |
|---|---|
| Carpet Cleaning & Exterminator | -149.96 |
| Tenant's rent for November | $ 48.94 |

NOTE 4: Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). (UPDATED 11/30/06)



# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
December 2006 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Pd: No pmt<br>New Lease 12/1/06<br>Section 8 Tenant |
| 2. Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell<br>964 North Capl Loop<br>Montgomery, AL 36110 | 550.00 | 0 | 400.00 | 360.00 | 40.00 | Will pay $150 on next pay period, 12/29/06 |
| 4. Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | Pd: Starting 2 new jobs. Will pay 1/3/07 |
| 7. VACANT<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to<br>2233 East 4th Street<br>Section 8 |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | Pd: No pmt Legal action taken 5 months in arrears<br>Section 8 Tenant |
| 9. Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 520.00 | 130.00 | Pd: 12/4/06<br>Nov. & Dec – Elite's Nov. fee will be deducted here. |
| 10. Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall<br>2233 E. 4th Street<br>Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Pd: 12/10/06<br>Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid. | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 5,506.00 | | | | | Highlighted properties not included in totals |
| December Rents Collected | 5,330.00 | 4,225.00 | 1,105.00 | 4,732.00 | 598.00 | |
| December Rents Pending | 176.00 | | | | | |

NOTE 1:

| | | | | |
|---|---|---|---|---|
| December Rents collected | $ 5,330.00 | | Collections for December | $1,105.00 |
| Montg. Housing Auth. Paid | - 4,225.00 | | Elite Commission | - 598.00 |
| Lessees Paid f/December | $ 1,105.00 | | Investor's sub-total | $ 507.00 |
| | | | Legal Filing Fee-Lois Webb | - 37.00 |
| | | | Investor's Net Return | $ 470.00 |

NOTE 2:

| | | | | |
|---|---|---|---|---|
| 105 Stuart St. Past due amount | $117.00 | | NOTE 4: | #11- will be transferred to Bruce Dunn on January 2007 |
| December rent owed | 20.00 | | | |
| Remainder | $137.00 | | | |

NOTE 3:    Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). No late fee was charged.

*(4)*

**EXECUTIVE SUMMARY**
**MATTHEW W. BAHR**
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
January 2007 FUNDS COLLECTED (Rental only)

*(handwritten top right: Bill before you send this report Theresa Maintaince Problem @ 817 North Pass)*

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian 105 Stuart Street Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 ✓ | 68.00 | Pd: No pmt New Lease 12/1/06 Section 8 Tenant |
| 2. Carla Henry 2029 Merrily Drive Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 ✓ | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell 954 North Gap Loop Montgomery, AL 36110 | 550.00 | 0 | Dec 1-5 50.00 500.00 | 50.00 500.00 | 0 | Pd: 1/2/07 Late Fee Dec Pd: 1/16/07 Jan 2007 |
| 4. Linda Dixon 1805 Rigsby Street Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 ✓ | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | 550.00 | 0 | 50.00 550.00 550.00 | 45.00 495.00 495.00 | 5.00 55.00 55.00 | Pd: 1/13/07 – For Dec 06 and Jan 07 + Late Fee |
| 7. VACANT 609 Boyce Street Montgomery, AL 36107 | 650.00 | 0 | 0 | ✓ | 0 | |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 ✓ | 55.00 | Pd: Deduct $37 legal fee Section 8 Tenant |
| 9. Wanda Johnson 507 5th Street Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 585.00 ✓ | 65.00 | Pd: 12/29/06 for Jan 2007 Lease 9/26/05 |
| 10. Sharice Vaughn 2017 Stella Street Montgomery, AL 36110 | 650.00 | 0 | 650.00 | 585.00 ✓ | 65.00 | Paid 100% by Section 8. |

*(handwritten note across row 5: Deduct 124.90 For Service call to this address)*

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 5,450.00 | | | | | Highlighted properties not included in totals |
| January Rents Collected | 5,330.00 | 3,630.00 | 1,700.00 | 4,847.00 | 483.00 | |
| Late Fees Collected | 100.00 | | 100.00 | 95.00 | 5.00 | |
| December Rents Collected | 550.00 | | 550.00 | 495.00 | 55.00 | |
| Total Monies Collected | 5,980.00 | 3,630.00 | 2,350.00 | 5,437.00 | 543.00 | |

**NOTE 1:**

| January Rents collected | $ 5,330.00 | | Collections for December | $ 1,800.00 |
|---|---|---|---|---|
| Montg. Housing Auth. Paid | - 3,630.00 | | Elite Commission | - 483.00 |
| Lessees Paid f/December | $ 1,700.00 | | Investor's sub-total | $ 1,317.00 |
| Dec. Late Fee | 100.00 | | Legal Filing Fee-Lois Webb | - 37.00 |
| Rents & Late Fees | $ 1,800.00 | | Cleanup – 609 Boyce St. | - 165.00 |
| | | | Mr. Electric-105 Stuart | - 730.00 |
| | | | **TOTAL TO INVESTOR** | **$ 385.00** ✓ |

**NOTE 2:**

| 105 Stuart St. Past due amount | $137.00 |
|---|---|
| January rent owed | 20.00 |
| Remainder | $157.00 |

**NOTE 3.** Guest Properties ordered work done by Mr. Electric-105 Stuart $730.00

**NOTE 4:** 2233 E. 4th Street was transferred to Bruce Dunn on January 2007.

*(handwritten at bottom: Update- Send Plummer re scheduled For Sat 1/26/07 Send report - when caught next month.)*

(5)

**EXECUTIVE SUMMARY**

**MATTHEW BAHR**

Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com

February 2007 Funds Collected (Rental Only)

*(handwritten: PENZED 03/04/07 9:38pm)*

*(handwritten: Stick this in #3 slot instead of #4)*

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. F | Comments |
|---|---|---|---|---|---|---|---|
| 1. Rita Julian 265-2829 105 Stuart St. Montgomery, AL 36105 | $ 700.00 | $ 680.00 | $ - | $ 20.00 | $ 612.00 | $ - 68.00 | Pd: No pmt. Section 8 Mr. Electric - $730 (inv) |
| 2. Carla Henry 239-8629 2029 Merrily Dr Montgomery, AL 36111 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Pd: 2/1/07 Section 8 |
| 3. Yolanda Boswell 964 North Gap Loop Montgomery, AL 36110 | $ 550.00 | | $ - | $ 550.00 | $ - | $ - | Pd: 2/6/07 Section 8 |
| 4. Linda Dixon 239-7200 1805 Rigsby Street Montgomery, AL 36110 | $ 600.00 | $ 600.00 | $ 361.00 | $ (50.00) | $ 864.90 | $ 96.10 | $495 will be paid separate from this report by Elite. Legal action pending. |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | $ 550.00 | $ 550.00 | $ - | $ - | $ 495.00 | $ 55.00 | Section 8 pays 100% beginning 2/1/07. |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | $ 550.00 | $ - | $ - | $ 550.00 | $ | $ | Promised to pay 3/9/07. Sec. 8 BHRS $45. (inv) Ramsey $35 |
| 7. Renee Williams & Josh Nixon 652-8327 609 Boyce Street Montgomery, AL 36107 | | $ | | | | $ | Lease takes effect 3/1/07. Base rent for 6 months. |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | $ 600.00 | $ 550.00 | | $ 50.00 | $ 495.00 | $ 55.00 | Lease 8/5/07 Lawsuit brought-tenant found in default for all back rent plus late fees. |
| 10. Sharice Vaughn 2017 Stella St. Montgomery, AL 36108 | $ 650.00 | $ 650.00 | $ | $ | $ 585.00 | $ 65.00 | Section 8 - 100% Ramsey Serv. $35 (inv) |

3/4/2007

February 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 10. Wanda Johnson     507 5th St.        Montgomery, AL 36107 | $   650.00 | $        - | $   650.00 | $        - | $      585.00 | $   65.00 | Lease 9/26/05 Pd: 2/1 |
| 11. VACANT            720 Cloverhill Rd Montgomery, AL 36105 | | | | | | | VACANT |

| | Rent Amt | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| Gross Income | $  5,450.00 | | | | | | |
| Rent Collected | $  4,641.00 | $    3,630.00 | $ 1,011.00 | | $    4,176.90 | $   464.10 | |
| Rent Overage/Under Paid | | | | $  1,120.00 | | | |
| Other Income (A | $        - | $         - | $        - | | $         - | $        - | |
| Total Income | $  4,641.00 | $    3,630.00 | $ 1,011.00 | | $    4,176.90 | $   464.10 | |
| Ramsey Service Call | $     70.00 | | | | | | |
| Mr. Electric | $    775.00 | | | | | | |
| Stanley Steemer | $        - | | | | | | |
| Bachus & Assoc | $        - | | | | | | |
| BHRS | $     45.00 | | | | | | |
| Total Expenses/ | $    890.00 | | | | | | |
| Gross Bal. Due Investor | $  3,751.00 | | | | | | |
| Gross (-HAP Pmt) | $    121.00 | | | | | | |
| Net (-Elite Commission) | $   (343.10) | | | | | | |

> What Is Due Investor
after 890⁰⁰ and ECG Fee 464.10
= -(Neg) 343.10

Matthews - 1354.10
Debt

From - 1,011.00
Colleton

Boswell's Rent
495⁰⁰ = #3 Will be Paid
separately

Neg 343.10 Neg Balance

3/4/2007

*(handwritten annotations across top)* 667 Ipis 3w / maxine wright / (123) 407 June / 6153 cherry Rd / 231 360,05 / 5th of the / month 07 / $4.20 (march) / APRIL 2 / 650 00 / made the APRIL / 3 00 00 / *(circled)* 1 / Held For Now / further projects are / pending – Ak 609 / @ henry Hill cheorleys / – cloude Hill rentr

**EXECUTIVE SUMMARY**

**MATTHEW BAHR**

1569 Amaryllis Circle, Orlando, FL 32825

Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com

March 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 1. Rita Julian 265-2829 105 Stuart St. Montgomery, AL 36105 | $ 700.00 | $ 680.00 | | $ 20.00 | $ 612.00 | $ 68.00 | No Payment |
| 2. Carla Henry 239-8629 2029 Merrily Dr Montgomery, AL 36111 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Section 8 - 100% |
| 3. Yolanda Boswell 964 North Gap Loop Montgomery, AL 36110 | $ ▨550.00▨ | | | $ ▨550.00▨ $ | Oh yes $ - | | ▨Pmts will be made by Elite in separate trans▨ |
| 4. Linda Dixon 239-7200 1805 Rigsby Street Montgomery, AL 36110 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Section 8 - 100% |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | $ 550.00 | $ 550.00 | | $ - | $ 495.00 | $ 55.00 | |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | $ ▨550.00▨ | $ - | $ ▨500.00▨ | $ ▨550.00▨ | | $ ▨50.00▨ | ▨$500 paid 3/16 for Feb RFTS. $15 for Ramsey $165▨ |
| 7. Renee Williams & Josh Nixon 652-8327 609 Boyce Street Montgomery, AL 36107 | $ 650.00 | $ - | $ 585.00 | $ - | $ 585.00 | $ - | Pays $585 for 1st 6 mos; deposit waived for first 6 mos. Paid 2nd of 6 pmt. on 3/6/07. Adams $50 |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | $ 600.00 | $ 550.00 | | $ 50.00 | $ 495.00 | $ 55.00 | Lawsuit filed - Tenant now in default for all back payments. |
| 10. Sharice Vaughn 2017 Stella St. Montgomery, AL 36108 | $ 650.00 | $ 650.00 | | $ - | $ 585.00 | $ 65.00 | |

*(handwritten left margin)* Paid yes 4/17 / (204 840 00) / *(right margin)* Paid by 4/11 / *** / **

| 10. Wanda Johnson 507 5th St. Montgomery, AL 36107 | $ 650.00 | $ - | $ 650.00 | $ - | $ 585.00 | $ 65.00 | Pd. 3/3 |
|---|---|---|---|---|---|---|---|
| 11. VACANT 720 Cloverhill Rd Montgomery, AL 36105 | | | | | | | |

| | Rent Amt | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. Fee | |
|---|---|---|---|---|---|---|---|
| Gross Income | $ 6,100.00 | | | | | | |
| Rent Collected | $ 5,365.00 | $ 3,630.00 | $ 1,735.00 | | $ 4,437.00 | $ 478.00 | |
| Rent Overage/Under Paid | | | | $ 1,170.00 | | | |
| Other Income (A | $ 550.00 | $ - | $ 550.00 | | $ 495.00 | $ 55.00 | 3/1/07 paid by Elite for 964 North Gap Lp |
| Total Income | $ 5,915.00 | $ 3,630.00 | $ 2,285.00 | | $ 5,323.50 | $ 533.00 | |
| Ramsey | $ 200.00 | | | | | | |
| Mr. Electric | $ - | | | | | | |
| Willie Adams, Maint | $ 50.00 | | | | | | |
| BHRS | $ 45.00 | | | | | | |
| Elite Feb. fee carried over | $ 173.00 | | | | | | |
| **Total Expenses/** | **$ 468.00** | | | | | | |
| **Gross Bal. Due Investor** | **$ 5,447.00** | | | | | | |
| Gross (-HAP Pmt) | $ 1,817.00 | | | | | | |
| **Net (-Elite Commission)** | $ 1,284.00 | | | | | | |

1st payment made by me

PLAINTIFF'S
EXHIBIT
_2_
PENGAD 800-631-6989

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1.     **Contents of Contract**

   This HAP contract has three parts:

   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

**2. Tenant**

   LOIS WEBB

**3. Contract Unit**

   3661 WHITING AVENUE  #

**4. Household**

The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   LOIS WEBB, CHARITY L WEBB, PATRICK D WEBB
   , MARVIN K POWELL

**5. Initial Lease Term**

The initial lease term begins on: 12/01/2005
The initial lease term ends on: 09/01/2006

**6. Initial Rent to Owner**

The initial rent to owner is: **$550.00**
During the initial lease term, the owner may not raise the rent to owner.

**7. Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $550.00 per month.

The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

## 8. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|
| Heating | ☐ Natural Gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | T |
| Cooking | ☐ Natural Gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | T |
| Water Heater | ☐ Natural Gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | T |
| Other Electric | | | | | O | T |
| Water | | | | | O | T |
| Sewer | | | | | O | T |
| Trash Collection | | | | | O | T |
| Air Conditioning | | | | | O | T |
| Refrigerator | | | | | O | O |
| Range/Microwave | | | | | O | O |
| Other (specify) | | | | | | |

**Signatures:**

**Public Housing Agency**

Print or Type Name of PHA
Montgomery Housing Authority

Signature
*Cathy Harris*

Print or Type Name and Title of Signatory
**CATHY HARRIS, Section 8 Coordinator**

Date (mm/dd/yyyy)
12/01/2005

**Mail Payments to:**

**Owner**

Print or Type Name of Owner
MATTHEW W. BAHR

Signature
*Matth W. Bah*

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)
12/01/2005

Name
MATTHEW W. BAHR

Address (street, city, State, Zip)
1569 AMARYLLIS CIRCLE
ORLANDO FL 32825-



**The Core Real Estate Consulting Group**
Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

PLAINTIFF'S
EXHIBIT
3



Cellular Phone:
334-202-8676

# FAX TRANSMITTAL FORM

TO: _Montgomery County Dist. Court_           FROM: Jamario K. GumBayTay, Ph.D., Ed.S.
CC: _____                  CELL: (334) 202-8676
ORGANIZATION: _____
TELEPHONE: _____
FAX: _____                  ☐ URGENT
DATE SENT: _____                   ☐ FOR REVIEW
TIME SENT: _____                   ☑ PLEASE COMMENT
# OF PAGES INCLUDING COVER PAGE: _____        ☐ PLEASE REPLY

COMMENTS: _Tennant Lease property 8/05/05 - under a Sec 8 Contract - Thus Contract to pay $50.00 as agreed upon by Landlord and Tenant. However, no payments have been received as of the leased date 8/05/05... @ $50.00 X 18 months = 900°° This does not include late fees, court costs, and a personal Loan the company made to help with utilities (see the attached promissory note)_

2007 FEB 16 PM 2 41
FILED DISTRICT COURT
MONTGOMERY COUNTY

_JK GumBayTay_
_02/16/07_

LN 1-4-07

AVSO350

ALABAMA JUDICIAL DATA CENTER
MONTGOMERY    COUNTY

SUMMONS

SM 2006 007328.00
LYNN C. BRIGHT

IN THE DISTRICT COURT OF MONTGOMERY    COUNTY

JAMARLO K GUMBAYTAY VS LOIS WEBB

SERVE ON: (D001)

SSN: 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

WEBB LOIS
3661 WHITING AVE

MONTGOMERY    ,AL  36105-0000

PLAINTIFF'S ATTORNEY

*** PRO SE ***

TO THE ABOVE NAMED DEFENDANT:

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS, YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:
FILL OUT THE ENCLOSED ANSWER FORM AND DELIVER OR MAIL IT TO THE COURT CLERK

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 14 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

( )    TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
       4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
       YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
       COMPLAINT IN THIS ACTION UPON DEFENDANT.

( )    THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
       WRITTEN REQUEST OF _____ PURSUANT TO RULE 4.1(C)
       OF THE ALABAMA RULES OF CIVIL PROCEDURE.

DATE: 01/02/2007                         CLERK:MELISSA RITTENOUR
                                              251 SOUTH LAWRENCE ST.
                                              MONTGOMERY  AL  36102-1667
                                              (334)832-1353

RETURN ON SERVICE:

( )    CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
       (RETURN RECEIPT HERETO ATTACHED)

(X)    I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND
       COMPLAINT TO Lois Webb

       IN Montgomery        COUNTY, ALABAMA ON (DATE) 1/10/07

DATE 1/10/07                             C. Simonton
                                         SERVER SIGNATURE

MCSO                                     Clerk
SERVER ADDRESS                           TYPE OF PROCESS SERVER

OPERATOR: HEE
PREPARED: 01/02/2007

| State of Alabama<br>Unified Judicial System<br><br>Form SM-1 (front)  Rev. 3/95 | **STATEMENT OF CLAIM**<br>(Complaint)<br>General | Case Number<br><br>*JM06-7328* |
|---|---|---|

IN THE SMALL CLAIMS COURT OF _____ *Montgomery* _____, ALABAMA

(Name of County)

_____ *Tamara K. Gumbayton* _____ v. _____ *Lois Webb* _____

          **Plaintiff**                                             **Defendant**

Plaintiff's  *4013 Tiffany Drive*        Defendant's  *3644 Whitmore*
Home Address  *Mont. AL 36110*       Home Address  *Montgomery AL 36105*

Plaintiff's Attorney's                   Additional
Address                                  Defendant(s)
                                        and Addresses

*FILED DISTRICT COURT*<br>*MONTGOMERY COUNTY*<br>*2006 DEC 18 PM 1*

**NOTICE TO EACH DEFENDANT - READ CAREFULLY**

    YOU ARE BEING SUED IN THE SMALL CLAIMS COURT BY THE PLAINTIFF(S) SHOWN ABOVE. THE JUDGE HAS NOT YET MADE ANY DECISION IN THIS CASE, AND YOU HAVE THE RIGHT TO A TRIAL TO TELL YOUR SIDE.

    HOWEVER, IF YOU, OR YOUR LAWYER, FAIL TO FILL OUT THE ENCLOSED ANSWER FORM AND DELIVER OR MAIL IT TO THE CLERK AT THE ADDRESS SHOWN BELOW, SO THAT IT WILL GET TO THE CLERK'S OFFICE WITHIN FOURTEEN (14) DAYS AFTER YOU RECEIVE THESE PAPERS, A JUDGMENT CAN BE TAKEN AGAINST YOU FOR THE MONEY OR PROPERTY DEMANDED IN THE FOLLOWING COMPLAINT. ONCE A JUDGMENT HAS BEEN ENTERED AGAINST YOU, YOUR PAYCHECK CAN BE GARNISHED AND/OR YOUR HOME OR PROPERTY SOLD TO SATISFY THAT JUDGMENT.

**COMPLAINT**

1. I claim the defendant owes the plaintiff the sum of $ *800.00* _____ because: *Tenant has not paid rents for several months (Help rent is separate than sec 8) Lates Fees for every months) Tenant has not paid. Tenant Doesn't was never paid - nor did she follow up on the agreement to pay.*

2. Plaintiff also claims from the defendant court costs in the sum of $ *37.00* _____ (see note below), plus $ _____ for interest and $ _____ for lawyers' fees (only if plaintiff is represented by a licensed, practicing attorney and if the contract or note you signed so provides.)

NOTE:    The total amount of court costs may be more than this amount when the case is finally settled. The clerk will inform you of any additional costs at the close of the case.

CLERK'S ADDRESS:    *Melissa Rittenour*       *Tamara K. Gumbayton*
**DISTRICT COURT OF MONTGOMERY**            Plaintiff or Plaintiff's Attorney (Signature)
**251 S. LAWRENCE ST**
**P O BOX 1667**                         Attorney Code _____
**MONTGOMERY, AL 36102-1667**
                                 *(334) 202 8676 (cell)*

Clerk's Phone No. _____             Plaintiff's or Plaintiff's Attorney's Phone Number

(See instructions on the Back)              Date of Filing _____

**EXECUTIVE SUMMARY**
**MATTHEW W. BAHR**
**1569 Amaryllis Circle**
**Orlando, FL 32825**
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
December 2006 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | **Pd: No pmt**<br>New Lease 12/1/06<br>Section 8 Tenant |
| 2. Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell<br>964 North Gap Loop<br>Montgomery, AL 36110 | 550.00 | 0 | 400.00 | 360.00 | 40.00 | **Will pay $150 on next pay period, 12/29/06** |
| 4. Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | **Pd: Starting 2 new jobs. Will pay 1/3/07** |
| 7. VACANT<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to<br>2233 East 4th Street<br>Section 8 |
| 8. Lois Webb<br>3861 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | Payments Tenant makes 0 | 495.00 | 55.00 | **Pd: No pmt Legal action taken 5 months in arrears**<br>Section 8 Tenant |
| 9. Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 520.00 | 130.00 | **Pd: 12/4/06**<br>**Nov. & Dec – Elite's Nov.** fee will be deducted here. |
| 10. Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall<br>2233 E. 4th Street<br>Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | **Pd: 12/10/06**<br>Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| **Gross Income** | 5,506.00 | | | | | Highlighted properties not included in totals |
| **December Rents Collected** | 5,330.00 | 4,225.00 | 1,105.00 | 4,732.00 | 598.00 | |
| **December Rents Pending** | 176.00 | | | | | |

NOTE 1:

| | |
|---|---|
| December Rents collected | $ 5,330.00 |
| Montg. Housing Auth. Paid | - 4,225.00 |
| Lessees Paid f/December | $ 1,105.00 |

| | |
|---|---|
| Collections for December | $1,105.00 |
| Elite Commission | - 598.00 |
| Investor's sub-total | $ 507.00 |
| Legal Filing Fee-Lois Webb | - 37.00 |
| Investor's Net Return | $ 470.00 |

NOTE 2:

| 105 Stuart St. Past due amount | $117.00 |
|---|---|
| December rent owed | 20.00 |
| Remainder | $137.00 |

NOTE 4:  #11- will be transferred to Bruce Dunn on January 2007

NOTE 3:  Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). No late fee was charged.

## Elite Real Estate Management Department
### February 2007 Monthly Rental Report

| Property Address | Tenant & Tel # | Owner & Address | Rental Amount | Section 8 Pays | Tenant Pays | Investor Share | ECG | Type of Lease | Lease Dates |
|---|---|---|---|---|---|---|---|---|---|
| 10C. 2 Davis Drive Montgomery, AL 36105 | Patricia Embry 205-266-2962 | Brett Rosenbaum 1827 Mahogany Drive Orlando, FL 32825 | 500.00 | | 500.00 | 500.00 | No fee 0 | Lease-Purchase | Pd: 2/6/07 Lease: 1/3/07 Deposit: $300 |
| 11. 3605 Norris Drive Montgomery, AL 36110 | Latoya Kelly 293-9881 832-1481 | Joyce Weber 10613 Sandridge Ct. Orlando, FL 32817 | $625.00 | 535.00 | Dec 90.00 90.00 | 562.50 | 62.50 | Lease/Purchase Section 8 | Pd Lease 5/4/06 |
| 12. 17 Davis St. Montgomery, AL 36105 | Tashier Townsend 280-2567 | Joyce Weber 10613 Sandridge Court Orlando, FL 32817 | 550.00 | 450.00 | 50.00 | 495.00 | No fee | Lease/Purchase Section 8 | Pd: Lease 8/1/06 |
| 13. 105 Stuart Street Montgomery, AL 36105 | Rita Julian 265-2829 | Matt Bahr 1569 Amaryllis Circle Orlando, FL 32825 | 700.00 | 680.00 | 20.00 | 630.00 | 70.00 | Mr. Elec. $730 Lease/Purchase Section 8 | Lease 12/1/05 Renew 12/1/06 |
| 14. 2029 Merrily Drive Montgomery, AL 36111 | Carla Henry 239-8629 | Matt Bahr 1569 Amaryllis Circle Orlando, FL 32825 | $600.00 | 600.00 | 0 | 540.00 | 60.00 | Residential Section 8 Full | Lease 8/1/05* |
| 15. 964 North Gap Loop Montgomery, AL 36110 | Yolanda Boswell 414-5242 | Matt Bahr 1569 Amaryllis Circle Orlando, FL 32825 | 550.00 | 0 | 550.00 | 495.00 | 55.00 | Lease/Purchase | Pd: Lease 10/1/06 |
| 16. 1805 Rigsby Street Montgomery, AL 36110 | Linda Dixon 239-7200 | Matt Bahr 1569 Amaryllis Circle Orlando, FL 32825 | $600.00 | 600.00 | 0 | 540.00 | 60.00 | Lease/Purchase Section 8 – 100% | Lease 4/15/06 |
| 7. 26 Kelly Lane Montgomery, AL 36105 | Escambia Mclean 288-9381 263-5579 | Matt Bahr 1569 Amaryllis Circle Orlando, FL 32825 | $550.00 | 550.00 | 0 | 495.00 | 55.00 | Lease/Purchase Section 8 – 100% | Lease 11/1/05* |
| . 817 North Pass Road Montgomery, AL 36110 | Shonna Pruitt | Matt Bahr 1569 Amaryllis Circle Orlando, FL 32825 | $550.00 | 0 | 550.00 | 495.00 | 55.00 | Lease/Purchase | Pd: Lease 11/1/06 |
| 809 Boyce Street Montgomery, AL 36107 | Renee Williams & Joshua Nixon | Matthew Bahr 1569 Amaryllis Circle Orlando, FL 32825 | 650.00 | | 650.00 | 585.00 | 65.00 | Lease/Purchase | Pd: Lease: 3/1/07 |
| 3661 Whiting Avenue Montgomery, AL 36105 | Lois Webb | Matthew Bahr 1569 Amaryllis Cir. Orlando, FL 32825 | $600.00 | 550.00 | 50.00 | 540.00 | 60.00 | Lease/Purchase Section 8 | Pd: Lease 8/5/05* |
| 2017 Stella Street Montgomery, AL 36108 | Sharice Vaughn 269-3163 | Matthew Bahr 1569 Amaryllis Cir. Orlando, FL 32825 | $650.00 | 650.00 | | 585.00 | 65.00 | Lease/Purchase Section 8 – 100% | Lease 7/3/06 |
| 507 5th Street Montgomery, AL 36107 | Wanda Johnson 220-4650 | Matthew Bahr 1569 Amaryllis Dr. Orlando, FL 32825 | $650.00 | 0 | 650.00 | 585.00 | 65.00 | Lease with Purchase Option | Pd: Lease 9/26/05* |
| 33 E. 4th Street Montgomery, AL 36106 | Loretta Hall 264-0139 | Matthew Bahr 1569 Amaryllis Dr. Orlando, FL 32825 | $650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Lease/Purchase Section 8 | Pd: Lease 12/1/06 |

*Handwritten annotations on row 3661 Whiting Avenue: "Amount Tennant pays" (circled over Tenant Pays column), "Date Rented" (circled over Lease Dates column)*

| State of Alabama<br>Unified Judicial System<br><br>Form C-25    Rev. 7/2000 | APPLICATION, AFFIDAVIT, AND<br>ENTRY OF DEFAULT | Case Number<br>SM 2006 007328.00 |

IN THE _District_ COURT OF _Montgomery_ , ALABAMA
(Circuit or District)          (Name of County)

_Jamarlo K. Gumbaytay_ v. _Ms. Lois Webb_
Plaintiff                          Defendant

☒ I, affiant, request that the ☒ clerk of court, or ☒ judge enter a default judgment against the above-named defendant,*
in the above case for the defendant(s)' failing to plead, answer, or otherwise defend.

**CERTIFICATE OF SERVICE ON OTHER PARTIES**
I hereby certify that a copy of this Application, Affidavit, and Entry of Default has        Signed _Jamarlo K. Gumbaytay_
been sent, by first class mail, postage prepaid, to all parties in this case.

The affiant, _Jamarlo K. Gumbaytay_ , being duly sworn, states as follows:

1. That the affiant has personal knowledge of the facts set forth in this affidavit.
2. That the defendant was served with a summons and a copy of the Statement of Claim/Complaint on (date) _1/10/07_ .
3. That more than _14_ days have elapsed since the defendant was served with a summons and a copy of the Statement of Claim/Complaint.
4. That the defendant has failed to answer or otherwise defend against the plaintiff's claim/complaint.
5. That this affidavit is executed by the affiant in accordance with Rule 55(a) of the Alabama Rules of Civil Procedure for the purpose of enabling the plaintiff to obtain an entry of default against the defendant, for the defendant's failing to answer or otherwise defend against the plaintiff's claim/complaint.
6. That the defendant is not an infant or an incompetent person, and there has been no violation of the provisions of Chapter 19, Title 5, Code of Alabama 1975.
7. Judgment Conditions: ☐ with ☐ without waiver of exemptions.
8. That the amount of money claimed by the defendant to the plaintiff is
   ☒ THE SUM OF      $ _400.00_ , which is to be determined as follows:
   Principal Balance    $ _____
   Interest    $ _____
   Attorney Fee    $ _____ (if requesting attorney's fees, it must be determined by the judge, not the clerk.)
   (If provided by contract, note or law)

☐ SPECIFY PROPERTY (Describe on a separate sheet of paper, property of which the plaintiff demanded right to possession from the defendant in the claim/complaint).

9. The affiant requests entry of judgment: ☐ By the Court    Name of Affiant: _Jamarlo K. Gumbaytay_
                                          ☐ By the Clerk    Signature of Affiant: _Jamarlo K. Gumbaytay_

Sworn To and Subscribed Before Me This        Affiant's Home or Business Address (if not represented by an attorney):
Date: _1/26/07_                               _____

_Janet Price_                                City        State        Zip Code
Officer's Signature          Title           Name of Attorney: _____
                                             Signature of Attorney: _____
                                             Business Address of Attorney: _____

                                             City        State        Zip Code

Entry of default entered against the defendant, _____

_____        _____
Date                    Judge/Clerk

Default judgment is hereby rendered against the defendant in the amount of $ _____

_____        _____
Date                    Judge/Clerk

Rule 55, ARCP
* Separate form shall be completed for each defendant in cases involving multiple defendants.

Original - Court File          Copy - Plaintiff          Copy - Defendant

```
AVSO351                                              SM 2006 007328.00

                                         JUDGE: LYNN C. BRIGHT
-------------------------------------------------------------------
                    ALABAMA JUDICIAL DATA CENTER
                     CASE ACTION SUMMARY
                        SMALL CLAIMS
-------------------------------------------------------------------
  IN THE DISTRICT COURT OF MONTGOMERY     COUNTY

  JAMARLO K GUMBAYTAY VS LOIS WEBB
  FILED: 12/18/2006 TYPE: UNPAID RENT      TYPE TRIAL: NON-JURY  TRACK:
*******************************************************************
 DATE1:            CA:           CA DATE:
 DATE2:            AMT:     $800.00  PAYMENT:
 DATE3:
*******************************************************************
 PLAINTIFF  001: GUMBAYTAY JAMARLO K
                 4013 TIFFANY DRIVE       ATTORNEY: *** PRO SE ***

                 MONTGOMERY, AL  36110-0000
                 PHONE: (334)000-0000
 ENTERED:  01/02/2007 ISSUED:           TYPE:
 SERVED:             ANSWERED:          JUDGEMENT:
-------------------------------------------------------------------
 DEFENDANT 001: WEBB LOIS
                 3661 WHITING AVE         ATTORNEY: *** PRO SE ***

                 MONTGOMERY, AL  36105-0000
                 PHONE: (334)000-0000
 ENTERED:  01/02/2007 ISSUED:  01/02/2007 TYPE:     SHERIFF
 SERVED:   01/10/2007 ANSWERED: 01/26/2007 JUDGEMENT:
-------------------------------------------------------------------

   01/02/2007   BENCH/NON-JURY TRIAL REQUESTED          (AV01)
   01/02/2007   GUMBAYTAY JAMARLO K ADDED AS C001        (AV02)
   01/02/2007   WEBB LOIS ADDED AS D001                  (AV02)
   01/02/2007   SHERIFF ISSUED: 01/02/2007 TO D001       (AV02)
   01/22/2007   D001 SERVED SHERIFF      ON 01/10/2007
   01/29/2007   APPLICATION FOR DEFAULT ON 01/26/2007 FOR D001
```

2-2007  Default entered,
        Default Judgement entered
        Against Defendant for _800 00_
        Plus costs _37 00_

```
SAB   01/29/2007                                    SM 2006 007328.00
```

| State of Alabama<br>Unified Judicial System | **WRIT OF EXECUTION** | Case Number |
|---|---|---|
| Form C-20     Rev 6/88 | | *DC2006007375.00* |

IN THE _District_ COURT OF _Montgomery_, ALABAMA
(Circuit or District)                        (Name of County)

_Tamecia L. Gumbaytay_ v. _Ms. Lois Webb_
**Plaintiff**                                **Defendant**

Home Address: _4013 Tiffany Dixie_    Home Address: _3661 Whiting Ave_

City/State/Zip Code: _Mont, AL 36110_    City/State/Zip Code: _Monty Al 36105_

Date of Judgment/forfeiture _3/26/07_    _800.00 JG_

Judgment amount $ _800.00_

Court costs _37.00_

Alternate property value _____

Damages/rent _____

Other _____

TOTAL $ _837.00_

**TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:**

You are ordered to perform the action specified:

☐ Seize the property described below which is in the possession of _Ms. Lois Webb_
_____ and restore to _Tamecia L. Gumbaytay_ if this property is not available, seize and sell any
personal and real property of _Ms. Lois Webb_ _____ for
the alternate value of the property.     ☐ Exemptions as to Personal Property waived.

☐ Restore to _Tamecia L. Gumbaytay_ the described
property now in the possession of _Ms. Lois Webb_

Collect $ _837.00_ for detention of the property.

☐ Seize any real or personal property of _Ms. Lois Webb_
that will satisfy the total monetary value specified above.     ☐ See description for exemption.

☐ Exemptions as to personal property waived.

☐ Hold until further court action ☐ Sell and return

☐ Sell property described below previously seized and being held by you.

☐ Collect from _Ms. Lois Webb_ the court cost
amount. If cash cannot be collected, seize and sell any real or personal property from which can be made the sum of the costs.

Description:

**YOU ARE TO MAKE RETURN OF THIS EXECUTION AND EXPLAIN BELOW HOW YOU PERFORMED THE SPECIFIED ACTION.**

Date issued: _4/27/07_    _Melissa_    By: _____
**Clerk**

Execution Date _____
Remarks: _____

_____    _____
Sheriff                        By Deputy Sheriff

| **COURT RECORD:** Original | **ADDRESSEE:** Copy |
|---|---|

LN 5-15-07    (Back rent money owed)

LN 6-22-01 — stated that she have paid plaintiff ½ of due amount.

7-31-01 — no change

THIS WRIT RETURNED "NOT FOUND"
IN MONTGOMERY COUNTY THIS **23**
DAY OF _**Aug**_                    **07**
FOR THE FOLLOWING REASON:

☐ MOVED
☐ NO SUCH ADDRESS
☐ INSUFFICIENT ADDRESS
☐ NEED WORK ADDRESS
☐ NOT EMPLOYED
☐ RETURN TO COURT BY ORDER
       OF
☒ _Writ Expired_
       MARSHALL, SHERIFF
       _Smith_ D.S.

ELITE ENTERPRISE
4013 TIFFANY DRIVE
MONTGOMERY, AL  36110-3003
(202) 202-8676



MEMORANDUM

From The Desk Of Jamarlo K. Gumbaytay Ph.D., EDS
To All Tenant New and Old

RE: Goals and Objective (My pledge to you)

Greeting! Happy New Year!!!  I'm hopeful that all is well with you and your
loved ones.

It is my desire to continue to work with all new and old tenants in the
upcoming year.  Thus, I've set some goals and objectives to accomplish for
this new year.

On behalf of all of your landlords, I pledge to, (one) address all service calls
within 48 hours of receipt.  Depending on the nature of the call, I pledge to
have all work completed within five (5) business days.   However you must
keep in touch with me on a daily basis if you expect this type of response.
Once I issue a service call out to Eric Crews and his crew, I have no way of
knowing the status of a call unless you keep me informed.  You have a right
to expect service within a reasonable time frame.  Thus, it's my duty to see
that this happens.

I pledge to inspect your property at lease once every four months.  It's very
important to both Elite and your landlord that you do your part in
maintaining your rental unit.  Even though you are renting, please treat your
home as if you own it with the property care and respect.  Thus, you must
keep in touch with Ms. Wanda Johnson.  In order to schedule an appointment
with her ASAP!  She can be reached at (334) 220-4650.  This is her cell #
so do leave a message in the event you do not reach her.

I pledge to meet all new tenants within the first sixty (60) days of this year.
Thus, if you just came under Elite's management within the past one hundred

and twenty (120) days or less, please call me as soon as you can to schedule an in house appointment with you. I will be happy to visit with you in your home at your convenience so you can get to know your management team. Remember you can always reach me at (334) 202-3676 (24/7). It's a must that this visit must take place within the first sixty (60) days so we can update your file.

Most of you don't have applications on file and/or updated leases. Some of you have changed job(s) and phone numbers. Remember it's your responsibility to provide us with this information in order to keep your file(s) current and in the event of an emergency. Therefore, please complete the enclosed application today then hold on to it until we meet in person.

Last but not least, I pledge to notify your landlord within seventy-two (72) hours of a service call if the work has not been completed as discussed. However, "There are always exceptions to the rule". Regardless, your concerns are our concerns both Elite's and your landlords.

Now, here's what I need for you to do for me. It is your duty and responsibility to keep your home clean and in good condition both inside and out. That means no junked or abandoned vehicles on the premises. Don't park on the lawn under any circumstances. You will be fined if warned more than twice. If said fines are not paid, I can assure you either it will come from your deposit and/or you will be sued to collect the fines. Also, it is your duty and responsibility to call me if you are going to be late with your rent payment or not pay it at all due to unforeseen circumstances. There's always a solution to the problem if you talk to me. Late fees, if not paid, will be deducted from your deposit and/or you will be sued to collect. A notice will be forwarded to Director Cathy Harris of the Montgomery Housing Authority explaining to them if and when such action will be taken. MHA will also be notified in writing if you continue to be this sort of problem. Any and all negative occurrences in our unit(s) that is your responsibility will be reported (i.e. lawn not being maintained, junked or abandoned vehicles, late fees and non payment of your share of the rent) to MHA.

We want to be fair and reasonable with you, however, everyone is not doing what they are required to do. Thus, from this point forward I will do my

best to make sure nothing will be over looked.  Remember, you have the same rights of fair and reasonable treatment as our tenants.  In the event you are not happy or satisfied with our services, please put it in writing to me first.  Then, and only then, if the matter is not being resolved, you have the right to forward that copy to the MHA.

I look forward to a wonderful business relationship with each and every one of you this year.  Remember, I am here to answer any questions or concerns you have.

Sincerely,

Jamarlo K. Gumbaytay



**The Elite Real Estate Consulting G**
Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003



PLAINTIFF'S
EXHIBIT
5

Fax:
334-241-5986

### MEMORANDUM / FYI

TO.          ALL TENANTS

FROM:        Jamarlo K. GumBayTay, Rental Manager

SUBJECT:     Maintenance & Upkeep; Pets & Community Assistance Available

DATE:        August 25, 2006

Attached you will discover our pet policy and deposit amounts. If you have one of these memos attached to this letter, that means I have observed a pet on your property on my last visit. Thus, if you are planning to keep your pet, please sign the attached form and forward it along with an additional $200.00 security deposit. These funds will be returned to you within fifteen (15) days of your departure at the end of your lease.

Again, if you receive a verbal or written notification from me regarding your lawn not being properly cut, we will send some one to do it for you within five (5) days of such notice. Remember, your next month's rental statement (deposit slip) should reflect those fees. In other words, you will automatically be charged for this service. Legal action will be taken if you do not pay said Pet Fees or Lawn Care Fees within thirty (30) days of your rental due date. **(See Sample Warning Notice)**



Also, prior to making a maintenance call to us, please see if you, or someone you know, can handle the problem first at little or no cost to you. Here lately, we have been called out for an air conditioning problem and all that was needed was a fuse. Always check your breaker box and/or other electrical sources prior to calling us. In the future, you will be billed if we have to take time out of our business schedule to visit with you on very minor things that you could have handled yourself.



Use your maintenance request form to describe or discuss your concerns, then call me - only prior to faxing it to 334-241-5986. We will try to follow up within 24 to 48 hours of receipt.



NOTE: All abandoned automobiles will be towed at the owner's expense within five (5) days of a verbal and/or written notice. JKG

COMMUNITY ASSISTANCE - Some of you have been experiencing financial difficulties, stress, and unexpected twists and turns. Thus, your rental payments are being made later than agreed. If this is so with you now or in the future, please contact the following agencies:

1)    Frazer Memorial United Methodist Church on the Atlanta Highway;
2)    Community Action on Adams Avenue;
3)    Catholic Social Services on Narrow Lane Road.

Page 2

Please review your telephone directory for phone numbers and other social service agencies that can help with such things as rent and/or utilities.

In the meantime you must <u>always</u>, and I do mean <u>always</u> contact me if you are having problems. Not talking to me will only cause concerns for both your landlord and me. Thus, "an understanding and communication is the best thing in the world. . ."

Also, do not forget to call me the very same day you make your deposit. AGAIN! <u>Always</u> place your name, address and the month in which your rent is being applied at the bottom of the deposit slip.

Enclosures:     Warning Notice
                Inspection Notice
                Lawn Service Notice

cc:     Guest Property Sales, LLC
        Sean McDonough
        Brett Rosenbaum
        Joyce Weber
        Todd M. Chamelin
        Matthew Bahr



PLAINTIFF'S
EXHIBIT
6

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st day of October ,20 06 , by and between the Lessor: Matthew W. Bahr , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell All Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

1. GRANT OF LEASE: Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property: N/A

2. NATURE OF OCCUPANCY: As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

3. TERM OF LEASE: This Lease shall commence on the 1st day of October ,20 06 ,and extend until its expiration on the 30th day of September , 20 06 unless renewed or extended pursuant to the terms herein.

4. SECURITY DEPOSIT: Upon execution of this Lease, Tenant shall deposit the sum of $350.00 to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

5. RENT PAYMENTS: Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $550.00 450 , said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October , 20 06

Tenant agrees that if rent is not paid in full on or before the 5th day of the month, Tenant will pay a late charge of $ 50.00 as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A , which amount shall be paid at the execution of this Lease.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: N/A _____

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. EMINENT DOMAIN: In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. LANDLORD ENTRY AND LIEN. In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. GOVERNING LAW: This Lease is governed by the statutory and case law of the State of Alabama.

35. LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

36. ADDITIONAL PROVISIONS:

_____
_____
_____
_____
_____
_____

* * *

WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:

LANDLORD    Matthew W. Bahr, Lessor

Sign: _Jamarlo K GumBayTay_    Print: Jamarlo K. GumBayTay, Agent    Date: _10/11/06_

TENANT

Sign: _____    Print: Yolanda Boswell, Lessee    Date: _10/11/06_

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

- ☐ Lawn should be kept cut, raked and edged
- ☐ No junked or abandoned vehicles on property
- ☐ No trash/paper/debris in yard or on lawn
- ☐ No automobiles parked on lawn
- ☐ Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
Yolanda Boswell, Lessee

Date: _____

*Exhibit 9*

PLAINTIFF'S
EXHIBIT
7

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st day of October ,2006 , by and between the Lessor: Matthew W. Bahr , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell                                                                        Ali Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

1. GRANT OF LEASE: Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property: N/A

2. NATURE OF OCCUPANCY: As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

3. TERM OF LEASE: This Lease shall commence on the 1st day of October ,2006 , and extend until its expiration on the 30th day of September ,2006 , unless renewed or extended pursuant to the terms herein.
*Expired short term lease for DHR purpose.*

4. SECURITY DEPOSIT: Upon execution of this Lease, Tenant shall deposit the sum of $ 350.00 to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

5. RENT PAYMENTS: Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $ 550.00 , said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October , 2006

Tenant agrees that if rent is not paid in full on or before the 5th day of the month, Tenant will pay a late charge of $ 50.00 as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A , which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):
☒ cash, ☐ personal check, ☒ money order, ☒ cashier's check, ☒ other deposit to Wachovia Bank
Rent payments shall be made payable to Jamarlo K. GumBayTay, Agent                and mailed or delivered to the
following address: 800 Madison Avenue, Montgomery, AL 36104 (Wachovia Bank)              All notices from
Tenant to Landlord under this Lease and applicable Alabama law shall be delivered to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either
by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered
paid, and rent will be considered unpaid until actual receipt thereof.

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable
under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other
Tenants.

6. CONSEQUENCES OF BREACH BY TENANT: If Tenant, by any act or omission, or by the act or omission of any of
Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other
documents made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one
tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease
and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease
and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not
be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this Lease, the entire remaining balance of unpaid
rent for the remaining term of this Lease shall ACCELERATE, whereby the entire sum shall become immediately due,
payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and
repairs as a partial offset to satisfaction of the accelerated rent.

7. DELIVERY OF NOTICES: Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant
in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or
registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or
Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in
the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed
in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

8. UTILITIES: Tenant will provide and pay for the following utilities (indicate those that apply):
☒ Electric, ☒ Gas, ☒ Telephone, ☒ Cable Television, ☒ Water, ☒ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply):
☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any
utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the
leased premises back unto Landlord upon termination or expiration of this Lease.

9. NOTICE OF INTENT TO SURRENDER: Any other provision of this lease to the contrary notwithstanding, at least
thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above,
Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term.
If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama
law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific
term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law, Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

I 1. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste m a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent _____ • upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

12. NO ASSIGNMENT: Tenant expressly agrees that the leased premises nor any portion thereof shall be not be assigned or sub-let by Tenant without the prior written consent of Landlord.

13. TENANT INSURANCE: Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from. any and all damages.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.



24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon -which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. **EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. **LANDLORD ENTRY AND LIEN.** In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. **GOVERNING LAW:** This Lease is governed by the statutory and case law of the State of Alabama.

35. **LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

36. **ADDITIONAL PROVISIONS:**

_____
_____
_____
_____
_____
_____

\* \* \*

**WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:**

LANDLORD   Matthew W. Bahr, Lessor

Sign: *Jamarlo K GumBayTay*   Print: Jamarlo K. GumBayTay, Agent   Date: 10/11/06

TENANT

Sign: *Yolanda Boswell*   Print: Yolanda Boswell, Lessee   Date: 10/1/00

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

- ☐    Lawn should be kept cut, raked and edged
- ☐    No junked or abandoned vehicles on property
- ☐    No trash/paper/debris in yard or on lawn
- ☐    No automobiles parked on lawn
- ☐    Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
Yolanda Boswell, Lessee

Date: _____



LEGAL SERVICES
ALABAMA

February 7, 2007


Mr. Jarmarlo K. GumBayTay
4013 Tiffany Drive
Montgomery, Alabama   36110-3003

Mr. Matthew Bahr
1569 Amaryllis Circle
Orlando, FL   32825


RE:  Tenant Complaint:  Sexual Harassment/Repair Request Ignored
      Yolanda Boswell
       964 Gap Loop
       Montgomery, Alabama   36110


Dear Mr. GumBayTay and Mr. Bahr:

We represent the above referenced client.  In light of Mr. GumBayTay's past behavior
and the notice dated January 19, 2006, to Ms. Boswell; a client trust account has been
set up for her rental payments.  You may pick up all future rent payments at this office
from this account.  The February rent payment was made on January 5, 2007, and is
now available to be picked up during normal business hours at the address listed below.
Promptly cease the above referenced offensive behavior and repair Ms. Boswell's toilet
at once.  The mal-functioning toilet complaint is over a month delinquent.  Your prompt
attention to this problem is appreciated.  Address future communications with our client
to this address.

                    Yours truly,



                    CONNIE J.M.C. BAKER
                    STAFF ATTORNEY

PLAINTIFF'S
EXHIBIT
9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

YOLANDA M. BOSWELL,                    )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )    CASE NO. 2:07-cv-135-WKW
                                       )
JAMARLO K. GUMBAYTAY                    )
DBA/THE ELITE REAL ESTATE              )
CONSULTING GROUP, and                  )
MATTHEW W. BAHR,                       )
                                       )
        Defendants.                    )

## ORDER GRANTING INJUNCTIVE RELIEF

Plaintiff's Motion for Emergency Injunctive Relief was heard on February 22, 2007, at

4:00 p.m., pursuant to the order entered in this cause on February 14, 2007 (Doc. #5). Plaintiff

appeared with Connie J.M.C. Baker and Kenneth James Lay, counsel. No Defendant appeared.

It affirmatively appearing from the record that the Defendants were served on February 16, 2007,

with copies of the Complaint, *in forma pauperis* motion, order granting motion for leave to proceed

*in forma pauperis* (Doc. #4) and the court's February 14, 2007 Order, the court proceeded to hear

testimony in support of the Plaintiff's motion for injunctive relief.

Based upon clear and convincing evidence heard in open court, the court finds that a

preliminary injunction is due to be entered against the Defendants and in favor of the Plaintiff as

follows: 1) Defendants are restrained and enjoined from instituting eviction proceedings against the

plaintiff, or from directly or indirectly threatening eviction proceedings against the plaintiff, until

further order of the court; 2) Defendant Jamarlo K. Gumbaytay is restrained and enjoined from

threatening, harassing, or communicating with Plaintiff or any of her immediate family who resides

at 964 North Gap Loop, Montgomery, Alabama until further order of this court; 3) Defendants are restrained and enjoined from interfering with Plaintiff's possession of the premises located at 964 North Gap Loop, Montgomery, Alabama until further order of this court.

The Plaintiff is directed to continue making monthly rental payments in the amount of $450 pursuant to the terms of the lease agreement between the parties dated October 1, 2006, until further order of the court.  Plaintiff shall make said payments to the trust account of Legal Services Corporation.  For any lease payments that are late, the plaintiff shall also pay a $50 late fee into the trust account of Legal Services Corporation.  Legal Services Corporation shall maintain these funds in trust on behalf of the Plaintiff, its client, until the funds are properly requested by the Defendants.

Done this 23rd day of February, 2007.


_____ /s/  W.  Keith Watkins _____
UNITED STATES DISTRICT JUDGE



PLAINTIFF'S
EXHIBIT
10
PENGAD 800-631-6989

# LEGAL SERVICES
## ALABAMA

May 14, 2007

Mr. Jarmarlo K. GumBayTay
4013 Tiffany Drive
Montgomery, Alabama   36110-3003

RE:  Yolanda Bowell
     964 North Gap Loop
     Montgomery, Alabama

Dear Mr. GumBaytay:

    I am writing on behalf of our client, the above referenced tenant, in accordance with the provisions of her lease, the new Landlord/Tenant law and pre-existing real property common law case law, to inform you our client requests the following repairs be completed immediately:  remedy leaking water pipes, correct the flooding from the front bathroom, repair or replace damp carpet and correct malfunction in the tenant's air-conditioning unit.  Additionally, as a reminder, Legal Services has rental monies to turn over to you paid by this tenant.

    Should you have any questions, please feel free to contact me at the address listed below.  Enclosed you shall find a lay version of the new Landlord/Tenant law.

Yours truly,

CONNNIE J.M.C. BAKER
STAFF ATTORNEY

Montgomery Office • 207 Montgomery Street, Ste 1100 • Montgomery, AL 36104 • T 334.832.4570 • F
334.241.8683 • www.alsp.org

PLAINTIFF'S
EXHIBIT
11



## The Elite Real Estate Consulting Group
### Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

## PROOF OF DELIVERY

A copy of this Notice was delivered to Tenant: _Yolanda Boswell (Jenette Boswell)_

☒ by hand

☐ by registered/certified mail at that above address, which is:
    ☒ the place designated by Tenant for receipt of communication _Legal Services of_
    ☐ Tenant's last known place of residence _Alabama_

☐ by posting prominently on the front door of the leased premises.

Notice delivered/mailed/posted by: _Jamarlo K. Gumbaytay_
               Jamarlo K. Gumbaytay

In his/her capacity as:    ☐ Landlord/Lessor  ☒ Manager  ☐ Agent

Notice delivered/mailed/posted on: _12 June 07_

_Delivered to_
_X Legal Srices Alabama_
_Montgomery Office_
_207 Montgomery Street. Ste 1100_
_Montgomery, Alabama 36104_

_X Pamela A. Martin_ — _Administrative Asst_
  Signature    Received by (office personell's name)

_X Pamela A. Martin_
    print name here



## The Elite Real Estate Consulting Group
### Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

## 7-DAY NOTICE OF TERMINATION OF RESIDENTIAL LEASE

T0: Tenant:   Ms. Yolanda Boswell     FROM:   Landlord  Matthew Bahr
               LSA Case No. 07-0004398                 Dr. Jamarlo K. GumBayTay, Rep.
               964 North Gap Loop                      Elite Real Estate Consulting Group
               Montgomery, AL 36110               East Estate Management
                                            4013 Tiffany Drive
                                          Montgomery, AL 36110

Address of Leased Premises:    964 North Gap Loop Road, Montgomery, AL 36110

TAKE NOTICE: your Lease is hereby terminated due to your default under the terms and conditions of said Lease Agreement, by reason of the following breach of breaches thereof:

Late Fees (February – May 2007) plus, May 2007 rent has not been paid as of 29 May 2007. Thus, you are not in compliance with the terms of your lease and the Federal Court Decree. Please be advised, said rent must be paid as soon as possible! Moreover, late fees to the expiration of this notice (7 days) or legal action will be taken.

You must vacate and surrender the leased premises unto Landlord within the seven (7) day notice period, said notice expiring at:

      12 p.m. o'clock on the 20th day of June, 2007.

You must completely vacate the premises by the above-stated deadline.

THIS NOTICE OF TERMINATION IS GIVEN PURSUANT TO APPLICABLE LAW AND IN NO WAY IMPAIRS ANY OF THE OTHER REMEDIES OR RIGHTS OF THE LANDLORD UNDER THE LEASE AGREEMENT OR UNDER APPLICABLE LAW.

Issued this the 12th day of June, 2007

Signed: _____ 20 JUNE 07
           Authorized Agent

cc:   Legal Services Alabama



# The Elite Real Estate Consulting Group
## Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

## NOTICE OF BREACH OF SPECIFIC PROVISIONS OR WRITTEN LEASE WITH NO RIGHT TO CURE RESIDENTIAL

T0:  Tenant:   Ms. Yolanda Boswell          LSA Case No. 07-0004398
                964 North Gap Loop            2:07CV135-WKW
                Montgomery, AL 36110

Address of Leased Premises:    964 North Gap Loop Road, Montgomery, AL 36110

This NOTICE is provided to you regarding the lease of the above identified leased premises. You are advised that you are in violation of the following provision(s) of the lease:

Act No. 2006 316 HB 287, Division II/Landlord Remedies 35-9A-421. Non-compliance with rental agreement failure to pay rent.

The reason you are in breach of the provision above is the following:

(b) If rent is unpaid when due and the tenant fails to pay rent within seven (7) days after receipt of written notice to terminate the lease for nonpayment and if the rent is not paid within the 7-day period, the Landlord may terminate the lease, page #29.

Pursuant to the lease, you are provided with this written notice of the breach and termination of the lease due to the breach. Due to the nature of the breach and in accordance with the lease provisions, there is no right to cure this default. This lease is therefore terminated effective seven days from the date of your receipt of this notice. Please vacate the premises and provide the keys to me by the termination date.

Signed this the _12th_ day of ___June_____, 2007

Signed: _____
           Jamarlo K. GumBayTay
           Authorized Agent



PLAINTIFF'S
EXHIBIT
12
PENGAD 800-631-6989

12/01/2006                7758

# NON-NEGOTIABLE

$5,053.00

MATTHEW W. BAHR
1569 AMARYLLIS CIRCLE
ORLANDO FL 32825-

| Owner Name | | | Owner # | Check Date | Check No. |
|---|---|---|---|---|---|
| MATTHEW W. BAHR | | | 011176 | 12/01/2006 | 7758 |
| **Contract #** | **Unit #** | **Tenant Name** | **Address** | | **Amount** |
| V00315 | 004363 | WEBB, LOIS | 3661 WHITING AVENUE | | 550.00 |
| V01523 | 004382 | WRIGHT, MAXINE | 667 IRIS LANE | | 408.00 |
| V00138 | 004440 | SMITH, MALIAKA | 126 KIWANIS STREET | | 595.00 |
| V00408 | 004255 | HENRY, CARLA | 2029 MERRILY DRIVE | | 600.00 |
| V00393 | 004455 | MCLEAN, ESCAMBIA | 26 KELLY LANE | | 550.00 |
| V00804 | 004494 | KING, LATRICE | 720 CLOVERHILL DRIVE | | 550.00 |
| V00200 | 004446 | HUMPHREY, MARY | 837 NORTH PASS ROAD | | 550.00 |
| V00158 | 004332 | DIXON, LINDA | 1805 RIGSBY STREET | | 600.00 |
| HV003000 | 004877 | VAUGHN, SHERICE | 2017 STELLA ST | | 650.00 |
| | | | | **TOTAL** | **XXXXX.XX** |



PLAINTIFF'S
EXHIBIT
13

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

---

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1.  Contents of Contract

    This HAP contract has three parts:

    Part A: Contract Information
    Part B: Body of Contract
    Part C: Tenancy Addendum

2. Tenant

    RITA JULIAN

3. Contract Unit

    105 STUART STREET  #

4. Household

The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

    RITA JULIAN, ALJUWAN K JULIAN, KENYATTA J BRIER
    , KAWOSKI D JULIAN, TRANOSKI T JULIAN

5. Initial Lease Term

The initial lease term begins on: 12/01/2005
The initial lease term ends on: 11/30/2006

6. Initial Rent to Owner

The initial rent to owner is: $700.00
During the initial lease term, the owner may not raise the rent to owner.

7. Initial Housing Assistance Payment

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $670.00 per month.
The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---



*To Be ror ?) 10/21/05 will*
*35# or TOP ED*

**Form W-9**
(Rev. January 2005)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give form to the requester. Do not send to the IRS.

Name (as shown on your income tax return)
MATTHEW W. Bohr

Business name, if different from above

Check appropriate box: ☒ Individual/ Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ►  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
1569 Amaryllis Cr.

Requester's name and address (optional)

City, state, and ZIP code
Orlando FL 32825

List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Social security number
or
Employer identification number

Note. *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here    Signature of U.S. person ► X  Matthew W. Bohr by SHN    Date ► X  10/20/05

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

Note. *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

For federal tax purposes you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

Foreign person. If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

Cat. No. 10231X    Form **W-9** (Rev. 1-2005)

04/18/2006  15:07    4072497948                          B                                                              PAGE   02
Tuesday, April 18, 2006 10:56 AM                    Letter Perfect 334 264 6452                                                        p.02



**R E Q U I R E D**

### The Housing Authority of the City of Montgomery, Alabama
### Authorization Agreement for Direct Deposit (ACH Credits)

Landlord SSN: \_\_\_\_-\_\_\_\_  or Tax ID Number: \_\_\_-_____

Landlord Name: __Matthew Bahr__

Payee / Agent Name: __Jamarlo K. GumBayTay__

Please check one of the following:

[X] Check here if you are a current Section 8 Landlord enrolling for the first time

[ ] Check here if you are changing any portion of this form from the original submission

[ ] Check here if you are a new Section 8 Landlord

Please check one of the following:

[X]  Start depositing the monthly housing assistance payment(s) to my account, as indicated below.

[ ]  Change the account information for my direct deposit, as indicated below.

Financial Institution Name: __Washington Mutual Bank, FA__

Financial Institution Address: __881 N. Alafaya Trail Orlando FL 32828__

Financial Institution Phone #: __1-800-788-7000__

Routing Transit Number of Account:  (Must be 9 digits) __267084131__

Account Number: __4292727638__ _____

Type of Account: (check the appropriate box)

[X] Checking Account    [ ] Saving Account

I hereby authorize the Housing Authority of the City of Montgomery, Alabama, and the financial institution identified above to electronically deposit my housing assistance payment(s) into my designated account and to correct my account for any amounts deposited to it which I am not entitled.

This authorization shall remain in effect until I submit a new authorization for, or until revoked by me in writing, or upon termination of my contract with said COMPANY.  I understand that a reasonable time period is needed to implement this authorization.

Landlord Signature: X __Matthew W Bahr__                    Date: __6-5-06__


Various - Inbox - Yahoo! Mail                                                                    Page 1 of 1

PLAINTIFF'S
EXHIBIT
16



Yahoo!   My Yahoo!   Mail   More                                    mbahr2000    Sign Out   All-New Mail   Help




FREE
*with completion of program requirements
LAPTOP    Pavilion Notebook PC   MacBook - White   Satellite Notebook PC    GET IT NOW
                                                                            @2007 YourGiftPro.com

| **Mail** | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |

Check Mail | Compose                                          Search Mail | Search the Web

Netflix
Only $4.99/mo.

Previous | Next | Back to Messages                    Mark as Unread | Print

Delete | Reply ▾ | Forward | Spam | Move... ▾

**Folders**    [Add - Edit]

**Inbox (328)**
Drafts
Sent
Spam (453)    [Empty]
Trash         [Empty]

**Search Shortcuts**
My Photos
My Attachments

**Various**                                    Thursday, January 3, 2008 1:27 AM
**From:** "Lynn at Letter Perfect" <letterperfect@charter.net>
**To:** "Matthew Bahr" <mbahr2000@yahoo.com>
**Cc:** "Jamarlo GumBayTay" <eliteconsulting@knology.net>

Matt,
Your December Executive Summary will be arriving tomorrow.

Yolanda Boswell moved from 3399 Tuskegee Circle and took the stove and refrigerator with her. We have a tenant for that unit (Brenda Waits) and will need another stove and refrigerator.

Charges need to be filed.

105 Stuart was approved retroactive to October 2007. Please let me know how much Section 8 is paying on this rent.

## Lynn Norsworthy
Letter Perfect Business Services
334-265-4466 Fax 334-264-8452

ADVERTISEMENT

Rent Movies
from Netflix
FREE
TRIAL
NETFLIX   Click here

Delete | Reply ▾ | Forward | Spam | Move... ▾

Previous | Next | Back to Messages          Select Message Encoding          | Full Headers

Check Mail | Compose                                          Search Mail | Search the Web

Copyright © 1994-2008 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

3927 06-09-08 Gumbaytay Jamarlo.txt

1

1           IN THE UNITED STATES DISTRICT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4   YOLANDA M. BOSWELL,

5           Plaintiff,

6   vs.                 CASE NO. 2:07-cv-135

7   JAMARLO K. GUMBAYTAY,
    d/b/a THE ELITE REAL ESTATE
8   CONSULTING GROUP

9   and,

10  MATTHEW W. BAHR,

11          Defendants.

12

13              *  *  *  *  *  *  *  *  *  *

14          DEPOSITION OF JAMARLO KALONJI GUMBAYTAY,

15  taken pursuant to stipulation and agreement

16  before Dee Coker, Registered Professional

17  Reporter and Commissioner for the State of

18  Alabama at Large, in the Offices of Legal

19  Services Alabama, 207 Montgomery Street

20  Suite 1100, Montgomery, Alabama, on Monday,

21  June 9, 2008, commencing at approximately

22  10:51 a.m.

23              *  *  *  *  *  *  *  *  *  *

2

1               APPEARANCES

2   FOR THE PLAINTIFF:

3   Ms. Allison Neal
    Attorney at Law
4   AMERICAN CIVIL LIBERTIES UNION
    207 Montgomery Street
5   Suite 910
    Montgomery, Alabama  36104

6
    Ms. Faith Cooper

                            Page 1

*Exhibit B*
*2:07-cv-135*

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7  Attorney at Law
    CENTRAL ALABAMA FAIR HOUSING CENTER
 8  1817 West 2nd Street
    Montgomery, Alabama  36106
 9
    Mr. Kenneth Lay
10  Attorney at Law
    LEGAL SERVICES OF ALABAMA
11  207 Montgomery Street
    Suite 1100
12  Montgomery, Alabama  36104

13  FOR THE DEFENDANTS:

14  Mr. Alfred T. Newell, IV
    Attorney at Law
15  Post Office Box 101432
    Birmingham, Alabama  35210
16
    ALSO PRESENT:
17
    Mr. Jonathan Watson, ACLU Intern
18  Mr. Edward Smith, CAFHC Intern

19     '     * * * * * * * * * *

20              EXAMINATION INDEX

21  JAMARLO KALONJI GUMBAYTAY
        BY MS. NEAL                        4
22

23         * * * * * * * * * * *
```

3

```
 1          STIPULATIONS

 2          It is hereby stipulated and agreed by

 3  and between counsel representing the parties that

 4  the deposition of JAMARLO KALONJI GUMBAYTAY is

 5  taken pursuant to the Federal Rules of Civil

 6  Procedure and that said deposition may be taken

 7  before Dee Coker, Registered Professional

 8  Reporter and Commissioner for the State of

 9  Alabama at Large, without the formality of a

10  commission; that objections to questions other

11  than objections as to the form of the questions

12  need not be made at this time but may be reserved

13  for a ruling at such time as the deposition may
```

Page 2

3927 06-09-08 Gumbaytay Jamarlo.txt

14  be offered in evidence or used for any other

15  purpose as provided for by the Federal Rules of

16  Civil Procedure.

17      It is further stipulated and agreed by

18  and between counsel representing the parties in

19  this case that said deposition may be introduced

20  at the trial of this case or used in any manner

21  by either party hereto provided for by the

22  Federal Rules of Civil Procedure.

23          * * * * * * * * * * *


                        4

1       MR. NEWELL:  You want to read

2           and sign the deposition?

3       MR. GUMBAYTAY:  I'll let you

4           read and authorize it.  I don't need

5           to sign it.

6       MR. NEWELL:  I'll do it for

7           him.  How about that?

8               You can sign it, too.

9       JAMARLO KALONJI GUMBAYTAY

10      The witness, having first been sworn to

11  speak the truth, the whole truth and nothing but

12  the truth, testified as follows:

13                  EXAMINATION

14  BY MS. NEAL:

15  Q.  Good morning, Mr. Gumbaytay.

16  A.  Good morning.

17  Q.  My name is Allison Neal, and I am an attorney

18      with the ACLU of Alabama.  And I'm the

19      co-counsel for the plaintiff in this case,

20      and I will be taking your deposition.

                                Page 3

3927 06-09-08 Gumbaytay Jamarlo.txt

21  A.  Okay.

22  Q.  To my right is Jonathan Watson, and he is an

23      intern with the American Civil Liberties

                          5

1       Union.  To my left is Faith Cooper.  She is

2       an attorney with the Central Alabama Fair

3       Housing Center.  To her left is Kenneth Lay.

4       He is an attorney with Legal Services of

5       Alabama.

6               MR. NEWELL:  He's from

7           Birmingham, too?

8               MS. NEAL:  That's right.

9   Q.  And to our left here is Edward Smith, and he

10      is an intern with Central Alabama Fair

11      Housing Center.

12  A.  Okay.

13  Q.  Now, have you ever been deposed before?

14  A.  No, ma'am.

15  Q.  Okay.  Well, in a deposition, I'll ask you

16      questions.  And my questions and your answers

17      are going to be recorded by Ms. Dee Coker

18      here, the court reporter at the end of the

19      table.  And you'll need to speak up and to

20      answer orally at the deposition, because

21      she's not going to be able to record if you

22      shake your head yes or no.  Okay?

23              Now, if I don't -- if I ask a question

                          6

1       and you don't understand what I'm saying or

2       for whatever reason, you don't understand,

3       just please ask me and I'll rephrase it

                     Page 4

3927 06-09-08 Gumbaytay Jamarlo.txt

4    and to be more clear.  Okay?

5  A.  Okay.

6  Q.  And I also want you to know that if you need

7    a break at any time, you know, you should

8    feel free to tell me or tell your attorney.

9    And we'll finish your answer if you're in the

10    middle of it and then, you know, we'll see

11    that you're able to take a break.

12          MR. NEWELL:  Okay.  It's eleven

13      o'clock.

14          MS. NEAL:  Okay.

15  Q.  I'm sure that your attorney has told you this

16    before; but let me just, you know, restate

17    that if you want to talk to your attorney,

18    that's fine.  I just ask that you finish the

19    answer to whatever question if you're in the

20    middle of an answer, and then you can go

21    ahead and speak with your attorney.

22      Sometimes when you're asking --

23    sometimes when you're giving an answer to a

7

1    question, you think you remember the entire

2    answer and then later on, maybe five minutes

3    later, you remember some additional

4    information in response to that question,

5    maybe a clarification.  And I just want to

6    let you know that if that happens, you know,

7    please tell us that you want to add something

8    to your previous statement; and you can do

9    that.  And you can tell us whatever is on

10    your mind at that point.

3927 06-09-08 Gumbaytay Jamarlo.txt

11  A.  Okay.

12  Q.  Okay.  And, also, sometimes when you're

13      answering, you may think of some documents

14      that might help us -- that might help you

15      remember the answer or might help you give a

16      more accurate answer.  And if you do, tell us

17      and we'll see if we have the documents with

18      us.

19          Now, you've sworn under oath that you

20      will tell the truth in your deposition today;

21      is that correct?

22  A.  Yes, that's correct.

23  Q.  Okay.  And I will be asking you questions,

                          8

1       and your responsibility is to answer those

2       questions truthfully.  You understand that

3       responsibility?

4   A.  Yes, I do.

5   Q.  Okay.  Are you taking any medication or do

6       you have any condition that may interfere

7       with your ability to testify today?

8   A.  No, I do not.

9   Q.  Okay.  So I just want to start with some

10      background questions.

11  A.  Okay.

12  Q.  Please state your full name for the record.

13  A.  My first name is Jamarlo, J-A-M-A-R-L-O.

14      Middle initial K, which is Kalonji.  Last

15      name is Gumbaytay, G-U-M-B-A-Y-T-A-Y,

16      Gumbaytay.  Kalonji is capital K-A-J-O-N-I --

17      J-O-N-I.  Kalonji, K-A-L-O-N -- K-O-N --
                          Page 6

3927 06-09-08 Gumbaytay Jamarlo.txt

18      K-A. I don't know how to spell my middle

19      name. K-A-L-O-N-J-I, Kalonji.

20  Q.  And are there any other names that you go by?

21  A.  No.

22  Q.  Are there any other names that you have gone

23      by in the past?

                 9

1  A.  In my -- I changed my name legally about 30

2      years ago.

3  Q.  Okay. What was your name before that?

4  A.  Roger Harris.

5  Q.  Roger Harris?

6  A.  When I was in the military.

7  Q.  Okay. And did you have any other name you

8      went by before that?

9  A.  No.

10  Q.  Okay. Did anybody else accompany you to this

11      deposition?

12  A.  Yes.

13  Q.  Could you please ask them to identify

14      themselves?

15          THE WITNESS: Mr. Newell, could

16        you identify yourself, please, sir.

17          MR. NEWELL: My name is Allen

18        Newell. I'm recently retained to

19        represent him in any representation

20        in the matter. And this is Charlotte

21        Tarwater, my paralegal.

22  Q.  Okay. And have you ever been involved in any

23      litigation or court proceedings before this?

3927 06-09-08 Gumbaytay Jamarlo.txt
10

1  A.  No, I have not, other than child -- a child

2      issue.  I had to get the custody of my

3      daughter when I was in Atlanta.

4  Q.  Okay.  So that was a -- I guess a civil --

5      civil matter?

6  A.  A civil matter.

7          MR. NEWELL:  Domestic civil.

8  Q.  Okay.  And that was -- what was the name of

9      that lawsuit?

10 A.  It's been -- she's over 21 years of age now.

11     She was 13 then.

12         MR. NEWELL:  How old is she

13     now?

14         THE WITNESS:  She's 21 now.  She

15     was 13 then.  So I can't recall.

16         MR. NEWELL:  You tried to get

17     custody or she tried to get custody?

18         THE WITNESS:  I tried to get

19     joint custody.

20         MS. NEAL:  Excuse me.  Could you

21     please stop coaching the witness?

22         MR. NEWELL:  Okay.  Well, I have

23     a right to cross-examine him on what

11

1      you ask him.

2          MS. NEAL:  Well, that's okay

3      under Civil Rules of Procedure.

4  Q.  So you tried to get custody in court?

5  A.  Joint custody.

6  Q.  Joint custody.  And that was in Atlanta?

Page 8

3927 06-09-08 Gumbaytay Jamarlo.txt

7   A.   That was in Atlanta.

8   Q.   Okay.  And so no other -- who were you

9        represented by?

10  A.   Donna Bland.  Attorney Donna Bland here in

11       Montgomery.

12  Q.   And how was it resolved?

13  A.   I got joint custody.  Everything that I

14       wanted, I got, and then some.

15  Q.   Okay.  So were there any other -- any

16       other -- no other court proceedings?

17  A.   No other court proceedings.

18  Q.   Okay.  So how did you -- how did you prepare

19       for this deposition?

20  A.   Could you clarify that, please?

21  Q.   Yeah.

22            MR. NEWELL:  He had to pay me

23            first, you know.  And that's about

                            12

1             it.

2   Q.   Did you tell anybody who is not present here

3        today about this deposition?

4   A.   No, I did not.

5   Q.   And how did -- what did you -- what did you

6        and your attorney do to prepare for this

7        deposition?

8   A.   We read the deposition, got some

9        clarification on the deposition.  And we had

10       a conversation about the deposition and we

11       moved forward.

12  Q.   Okay.  And how long would you say that you

13       met for?

3927 06-09-08 Gumbaytay Jamarlo.txt

14  A.  Well, briefly, we just -- I only retained him

15      last week.  So it was -- it's been very

16      brief.

17  Q.  And how many times did you --

18  A.  We conversated on the telephone on some

19      occasions.

20  Q.  Okay.  Was anybody else present?

21  A.  No, other than his legal -- paralegal.

22          MR. NEWELL:  He wanted me to

23          hold off until he sold some house

                        13

1           previously.  It's been a while, like

2           six months ago.  Still, I wasn't

3           retained then, so --

4   Q.  Okay.  Did you review any documents?

5   A.  Such as what?

6   Q.  Did you review any documents in preparation

7       for --

8           MR. NEWELL:  No.

9   Q.  -- this deposition?

10          MR. NEWELL:  He gave me -- he

11          gave me papers.

12          MS. NEAL:  Excuse me.  You're

13          going to have to refrain from

14          answering for your client.

15  A.  No, I did not.  I turned everything over to

16      my attorney.  When I retained him, I turned

17      everything over to him.

18  Q.  Okay.  And so when you were discussing this

19      case with -- with your attorney beforehand,

20      you didn't -- he didn't show you any

                        Page 10

3927 06-09-08 Gumbaytay Jamarlo.txt

21  documents that might help refresh your

22  recollection or --

23  A.  I turned the entire case over to him.

                            14

1  Q.  Okay.

2                MR. NEWELL:  What did I call you

3           at one o'clock in the morning to ask

4           you -- tell you?

5                MS. NEAL:  Excuse me.  You're

6           going to have to --

7                MR. LAY:  Mr. Newell, do you not

8           understand how to conduct a

9           deposition?

10               MR. NEWELL:  Yeah.  Yes, I do.

11               MR. LAY:  Okay.  Well, if you

12          continue to interrupt and you

13          continue to answer for him, we're not

14          going to get through this.

15               MR. NEWELL:  Okay.

16               MR. LAY:  Okay?  I'm not trying

17          to be ugly; but, you know, she's said

18          something three times now.

19               MR. NEWELL:  Which one?

20               MS. NEAL:  I did.  I said three

21          times that you're going to please

22          have to stop answering questions for

23          your witness.  This is our time to

                            15

1           get his answers, to get his

2           testimony.

3                MR. LAY:  If you want to ask him
                         Page 11

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 4        follow-up questions or to ask
 5        questions at the end, you certainly
 6        have that right; but now is not the
 7        time.
 8            MR. NEWELL:  Okay.  Y'all go
 9        ahead, and I'll quit objecting until
10        the end.  It's two parts.
11  Q.  So, Mr. Gumbaytay, what is your date of
12      birth?
13  A.  6/28/53.
14  Q.  Okay.  And where were you born?
15  A.  Macon County, Alabama.
16  Q.  Okay.  And are you married?
17  A.  No, I'm not.
18  Q.  Have you been married previously?
19  A.  Yes, I have.
20  Q.  Can you please state each person you've been
21      married to?  How many times have you been
22      married?
23  A.  Once.
```

```
                        16
 1  Q.  Once.  And what's the name of your ex-wife?
 2  A.  Rochelle Abere.
 3  Q.  Can you please spell that for the record?
 4  A.  A-B-E-R-E.
 5  Q.  And how do you spell Rochelle?
 6  A.  R-O-C-H-E-L-L-E.
 7  Q.  Okay.  And how long were you -- were you
 8      married?
 9  A.  26 -- five -- five and a half years.  I have
10      a 26-year-old son.
```

3927 06-09-08 Gumbaytay Jamarlo.txt

11  Q.  Okay.  And what was the -- what was the time
12      period?  What was --
13  A.  That was when -- we got married when we both
14      were 21 years of age.
15  Q.  Okay.  And I mean what -- do you remember
16      what year that was approximately?
17  A.  She had graduated from Lawrence Brown in
18      1976, so it was in the early '70s.
19  Q.  Okay.  And do you have any children?
20  A.  I have a 26-year-old son.
21  Q.  Okay.  And where does your -- where does your
22      child live?
23  A.  He lives in College Park, Georgia.

                        17

1   Q.  And what is your current address?
2   A.  4013 Tiffany Drive, Montgomery, Alabama,
3       36110.
4   Q.  How long have you lived there?
5   A.  I lived there for approximately four -- a
6       little over four years now.
7   Q.  Okay.  And does anyone else live there with
8       you?
9   A.  No.
10  Q.  Okay.  Oh, I'm sorry.  Who was the mother of
11      the -- I'm sorry.  I take a moment to ask the
12      question.  Do you have a daughter?
13  A.  Yes.
14  Q.  Okay.  And when -- how old is -- how old is
15      your daughter?
16  A.  She's 21.
17  Q.  21.

                    Page 13

3927 06-09-08 Gumbaytay Jamarlo.txt

18  A.  She'll be 21.

19          MR. NEWELL:  He's already told

20      you that.

21  Q.  And who is the mother of your daughter?

22  A.  Angela Zanders, Z-A-N-D-E-R-S.  She

23      remarried.  Her last name is Jones now.

                        18

1       Maiden name was Zanders.

2   Q.  Okay.  And so you have a son that's 26 and a

3       daughter that's 21.

4   A.  Correct.

5   Q.  Do you have any other children?

6   A.  No.

7   Q.  Okay.  And have you -- did you ever live in

8       Georgia?

9   A.  Yes.

10  Q.  What -- do you remember your addresses when

11      you lived in Georgia?

12  A.  No.

13  Q.  Okay.  What is your telephone number?

14  A.  334-241-5986.

15  Q.  And do you have any other numbers in which

16      you --

17  A.  Cell phone is 334-202-8676.

18  Q.  And work number or anything else?

19  A.  No.

20  Q.  Okay.  And what is your social security

21      number?

22  A.  ██████████

23  Q.  Have you ever had a different social security

                        Page 14

3927 06-09-08 Gumbaytay Jamarlo.txt
19

1    number or --
2  A.  No.
3  Q.  -- have you ever used a different social
4      security number?
5  A.  No.
6  Q.  Okay.  What is your educational background?
7  A.  I have an AA degree in journalism.  I have a
8      bachelor's degree in social science.  I have
9      a master's degree in social science.  I have
10     an Ed.S. in school administration.  And I
11     have a Ph.D. in education, secondary
12     education.
13 Q.  Okay.  Well, let's start with the first
14     degree you got.  You got your bachelor's
15     degree?
16 A.  Correct.
17 Q.  And where did you get that?
18 A.  Auburn University.
19 Q.  Okay.  And approximately when did you get it?
20 A.  Graduated in '94.
21 Q.  Okay.  And when did -- what was next --
22 A.  I got an AA before then.
23 Q.  Okay.  You got an AA before that.  And where

20

1      did you get that?
2  A.  In Atlanta, Georgia.
3  Q.  Okay.  And when did you get that?
4  A.  Back in '82, '83.
5  Q.  And what does AA stand for?
6  A.  Associate of Arts.

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7  Q.  Okay.  And after you got your degree at

 8      Auburn, your bachelor's degree at Auburn,

 9      what did you get next?  What was your next

10      degree?

11  A.  Got a master's degree in social science,

12      secondary education, from Alabama State

13      University.

14  Q.  Okay.  And then what about after that?  What

15      did you get?

16  A.  I got an Ed.S., which is an education

17      administration certification in school

18      administration, at Auburn University of

19      Montgomery.

20  Q.  And what year did you get that?

21  A.  I'm not sure.  It's been a while.  And that

22      was right after the Alabama State.  It was in

23      the early -- had to have been in the '80s.
```

                              21

```
 1  Q.  Okay.

 2  A.  It was in the '80s.  I'm not sure of that,

 3      it's been so long ago.

 4  Q.  Okay.  Were there any other degrees you got?

 5  A.  I got a Ph.D. in secondary education from --

 6  Q.  From where?  I'm sorry.

 7  A.  From Hamilton University.

 8  Q.  From Hamilton.  And when did you get that?

 9  A.  I got that in -- shortly after the Ed.S. in

10      the late '80s.  It was the '80s or the '90s.

11      I'm not sure.

12  Q.  Okay.  Are you affiliated with any church?

13  A.  Yes, I am.
```

                        Page 16

3927 06-09-08 Gumbaytay Jamarlo.txt

14  Q.  In what capacity?

15  A.  I am a member of a church as parishioner.

16  Q.  The name of the church is Asparishioner?

17  A.  I'd rather not -- I'm a parishioner.

18  Q.  Oh, parishioner.

19  A.  Just a churchgoer.

20  Q.  Oh, okay.  Okay.

21  A.  Just a regular member.  Yeah, parishioner.

22  Q.  So let's -- I want to talk a little bit about

23      your employment history.  What was your first

                          22

1       job?

2   A.  I worked with the Atlanta Police Department

3       in Atlanta, Georgia, for about six and a half

4       years as an officer, as a public relations

5       officer.  In other words, I'm the one that

6       said no comments to the media.  I was

7       departmental spokesperson for the Bureau of

8       Corrections, Bureau of Police Services,

9       Bureau of Fire Services, Bureau of Civil

10      Defense.  Just say the Department of Public

11      Safety for the City of Atlanta.  That covers

12      four different bureaus.

13          I was the information officer assistant.

14      I was working on a journalism degree then at

15      Alabama State -- correction -- at Georgia

16      State University.  So Department of Public

17      Safety, I was the spokesperson for the

18      departmental heads.

19  Q.  And when did you work there?

20  A.  That was -- let me see.  I got my -- I was at

                          Page 17

3927 06-09-08 Gumbaytay Jamarlo.txt

21  Georgia State.  I transferred from Atlanta

22  Junior College, went to Georgia State

23  University probably in -- my son was born in

                        23

1   1981.  It was in the early '80s.  I can't

2   remember the exact date.  I just know my son

3   was -- was born in December 1981.

4  Q.  Okay.  Well, I'm sorry.  I didn't realize

5      that you went to Georgia State before that.

6  A.  Right.  I didn't get a degree from Georgia

7      State University.  I had did all the course

8      work but never got the degree.  I had some

9      other things come up on my schedule, so I

10     stopped school and took all that -- all those

11     courses I took at Georgia State University

12     and transferred to Auburn.

13 Q.  Oh, okay.  Okay.

14 A.  So I was working on a journalism degree at --

15     a communications degree at Georgia State, and

16     I transferred that and changed careers.  And

17     when I -- a couple of years later when I got

18     back from Desert Storm, and I started working

19     on a degree in education.

20 Q.  Okay.  So how did your job end at the police

21     department?

22 A.  It was -- at that time, it was a temporary

23     job.  It was with the -- called the CETA

                        24

1      program that the federal government had.  I

2      forgot the acronym as far as -- it was a

3      federally funded program; and so when that

                     Page 18

3927 06-09-08 Gumbaytay Jamarlo.txt

4    program ended, the job ended.  And I started

5    with them.

6  Q.  And what was your -- what was your next job

7    after that?

8  A.  I worked for the Atlanta Life Insurance

9    Company.

10  Q.  How long did you work there?

11  A.  Less than -- less than two years.  I was an

12    agent, health -- health agent.

13  Q.  And do you -- do you remember approximately

14    the dates that you worked there from?

15  A.  No.  It was in the '80s, because all that was

16    shortly after my son was born.

17  Q.  In the '80s.

18  A.  Right.

19  Q.  Early '80s?

20  A.  Early '80s, right.

21  Q.  Okay.  And how did your job end?

22  A.  I changed jobs and went independent, went

23    to -- started as an independent agent.

25

1  Q.  An independent health agent?

2  A.  Insurance agent, yeah, health and life.

3  Q.  Okay.  And so you worked for your -- you

4    worked for yourself at that time?

5  A.  Correct.

6  Q.  Okay.  And when was that?  Do you remember

7    the --

8  A.  The same, about the early '80s.  That's all I

9    can remember.

10  Q.  Early '80s.

3927 06-09-08 Gumbaytay Jamarlo.txt

11  A.  Correct.

12  Q.  And how many years did you work there?

13  A.  It was less than two years.

14  Q.  Less than two years?

15  A.  I had got my -- I received my state license.

16  Q.  Okay.  And why did you stop working as an

17      independent health and life insurance agent?

18  A.  I -- I joined the -- the National Guard, came

19      back -- relocated to Alabama, got sent to --

20      I think I had -- joined the National Guard,

21      did that for what -- relocated to Alabama,

22      started school at Auburn.

23  Q.  Okay.

26

1   A.  I was starting to finish up my degree.  And

2       during that -- somewhere during that time

3       frame when that first Gulf War started up, I

4       left and went to Desert Storm.  I was with

5       the 214 Military Police Company.  I was an MP

6       in Desert Storm.  So that's why.

7   Q.  Okay.  And how many -- how many -- how long

8       were you in the National Guard?

9   A.  Six and a half years with the Army National

10      Guard, did about six years with the United

11      States Marine Corps -- that's the military --

12      as an E-5, which is a sergeant.  I was a

13      training NCO and a recruiter.  So it was a

14      total of 12 years with both Reserve -- both

15      active and Reserve time.

16  Q.  Okay.  And when did your time with the Army

17      National Guard start?

Page 20

3927 06-09-08 Gumbaytay Jamarlo.txt

18  A.  It was just about a year before the Gulf

19      War.  When was that?  Back in early '90s?

20  Q.  Yes.  I --

21  A.  I'm not sure, but about a year, but I had

22      joined in Atlanta and then transferred to --

23      back to Alabama.  Then I relocated back to

27

1       Alabama to finish up my education.  Then I

2       think within the six-month time period I

3       left, they started the first Gulf War.

4   Q.  Okay.  And when did your time with the -- the

5       Marine Corps -- with the National Guard

6       Marine Corps stop?

7   A.  I had stopped that probably in the -- in the

8       late '70s because I had -- I was at Georgia

9       State University at that time.  So it was

10      conflicting with my class.

11  Q.  Oh, I'm sorry.  My -- I --

12  A.  Oh, with the National Guard?

13  Q.  Yes, the National Guard.

14  A.  Late '90 -- probably '94, because I had --

15      probably '93, '94, about a year after I

16      returned back from Desert Storm.

17  Q.  So you -- I'm sorry.  So you -- you said that

18      you were in the Army National Guard for --

19  A.  Six and a half years total.

20  Q.  For six and a half years.

21  A.  Reserve.

22  Q.  Reserve?

23  A.  National Guard Reserve, correct.

3927 06-09-08 Gumbaytay Jamarlo.txt
28

1  Q.  So how long were you on active duty?

2  A.  National Guard, I had six -- I did about six

3      and a half years with them.  Six or six and a

4      half years, just Reserve time.

5  Q.  With Marine --

6  A.  Except for the active duty time.

7  Q.  How long was your active duty time?

8  A.  The Gulf War lasted, what, four months?  So

9      that's about it.  We -- we went in, came in

10     and came out in about two and a half months,

11     three months or something, I believe.

12  Q.  Okay.  And so you had approximately four

13     months of active duty and then --

14  A.  We was called up to active duty.  I wasn't

15     necessarily considered as active duty.

16  Q.  Okay.  So while you were -- did you have

17     another profession while you were a

18     reserve -- on reserve?

19  A.  Just a student.

20  Q.  You were just a student?

21  A.  Correct.

22  Q.  Okay.  And when did your next stint of

23     employment start?

29

1  A.  It started with the Montgomery Public School

2      System once -- upon graduation from Auburn

3      University in November of 1994.  I was

4      offered a position as a secondary education

5      teacher in social science.  So I taught

6      social studies at Bellingrath Junior High

3927 06-09-08 Gumbaytay Jamarlo.txt

7   School.

8   Q.  And that's here in Montgomery?

9   A.  Correct.

10  Q.  How long did you teach social sciences?

11  A.  I worked with the school system for about

12      seven to eight years.

13  Q.  What all did you -- in what capacities did

14      you work for the school system?

15  A.  The first year, I was a social studies

16      teacher for the ninth grade at which --

17      sequence basically -- ninth grade social

18      science at Bellingrath Junior High School.  I

19      started out in 1994, November of 1994, until

20      the end of that school year.  I started out

21      working with Bellingrath Junior High School

22      in Montgomery, Alabama.  The second year I

23      requested and received transfer to an

                        30

1       alternative school.  I worked in alternative

2       education with the project, the Madison Park

3       Alternative School, as an alternative school

4       teacher, social science, for about seven --

5       pretty close to seven years.

6   Q.  Okay.  And what made you seek transfer?

7   A.  I wanted to work with at-risk kids.  I was a

8       father -- I was a child who parents divorced

9       at a very early age.  And I wanted to work

10      with young, at-risk, inner-city kids.  And I

11      felt like I had something to offer them,

12      which I -- it was very rewarding for me.

13  Q.  Okay.  And so when, approximately, did your

                    Page 23

3927 06-09-08 Gumbaytay Jamarlo.txt

14    job end?

15  A.  I left -- after I did the seven years with

16     the Montgomery Public School, I took two

17     years off, started my own -- started a

18     business again at -- worked two years for

19     myself.  I had a little office set up over

20     there at the Montgomery Incubator over there

21     on South Court Street.  I opened up an office

22     over there as a financial consultant.

23        After -- that was probably from '90 --

31

1     seven years from '94, two years doing my own

2     self-employment.  Went back to the school

3     system I'm thinking in 2000.  I was hired as

4     an assistant principal at Fews Alternative

5     School.  I transferred to Carver Senior High

6     School.  I was assistant principal at Carver

7     Senior High School.  I left Carver Senior

8     High School at the end of that school year.

9     That's one year as assistant principal.

10        The next school year, because I had no

11     tenure with the school system because I had

12     left those previous two years, I was placed

13     at Brewbaker Junior High School in

14     Montgomery, Alabama, as a seventh grade

15     social science teacher.

16  Q.  And so when you had -- from 1994 until 2001

17     or so, when you worked with at-risk kids in

18     the alternative education system, why did

19     you -- why did you leave that job?

20  A.  I started my own business again.

3927 06-09-08 Gumbaytay Jamarlo.txt

21  Q.  Okay.  So, I mean, were you -- did you
22      voluntarily leave?
23  A.  I voluntarily left, right.  You know,

                          32

1       remember I told you I had left two years,
2       went back as assistant principal, left as a
3       teacher, I got rehired as an assistant
4       principal, left voluntarily, went back into
5       my own business.  So basically, I went back,
6       stopped, went back, stopped, went back.
7   Q.  And why did you -- so for two years, you
8       worked as a financial consultant?
9   A.  Correct.
10  Q.  Was that here?
11  A.  In Montgomery, Alabama.
12  Q.  Okay.  And when was that, approximately?
13  A.  For the -- when I left the school system?
14      Let's see.  I graduated in '94, worked from
15      '94 to '95, worked '95 for seven years at the
16      alternative school.  So about early 2000.
17  Q.  Early 2000?
18  A.  It was probably the late '90s.  The late
19      '90s.  '80 -- '97, '98.  I'm not exactly
20      sure.  It's --
21  Q.  Well, are you positive that you worked for
22      seven years in your --
23  A.  Right.

                          33

1   Q.  Okay.
2   A.  I have approximately -- with all the time, I
3       have approximately eight years in with the
                     Page 25

3927 06-09-08 Gumbaytay Jamarlo.txt

4    school system, eight, eight and a half.

5    Eight, eight and a half years.  Because I

6    know I had -- I was short two years from

7    getting my tenure.

8  Q.  Okay.  Was your employment with the school

9    system ever involuntarily terminated?

10 A.  No.  No.

11 Q.  Okay.  And were you ever asked to transfer to

12   a different school?

13 A.  No.  I was very good at what I did.

14 Q.  So why did you -- why did you transfer to

15   Carver?

16 A.  The principal at Carver High School had had a

17   lot of problems at Carver, and they didn't

18   have enough personnel over there.  And I

19   was -- I was the new kid on the block, so to

20   speak, so they picked the rookie to send me

21   over there.  And, plus, I had a pretty good

22   reputation in terms of being a

23   disciplinarian.  Because I was a former U.S.

                        34

1    Marine, and I had worked with alternative

2    school kids for seven and a half years and

3    at-risk kids.  So I had a pretty good track

4    record of being a disciplinarian.

5         So I went in with the request of the

6    superintendent to assist Mr. Dalford over

7    there, who was a fairly new principal at that

8    time, because the principal at that time had

9    been called up to Iraq.  So he was in as an

10   interim principal.  So he called in -- called

                        Page 26

3927 06-09-08 Gumbaytay Jamarlo.txt

11    in me to assist.  And they only had two

12    administrations -- two administrators over

13    there, and so they had a slot for another

14    one.

15         So the alternative school was small.

16    They only had about 15 or 20 students at the

17    alternative school.  And Carver had pretty

18    close to 2,000 students, I believe, at that

19    time.

20  Q.  Okay.  And so how long -- then after you

21    worked for a year at Carver as the assistant

22    principal, you went to Brewbaker?

23  A.  I did -- the following school year, when the

                          35

1    contract ended, they rehired me as a social

2    science teacher at Brewbaker Junior High

3    School.

4  Q.  Okay.

5  A.  I was a social science teacher, seventh

6    graders.  And you remember I indicated on the

7    record I was not tenured?  So they had that

8    right to reassign you because you -- when you

9    lose your tenured status.  So if -- I was

10    tenured as a teacher before I left, but I had

11    lost that tenureship when I left the school

12    system for two years.  Because you have to

13    have three years in before you receive your

14    tenured status.  So I wasn't a tenured

15    administrator either.

16  Q.  Well, how long did you work at Brewbaker

17    Junior High School?

3927 06-09-08 Gumbaytay Jamarlo.txt

18  A.  One full school year.

19  Q.  One full school year?

20  A.  Correct.

21  Q.  And what did you -- what did you end up doing

22      after that?

23  A.  I started my own business again.

                            36

1   Q.  Okay.  And what -- do you remember

2       approximately what year that was in?

3   A.  I believe I left Brewbaker -- left the school

4       system for the final time -- let's see.  It's

5       2008 now.  Probably around 2004 -- four,

6       five, six, seven, eight -- probably around

7       2004 was my last school year with the

8       Montgomery Public School.

9           I can go back, you know, I can -- they

10      don't have no problem rehiring.  I have a

11      pretty good track record.  They never had any

12      problems.  So, you know, if I wanted to go

13      back this school year, I'm quite sure I would

14      get rehired.

15  Q.  Were there ever any complaints against you

16      while you were working in the school system?

17  A.  No, not a one.

18  Q.  Not from any parents?

19  A.  Not from any parents.  I had the best rapport

20      with parents than anyone have ever had.  I

21      got highly recommendation from the principal

22      as to the success of most all of my parent

23      conference.  Never had a conflict with --

                        Page 28

3927 06-09-08 Gumbaytay Jamarlo.txt
37

1      with students.  Worked with the alternative

2      school for seven and a half years, never had

3      a fight in my classroom.

4  Q.  Okay.  And so when you start -- what kind of

5      business did you start in 2004?

6  A.  Real estate consulting.

7  Q.  And what was the name of that business?

8  A.  Elite Real Estate Financial Investment Group.

9  Q.  Okay.  And you -- so you never -- you never

10      worked under any other -- under any other

11      business title?

12  A.  My business title I worked up under as a real

13      estate consultant was Elite Real Estate

14      Investment Consultant and Elite Real Estate

15      Consultant doing business as Real Estate --

16      Elite Real Estate Management Group.

17  Q.  Okay.

18  A.  You know, doing business as.  But my legal

19      LLC is incorporated under the Elite Real

20      Estate Investment Group.  The Elite Real

21      Estate Investment Group is -- that's the LLC

22      for the state of Alabama, city of

23      Montgomery.  Papers has been filed with the

38

1      probate office if you want to verify that.

2      And I think I have a copy of it in my

3      documents.

4  Q.  And how long did you operate that business?

5  A.  Since the -- I left from -- when I left the

6      school system.  So I think -- I believe I'd

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7    say it was -- at last, about 2003.  2004 I
 8    went back to work for myself again.
 9 Q.  Okay.
10 A.  I'm just determined to -- to make it work,
11    you know.  If all else fails, you know.
12 Q.  So are you still -- are you still operating
13    that business or --
14 A.  No.  No.  No, I'm not doing anything along
15    that line right now.
16 Q.  Okay.  When did you -- when did you stop
17    running Elite?
18 A.  All of my clients was put on hold as of the
19    first part of this year when I received a
20    notice from the Real Estate Commissioner that
21    I was -- someone had informed the Real Estate
22    Commissioner that I was operating without a
23    real estate license in the state of Alabama.
```

                          39

```
 1    And I had assisted these -- some private
 2    investors from Florida to make a transition
 3    into the state, and I basically took over the
 4    responsibility of trying to assist them in
 5    doing that.
 6        So the Real Estate Commission gave me a
 7    cease and desist order, so I don't do
 8    anything along that line.  That's why I
 9    entered into real estate school, at the
10    request of Charles, the real estate
11    investigator over there.
12 Q.  And what -- what are you doing right now
13    other than going to real estate school?
```

                                   Page 30

3927 06-09-08 Gumbaytay Jamarlo.txt

14  A.  Right now we're working on doing a

15      subdivision development.  I have a few of my

16      associates.  We're contemplating on working

17      on doing a subdivision development.  So if

18      everything goes according to plan and we get

19      the financing, we're just going to start to

20      building houses.

21  Q.  Okay.  So when you worked at Elite Real

22      Estate Consulting Group, what was your

23      position?

                        40

1   A.  I was the head person down there.  It's just

2       a small operation.  I operate out of my

3       home.  I have a small home in North

4       Montgomery.  I had an office set up there.

5       All the office equipment that I had from my

6       previous business, I just set up in my

7       bedroom, one of the bedrooms in my home.  So

8       there wasn't anybody -- I mean, it wasn't a

9       storefront operation.  It was private.

10  Q.  Did Elite always operate out of your home?

11  A.  That is correct.

12  Q.  Okay.  And were there any other owners of

13      Elite?

14  A.  No.

15  Q.  When you say that you -- when you said that

16      you took some of the equipment from your

17      previous job, what were you referring to?

18  A.  When I was -- remember, I had indicated

19      earlier that I had -- when I first started, I

20      had an office over there at the Montgomery

                                    Page 31

3927 06-09-08 Gumbaytay Jamarlo.txt

21    Incubator?  I had some office equipment, you

22    know, like a computer left over, a desk,

23    chairs, just basic office furniture.

41

1  Q.  And that's when you were working as a

2      financial consultant?

3  A.  Correct.  So I just had -- I had it in

4      storage, so when I helped -- you know,

5      started helping these guys out, I just took

6      it out of storage.  And my cousin and I

7      had -- were sharing an apartment -- sharing a

8      house initially.  And when she moved out, I

9      just converted the bedroom to an office.

10  Q.  Okay.  And so does Elite Real Estate

11      Consulting Group -- you guys have insurance?

12  A.  I have homeowner's insurance, but not

13      liability insurance.

14  Q.  Okay.  And --

15  A.  Not business insurance, if that's what you're

16      asking.

17  Q.  And what role did Eric Cruz play?

18  A.  Eric Cruz?  He met Mr. Guest when he came

19      to -- at Montgomery, just like I did.  I

20      don't know Eric personally.  I don't know

21      where he live at, never known where he live

22      at.  So he played the role as the maintenance

23      person.

42

1  Q.  Okay.

2  A.  When something went wrong with one of the

3      houses, they called him for maintenance

Page 32

3927 06-09-08 Gumbaytay Jamarlo.txt

4    services.

5  Q.  Who -- you mentioned a name.  You said that

6    Mr. Cruz knew somebody that you knew.  What

7    was --

8  A.  Yeah.  Mr. Guest, Chip Guest.  He's the

9    private investor that came to Montgomery.  A

10    great deal of investors came from

11    Montgomery -- came from Florida and

12    California.  And they started to buying up a

13    great deal of houses in North Montgomery,

14    West Montgomery.  And so Mr. Chip Guest is

15    the one that was buying the properties, and

16    he had sold the properties to other

17    individuals in Florida.

18        And those individuals that he sold the

19    properties to, prior to selling them to -- to

20    them, he had contacted me and had an

21    article -- not article -- I had an ad in the

22    Section 8 Bulletin Board.  So that's how I

23    met him for the first time.  He had started

43

1    calling around to people who had -- already

2    had some rental properties in there I was

3    contemplating on renting myself.  And we

4    talked, and he asked me would I consider

5    renting the properties for him.  I said I

6    would.  He -- and we both agreed upon what he

7    would compensate me for.

8        Then after I got those rented to Section

9    8 clienteles or non-Section 8 clienteles, he

10    asked me -- requested would I -- until he

Page 33

3927 06-09-08 Gumbaytay Jamarlo.txt

11    found a real estate company, would I consider
12    just maintaining the status quo until they
13    could get an agent.
14  Q.  And how do you spell his name?
15  A.  Chip Guest like -- like a guest room, a guest
16    in your home.
17  Q.  Okay.
18  A.  Right.  Then Eric, I guess he met him the
19    same way.  Because he had a -- they had a --
20    a group of Hispanic individuals working with
21    him from -- they had brought up from Florida
22    and -- and from Texas.  And they was doing
23    all the repairs and renovation on these

                        44

1    properties.  And Eric was sort of like the
2    overseer at that point in time.
3        Then when I left Guest Properties, I
4    left them and started to focus on my own
5    financial consulting business again at that
6    particular time.  That was -- I cut ties off
7    with him a year later, in other words.  Eric
8    came into play, and that's when I knew Eric
9    had came into the system.  And he called me
10   up and -- and asked me to -- to assist him
11   then with some additional rentals because
12   they had got into a situation here.  They
13   went out of business, in other words.  So I
14   started to taking over the property for some
15   other individuals two years later that I
16   wasn't expecting when they left town.  I
17   didn't know they had left town for some other

3927 06-09-08 Gumbaytay Jamarlo.txt

18    reasons.  So --

19  Q.  Well, when you say you left Guest Properties,

20        what was your -- what was your role with

21        Guest Properties?

22  A.  I had no role with Guest Properties other

23        than the fact I rented -- he asked me to rent

                              45

1      his properties for him, and I rented his

2      properties for him.  And that's the only

3      relationship that I ever had with him.  He

4      met me as a result of the ad that I put in

5      the Section 8 Bulletin, like 10,000 other

6      landlord wannabes.

7            So he just called me because I had about

8      six or seven houses listed in that

9      publication.  He called me and introduced

10    himself and told me he had just came in from

11    Florida and he was just -- had an interest in

12    what I was doing.  I told him what I was

13    doing.  I said, well, I have these properties

14    I'm trying -- trying to rent.  And he said,

15    well, I'd like for you to try to help me rent

16    mine.

17          And so at that particular time -- he

18    called me up about two months later, three

19    months later.  He came by my house, him

20    and -- came by my house.  We talked.  And a

21    couple months later he called me again -- I

22    guess he was getting everything set up -- and

23    asked me would I rent the properties for

                         Page 35

3927 06-09-08 Gumbaytay Jamarlo.txt
46

1    him.  And I said I would.  And he offered me

2    a fee to do so, and I -- I volunteered to do

3    so.

4          We had no contract relationship.  It was

5    just a gentlemen's agreement that, you know,

6    for a fee, I would rent his house.  And I

7    did.  And then until he found someone to

8    manage those properties, since he didn't know

9    anybody in town, he asked me would I take

10   over the management of those properties for

11   him in the capacity of a manager, because I'm

12   not a management company.

13 Q.  So how long did -- how long did you -- did

14   you work for Guest as a manager of the

15   properties?

16 A.  No, I didn't work for Guest.  Remember, I

17   said earlier that Guest Properties was the

18   investor.  Guest Properties came in, bought

19   investment properties in Montgomery, in West

20   Montgomery, North Montgomery, Central

21   Montgomery.  He called me and asked that I

22   rent those properties for them because they

23   didn't know anything about the city, they

                           47

1    didn't know anything about the town, for a

2    fee.  And I told him I would.

3          After I rented the properties, I didn't

4    have no relationship with him.  No cordial

5    relationship with him.  No contract with him

6    in any form, fashion, or shape.  Every house

                        Page 36

3927 06-09-08 Gumbaytay Jamarlo.txt

7    that I rented and got a person in, he

8    compensated me for it; and that was the

9    extent of our relationship.

10  Q.  Oh.  So you never -- you never managed

11    properties.

12  A.  I never -- no.  He just -- he -- he was

13    buying properties to sell to private

14    individuals in Florida, like doctors,

15    lawyers, engineers, architects, professional

16    people --

17  Q.  Sure.

18  A.  -- who had excellent credit scores.  And back

19    in those days when the subprime market was

20    real, real good, these investors can get up

21    to 10 or 15 properties just on their credit

22    scores alone.  So, apparently, he must have

23    been marketing to these individuals, because

            48

1    he got quite a few of them to come on board.

2    And those individuals that came on board, I

3    just happened to have been in the right place

4    at the wrong time; because I found out

5    eventually, that he eventually found himself

6    into some legal issues that you probably were

7    aware of, that I have nothing to do with.

8        And I was investigated and questioned.

9    I was interviewed by the FBI in my

10    involvement.  And I said, sir, anything you

11    need, anytime you need it, let me know.  You

12    know, I am a former military police officer.

13    I have no intention of, you know, lying to

3927 06-09-08 Gumbaytay Jamarlo.txt

14    the FBI in any form, fashion, or shape;

15    because anything the FBI want, they going to

16    get it anyway.

17        So I explained to him the same thing I

18    just explained to you. I was just in the

19    right place at the wrong time, didn't know

20    anything about it. I got burned along with

21    everybody else that got burned, you know,

22    that bought these properties from him,

23    unsuspecting investors in Florida.

                           49

1  Q.  Did you buy properties from him as well?

2  A.  No, no, no. No. No, ma'am. I had my own

3       program going.

4  Q.  Okay. So when did you place an ad in the

5       Section 8 Bulletin?

6  A.  I think they came through here -- if I had

7       to -- they probably came through here in,

8       what, 2000 -- they probably came -- he

9       probably came in town -- I can't say

10      exactly. Probably about 2002, 2003 when they

11      first started.

12         A group of investors out of California,

13      Florida, and some other parts of the country,

14      you know, saw that Montgomery was a very

15      lucrative market and they can buy up a lot of

16      houses cheap in low income areas. And they

17      came in and started scooping up properties.

18      So it was probably as early as two -- 2001,

19      2002, 2003, somewhere around that area.

20 Q.  Okay. So, I mean, when you -- when you

                                      Page 38

3927 06-09-08 Gumbaytay Jamarlo.txt

21   started the Elite Real Estate Consulting

22   Business, how did you attract owners?

23  A.  I did not.  Chip -- that's what I was

50

1   saying.  Guest Properties was the contact

2   person.

3      I don't know anything about Guest

4   Properties.  I don't know anything about Chip

5   Guest.  I don't know anything about these

6   individuals that he brought on from Florida.

7   I had no relationship then, never seen any of

8   these folks to this day in my life, never

9   seen any of them.

10      I've met Mister -- I take that back.  I

11   met Mr. Matthew Bahr one time when he came up

12   here and looked at a couple of his

13   properties.  I -- he introduced himself to

14   me.  Him and his wife came back on another

15   occasion because they had a couple of

16   break-ins, vandalism, and introduced himself

17   to me.  But other than that, I don't know

18   anything about him.

19      I don't know where these folks live at,

20   never been to their house, never had a

21   personal relationship with them in any form,

22   fashion, shape.  I was just in the right

23   place at the wrong time when they called me

51

1   and I started to rent these properties for

2   him.

3  Q.  Okay.  I believe you did say earlier that you

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 4    had placed an ad in this Section 8 Bulletin
 5    at some point.
 6  A.  Right.
 7  Q.  When -- why did you originally place that ad?
 8  A.  You know, originally, I told you when I first
 9    started out, I was intending to rent
10    properties on my own.  I had about five or
11    six houses in the Section 8 publication along
12    with a hundred other landlords, potential
13    landlords.  I had five or six houses that I
14    was in the process of buying through my
15    investors, which are my acquaintances.
16        He called me when he got in town.  When
17    they first got in town, he just -- the first
18    thing they do, I guess, when they operate in
19    a city, they go by the Section 8 Housing
20    Authority office first because that is
21    guaranteed rent for them.
22        And so he picked up one of those
23    publications.  I guess he scanned down it,
```

                            52

```
 1    saw my name, called me.  I communicated with
 2    him.  He asked me what I was doing.  I told
 3    him.  He told me what he was doing, he was
 4    just in town, he was looking for -- to buy
 5    some properties.  And we met.  He came by my
 6    home.  We talked briefly.  He told me what he
 7    was trying to do.  I told him I had a list of
 8    people who had interest in renting some
 9    houses.  I have not bought these houses yet;
10    they are in the makings; so I had calls
```
                            Page 40

3927 06-09-08 Gumbaytay Jamarlo.txt

11    coming in.

12        He said, well, look, I tell you what.  I

13    need my property rented.  I don't know

14    anybody in this city, and I'm just starting

15    out in this city, so I would be glad to

16    compensate you for just renting these

17    houses.  So that's how we met.

18  Q.  Okay.  What is your understanding of the

19    issues that the FBI is investigating?

20  A.  I have -- other than what I read in the

21    newspaper, the fact that Guest Properties

22    and -- got a bad relationship with -- I think

23    that Countrywide Mortgage.  They got into a

                        53

1     bad relationship with them.  And Countrywide

2     got into an even more serious relationship

3     with one of the appraisal companies in

4     Montgomery and they was overinflating the

5     properties in Montgomery.  So there was a

6     relationship between a private investor who

7     buys subprime houses and getting subprime

8     money, and somehow or another it got

9     Countrywide involved.  Countrywide got an

10    appraisal company involved.  I can't think of

11    the appraisal company.

12        And other than what I read in the

13    newspaper and what Eric had shared with me

14    and one of Mr. Guest's associates had shared

15    with me, Jeremiah, that, you know, the

16    situation is not looking real good for

17    Mr. Guest's property, they getting to fold up

3927 06-09-08 Gumbaytay Jamarlo.txt

18    and they getting ready to go out of town.

19    But he never got -- Guest Properties never

20    told -- Mr. -- Guest Properties never told me

21    anything about what's going on.

22        So all of a sudden, I inherit all of

23    these other properties that I had no reason

54

1    of knowing why I inherited.  Because I had

2    cut my ties with him within a year after he

3    got out of town.  I started a relationship

4    with another company.  I cut my ties with

5    him.  So two years later, all of a sudden,

6    I'm getting 60 properties at one time, 60 or

7    70 properties.  And that was some -- those

8    other individuals, other than the original

9    ones that I had.  You know, I had them for

10   about a year.  So I had developed a

11   relationship with them.

12       So other than those individuals, they

13   dumped the rest of them in my hand and not --

14   me even not knowing what was going on.  So I

15   was blindsided.  And then I got a call from

16   the FBI one day and told me they needed to

17   talk to me and went down to the office

18   downtown here and went in and talked with the

19   FBI agent.  And anything and everything he

20   asked me, I gave him that and then some, gave

21   him a list of all the houses I rented and who

22   I rented them to and so forth and so on

23   and -- you know, because like I say, I used

Page 42

3927 06-09-08 Gumbaytay Jamarlo.txt
55

1    to be a military police officer.  I'm not

2    going to lie to the FBI and deceive them in

3    any form, fashion, or shape because they're

4    going to find out what they're going to find

5    out whether you tell them the truth or not.

6    And they can freeze your bank account and

7    everything.  I have a good -- I have

8    ultimate, ultimate respect for law

9    enforcement.

10  Q.  When did you produce the list of houses that

11       you rented out?

12  A.  That was about -- it was about two years ago

13       now.

14  Q.  Okay.  When you say that --

15  A.  About two or three years ago since that thing

16       been going on.

17  Q.  When you say these other properties kind of

18       got dumped on you, I think was the --

19  A.  Right.

20  Q.  What did you mean by that?

21  A.  When they -- they had found themselves in a

22       precarious relationship with Countrywide.

23       And Countrywide and Guest Properties and this

56

1    real estate appraisal company -- I can't

2    think of the name of it -- had a cozy

3    relationship together.  Well, they was

4    overinflating these properties.  They was

5    turning around and, with the appraisal,

6    getting a loan from -- from Countrywide.

Page 43

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7    They sold these properties to unsuspecting
 8    individuals in Florida.  Like I said, some of
 9    these guys was doctors, lawyers, all
10    professional people who had excellent, if not
11    superb, credit scores.
12        And so when the FBI got involved and the
13    truth came to light, a lot of these investors
14    in Florida found out that they had bought a
15    pig in a poke, quote/unquote, for lack of a
16    better word.  Just say they bought some bad
17    properties, overinflated property.  They was
18    upside down in the property because most of
19    the properties in the West -- in the West
20    Montgomery and North Montgomery, you -- they
21    were buying those properties for maybe 10,
22    15, 20,000 dollars.  And then they fix them
23    up and they get an appraisal company to come
```

                          57

```
 1    in and say they're worth more than what they
 2    paid for them.
 3 Q. But what -- I guess when you say that you --
 4    these people were dumped on you or you
 5    inherited them, do you mean that as a result
 6    of -- what do you mean by that, that they
 7    contacted you?
 8 A. Right.  Chip Guest had contacted me and said
 9    we are -- we are folding this table, we're
10    leaving town, and never got into any
11    specifics of why they was leaving town.  I
12    found out when everybody else found out, when
13    it hit the newspaper.  I know one night, you
```

                          Page 44

3927 06-09-08 Gumbaytay Jamarlo.txt

14    know, I was very happy and elated that I had

15    done picked up 60 more houses.  But he never

16    went into detail.

17  Q.  Meaning -- meaning that -- you mean that you

18    became the --

19  A.  I inherited --

20  Q.  You became the manager of these properties?

21  A.  Exactly.  I inherited those other properties

22    by default, you know, by happenstance.  It so

23    happened I was in the right place but the

                              58

1    wrong time again and not understanding what

2    was going on and was inheriting them by

3    default.  And these individuals to this day

4    have not met me.  I don't even know any of

5    these individuals.  And they allowed me to --

6    to make that transition so they can have

7    someone that could keep an eye on their

8    properties while they go through the legal

9    complicated issues with this Countrywide Home

10    and the appraisal company.  So it's in a

11    litigation right now.

12  Q.  So when would you say you got all these

13    new -- these new properties?  Do you know?

14  A.  It was about two years after I had left Guest

15    Properties.  Probably -- I can't remember the

16    date.  Like I said, I had rented his

17    properties and maintained them for about a

18    year.  About two years -- let's see.  2000,

19    2002, 2003.  It was early 2000, 2002, 2003,

20    somewhere in there.  I can't remember the

                           Page 45

3927 06-09-08 Gumbaytay Jamarlo.txt

21   exact date, but whenever they left town,

22   whenever that newspaper ad came out.  If you

23   go back and research their article, that --

59

1    whatever that date was, it was along that

2    time frame.

3  Q.  What newspaper article are you referring to?

4  A.  About this situation with Guest Properties

5    and Countrywide and this appraisal company.

6  Q.  Okay.  And so can you -- I mean, can you name

7    some of the owners that you worked with or do

8    you -- do you remember all of their names?

9  A.  Right off the top of my head, there was --

10   the -- the second wave of property came in by

11   default.  I believe it was Lori Williams.

12   Let's see here.  James Klark.

13  Q.  I think I have -- I think I have a list that

14   might help you if you're having trouble

15   remembering.

16  A.  Okay.

17  Q.  This is a letter that I believe -- I don't --

18   I believe you wrote it, but it's dated

19   January 24th, 2007.  And it's to the

20   Montgomery Housing Authority.  And it has --

21   it says that, This letter is to notify you of

22   mailings that have gone out to all the

23   tenants of your property.

60

1        MR. NEWELL:  Refresh your

2    recollection.

3        MS. NEAL:  Could we please mark

Page 46

3927 06-09-08 Gumbaytay Jamarlo.txt

4        this as Plaintiff's Exhibit #1?

5   A.   Right.  Right.  Those are them.

6             MR. NEWELL:  What's the exhibit?

7             MS. NEAL:  A list of the owners

8        that he managed properties for.

9             MR. NEWELL:  Okay.

10  Q.   So when did your -- when did your employment

11       with these owners begin?  Was it all around

12       the same time?

13  A.   Right.  That second wave -- like I said, I

14       only had about 30 properties when Guest

15       Properties first came into town.  And I

16       rented all of those, and he asked that I be

17       caretaker of them, and I agreed that -- which

18       we have already discussed.  Two years, three

19       years later, these second wave of individuals

20       was by default.  He called me up, hey, I got

21       some more property for you.  Because I didn't

22       know anything about what was going on, like

23       we have already indicated.  And then that's

                            61

1        when I inherited those.

2             And it -- and it was a short -- very

3        short-term relationship with them.  Because

4        they didn't know me, I didn't know them.

5        They didn't feel comfortable doing business

6        with someone that Guest Properties had

7        already conducted business with because they

8        had a bad taste in their mouth with this

9        individual, who had already scammed --

10       quote/unquote, scammed them.  So they didn't

3927 06-09-08 Gumbaytay Jamarlo.txt

11    have a relationship with anyone who

12    associated with Guest Properties, even though

13    I didn't have nothing to do -- emphasize --

14    nothing to do with the legalities of what's

15    going on with the complaints right now

16    between the landlords and Guest Properties

17    and Countrywide and the real estate company.

18        So they -- they departed ways.  They

19    found someone else.

20  Q.  All of the owners departed ways?

21  A.  All of them departed.  Well, you know, I told

22    you I got a letter to cease and desist from

23    the Real Estate Commission.  So, you know, in

62

1    the light of that, some of them had already

2    abandoned ship before I got that letter.

3    When I got that letter, I called them and

4    told them -- I informed the Housing Authority

5    that, you know, I could no longer conduct

6    business in the state.  I didn't tell them

7    exactly what I'm telling you guys now

8    because --

9  Q.  Sure.

10  A.  -- you know, I had a pretty good -- had a

11    pretty good relationship with them until all

12    this came to light.

13  Q.  So which of these owners did you still have a

14    relationship with prior to getting the cease

15    and desist order?

16  A.  The first chain -- first -- I would say --

17    let me see here.  Well, all these had lost

Page 48

3927 06-09-08 Gumbaytay Jamarlo.txt

18    their property.  It was -- all of these --
19    because I'm checking.  Lori Williams, Calvin
20    Ellis, James --
21         MR. LAY:  Can we just say for
22         the record that he is examining
23         Exhibit #1?

                          63

1         THE WITNESS:  I am examining
2         Exhibit #1.
3         MR. LAY:  And that he is
4         marking -- you're marking the ones
5         that you -- what?
6         THE WITNESS:  The ones that I
7         had a relationship with up until the
8         time I got a cease to desist order.
9         MR. NEWELL:  From the Real
10        Estate Commission.
11        THE WITNESS:  From the Real
12        Estate Commission.
13   A.  I take that back.  Let me just do it this
14    way.  Let me put a -- I will put a -- two Xs
15    in front of the individuals that I had a
16    relationship with up until I received a cease
17    to desist order.  And that person is George
18    Schimeder, put two -- two stars; Terrill
19    Jorgensen, two stars; Matthew Bahr, two
20    stars; Brittany Young, which is Matthew
21    Bahr's daughter, two stars; Jewel Manahan,
22    M-A-N-A-H-A-N, two stars, which is -- for the
23    record, is Matthew Bahr's wife.

                     Page 49

3927 06-09-08 Gumbaytay Jamarlo.txt
64

1  Q.  I notice that you only put one star by --

2  A.  Thank you.  Thank you.  Okay.  And the rest

3      of the folks either lost their property in

4      foreclosure or they got a bad taste about

5      dealing with anybody who had dealt with Guest

6      Properties and they moved on to bigger and

7      better things without me asking them --

8  Q.  Okay.

9  A.  -- and found someone else because of this

10     litigation issue.

11 Q.  Well, let's talk about -- let's talk about

12     some of your -- let's take Brett Rosenbaum,

13     for example, since he's at the top.  How many

14     properties did you manage for him?

15 A.  I think Brett had up to about 12 properties

16     at any given time, 12, 14 properties at any

17     given time.

18 Q.  And did you have an employment contract with

19     him?

20 A.  No.

21 Q.  What sort of agreement did you have?

22 A.  Just a gentlemen's agreement.

23 Q.  And what was the -- what was the gentlemen's

65

1      agreement?

2  A.  I agreed to collect his rent for him.  I

3      agreed to take any service calls for him; and

4      any and all rent that I collected, take my

5      fees associated with that and forward them on

6      to him.  So, basically, a gentlemen's

Page 50

3927 06-09-08 Gumbaytay Jamarlo.txt

7    agreement agreeing to maintain, sustain the

8    best interest of his property for a small

9    service fee.

10 Q.  Okay.  You said -- so you collected rent.

11    What -- did you have any other duties that

12    you -- that you didn't mention right now?

13 A.  Just basically what a -- any services that a,

14    quote/unquote, licensed real estate company

15    would be expected to perform, you know, I

16    provided him those services, like maintenance

17    calls, eviction notices, eviction procedures,

18    those kinds of issues that most of your

19    licensed management company would normally

20    do.  I was --

21 Q.  What tasks did the owners take care of

22    themselves?

23 A.  None.  These individuals -- all of those

            66

1    individuals lives in the state of Florida.

2    And most of them live in Orlando or the

3    surrounding area.  So they had -- matter of

4    fact, I -- I can probably comfortably say

5    that the majority of the individuals never

6    even seen these houses before.

7       Brett Rosenbaum probably saw his.  He

8    came up because he was working as -- working

9    on his properties a lot.  Matthew Bahr

10    probably saw his.  I can only recall -- Woody

11    came up one time; and when he -- the day he

12    came up, Woody -- for the record, Woody

13    Franklin.  For the record, his wife is Lori

3927 06-09-08 Gumbaytay Jamarlo.txt
14    Williams.  He came up one time about a year

15    ago and fixed on one of his properties,

16    because one of his properties had burned

17    down.  But other than that, that's the first

18    time I ever saw him.  And shortly after he

19    had left, within 24 hours, I got a notice

20    that he no longer had an interest in me

21    having anything to do with his property.

22    I -- I -- I feel certain that the attorney

23    that they are working with on these legal

                    67
1     issues had informed them to cut all ties with

2     me because of my, quote/unquote, affiliation

3     indirectly with Mr. Chip Guest.

4  Q.  Did you have access to your tenants'

5     properties?

6  A.  Yes, ma'am, some of them.  Because when --

7     the new ones, you remember I told you that I

8     had no recollection -- I don't have no access

9     to all the new tenants' properties.  Because

10    they was dumped -- well, they was transferred

11    to me by default, and the default is the fact

12    that they left town.  So, no, I had no access

13    to those.  But the first ones that came on

14    line with the first line of investors, yes, I

15    did because I was -- they was in the process

16    of renting those.  So I had to show those

17    properties to prospective clients.

18 Q.  So what properties would you say you had

19    access to?

20 A.  The first wave.  Probably Brett Rosenbaum,

                    Page 52

3927 06-09-08 Gumbaytay Jamarlo.txt

21    Matthew Bahr's, his wife, and his daughter

22    Brittany Young, some of their property.

23    Because some of those properties was picked

                          68

1     up in the second, but I think Matthew Bahr

2     probably had about three houses -- three to

3     five houses that first wave when I -- when

4     I -- before I had left Guest, working with

5     Guest, working along with Guest Properties.

6         Let me look at this list here.  Joyce

7     Weber, she had only two houses here.  Todd

8     Chamelin, he had only two houses here.  And

9     eventually, these two houses have gone into

10    foreclosure.  Bob Fielder, he called me a

11    year after everybody -- Bob Fielder had

12    called me.  And I was in Birmingham looking

13    at Mr. James Klark property probably a year

14    ago.  And he called me while I was in

15    Birmingham, and he gave me access to his

16    property, but they were two vacant houses up

17    there in Birmingham.

18        Bruce Dunn.  Some of -- some of Bruce

19    Dunn -- one of Bruce Dunn's properties.

20    Because, once again, they were the first

21    wave.  One of -- a handful of Schimeder

22    property.  But that's it, that I can recall.

23  Q.  What was your fee arrangement with the --

                          69

1     with the owners?

2   A.  Generally, about 5 to 10 percent, which is

3     customary with your real estate companies.

                     Page 53

3927 06-09-08 Gumbaytay Jamarlo.txt

4  Q. Okay.  And how was rent determined?

5  A. Section 8 vouchers.

6  Q. Section 8 vouchers?

7  A. Yeah.  Right.

8  Q. And --

9  A. That's why they focus on Section 8 clientele,
10    because they pay, more bang for the bucks.
11    In the areas that they was buying the houses
12    in, you could not cater to the individual who
13    had -- who could afford 650, 700 dollars a
14    month; so they catered to those individuals
15    that was receiving subsidies from Section 8
16    Housing Authority.

17 Q. Did you have any written fee arrangement with
18    any of the owners?

19 A. No, ma'am.  It just -- the standard rent was
20    anywhere between 650, 700 dollars a month.
21    So other than -- if a person had, say, ten or
22    more properties, I would reduce my fees to
23    5 percent of the rent amount.  If they had a

                        70

1     handful of properties -- like Lori only
2     had -- correction -- Joyce Weber only had two
3     properties, Todd only had two properties.  I
4     charged them 10 percent because by the time I
5     leave side -- you know, run across town, I
6     charged them.  If you had a large amount
7     property, generally for -- unless someone
8     complained -- I only got 5 percent.

9  Q. What did you charge Mr. Bahr?

10 A. Five percent, because he had -- it was
                     Page 54

3927 06-09-08 Gumbaytay Jamarlo.txt

11    Mr. Bahr -- as I indicated earlier, it was

12    him and his wife and his daughter.  They was

13    a team.  I didn't realize they was a family

14    until I interviewed with the FBI.  So that's

15    how little I knew about his -- their

16    relationship.

17  Q.  Okay.  So, to your knowledge, did any of the

18    owners ever receive any complaints about you

19    from any of the tenants?

20  A.  No.

21  Q.  Not -- I mean for any reason?

22  A.  For any reason.  I had an excellent, superb

23    relationship with all the tenants.  I made

71

1    sure that their maintenance needs was

2    addressed, tried to be addressed within 48 to

3    72 hours.

4  Q.  So nothing -- no failure to make repairs,

5    harassment, nothing?

6  A.  None, to my recollection, other than the

7    situation we -- that we are involved in now.

8    But other than that, no.

9  Q.  Oh, did Mr. Bahr receive a complaint about --

10    from Ms. Boswell, to your knowledge?

11  A.  To my knowledge, right.

12  Q.  Yeah.  When did he get a complaint from

13    Ms. Boswell?

14  A.  I don't have the papers in front of me.

15    Whatever the papers say.  I don't recall.

16  Q.  I don't think I have those papers with me.

17  A.  They're just -- the first -- I think the

3927 06-09-08 Gumbaytay Jamarlo.txt

18    latter part of last year.  I'm not --
19    whatever the first request came in.  I can't
20    recall because I don't have it in front of
21    me.
22  Q.  So before the -- before the lawsuit was
23    filed, did -- to your knowledge, did Mr. Bahr

                                72

1    have any --
2  A.  No.
3  Q.  -- contact with Ms. Boswell?
4  A.  No.  Because once -- remember, I told you the
5    maintenance department was handled by Eric
6    Cruz.  The initial maintenance call went in
7    through him.  I had nothing to do with
8    maintenance.  So when they departed town,
9    they transferred these properties to me or
10    requested for me to take them over.  That's
11    when Eric and everybody left and I inherited
12    these properties, when I inherited these
13    properties by default.
14  Q.  So how did repairs work?  So you're saying
15    that -- how did repair -- how did the repair
16    system work?  If you got a complaint from a
17    client, how --
18  A.  If a tenant called, communicated to Eric,
19    Eric would call one of the Hispanic
20    gentlemens, whom I indicated to you earlier
21    there was a group of Hispanic individuals
22    that he had brought up from Florida and
23    brought out of Texas to make all the

                      Page 56

3927 06-09-08 Gumbaytay Jamarlo.txt
73

1    necessary repairs and maintenance calls.  And
2    Guest Properties was paying for all the
3    service calls.  Because the contractor
4    relationship -- or verbal relationship -- I
5    don't think he ever had anything in writing.
6    The verbal relationship that he had with
7    these landlords that he sold these properties
8    to, that he would take care of all the
9    maintenance calls for one full year.
10  Q.  Okay.
11  A.  So when the system was working the way the
12       system they had set up to work, you called
13       Eric, Eric called Guest.  Mr. Guest --
14       Mr. Guest approves it, cuts the check to the
15       maintenance person, which is Eric.  Eric
16       would send a maintenance person over there,
17       which was one of the Hispanic gentlemens.
18       And they would rectify the situation.
19  Q.  But that was -- what about later?  That
20       was -- I assume that that was before you cut
21       ties with Guest Properties.
22  A.  Right.
23  Q.  What about after you cut ties with Guest

74

1       Properties?
2  A.  Same procedure.  I would -- I would call Eric
3       and Eric would -- would put forth the same
4       steps.  He would contact Mr. Guest, and
5       Mr. Guest would contact the Hispanic
6       gentlemens, and the Hispanic gentlemens would
                              Page 57

3927 06-09-08 Gumbaytay Jamarlo.txt

7    rectify the situation.  Now, after they had

8    left town, the maintenance people that they

9    still had around was ones that he had formed

10    a relationship with, a couple of maintenance

11    guys that used to do -- was doing his

12    plumbing and some of his basic work.

13        I had -- I had a knowledge of them.  So

14    when I had no one else to turn to but them, I

15    called them, when I found myself with a

16    hundred some odd properties.  One person went

17    all to hatch.  So I called upon them because

18    they knew the area, they knew the property,

19    they were familiar with the -- the

20    maintenance situation.  So I would call them

21    when there was no more Eric to call and call

22    a plumber or electrician, for example, and

23    ask him or her -- ask him to go out to the

75

1    property and see what the situation is.

2  Q.  When -- when was -- when did Eric leave town?

3  A.  I can't remember when -- whenever, but I

4    can't remember specifically, exactly.  I know

5    it was along the same time that they had --

6    Guest Properties had went out of business.

7  Q.  So I'm going to go back and ask you a little

8    bit more about Elite for a moment and that

9    setup.  Did you have any employees that

10    worked for you at Elite?

11  A.  Not employees.  I had assistants, independent

12    assistants and not -- I don't pay taxes.  You

13    know, I had a -- contracted out with an

Page 58

3927 06-09-08 Gumbaytay Jamarlo.txt

14    individual that had skills that I didn't

15    have, which are administrative skills.  You

16    know, I know a whole lot about education; but

17    computers, I'm -- I'm limited.  And my speed

18    on computers is -- is a handicap.  So I

19    contract out -- independent contract out with

20    individuals to provide those services.

21  Q.  Okay.  Can you please -- can you please list

22    the people that you have had contracted out?

23  A.  Letter Perfect, Lynn Norsworthy.  I think

76

1    you-all have -- and I have been knowing Lynn

2    for a long time because Lynn did all my

3    graduate papers for me when I was in grad

4    school and postgraduate school.  So Lynn and

5    I been knowing each other probably for

6    about -- and I didn't realize I had a

7    relationship with her that long -- probably

8    about 15 years because she goes back.

9        And when these properties came into my

10    care, Lynn was the first person I called,

11    because she -- she has a professional

12    business setup; but she operates out of her

13    home, too.  If you have not met her yet,

14    she's handicapped and her husband is also

15    handicapped.  So she operates her business

16    out of her home.

17  Q.  So when would you say you employed her?

18  A.  I contacted her when -- when I first

19    established a relationship with Guest

20    Properties.  And she was the first person I

Page 59

3927 06-09-08 Gumbaytay Jamarlo.txt

21    brought on and asked to do what needs to be

22    done in order to keep efficient records and

23    send out -- as if, though, any management

77

1     company would.  When they collect rent, they

2     do an accounting at the end of the month and

3     send the landlord their statements.  So she

4     was taking care of all that for me.

5          And I think at some point in time, we

6     came to the conclusion, when these other

7     properties was inherited by me, that she

8     would need some help.

9  Q.  And what were her other -- she had

10    recordkeeping duties.  And what else would

11    she -- did she have any other duties?

12 A.  That's basically it.  Accounting.  You know,

13    here again, I don't type.  You know, I'm a

14    real sharp guy, but I don't type at all.  I

15    mean, I peck and I hunt.  So she had

16    administrative duties, period.

17 Q.  Okay.  And when -- is she still -- is she

18    still working for you in some capacity?

19 A.  She do my personal papers.  As I've indicated

20    to you before, she has done all my graduate

21    papers in the past.  Personal stuff that I

22    would need to be done, she would do them for

23    me.

78

1  Q.  Okay.  But she's no longer doing anything

2     related to the --

3  A.  I have some -- I have -- I had to -- I had a

Page 60

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 4    sermon this weekend that I did, conducted at
 5    an independent church.  So I asked her -- she
 6    drafted up the sermon for me just -- well, as
 7    a matter of fact, the sermon was Sunday.  So
 8    she drafted that up just this past week.  So
 9    any -- any and everything that I have for her
10    to type, if it needs typing, Lynn would be
11    the person that I would call.
12 Q. In what capacity were you doing a sermon?
13 A. My cousin had his 12th anniversary as a
14    pastor at this Baptist church in Notasulga,
15    Alabama.  And he asked me would I be one of
16    the speakers because he wasn't planning on
17    doing anything that morning.  And I told him
18    that I would be glad to.  So I spoke at the
19    morning services.  I wouldn't call it a
20    sermon, but I spoke at the morning services.
21    I have some seminary training, about 11 years
22    of theology training.  So I spoke at his
23    morning services and then two o'clock.  He
```

                         79

```
 1    had his annual presentation at two.
 2 Q. And when did you get your seminary training?
 3 A. It was during the course of when I was
 4    working on my master's.  When I was working on
 5    my master's and my postgraduate degree, I was
 6    working on my -- I was going through seminary
 7    school at Concordia College Selma.  It was
 8    independent courses, satellite courses that
 9    was taught by the school.  They sent
10    professors down from the seminary.  One
```

                         Page 61

3927 06-09-08 Gumbaytay Jamarlo.txt

11    weekend every other month, they would offer

12    satellite courses there, other than we did

13    one of them by, what they call it, satellite

14    hookup, television. So it was all during the

15    time I was working on my graduate degree and

16    postgraduate degree. And believe me, it was

17    a burnout.

18  Q.  Do you remember the approximate tine?

19  A.  The time frame when I was at Alabama State

20    University. That was, what, late -- late

21    '80s? It was the late '80s.

22  Q.  Okay. And have you ever worked in any

23    capacity at a church or for a church?

80

1  A.  No. Just a parishioner. I have seminary

2    training, but I don't have a theology degree

3    in seminary. That's something we're still

4    working on. So I speak at different

5    churches. I have spoken at schools and, you

6    know, for people who call me and know me from

7    the school system. They think I can come in

8    and give a word of encouragement, because I

9    worked with alternative kids for seven and a

10    half years.

11  Q.  So let me go back to asking you about --

12    about Ms. Norsworthy for a second. To your

13    knowledge, did she ever receive any

14    complaints from any of the tenants?

15  A.  No, ma'am. To my knowledge, no. Because

16    she -- she wouldn't be the person that they

17    would voice that complaint anyway. I have --

3927 06-09-08 Gumbaytay Jamarlo.txt

18    I have indicated to all the tenants -- we

19    sent out a letter -- if you don't receive

20    services within a certain time frame, call

21    me.  And if you don't receive services then,

22    call the Housing Authority.

23         Every -- people maintain the service

81

1    calls.  Sometimes they was real slow because,

2    you -- you understand, they had over -- at

3    any given point, this man had bought over --

4    probably over 125, 130 properties in this

5    town.  And -- and he had this -- this small

6    group of Hispanic individuals running the

7    operation.  And, you know, as the old saying

8    goes, what you get -- you pay for what you

9    get -- you get what you pay for.  And it

10   wasn't -- it wasn't run as professionally as

11   it should have been ran if I had the

12   opportunity to hire my own individual people,

13   because they was very -- how can I put it --

14   unprofessional.

15 Q.  Okay.

16 A.  So, no, they -- to answer your question, no

17   complaints goes to her.  They always come to

18   me.  She may have a call or two because they

19   probably think we have a more close

20   relationship than what it actually is.

21        And the only thing she would do is draft

22   up contracts for me, you know, rental

23   contracts, and collect -- I mean do the

Page 63

3927 06-09-08 Gumbaytay Jamarlo.txt
82

1   administrative services for the invoices and
2   what-have-you for the landlord.  But other
3   than that, she may get a call; and she know
4   to call me -- call me or Eric at that time.
5  Q.  Did she ever work out of your office?
6  A.  No, ma'am.  She's handicapped.  Like I said,
7      Lynn been handicapped, in a wheelchair all of
8      her life, her and her husband both.  Real,
9      real sweet lady.
10 Q.  And so when you say she drafts rental
11     contracts, is she ever the person who sits
12     down with the tenant and goes through the
13     rental contract?
14 A.  She was the person that would draft them up
15     and give them opportunity read it.  She
16     don't -- she don't get involved in going
17     through the contract.  She give the person
18     the opportunity to read it.  She just do what
19     Lynn does, and that's it.  She don't get
20     involved in any legalities or you need to
21     look at this, this.  She typed -- I send her
22     the information that need to go in the
23     contract.  She type it up, we give it to the

83

1   tenant.  The tenant takes it.  That's the
2   tenant's responsibility to read it.  Because
3   she's on one side of town; I'm on the other
4   side of town.
5       But to answer your question, no.
6  Q.  So who actually signs the lease?  Is that you

Page 64

3927 06-09-08 Gumbaytay Jamarlo.txt

7    or --
8  A.  The tenant signs their part.  She'll fax it
9       over to me, and I sign where I need to sign
10      at and -- or either she would -- I would
11      authorize her to sign for me.
12  Q.  Okay.  So the tenant -- once the tenant has
13      looked through the lease, then they give it
14      back to you at your house or they give it to
15      her?
16  A.  Lynn would either -- Lynn would -- if I'm in
17      position to receive the lease, if I'm at
18      home, she'll fax it over to me so I can sign
19      the page on behalf of the person that the
20      house is being rented, or I will authorize
21      Lynn to sign my name for me on the behalf of
22      the person that owns the house.
23  Q.  So has there ever been an occasion where a

                              84

1       tenant has come to your house to sign the
2       lease?
3  A.  Yes.  Yes, if they're closer to me.  But
4       usually I don't -- normally, it don't happen
5       that way because I don't type.  Once again, I
6       don't do any administrative stuff at all.
7       That's what I'm compensating her for.  But
8       that's -- that's far and few in between.
9  Q.  So you -- okay.  Who else is employed by --
10      who else have you employed in an independent
11      contractor sort of way?
12  A.  I have offered Ms. Bassett, Cameron
13      Bassett -- she was an independent contractor,

                              Page 65

3927 06-09-08 Gumbaytay Jamarlo.txt

14     and I had -- she asked me was there anything

15     that I could -- I could -- that she could

16     do.  I asked her what kind of skills she

17     had.  She told me she worked as an

18     administrator, she -- she knows the computer

19     and everything else about it.  I said, well,

20     you know, Lynn going to need some help.  So I

21     said, you can take over some of these

22     contracts.

23          So Ms. Cameron Bassett and Ms. -- I

                              85

1      can't think of her name right now.  There was

2      another young lady I had hired when I was

3      working with -- when I had left Guest

4      Properties and started to work with Omar, who

5      is another investor who came up from

6      Florida.  She worked in his office as a

7      management personnel in his office.  So she

8      had contacted me one day.  She had talked to

9      me one day when I went over to her office and

10     asked me did I have any work for her to do.

11     And I told her, well, Lynn is going to need

12     some help.  I got all of these properties.

13     You can get with her and you-all can divide

14     up what -- down the middle or two ways.

15     Because there was -- there was Lynn and -- I

16     can't think of that girl's name right now.

17          Well, anyway, yes, to answer, there was

18     two other peoples.

19  Q.  Okay.  What about as inspectors?

20  A.  I hired some independent contractors.

                                   Page 66

3927 06-09-08 Gumbaytay Jamarlo.txt

21  They -- which they never -- one of them was a

22  former student at Carver when I was at Carver

23  Senior High School as administrator.  He was

86

1   a real good kid.  He used to come in my

2   office and work with us, do paperwork and

3   stuff.  And I had a -- he had a lot of

4   respect for me.  He called me up one day and

5   asked me, Mr. Gumbaytay, you have anything

6   for me to do?  I need to work; I'm in school

7   and I'm a student.  I said, well, you can

8   be -- I may need you to go by and inspect

9   some houses every once in a while.

10      So he went out on one or two

11  inspections, and he ended up being a dud.  So

12  I hired -- I had hired two other people, but

13  it never really got off the ground.  It was

14  getting to the point that it was too many

15  houses for me to -- to manage.  So I hired

16  about three or four individuals.  One of

17  them -- one or two of them went on a couple

18  of inspections.  Other than that, that was

19  it.  So it never really got off the ground

20  when I was trying to set that part up.  It

21  never materialized.

22  Q.  When did -- when would somebody be hired to

23  do an inspection?

87

1   A.  It was -- as an independent contractor, I

2   was -- I -- you know, in other words, we had

3   a hundred and some odd houses.  I said, okay,

Page 67

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 4    we're going to divide these up by two people
 5    or three people at a time.  We had talked
 6    about doing this and a way of going about
 7    doing it.  I suggested to them every four
 8    months, they do a quarterly inspection.  That
 9    wasn't something that the landlord requested
10    of me to do; but, you know, since they was
11    being so gracious and -- and I realized a lot
12    of them was having a lot of problems with
13    these properties, so I decided to set up an
14    inspection team.  So every four months --
15    every three to four months, we would do it.
16         Now, I sent letters out to all the
17    tenants and let them know that every three
18    months, we'd be conducting inspections; that
19    person would call you 24 hours prior to us
20    coming out there.  And so -- but that never
21    got off the ground.
22  Q.  Okay.  Let me go back to Ms. Bassett really
23      quick.  How long was she employed with you?
```

                              88

```
 1  A.  It was probably less than a -- less than six
 2      to seven months.  Because no sooner after
 3      she -- probably less than six or seven
 4      months.  Because no sooner after she came on
 5      board, that's when these investors had folded
 6      shop and closed.  So probably less than six,
 7      seven months.
 8  Q.  Do you remember approximately when she was --
 9      worked for you?
10  A.  Up to -- let's see.  That letter went out to
```
                            Page 68

3927 06-09-08 Gumbaytay Jamarlo.txt

11    the Housing Authority.  Up to that year
12    before that -- before that letter went out to
13    the Housing Authority, this letter here
14    (indicating).
15  Q.  Plaintiff's Exhibit #1?
16  A.  Yeah.  Exhibit #1 dated January 24th, 2007.
17    So she had worked with me probably six or
18    seven months prior to then, and I -- and I
19    informed her that I had got a letter and I
20    would no longer be in need of her services.
21    And a lot of these investors on here had
22    either went in foreclosure, bankruptcy, or
23    both.  Their attorney advised them to cut all

                    89
1    ties with me because of the ongoing
2    investigation.
3  Q.  So -- I'm sorry.  So when exactly?  At around
4    this time or --
5  A.  Yeah.  She probably came within -- she worked
6    for me about -- probably back in June or
7    July.  I know she was on board no more than
8    about six or seven months, because I didn't
9    have these new individuals under my wing
10    probably less than a year.
11  Q.  So June or July of 2007?
12  A.  I would say pretty close to, yes, the spring
13    or the summer of 2006.  It's 2008 now.
14  Q.  2000 -- so --
15  A.  2008.
16  Q.  So her --
17  A.  So whenever I got the -- yeah, up until
                    Page 69

3927 06-09-08 Gumbaytay Jamarlo.txt

18    2000 -- it was the latter part of 2007 going

19    into 2006.  Probably the latter part of 2007

20    until I got that letter.

21  Q.  Until you got the cease and desist letter?

22  A.  Right.

23  Q.  Okay.  So she worked with you up until the

                          90

1     cease and desist letter?

2   A.  It was probably less than six or seven

3     months.  I can't remember the exact -- the

4     exact dates and times; but I know it wasn't

5     that long because most of these investors, as

6     I indicated before, had moved on.

7   Q.  Okay.  And why did her -- why did her

8     employment end?

9   A.  No work and no income.  I don't -- I didn't

10    have no work for her to do.  Like everybody

11    else, mine's ended, too.

12  Q.  And what were her duties?

13  A.  The same thing Lynn was doing.  She had --

14    they divided the responsibilities, the

15    administrative.

16  Q.  To your knowledge, did she ever receive any

17    complaints about you --

18  A.  No.

19  Q.  -- from any of the tenants?

20  A.  No.

21  Q.  Any of the owners?

22  A.  No.

23  Q.  Okay.  Do you have any current contact

3927 06-09-08 Gumbaytay Jamarlo.txt
91

1    information for Ms. Bassett?

2  A.  No.  She had -- all of her numbers -- the

3      last I had, had been disconnected because

4      right now she's not working anywhere.  The

5      only income she had coming in was the income

6      that I provided her from -- from conducting

7      these administrative services.

8  Q.  What about Ms. -- Ms. Williams?  Did you ever

9      employ -- did you ever employ someone named

10     Renee Williams?

11 A.  Yeah.  That's the other person I was trying

12     to think of.

13 Q.  Okay.

14 A.  Yeah, Renee Williams.  Yeah.  See, I hired

15     her first.  And she and Lynn got together,

16     and her and Lynn split up the initial houses

17     I got.  And that got too much for her and

18     Lynn.  Then Ms. Bassett asked me for a job,

19     and I had hired her as an independent

20     secretary.

21 Q.  Okay.  And --

22 A.  Lynn worked out of her house.  Ms. Renee

23     Williams worked out of her house.  I had

92

1      bought Ms. Renee Williams a computer, a

2      laptop computer, and a -- I got her started

3      in business -- cell phone, laptop computer, a

4      fax machine to get her started then, because

5      she didn't have anything, any money.  And I

6      ended up -- right now we're in litigation for

Page 71

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7     those -- for those items.  And she had -- I'm

 8     in litigation with her right now.

 9  Q. So you -- you started a suit?  You instigated

10     a suit against her?

11  A. Right.

12  Q. And when did you -- when did you bring that,

13     bring that lawsuit against her?

14  A. This -- this past -- the early part of this

15     year, she still had -- she left me with a

16     phone bill, cell phone bill.  She left me

17     owing me on that computer I bought for her.

18  Q. What is the title of that case?

19  A. I have no idea.  You can call --

20  Q. Gumbaytay v. Williams or --

21  A. Yeah.  Probably, yeah, Jamarlo Gumbaytay

22     versus Williams and her fiance.  I don't know

23     what her fiance name.  You can contact
```

                              93

```
 1     Mr. Chris Pitts.  He's my real estate

 2     attorney on record on that.  He probably can

 3     give you that information.

 4  Q. Where is this suit filed?

 5  A. Civil court.

 6  Q. In?

 7  A. Montgomery.

 8  Q. In Montgomery?

 9  A. Small claims.

10  Q. Small claims.

11  A. Right.

12  Q. Okay.  Are there any counterclaims against

13     you at this point?
```

3927 06-09-08 Gumbaytay Jamarlo.txt

14  A.  No, ma'am.

15  Q.  Okay.  Do you have any other suits involving

16      your business at this time?

17  A.  No, ma'am.

18  Q.  And -- or in the past, do you?

19  A.  No.  No.  Other than what we're going through

20      right now and everything that's been circling

21      the wagon and came out of the woodwork that

22      never cease to amaze me, but, no, ma'am.

23  Q.  Okay.  And for what time period was

94

1       Ms. Williams employed by Elite?

2   A.  Probably up to about six or seven months,

3       also, because she had -- she had ended up

4       back-stabbing me.  She stole my clients.  For

5       the record, those clients of record that she

6       took and without my knowledge, after I had

7       bought her into business, was Mr. Calvin

8       Elder, Mr. Chris Wunschel, Mr. Lori

9       Williams -- Ms. Lori Williams, Woody

10      Franklin, and Lee Ann Melchiorre,

11      M-E-L-C-H-I-O-R-R-E -- who, for the record,

12      is the wife of Woody D. Franklin.

13  Q.  I have a letter right here to Ms. Toodle from

14      the Montgomery Housing Authority that I

15      believe is from Renee Williams.  And I just

16      want you to look at it.  We can mark it as

17      Plaintiff's Exhibit #2.

18          MR. NEWELL:  Refresh your

19          recollection first.  Are you familiar

20          with this?

Page 73

3927 06-09-08 Gumbaytay Jamarlo.txt

21  A.  Let me see that.  I think these are clients

22      that she included.

23  Q.  Yeah.

                              95

1   A.  Yeah.  Initially -- what was it?  February

2       2007.  Initially when we had inherited all

3       these properties I was telling you about, I

4       had hired her as an independent secretary.

5       Her and Lynn Norsworthy got together, and

6       they settled on which one of the accounts

7       that they was going to take, and they split

8       them down the middle.  Yeah, that's what this

9       is all about.  So she was notifying the

10      Housing Authority that she was working with

11      me; and so any response that she needed from

12      them, that she was in the okay with them.

13  Q.  I just want to finish up with -- with talking

14      about Ms. Williams for a second, and then we

15      will take a lunch break if that's okay with

16      everybody.

17          So as far as Ms. Williams, is this

18      approximately when she started working for

19      you, the January 27th, 2007, as shown in

20      Plaintiff's Exhibit #2; or how long before or

21      after was it?

22  A.  I can't remember exactly.  You probably can

23      contact Ms. Williams and see whether or not

                              96

1       she have anything of record.  I have -- I

2       can't remember the exact date we contracted

3       out with, but she -- she probably would have

                         Page 74

3927 06-09-08 Gumbaytay Jamarlo.txt

4    that on her record if she have anything.  But

5    it was pretty close to that time, so I'm

6    sorry I can't answer that for you.

7  Q.  So close to January of 2007?

8  A.  Close to January, right.

9  Q.  Okay.  And when did her employment with you

10   end?

11 A.  When she had started stealing my clients.

12 Q.  Approximately when was that?

13 A.  Probably shortly after this letter had went

14   out.  I -- if I would guess, when you -- if

15   you ever get an opportunity to talk with

16   those individuals that I mentioned on the

17   record, you can ask them when did they

18   establish a relationship; but when she

19   started stealing my clients.  And some of

20   those clients I had indicated to you had

21   already closed shop and decided not to do

22   business with anyone that had any affiliation

23   with Guest Properties.  Shortly thereafter,

97

1    she had picked those clients up -- or she had

2    started picking them up, undermining me.  And

3    not realizing I was being undermined and fed

4    this young lady, literally, in terms of

5    getting her in business because she had came

6    to me for help.  And she turned around and

7    stabbed me in the back and stole my clients

8    and started doing the same thing that I

9    was -- I had trained her to do or asked her

10   to do.

Page 75

3927 06-09-08 Gumbaytay Jamarlo.txt

11          And she's not a licensed real estate
12     broker either.  And I truly believe -- and I
13     can only say -- I can't prove it -- that
14     she's the one that contacted the Real Estate
15     Commission and informed them, because I have
16     a litigation pending against her, to try to
17     undermine, sabotage, and destroy my
18     reputation.
19          So she had contacted the Real Estate
20     Commission.  So when I went to the Real
21     Estate Commission and offered to address
22     those issues, I had indicated to him, I
23     guarantee you I know who the person that told

                        98
1      you.  So I informed the Real Estate
2      Commission of her status and what she had
3      done.  So they started investigating her as
4      well and gave her a cease to desist order.
5  Q.  I mean, did you terminate her employment?
6  A.  She terminated her own employment.  She --
7      here again, once she started to undermine me,
8      after she was stealing my clients without my
9      knowledge, without my aware, so she gave me a
10     letter saying she's moving on to bigger and
11     better things; but she was moving on to other
12     things that -- of her interest.  Because she
13     had stole my clients without my knowledge.
14     So she gave me a -- sent me a letter -- and I
15     can't recall the date she sent the letter --
16     saying she was terminating our relationship.
17 Q.  Do you still have a copy of that letter?
                     Page 76

3927 06-09-08 Gumbaytay Jamarlo.txt

18  A.   It's probably in the file from my attorney.

19       You want to contact Chris Pitts.  I just had,

20       like I say, a litigation package I had

21       submitted to him.  So he will give you a copy

22       of that letter.  So she had -- when she

23       submitted that letter, then she had ended our

                              99

1        relationship.

2   Q.   I've got a letter here to Ms. Toodle from

3        Montgomery Housing Authority sent by

4        Ms. Williams that I'd like to mark as

5        Plaintiff's Exhibit #3 that just is a notice

6        from her saying that she's no longer going to

7        be working for you as of July 31st.

8   A.   That's probably it right there.  Yeah, that's

9        probably it right there.

10  Q.   Okay.  So that is your recollection of --

11  A.   Yeah, that is it right there.  That's the one

12       that's in my attorney's file.

13  Q.   Okay.  And what were -- what were

14       Ms. Williams' duties?  Were they the same

15       as --

16  A.   The same as Lynn.  Lynn had trained her.  you

17       know, like I say, I've been knowing Lynn for

18       15 years.  She did all my graduate work, all

19       my undergraduate work.  So Lynn was getting

20       overwhelmed.  Because Lynn only had about --

21       we only had about 20, 25 properties, give or

22       take, you know.

23            So Renee asked me for a job.  She was

                          Page 77

3927 06-09-08 Gumbaytay Jamarlo.txt
100

1   working at the company that I used to work
2   at.  She came to me and asked me for a job.
3   First she asked me to help her get a cell
4   phone.  Out of the goodness and kindness of
5   my heart, I did.  Didn't even know the lady;
6   but because she worked for Omar and I knew
7   Omar, had worked for Omar for a year, I got
8   her a cell phone.
9       Then she asked me can she help Lynn out,
10  if I needed any help.  I said, sure, because
11  Lynn can't do it.  Then her and Lynn got
12  together.  Lynn trained her to do what Lynn
13  was already doing.  So she caught on pretty
14  quick.  She's a quick study.  She's managed
15  properties before.
16  Q.  To your knowledge, did Ms. Williams ever
17      receive any complaints about you from any of
18      the tenants?
19  A.  No, ma'am.
20  Q.  About anything?
21  A.  No, ma'am.  No, ma'am.
22  Q.  Do you have current contact information for
23      Ms. Williams?

101

1   A.  Other than what you see on here, you probably
2       will have to contact her attorney, which is
3       one of the Legal Aid attorneys here in this
4       office represent her in the courts.  I don't
5       have any contact with her because she don't
6       have any love for me at this point anyway,

Page 78

3927 06-09-08 Gumbaytay Jamarlo.txt

7    for obvious reasons.

8  Q.  And did Ms. -- I just want to ask one

9    clarifying question.  When -- did Ms. Bassett

10    work -- I'm still a little unclear on when

11    Ms. Bassett worked for you.  Was that at the

12    same time as Lynn?

13  A.  Right.  It was at the same time and the

14    same general area.  Once again, I hired Renee

15    first.  Okay?

16  Q.  Uh-huh.

17  A.  Lynn came on board within two or three

18    months, give or take.  Ms. Cameron Bassett

19    said, well, I know how to -- I have

20    administrative skills, too.  So she asked me

21    for a job.  So I gave Ms. Bassett a job.  I

22    said, okay, here's what we can do.  Since we

23    got a hundred -- we have about a hundred --

102

1    over a hundred and some odd houses, we can

2    take these houses and divide them by three.

3    That will be less load on everybody so they

4    can get these contracts out -- I mean get the

5    monthly statements out in a timely manner.

6    Because they were getting behind, about a

7    week or two behind.

8    So it was about the same time, about a

9    month or two after Renee was hired.  And when

10    Renee started to back stab me, she left.

11    Cameron Bassett took over her accounts, and I

12    split her accounts between her and Lynn.

13    Does that make any sense?

Page 79

3927 06-09-08 Gumbaytay Jamarlo.txt

14  Q.  Yes.  And how did you -- how did you know

15      Ms. Bassett?

16  A.  She was a -- she was a Section 8 tenant who

17      rented from Mister -- she rented from

18      Mr. George K. Schimeder.  That's spelled

19      S-C-H-I-M-E-D-E-R.  She had a service call at

20      her house.  I sent a maintenance person

21      over.  And conversation came up because she

22      know I was -- Renee was sending letters out

23      and stuff.  She had asked me for a job, to

                        103

1       see whether or not I had anything that I

2       could do, because she know I had a

3       relationship with her landlord.

4           So I offered her -- just like Lynn,

5       independent.  They don't get a salary or

6       anything.  Just, you know, when they conduct

7       administrative services, I pay them twice --

8       I was paying them twice a month, on the 15th

9       and the 30th, because that's -- the first

10      part of the month, I collect the rent.  And

11      the rent that was slow to come in towards the

12      end of the month, I set those two days aside

13      and paid them on the 15th and the 30th out of

14      my commission that I received from collecting

15      that 5 or 10 percent from the landlords.

16  Q.  Okay.  And how did you know Ms. Williams?

17  A.  Ms. Williams, I had met her when I was

18      working with Omar.  Remember I was telling

19      you that I was working with Omar?  I can't

20      remember the name of the company.  It's over

                    Page 80

3927 06-09-08 Gumbaytay Jamarlo.txt

21    there on -- on Mulberry Street.

22  Q.  Okay.

23  A.  Millennium Properties.

                         104

1   Q.  And how did -- I mean --

2   A.  Millennium Properties, Mr. Omar -- I can't

3       think of Omar's last name.  He was from

4       Florida, also.  He was working with Guest

5       Properties.  They was buying up properties in

6       Alabama.  They was buying up properties in

7       Tennessee.  Mr. Guest had told Omar about me,

8       but I didn't know anything about Omar.

9           Omar had severed his ties with Guest

10      Properties, with Mr. Guest, according to

11      Omar.  One day he was riding over there on

12      East 5th Street.  He saw a sign that I had a

13      property for rent -- for rent, and he had

14      called me.  My name wasn't on it or

15      anything.  He had called me and started

16      talking to me.  And he asked me would I

17      consider coming and working for him.  So I

18      told him let's talk about it.

19          So he offered me a -- a better proposal

20      working in-house without the stress, as an

21      independent contractor.  He offered me a

22      salary.  Millennium Property had offered me a

23      salary for renting properties for them.  And

                         105

1       I had terminated my relationship with Guest

2       Properties to establish a relationship with

3       Millennium Property, which was ongoing.

                    Page 81

3927 06-09-08 Gumbaytay Jamarlo.txt

4    They -- for a little over a year.  I had a

5    one-year contract with them, independent

6    contractor contract with them to rent

7    properties, you know, advertise for this

8    company under the -- the -- I had met Renee

9    Williams there.

10        Two years after I had left that company,

11    I still had a good rapport, a good

12    relationship with Millennium.  I went by

13    there one day.  Omar wanted to bring me back

14    in because there was some other things that

15    they was doing, and he wanted to bring me

16    back in.  So they had set up some offices

17    there.  He wanted to bring me back in and --

18    and do the same thing I was doing.  And I

19    told him yes.

20        And Renee was sitting there at the front

21    desk.  She was their office manager, slash,

22    property manager.  And she had asked me,

23    after going through there on a couple of

106

1    occasions, would I assist her in getting a

2    cell phone.  Here again, I didn't know Renee

3    from nobody.

4  Q.  Sure.

5  A.  So I did.  I said, well, sure, you work here

6    with Omar.  You're not going nowhere.  So I

7    know I'm going to just -- I'll get you an

8    account open with my account, and you just

9    pay the bill.  So we agreed to that.

10        And then shortly thereafter, maybe a

3927 06-09-08 Gumbaytay Jamarlo.txt

11    couple -- two or three weeks later, she had

12    asked me did I have any extra work for her to

13    do, she was -- she was really having a hard

14    time.  And she said -- I told her, yes.  I

15    said, Lynn needs some assistance.  I have

16    these properties.  She's being overloaded.

17    So you can -- you can assist her if you

18    like.  And so they started to talking and I

19    got -- got things set up, which we have

20    already discussed.

21        So to answer your question, that's how I

22    met Renee Williams.

23  Q.  What was Omar's last name?

                        107

1   A.  I can't think of it.  He's an Iran -- he's

2       Afghanistan.  His family came over here when

3       the Soviet Union had the war with

4       Afghanistan.  That was -- he came over here

5       as a little boy.  They relocated out there in

6       California.  He grew up an America.

7   Q.  So is Millennium Properties still a company

8       in operation?

9   A.  No.  He -- he packed up his bag and went back

10      to Florida, also.

11  Q.  Okay.  And when you -- earlier when you were

12      talking about Millennium Properties, I

13      thought I heard you say something about

14      working in-house for them.  What is that?

15  A.  Right.  He had -- remember I had indicated to

16      you I had cut ties with Guest Properties

17      after renting those first 25 houses?  I

3927 06-09-08 Gumbaytay Jamarlo.txt

18    indicated to Mr. Guest that I had no longer

19    had an interest in pursuing a relationship

20    and started a relationship with Omar at

21    Millennium Properties.

22          He had contacted me, you know, once

23    again because he saw my name -- saw my sign

108

1     up with my number and called me:  I heard a

2     lot of talk about you, you know, heard that

3     you was pretty good in renting houses.  Guest

4     told me you had rented all of their houses.

5     I would love you to come be a part of us.

6     Said, I'll make you an offer that you can't

7     refuse.

8          He offered me a contract.  He offered to

9     pay me a salary plus if I managed his

10    properties for him.  So that's when I cut all

11    ties with Guest Properties again, was

12    beginning a relationship with him.  He had

13    signed me a full year contract and paid me a

14    salary as an independent contractor to rent

15    his properties.

16 Q. And this was you acting in your capacity as

17    the owner of Elite?

18 A. Acting in my capacity at that time as an

19    employee under an independent contract.  You

20    know, in other words, Elite was -- I wasn't

21    doing anything for Elite.  I still had those

22    few properties that I had initially started

23    out with Guest Properties, which was about

Page 84

3927 06-09-08 Gumbaytay Jamarlo.txt
109

1    25 -- I think it was 25 or 30 I indicated.  I
2    still had those properties.  I was still
3    managing those and receiving service fees for
4    those every month; but this relationship that
5    I developed with this gentleman supplemented
6    that salary.
7         Here again, I left a $50,000 a year job
8    with benefits and sort of stepped out on
9    faith to start my own company and to do my
10   own thing, so that took a lot of risk.  And
11   it got pretty tough out there at times.  But
12   I stayed prayed up, and I -- I did what I had
13   to do to keep my business afloat legally.
14 Q. And so you were working -- were you working
15   out of the Millennium office at that point?
16 A. At the Millennium office.  I was required to
17   come in every day like any other employee,
18   because he was -- if he was paying me, he
19   expected me to be there.  And I used to come
20   in about 9:30 or ten o'clock.  He -- he
21   allowed me to, you know, come in at nine or
22   ten.  And at the end of the business day, I
23   usually leave about three or four o'clock in


110

1    the afternoon.
2 Q. And when did you stop working for Millennium
3    in that way?
4 A. We had a one-year contract.
5 Q. So after the contract expired?
6 A. After the contract expired, but we kept a

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7    relationship, you know, a friendly
 8    relationship, but not a business
 9    relationship.  If he needed me, I would come
10    to his assistance, because we had left on
11    good terms.
12  Q.  How much did he pay you?
13  A.  He paid me $500 -- it was $1500 -- it was
14    about $1500 a month.  And he -- and I think
15    he paid that like 500 a -- he broke it into
16    two weeks.  It was roughly $1500 a month plus
17    any other incentives that -- some other
18    things he asked that I do.  But other than
19    that, $1500 a month, plus I was still
20    receiving my service fees from those other 30
21    properties.
22        So in Montgomery, Alabama, you know, you
23    can live a pretty good life, that's
```

                              111

```
 1    comfortable, for less than -- well, I wasn't
 2    making $50,000 a year.  Let me put it that
 3    way.  But we survived.
 4  Q.  So did you have an employment contract
 5    with him?
 6  A.  Just an independent contractor contract.
 7  Q.  But you had like a written agreement?
 8  A.  Handwritten agreement that he typed up and we
 9    both signed off on the terms of our
10    relationship.  So it wasn't a standard
11    independent contractor contract that you
12    would get a lawyer to draw up if you had from
13    one business to another.  I just asked him to
```

                              Page 86

3927 06-09-08 Gumbaytay Jamarlo.txt

14  make me feel comfortable and just put it in

15  writing.  Whatever you say you're going to

16  do, just write it down; and we'll sign off on

17  it.  So that's exactly what we did.

18         MS. COOPER:  Let me ask this

19      question.  Did you -- did you

20      incorporate Elite after you left

21      his --

22         THE WITNESS:  After I left --

23         MS. COOPER:  Yes.

                    112

1          THE WITNESS:  Yes.  I was --

2      yes, exactly.

3          MS. COOPER:  Okay.

4          THE WITNESS:  Right.

5          MS. COOPER:  And were some of

6      these same properties, then, did you

7      take with you or --

8          THE WITNESS:  No, no, no.

9          MS. COOPER:  No?

10         THE WITNESS:  No.  Here again,

11     Omar is someone don't have anything

12     to do with Guest Properties, don't

13     have anything to do with me.  He

14     called me out of the thin blue air

15     and because he had heard that I had

16     rented all Guest Properties'

17     properties and Guest Properties had

18     told him some great, wonderful things

19     that I had done and continued to do

20     and he was very pleased with my

                    Page 87

3927 06-09-08 Gumbaytay Jamarlo.txt

21    services.  So they called me and made

22    me an offer.  And I went on and

23    talked with him.

113

1          And that's -- the offer was

2    what we had just indicated.  So we

3    signed a verbal contract and put that

4    verbal contract in writing, and that

5    relationship would last for one full

6    year.  But his property remained with

7    his company, which is my Millennium;

8    and we started to working with him.

9    I went in the office every day,

10   stayed, you know, about anywhere

11   between five to six hours a day

12   during that time frame.

13        MS. COOPER:  So there were no

14   properties that you managed for

15   him --

16        THE WITNESS:  No.

17        MS. COOPER:  -- that you would

18   have managed under Elite -- that came

19   with you to Elite?

20        THE WITNESS:  No, ma'am.  He

21   was -- it was set up as a legitimate,

22   quote/unquote, real estate business.

23   I just came in as a rental agent, a

114

1    representative.

2          MS. NEAL:  All right.  Well, I

3    think that we're ready to take a

Page 88

3927 06-09-08 Gumbaytay Jamarlo.txt

4      break for lunch and then resume after

5      lunch, if that's all right with

6      everybody else.

7           Do you guys want to say

8      1:35?  Is that all right with

9      everyone?

10     MR. NEWELL:  Yeah.

11        (Lunch recess 12:36)

12        (Deposition resumed at

13           1:59 p.m.)

14  Q.  Good afternoon.  I just have some questions

15     about your relationship -- your relationship

16     with Mr. Bahr.  When did your -- when did

17     your employment relationship with him begin?

18  A.  Going back to our initial conversation when

19     Guest Properties first came into town, if you

20     remember -- if you recall, the first few

21     properties that he began to buying here in

22     the Montgomery area, Mr. Guest's property --

23     let me see this list.  He had sold the very

115

1      first houses to Brett Rosenbaum.  It's on the

2      exhibit -- Plaintiff's Exhibit #1 -- Joyce

3      Weber, Todd Chamelin.  It's on -- Sean

4      McDonough.  Those are the first group of

5      individuals that Guest Properties had

6      transferred these properties to.

7         So they bought anywhere between 10 to 15

8      property each.  Here again, that was before

9      the subprime crashed, as you and I know

10     that's going on today.

Page 89

3927 06-09-08 Gumbaytay Jamarlo.txt

11  Q.  And what about Mister -- what about

12      Mr. Bahr?  When did -- when did Mr. Bahr

13      first contact you?

14  A.  He -- he did not contact me.  The contact

15      was -- you know, if you recall initially,

16      Guest Properties came in and bought all these

17      properties up, West Montgomery, North

18      Montgomery, East Montgomery.  And he had

19      turned around and, lack of a better word,

20      they call it flipping.  You know, an investor

21      come in, clean the houses up, clean them up,

22      fix them up, get them ready for rental.  And

23      then he would turn around and flip those

                        116

1       properties to individuals who have good

2       credit.

3   Q.  Mister -- Mr. Bahr would?

4   A.  No.  Guest Properties.

5   Q.  Guest Properties?

6   A.  Guest Properties.  So Guest Properties would

7       sell those to professional peoples who had

8       great credit in Florida.  That's the lawsuit

9       that they involved in right now because

10      they -- it has been determined that he was --

11      had a cozy relationship with Countrywide

12      Mortgage and the real estate company.  So all

13      these guys I just mentioned in exhibit --

14      Plaintiff's Exhibit #1, they were all sold

15      the initial 25, 30 properties that Guest

16      Properties bought.  So my contact was -- all

17      my relationship, to answer your question,

                     Page 90

3927 06-09-08 Gumbaytay Jamarlo.txt

18    were with Guest Properties.
19  Q.  At no time did you have any relationship with
20    Mr. Bahr outside of Guest Properties?
21  A.  Yes.  After we had -- if you recall, after we
22    had rent all their property, I just got a
23    referral fee, a rental referral fee.  Since

117

1    he didn't know anybody in town, didn't know
2    any real estate company -- like I say, he met
3    me through a listing I had at the Housing
4    Authority.  I didn't know him; he didn't know
5    me.  He asked that I would take over these
6    properties and -- and facilitate and -- and
7    care for them and manage them until such time
8    he get a real estate company.
9  Q.  So Mister --
10  A.  So Mr. Bahr turned the contracts -- when he
11    turned the contracts -- so he informed them,
12    I guess, about six months after they had
13    rented -- four or five months after they had
14    rented all the property, he turned the
15    contracts over to them and let them know that
16    I would be renting the property -- managing
17    the property for them.
18  Q.  I'm sorry.  So when -- so did Mr. Bahr obtain
19    his property through Guest Properties?
20  A.  Exactly.  All the investors ascertained their
21    property through Guest Properties.
22  Q.  Do you know approximately when Mr. Bahr got
23    properties through Guest Properties?

Page 91

3927 06-09-08 Gumbaytay Jamarlo.txt
118

1  A.  The first year they came in town.  I -- I
2      can't recall the date, but it was -- it had
3      to have been back in 2000 -- like I said,
4      2003, 2002, 2003.  when they first came in
5      town, all these California investors came to
6      Montgomery and Florida investors, that was
7      the first wave of properties that he
8      purchased.
9          And, you know, I shared with you earlier
10     that he had called me out of the thin blue
11     air.  A couple of days later, we met.  And --
12     and that's when he had told me what he was
13     trying to do and asked did I have any
14     interest in helping him rent the property.
15 Q.  Mr. Bahr called you?
16 A.  No.  Guest Properties.
17 Q.  Guest Properties.  Okay.
18 A.  Guest Properties is the -- let me see.  Now,
19     how can I clarify this?
20 Q.  I'm not really concerned about Guest
21     Properties so much as --
22 A.  Yeah.  Well, I'm trying to get you to
23     understand the relationship between Guest

119

1      Properties and all these individuals on this
2      list.  Chip Guest, to my understanding, is a
3      real estate investor.  He buys properties at
4      a discount.  He use what they call hard
5      money.  Hard money, you buy -- you can buy
6      regular properties at a -- at a high interest

Page 92

3927 06-09-08 Gumbaytay Jamarlo.txt

7   rate to fix these properties up. That's all
8   he was doing.
9       He would -- the relationship, as I
10  understood it as it unwind, he would make
11  contact with individuals like these
12  individuals -- and I'm quite sure this is not
13  the first time he had done this. He
14  contacted these individuals and told them
15  that he had -- on Exhibit A, had bought 30
16  properties. He had his -- the Mexican guys,
17  the Hispanic gentlemens, to go in and clean
18  up the properties. And once they get them
19  cleaned up, we would get them rented for
20  him.
21      So my relationship was only with
22  Mr. Guest, Chip Guest, who's now caught up in
23  this legal issues with Countrywide and this

                        120

1   real estate company. Once Guest Properties
2   rented the property, two or three months
3   later, he asked me would I consider renting
4   these properties for him; and I told him I
5   would. Now, he ask -- he said, well, a real
6   estate company will get anywhere between 5 to
7   10 percent service fee. And he was aware of
8   the fact that I was not a licensed real
9   estate agent.
10 Q. And this is Mr. Guest?
11 A. Mr. Guest. I don't know anything about these
12     guys, didn't even know they even existed. So
13     two or three months later, he contacted me
                        Page 93

3927 06-09-08 Gumbaytay Jamarlo.txt

14  and asked me would I just take over the

15  management until they find a management

16  company.

17        One year later, that never happened.  So

18  I began to manage these properties on behalf

19  of these -- I never met none of these

20  individuals in person ever except I told you

21  Mr. Bahr came up on one or two occasions.

22  Like I said, I never saw these guys, don't

23  know where they live at; all I had was an

                         121

1  address, just talked to them on the

2  telephone.

3  Q.  Now, when did you start managing the

4      properties for these owners?

5  A.  Just shortly after we rented them.  I mean, I

6      can't remember the year, the exact year; but

7      if you go back to the first time they came in

8      town, whatever is on the record -- I think it

9      was 2003, 2002, somewhere in that area.  When

10     they first came in town, again, shortly after

11     these properties was rented, a short time

12     later, Mr. Guest -- because he still owned

13     the properties.  He asked me would I consider

14     managing them because he had some buyers, end

15     buyers.  Did that make any sense now?

16  Q.  So I apologize for having to go over this

17      again, but I'm --

18  A.  Not a problem.

19  Q.  I'm still having kind of a hard time

20      understanding.  At some point, you said that

                    Page 94

3927 06-09-08 Gumbaytay Jamarlo.txt

21    your relationship with Guest Properties

22    ended.

23  A.  Right.


                        122

1   Q.  Right?

2   A.  Exactly.

3   Q.  When was that?

4   A.  Remember I told you, I said Omar -- I can't

5       remember Omar's last time.  Iranian -- he's

6       not Iranian, but he's from Afghanistan.

7       During the Soviet war, his family was -- a

8       lot of families was brought to America.  He

9       lived -- he grew up in America.

10          But to make a long story short, he had a

11      business relationship with Chip Guest.  And

12      Chip had mentioned my name to him more often

13      than not because they was buying properties

14      not only in Montgomery, they were buying them

15      in Birmingham, they was buying them in

16      Texas -- I mean in Tennessee.  He had

17      mentioned my name and spoke very highly of me

18      since I had already rented all 25 of his

19      properties within a short time frame.

20          Omar had called me.  You recall I said

21      he saw my sign up with the telephone number

22      on it?

23  Q.  Right.  Right.


                        123

1   A.  He contacted me from that number.  He didn't

2       know who that number belonged to because he

3       and Chip and I really never got together.  We

                        Page 95

3927 06-09-08 Gumbaytay Jamarlo.txt

4   was trying to get together.  He called me and

5   told me who he was and he had heard about

6   what I was doing and how well I was doing

7   what I was doing.  He asked me to come into

8   his office.  He had an interest in me renting

9   properties for him.

10      If you recall the earlier conversation,

11  we had a contractual -- verbal contractor

12  agreement.  I said, if you're for real, if

13  you're sincere, put it in writing.  So he

14  drafted up that verbal conversation in

15  writing; he and I signed off on it.  And

16  that's my relationship, limited relationship,

17  with Omar.

18      And I terminated my relationship with

19  Guest Properties at that time, but I could

20  remained the relationship that I had

21  established with those initial individuals on

22  the -- on this Exhibit #1.  Okay.

23      MR. NEWELL:  Let's take a five-

                        124

1       or ten-minute break.

2            (Brief recess)

3       MS. NEAL:  I'd like to say on

4       the record that we want to reserve

5       the right to call you back given the

6       delays in this deposition to make

7       sure we get everything -- everything

8       that needs to be asked, asked.

9  Q.  So we were talking about Mr. Bahr.  And my

10     understanding is that while you were working

                     Page 96

3927 06-09-08 Gumbaytay Jamarlo.txt

11    with Millennium Properties, you continued to
12    work with the owners that you had established
13    a relationship with through Guest Properties;
14    is that correct?
15  A.  Let me finish this stuff.  Could you hold for
16    one second, please?
17              (Brief pause)
18          THE WITNESS:  It's your last
19        business card and you're holding
20        back?
21          MS. COOPER:  It sure is.
22  A.  All right.  Now, could you --
23          MR. NEWELL:  Don't feel lonely.

                    125

1        I only got one card, too.  I can get
2        some more, but not right now.
3   Q.  So while you were working with Millennium
4     Properties, you continued to work with the
5     owners that you had -- that you worked with
6     in Guest Properties?
7   A.  I continued to service, assist them.
8   Q.  Assist them.
9   A.  Right.
10  Q.  Okay.  And that included Mr. Bahr?
11  A.  Included Mr. Bahr, too, yes, ma'am.
12  Q.  Okay.  And how many properties did you manage
13    for Mr. Bahr?
14  A.  I think between him and his family, I -- they
15    probably had -- I can't -- right off the top
16    of my head, they probably had about 12,
17    between --
                    Page 97

3927 06-09-08 Gumbaytay Jamarlo.txt

18  Q.  Well, just Mr. Bahr.  I'm not concerned about

19      his wife or anyone else.

20  A.  He probably had about 15 -- 12, 15

21      properties.

22  Q.  And what sort of agreement did you have with

23      Mr. Bahr?

                        126

1   A.  Just a verbal agreement.  Here again,

2       Mr. Chip Guest had introduced me to these

3       individuals.  So it was just a verbal

4       agreement and to assist Mr. Guest

5       Properties -- Guest Properties.  So there

6       wasn't a written agreement, if that's what

7       you're asking.

8   Q.  So after your relationship with Guest

9       Properties ended, did you ever have any kind

10      of conversation with Mr. Bahr about what sort

11      of agreement you were going to have at that

12      point?

13  A.  No.  Because Mister -- Mister -- Mr. Guest,

14      Mr. Chip Guest, had already --

15  Q.  I'm not concerned about Mr. Guest.

16  A.  No, ma'am.  To answer your question, no.  He

17      had already indicated to them that I would be

18      taking over these properties.  And we had

19      talked about what I would be doing as -- the

20      same services that a real estate company

21      would provide you, I would provide you those

22      similar service.

23  Q.  So Mr. Guest -- did Mr. Guest send a letter

                      Page 98

3927 06-09-08 Gumbaytay Jamarlo.txt
                    127

1      to --

2   A.  No.

3   Q.  -- these owners?

4   A.  No.  No.  It just a --

5   Q.  How did --

6   A.  -- verbal.

7   Q.  So Mr. Guest communicated to these owners --

8   A.  To my understanding, it just was verbal.

9       Here again, I don't know anything about these

10      people, never met them before in my life,

11      don't know where they live at, didn't know

12      what they looked -- look -- don't know what

13      they looked like, other than Mr. Bahr.  He

14      came up here a time or two.  I don't have no

15      idea what -- what he had told them, how he

16      make that arrangement, ma'am.

17  Q.  Well, what were -- well, you had -- I mean,

18      you did have a relationship with these owners

19      after your relationship with Guest Properties

20      ended; is that correct?

21  A.  I had a relationship with them in terms of

22      assisting them to continue to maintain the

23      care of their properties.

                    128

1   Q.  Right.

2   A.  Yes, that is correct.

3   Q.  And that's what -- I'm just trying to

4       determine what sort of arrangement you had

5       with these owners.  I mean, what were your --

6       what were your duties with Mr. Bahr?  What

                    Page 99

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7      were you supposed to do for his property?
 8   A. The same thing as any other real estate
 9      company would be expected to do for his
10      property.  That's to provide services.
11   Q. And what sort of services?  I mean, would you
12      make repairs?
13   A. That's to -- I don't make repairs.  I don't
14      have a maintenance company.  I contact
15      individuals.  As I've indicated to you
16      before, they are a group of Hispanic
17      individuals that Guest Properties brought up
18      from Florida and out of Texas.  They did --
19      conducted all the maintenance repairs on
20      these properties.
21   Q. But so my --
22   A. And in addition to that, the services, you
23      would collect rent, draft up leases, and
```

                             129

```
 1      basically provide the necessary services that
 2      any other real estate company would expect to
 3      provide.  And they were aware of the fact
 4      that I'm not a licensed real estate broker;
 5      but here again, I started out with them --
 6      with Chip in terms of helping him sell --
 7      rent these properties.  I had built a pretty
 8      good relationship with them --
 9   Q. No, I understand that.
10   A. -- an excellent, if not superb, rapport with
11      them.  So they felt comfortable in doing
12      business with me.  This is why -- let me
13      share this with you.  This is why when those
```

                          Page 100

3927 06-09-08 Gumbaytay Jamarlo.txt

14    second wave of properties came into my fold,

15    I didn't have those contracts very long.  And

16    this is why Renee Williams was able to steal

17    those clients from me, because the

18    relationship with those individuals had not

19    manifested -- had not manifested over a

20    period of time and months.  I didn't have a

21    relationship with them.  I didn't know those

22    folks either.

23        So they parted ways when the attorney

130

1    advised them to part way, because they don't

2    want anybody who is associated with Guest

3    Properties in any form, fashion, or shape,

4    good or bad or indifferent, to be a part of

5    it.  So they left.  Renee stole those

6    clients.  And that's it.

7        So the relationship was the same with

8    all of them, equally the same with all of

9    them.  It's just I inherit these properties

10    because Guest Properties went into default.

11    Eric Cruz and all those guys went out

12    business.  I got a call one day that said you

13    got to pick up 60 some odd more properties.

14  Q.  Well, so did people make the rent checks out

15    to you, or did they make them out to

16    Mr. Bahr?

17  A.  They made the rent checks out to me on some

18    occasions.  They make them -- they had three

19    ways to pay their -- pay their rent.

20  Q.  Okay.

Page 101

3927 06-09-08 Gumbaytay Jamarlo.txt

21  A.  They could have deposit them in my account,

22      which I gave them my account number.  They

23      could have put it in the mail, or they could

                        131

1       have brought it by Lynn or either brought it

2       by my house.  So most of them chose, for

3       convenience purposes -- because most people

4       who don't pay their rent, they're not going

5       to pay their rent.  But if you make the bank

6       available to them 24 hours a day because you

7       can do a night deposit, most of them elected

8       to just put their portion of the rent in the

9       bank every month.

10  Q.  When would you give that money to Mr. Bahr?

11  A.  Once we -- you remember my -- if you recall

12      the conversation earlier, I had paid the

13      secretary services on the 15th and the 30th

14      of each month once I collect all the rent.

15      The checks went out on or by the 15th; the

16      last check goes out around the 30th.  So in

17      other words, all the rent I did not collect

18      up until the 15th -- you have a few people

19      who never paid on time and you always have to

20      work with a little harder than other ones.

21      Others, I collected on the end of the month.

22      But for the most part, most of your landlords

23      receive their check on around the 15th of the

                        132

1       month.

2   Q.  And when did -- how did -- who did the

3       Montgomery Housing Authority make their

                        Page 102

3927 06-09-08 Gumbaytay Jamarlo.txt

4    payments to?

5  A.  To the landlord.

6  Q.  To the landlord?

7  A.  Correct.

8  Q.  And --

9  A.  And then a portion -- to elaborate on that
10      further, the portion that the landlord did
11      not receive from the Montgomery Housing
12      Authority, that ten -- it may have been $10,
13      it may have been $15, it may have been $30.
14      Whatever portion that they were required to
15      pay, they sent that portion of that in the
16      mail.
17          We sent out those reports every month,
18      total collection that's -- went to -- was
19      submitted to the Housing Authority that the
20      landlord collected, total collection that I
21      collected or did not collect, add, multiply,
22      and divide the balance of that minus my
23      service fees was -- we indicated on their

                        133

1      monthly reports.

2  Q.  So you sent monthly reports to Mr. Bahr?

3  A.  To the -- each and every landlord, not just
4      to Mr. Bahr.

5  Q.  And that was every month?

6  A.  Correct.

7  Q.  Okay.

8  A.  Right.

9  Q.  And what if a tenant needed the rent to be
10      changed, or what if -- what if the Montgomery
                    Page 103

3927 06-09-08 Gumbaytay Jamarlo.txt

11    Housing -- start with if the Montgomery

12    Housing Authority said to you that the rent

13    was too high?

14  A.  I would -- I would contact the landlord.  I

15    don't have the authority to adjust anybody's

16    rent because if -- if you -- most of the

17    landlords had to pay the principal, interest,

18    taxes, and insurance.  Out of that, they're

19    looking to make a profit, what they call a

20    positive cash flow in this business.  They're

21    looking to make anywhere from 25 to 50

22    dollars above their mortgage payment.

23  Q.  Sure.

                    134

 1  A.  So if any adjustment had to be made, I would

 2    have to call each and every landlord that it

 3    applied to and ask them would they

 4    consider -- because I don't have no idea what

 5    their mortgage payment would have been --

 6    would they consider dropping down.  Then they

 7    would say yes, and I would contact Lynn and

 8    ask Lynn to send out a formal letter to the

 9    Montgomery Housing Authority indicating to

10    them that the Landlord A have considered

11    reducing this rent amount by X number of

12    dollars.

13  Q.  What -- if there was a repair that needed to

14    be made, what was the process?  A tenant

15    would -- a tenant would call you and tell you

16    that there was a problem?

17  A.  If you go back to y'all's first part of the
                    Page 104

3927 06-09-08 Gumbaytay Jamarlo.txt

18    day, we have already discussed this; but if

19    you want me to go through it again --

20  Q.  I would like you to go through it again.

21  A.  Not a problem.  Initially when Guest

22    Properties came into town --

23  Q.  I'm not concerned about when Guest Properties

135

1    came to town.  I'm talking about when you

2    were -- when you were managing these on your

3    own.

4  A.  Eric Cruz, as I have said before -- all

5    maintenance service call went through Eric

6    Cruz.  I indicated this in the first part of

7    our deposition.

8  Q.  Mr. Gumbaytay, when -- did you receive the

9    calls from the tenant?

10  A.  I'm going to repeat again.  The first part of

11    the deposition, I have indicated that all

12    complaints, service calls went through Eric

13    Cruz.  Upon the relationship that Guest

14    Properties had terminated and -- and left and

15    went out town, Eric Cruz was no longer in

16    position to do the services that he normally

17    would do.  At that time, the tenant would

18    contact myself and request a service call.

19    And I had mentioned that in the first part of

20    the deposition.

21  Q.  So if a tenant called you and indicated they

22    had a repair problem, would you then contact

23    the landlord, the owner of the property, to

Page 105

3927 06-09-08 Gumbaytay Jamarlo.txt
136

1    determine whether it should be fixed or not?

2  A.  I would contact them -- here again, anything

3    that's usually over $75 to $100, I would have

4    to get authorization from the landlord.

5    Because I didn't have no indication as to

6    what that person's budget is for that month.

7    So, yes, I would make initial contact with

8    each landlord if it went over $75, in most

9    cases up to $100, without -- before I can

10    have permission to send anyone out there.

11    Because those funds -- I have to determine

12    whether or not they have the funds in the

13    budget first that was collected the first

14    part of the month.  Any funds that was

15    collected and it's not enough to take care of

16    that call, then that landlord would have to

17    send a check up or make a deposit in my

18    account to take care of the necessary

19    repairs.

20        But to answer your question, yes, the

21    landlord would have to approve any and all

22    repairs.  I had no authority to do that.

23  Q.  I have an exhibit here that I'm marking as

137

1    Plaintiff's Exhibit #4.  Would you please

2    look at what I've marked as Plaintiff's

3    Exhibit #4 and try to describe what it is.

4  A.  All right.  Let me read it, too.

5  Q.  Well, can I point out the --

6  A.  Okay.  What particular one you want me to --

Page 106

3927 06-09-08 Gumbaytay Jamarlo.txt

7    I can read the whole thing for the record,

8    because all she have there is Exhibit #4, and

9    I'd like to read the entire exhibit because

10   that's a letter that --

11 Q. It's going to be in the record.

12        MR. LAY:  All exhibits are

13        included in the deposition.

14        THE WITNESS:  Okay.  Thank you.

15 Q. What I'm trying to draw your attention to are

16   the paragraph -- I believe it is the second

17   paragraph where it says, On behalf of all

18   your landlords; and it goes on to talk

19   about --

20 A. Oh.  This second paragraph, On behalf of all

21   your landlords, I pledge to, one, address all

22   service calls, which I've indicated before,

23   within 48 to 72 hours.  Depending on the

                    138

1    nature of the call, I pledge that I have all

2    work completed within five business days.

3        I indicated that in our earlier

4    conversation.

5        If -- and then if it does not happen,

6    that person, who is a Section 8 client, they

7    had the right to contact the Housing

8    Authority to advise the Housing Authority the

9    work was not done.  At that particular point,

10   the Housing Authority will take the necessary

11   action.  But to let them know it's not me

12   that's not getting the work done.  I'm

13   limited by the moneys that is sent to me.

                    Page 107

3927 06-09-08 Gumbaytay Jamarlo.txt

14      It goes on to say, However, you must

15   keep in touch with me on a daily basis if you

16   expect this type of response.  And I said

17   that to them because sometimes a service call

18   would go out and that person would not get

19   back with me to let me know that that service

20   call has been taken care of and has been

21   rectified and I get a call four or five days

22   later saying, Mr. Gumbaytay, when the

23   plumbers coming out here, when the

                        139

1    electrician?  Well, ma'am, I thought it was

2    taken care of.

3        So this is why I sent this letter out in

4    the first place.  Because I was getting a lot

5    of complaints, and they was contacting the

6    Housing Authority without me having an

7    opportunity to get some money in from the

8    landlord to fix the problem.  So the problem

9    went on and on and on and on without me being

10   aware that it went on, because they was not

11   communicated with me.

12       All right.  Let me finish reading here.

13   So, however, you must --

14  Q.  Hold on.  Let me --

15           MR. LAY:  The question is --

16           THE WITNESS:  I'm reading.

17           MR. LAY:  Just a minute.  Is

18       that exhibit -- do you recognize that

19       exhibit?

20           THE WITNESS:  Yes, I do.

                                Page 108

3927 06-09-08 Gumbaytay Jamarlo.txt

21       MR. LAY:  Can you let me finish,

22    please?

23       THE WITNESS:  Yes, sir.

               140

1       MR. LAY:  Do you recognize that

2    exhibit as a letter you sent?

3       THE WITNESS:  That's -- I do.

4       MR. LAY:  That's all she was

5    asking.

6       THE WITNESS:  Yes, sir.  Now,

7    let me finish.  Now, the question

8    is --

9       MR. LAY:  She'll ask you what

10    she wants to ask you.

11       THE WITNESS:  Okay.  Well, let

12    me finish it since I started it,

13    sir.  I have no way of knowing the

14    status of --

15       MR. LAY:  Mr. Gumbaytay, you

16    don't dictate the deposition.  We do.

17  A.  Yes, ma'am.  What else you need to ask me?

18       THE WITNESS:  I appreciate that

19    advice, sir.  I'm not familiar with

20    legal proceedings, but we're going

21    according --

22       MR. LAY:  Sir, if you want to

23    clarify something, your attorney can

               141

1    ask you when we're finished.

2       MR. NEWELL:  Let me look at this

3    thing.

3927 06-09-08 Gumbaytay Jamarlo.txt

 4  A.  All you want to know, whether or not did I

 5      send that letter out.  And the question is

 6      yes.

 7  Q.  My question about the exhibits was whether

 8      what you were reading in that paragraph

 9      fairly -- if that fairly and accurately

10      describes your policy in terms of making

11      repairs.

12  A.  Exactly, which we had mentioned at first.

13      You know, I told you I would go call Eric

14      Cruz up.  Eric Cruz the one that handled all

15      the maintenance.

16  Q.  Right.

17  A.  So it's basically what I had already said.

18      And I just put it in writing because it

19      wasn't getting done.  It still wasn't getting

20      done the way it should have been done.  So I

21      got frustrated myself and said, okay, y'all

22      call me; then you call me again; then if it

23      don't happen then, you call the Section 8.


                            142

 1  Q.  What instructions did you have from Mr. Bahr

 2      about maintaining properties?  Were there

 3      any -- did you have any additional -- any

 4      additional --

 5  A.  No.

 6  Q.  Okay.

 7  A.  I created a lot of stuff out nothing from --

 8      from trial by error, baptism by fire.  In

 9      other words, I had never managed property

10      before in my life.  I'm not a licensed real

                        Page 110

3927 06-09-08 Gumbaytay Jamarlo.txt

11    estate agent. I just took the bull by the
12    horns, lack of a better word, and just
13    figured it out.
14  Q.  Were you Mr. Bahr's agent?
15  A.  No, ma'am.
16  Q.  Did he describe you as his agent?
17  A.  No, ma'am. The only relationship we had,
18       like I said, with everybody else, I managed
19       their property. If you can consider it as an
20       agent, but I'm not an agent in terms of by
21       definition of the State of Alabama. I was an
22       agent in terms of representing him and all
23       the other landlords by facilitating the care

                          143

1     of their properties.
2  Q.  What is the -- what is your understanding of
3       the difference between what you did and what
4       an agent does?
5  A.  I provide the same services that an agent
6       would provide or a real estate management
7       company would provide once I figured out what
8       I was doing and I figured out that's what all
9       real estate companies would do. But I had no
10       indication what services a real estate agency
11       would provide, but I assumed that what I was
12       doing was what all a real estate agency would
13       do, services they would provide. And I
14       provided those services by growth in
15       experience and trial and error. So --
16  Q.  I have what I'm marking here as Plaintiff's
17       Exhibit #5. Do you recognize this?
                          Page 111

3927 06-09-08 Gumbaytay Jamarlo.txt

18  A.  Yes, I do.

19  Q.  And is that a lease that you entered into?

20  A.  This is a lease, but it's not the correct

21      lease, because the lease that we entered into

22      was for 550.  This lease has 450 on there,

23      and there was -- it was a mistake by my

                        144

1       secretary service, Letter Perfect.  And Lynn

2       will testify to that when you guys talk with

3       her next week.  But this is the -- the

4       standard lease that we would use for all of

5       our tenants, to answer your question, but

6       that's not the -- a legal lease.

7   Q.  Well, I'm actually going to talk about the

8       standard language first.

9   A.  Right.

10  Q.  And then we can get into the specifics of

11      what it says.

12  A.  Right.

13          MR. NEWELL:  I was going to

14      bring this out.

15          THE WITNESS:  See Lynn's

16      signature.

17          MR. NEWELL:  He's just -- can I

18      speak for him for a minute?

19          MR. LAY:  You can't speak for

20      him.  He's testifying.

21          MS. NEAL:  No.

22          MR. NEWELL:  Can I ask him

23      questions?

                    Page 112

3927 06-09-08 Gumbaytay Jamarlo.txt
145

1          MR. LAY:  When we're finished,
2     you can ask.
3          MS. NEAL:  Yeah, at the end of
4     it.
5          MR. NEWELL:  Okay.  Fine.
6  Q.  So what I'm -- what I actually am looking at
7     right here is at the last page, where it
8     says, you know, witness signature of the
9     parties.  And it lists -- right here it says,
10    print, Jamarlo Gumbaytay, Agent.
11 A.  Right.  Here again, I acted in the capacity
12    of an agent; but I'm not a real estate agent.
13 Q.  But you wrote -- I mean, you filled --
14 A.  This is a --
15 Q.  You filled out that form where you typed in
16    agent, or Lynn typed that word "agent" for
17    you.
18 A.  Right.  This is a standard Alabama lease that
19    you can download from U.S. Legal Form dot
20    com.  And it is on all their leases.
21 Q.  Okay.
22 A.  So this is where this lease came from, U.S.
23    Legal Form dot com.  You click on Alabama,

146

1     you download a landlord package.  That's
2     automatically in there.
3  Q.  But it does say agent?
4  A.  It does say agent, correct.
5  Q.  Okay.
6          MR. LAY:  Were you transacting

Page 113

3927 06-09-08 Gumbaytay Jamarlo.txt

7  business on behalf of Mr. Bahr?

8      THE WITNESS:  I was transacting

9  business on behalf of Mr. Bahr from

10  the standpoint of servicing his

11  properties, making sure his rent got

12  collected, also transacting leases,

13  doing those things that --

14      MR. LAY:  And you were doing

15  that at his directions?

16      THE WITNESS:  No, sir.  I was

17  doing it as -- as a -- let me put it

18  this way -- as an independent company

19  with the understanding that my

20  services that I provide would entail

21  these services, but I could not do

22  anything without his permission or

23  any other landlord permission because

147

1  I have no authority to act in their

2  behalf because it's not my property,

3  only with limited authority.

4      MR. LAY:  But you did transact

5  business --

6      THE WITNESS:  I transact --

7      MR. LAY:  -- at his direction?

8      THE WITNESS:  I transacted --

9      MR. LAY:  -- or his approval.

10          (Court reporter interrupts)

11      MR. LAY:  Did you transact

12  business at his direction?

13      THE WITNESS:  I transacted

Page 114

3927 06-09-08 Gumbaytay Jamarlo.txt

14    business as was deemed necessary.

15    Yes and no.  Some things I did on my

16    own as simple things.  Like if a yard

17    need to be cut, I'd go out there and

18    put a notice on the door on the --

19    let them know that the yard need --

20    he -- a lot of things Mr. Bahr

21    never --

22        MR. LAY:  No.  Let me ask you

23    this.  Were you --

148

1        THE WITNESS:  That question is a

2    yes and no question.

3        MR. LAY:  Were you acting on his

4    behalf when you were managing his

5    properties?

6        THE WITNESS:  Yes.  Yes and no.

7    Because some things I did without

8    him -- as a management company, I did

9    out of the goodness and kindness of

10    my heart, like let people know their

11    yard needed to be cut, they got an

12    abandoned car in their driveway, they

13    need to remove that car.  I drafted

14    that up and made it a part of that

15    lease.  Mr. Bahr did not ask me to do

16    that.  That was something I thought

17    that was appropriate and necessary

18    and needed to be done, because we had

19    a lot of problems out of a lot of

20    people.  And I feel as though if I'm

Page 115

3927 06-09-08 Gumbaytay Jamarlo.txt

21    going to be paid for managing these

22    properties, I need to give them the

23    best service proper -- the best

149

1    service as possible.

2        MR. LAY:  So he did pay you to

3    manage these properties?

4        THE WITNESS:  He paid us a

5    service fee, yes, sir.

6        MR. LAY:  That's all we needed

7    to know.

8  Q.  (Ms. Neal continuing:)  When did you -- when

9    did you meet Ms. Boswell?

10  A.  She had came to us -- what's the lease date

11    on that?  She had came to us in the month

12    of -- September, October.  I believe she had

13    came to us in -- someone had referred her to

14    us.  She had came to us in the month of -- I

15    believe the month of September.  Someone had

16    referred her.  I talked to her on the phone.

17    She asked me did I have any properties for

18    rent.  I said I do.  And I asked her -- the

19    first thing that come out -- out of our mouth

20    is, are you Section 8?  She said, no, I'm

21    not.

22        I said, well, if you're not Section 8,

23    what is the -- what is the -- the -- the rent

150

1    run from 550 to 700 dollars a month for a

2    three bedroom.  And if you're non Section 8,

3    you have to be -- you're responsible for

Page 116

3927 06-09-08 Gumbaytay Jamarlo.txt

4      paying the whole thing by yourself.  So I
5      asked her, what can you afford to pay?  She
6      said, I can only afford to pay $450 a month.
7      I said, well, I don't have anything in our
8      repertoire.  And I did not and I do not up
9      until the time I asked her, well, I do not
10     have anything for 450.  The lowest house we
11     had is 550, and that was a two-bedroom at
12     that time.  I said, I can rent you a house
13     that has been abandoned and been vandalized
14     if you and your family go in and fix the
15     house up and clean that house up, and I --
16     I -- I would not charge you a deposit and nor
17     would I -- and I'd make the rent -- we'll set
18     the rent at 450.
19          So when Lynn originally drafted that
20     lease up, it was for the property that
21     belongs to a Sean McDonough.  She -- she
22     print it through the computer.  She forgot to
23     take the 450 off of there when she had draft

                        151
1      up the lease for the other property.  So that
2      lease for 450 she had was a mistake by
3      Ms. Lynn Norsworthy.
4          So I came in contact with her.  I sent
5      her to the house.  She could never get her
6      uncle to do any of the work over there.  She
7      had some other relatives that was going to
8      help her do the work.  They was homeless.
9      They didn't have anyplace to go.  I kind of
10     felt sorry for them because I went through
                        Page 117

3927 06-09-08 Gumbaytay Jamarlo.txt

11    the same thing as a young kid growing up in

12    the housing project, struggling.  I saw my

13    mother struggle.  She was a single

14    African-American female with four boys.

15  Q.  See, you said that the initial -- the initial

16    house that -- that Ms. Boswell was interested

17    in was -- was managed -- was owned by Sean --

18  A.  Mr. Sean McDonough.  He is one of the -- on

19    exhibit -- Plaintiff's Exhibit --

20  Q.  No.  I -- I know -- I know who he is, yeah.

21  A.  Yeah.  Sean McDonough, yeah.

22  Q.  Yeah.

23  A.  That was the initial -- that was the house he

152

1    had over there on -- off of Hall Street, by

2    Hall Street Baptist Church.  I can't think of

3    the house.  Lake Street.  That's what it was,

4    Lake Street.  So she should have a -- when

5    you talk to Lynn, she should have a lease in

6    her -- in her computer for 450 for Lake

7    Street.  And you look at the list of houses I

8    have, you'll never see anything in there for

9    less than $550 a month.

10  Q.  So in the exhibit marked as a Plaintiff's

11    Exhibit #5, you're claiming -- what are you

12    claiming about this exhibit?  You're --

13    you're alleging -- you're alleging to me that

14    this was an error on Ms. Norsworthy's part?

15  A.  Right.  Because these -- these are standard

16    leases.  Okay?  I got this from U.S. Legal

17    Form, downloaded it.  Lynn got all these in

Page 118

3927 06-09-08 Gumbaytay Jamarlo.txt

18    her computer. She's real good. Like -- as I

19    indicated before, she's been working for me

20    as an independent for 15 years. She has all

21    of these in her computer.

22        We don't have any leases in our computer

23    but either 550, 600, 650, or 700 dollars. So

153

1    she just downloaded one without actually

2    looking at it. And she had -- this lease was

3    originally for Lake Street. I reduced the

4    rent on Lake Street for them because they

5    ain't have no place else to go. And I asked

6    her to fix the house up, to clean it up and

7    paint it up; and they agreed to do that.

8        Lynn just forgot to change the numbers

9    on here. When I told her -- when she told me

10    that her uncle could not help them, she had

11    no place else to go, she don't know what to

12    do, I told her about the other property that

13    Mr. Bahr had across town. I said, it's over

14    there in a rough neighborhood and, you know,

15    they have a lot of shooting and killing over

16    there in that neighborhood. And she

17    understood. And that's the only thing they

18    could afford. I said, I'll rent you that one

19    for $550 a month.

20 Q.  She remembered to change the name of the

21    property owner, correct?

22 A.  No, not the property owner. The property.

23    It was -- it was -- Sean McDonough was the

Page 119

3927 06-09-08 Gumbaytay Jamarlo.txt
154

1     property owner.  Yes, Sean McDonough was the

2     property owner.

3  Q.  Could I point out to you this sentence right

4     here where it says, You, between the lessor,

5     Matthew W. Bahr.  So she did remember to

6     change who --

7  A.  Right.  Because -- because Matthew Bahr

8     has -- when I sent her -- here's how it works

9     with Lynn, you know.

10  Q.  Well, no.  I mean, here's --

11  A.  She has -- let me put it this way.  She has

12     all of Matthew Bahr's leases, blank leases,

13     already in her computer in the system.  If I

14     tell her that I have a tenant that want to

15     rent a property belongs to Matthew Bahr, it's

16     already in her system.  All she has to do is

17     print up a lease.  Matthew Bahr name and

18     everything, and it's already printed in the

19     lease.  All she have to do is download it.

20     Because she makes her job easier,

21     because we have a high turnover on these

22     properties.  So Lynn figure out a system

23     where it can make it easier for her.  So

155

1     when -- that original investor that owned the

2     Lake Street property was Sean McDonough.

3     Sean McDonough has a system set up for --

4     for -- she has blank leases set up anyway in

5     the system.  She had made the initial lease

6     out with Sean McDonough as the management

Page 120

3927 06-09-08 Gumbaytay Jamarlo.txt

7  company.  She just never probably changed it

8  out.  And I asked her to write a letter and

9  explain what -- to the courts that that was a

10  mistake on her behalf.

11       MR. LAY:  Did you sign that

12  document?

13       THE WITNESS:  No.  Lynn did.

14  She has -- you know, remember, I told

15  you guys earlier --

16       MR. LAY:  Did you sign the

17  document is what I said.

18       THE WITNESS:  No, not this

19  document.

20       MR. LAY:  Who signed it for

21  you?

22       THE WITNESS:  Lynn.  You

23  remember I --

                    156

1       MR. LAY:  She signed your name?

2       THE WITNESS:  Yeah.  Right.  You

3  remember I said earlier before we

4  went to lunch --

5       MR. LAY:  Did she sign your

6  name?

7       THE WITNESS:  She signed my name

8  here.

9       MR. LAY:  Okay.

10       THE WITNESS:  Yeah.  And let me

11  repeat, as I said earlier, if I am

12  not available, I will call Lynn, give

13  Lynn permission to sign my name in

                 Page 121

3927 06-09-08 Gumbaytay Jamarlo.txt

14    behalf of Matthew Bahr.

15        So that is proof positive

16    there that if I'm not available -- I

17    may be out of town.  Everybody -- I

18    send everybody over to Lynn's house

19    because Lynn has a -- actually has

20    the professional business set up.  So

21    I send them up to Lynn.  Lynn does

22    all the contracts.  Lynn will sign

23    the contract with my name on it

                    157

1    because I'm not available.

2        She handle -- that's what I

3    pay her for.  You know, she was

4    charging me almost $30 an hour.  So,

5    you know, why should I do the work

6    when I can send them over to her?

7        MR. LAY:  So you pay for her

8    mistakes?

9        THE WITNESS:  I pay for whatever

10    services she provided.  And she has

11    made quite a few.  Remember, she's

12    been with me for 15 years.  Lynn is

13    good.  I don't question her

14    judgment.  I don't even look at her

15    paper.  She's a real sweet lady, and

16    she's a very kind and compassionate

17    person.  She's done made a mistake on

18    a few master degrees -- I mean, a few

19    papers I turned in for grad school.

20        MR. LAY:  Okay.  Is that -- is

                    Page 122

3927 06-09-08 Gumbaytay Jamarlo.txt

21    this a valid lease, then, since she

22    had the authority to sign your name?

23        THE WITNESS:  She had -- it is a

158

1    valid lease, I guess.  Well, the

2    State of Alabama wouldn't consider it

3    a valid lease; but if I gave her

4    verbal permission to sign it, it

5    would be a valid lease.

6      MR. LAY:  So this lease is not

7    invalid?

8       THE WITNESS:  Well, according to

9    the State of Alabama, none of my

10    leases are invalid because I'm not a

11    legal real estate agent -- none of

12    the leases that I have signed,

13    according to the State of Alabama,

14    since I'm not a licensed real estate

15    agent, are legal and binding.

16        And matter of fact, your

17    office had -- had me in court.

18    Because we had evicted Renee

19    Williams, one of our independent

20    employees.  I evicted her.  Your

21    office brought the case in Small

22    Claims Court that I have no legal

23    standing to even draw up a lease and

159

1    to even sign a lease, to even conduct

2    any business on the behalf of Matthew

3    Bahr or anyone else because I'm not a

Page 123

3927 06-09-08 Gumbaytay Jamarlo.txt

4    licensed real estate agent.

5       MR. LAY:  And you told us

6    earlier that Mr. Bahr knew that you

7    weren't licensed, did you not?

8       THE WITNESS:  Yeah.  He was

9    aware.  All of them was aware that I

10    wasn't licensed.  Guest Properties

11    was aware I wasn't licensed.  But the

12    State of Alabama --

13       MR. LAY:  Well, what gave you

14    the idea that you could conduct

15    leasing property when you don't have

16    a license?

17       THE WITNESS:  I had -- that's a

18    good question.  What's your name

19    again?

20       MR. LAY:  Mr. Lay.

21       THE WITNESS:  Mr. Lay, that's a

22    good question.  I asked my attorney,

23    believe it or not.  He's a real

160

1    estate attorney.  I asked him.  I

2    promise you I did.  I consulted with

3    my attorney, the same person that

4    showed up, we went to court with, on

5    the case pending right now with Renee

6    Williams.  I asked him could I

7    legally do what I was doing.

8        He was aware -- I made him

9    aware of all the legal transactions

10    that's transpiring now between Guest

Page 124

3927 06-09-08 Gumbaytay Jamarlo.txt

11    Properties and the other industries

12    that we had mentioned.  I asked him.

13    He's a real estate attorney,

14    Mr. Chris Pitts.  And it's in the

15    record at the Small Claims Court.

16    Can I do what I'm doing legally?  He

17    said, yes.  I said, I don't have a

18    license.  He said, yes.  I have an

19    LLC, but I didn't have a license.

20          So acting upon my attorney's

21    information -- I got some bad

22    information, sir.

23          MR. LAY:  I want to ask you

161

1     right here, this says -- you said she

2     put a mistake here and the rent was

3     supposed to be 550.  Well, actually,

4     on the document, I'm going to show

5     you back -- isn't 550 marked out and

6     450 --

7           THE WITNESS:  Right.  Because

8     that was --

9           MR. LAY:  -- with her initials?

10          THE WITNESS:  Right.  That was

11    initially for Sean McDonough's

12    house.  Remember, I told you Sean --

13    that was initially a contract that

14    Lynn Norsworthy --

15          MR. LAY:  What I asked you,

16    Mr. Gumbaytay, is, is that marked out

17    and is it written in for 450 and

Page 125

3927 06-09-08 Gumbaytay Jamarlo.txt

18 initialed?
19   THE WITNESS:  A mistake, yes.
20   MR. LAY:  Is that what the
21 document reflects?
22   THE WITNESS:  It's a mistake.
23 Yes, it reflects --

       162

1   MR. LAY:  I don't care whether
2 it's a mistake.
3   THE WITNESS:  Yes.
4   MR. LAY:  Is that what the
5 document reflects?
6   THE WITNESS:  Yes.  Yes.
7   MR. LAY:  Okay.  And what is the
8 property address up there?
9   THE WITNESS:  The property
10 address up there is 964 North Gap
11 Loop.
12   MR. LAY:  And you're saying Lynn
13 signed your name with your
14 permission?
15   THE WITNESS:  She signed my
16 name, but --
17   MR. LAY:  With your permission?
18   THE WITNESS:  Right, with my
19 permission.
20   MR. LAY:  And she initialed
21 that.
22   THE WITNESS:  She initialed it.
23   MR. NEWELL:  Yeah, she initialed

Page 126

3927 06-09-08 Gumbaytay Jamarlo.txt
163

1       it.
2              THE WITNESS:  And once again, if
3          you look at all the rental property I
4          have, you will not see any property
5          for 450.
6              MR. LAY:  Let's -- go ahead.
7              THE WITNESS:  None of them.
8    Q.  (Ms. Neal continuing:)  When you first met
9        Ms. Boswell, did you indicate to her that you
10       were interested in her romantically?
11   A.  No, I did not.
12   Q.  Did you indicate to her that you were
13       interested in her sexually?
14   A.  No, I did not.
15   Q.  Did you ask her out on a date prior to her
16       moving in?
17   A.  No, I did not.  Now, I joke and tease with a
18       lot of females.  She might have took it --
19       like she might have took it personal.  But
20       other than that, you know, anything that I
21       said to her, you know, she may feel as though
22       I was coming on to her.  I joke and tease
23       with all the time with females, but I don't

164

1        have any interest in having a relationship
2        with my tenants.
3    Q.  What sort of things would you say to her that
4        she might have misconstrued?
5    A.  Probably a nice -- well, most things that
6        most guys says to a lady, that she's -- that

Page 127

3927 06-09-08 Gumbaytay Jamarlo.txt

7   she's attractive, I like your hair style, I

8   like the car that you drive, just small talk.

9   Q.  Okay.  Well, let me -- I want --

10          MR. NEWELL:  I didn't see any of

11      that.  There's a couple things that

12      he says he was joking, now.

13          MS. NEAL:  Excuse me.  This is

14      not the time for you to be presenting

15      your argument.

16          THE WITNESS:  Okay.  Just --

17  Q.  I want to go through some conversations that

18      you had with Ms. Boswell that were recorded.

19      I believe you have already -- I believe you

20      received a copy of this before.

21  A.  Right.

22  Q.  I'm going to identify this as Plaintiff's

23      #6.  I actually --

165

1           MR. NEWELL:  That's those

2       transcripts of these tapes.  We're

3       going to object to that being

4       anything.  What's on the disk is

5       real.  That's the only evidence.

6           MS. NEAL:  Okay.

7           MR. NEWELL:  If you hear them,

8       you're going to find out the whole

9       thing is a joke.

10          MS. NEAL:  Okay.

11          MR. NEWELL:  I'm serious.

12  Q.  So I'm showing you what is marked as

13      Plaintiff's Exhibit #6.  And this is a

Page 128

3927 06-09-08 Gumbaytay Jamarlo.txt

14   transcript of a recorded conversation between

15   you and Ms. Boswell. Can you look at it? Do

16   you recognize that conversation?

17        Yeah. I believe that it's dated on the

18   front --

19        MR. NEWELL: That's the better

20        evidence on this disk --

21  Q.  -- as 10/12.

22        MR. NEWELL: -- instead of going

23        on these transcripts.

166

1        THE WITNESS: Come again?

2        MR. NEWELL: There's much better

3        evidence on the disk than trying to

4        go on these transcripts. Just listen

5        to it. Everybody can hear it.

6        MS. COOPER: Let him read it.

7        MS. NEAL: He can read the

8        transcript and identify it.

9        MR. NEWELL: I want him to

10        listen to the tapes -- the disk,

11        I mean. It's just six short media

12        files. It's the whole --

13        MS. NEAL: Mr. Newell, it's not

14        your business how we decide to

15        introduce the evidence, whether we do

16        it by transcript or by the

17        recordings. And we're doing it by

18        transcript today.

19  A.  Yeah. Let me clarify this. She signed off

20     on 450 for Sean McDonough's property.

Page 129

3927 06-09-08 Gumbaytay Jamarlo.txt

21  Q.  Well, hold -- my -- first, do you recognize

22      this as a conversation --

23  A.  I do not.

167

1  Q.  -- that you had with Ms. Boswell?

2  A.  I do not.  Because I never -- I haven't had a

3      chance to listen to the disk yet.  I do not

4      recognize this nor did I realize -- nor did I

5      realize that this conversation was being

6      recorded without my permission.

7  Q.  Well, my question is, so you don't --

8  A.  No.

9  Q.  So looking through it, you don't remember

10     having this conversation?

11  A.  I don't remember having this conversation.

12  Q.  This does not reflect -- this does not

13     refresh your recollection?

14  A.  No, ma'am.  We had a conversation about her

15     signing off on a lease at Lynn's.  I do

16     recall that conversation, that lease that she

17     should have signed off on.  And I have an

18     application on file for her for Lake Street.

19     And on the application -- and I asked her to

20     get over to Lynn, sign off on the 450 lease.

21     Lynn had drafted the lease up.

22         So this conversation, from what -- from

23     what I can see here, is regarding that

168

1      conversation pertaining to Lake Street.

2  Q.  Well, why don't you take a second to review,

3      review that document, and look at it and see

Page 130

3927 06-09-08 Gumbaytay Jamarlo.txt

4    if it refreshes your recollection.

5              (Brief pause)

6  A.  No.  I don't remember this specific -- I

7       don't remember this conversation ever taking

8       place.

9  Q.  Okay.  How about this one?  I'm going to show

10      you another conversation.  Let's mark it as

11      #7, Plaintiff's Exhibit #7.  And this is --

12 A.  The only thing I remember on this -- on that

13      exhibit --

14            MR. NEWELL:  There's four little

15            media things.

16 A.  Yeah.  The only thing I remember about the

17      rent --

18            MR. NEWELL:  She talks about the

19            toilet, and that's it.  The toilet is

20            stopped up.

21 A.  That's it.

22 Q.  But do you remember the conversation?

23 A.  The only -- I have -- let me say it this way,

                        169

1    without being disrespectful to you and this

2    team.  I had over 115 properties at any given

3    time.  I cannot recall every conversation I

4    had with every single tenant.  And literally,

5    we receive 10 to 20 calls a day, per day,

6    maintenance service calls.  I cannot remember

7    every conversation I had with every tenant a

8    day, seven days a week, up to nine o'clock at

9    night, to when I turned my phone off.  Ten

10   o'clock sometimes I'm answering service

                    Page 131

3927 06-09-08 Gumbaytay Jamarlo.txt

11    calls. So, no, I cannot remember it.

12        The only reason I remember the 450 is

13    because the only property that we ever rented

14    was at Lake Street for $450. I told her to

15    go to Lynn and sign the lease off -- sign off

16    on that lease because Lynn had made a mistake

17    on that lease, go by and sign off on it. She

18    never did go by there.

19 Q.   Well, let's look at -- let's look at this

20    call. This is a different call. I marked it

21    as Plaintiff's Exhibit #7. And this is a

22    call between you and Ms. Boswell on

23    10/17/2006. Will you look through it and see

                        170

1     if you recollect this call?

2        MR. NEWELL: Will your thing

3        play DVD tapes -- I mean disks?

4        COURT REPORTER: I think, but

5        I'm not going to be able to write at

6        the same time.

7        MS. NEAL: This is not --

8        MR. NEWELL: Well, if you want

9        to clarify this, here it is.

10 A.  I don't recall this conversation without

11    seeing the rest of it. And I --

12        MR. NEWELL: These don't reflect

13        anything I heard. It's just several

14        little ol' media files. Four of them

15        talk about the toilets. One of them

16        he might be asking for a date. You

17        can see he was joking.
                                    Page 132

3927 06-09-08 Gumbaytay Jamarlo.txt

18  Q.  Do you recognize the conversation that took

19      place, Plaintiff's Exhibit #7?

20  A.  Once -- once again, I have indicated before I

21      have 20 to 30 calls coming in a day, seven

22      days a week, 114 clients.  I cannot remember

23      every single conversation I have had with

                           171

1       every single client.

2              MR. NEWELL:  Every single one of

3           these things is recorded on a tape by

4           her on her phone.  He did not know he

5           was being recorded.

6              MS. NEAL:  Mr. Newell, any

7           objection that you have to this

8           should not be made in that fashion.

9              MR. NEWELL:  Well, I'm letting

10          you know.  I do object to it in that

11          fashion.  It's on this disk, and you

12          can listen to it just as well as they

13          can.

14  A.  Okay.  She says something about the house.

15  Q.  What is -- let me ask you -- let me ask you

16      about some --

17  A.  Let me just --

18             MR. NEWELL:  You gave us the

19          same -- this disk that you gave us --

20  A.  I have --

21             MS. NEAL:  Do you want me to get

22          the magistrate judge on the phone?  I

23          mean, are you not going to let me

                         Page 133

3927 06-09-08 Gumbaytay Jamarlo.txt
172

1    conduct the deposition as it should

2    be conducted?

3        MR. NEWELL:  No, I'm not,

4    because you won't listen to the

5    disk.  It's not anything --

6        MS. NEAL:  Well, I already

7    said -- Mr. Newell, I already said

8    that we were not interested in

9    listening to the disk at this time.

10       MR. NEWELL:  Well, it's not like

11   this is not -- this is not evidence.

12   They're not even evidence.

13       THE WITNESS:  Mr. Newell, hold

14   on a second.

15  A.  The 3,000 she's talking about in here, which

16   I don't -- I remember the conversation

17   because we were talking about that house on

18   Lake Street.  You know, I indicated to you

19   that it was severely damaged, vandalized.  It

20   was boarded up.  On page 6 --

21       MR. LAY:  Okay.  I think the

22   question she asked you was do you

23   recall this conversation --

173

1        THE WITNESS:  No, I do not.

2        MR. LAY:  -- on 10/17?

3        THE WITNESS:  I do not.

4  Q.  But you remember parts of the conversation.

5  A.  I do not remember -- I remember that

6    particular conversation in conversation,

Page 134

3927 06-09-08 Gumbaytay Jamarlo.txt

7      because that's the only house that I ever

8      rented out for $450.  The house was

9      abandoned.  The house had been destroyed.

10     Her and her family went in there and looked

11     at it.  Her and her uncle said that they

12     would fix the house up.  And I would charge

13     her no deposit, $450 in rent.  I would knock

14     off a hundred dollars, would --

15  Q.  Did you --

16  A.  Listen to me, now, so you can get

17     clarification on it.  Would knock off a

18     hundred dollars a month for six months.  And

19     that was in her application that I took for

20     her, a hundred dollars a month for six

21     months.  And the repairs in here, if you see,

22     was $3,000 for repairs that her uncle

23     estimated.

                        174

1   Q.  So you --

2   A.  So that hundred dollars a month we was going

3      to knock off because they was going to do the

4      work along with the deposit on Lake Street

5      and Lake Street only.

6   Q.  So reading form page 6, you remember the

7      portion where you say, You could have got

8      that house for 450 if you, your folks went in

9      and put $3,000 of labor in there?

10  A.  I remember that conversation because that's

11     what she told me her uncle said that it would

12     cost.

13  Q.  Well, if you look back -- I mean --

                                    Page 135

3927 06-09-08 Gumbaytay Jamarlo.txt

14  A.  But --

15  Q.  -- this is part of one conversation.  I

16      mean --

17          MR. NEWELL:  No, it isn't.

18  Q.  -- this is all part of a conversation that

19      took place on 10/17/2006.

20  A.  I -- I -- I can't recall anything else in

21      this, ma'am.  I just can't recall it.  If you

22      want to just make it for the record, I cannot

23      recall the rest of this conversation.  I

                           175

1       remember that because that house was

2       abandoned, was tore up.  That's the only way

3       I remember that one.  Because the family were

4       poor, didn't have anyplace to go, they were

5       homeless.  And I felt really, literally sorry

6       for them.

7           MR. LAY:  Look at page 4.

8           THE WITNESS:  Okay.

9           MR. LAY:  Can you read that

10          first section that begins with your

11          name?  Do you remember saying that?

12          THE WITNESS:  No.  I --

13          MR. NEWELL:  It says on one of

14          these tapes, he's says he's kidding.

15          He didn't do --

16          THE WITNESS:  Here again, I

17          tease and I joke.

18          MS. COOPER:  You're not

19          testifying.

20          MR. LAY:  He can speak for

                      Page 136

3927 06-09-08 Gumbaytay Jamarlo.txt

21    himself.

22        THE WITNESS:  Once again --

23    Mister -- I'd say again, I don't

176

1    recall --

2        MR. LAY:  Do you remember at any

3    time saying those words?

4        THE WITNESS:  No, I do not.  I

5    do not.  But if I did, I was just

6    joking or kidding.  I don't -- I

7    don't -- I cannot remember every

8    single conversation I had, sir, with

9    everybody.

10       MR. LAY:  Well, now that you've

11   read it --

12       THE WITNESS:  No, I do not

13   recall.

14       MR. LAY:  -- can you remember

15   it?

16       THE WITNESS:  If I did, no, I

17   don't remember it, sir.  I just --

18       MR. LAY:  Do you remember

19   calling yourself her sugar daddy --

20       THE WITNESS:  No, sir.

21       MR. LAY:  -- and agreeing to pay

22   a hundred dollars --

23       THE WITNESS:  No, sir.

177

1        MR. LAY:  -- of her rent?

2        THE WITNESS:  No, sir.

3        MR. LAY:  You don't remember
                    Page 137

3927 06-09-08 Gumbaytay Jamarlo.txt

4    that?

5         THE WITNESS:  If I did say

6    that -- I don't remember saying it;

7    but if I did say that, like I told

8    you, I joke and I tease and I jive

9    with a lot of ladies.

10        MR. NEWELL:  Well, I mean, I

11   thought you said here's a hundred

12   dollars for being a nice guy, making

13   it good for making a mistake in the

14   lease in the first place.

15        MS. COOPER:  Mr. Newell, we're

16   going to call the magistrate judge if

17   you do that one more time.

18        THE WITNESS:  Well, if

19   Mr. Newell go, I got to go, because I

20   can't conduct without my attorneys

21   here.

22            So you want to just hold

23   tight a second, sir, and let us get

                    178

1    through this.

2            But to answer your question,

3    no, I do not recall the conversation.

4         MR. LAY:  Do you ever recall

5    using the phrase "sugar daddy" --

6         THE WITNESS:  No, I do not, sir.

7         MR. LAY:  -- at any time with

8    Ms. Boswell?

9         THE WITNESS:  No, I do not.

10        MS. COOPER:  Or with anyone
                    Page 138

3927 06-09-08 Gumbaytay Jamarlo.txt

11          else.
12              THE WITNESS:  No.  If I did, I
13          joke, I tease, I shuck and I jive a
14          lot with -- like any other
15          red-blooded American male would do,
16          you know.
17  Q.  (Ms. Neal continuing:)  What does the phrase
18      "sugar daddy" mean to you?
19  A.  I have no idea.
20  Q.  You don't know what the -- you don't know
21      what the phrase "sugar daddy" means?
22  A.  Sugar daddy candy bar.
23  Q.  You're telling me that you don't have --

                        179

 1  A.  I have -- I have no idea.  You have any --
 2      you give me a definition, I can -- I can
 3      agree with you.  I know the sugar daddy candy
 4      bar.
 5  Q.  What about cake daddy?
 6  A.  Sweet daddy.
 7  Q.  What does the phrase "cake daddy" mean to
 8      you?
 9  A.  Those are some of the terminology that some
10      people utilize in the ghettos.  I don't --
11      I'm not ghetto, ma'am.  I grew up out of the
12      ghetto.
13  Q.  But you've heard the phrase before?
14  A.  I have no idea.
15  Q.  You've heard somebody use the phrase "sugar
16      daddy"?
17  A.  You asked me a question.  I just gave you an
                    Page 139

3927 06-09-08 Gumbaytay Jamarlo.txt

18     answer.  I have no idea, ma'am, what that

19     means.

20  Q.  You've heard somebody use the phrase "sugar

21     daddy."

22  A.  I have no idea, ma'am, what that means.

23  Q.  Well, answer the question I'm asking.  I said

              180

1     have you heard the person use --

2  A.  I have heard it used on television.  I have

3     heard it used in conversation.  I work with a

4     lot of at-risk kids.  I work with a lot of

5     lower income individuals.  And so --

6  Q.  So you're --

7  A.  And in most -- in most of your lower income

8     communities, they use slang and terminology

9     that I'm not familiar with; but I try to be

10    with the hip crowd.

11  Q.  So you're saying you've never used that term

12    yourself?

13  A.  If I have used it, I don't recall using it.

14    I try to use -- I try to carry and conduct

15    myself in a professional manner at all times

16    because of the -- the time I have invested in

17    my education.  And I have no interest in --

18    in taking that education and changing into

19    another person.  It's not -- I don't -- I

20    don't hang out in the ghettos.  I grew up in

21    a housing project when I was a kid.  That's

22    the last time I've been back.

23  Q.  Okay.  So when Ms. Boswell signed her lease,

Page 140

3927 06-09-08 Gumbaytay Jamarlo.txt
181

1    you're saying that she -- she signed it at

2    Ms. Norsworthy's house?

3 A.  Correct.

4 Q.  Did Ms. Boswell ever go to your house?

5 A.  She came by.  She came by on one or two

6    occasions.  I think that was to pay a partial

7    deposit because she was close by.  She was

8    close by me than she was Miss Lynn once she

9    got settled in on that side of town.  Well,

10    she came by initially to -- to -- when

11    someone had introduced her to me, I told her

12    where I lived at.  She came by initially, and

13    I gave her an application to fill out, and

14    she completed the application.

15 Q.  That was before -- that was before she filled

16    out the lease?

17 A.  Right.  That was for Lake Street.  She filled

18    out a Lake -- so from that point forward when

19    she got the lease -- I mean the application

20    filled out, I sent it over to Lynn; and Lynn

21    took over from there.

22 Q.  Did you ever offer to help Ms. Boswell in any

23    way?

182

1 A.  No, ma'am.  I have never helped Ms. Boswell

2    or anybody else, as far as that's concerned.

3 Q.  You've never offered to help anybody out

4    financially?

5 A.  No, ma'am.

6 Q.  You've never offered to pay for somebody's

Page 141

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7    cell phone?
 8 A. Yeah.  Renee Williams is the only person.
 9    That was a business relationship because I
10    had a contract relationship with her.  And
11    once again, if I ever said anything to
12    anybody, I was joking, I was kidding.  But
13    other than that, ma'am, Renee Williams, I
14    helped her got a cell phone.  I helped Renee
15    Williams got a fax machine, helped Renee
16    Williams -- set her up in business with a
17    color copier.  I didn't know Renee Williams
18    from -- from you.
19        I helped Renee Williams pay -- her and
20    her husband -- fiance -- had a car broke
21    down.  I paid the wrecker to haul that car
22    off from point A to point B.  Renee Williams'
23    rent was never on time.  I gave Renee
```

                              183

```
 1    Williams a break on her rent.  I did the nice
 2    things because I'm a nice guy, but sometimes
 3    nice guys get caught up with the wrong
 4    people.
 5        And Renee Williams will tell her she
 6    borrowed money from me.  And it's in the
 7    contract that your -- that your attorney
 8    have.  She borrowed money from me because she
 9    had a storage that she was about to be -- she
10    was about to lose her furniture in storage
11    down there in Florida.  I loaned this lady up
12    to 600 and some odd dollars.  I got her a
13    $1500 computer because she said she needed
```

                          Page 142

3927 06-09-08 Gumbaytay Jamarlo.txt

14  some help.

15          MR. LAY:  We're talking about

16      Ms. Boswell.

17          THE WITNESS:  She asked me a

18      question about Renee Williams, have I

19      ever gave anybody a phone.  I told

20      her --

21  Q.  I said did you ever.  I didn't say who.

22  A.  No.  Yeah, Renee Williams.

23  Q.  Did you ever meet Jenette Boswell,

184

1      Ms. Boswell's mother?

2  A.  Yeah.  Both of them came over to my house,

3      which I had my business in my home.  They

4      came over to my home, completed the

5      application.  At such time, I sent it in to

6      Lynn, let Lynn finish up the paperwork.

7  Q.  So when you say they completed an

8      application, I mean, what --

9  A.  For Lake Street.

10  Q.  What did -- so they didn't fill out a lease

11      at this time?

12  A.  No.  No, I don't do leases.  You remember I

13      told you all -- Lynn does all that.  I don't

14      have the computer skills necessary to -- to

15      facilitate those -- those kinds of matters.

16  Q.  Did Jenette Boswell ever bring you the rent?

17  A.  I picked up the rent on one occasion prior to

18      this incident going on here.  And I think she

19      brought me a deposit by, and maybe she

20      brought me the first time.  Maybe she brought

Page 143

3927 06-09-08 Gumbaytay Jamarlo.txt

21    me the first time.  I can't recall.  Because

22    usually she would mail it in or either send

23    it over to Lynn.  But she brought me a

185

1    deposit by for Mr. Matthew Bahr's property.

2    And I believe she brought me -- maybe once or

3    twice she did.  I can't recall exactly when

4    and what she -- how much she brought by or

5    anything at this time.

6  Q.  How often did you call Ms. Boswell?

7  A.  I didn't call Ms. Boswell.  Only when -- only

8    time I called Ms. Boswell is when Ms. Boswell

9    had called me earlier that day or had called

10    me for whatever reason, I responded to her

11    call.  But just up and calling Ms. Boswell

12    out of the thin blue air, that never

13    happened.

14       I never called her or anybody else, as

15    far as that is concerned, without first

16    receiving a call from them.  I respond to

17    that call whenever that call had came in.

18    May not respond to it then, but I will

19    respond to it within 48 hours.  As I

20    indicated on the paperwork that you have,

21    within 24 to 48 hours, I make every attempt

22    to get back with the tenants.

23  Q.  Did you ever show up at Ms. Boswell's house

186

1    without calling first?

2  A.  The only time I show up at Ms. Boswell's

3    house, we do -- I told you we was doing

Page 144

3927 06-09-08 Gumbaytay Jamarlo.txt

4    housing inspections.  I noticed she had cars

5    parked in her driveway, on the grass.  They

6    had cars parked around the back on the

7    grass.  So we would -- if I'm in a

8    neighborhood, and which I had two other

9    houses in the neighborhood -- one other house

10    in that neighborhood at the time.  If I'm in

11    a community, I would drive by other houses in

12    that community to see whether or not the

13    grass being cut, whether there's leaves on

14    the grass.

15  Q.  Did you ever stop by her house?

16  A.  No, other than for business, strictly for

17    person --

18  Q.  How many times would you say you came by her

19    house for business purposes?

20  A.  I can't say but one time that I recall.

21  Q.  And what did you do that one time?

22  A.  I think she had an eviction notice that I

23    was -- eviction notice, and I collected the

187

1    rent one time before this came about.

2  Q.  So one time you came to drop off an eviction

3    notice?

4  A.  Yeah.  Let me -- let me clarify that.  She

5    brought her rent by -- deposit by I think the

6    first couple of months because she was close

7    by.

8  Q.  Let's -- how many --

9  A.  I'm trying to -- I'm trying to recall here if

10    you want me to recall.  I'm trying to get

Page 145

3927 06-09-08 Gumbaytay Jamarlo.txt

11     some accuracy here.  Okay?  Probably -- she

12     told me at one time that she didn't have any

13     transportation and asked me would I come by,

14     would I come by and pick up the rent.  So on

15     that occasion.  And then other than that, I

16     don't recall coming by there after I got this

17     notice from you guys.

18  Q.  So one time you came by to pick up the rent?

19  A.  Right.

20  Q.  And then I believe you already testified that

21     one time you came by to drop off an eviction

22     notice.

23  A.  An eviction notice, yes.

                       188

1  Q.  Did you ever ask Ms. Boswell to go to dinner?

2  A.  No.

3  Q.  Did you ever ask her to a movie?

4  A.  No.

5  Q.  To have cocktails?

6  A.  No, never.

7  Q.  Did you ever ask her to go out of town with

8     you?

9  A.  Please.  No.  Ms. Boswell not even my type,

10     ma'am, to be honest with you.

11  Q.  I mean, I --

12  A.  Please.  I won't even -- I'm a highly

13     educated man.  You think I would be

14     associated with a female like Ms. Boswell in

15     public?

16           MR. NEWELL:  Seriously, I think

17        he's --
                              Page 146

3927 06-09-08 Gumbaytay Jamarlo.txt

18       MS. NEAL:  Please, please.

19       MR. NEWELL:  I can --

20  A.  I don't think so.  I'm not trying to

21       assassinate her character or anything like

22       that; but if you have as much education as

23       you and I have or everybody at this table

                          189

1        have, I kind of doubt that you would

2        associate and socialize with females or a

3        male that has nothing to offer you.

4   Q.  Did you -- I mean --

5   A.  She -- she's poor.  I don't have no interest

6        in a poor woman.  If I wanted a -- wanted to

7        get married, I could have gotten married to

8        one of the teachers.  Ms. Boswell is not my

9        type, for the record.

10  Q.  So did you -- do you go to Mississippi on any

11       kind of regular basis?

12  A.  You know, I indicated to you I was taking

13       some seminary classes up, and we had those

14       satellite classes they was offering.  They

15       offered them in Mississippi.

16  Q.  So how often do you go?

17  A.  They offer those classes probably once a

18       year.

19  Q.  Just once a year?

20  A.  Correction.  The cycle came around -- let me

21       put it this way.  They had -- they were

22       satellite courses that was offered from Fort

23       Wayne, the first courses I took.  The second

                    Page 147

3927 06-09-08 Gumbaytay Jamarlo.txt
190

1    course that I took was offered by the

2    Southern District. They're in cycle and

3    every quarter. So if you missed a course

4    that cycle, you had to wait until a year to

5    catch that course. So maybe once every four

6    or five months, they would start a new course

7    up.

8  Q.  When they started it -- like when they

9    started a new course, did you go up, say,

10   maybe once a month?

11 A.  Yeah. Once a month, right, they -- they

12   offered those courses up there.

13 Q.  So you never offered to have Ms. Boswell ride

14   down with you to Mississippi?

15 A.  Absolutely, positively no. Ms. Boswell or

16   anybody else, as far as that is concerned,

17   ma'am. If you understand the reason why I

18   wouldn't ask her or anyone else, I was taking

19   seminary classes. It was theology students.

20   And there was other students that shared the

21   same hotels with you. So for a person who's

22   taking classes in that capacity, you don't

23   want to be associated with a female that

191

1    you're not married to.

2        So I would not take another female to a

3    setting like that anyway because I had

4    classes during the day; that if I took

5    somebody, they would have to stay there until

6    I got back in the afternoon. And that is not

Page 148

3927 06-09-08 Gumbaytay Jamarlo.txt

7   the professional way I conduct business.

8           COURT REPORTER:  Is this a good

9   time for a break?

10          MS. NEAL:  I think it would be,

11  yes.

12          (Brief recess)

13          MR. NEWELL:  That first document

14  that you introduced into evidence, I

15  do want to object to it on the record

16  because there's no record of it

17  except what you wrote or -- we don't

18  even know how it exists.

19          MS. NEAL:  I'm sorry?

20          MR. NEWELL:  The one where you

21  asked about the house, her fixing up

22  the house and stuff, we don't have

23  any record or anything of that.


                    192

1           Now, he admits to it, and he

2   clears it up, but we don't have any

3   record of that.

4           MR. LAY:  What exhibit are you

5   speaking of?

6           MS. NEAL:  Yeah.  Tell me what

7   exhibit you're talking about.

8           THE WITNESS:  With the $3,000 in

9   it, I believe.

10          MR. NEWELL:  Right.

11          THE WITNESS:  That's the only

12  conversation I remember having with

13  her.

                    Page 149

3927 06-09-08 Gumbaytay Jamarlo.txt

14      MR. NEWELL:  Now, let's don't -

15  okay.  You do remember --

16      MR. LAY:  You're talking about

17  one of the transcripts?

18      MR. NEWELL:  You do remember

19  this?

20      THE WITNESS:  It wasn't a

21  transcript.  I remember having --

22  well, all the conversations I had

23  with all the peoples since I've been

                    193

1   doing this, I remember having that

2   conversation about that house up

3   there on Lake Street.

4       MR. LAY:  Are you saying you now

5   wish to change your testimony and say

6   you do remember?

7       THE WITNESS:  No.  What he's

8   saying, he don't have a -- it's not

9   on the disk, that $3,000.  On that

10  disk that you all sent to us, it's

11  not -- that conversation is not on

12  that disk.

13      MR. NEWELL:  No.

14      MR. LAY:  The one that's been

15  marked Plaintiff's #4, you don't have

16  that?

17      MR. NEWELL:  There's seven

18  little media files.  They're like

19  three- to five-minute media files.

20      THE WITNESS:  No, sir.

                                Page 150

3927 06-09-08 Gumbaytay Jamarlo.txt

21    MS. COOPER:  Well, Mr. Gumbaytay

22  received copies of these transcripts.

23    MR. NEWELL:  Well, they're on

         194

1  those -- this disk, the same thing.

2  This $3,000 and all that stuff --

3    MS. COOPER:  Well, you can

4  object to it at trial.

5    MR. NEWELL:  There's no record

6  of anything we --

7    MS. COOPER:  But we're

8  introducing this.

9    MR. NEWELL:  I'm just letting

10  you know we -- we want to, you know,

11  lodge an objection about that.

12  Otherwise, I -- you know, I don't

13  care.  And he's explained as he

14  goes.  Is that fair enough?

15    MS. NEAL:  Did you want to go

16  back?  Did you have a couple of

17  questions?

18    MR. LAY:  Yeah.

19     (Court reporter interrupts)

20    MR. LAY:  Mr. Gumbaytay, I

21  wanted to go back to -- you continue

22  to emphasize your education and

23  professionalism, so I'd like to go

         195

1  back and see if we can clear up a few

2  things about your education.

3     You testified earlier that

        Page 151

3927 06-09-08 Gumbaytay Jamarlo.txt

4    you received your Ph.D. in 1988 from
5    Hamilton University; is that correct?
6         THE WITNESS:  I received it
7    from -- not Hammondton University.
8    It's some small college out there in
9    Evanston, Wyoming, Hamilton
10   University.
11        MR. LAY:  And you got a degree
12   from there in 1988?
13        THE WITNESS:  I don't recall --
14   let me put it this way.  And I'm not
15   trying to be vague about it, but I
16   went from undergraduate school --
17   when I left Desert Storm in 1994, I
18   started back to school, had all my
19   transcripts transferred from Georgia
20   State University.  I started back to
21   school in '92, '91 or '92 at Auburn;
22   and I went nonstop.  And while I was
23   working on all that -- all those

                    196
1    degrees, I was working on those
2    seminary courses as well.
3         So I was working on a
4    master's at the same time I was
5    working on the seminary courses.  I
6    worked --
7         MR. LAY:  You do understand you
8    cannot get a Ph.D. before you get a
9    bachelor's degree?
10        THE WITNESS:  Let me -- let me
                    Page 152

3927 06-09-08 Gumbaytay Jamarlo.txt

11     put it this way.

12         MR. LAY:  Do you not understand

13     that?

14         THE WITNESS:  Yes, sir.  Let me

15     put it this way.  Yes, sir.  I have a

16     Ph.D.  Let me explain it to you so

17     you can understand.  So in the

18     education field, it's a little bit

19     different.  Let me clarify it for

20     you.  That's what I'm trying to do

21     for you now.  Okay?  And I have

22     degrees at home to prove them, and I

23     can bring them in and show them to

197

1     you, a transcript to go with them.

2         MR. LAY:  Well, can you get us a

3     copy of that?

4         THE WITNESS:  Okay.  It's not

5     having any relevance to this case,

6     but I can explain to you how the

7     process works.

8         MR. LAY:  Well, it has a

9     relevance to your veracity.

10         THE WITNESS:  Yes, sir.  Let

11     me -- let me share this with you,

12     sir, how this process works.  In the

13     education field, you don't have to.

14     I started out with an AA in social

15     science, okay, an AA in journalism at

16     Atlanta Junior College.

17         I left there -- it was all

3927 06-09-08 Gumbaytay Jamarlo.txt

18    in the '70s.  I left there.  That's
19    when I was working on the mass
20    communication degree.  I left there
21    and went to Georgia State University,
22    majored in mass communication.  I had
23    stopped school.  I had ten hours left

                        198
1    at Georgia State University, but I
2    was in my early 20s then.  I had
3    stopped school and had started to
4    work with the Atlanta Police
5    Department, for the record.
6         MR. LAY:  Okay.  I don't want to
7    go back through all that.
8         THE WITNESS:  Well, I'm just
9    trying to explain to you.
10         MR. LAY:  I want to know where
11    you got a degree from and when.
12         THE WITNESS:  Okay.  I'm trying
13    to explain that to you now.
14         MR. LAY:  I don't -- it's a
15    simple answer.
16         THE WITNESS:  Okay.  I got them
17    from -- I don't remember the days --
18    the dates, sir.  They're -- I'll be
19    glad to give you a copy of the
20    transcripts.  I'll be glad to give
21    you the degrees itself.  They have
22    the dates, some of them.  Sir, I'm
23    not trying to be disrespectful.  I

                    Page 154

3927 06-09-08 Gumbaytay Jamarlo.txt
                    199
1       just don't remember because I was

2       working on three degrees at the same

3       time.

4              You get an undergraduate

5       degree.  That's a bachelor's from

6       Auburn.  You got a master's degree

7       from Alabama State University.  I

8       left Auburn, went directly to Alabama

9       State University nonstop when I

10      started working for the Montgomery

11      Public School System.

12          MR. LAY:  Okay.  Well, you told

13      us earlier you got a master's from

14      AUM.

15          THE WITNESS:  No.  I said an

16      Ed.S.  That's what I'm trying to

17      explain to you.  There's got to be

18      some clarification.  And it's on the

19      record.

20             Let me just explain for the

21      record.  I have a BS degree from

22      Auburn University when I started

23      there in the early '90s.  I graduated

                    200
1       in '94.  I left Auburn University in

2       1994, went directly nonstop to

3       Alabama State University, worked on

4       and received a Master of Social

5       Science in secondary education from

6       Alabama State University.  Left

                                Page 155

3927 06-09-08 Gumbaytay Jamarlo.txt

7    Alabama State University directly

8    after that quarter ended and the next

9    quarter began, went directly over to

10    Auburn University Montgomery, AUM.  I

11    worked on an Ed.S.  That is a

12    postgraduate degree.  That is the

13    degree --

14        MR. LAY:  I know what an Ed.S.

15    is.

16        THE WITNESS:  It's a -- it's a

17    postgraduate degree.  It's a

18    higher -- it's between a master --

19    she doesn't know.  For the record,

20    it's between a master and a

21    doctorate.

22        I had 20 hours left.

23    Because I had worked on the Ed.S.,

201

1    had I went from a master's to a

2    doctorate, then I would have to do

3    those hours anyway.  Since I worked

4    on the Ed.S. first in school

5    administration, I had 30 hours left

6    on -- for ascertaining a doctoral

7    degree.

8        I got the doctoral degree

9    from Hamilton University in Evanston,

10    Wyoming.  And -- and during that time

11    frame, we was working on a Master of

12    Divinity in theology at Concordia

13    College Selma.  That was a satellite

Page 156

3927 06-09-08 Gumbaytay Jamarlo.txt

14    program.

15         So those are the degrees I

16    have.  I have the degrees at home.  I

17    can bring them to you, make copies of

18    them, let you post them.  I have no

19    reason to lie about my education.

20         MR. LAY:  Okay.  And you -- are

21    you still maintaining that you got a

22    Ph.D. before you got a bachelor's?

23         THE WITNESS:  No, sir.  I didn't

                          202

1     main -- I didn't say that, sir.  I

2     was trying to explain to you the

3     order that they came in.

4          MR. LAY:  Well, you said 1988

5     earlier.  That's why I'm asking you.

6          THE WITNESS:  Yeah.  I -- I

7     don't remember.  If -- I don't

8     remember.  Look in the -- in the -- I

9     think I probably submitted my resume

10    at one point in time.

11         MR. LAY:  So just to make sure I

12    get this right, you have a bachelor's

13    degree from Auburn.

14         THE WITNESS:  Right.

15         MR. LAY:  A master's degree from

16    Alabama State.

17         THE WITNESS:  Correct.

18         MR. LAY:  And an Ed.S. degree

19    Auburn, AUM.

20         THE WITNESS:  Correct.

                          Page 157

3927 06-09-08 Gumbaytay Jamarlo.txt

21          MR. LAY:  And a Ph.D. from

22     Hamilton University in Wyoming?

23          THE WITNESS:  Correct.  Yeah,

                        203

1      Wyoming.

2           MR. LAY:  All right.

3           THE WITNESS:  Right.  And I

4      don't remember the dates or the days,

5      but I got the degrees.  You can see

6      the dates on there.  It's been --

7           MR. LAY:  And who is your cell

8      phone service with?

9           THE WITNESS:  At that time, I

10     had one with --

11          MR. LAY:  No.  I want to know

12     during the time you were dealing with

13     Ms. Boswell, who was your --

14          THE WITNESS:  The same company,

15     Nextel.

16          MR. LAY:  Nextel?

17          THE WITNESS:  Correct.

18          MR. LAY:  And what was your

19     number then?

20          THE WITNESS:  The same as it is

21     now, area code 334-202-8676.

22          MR. LAY:  Okay.  And if we

23     subpoena those records, are they

                        204

1      going to -- do you understand that

2      you've testified that you did not

3      call her?

                        Page 158

3927 06-09-08 Gumbaytay Jamarlo.txt

4        THE WITNESS: You can do that,

5    and you can see where the calls was

6    made to me.  If I called her, for the

7    record, as I've indicated to you,

8    it's in response to a call that I

9    received from them.  And I shared

10    with you if I do not return the call

11    within a reasonable amount of time --

12    I said 24 to 48 hours I will get back

13    with the client.  So if I didn't call

14    them --

15        MR. LAY:  So every time you

16    called her was in response to a --

17        THE WITNESS: It was a response

18    to a call from --

19        MR. NEWELL:  Three or four of

20    them I think was --

21        THE WITNESS:  Right.  Every time

22    that she or any other tenant called

23    me.  It was in response to a call

                205

1    received from them.

2        MR. LAY:  Did you ever call her

3    after ten o'clock?

4        THE WITNESS:  If I called her

5    after ten o'clock, it was in response

6    to a call.  You remember I was

7    telling you I had service calls at --

8        MR. LAY:  It's a simple yes or

9    no.

10        THE WITNESS:  I don't recall.
                Page 159

3927 06-09-08 Gumbaytay Jamarlo.txt

11    If I did, I don't recall.

12        MS. COOPER:  Did you have a

13    land-line phone?

14        THE WITNESS:  Yes, ma'am.

15        MS. COOPER:  And what number is

16    that?

17        THE WITNESS:  That's 334 --

18        MR. NEWELL:  It shows it on the

19    disk.  Go listen to them.

20        THE WITNESS:  -- 241-5986.

21        MR. NEWELL:  That's the reason

22    I'm telling y'all to play the disk.

23        MR. LAY:  Mr. Newell, I assure

                    206

1    you that each one of us has listened

2    to that disk on numerous occasions.

3        MR. NEWELL:  Okay.  And y'all --

4    okay.  Y'all found out about the

5    toilet calls, too.

6        MR. LAY:  Yeah.  We know all

7    about them.

8        MR. NEWELL:  Okay.

9        MR. LAY:  We didn't send you

10    anything we didn't listen to first.

11        MR. NEWELL:  Okay.  Okay.

12        MS. COOPER:  So right now I'm

13    marking what I'm going to mark as

14    Plaintiff's Exhibit #8.

15        MR. NEWELL:  I want to throw out

16    that I still object to the thing

17    about the $3,000.  We still have no

                    Page 160

3927 06-09-08 Gumbaytay Jamarlo.txt

18          evidence of that conversation or
19          whatever.  If there's a statement she
20          wrote or whatever, please clue us
21          in.  We can't find it.
22  Q.  So about what I'm marking as Plaintiff's
23          Exhibit #8, it's a transcript of a recorded

                          207
1       conversation between you and Ms. Boswell.
2       will you look through that and see if you
3       recognize that conversation.
4   A.  (Witness complies)
5   Q.  Do you recognize that conversation?
6   A.  No, ma'am, I don't recognize this
7           conversation.  But I --
8   Q.  Listen to the question.  Do you -- you
9           don't --
10  A.  No.
11  Q.  Okay.
12  A.  No, I don't recognize the conversation.  Like
13          I said, I talked to -- that's about the
14          toilet situation, but I don't recognize every
15          conversation.  Remember -- remember --
16          understand this.  Let me say this.  This will
17          be for the record again.  Okay?  I get 20 to
18          30 service calls per day seven days a week up
19          to ten o'clock.  I cannot humanly remember
20          every conversation I have ever had with every
21          human being that called me about service
22          calls.  This is all day every day.
23  Q.  You're saying you do remember having some

                     Page 161

3927 06-09-08 Gumbaytay Jamarlo.txt
208

1    conversation with Ms. Boswell about a

2    malfunction in her toilet?

3  A.  And the only reason I have -- remember that

4       toilet situation, because he -- I listened

5       to the tape that you-all -- that I -- that

6       you guys sent me. I don't -- other than

7       that, I don't remember that conversation

8       other than she had toilet problems. Because

9       it was in the legal paperwork. But other

10      than that, I don't recall that conversation

11      specifically no more than I can recall any

12      other conversation I had with anybody else.

13  Q.  Do you remember using a phrase, "You're going

14      to start trying to work on your next month

15      rent this month"?

16  A.  No, ma'am. If I ever said anything to her or

17      anybody else, I apologize, but just joking

18      and teasing. But, no, ma'am, I don't recall

19      saying that to her or nobody else.

20  Q.  What did you mean when you -- did you ever

21      use the phrase, "I'm going to pay my part of

22      it now"?

23  A.  No. I don't recall having that conversation

209

1    with her, ma'am. Like I said, if I -- if

2    I -- if the conversation came up off the

3    record, it was joking and teasing; other than

4    that, flirtation maybe. But I don't recall

5    having that conversation with her.

6  Q.  What would you have meant by that, I'm going

Page 162

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 7       to pay my part of it now?
 8   A.  I don't have no idea.  I can't remember even
 9       having the conversation.  Maybe because she
10       was late on her rent, because she has been
11       late more often than not.  She -- matter of
12       fact, when she started paying the rent to --
13   Q.  What if it --
14   A.  Let me just share this with you for the
15       record.  When she started paying rent to
16       Legal Service, she had -- she was three, four
17       months behind on her rent before I even came
18       collecting the rent at all.  So she --
19       probably because of back rent that she didn't
20       pay for, that conversation took place.
21           She was -- I picked up a check here.
22       She started paying rent up here in February,
23       I believe, and I picked up a check in July.
```

                              210

```
 1       And she was behind more often than not, and
 2       she ended up getting evicted.  So if there
 3       was a conversation along that line, it was in
 4       regards to rent that she has not paid,
 5       promised to pay.
 6           She had not made a full deposit payment
 7       on the Boswell property, if I can remember
 8       correctly, so she -- probably pertaining to
 9       that.  I can't tell you specifically whether
10       that conversation --
11   Q.  Actually --
12           MR. LAY:  Did you ever offer
13               to --
```

                              Page 163

3927 06-09-08 Gumbaytay Jamarlo.txt

14      THE WITNESS:  No, sir.

15      MR. LAY:  -- pay part of her

16  rent to --

17      THE WITNESS:  I can assure you,

18  sir, Mr. Lay --

19      MR. LAY:  -- Mr. Bahr?

20      THE WITNESS:  No, no, no.  What

21  I did with Mister -- let me just

22  share this with you.  Let me clarify

23  that.

211

1      MR. NEWELL:  Okay.

2      THE WITNESS:  Let me clarify

3  that.

4      MR. NEWELL:  Please.

5      THE WITNESS:  When this young

6  lady filed this suit against me,

7  Mr. Bahr has a lot of accounts with

8  me.  Remember, I indicated to you

9  guys earlier, he has a great deal of

10  accounts with me.  I got his account,

11  his wife account, his daughter

12  account.  They have approximately --

13      MR. LAY:  Mr. Gumbaytay --

14      THE WITNESS:  I'm going to

15  clarify --

16      MR. LAY:  -- I want you to

17  answer the question.

18      THE WITNESS:  Yes.  I'm trying

19  to answer it, sir.

20      MR. LAY:  Well, answer this

Page 164

3927 06-09-08 Gumbaytay Jamarlo.txt

21    question that I asked.

22        THE WITNESS:  They have 30 --

23    they got over --

                    212

1         MR. LAY:  Did you ever offer to

2    pay part of the rent that was owed to

3    Mr. Bahr on Ms. Boswell's behalf?

4         THE WITNESS:  No, sir.  I'm

5    trying to clarify, Mr. Lay.

6  Q.  Did you ever --

7         MR. LAY:  You've answered the

8    question.

9         THE WITNESS:  No.  No.  I

10   paid --

11        MR. LAY:  You've answered the

12   question.  If you want to clarify

13   something, that's your attorney's

14   job.

15        THE WITNESS:  Yeah.  Yes and --

16   yes and no.  Yes and no.  Let me

17   clarify the yes and no.  Yes and no.

18          For the record, yes and no.

19   And the yes part is because as this

20   young lady was tied up in a legal

21   suit, I was paying Mr. Bahr's

22   mortgage payment for him.  I agreed

23   to pay Mr. Bahr's mortgage payment

                    213

1    for him, and which I did, the

2    principal, interest, taxes, and the

3    insurance up until the time that this
                    Page 165

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 4        young lady was evicted, because I
 5        felt very guilty about the fact that
 6        Mr. Bahr had to go through this
 7        unnecessarily and I did, too.  So I
 8        offered to pay his rent because I was
 9        getting enough commission from him
10        and his wife and his daughter that I
11        could afford to pay his mortgage
12        payment.  So that's why I say yes and
13        no.
14   Q.   (Ms. Neal continuing:)  Did you ever -- do
15        you recall using -- saying you were going to
16        work on that sugar daddy account this week?
17   A.   No, ma'am, I sure do not recall having that
18        conversation with her or anyone else.
19   Q.   Did you ever ask Ms. Boswell to come and
20        spend a little time with you?
21   A.   I can't recall that conversation.  If I did
22        say that, I probably was joking and teasing;
23        but other than that --
```

                              214

```
 1             MR. LAY:  Well, I'm going to --
 2        you keep talking --
 3             THE WITNESS:  No.
 4             MR. LAY:  -- about joking and
 5        teasing.  You said you had no
 6        interest in her, she wasn't your
 7        type, she wasn't attractive, she was
 8        poor, and you wouldn't have any
 9        interest in that.  So you can't say
10        on the one hand, Mr. Gumbaytay, that
```
                         Page 166

3927 06-09-08 Gumbaytay Jamarlo.txt

11    you had no interest whatsoever in her

12    and then turn around and say, well, I

13    don't remember but I may have been

14    joking.  So which was it?

15         THE WITNESS:  I joke and tease

16    females whether they're my type or

17    not because I -- I'm a very

18    personable guy.  And I joke and tease

19    because females like to know that

20    they are attractive.  Whether I'm

21    attracted to them physically or not

22    or have a -- want to have a

23    relationship with them or not, I will

                    215

1    tell any woman that she's a

2    nice-looking woman.  She can look

3    like a big, fat woman or she can be a

4    nice, Halle Berry type.

5          I'm just a nice guy.  I

6    compliment women whether they're

7    nice-looking or attractive or not,

8    you know.  And it just -- because

9    females like for you to do that, you

10   know.  And --

11        MR. LAY:  So you think it's your

12   role to tell them --

13        THE WITNESS:  No, it's --

14        MR. LAY:  -- whether or not they

15   look good or not?

16        THE WITNESS:  No, sir.  I am

17   a -- any red-blooded American, you

                  Page 167

3927 06-09-08 Gumbaytay Jamarlo.txt

18    can see a lady walking and you think

19    that she is attractive or whether

20    she's unattractive, you make comments

21    good, bad, or indifferent.  But most

22    of the comments I make to people, I

23    praise them.  I'm in the appraising

216

1    business.  So, no, it's not my duty

2    or my job and responsibility, but I

3    am not homosexual.  I am not in any

4    form, fashion, or shape a monk.  I am

5    not Catholic or a Catholic priest.

6    So I can have a relationship and talk

7    to other people of the opposite sex.

8        MR. LAY:  So you admit, then,

9    that you, on a regular basis, make

10    comments to females that you consider

11    joking?

12        THE WITNESS:  No, no.  No, not

13    on a regular basis, sir.  No, to

14    answer your question.

15        MR. LAY:  Well, how often do you

16    do it?

17        THE WITNESS:  I don't do it as

18    often as you think -- or you would

19    like to think, Mr. Lay.  If you --

20    you know, it's --

21        MR. LAY:  Well, tell us how

22    often you do it.

23        THE WITNESS:  Once in an every

Page 168

3927 06-09-08 Gumbaytay Jamarlo.txt
217

1    blue moon.  And once in a blue moon,
2    maybe --
3        MR. LAY:  Well, why did you do
4    it to Ms. Boswell, then, if you
5    didn't find her attractive anyway?
6        THE WITNESS:  I did not find
7    Ms. Boswell attractive.  And to this
8    day, I don't find her attractive.
9    Ms. Boswell --
10        MR. LAY:  Well, I said why would
11    you make a comment like that if you
12    didn't find her attractive?
13        THE WITNESS:  There was once in
14    that blue moon that I made that
15    comment to her.  Once in those blue
16    moons, I may comment a woman that's
17    unattractive.  And that once in a
18    blue moon when Ms. Boswell came
19    along, Mr. Lay.
20        MR. LAY:  And this just happens
21    to be that one time?
22        THE WITNESS:  And I -- I can't
23    give you specific because there's --

218

1    that's one I can't recall, sir.  I
2    cannot recall.  I cannot recall.  I
3    talked to -- I was -- every day of
4    your life you walk out of your house,
5    there's 100,000 contacts you can
6    possibly make with the opposite sex.

Page 169

3927 06-09-08 Gumbaytay Jamarlo.txt

7    I can't recall every conversation I

8    had with every lady, good or bad or

9    indifferent, because I just can't.

10        We, as guys, red-blooded

11    American mens who like the opposite

12    sex, we compliment females.  That's

13    what we do.  And I have worked with

14    school teachers.  I have worked with

15    principals.  I have never had a

16    relationship with a school teacher in

17    my life, and I worked with the public

18    school system, because I knew one day

19    I may become an administrator.  I

20    never had an affair with anybody

21    worked in the school system.  Never

22    had a relationship with the

23    principals, assistant principal,

219

1    teachers, students.

2        I always respect their

3    mothers and I always compliment their

4    mother.  I may have said some

5    off-the-cuff remark to a student's --

6    oh, Ms. Jones, you're looking very

7    nice today.  And she could be the

8    worst looking woman in the world.  If

9    you -- if you -- if you understand

10    that --

11    MR. LAY:  Well, what do you

12    consider joking around and teasing?

13    THE WITNESS:  If you understand

Page 170

3927 06-09-08 Gumbaytay Jamarlo.txt

14   the definition of joking around and

15   teasing, that's the definition of

16   joking around and teasing.  Like

17   Ms. Jones may walk in the class --

18       MR. LAY:  Well, what do you

19   consider the definition?

20       THE WITNESS:  Just being

21   off-color remarks.

22       MR. NEWELL:  Like you asking her

23   for a date as a joke?

220

1       THE WITNESS:  Yes.

2       MS. NEAL:  Please --

3       MR. NEWELL:  Thank you.

4       MS. NEAL:  Please.

5       MR. NEWELL:  Thank you.

6       MS. NEAL:  Please don't testify

7   for your client.

8       THE WITNESS:  Yeah.  If -- if --

9   to answer Mr. Lay's question --

10       MR. NEWELL:  Thank you.

11       THE WITNESS:  -- off -- you

12   know, jokingly, teasing, something

13   that -- you would see someone, you

14   know their hair is looking bad, but

15   you would give them a compliment

16   anyway:  Ms. Jones, your hair is

17   really looking nice today.  You know

18   and she knows that it's looking bad;

19   but you give her a compliment anyway,

20   give her one of those feel-good

Page 171

3927 06-09-08 Gumbaytay Jamarlo.txt

21   remarks.

22       If you see her and she is --

23   I have had parents to come in my

            221

1   office.  And I'm telling you I have

2   seen the best and the worst of

3   parents, male and female.

4      MR. LAY:  Well, let me ask you

5   this.

6      THE WITNESS:  But I would give

7   them a compliment.

8      MR. LAY:  What other tenants

9   besides Ms. Boswell did you make

10   these joking or teasing remarks to?

11      THE WITNESS:  I don't recall.  I

12   don't recall, sir.  Here again, I

13   don't recall every conversation I

14   made with every female, because 99.9

15   percent of the females that I meet

16   that I don't have a relationship with

17   and that 1 percent that I probably

18   like, that's the one I'll probably

19   settle down with and maybe at some

20   point in time get serious about.

21       But, no, every woman I talk

22   to, every woman I joke and tease and

23   flirt with, I have no interest in

            222

1   pursuing them in any form, fashion,

2   or shape.  I'm just being a

3   red-blooded American male that has an

          Page 172

3927 06-09-08 Gumbaytay Jamarlo.txt

4        interest in the opposite sex from a
5        spirited standpoint.  Opposites --
6        the opposite attracts.
7              MR. LAY:  Go ahead, Allison.
8    Q.  Sir, I'm going to show you a document that
9        I've marked as Plaintiff's Exhibit #9.  And
10       it is a transcript of a conversation between
11       you and Ms. Boswell.  Can you look through
12       the conversation and see if you recognize
13       it?
14   A.  Yeah.  I remember someone had -- had --
15   Q.  So you recognize the conversation?  You
16       remember having it?
17   A.  I recognize having this conversation because
18       the person that called me from the Hyundai
19       plant, I didn't know them from Adam.  And for
20       some reason or another, they just called me.
21       I don't know how they got my number, why they
22       decided to call me about this cell phone; but
23       I told them that I know somebody that rent

                              223
1        it.  And I called her and advised her that
2        someone had found her cell phone.  I guess
3        they checked her cell phone records and
4        called everybody in that cell phone, and they
5        ended up contacting me.  And I had advised
6        her that somebody found your cell phone, and
7        she advised me that was not hers.  But I --
8    Q.  So that is an instance where you called
9        Ms. Boswell?
10   A.  Right.  At -- at the response of someone had
                         Page 173

3927 06-09-08 Gumbaytay Jamarlo.txt

11    called me and indicated my number was in her

12    I guess "saved" section.

13  Q.  Here is a document that I've marked as

14    Plaintiff's Exhibit #10.  And it is a

15    transcript of a recorded conversation between

16    you and Ms. Boswell.  Will you look through

17    it and see if you remember that conversation?

18        MR. NEWELL:  I fail to

19    understand what the deal about the

20    cell phone proves or disproves, if

21    anything.  I mean, it's immaterial,

22    irrelevant.

23        MS. NEAL:  Is that an objection?

                  224

1         MR. NEWELL:  Yeah, I object.  I

2     mean, you know, what about the cell?

3     You know, what about it?  He found

4     somebody's cell phone and he asked

5     her if it was hers.  So what?  I

6     mean, is that what I'm getting out of

7     this?  I heard -- I did hear it on

8     the disk.

9         MR. LAY:  Mr. Newell --

10        MS. NEAL:  I don't have to

11    justify my questions to you.

12        MR. LAY:  We are not a jury.

13    And your grandstanding arguments are

14    wasted on us.

15        MR. NEWELL:  I'm not trying to

16    grandstand.  I'm trying to explain

17    what I'm getting at.
                      Page 174

3927 06-09-08 Gumbaytay Jamarlo.txt

18  A.  That's the -- here again, she asked about the
19      toilet on that one.  I listened to that tape
20      for the first time.  And I sent -- everything
21      that you-all sent to me, I sent it directly
22      to him.  I did not listen to anything.  When
23      he played it back to me, that conversation

                          225

1       about that toilet, that's the only reason I
2       remember that conversation.  But that
3       conversation -- I would never have remembered
4       the conversation unless he played it back to
5       me.
6   Q.  Right.
7   A.  But I know we had to send a maintenance
8       person over there.  I think we sent Gerald
9       Ramsey over there because he usually pretty
10      good at -- I don't know whether it was Gerald
11      or one of them Mexican guys, but they
12      couldn't do anything.  So I think we had to
13      end up calling Roto-Rooter.
14  Q.  So Gerald Ramsey, is that a person that
15      contracted with you?
16  A.  Yeah.  They used to --
17          MR. NEWELL:  A plumber?  Is he a
18      plumber?
19          THE WITNESS:  He's a -- no.
20      He's just a general maintenance.  He
21      don't have an office or a business.
22      He's just somebody that Guest
23      Properties uses.

                     Page 175

3927 06-09-08 Gumbaytay Jamarlo.txt
226

1       MR. NEWELL:  And he fixes

2    plumbing?

3       THE WITNESS:  Fixes plumbing and

4    stuff, you know.  And he hired them

5    ol' Mexicans and some other folks

6    that he know.

7  Q.  Here is an exhibit that I've marked

8    Plaintiff's Exhibit #11.  Can you look at it

9    and see if you recall having that recorded

10    conversation with Ms. Boswell.

11       (Brief pause)

12  Q.  Do you recognize that conversation?

13  A.  So far.  Let me see the rest of it.

14    We had already talked about the lease

15    that -- that was -- Lynn had made a mistake

16    on.  Let me just go one page at a time.

17  Q.  Well, let me -- yeah.  Let's go through one

18    page at a time.

19  A.  Okay.

20  Q.  Do you remember having a conversation with

21    her where you said that -- and I'm looking at

22    the bottom of page 2 where it says, The 550

23    lease got to go to the landlord.  I can't --

227

1    you know, I can't rent that house and tell

2    him I'm renting that house for 450.

3    And then you go on to say, But that 550

4    lease goes to him and that 450 lease you can

5    take over to DHR to do what you got to do.

6  A.  Right.  She -- let me explain that.  Her

Page 176

3927 06-09-08 Gumbaytay Jamarlo.txt

7    mother was on welfare.  She's on welfare.

8    She told me -- and I usually do this.  And I

9    shouldn't do it, but since I'm not a licensed

10    real estate broker -- she said, DHR need a

11    lease so I can get my benefits started and

12    keep my benefits going.  Because I have done

13    leases for people before who want to put the

14    utilities in someone else's name because they

15    did not have a good account with the power

16    company or water company.

17        So as a favor to her and Lynn -- and I

18    have done that.  Lynn has drawn up separate

19    leases for that reason.  Draw this lease up

20    for Ms. Jones, but put Ms. Jones' and

21    Mr. Jones' name on that lease for this, but

22    Mr. Jones going to take it to the water

23    company.

228

1        She wanted to take a lease to DHR to get

2    her benefits so they -- because she could not

3    show them that she was paying $550 a month

4    for rent.

5  Q.  So you drew up a lease for $450 for

6    Ms. Boswell's use?

7  A.  The $450 initially were, right, for Sean

8    McDonough's property; but she asked us to

9    draw up a lease for that purpose.  And I

10    noticed, like I kept telling her, when you

11    going to go over and sign the $550 lease.  I

12    should have never released the 550 (sic)

13    lease until she signed the 550 lease; but

Page 177

3927 06-09-08 Gumbaytay Jamarlo.txt

14      once she got what she wanted to get, that's

15      when she basically didn't come back.  So she

16      said, well, I got a lease for 450; I got a

17      lease for 450.

18  Q.  So let me go back and look at what we've --

19      what we've --

20  A.  So I said, no, I'm not renting that

21      property -- I can't rent that property for

22      450.

23  Q.  Well, let me go back and look at what we had

                        229

1       previously marked as Plaintiff's Exhibit #5.

2       And this was a lease that we got from

3       Ms. Boswell that had been marked $450.

4              MR. NEWELL:  He's already

5          explained that.  The secretary made a

6          mistake.

7              MS. NEAL:  Now, excuse me.

8          Excuse me.

9   Q.  Now, is it -- now, it says that it's marked

10      for 450.  You just told me that you had

11      marked a lease for $450 for her purposes for

12      DHR.  Now, is this for her purposes at DHR?

13  A.  This -- I don't know which one it was.  You

14      got -- when you -- when you -- when you get

15      Lynn over here, Lynn could better clarify

16      that than I can.  I don't do none of the

17      paperwork.  So Lynn can get you to understand

18      that conversation.

19             MR. NEWELL:  That's the

20         secretary that made the mistake.

                              Page 178

3927 06-09-08 Gumbaytay Jamarlo.txt

21      THE WITNESS:  Yeah, the

22      secretary that made the mistake.

23          MS. NEAL:  Excuse me.  Excuse

                    230

1       me.

2   A.  To answer your question, no, I don't know

3       which is which because Lynn does all my paper

4       work, all my administrative stuff.

5   Q.  But you had two leases that were marked for

6       $450.

7   A.  Yeah.  450 for Sean McDonough.  450 because

8       she wanted to take one to the DHR.  Those

9       why -- that's why.  And then -- and remember

10      I told you -- hold on one second.  If you

11      recall, earlier you remember I indicated to

12      you that Lynn had all these leases in the

13      computer.  They already preprogrammed 550,

14      650, 700.  So if you see here, it was already

15      preprogrammed for 550.  She scratched it out

16      because she had indicated she needed one for

17      DHR.  And I told her that we would -- I would

18      do that for her.  But she never got back over

19      there to sign that 550 lease, so I've been

20      trying to get her to get back over there to

21      sign that lease.

22          And Lynn can tell you that when you talk

23      with her.  Because she's not going to lie for

                    231

1       me in any form, fashion, or shape.  She does

2       all of my documents, all of my documents.

3   Q.  So did Lynn mark 450 as a mistake, or did she

                    Page 179

3927 06-09-08 Gumbaytay Jamarlo.txt

```
 4      mark 450 for DHR?
 5  A.  Here again, you're talking -- when you talk
 6      to Lynn, this lease is for -- for -- this
 7      property is for $550.  All of our leases are
 8      for $550.
 9  Q.  Please just answer the question.
10  A.  I don't know what Lynn did.  You have to ask
11      Lynn that.  Okay?  I really don't know.  But
12      I'm just telling you how it could have got
13      confused, why she got confused and made the
14      mistake that she did.
15          MR. NEWELL:  The mistake was a
16      mistake that she made.
17          THE WITNESS:  Yeah.  It's just a
18      mistake that she made.
19          MR. NEWELL:  Thank you.
20          MR. LAY:  Did you instruct Lynn
21      to do any of that?
22          THE WITNESS:  We have --
23          MR. LAY:  Did you?

                    232
 1          THE WITNESS:  Yes.  I have --
 2      that's Lynn -- you know, I just said
 3      a few minutes ago, Mr. Lay, a person
 4      may come in that have a bad credit
 5      with the utility company.  I will
 6      draw up a lease in mama's name or
 7      cousin's name so they can go get the
 8      utilities turned on.
 9          MR. LAY:  You help people commit
10      fraud.
                            Page 180
```

3927 06-09-08 Gumbaytay Jamarlo.txt

11      THE WITNESS:  I help people to
12    get their utilities to come on,
13    turned on.  I don't help people
14    commit fraud.  They ask me to put --
15      MR. LAY:  Well, you're doing
16    fraudulent leases.
17      THE WITNESS:  No, sir.  I'm not
18    doing a fraudulent lease.
19      MR. LAY:  You said you just made
20    up leases to help people --
21      THE WITNESS:  No.
22      MR. LAY:  -- do things that
23    they're not supposed to do.

         233

1      THE WITNESS:  She asked me to
2    get a lease for her for DHR.  I did
3    that.  That's not any --
4      MR. LAY:  You're admitting that
5    you falsify leases for certain
6    purposes.
7      THE WITNESS:  No, I didn't admit
8    that.  I asked -- she asked me to
9    submit a lease for her for 450 so she
10    can take it over to DHR.  What she
11    decided to do with it from that point
12    forward, I don't know.  That's what
13    she asked me.  Whether she did it or
14    not, I don't know.
15      MR. LAY:  Did you submit a
16    false -- what you knew to be a false
17    lease for purposes to give the
         Page 181

3927 06-09-08 Gumbaytay Jamarlo.txt

18    Department of Human Resources?

19       THE WITNESS: No. I submitted

20    the lease to Ms. Boswell. If

21    Ms. Boswell gave it to the Department

22    of Human Resources, she committed

23    fraud, not me.

                234

1       MR. LAY: Did you know that was

2    what the purpose was?

3       THE WITNESS: She informed me

4    that's what she was going to do. I

5    didn't know that for sure.

6       MR. LAY: So you conspired with

7    her potentially, right?

8       THE WITNESS: Or she could have

9    told me that to get a lease for 450

10    so she can come back and say my lease

11    is for 450. So she could have came

12    back and said, I have a lease for

13    450. So she could have committed

14    fraud by telling me that --

15       MR. LAY: Well, you told us

16    earlier that it was all a mistake.

17       THE WITNESS: It was a mistake.

18    But what I'm saying to you is I'm

19    basing this on information on she

20    said I need; I said I can provide, I

21    don't know what you're going to do

22    with it. I don't know what she did

23    with it. That's not my business.

             Page 182

3927 06-09-08 Gumbaytay Jamarlo.txt
235

1        MR. LAY:  Is that how you

2  conduct business --

3        THE WITNESS:  That's not how I

4  conduct business, sir.

5        MR. LAY:  -- to have two or

6  three leases floating around in

7  different amounts?

8        THE WITNESS:  I have assisted

9  people.

10       MR. NEWELL:  Wait.  Where is two

11  or three leases?  There's just one.

12       MR. LAY:  Oh, there's about to

13  be two.

14       MS. NEAL:  Yeah.

15       THE WITNESS:  Yeah.  I had -- I

16  had -- I have assisted people.  And

17  now you want to consider that as

18  fraud, then, by me giving a lease for

19  Uncle Joe to put utilities in his

20  name because they can't get utilities

21  in their unit, then I don't -- by

22  definition, I don't know what the

23  definition of fraud is -- then I have

236

1  done that.

2       Someone comes to me and

3  indicates that they need to get a DHR

4  lease submitted so that they can get

5  their benefits started to help pay

6  their rent, if I did something of

Page 183

3927 06-09-08 Gumbaytay Jamarlo.txt

7        that magnitude, it was because she

8        had indicated to me that would be a

9        means for her to pay her rent once

10       she got her check started with DHR.

11       So she deceived me.  Then I had no

12       intention that that's what she was

13       going to do -- use it for, Mr. Lay.

14   Q.  (Ms. Neal continuing:)  So I have here what

15       is marked as Plaintiff's Exhibit #12.  Can

16       you look over this and tell me if you

17       recognize that?

18   A.  Right.  This is the one that's -- should have

19       been for five -- for 550.  Ms -- once again,

20       Ms. -- Ms. Boswell never came back to sign

21       this lease.  So I told Lynn, since she had

22       already signed the lease for 450, all I have

23       to do -- and I have the -- I have the

                         237

1        responsibility of submitting the proper

2        lease.  I just scratched out 450 for -- for

3        this property and put five on there and

4        initialed it.  You know, because this was for

5        the right lease.  Because we begged and we

6        pleaded for her to come back.  She never

7        did.  So in order for me to get a correct

8        lease in my file, I just told her -- I

9        indicated to her that I was going to make a

10       correction on the lease and I was going to

11       submit that since she hadn't gotten back over

12       to Lynn yet.

13   Q.  Well, there's one thing that I really don't

                              Page 184

3927 06-09-08 Gumbaytay Jamarlo.txt

14    understand about these two leases that's kind

15    of been bothering me for a while.

16  A.  Right.

17  Q.  This one that's marked as Plaintiff's Exhibit

18    #5, 550 was typed in and then Lynn noted it

19    and said 450 --

20  A.  Right.

21  Q.  -- as we've been over.  This one marked

22    Plaintiff's Exhibit #12, some number had been

23    marked out and you wrote 550 on top of that.

                         238

1  A.  Okay.  I'm glad you asked that.

2  Q.  What number was marked out?

3  A.  I'm glad you asked that question.  This lease

4    and this lease, you remember I told you she

5    would print leases from her computer.  This

6    is a computer-generated lease for 550

7    automatically.

8  Q.  Well, then, why did you have to make a

9    correction to it --

10  A.  Because --

11  Q.  -- if it already said 550?

12  A.  Because Lynn had submitted this lease for her

13    to take to DHR.  And initially the 450 lease

14    was for Lake Street, which was

15    computer-generated for $550.  So you see the

16    $550 in there, right?  So she had to take

17    this to DHR.  So she -- Lynn initialed that

18    so she could give that to DHR.

19        She never did come back to sign this

20    lease; but since she signed this lease

                                    Page 185

3927 06-09-08 Gumbaytay Jamarlo.txt

21    already, I just initialed it and told
22    Ms. Boswell that I already got the lease
23    rectified.  I just initialed and circled it

239

1    for -- for -- for the -- what she should have
2    signed.  I never would have had to did this.
3    You follow me?  I never would have had to do
4    that had she came back and signed that lease,
5    which she never did.
6   Q.  Wall, what did you mark out here?
7   A.  It's --
8   Q.  What number did it say?
9   A.  It's the same thing, 550.
10  Q.  So why did you write a five over 550?
11  A.  Because -- okay.  Let me see can I explain
12       this this way.  Let me slow down a little
13       bit.  This is a computer-generated lease.
14  Q.  I understand that.  And I understand that
15       that's a computer-generated lease as well.
16  A.  Both of these lease are for $550.  Okay.  Let
17       me do them one at a time.  Both of these
18       leases are for $550 on computer-generated
19       leases.
20  Q.  Okay.
21  A.  Okay.  You got me?  The Lake Street property
22       is $450, period.  All right.  Now, Lynn did
23       not generate the 450 -- she did not go back

240

1    in -- she made a mistake.  She did not go
2    back in and put in 450.  So she scratched it
3    out and initialed it.  Okay?
                          Page 186

3927 06-09-08 Gumbaytay Jamarlo.txt

4  Q.  What about -- I understand --

5  A.  Now, this -- so Boswell -- he -- Boswell had

6      two leases.  She had this one and this one

7      originally; one for 450, one for $550.

8      Ms. Boswell never did come back and sign the

9      550, so it was still 450 on there since she

10     only signed the lease for $450.  I scratched

11     through the four, made it a five, initialed

12     it.

13 Q.  Well, can you please -- can you explain to me

14     something.

15 A.  Is that clear?

16 Q.  Well, I understand what you're trying to

17     saying, but please explain this to me.  This

18     one computer-generated, which is marked as

19     Plaintiff's Exhibit #5 --

20 A.  Right.

21 Q.  -- has $550 and is marked by Lynn.  There is

22     this second exhibit, Plaintiff's Exhibit #12,

23     that is not initialed by Lynn, that is

                      241

1      initialed by you; and there is a number

2      scratched out and five is written in front of

3      it.  Is this Plaintiff's Exhibit #12 --

4  A.  Right.

5  Q.  -- did it initially say 450?

6  A.  Yes.  Lynn -- Lynn generate two leases, one

7      for the tenant, one for our file.

8  Q.  And both of them said 450.

9          MR. NEWELL:  And she was making

10         the lease for someone else.
                      Page 187

3927 06-09-08 Gumbaytay Jamarlo.txt

11          MS. NEAL: Hold on.  Excuse me.

12          THE WITNESS:  Yeah.

13          MS. NEAL:  Please do not testify

14      for your client.

15          THE WITNESS:  Yeah.

16  A.  Lynn generate two leases.

17          MR. NEWELL:  He's already

18      testified to that.

19  A.  These are the same two leases that she

20      generated.  Okay?  The client gets one,

21      Boswell gets -- I mean gets -- I mean Boswell

22      gets one, Bahr gets one.  This goes in our

23      file.  I picked the one up from Mr. Bahr.

                          242

1       She never came back to sign Mr. Bahr's 550

2       lease.  It still had the 450 on here that she

3       took to the Housing Authority.

4   Q.  Well, my question is --

5   A.  It still had -- she still had -- it still had

6       450 on this lease.  So I changed the four to

7       a five because she refused to sign the 550

8       lease.

9   Q.  Well, I guess my question is why is 450

10      written here, written in -- written in

11      handwriting by Lynn Norsworthy and then 450

12      is computer generated on that form marked

13      Exhibit #12?

14  A.  No.  Both -- both -- listen to me, now.  I'm

15      going to explain it to you again.  Let me --

16  Q.  No.  Please just answer the question.

17  A.  Okay.

                              Page 188

3927 06-09-08 Gumbaytay Jamarlo.txt

18  Q.  Why does this say --

19  A.  This is the one she requested for us to give

20      to her so she can take to the Montgomery

21      Housing -- or DHR.

22  Q.  I understand that.

23  A.  Lynn probably gave her this lease to take to

                        243

1       DHR.  She initialed it.  Because she

2       scratched it out for 550 rent, because the

3       550 rent would not have gotten her through

4       the door with DHR.

5   Q.  Mister --

6   A.  So she scratched out the 550 and she put the

7       450 there.  She generated both of these

8       leases at the same time.  Ms. Boswell

9       supposed to have came -- should --

10      Ms. Boswell should have came back over and

11      signed this lease at the same time she signed

12      this one, but she only signed this one.  And

13      this is the one that I changed because this

14      with the initials for the rent should have

15      been on this lease.  Does that make sense

16      now?

17  Q.  What I'm asking and the only thing I want to

18      know is why does this say 450 typewritten

19      that you have over -- you have written a five

20      over the four?

21  A.  Because the 450 -- if you remember, I was

22      telling you Lake Street was the only property

23      we have ever rented --

                    Page 189

3927 06-09-08 Gumbaytay Jamarlo.txt
244

1   Q.  But that lease isn't for Lake Street.

2   A.  It was in -- it was in the computer, though.

3       I'm trying to get you to comprehend, ma'am,

4       if you'll listen to me.  It was already in

5       the computer for Lake Street at $450, which

6       we agreed to lease Lake Street for $450.

7   Q.  But if you look, this doesn't say anything

8       about Lake Street.  This -- look at this.

9   A.  I know.

10  Q.  Look at the --

11  A.  I understand that.

12  Q.  Can you please tell me what property this

13      lease says right there?

14  A.  Okay.  Okay.  Let me do this.

15  Q.  No.  Please, sir, can you please tell me what

16      this says in terms of what street --

17  A.  Let me do this.  Let me do this.  Lynn made a

18      technical mistake.  It wasn't intentional.

19      Lynn knows how many properties we rent.  Lynn

20      has a rent roll on every last one of those

21      properties, Ms. Allison.  If you look at the

22      rent roll, you will not see $450 not on one

23      of those rent rolls ever from day one.

245

1   Q.  Then will you please -- then, Mr. Gumbaytay,

2       can you please explain to me why that needed

3       to be changed to 550?

4   A.  Because her --

5   Q.  Hold on.  Excuse me.  Let me finish asking

6       the question first.

Page 190

3927 06-09-08 Gumbaytay Jamarlo.txt

7  A.  Okay.

8  Q.  Why is it that if you never had 450 written

9      on any one, why, in Plaintiff's Exhibit #12,

10     did you have to cross out a four and add a

11     five?

12 A.  Because her lease amount at Bahr's property

13     was $550.  Ms. Boswell never came back over

14     to sign the original lease that she should

15     have signed that we agreed upon for $550.  So

16     since I had already had her signature on

17     here, I went on and told her -- I called her

18     and told her, I went on and put 500 on the

19     lease because you never did come.

20         And she never to this day came back and

21     asked for and got a clean lease.  I -- I

22     swear to that.  I'll take a lie detector to

23     that.  She never came back to this day, after

                          246

1      I told her I had made the change on the

2      paper, to come back and sign that lease.  She

3      refused to do it because she knows she was

4      running a scam on me.  And I was an

5      unsuspecting nice guy that got slammed, got

6      conned by Ms. Boswell, being too nice.

7  Q.  I'm showing you what I have marked as

8      Plaintiff's Exhibit #13.  And it is a

9      transcript of a recorded conversation between

10     you and Ms. Boswell.  Can you please look

11     through it and see if you recognize that

12     conversation?

13 A.  (Witness complies)

                   Page 191

3927 06-09-08 Gumbaytay Jamarlo.txt

14  Q.  Do you recognize that call?

15           MR. NEWELL:  Okay.  Just for the

16       record, this Exhibit #5, this is the

17       first one where the secretary made a

18       mistake, right?

19           THE WITNESS:  Both of them.

20       Both of them are.

21           MR. NEWELL:  Both of them are?

22           THE WITNESS:  Yeah.  Right.

23       Right.  She made -- well, it supposed

                        247

1        to have been 550, not 450.

2            MR. NEWELL:  It's supposed to

3        have been 550.  The secretary put it

4        in there for 450.

5            THE WITNESS:  No.

6            MR. NEWELL:  They're going to

7        quiz her on it.  They're going to

8        take her deposition next week or

9        whatever, right?  This is the same

10       Lynn Norsworthy?

11           THE WITNESS:  Right.  Yeah.

12           MR. NEWELL:  Okay.  Thank you.

13  A.  No, ma'am.  I don't -- I don't -- I don't

14       recall.  Like I say, I do --

15  Q.  Do you recall ever having a conversation with

16       Ms. Boswell where you called her baby girl?

17  A.  I can't recall, ma'am.  I probably said baby

18       girl.  That's a -- that's a slang that most

19       people use.  I don't know whether you're

20       familiar with it in the European ancestry

                        Page 192

3927 06-09-08 Gumbaytay Jamarlo.txt

21    community, but in the African-American
22    community.  There was a movie came out -- you
23    could recall the movie, Mr. Lay -- probably

                        248

1    about six or seven years ago called Baby
2    Girl.
3         So in our community, we refer to our
4    lady friends, females, hey, baby girl.  It's
5    a slang.  You know, I -- you know, we just --
6    and baby boy.  It's a -- it's a nice thing.
7    So it's -- it's a slang that's commonly
8    used.  What they call it?  A euphemism.  It's
9    commonly used in the African-American
10    community.  It's what they call the black
11    dialect or Ebonics.
12  Q.  Do you ever --
13  A.  So if I did, it was in communication with
14    her.
15  Q.  Do you ever recall telling Ms. Boswell
16    that -- saying anything to her, such as, you
17    know, Mr. Gumbaytay is going to help you with
18    your life and try to get you financially
19    secure over there?
20  A.  No, ma'am.  I don't recall having that
21    conversation.  If I did, you know, like I
22    said, I joke, tease; but I don't -- I don't
23    have any interest in Ms. Boswell.  And all

                        249

1    due respect to Ms. Boswell and her family,
2    but, you know, her mother is -- is on drugs.
3    I have no interest in dealing with peoples
                     Page 193

3927 06-09-08 Gumbaytay Jamarlo.txt

4       who associate with, like, drugs or affiliate

5       with drugs or in the drug culture.

6   Q.   Did you ever --

7   A.   No.

8   Q.   Did you ever offer to help her financially?

9   A.   No, I have not.

10  Q.   Okay.

11  A.   In any form, fashion, or shape.

12  Q.   What is your definition of sexual harassment?

13  A.   I haven't the slightest idea, ma'am.  This is

14      the first time it ever came to my attention.

15      When I -- when you guys brought it to my

16      attention, I went on the Internet and I read

17      it.  I read about sexual harassment.  Sexual

18      harassment, based on what you guys have -- I

19      never had to come up against nothing like

20      this, so I don't know.

21  Q.   In all your years of education, you never

22      heard the term "sexual harassment"?

23  A.   I have -- I can give you -- I can give you

                          250

1       the version that I have heard; but in terms

2       of understanding the way you understand it, I

3       do not understand it from a legal standpoint.

4       Sexual harassment, when you coming on to a

5       person, male or female, for sexual favors;

6       and when that person do not perform the

7       sexual favors, you have -- you put pressure

8       on them to do so; and if they don't do so,

9       you threaten them with firing them or

10      whatever the case may be.
                                    Page 194

3927 06-09-08 Gumbaytay Jamarlo.txt

```
11        In this case, she accused me of
12    threatening to put her out if I didn't have
13    sexual favors with me.  But other than that,
14    just if you come on to a person and that
15    person don't have any interest in --
16            MR. NEWELL:  Was she just doing
17        this to get out of paying the rent?
18            MS. NEAL:  Excuse me.  Please do
19        not testify for your client.
20            MR. NEWELL:  Was she just doing
21        this --
22            MS. NEAL:  Please do not testify
23        for your client.

                        251
 1  A.  It's -- it's -- it's --
 2            THE WITNESS:  Don't get me
 3        thrown out of here.
 4  A.  To be honest with you --
 5            MR. NEWELL:  I don't care.  I'll
 6        get thrown out.
 7            THE WITNESS:  Listen to me.
 8        Seriously, though.
 9  A.  I worked for the school system.  They have
10    information going around about the
11    male-female sexual harassment and stuff.  I
12    didn't look at it because it's never been an
13    issue for me to address because I'm not that
14    kind of person.  As an administrator, you get
15    that stuff, you look at it so you won't
16    know -- so you know not to have certain
17    relationship.
```
                                    Page 195

3927 06-09-08 Gumbaytay Jamarlo.txt

18    I never got involved with sexual
19    relationship with students, teachers, other
20    administrators.  Never had an affair with
21    anybody in the school system during the nine
22    years I was working there.  So I looked at
23    it, but I didn't look at it.  I threw it to

                    252

1    the side because I knew I never would
2    encounter anything like that because I know
3    I'm not that kind of person anyway.  Like I
4    said, I will joke, I will tease, I will flirt
5    with everybody.  I'm just a friendly guy.
6         MR. LAY:  Mr. Gumbaytay, look at
7         Exhibit #7, page 9.
8              (Brief pause)
9         MR. LAY:  For the record, he's
10        reviewing Exhibit #7, page 9.
11             Do you see the middle
12        paragraph of page 9?  That would be
13        lines 10 through 22.  Would you read
14        that for us?
15        THE WITNESS:  The middle of --
16        MR. LAY:  Beginning on line 10,
17        page 9.
18        THE WITNESS:  Line 10.
19    Mr. Gumbaytay -- Mr. Gumbaytay, I
20    mean, if you -- I mean, because I --
21    I thought I made this perfectly
22    clear.  You do not use that word that
23    abruptly like that because that --

                    Page 196

3927 06-09-08 Gumbaytay Jamarlo.txt
253

1    that is borderline sexual harassment,

2    and I -- I don't want nobody to say,

3    well, this man said if I do not do

4    this with him -- if I do not that

5    with him, then I got to pay 550 --

6    450 -- 450, 550 a month.  No, I am

7    not saying that I will be willing to

8    help you out if you need the help

9    over there.  And there will be a base

10    that at the same time or we can both

11    benefit in more ways than one, but it

12    putting the -- that -- putting the

13    way you putting it, it just sound

14    too, too harsh.  Ms. Boswell:  No,

15    I -- I --

16        MR. LAY:  That's enough.  So you

17    don't recall having a discussion with

18    Ms. Boswell about sexual harassment?

19        THE WITNESS:  Mr. Lay, this

20    may -- Mr. Lay, let me put it this

21    way.

22        MR. LAY:  I mean, you said you

23    never even heard of this.  And you're

254

1    sitting here talking about it in this

2    transcript.

3        THE WITNESS:  I said I have -- I

4    know about sexual harassment, but I

5    don't know it to the legal

6    perspective as you in the legal

Page 197

3927 06-09-08 Gumbaytay Jamarlo.txt

 7    profession are expected to know it.

 8         MR. LAY:  Well, you knew enough

 9    to use it right there, didn't you?

10         THE WITNESS:  I said I --

11         MR. LAY:  Do you recall saying

12    that?

13         THE WITNESS:  -- that I -- let

14    me stop.  Go head.

15         MR. LAY:  Do you recall saying

16    that?

17         THE WITNESS:  No, I do not

18    recall having that conversation with

19    her, sir.  I have many conversations

20    with many folks.  I said --

21         MR. LAY:  You have many

22    conversations with many folks about

23    sexual harassment?

                    255

 1         THE WITNESS:  Let me clarify

 2    again for the record.  On numerous of

 3    occasions, the public school system

 4    publish information on sexual

 5    harassment, both as to teachers and

 6    as to administrators.  I do not

 7    understand from a legal perspective

 8    the -- the legal definition of sexual

 9    harassment.

10         I do not recall having a

11    conversation with Ms. Boswell

12    regarding sexual harassment.  If that

13    conversation occurred, to this day --

3927 06-09-08 Gumbaytay Jamarlo.txt

14    I'm not saying it did not occur. I

15    just do not recall that conversation

16    taking place. And if it did, I was

17    just joking and teasing with the

18    lady.

19        MR. LAY: You joke and tease

20    about --

21        MR. NEWELL: This is just joking

22    and teasing.

23        MR. LAY: You joke and tease

                        256

1    with her about sexual harassment?

2        THE WITNESS: I said yes, sir.

3    I just made a definite statement to

4    that point.

5        MR. LAY: So if you used the

6    word "sexual harassment," you were

7    joking and teasing?

8        THE WITNESS: Let me put it this

9    way. Let me clarify that. Anita

10    Hill was accusing Clarence Thomas,

11    Supreme Court Justice, of sexual

12    harassment. I'm going to share this

13    with you. I used to flirt with a lot

14    of teachers when I was in school, and

15    I hugged them like that.

16        MR. LAY: You told us earlier --

17        THE WITNESS: Let me say --

18        MR. LAY:  -- you never did that

19    in school.

20        THE WITNESS: Let me -- I hugged

                        Page 199

3927 06-09-08 Gumbaytay Jamarlo.txt

21    them, How you doing today,

22    Ms. Brown?  How you doing?  You

23    having a hard day?  Oh, let me stop.

257

1    I was just teasing with you.  I was

2    just joking, because you could be

3    Anita Hill, you could accuse me of

4    sexual harassment.  So you could be

5    Anita Hill.  You know, ten years from

6    now, I may get a job as an

7    administrator; you may come back like

8    Anita Hill did.

9         And I was joking and teasing

10    with them, because what -- the

11    mockery that Anita Hill made out of a

12    sexual harassment suit against

13    Clarence Thomas 20 years ago.  And I

14    would tease and joke along that line

15    and always bring that up to maybe get

16    a laugh out of Anita Hill.  And then

17    you --

18         MR. LAY:  Well, I don't see

19    anything in this conversation about

20    Anita Hill.

21         THE WITNESS:  But I'm -- you

22    asked for clarification.  I'm giving

23    you clarification.  If I did use it,

258

1    it would be along that line of a

2    joking and teasing perspective, but

3    not -- I don't recall having a

Page 200

3927 06-09-08 Gumbaytay Jamarlo.txt

4    conversation with her about that.  I

5    don't know the legal definition of

6    sexual harassment other what I have

7    read.  And I don't take my time out

8    of every day and read sexual

9    harassment definition, Mr. Lay.

10          I'll take a lie detector

11    test if you want me to, sir.  Never

12    in my life have said anything to any

13    teacher or to a student or anybody.

14    And I will ask -- if you ask

15    Ms. Boswell to take a lie detector

16    test, I'll pay for it.

17       MR. LAY:  Mr. Newell, several of

18    us have somewhere to go.  It's 4:30.

19    We're not finished.  What would you

20    like to do about rescheduling?  We're

21    about halfway through.

22       MR. NEWELL:  How about next

23    Monday?

                 259

1       MS. NEAL:  I have to go check my

2    calendar.  I don't know about next

3    Monday.

4       MR. NEWELL:  My schedule is

5    pretty busy.  I mean, I'm sorry.

6       MR. LAY:  Well, I'm asking you

7    when would be a good time to

8    reconvene?  Would you like to give us

9    some dates to look at?

10       MR. NEWELL:  Can I just call you

                 Page 201

3927 06-09-08 Gumbaytay Jamarlo.txt

11    back?

12         MR. LAY:  Okay.

13         MR. NEWELL:  Every time I try to

14    call you, I left a message.  I don't

15    know if you got it or not.

16         MS. NEAL:  Well, why don't we

17    try to --

18         MR. NEWELL:  The first day I

19    knew I couldn't get there.  I was

20    supposed to have a trial.

21         MR. LAY:  We're beyond that.

22    We're also under a deadline.

23         MR. NEWELL:  What's the

                      260

1    deadline?

2         MR. LAY:  The deadline for

3    motions is June the 16th.

4         MR. NEWELL:  Wait a minute.  The

5    deadline for a motion.  For which

6    motion?

7         MS. NEAL:  For dispositive

8    motions.

9         THE WITNESS:  He got that -- you

10    got that in your paperwork.

11              Mr. Lay, excuse me a

12    minute.  I apologize for him.  Could

13    you show him that motion right there

14    so he'll know which one to look?

15    Because I gave him a whole bunch of

16    stuff.

17         MR. NEWELL:  Yeah, two boxes of
                      Page 202

3927 06-09-08 Gumbaytay Jamarlo.txt

18  stuff.

19       THE WITNESS:  Yeah, I know.

20            Can you show that to him and

21  let him make a copy of that?

22       MS. NEAL:  You can get it on

23  PACER, the section that says


                    261

1  dispositive motions.

2       MR. LAY:  The deadline discovery

3  is not until September; but the

4  deadline to do dispositive motions,

5  which include motions for summary

6  motions which will include

7  attachments --

8       MR. NEWELL:  Yeah.  I'm going to

9  file them pretty soon.

10       MR. LAY:  We're not worried

11  about when you're filing one.  We're

12  worried about when we're filing one.

13  So what I'm trying to ask is, you

14  know, we have asked for an extension

15  of the deadline.  And that's set for

16  a hearing on the 18th.

17       MR. NEWELL:  Of September?

18       MR. LAY:  No.  That's --

19       MS. NEAL:  June.

20       MR. LAY:  June the 18th.

21       MR. NEWELL:  A hearing on the

22  scheduling deadline?

23       MS. NEAL:  It's -- actually,

                    Page 203

3927 06-09-08 Gumbaytay Jamarlo.txt
                     262

1     it's -- no.  A hearing on -- the

2     hearing is going to be on -- it's

3     just going to be on costs for

4     depositions.

5          MR. LAY:  I thought he was going

6     to hear the other part about the

7     extension.

8          MS. NEAL:  My understanding is

9     that that's just pending and that the

10    Court has not decided that yet.

11         MR. COOPER:  You're right.

12         MS. NEAL:  But, hopefully, we'll

13    hear about that way ahead of time,

14    but if there's sometime this week

15    when you're available --

16         MR. NEWELL:  Well, wait a

17    minute.  June 16th is the deadline?

18         MS. NEAL:  For dispositive

19    motions.  It says right there under

20    Section 2.

21         THE WITNESS:  Yeah.  You have

22    that in your --

23         MR. NEWELL:  Okay.  September.

                     263

1     June 16th.

2          THE WITNESS:  You want to make a

3     copy of that?

4          MR. NEWELL:  Yeah, I better.

5          THE WITNESS:  Yeah.  It's in

6     your paperwork.

                          Page 204

3927 06-09-08 Gumbaytay Jamarlo.txt

7        But I gave him all this

8    stuff at one time, so he probably

9    haven't had a time to sort through

10   all this.  It's in here.

11       MR. NEWELL:  I must have missed

12   that.

13       THE WITNESS:  Let me see if I

14   can find it on the one I gave you.

15       MR. LAY:  Do you have a specific

16   time you would like to reconvene?

17       MR. NEWELL:  What's good for

18   y'all?

19       MR. LAY:  Well, you just told us

20   you were very busy.

21       MR. NEWELL:  I am.

22       MR. LAY:  I mean, we're all

23   busy, too.

                    264

1        MR. NEWELL:  I can put something

2    else off, you know.  Other than

3    that --

4        MR. LAY:  All right.  Well, why

5    don't we all look at our calendars

6    and we can --

7        MR. NEWELL:  You want to just

8    kind of stipulate --

9        MR. LAY:  Yeah.  if we can

10   stipulate that, we will --

11       MR. NEWELL:  -- we'll extend the

12   deadline for a couple of weeks to

13   determine when we can do it?

                            Page 205

3927 06-09-08 Gumbaytay Jamarlo.txt

14          MS. NEAL:  Well, we're not able

15     to do that.  The Court has said the

16     deadline for motions is June 16th.

17     We filed a motion for extension.  It

18     hasn't been ruled on yet.

19          MR. NEWELL:  Okay.  Well, that's

20     what I thought.

21          MR. LAY:  What we're asking is

22     do we have a stipulation that the

23     deposition will be continued at an

                        265

1      agreed-upon date?

2           MR. NEWELL:  Yeah.  You bet.

3      Yeah.  Sure.  And I wanted the

4      opportunity to take the depo,

5      everybody knows, of this Yolanda

6      lady.  I want her deposition.  And he

7      wants to pay for her to take a lie

8      detector test.  And if y'all will

9      agree to it, I mean --

10          MR. LAY:  I mean, we'll be happy

11     to -- if you notice her deposition --

12          MR. NEWELL:  I'm serious as a

13     heart attack about this, now.

14          MR. LAY:  If you will notice her

15     deposition, we'll be happy to --

16          MR. NEWELL:  Okay.  Well, I

17     haven't gotten there yet.  This is as

18     far as I've gotten in this deal.  You

19     haven't seen me file any summary

20     judgment yet or anything, have you?

                                    Page 206

3927 06-09-08 Gumbaytay Jamarlo.txt

21        MR. LAY:  No.

22        MR. NEWELL:  Okay.  You haven't

23    seen me do anything but what little

                    266

1     evidence or argument I have done.

2         MR. LAY:  So we do have your

3     agreement that this deposition will

4     be continued upon agreement?

5         MR. NEWELL:  Yes, sir.  You bet

6     you.

7         MR. LAY:  That's it.

8              (The deposition recessed at

9                4:29 p.m.)

10          * * * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 207

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

267

1          IN THE UNITED STATES DISTRICT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4   YOLANDA M. BOSWELL,

5          Plaintiff,

6   vs.                CASE NO. 2:07-cv-135

7   JAMARLO K. GUMBAYTAY,
    d/b/a THE ELITE REAL
8   ESTATE CONSULTING GROUP

9   and,

10  MATTHEW W. BAHR,

11         Defendants.

12

13         *  *  *  *  *  *  *  *  *  *

14         CONTINUATION OF THE DEPOSITION OF

15  JAMARLO KALONJI GUMBAYTAY, taken pursuant to

16  stipulation and agreement before Dee Coker,

17  Registered Professional Reporter and Commissioner

18  for the State of Alabama at Large, in the Offices

19  of Legal Services Alabama, 207 Montgomery Street

20  Suite 1100, Montgomery, Alabama, on Monday,

21  June 30, 2008, commencing at approximately

22  11:04 a.m.

23         *  *  *  *  *  *  *  *  *  *

                        268

1                  APPEARANCES

2   FOR THE PLAINTIFF:

3   Ms. Allison Neal
    Attorney at Law
4   AMERICAN CIVIL LIBERTIES UNION
    207 Montgomery Street
5   Suite 910
    Montgomery, Alabama  36104
6
    Ms. Faith Cooper

                             Page 1

*Handwritten annotations:* Exhibit B  2:07-CV-135

```
                3927 06-30-08 Gumbaytay Jamarlo_part1.txt
 7  Mr. John Pollock
    Attorneys at Law
 8  CENTRAL ALABAMA FAIR HOUSING CENTER
    1817 West 2nd Street
 9  Montgomery, Alabama  36106

10  Mr. Kenneth Lay
    Attorney at Law
11  LEGAL SERVICES OF ALABAMA
    207 Montgomery Street
12  Suite 1100
    Montgomery, Alabama  36104

13
    FOR THE DEFENDANTS:
14
    Mr. Alfred T. Newell, IV
15  Attorney at Law
    Post Office Box 101432
16  Birmingham, Alabama  35210

17  ALSO PRESENT:

18  Ms. Charolette Tarwater, Paralegal

19          *  *  *  *  *  *  *  *  *  *

20              EXAMINATION INDEX

21  JAMARLO KALONJI GUMBAYTAY
        BY MS. NEAL                270
22      BY MR. LAY                 470
        BY MR. NEWELL              508
23
            *  *  *  *  *  *  *  *  *  *
```

269

```
 1              STIPULATIONS

 2      It is hereby stipulated and agreed by

 3  and between counsel representing the parties that

 4  the deposition of JAMARLO KALONJI GUMBAYTAY is

 5  taken pursuant to the Federal Rules of Civil

 6  Procedure and that said deposition may be taken

 7  before Dee Coker, Registered Professional

 8  Reporter and Commissioner for the State of

 9  Alabama at Large, without the formality of a

10  commission; that objections to questions other

11  than objections as to the form of the questions

12  need not be made at this time but may be reserved

13  for a ruling at such time as the deposition may
```

Page 2

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  be offered in evidence or used for any other

15  purpose as provided for by the Federal Rules of

16  Civil Procedure.

17       It is further stipulated and agreed by

18  and between counsel representing the parties in

19  this case that said deposition may be introduced

20  at the trial of this case or used in any manner

21  by either party hereto provided for by the

22  Federal Rules of Civil Procedure.

23            * * * * * * * * * * *


                    270

1        JAMARLO KALONJI GUMBATAY

2        The witness, having first been duly

3   sworn to speak the truth, the whole truth and

4   nothing but the truth, testified as follows:

5                EXAMINATION

6   BY MS. NEAL:

7   Q.  Good morning, Mr. Gumbaytay.

8   A.  Good morning.

9   Q.  As you may recall, I'm Allison Neal; and I'm

10      an attorney at the ACLU and co-counsel for

11      Plaintiff Boswell in this case.  And I think

12      you've met everybody in the room before; but

13      just to, you know, refresh your memory, I'm

14      going to introduce everybody again.

15       This is John Pollock with Central

16      Alabama Fair Housing Center.  Ken Lay will be

17      joining us.  He's an attorney for Legal

18      Services of Alabama.  He will be sitting to

19      the left of Mr. Pollock.  And then that's

20      Ms. Faith Cooper, the executive director of

                    Page 3

```
                    3927 06-30-08 Gumbaytay Jamarlo_part1.txt
21    Central Alabama Fair Housing Center at the
22    end.
23  A.  Okay.

                              271

1   Q.  So we already took the first portion of your
2       deposition, and we went over the process for
3       taking your deposition in-depth at that
4       time.  So unless you have any questions, I'm
5       not going to go over that process again.
6   A.  You can repeat it for the record because it's
7       been a while since we -- go over the process
8       again for me, if you don't mind.
9   Q.  Okay.  Well -
10  A.  Because it's been a while.  You know, I want
11      to make sure I'm in -- in -- in compliance
12      and within the limits and guidelines.
13  Q.  Okay.  Well, your testimony is being taken
14      under oath.  And you understand that you have
15      sworn under oath that you were going to tell
16      the truth in the deposition today; is that
17      correct?
18  A.  Correct.
19  Q.  And you understand that I'll be asking you
20      questions.  I'm going to ask you questions,
21      and your responsibility is to answer those
22      questions truthfully.  You understand?
23  A.  Correct.

                              272

1   Q.  Yeah.  And you need to answer yes or no to
2       the questions as opposed to nodding or
3       shaking your head, because the court reporter
                              Page 4
```

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    needs to be able to -- to record these

5    things, and she will not be able to record a

6    nod or a shake of your head.

7        If for some reason at any time you don't

8    understand a question that I have asked,

9    please let me know and I will try to restate

10   it in a way that you will understand.

11       And if for any reason at any time you

12   need to take a break, I'll ask that you

13   finish the answer to the question, if we're

14   in the middle of a question, and then we can

15   see what we can do about giving you a break.

16       And are you taking any medication or do

17   you have any condition that interferes with

18   your ability to testify today?

19  A.  No.

20  Q.  Okay.  I also wanted to see if you have

21   brought any documents with you that might

22   help you recollect what has occurred.

23  A.  No.  Anything that I have, you currently

273

1    have.

2  Q.  Okay.  So I want to start by asking some

3   clarifying questions about the background

4   information that you provided last time.

5       You testified previously that you had

6   only been involved in one lawsuit before and

7   it was a custody dispute between you and your

8   ex-wife, Rochelle Abere.  And then later you

9   testified that you are also currently

10  involved in a lawsuit against Renee

Page 5

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    Williams.  Is that correct?

12  A.  Correct.  I wouldn't consider that as a

13    lawsuit.  It's a -- well, I guess it is a

14    lawsuit.

15  Q.  Well, are there any other -- are there any

16    other court proceedings that you have ever

17    been involved with other than the two that

18    you mentioned previously, civil or criminal?

19  A.  Civil, yes.  Evictions.

20  Q.  Evictions.  Okay.  I want to show you what I

21    have marked --

22  A.  And -- yeah, evictions and other things that

23    are related to evictions set in civil court.

                        274

1    And I -- some years ago, I think I had a

2    civil proceeding against someone; they owed

3    me some money.

4  Q.  Okay.  Well, I'm going to show you what I've

5    now marked here as Plaintiff's Exhibit #14.

6        MS. NEAL:  I have a copy for

7      each of you.

8  Q.  So if you look at it, it is a -- it looks

9    like a Georgia court report.  I mean, it says

10    that it's offender information for, name,

11    Jamarlo Kalonji Gumbaytay.  Do you see the --

12    at the bottom where it says different

13    offenses that you have committed?

14  A.  Yes.

15  Q.  It says that you have committed the offense

16    of deposit account fraud, hyphen, bad

17    checks.  And it was a felony.  Is that

                        Page 6

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    correct?

19  A.  Correct.

20  Q.  And you were -- you were convicted?

21  A.  Correct.

22  Q.  Okay.  And there's a second offense misted

23      here -- offense listed here for forgery

                        275

1       second -- first degree.  It says that you

2       were convicted.  Is that also correct?

3   A.  Correct.

4   Q.  Are there any other criminal charges that you

5       want to let us know about at this time?

6   A.  Those are the only -- that was over, what,

7       back in 1988?

8   Q.  Well, actually, it says the court disposition

9       date was in March of 1990.

10  A.  Well, that was -- it wasn't 1990 because I

11      wasn't even in Georgia in 1990.

12          MR. NEWELL:  How is that

13      relevant to any of this?

14          MS. NEAL:  It impeaches his

15      credibility.

16  Q.  So are there any other civil or criminal

17      court proceedings that you can recall at this

18      point?

19  A.  No, no more, nothing I can mention.  Do you

20      want me to clarify this?

21  Q.  No.

22  A.  Okay.

23          MR. NEWELL:  Isn't this -- isn't

                      Page 7

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
276

1       this too old?

2              MS. NEAL:  If you have any

3       objections, they should not be made

4       in that form.  Your objections need

5       to be -- they need to be limited.

6       They must be stated concisely in a

7       nonargumentative and a nonsuggestive

8       manner.

9   Q.  So have you ever been a witness in a civil or

10      criminal court proceeding?

11  A.  Civil court here in Montgomery along the same

12      lines that we had discussed for evictions,

13      that I can recall.

14  Q.  Have you ever been deposed or questioned as

15      part of a civil or criminal investigation?

16  A.  No, not that I can recall.

17  Q.  In the first -- in the first portion of your

18      deposition, you referenced an FBI

19      investigation of Guest Properties and its

20      owner.  Are you also being investigated?

21  A.  No.

22  Q.  Are you a witness in this matter?

23  A.  No.

                        277

1   Q.  Have you been deposed?

2   A.  No.

3   Q.  You did testify that you had provided some

4       documents for the FBI previously and may have

5       answered some questions for them.  Under what

6       circumstances did you provide those

                                    Page 8

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7    documents?

8  A.  In the event they asked me questions I didn't

9    have the answers to, that master sheet that I

10   gave you with all the -- the investors from

11   Florida, I just -- they didn't ask me for it;

12   they just wanted me to come in for an

13   interview.  They told me before I even got

14   there I wasn't in any trouble or anything,

15   they just wanted to talk to me, see who I was

16   and how I was related to Mr. Guest.

17  Q.  They just gave you an informal kind of

18   interview?

19  A.  Yeah.  I couldn't -- they didn't ask for

20   that.  I just took it with me anyway.  I say

21   here's what peoples I had worked with in the

22   past, and then I gave it to them

23   voluntarily.  They didn't ask for it or

                          278

1    anything.

2  Q.  Okay.

3  A.  In other words, I tried to be as helpful as I

4    possibly could.

5  Q.  Okay.  You testified previously that your

6    full name is Jamarlo Kalonji Gumbaytay.

7  A.  Correct.

8  Q.  And then I then asked whether you had ever

9    gone by any other names, and you said that

10   you used to go by Roger Harris.

11  A.  Correct.

12  Q.  I then asked you if you ever went by any

13   other names, and you said no.

                    Page 9

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  A.  Correct.

15  Q.  Do you --

16  A.  Not legal, you know.  Nicknames, but no, not

17      legal.  This is my -- Roger Lee Harris is my

18      birth name.  Jamarlo Gumbaytay is my -- I

19      changed my name after I left the Marine Corps

20      back in --

21  Q.  When you say that you -- so have you ever

22      used any other names not legally?

23  A.  No.  No.  Nicknames.  People have -- you have

                          279

1       nicknames, you know, people call you; but no,

2       not -- I haven't used any other names legally

3       in any form, fashion, shape but Roger Harris,

4       which is my birth name, and Jamarlo

5       Gumbaytay, which I legally changed after I

6       got out of the Marine Corps.

7               MS. NEAL:  Okay.  I want to take

8           a second just to note that a new

9           person has entered the room, and I

10          believe that it is a paralegal for

11          Mr. Al Newell named Charolette

12          Tarwater.  Am I correct?

13              MR. NEWELL:  Yes.

14  Q.  Okay.  Do you recognize the name Lawrence

15      Lamar?

16  A.  Lawrence Lamar.  That name sounds familiar.

17      It rings a bell, but I can't recall --

18  Q.  I have here what I'm --

19  A.  -- in what capacity.

20  Q.  I have here what I'm introducing as

                                    Page 10

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    Plaintiff's Exhibit #15.  And this is a

22    report that we -- that we did on you after

23    looking up your social security number.  And

280

1    Lawrence Lamar is also associated with your

2    social security number.  Does this refresh

3    your recollection?

4  A.  No, unless it's someone falsely ascertained

5    my social security number.  I don't recall

6    this person.  I can't -- he don't ring a bell

7    to me.

8  Q.  Did you ever live at 1407 Summit Creek Drive

9    in Stone Mountain, Georgia?

10  A.  Correct.  It was back in the '80s.  I was

11    evicted from that unit, so a lot of my

12    personal stuff was probably still in that

13    apartment at the time.  Someone probably

14    accessed the -- some documents there, and

15    they probably got ahold of my social security

16    number, because all of my stuff was possessed

17    and put out.  When I came back -- I was -- I

18    was in my 20s then -- early 20s when all

19    that -- when all that happened.

20  Q.  Okay.  I believe earlier I asked you your

21    social security number.  And you said that

22    your social security number is ███████████;

23    is that correct?

281

1  A.  Correct.

2  Q.  And I asked if you had ever gone by or used

3    any other social security number, and you

Page 11

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    said no, correct?

5  A.  Correct.  My business -- under Elite

6    Enterprises is my business number, not my --

7    I may interchange my business, Elite

8    Enterprises, with my social security number.

9    If you look at the -- I did a nonprofit

10    organization about ten years ago, and I got a

11    tax ID number.  So I probably used that in

12    that capacity.

13  Q.  Okay.  I have here what is -- what is marked

14    as Plaintiff's Exhibit #16.  And I want to

15    draw your attention to that page

16    (indicating).  I don't know what -- excuse

17    me.  And this is a comprehensive report that

18    was processed for the name Jamarlo

19    Gumbaytay.  And it was a search -- if you

20    look at the page that I -- that I've turned

21    it to, I believe that is the -- it's the

22    third-to-last page in the document.  It shows

23    your name as being -- and your current

282

1    address as being identified with another

2    social security number, 631-26, and then the

3    last four digits are crossed out.

4  A.  That's my tax ID number, my federal tax ID

5    number, for -- like I said, when I started my

6    nonprofit business over ten years ago, that's

7    the federal tax ID number I used.  And I use

8    it for Elite Enterprises also, the same

9    business.

10  Q.  Okay.

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11          MR. NEWELL:  How is this

12      relevant to anything?

13          THE WITNESS:  Trying to

14      establish character.

15  Q.  Did you do anything to prepare for this

16      deposition?

17  A.  No.

18  Q.  Did you -- did you meet with your attorney?

19  A.  We met over the phone.

20  Q.  And this is in preparation for this --

21          MR. NEWELL:  We both have very

22      busy schedules.  We apologize, but we

23      can't help that.

                        283

1  Q.  After -- after the first portion of the

2      deposition, have you -- did you meet with him

3      again?

4  A.  By phone, yeah.  He has a busy schedule; I

5      have a busy schedule.

6  Q.  What did you guys talk about?

7  A.  Just general conversation.  He asked me -- he

8      had a chance to went through the documents,

9      and he basically shared with me what he

10     had -- what he has reviewed so far, nothing

11     that we don't -- we haven't talked about in

12     the past.

13 Q.  Did you review any documents?

14 A.  No.  Just the ones that you have and I have

15     in your possessions.

16 Q.  Did he suggest any documents that you might

17     want to look at to refresh your recollection?

                    Page 13

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18  A.  No.

19  Q.  Did you talk with anybody about the

20      deposition?

21  A.  No.  Other than my attorney, that's it.

22  Q.  Did you talk with Ms. Lynn Norsworthy about

23      your deposition?

284

1   A.  No.  She was aware of the fact that I was

2       coming here, and I was aware of the fact that

3       she was coming here.

4   Q.  How were you aware of the fact that she was

5       coming here?

6   A.  She had informed me that she had a date.

7   Q.  So you did talk about the deposition?

8   A.  No, not about the deposition.  The fact that

9       she was coming here to the deposition, and --

10      and she said, well, I don't know, I don't

11      have anything to give them, I turned

12      everything over to you.  So we just

13      elaborated from that standpoint to what she

14      had turned over to me and she don't recall a

15      whole lot about -- because, like I said, we

16      had 114 clients.  She don't recall everything

17      about the case.  And I was refreshing her

18      memory on the house on Lake Street that we've

19      talked about we had rented for 450.  And she

20      recalled and recollect, you know, what has

21      transpired.

22  Q.  You refreshed her recollection before the

23      deposition about -- about the house on Lake

Page 14

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
285

1      Street?

2  A.  We had discussed it briefly.

3  Q.  And what did you -- what did you tell her?

4  A.  I didn't tell her anything.  She asked me --

5      she said she don't remember a whole lot.  I

6      said, well, look in your file; you wrote a

7      letter.  She had issued a letter that I took

8      to court with me that it indicated that --

9      well, the same thing she had written in that

10     letter.  I said look in your computer to see

11     whether or not she could find that letter.

12     She said she had deleted it.  And on that

13     letter, it indicated that the 450 was for

14     Lake Street.  And she recalled -- she recalls

15     it.

16         Like I said, Lynn and I have over 114

17     clients, so we can't recall everything, but

18     she recalled that conversation.

19 Q.  So you did suggest that she look at the -- at

20     the letter that she had drafted to the Court?

21 A.  See could she find it.

22 Q.  Okay.

23 A.  Yes.


                    286

1  Q.  Did you suggest any other documents that

2      Ms. Norsworthy could look in -- look at in

3      preparation for the deposition?

4  A.  No.

5  Q.  Did you remind her of anything else that had

6      happened?

                    Page 15

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7  A.  No.
 8  Q.  Do you recall that in our court hearing the
 9      other day, Judge Moorer asked for you and
10      Mr. Newell to look at our first request for
11      the production of documents and see whether
12      there were any documents that you did not
13      give us at the hearing that were responsive
14      to our request?
15  A.  Yes.
16  Q.  Have you done this?
17  A.  As I've indicated in here, what you have is
18      all I have.  I have nothing else to -- to
19      produce.  I'm not a business, ma'am.  I work
20      out of my home.  I have a two-bedroom house.
21      I'm not a corporation set up like Aronov
22      Realty.
23  Q.  When we talked with Ms. Norsworthy, she
```

                              287

```
 1      mentioned that she had turned over three
 2      letter-sized storage boxes to you in May that
 3      included HAP contracts, HAP reports,
 4      contracts between you and owners, and
 5      correspondence between the Housing Authority
 6      and owners.  Do you still have copies of
 7      those documents?
 8  A.  No.
 9  Q.  What happened to them?
10  A.  As I've indicated to you before, when I
11      received a cease and desist letter from the
12      Real Estate Commission, since I'm not a
13      licensed, insured, and bonded agent in the
```

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    state of Alabama, it was to my best interest,

15    just in case they wanted to verify and

16    document whether or not I was still doing

17    what I told them I wasn't going to do

18    anymore --

19  Q.  When did you receive the cease and desist

20    letter?

21  A.  I can't recall.  It was sometime back in

22    February.  February -- January or February.

23    I'm not -- one of those months.

                        288

1  Q.  And when did Lynn turn the documents over to

2    you?

3  A.  I can't recall the exact date and time.

4  Q.  Okay.  I want to ask a few clarifying

5    questions about some of the personal

6    information you provided to us last time.

7    You stated that you had an ex-wife named

8    Rochelle Abere?

9  A.  Correct.  Rochelle Jackson.

10  Q.  That's her new married name?

11  A.  No.  Her married name -- new married name was

12    Abere, right.  She was a Jackson before she

13    married me.

14  Q.  Okay.  And you stated that you have a

15    21-year-old son?

16  A.  I have a 21-year-old daughter.

17  Q.  Oh.  A 26-year-old son.

18  A.  A 26-year-old son by my ex-wife -- with my

19    ex-wife.

20  Q.  So she's the mother of that -- of that child?

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  A.  Correct.

22  Q.  And what is your son's name?

23  A.  Kenyatta, K-E-N-Y-A-T-T-A, middle initial M.,

                        289

1       last name Harris.

2   Q.  And what is your daughter's name?

3   A.  Rikiya, R-I-K-I-Y-A, middle initial J., last

4       name Gumbaytay, G-U-M-B-A-Y-T-A-Y.

5   Q.  And where does your daughter live?

6   A.  She lives in Georgia.

7   Q.  What -- what city in Georgia?

8   A.  I have no idea.  I got two letters going out

9       to her this week trying to find my daughter.

10      Her mother and -- had a -- kept her from me

11      all her life.  And I had filed a suit against

12      her for joint custody, and I was successful

13      in providing that -- winning that lawsuit,

14      but I don't have no idea where she live.  I'm

15      trying to find her as we speak today.  I got

16      a couple of letters going out to a couple of

17      old addresses.

18  Q.  What --

19  A.  I haven't talked to her in about -- probably

20      about two or three years now.

21  Q.  What church do you attend?

22  A.  At the time, I was with United Evangelical

23      Lutheran Church.  Now I attend All Savior

                        290

1       Lutheran Church in Shelby County as of the

2       first of the year.

3   Q.  Okay.  I'm going to ask you some questions

                    Page 18

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4      about your real estate business.  You

5      mentioned before that a Ms. Bassett worked

6      for you.  Did Ms. Bassett live in the

7      property that you managed?

8   A.  Yes.  She lived in one of the property.

9   Q.  What property?

10  A.  Mr. Kevin Schimeder, one of Kevin Schimeder's

11      house.

12  Q.  And do you remember the address?

13  A.  No.

14  Q.  Does she still live in that property?

15  A.  As far as I know of, she is.  I don't have

16      anything to do with those properties anymore.

17  Q.  What sort of relationship did you have with

18      Ms. Bassett?

19  A.  Just a business relationship.  She was my --

20      she, along with Lynn and along with Ms. Renee

21      Williams, I hired them to be my account

22      managers.

23  Q.  Right.  Please just answer the question

                        291

1       that's asked.

2   A.  Just account manager.

3   Q.  Okay.  Did Renee Williams live in a property

4       you managed?

5   A.  Correct.

6   Q.  Who was the owner?

7   A.  Mr. Bahr.

8   Q.  And does she still live in that property?

9   A.  No.

10  Q.  Did you do eviction proceedings against her?

                     Page 19

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  Correct.

12  Q.  When did those start?

13  A.  She had -- she had moved out before the

14      eviction proceedings started.  It was back

15      in -- I believe back in September.  Your

16      office handled that case, so you -- you can

17      look at the file up there.  I think it was

18      back in September of last year.

19  Q.  Actually, my office didn't handle the case.

20  A.  Not your office, you're right.  Legal

21      Services of Alabama.  Thank you.

22  Q.  And what sort of relationship did you have

23      with Renee Williams?

                         292

1   A.  Account manager.

2   Q.  No personal relationship --

3   A.  No.

4   Q.  -- of any type?  Did anyone else you've

5       contracted with live in a property you

6       managed?

7   A.  No, not that I can recall.

8   Q.  Did you ever flirt with Renee Williams?

9   A.  No.  By your definition of flirt, no.

10  Q.  Well, did you ever provide any sort of

11      compliments to her that you kind of referred

12      to at your last deposition?

13  A.  Right.  Compliments all the time.  I always

14      provided compliments to ladies.

15  Q.  What sort of compliments would you give her?

16  A.  Just general compliment, nothing out of the

17      ordinary, nothing derogatory or

                              Page 20

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    disrespectful.

19  Q.  Give me an example.

20  A.  I can't recall an example at this time.  You

21      know, I can't recall every word that I said

22      to every female.

23  Q.  Did you compliment Ms. Bassett?

293

1  A.  I always compliment ladies.

2  Q.  Okay.  Did anyone who worked for you at Elite

3      Real Estate Consulting Group ever complain to

4      you about your behavior?

5  A.  No.

6  Q.  Ever ask you not to speak with them in a

7      certain manner?

8  A.  No, not that I recall.

9  Q.  You testified earlier that you didn't have

10     access to some of the properties that were

11     dumped on you after Guest Properties left

12     town.  What did you mean by this?

13  A.  I don't have access to them.  In other words,

14      I have no right to facilitate any type of

15      transaction in any form, fashion, or shape,

16      so I don't go near them unless someone call

17      me and asked me to run by and check them.  I

18      don't -- when -- when I terminate a contract

19      or a relationship with an investor, I don't

20      have anything to do with them directly or

21      indirectly; because that's considered as

22      trespassing.

23  Q.  But that's not true for the properties that

Page 21

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
294

1      Mr. Bahr owns?

2   A.  Correct.  Up to the time that we had

3       terminated our relationship.  I don't -- up

4       to -- up to the time we had terminated our

5       relationship.  And our relationship been

6       terminated by default with him.

7   Q.  When was your relationship with Mr. Bahr

8       terminated?

9   A.  When -- once again, when the Real Estate

10      Commission gave me a letter, I sent everyone

11      out a letter informing them that I have --

12      cannot legally conduct business in the state

13      of Alabama in any form, fashion, or shape.

14      So --

15  Q.  When did you send that letter out?

16  A.  Shortly after I -- Mr. -- the Real Estate

17      investigator gave me 10, 15 days to

18      clear up -- contact everybody.  So I -- I had

19      already verbally communicated with them that

20      we was going to wind down.  And the Real

21      Estate Commission gave me an opportunity to

22      send people a letter out, collect their rent,

23      final rent, and make sure that the tenants

295

1       knew that we was no longer going to be

2       interacting with them.  So it was during

3       that -- shortly after I received that first

4       verbal, in-person relationship with the Real

5       Estate Commission.

6   Q.  Do you still have a copy of the letter you

Page 22

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7        sent to them?
 8   A.   It's in -- it's on file, on -- on -- it's --
 9        talking about as far as the -- I sent to the
10        tenants?  No.
11   Q.   Well, no.  The letter that you sent to the
12        owners letting them know that you would no
13        longer be able to represent them.
14   A.   No, ma'am.  If -- if -- if it's available --
15        Lynn does all of my typing.  As I've
16        indicated to you, I don't do any typing at
17        all.  I'm not that great on terms of speed,
18        so Lynn does all my typing.  If anyone has
19        that letter, it would probably be her.
20   Q.   So you still worked for Bahr after this
21        lawsuit was filed?
22   A.   After the law --
23   Q.   After this lawsuit was filed.

                         296
 1   A.   I wouldn't necessarily say worked for him,
 2        but I still had his best interests.
 3   Q.   You still managed his properties?
 4   A.   Yes.
 5   Q.   And you still managed Ms. Boswell's property
 6        after this lawsuit was filed?
 7   A.   Yes.  Yes.  Right.
 8   Q.   Okay.
 9   A.   Yes.
10   Q.   You testified that when you first opened
11        Elite Real Estate Consulting Group, that you
12        had five or six houses listed in the
13        Section 8 publication that you were in the
```

Page 23

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  process of buying through a group of

15  investors.

16  A.  Yes.

17  Q.  Did you ever purchase those homes?

18  A.  No.

19  Q.  Did you rent those houses out at any time?

20  A.  No.

21  Q.  Do you currently own any rental property?

22  A.  No.

23  Q.  Do you currently own any property other than

297

1  your home?

2  A.  No.

3  Q.  When did you start listing yourself on the

4  Section 8 Bulletin Board?

5  A.  It was about -- I can't recall the exact

6  date.  It has to be a little over five -- it

7  had to have been a little over five years ago

8  now, because -- it was about five years

9  ago -- four or five years ago.  I can't

10  recall the exact date.

11  Q.  I believe you testified earlier that you

12  didn't have a written agreement with any of

13  the owners; is that correct?

14  A.  No, I didn't have a written agreement with --

15  with -- with any of the owners.  Because like

16  I said, these people were just given me.  And

17  I sent them letters out that requested for

18  them to -- to complete a written agreement.

19  And -- and most of them didn't respond at all

20  because they --

Page 24

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21 Q.  Did Mr. Bahr respond?

22 A.  No.

23 Q.  So if Ms. Norsworthy remembers you having a

                        298

1      written agreement with some of the owners,

2      then you would say that she was lying or

3      remembering incorrectly?

4  A.  No.  I don't recall having a written

5      agreement with -- with -- it was about 15, 20

6      peoples at the time.  I don't recall having a

7      written agreement with them.  Like I say,

8      Ms. -- Ms. Norsworthy kept all the

9      documents.  So if there was -- are any

10     written agreements, she would have those

11     written agreements.

12         I was going about the business of just

13     taking care of the rent and make sure that

14     the maintenance calls were taken care of.  So

15     she can basically handle all the

16     administrative details.  So if there are any,

17     I am not aware of them; because when they

18     sent them in, she sent them it out by e-mail

19     and they sent them in to her.  So we just

20     went on with a verbal understanding that I

21     was going to be conducting the affairs of

22     their property.

23 Q.  So you didn't tell her something to be

                        299

1      written in a written agreement with the

2      owners?

3  A.  Yes.  Yeah.  We have a written -- we have a,

                   Page 25

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4    quote/unquote -- I usually get all my forms

 5    from U.S. Legal Forms dot com.  So I

 6    downloaded a form that has to do with a

 7    relationship between a landlord and a --

 8    landlord -- like a real estate agent would

 9    do.

10         I downloaded a U.S. form, and I sent

11    them out to all -- every last one of the

12    owners when they first came in town.  And

13    some of them responded; some of them not.  If

14    they did respond, they sent everything back

15    to Lynn.  So if there are any, I never was --

16    you know, we just went on with business as

17    usual.

18 Q.  And these were documents that you destroyed

19    in response to the cease and desist letter?

20 A.  I -- let me put in this way.  Every file that

21    was in file, in my file cabinet -- like I

22    say, I work -- I have a two-bedroom house.  I

23    work out of one of the offices.  I just took
```

300

```
 1    all those documents out of there in the event

 2    that the Real Estate insurance -- the Real

 3    Estate Commission wanted to come by my house

 4    and see whether I was still operating.

 5    Everything in every box.  I didn't even look

 6    at it.  Because Ms. Bass (sic) and Lynn and

 7    Renee handled all the files.

 8 Q.  So it's -- but -- so it's likely?

 9 A.  It's a likely possibility that all of that

10    could have been in there, that is correct.
```
                              Page 26

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  Okay.  Did Ms. Toodle or Ms. Harris at

12      Montgomery Housing Authority ever call you

13      about your behavior around tenants?

14  A.  No.

15  Q.  So if they say they did call you, then

16      they're lying?

17  A.  Yes.  I never had a complaint from not one

18      tenant.

19  Q.  What tenant?

20  A.  I have never had a complaint.

21  Q.  Oh, okay.  Okay.

22  A.  Ms. Harris and Ms. Toodle, I had an

23      excellent, if not a superb relationship with

                           301

1       them.  They knew that my focus was, and still

2       is, at that time was to make sure that every

3       tenant was taken care of.  And I went above

4       and beyond that to do so.

5   Q.  How many of your tenants are -- or were

6       unmarried African-American women with

7       children?

8   A.  A hundred percent of them, because you can't

9       be on Section 8 without -- and be married.

10  Q.  You testified previously that you would

11      collect rent from owners, field maintenance

12      calls, and handle evictions.  Did you have to

13      get the owner's approval before you did

14      evictions?

15  A.  No.  No.  I acted in the -- in the best

16      interest of the owner if anything transpired,

17      you know, based on the documents I received

                      Page 27

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    from -- the download from U.S. Legal Forms,
19    all the necessary forms that you --
20 Q.  So, no?
21 A.  No.
22 Q.  Did landlords ever sign leases?
23 A.  No.

                              302

1 Q.  And what about --
2 A.  No.
3 Q.  -- HAP contracts?  Did the landlords ever --
4 A.  Some did at some time, because the HAP
5     contract had to have their payroll signature
6     on them.
7 Q.  But sometimes you signed them on behalf of
8     owners?
9 A.  Correct, yeah.  Because time was of the
10    essence in most cases.  You had to get the
11    documents in.
12 Q.  Earlier you testified that for repairs over
13    75 to 100 dollars, you would contact the
14    landlord to get authorization.
15 A.  Correct.
16 Q.  Did the landlords then send you money to fix
17    the repairs?
18 A.  No.  In some cases, yes; in some cases, no.
19 Q.  How would the -- how would the process work?
20 A.  I collected the rent, as I've indicated
21    before, for the 1st through the 15th.  I
22    would have a substantial amount of money that
23    the Housing Authority wouldn't pay.  I would

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
303

1   collect the difference.  So at any given time
2   in any given month, depending on the
3   collection, I would have somewhere between
4   six or seven hundred dollars of that person's
5   money, so I would take it from those
6   proceeds.
7        That's how I got paid, also.  You know,
8   if they owed me anything, I would take my
9   percentage out of that.  And if the repairs
10  came in, if it was over a hundred dollars, I
11  would call them.  If it was under a hundred
12  dollars, I would take it from that.  Then
13  Lynn or Renee or Ms. Bassett would do the
14  accounting; and at the end of the month, they
15  would send them out an executive summary.
16 Q.  So if there was a repair for a hundred
17     dollars and a tenant had paid you $500, then
18     you would end up sending a check to the
19     landlord for $400, something like that?
20 A.  Minus my fees.
21 Q.  Minus your fees.  Okay.
22 A.  Right.
23 Q.  So if the repairs were for less than 75 to a

304

1   hundred dollars, you would still use the
2   money out of -- out of the money that you had
3   received from rent?
4  A.  Yes.
5  Q.  Was this your policy, or did the owners tell
6      you to do this?

Page 29

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7  A.  It was standard -- it was standard practice

 8      in the real estate industry, you know, once I

 9      figured out what I was supposed to do and how

10      to go about doing it and I read up on it a

11      little bit.  Because --

12  Q.  So this was your policy?

13  A.  It was -- it was the standard policy, yes.

14  Q.  Did the owners ever tell you that you needed

15      to follow the standard policy?

16  A.  No.  It was just a -- it was just an

17      assumption of responsibility that you -- that

18      I took to -- to -- because they needed the

19      repairs to be done if I had the money

20      available.  So the maintenance people that

21      was available at the time, we just made sure

22      they got paid when they got through with the

23      job.
```

                              305

```
 1  Q.  Did you ever charge tenants for making

 2      repairs?

 3  A.  No.  We sent -- we sent -- we have sent

 4      out -- let me clarify that.  Yes and no.  If

 5      a -- if a person calls us for something

 6      that -- damage that they did, then you're

 7      responsible for that.  If it's something that

 8      you could handle, like if a wiring situation

 9      with shortings and it was -- they sent the

10      maintenance person out there.  Then we would

11      request for them not to call us on false

12      repairs.

13          In other words, if you had a blown fuse
```

                                        Page 30

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    and you sent a person out there, they charge

15    you $45 just to change out the fuse, I would

16    charge them for something like that, for

17    making a service call that they could have

18    handled themselves.  But they never paid.

19  Q.  I've got a document here that I've marked as

20    Plaintiff's Exhibit #17.  And I believe that

21    it was issued by you on August 25th, 2006.

22    And I believe that it -- paragraph -- the

23    third paragraph down, it looks like reflects

306

1    what you already said.

2  A.  Yes.

3  Q.  That prior to making a maintenance call,

4    please see if you or someone you know can

5    handle the problem first at little or no cost

6    to you.  And then later on, it says, In the

7    future, you will -- in that paragraph, it

8    says, In the future, you will be billed if we

9    have to take time out of our busy schedule to

10    visit with you on very minor things that you

11    could have handled yourself.

12       How would you determine if it was a

13    minor thing that somebody could handle

14    themselves?

15  A.  Well, you have -- I emphasized if a fuse

16    blow.  And you realize and I realize that

17    some people are limited even in terms of

18    changing out a fuse, but I wanted to make it

19    simplified as possibly I -- as I possibly

20    could.  So that's why I used that example.

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    But once again, if that person did call
22    us and the maintenance person determined that
23    it was a blown fuse, we have to send out

307

1    notices anyway.  But they never paid, and no
2    one never took them to court on it for not
3    paying.
4    Q.  Did you ever send them notices that they owed
5        you money?
6    A.  I have sent out, you know, just a standard
7        notice like this that they owed them.  I
8        never officially sent out a demand for
9        payment unless they behind on their rent.
10   Q.  Okay.  Did Beverly Toodle or Kathy Harris at
11       the Housing Authority ever call you about
12       charging tenants for repairs?
13   A.  Yes.
14   Q.  What did they -- what did they say?
15   A.  They said that the landlord should be fully
16       responsible for every single thing as -- as
17       pertaining to the house.
18   Q.  If you weren't charging the tenants for
19       repairs, why did they call you?
20   A.  Because they had got this same letter.  You
21       know --
22   Q.  So the only time that they called you about
23       charging people for rent was in response to

308

1        this letter?
2    A.  No.  Or if a tenant called them and -- and
3        shared with them that Mr. Gumbaytay or Eric

Page 32

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    Cruz or whoever the case may be -- more than

5    my case.  You can only request.  So if

6    they -- if a tenant called Ms. Harris or

7    Ms. Toodle and asked them why Mr. Gumbaytay

8    charge them the repair, then they would call

9    me and I would respond.  I would say, ma'am,

10    I respect your request.

11  Q.  How many times did they call you?

12  A.  I can't recall.  I can't recall.

13  Q.  Okay.  So you testified earlier that the

14    rental amount for locations was often

15    determined through Section 8 vouchers.

16  A.  Yes.

17  Q.  What if a tenant was not on Section 8?

18  A.  Then the rental amount was already

19    predetermined as to what the landlord would

20    want to -- to -- to ascertain for his rent.

21    And usually, it's -- it's -- on a two-bedroom

22    house, we usually went 550.

23  Q.  What if a tenant --

309

1  A.  And on a three-bedroom house, it's 600 or

2    more.  Of course, if you can get more, then

3    fine.  Most of these houses were located in

4    low income neighborhoods, so the rental was

5    pretty much set in -- the rental was pretty

6    much set in stone.

7  Q.  What if a tenant couldn't afford the amount

8    determined?

9  A.  If they were non-Section 8?

10  Q.  If they were non-Section 8.

Page 33

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  They would not get a lease with us.

12  Q.  Did you ever contact an owner and ask if you

13      could make adjustments to the rent?

14  A.  Yes.  On Section 8 folks.  If Section 8

15      called me and say, Mr. Gumbaytay,

16      Mrs. Blank-Blank cannot afford this based on

17      her voucher amount, and then at that time I

18      would call the landlord and ask them would

19      they be willing to reduce the price.  Because

20      they have to cover their principal, interest,

21      taxes, and insurance.  And they're trying to

22      make a profit on top of that, 25, 50 to 100

23      dollars above what the rent is in order to

                            310

1       stay in business, in order to pay my fees and

2       take care of maintenance costs.

3   Q.  Did you ever contact an owner and ask if you

4       could make adjustments for a person who

5       wasn't on Section 8?

6   A.  No.  That decision was not necessary, because

7       the rent was what it was.  And if I -- if

8       I -- if someone came along that was

9       non-Section 8, they understood what the rent

10      amount was and the way -- it was pretty much

11      written in stone that that's what you going

12      to pay, except for this case of Ms. Boswell.

13      But since the house that she wanted --

14      originally wanted to rent was so badly abused

15      by the former tenant -- it was vandalized --

16      we just asked her if she was willing to fix

17      it up, clean it up, clean it out, and then we

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    would give her a reduced amount --
19  Q.  Yeah.
20  A.  -- to offset the cost of what she would
21    normally have to pay.
22  Q.  Did you ever pay any portion of your tenants'
23    rent?

311

1  A.  No.
2  Q.  Did you ever offer to pay any portion of your
3    tenants' rent?
4  A.  No.
5  Q.  Earlier you testified that you gave Ms. Renee
6    Williams a break on her rent a few times.
7    What did that mean? What sort of break on
8    her rent did you give her?
9  A.  The break that we gave her is -- is written
10    in her lease. If you look at the lease, it
11    says that -- and I talked to Mr. Bahr about
12    it. And he realized that Ms. Renee Williams
13    was helping us as our account manager.
14      So I wrote in her lease that your
15    deposit would be deferred for six months.
16    It's in writing. I wrote in her lease that
17    she would be reduced $50 per month for the
18    first six months. We -- we -- because she
19    worked for me. So we reduced that amount,
20    and it was written in the contract that that
21    would transpire. And then on the six months,
22    when it was time for Renee Williams to pay
23    her deposit and to pay the full rent amount,

Page 35

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
312

1    that's when she departed.

2  Q.  So you talked to Mr. Bahr about this before

3       you reduced her rent?

4  A.  Yes.

5  Q.  Was she a Section 8 tenant?

6  A.  No, she was not.

7  Q.  So there were times when you adjusted the

8       rent to a person who was not a Section 8

9       tenant?

10 A.  A person in that capacity that worked as an

11      employee, in her capacity.  She worked as

12      independent contractor.

13 Q.  Did you reduce Ms. Bassett's rent?

14 A.  No.  No.  She's Section 8.

15 Q.  Did you reduce anybody -- any of your other

16      employee -- independent contractors' rent to

17      your knowledge?

18 A.  No.  That's the only two independent

19      contractor ever worked for me on the Section

20      8 was Bassett.  And Ms. -- Ms. Renee

21      Williams, as I indicated, is self-employed --

22      I mean is an independent contractor.

23 Q.  Did you contact Bahr about reducing the rent

313

1       for Ms. Boswell?

2  A.  No.  No.  Because it was -- it was written in

3       stone.  If you look at the contract

4       information that you have in your possession,

5       the house was rented for -- before she moved

6       in there, for $600.  A tenant -- no.  650.  I

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7     rent it for 650, 600 dollars.  And she was
 8     the only person that we had made an agreement
 9     with at the other house.  But, no, that would
10     never have happened because I know what the
11     house would rent for.  And I always rented
12     for 600 or more.
13  Q. Okay.  So you --
14  A. In her case, I gave her -- I gave her a
15     break.
16  Q. So you guys --
17  A. And that's when -- and let me clarify that.
18     I -- I did not charge Mister -- in some
19     cases, I would not charge the landlord a -- a
20     fee if that house has been vacant for a long
21     time.  If it's in a crime ridden
22     neighborhood, I would -- just to get the
23     house rented and keep it with a tenant in it
```

                              314

```
 1     and to avoid vandalism, I would ask them to
 2     let's not rent it for $600 this month.  Let's
 3     try to rent it for $50.  And that $50 that
 4     you would pay me, which would have been ten
 5     percent of $600 -- it would have been $60.  I
 6     would just not take any fees because -- just
 7     to rent the house.
 8         Because with the Bahr family, there was
 9     three members that had houses, him and his
10     wife, and they had their daughter in the
11     business.  So I had a large -- a large volume
12     of business with Mr. Bahr that I could have
13     done that with him more so than anybody
```

                          Page 37

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    else.  Matter of fact, I reduced his fees

15    after a while from 5 percent -- from 10

16    percent to 5 percent of each rental amount.

17  Q.  Did you do that with him?

18  A.  With Mister -- with Mr. Bahr, I --

19  Q.  Yes.

20  A.  Well, he asked me because he and his wife and

21    his daughter, between all three of them.

22  Q.  I'm actually -- I'm asking about you

23    mentioned that you had -- would occasionally

                        315

1    reduce the amount of rent just to get a house

2    rented.  Did you ever do that with any of

3    Mr. Bahr's properties?

4  A.  Yes.

5  Q.  What property did you do that with?

6  A.  Ms. -- the one that Ms. Boswell lived in.

7    Because that house is in a high crime

8    neighborhood and -- and infested with drugs

9    and other kind of delinquent activities over

10    there.  So it's hard to rent houses -- a

11    house in that area, so that house had been

12    vacant for a while.

13        And the two people that lived there

14    before she did, they end up getting evicted

15    out of the house.  So the people that you

16    rent it to, you basically have to be more

17    flexible in your credit criterias.  As you

18    notice in your document I submitted to you

19    last week, I had to evict both of those

20    tenants prior to Ms. Boswell because they

                    Page 38

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    were not paying their rent on time.

22  Q.  That's the house at 964 North Gap Loop?

23  A.  Yes.  964 North Gap Loop, right.

316

1  Q.  What was the rent originally for that house

2      before you reduced it to get a tenant in?

3  A.  We were trying to rent that house for 650.

4      We tried to get the maximum amount of money.

5      Because the more money I get, of course, the

6      more percentage I make.  So it's in my best

7      interest to always rent it for the maximum

8      amount, 650.

9          And I think I rented it to the Epps

10     family.  If you look at the document, we had

11     a contract with them for $650.  And then they

12     stayed there about a good three months, and

13     they would not pay the rent, so we had to end

14     up putting them out.  Then I rented it to

15     another lady shortly thereafter.  Well, it

16     stayed vacant again for a while.

17  Q.  And that was for 650 again?

18  A.  600.  I went down to 600.  And then -- then

19     we ended up in three months putting her out.

20     So he had not collected any consistent rent

21     on it, between those three tenants, for

22     almost a year.  So I kind of felt, you know,

23     obligated because I'm the one that referred

317

1      those people and did the paperwork and

2      qualified them.  And I qualified them not

3      based on credit.  I qualified them based on

Page 39

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    the fact that if I don't get somebody in this

5    house, this house is going to be torn up.

6    And every house in every area has been torn

7    up.

8  Q.  So you testified earlier that when you and

9    Ms. Boswell originally -- you testified that

10    when you and Ms. Boswell originally talked

11    about the house on Lake Street, that the rent

12    was $550 but you agreed to change the rent to

13    450 in exchange for making repairs to the

14    house, right?

15  A.  Yes.

16  Q.  Did you tell the owner, Mr. McDonough, that

17    you were going to change the amount to 450?

18  A.  I contacted him and indicated to him that I

19    would, once again, take a reduced -- say if I

20    rented the house for six -- it was rented for

21    600. So I took a reduced fee of that $60.

22        So in their case, if -- the house had

23    already been vandalized before they -- before

318

1    they got there. So in her case, if you clean

2    it -- holes was in the wall. Paint was all

3    over the place. So I told Mister --

4  Q.  Mr. McDonough?

5  A.  -- Mr. McDonough he couldn't afford to do the

6    repairs, and so it was going to sit there

7    forever and a day. So to answer your

8    question, yes, I did tell him.

9  Q.  Okay. So he -- he agreed to reduce the

10    amount to 450?

Page 40

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  Yes.

12  Q.  Did any of the owners ever call you or

13      anybody else that worked for you to complain

14      that you were collecting more or less rent

15      than they had authorized?

16  A.  Any of the owners?

17  Q.  Did any of the owners ever call you or anyone

18      else that worked for you?

19  A.  No.

20  Q.  So if we have testimony from -- from any of

21      your employees saying that they got

22      complaints from the owners, then they would

23      be lying?

                        319

1   A.  They would be lying.  Because every house

2       that we ever rented to anyone, there was a

3       lease drafted up and it was put into their

4       executive summary report.  So the lease and

5       the executive summary report matched each

6       other.

7           So if I rented a house for 550 and that

8       person had a lease for 550, then that's what

9       that house rented for.  If I rented a house

10      for 650 and that person -- we would have

11      drawn -- Lynn would have drafted up the lease

12      for 650.  It would have been placed under

13      their executive summary.  Each and every

14      month they get a copy of that executive

15      summary.  So they know exactly what rent --

16      what houses rented for, and they have a lease

17      to -- to verify that.

                                Page 41

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18      So if someone has told you anything
19      different than that, then it's -- it's not
20      the truth.
21  Q.  How did the folks that you contracted with,
22      Lynn and Cameron Bassett and Renee Williams,
23      how did they know how much rent to put in the

                    320

1       lease amount?
2   A.  Based on the amount that the landlord want
3       for those units.  Once again, the standard
4       for a two-bedroom, which was the standard for
5       the Housing Authority, is no more than $550.
6       The standard -- the minimum standard you can
7       get -- you can get up to $700 for a unit with
8       the Montgomery Housing Authority.  As I
9       shared with most of the landlords, you're not
10      going to get $700 in the ghettos.  That's
11      just plain and simple.
12  Q.  Well, how did they know how much money a
13      landlord wanted to charge for a unit?  Did
14      you tell them?
15  A.  No.  Guest Property.  When they first came in
16      town, they indicated what the set amount
17      would be based on what the Housing Authority
18      would pay.
19  Q.  Well, after Guest Property departed town and
20      you're now managing these properties without
21      Guest Property's involvement, how would
22      you -- how would they find out then how much
23      rent to put in the lease amount?

                    Page 42

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
321

1  A.  Once again, based on the maximum -- the

2      Housing Authority put out a criteria sheet,

3      what they would pay for a two-bedroom, a

4      one-bedroom, a zero-bedroom to a five-bedroom

5      unit.  They would --

6  Q.  Well, Mr. Gumbaytay, did you tell them the

7      amount?  Did you -- I mean, did you tell Lynn

8      and Cameron, based on -- based on whatever

9      document --

10  A.  Yes.

11  Q.  -- you told them what amount to put in?

12  A.  Exactly.  Exactly.  Yes.  Yes.

13  Q.  And how did they know how much rent was paid

14      by the tenants?

15  A.  When the rent was collected by me, I reported

16      to one of the account managers.

17  Q.  So you would tell them?

18  A.  Correct.

19  Q.  And how much -- and you would tell them also

20      how much rent was due?

21  A.  Correct.

22  Q.  Okay.  And how did they know how much --

23  A.  Yes.


322

1  Q.  How did they know how much Section 8 was

2      paying?

3  A.  The Section 8 voucher would -- when you

4      complete a lease, the tenant would take the

5      lease to the Section 8 office to get a

6      qualified voucher.  The Section 8 would tell

Page 43

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7   that person whether or not they qualified for

8   that unit and what amount they qualified

9   for.  So if the Section 8 told that person

10   they qualified for 550 and the unit rented

11   for 550, then we was -- we was okay.

12  Q.  So did -- did your -- did Ms. Norsworthy and

13   Ms. Bassett and Ms. Williams and the other

14   folks that worked for you, did they get a

15   copy of the Housing Authority voucher, or did

16   you have a copy of the Housing Authority

17   voucher?

18  A.  Whatever the Section 8 counselor had informed

19   the person that they qualified for, they

20   would inform me; and then that information

21   would go to Lynn.

22  Q.  So after -- so after you would find out what

23   the Housing Authority was willing to pay, you

323

1   would tell that amount to Lynn or Renee or --

2   or Cameron, and they would fill it in the

3   sheet?

4  A.  Yes.  And the only other way that I knew what

5   part that the landlord would receive and what

6   part that the tenant would have to pay was --

7   is from the landlord themself.  And we had

8   some accounting problem, because the landlord

9   never told us, because they don't send

10   that -- if I was a real estate agent, they

11   would send that information to me.  I would

12   collect all the money.  They would have to --

13   I would have to receive the -- the amount

Page 44

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14   that the Section 8 paid plus the amount that

15   the tenant paid.

16      So they would send that voucher amount

17   to -- directly to the landlord so he or she

18   would know exactly what part the Housing

19   Authority would be paying.  A lot of times I

20   didn't even have the information.  I had to

21   call -- we had to call the landlord and ask

22   them, verify -- based on what Ms. Susie told

23   me, can you verify that what the Housing

324

1   Authority is telling you what her part is.

2   Because sometimes they'll deceive you.

3  Q.  Ms. who?

4  A.  I was using that name as an example.

5  Q.  Oh, okay.

6  A.  You know, John Doe or Susie.

7  Q.  Okay.  And -- but did they -- I mean, were

8   the Housing Authority vouchers ever sent to

9   you?  I know you said sometimes they were

10   sent to the landlords.  Did you sometimes

11   receive them as well?

12  A.  No.  None of the legal -- any documents that

13   the Housing Authority was -- would go

14   directly to the landlord, the person that

15   owns the property.

16  Q.  But you did sign some of the -- some of the

17   Housing Authority documents on behalf of the

18   landlords.

19  A.  That is correct.  Those vouchers -- they have

20   to turn in a voucher.  Lynn or the other

Page 45

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21   account manager would have to process that

22   voucher.  They take that voucher back to the

23   Housing Authority.  The Housing Authority

325

1    would tell them whether or not they are --

2    are or are not qualified for that unit.  And

3    if they are qualified, then we move forward.

4    If they are not qualified, we ask the

5    landlord would they make an adjustment.  And

6    normally, they would.  It depends on what the

7    principal, interest, taxes, and insurance

8    would be -- would determine what amount they

9    would reduce it for.

10   Q.  So you testified at the first portion of this

11       deposition that Ms. Boswell had told you that

12       she could only afford $450 in rent.  Did you

13       ever convey this to Mr. Bahr?

14   A.  Yes.  No.  On the -- the Lake Street property

15       was not Mr. Bahr's property.

16   Q.  I know.  I'm saying I know that she had told

17       you that she could only afford $450 in rent

18       in general.

19   A.  She told me on -- that she could only afford

20       450.  So that's why I directed her to the

21       Lake Street, and I told her to go look at 964

22       Gap Loop.  I said I can't rent that for no

23       450, period.

326

1    Q.  But she did tell you that she couldn't afford

2        more than $450 in rent.

3    A.  Yes.  But she also told me that she had

Page 46

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4    disability income coming in.  And she wanted
 5    me to draft up a lease for 450 so she could
 6    take and get her voucher approved so she can
 7    have the funds because she really, really
 8    liked the house.
 9  Q.  Did you ever tell her --
10  A.  So, no.  See, that house, that was never told
11      to her that that house would rent for $450.
12  Q.  Did you ever tell Mr. Bahr that Ms. Boswell
13      had told you that she could only afford $450
14      in rent?
15  A.  No.
16  Q.  Did you ever discuss Ms. Boswell with
17      Mister -- Ms. Boswell with Mr. Bahr?
18  A.  No.
19  Q.  Her tenancy?
20  A.  No.  Everything -- everything we communicated
21      to the landlord, because of the volume of
22      landlords that we had, we communicated in the
23      executive summary.  All notes or any concerns
```

                              327

```
 1    was communicated in the executive summary.
 2    Because I asked Lynn, to protect herself and
 3    myself, you know, document everything by
 4    writing up the little note -- footnotes at
 5    the bottom.  So if that conversation came up
 6    again regarding anything pertaining to that
 7    particular unit, she and I will acknowledge
 8    the fact that, you remember we sent you an
 9    executive summary.  Because anyone can forget
10    a conversation or situation six or seven
```
                         Page 47

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    months down the road.

12  Q.  So did you ever talk to Mr. Bahr about any

13      repairs that needed to be made to

14      Ms. Boswell's house?

15  A.  Yes.

16  Q.  So you just testified that you didn't talk to

17      Mr. Bahr about -- about Ms. Boswell at all,

18      but now you're saying that you did talk to

19      him about repairs that needed to be made.  So

20      which is it?

21  A.  The rent -- I usually determine it, and it's

22      written in stone, so there was no need to

23      communicate with Mr. Bahr.  On repairs of

                          328

1       anything that was above 75 or a hundred

2       dollars, I usually talk to him and get

3       permission.

4           So, in her case, she had some real

5       serious problems over there.  And I had to

6       confer with him in order to make sure that he

7       would be willing to pay what needs to be paid

8       to rectify the situation over there.

9   Q.  When did you talk to him about repairs that

10      needed to be made?

11  A.  I don't recall the -- all the information.

12      It's -- it's already on file.  Whenever the

13      problem came up, you know, like I said, once

14      again -- and I'm not being vague.  I just

15      can't remember everything with every tenant.

16      But if it was over -- if it was over a

17      hundred dollars, I would e-mail him so I
                       Page 48

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    could have a record of it, leave him a voice
19    mail if I can't get in touch with him, inform
20    him in some form, fashion, or shape that we
21    got an issue.
22        And that's one of the reasons I shared
23    with you earlier, last week, that I sent out

                                329

1    those memos to tenants, each and every last
2    one of the tenants, about the owners knowing
3    that I was concerned about the tenant and
4    why -- why they was not getting their repairs
5    done in a timely manner.  And I suggested to
6    each tenant if your repairs are not done
7    within 48 -- 24 to 48 hours, in 72 hours,
8    call the Housing Authority; because the
9    Housing Authority can force them to make the
10   necessary repairs where I could not.  My
11   hands were tied.
12        So that's one of the reasons I sent the
13   letters out to the tenants, informed them
14   what their choices are.  I can only do so
15   much.
16 Q.  Let's -- have you finished answering your
17     question?
18 A.  Yes.
19             MS. NEAL:  Can we take a
20         five-minute recess real quick?
21             THE WITNESS:  Yes.
22                 (Brief recess)
23             MS. NEAL:  Before we get started

                         Page 49

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
330

1       again, I realize that I neglected to
2       mention on the record before that
3       this deposition was scheduled to
4       start at 10 a.m. and it did not start
5       at 10 a.m. because Mr. Newell was
6       late.
7              Mr. Newell, for the record,
8       will you state what time you got
9       here?
10         MR. NEWELL:  I don't know
11      exactly.
12         MS. NEAL:  I believe it was
13      11:05.  Does that sound about right?
14         MR. NEWELL:  We'll stipulate
15      that.
16         MS. NEAL:  Okay.  And I also
17      want to note for the record that we
18      took a five-minute recess at 11:56,
19      and we are getting started at 12:10.
20      So that was longer than the
21      five-minute recess, and again that is
22      because Mr. Newell was not here
23      present for the deposition to start

331

1       again.
2   Q.  So I'm going to go back to talking about
3       Mr. Bahr and your relationship with him.  And
4       you were talking about whether you and
5       Mr. Bahr had ever discussed Ms. Boswell.
6              And what about after the lawsuit was
                                        Page 50

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7   filed? Did you and Mr. Bahr ever talk about

8   Ms. Boswell then?

9  A.  In -- in -- yes and no.

10  Q.  How -- how did you talk about her?

11  A.  As it relates to this case.  And --

12  Q.  What did you say?

13  A.  I told him the same thing that I'm telling

14      you, that I was deceived by Ms. Boswell.

15          MR. LAY:  Well, did you contact

16          him about the lawsuit or did he

17          contact you?

18          THE WITNESS:  I don't recall who

19          contacted who, Mr. Lay.  I don't know

20          whether he contacted me or I

21          contacted him.  I don't recall.

22  A.  But I told him the same thing that I shared

23      with you already.  I was deceived, misled by

332

1   Ms. Boswell; and that she was trying to get

2   out of paying the amount of rent that she was

3   obligated to pay and she --

4  Q.  What did Mr. Bahr say?

5  A.  He believed me because he know me.  He have

6      gotten to know me as a person.  And over the

7      years that I have worked for him and his

8      family, we have been pretty much good to go.

9  Q.  Okay.  So did Mr. Bahr have the authority to

10      fire you if he was unhappy with your work?

11  A.  He had the -- he had -- he couldn't fire me

12      because I'm not an employee of his.

13  Q.  But he could ask you no longer to manage his

Page 51

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    properties?

15  A.  Yes.

16  Q.  Did you and Mr. Bahr ever discuss your

17    performance?

18  A.  No.

19  Q.  Did he ever give you a performance evaluation

20    or anything like that?

21  A.  No.

22  Q.  I want to talk about the leases.

23        MS. COOPER:  Allison, if I can

                              333

1      ask one question.

2          When you spoke to Mr. Bahr

3      after the lawsuit was filed, did he

4      ask you if you ever sexually harassed

5      Ms. Boswell?

6        THE WITNESS:  No.  Because it

7      never happened.

8        MR. LAY:  You said you were

9      deceived.  What were you deceived

10     about?

11       THE WITNESS:  She had lied to me

12     and Lynn, indicating that she wanted

13     that 450 lease so she can take it

14     over to the Department of Human

15     Resources in order to get her a check

16     started.  And I -- I was kind enough,

17     out of the -- out of my goodness and

18     kindness of my heart to -- not to

19     follow my judgment and made a bad

20     decision in doing so.  And then --

                              Page 52

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21     MR. LAY:  How were you deceived

22     about that?  Because you said you

23     agreed to do that.

334

1     THE WITNESS:  I was deceived in

2     terms of that -- the funds that she

3     would have received from the

4     Department of Human Resources would

5     have assisted her in paying that

6     extra $100 of rent.  So I was

7     deceived in the fact that the purpose

8     of me doing this is to do that.

9     MR. LAY:  What kind of funds was

10     she expecting from the Department of

11     Human Resources?

12     THE WITNESS:  I have no idea,

13     sir.  She never shared that with me.

14     But, apparently, it was enough to

15     assist her in covering what she was

16     short of.  And I -- I requested for

17     her to -- to -- to -- to, you know,

18     get back with me as soon as

19     possible.  But she never shared that

20     with me, no.  That's --

21 Q. (Ms. Neal continuing:)  Okay.  So I want to

22     talk first about Lake Street.  Did

23     Ms. Boswell sign a lease for the property on

335

1     Lake Street?

2 A. Yes.

3 Q. When did she sign this document?

Page 53

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4  A.  I -- I don't -- it's -- I do not recall the
5      date that she signed that, but it's --
6  Q.  Do you remember approximately what date it
7      was?
8  A.  I don't even remember the month, ma'am, to be
9      honest with you because I just have too
10     many -- I have too many peoples I was dealing
11     with.  I can't remember every lease or every
12     person that everybody signed.
13 Q.  And where did she sign the lease?
14 A.  She signed the lease at Lynn's, because Lynn
15     the one that handled all the leases and
16     paperwork.
17 Q.  Okay.  And did you sign the lease or did
18     Ms. Norsworthy sign the lease on your behalf?
19 A.  Ms. Norsworthy in this case.
20 Q.  And what amount was reflected on this lease?
21 A.  450.  And also, in her rental application, we
22     reflected -- and I shared that with you last
23     time here.  The rental application reflected

                         336

1      450.
2  Q.  Well, right now I just want to talk about the
3      lease.
4  A.  Yes.
5  Q.  So the amount on the lease was 450?
6  A.  Yes.
7  Q.  And was that amount handwritten or typed in?
8  A.  It was typed in.
9  Q.  And was a copy of the lease then faxed to
10     you?
                    Page 54

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  Yes, I believe it was.  Usually that's the

12      way we handled it.

13  Q.  Okay.  So I'm going to talk about the lease

14      at 964 North Gap Loop now.  Prior to the

15      signing of the lease, did you have any

16      conversations with Ms. Boswell concerning the

17      amount of rent that was going to be charged

18      at 964?

19  A.  Yes.

20  Q.  And you told her, what, that the rent was

21      going to be 550?

22  A.  Yes.

23  Q.  Okay.  And did she say that she could only

                            337

1       afford 450 in rent?

2   A.  No.

3   Q.  Did you guys have any conversations other

4       than about the rent prior to the signing of

5       the lease?

6   A.  No.

7   Q.  What -- did you have -- can you please state

8       in close actual words any conversation that

9       you had with Ms. Boswell prior to the signing

10      of the lease, including but not limited to

11      conversations about -- about the lease

12      amount?

13  A.  In all due respect, ma'am, I cannot remember

14      or recall every conversation I have had with

15      every person regarding all the leases.  I --

16  Q.  Okay.  So the answer is no?

17  A.  No, I don't --

                        Page 55

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18  Q.  Okay.

19  A.  The answer is no, I don't recall.

20          MR. LAY:  You said Ms. Boswell

21      signed a lease for the Lake -- is it

22      Lakeview?

23          THE WITNESS:  Lake Street.

                    338

1           MR. LAY:  Lake Street.  Where is

2       that lease?  We've never seen such a

3       lease.

4           MR. NEWELL:  Ms. Norsworthy

5       produced both of those.  That's the

6       only -- the only time I've ever seen

7       them.  She had them.

8           MR. LAY:  Okay.  Let him answer,

9       if you would.

10          THE WITNESS:  It's been turned

11      in to your office.

12          MR. LAY:  Did she ever live at

13      that address?

14          THE WITNESS:  No.  She couldn't

15      afford to make the repairs.

16          MR. LAY:  So you gave her a

17      lease, but she never moved in?

18          THE WITNESS:  With the intention

19      of moving in, because her --

20          MR. NEWELL:  You were showing

21      her two properties.

22          THE WITNESS:  Right.  The -- let

23      me clarify again for the record.  The

                    Page 56

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
339

1    very first -- when she told me what

2    she can afford, the very first house

3    that we showed her --

4         MR. LAY:  We've established that

5    several times.

6         THE WITNESS:  Yeah.

7         MR. LAY:  What I'm asking you

8    specifically is you said she signed a

9    lease.

10        THE WITNESS:  Yes.

11        MR. LAY:  Yet we've never seen

12   such a lease.

13        THE WITNESS:  Yeah, she signed a

14   lease for Lake Street so she can --

15        MR. LAY:  Where is it, then?

16        THE WITNESS:  I have no idea if

17   Lynn doesn't have it, because that

18   entire transaction, Mr. Lay, took

19   place in Lynn's presence.

20        MR. LAY:  Do you have such a

21   lease in your possession?

22        THE WITNESS:  All the

23   information that I have --

340

1         MR. LAY:  Do you have it?

2         THE WITNESS:  No.  It should

3    be --

4         MR. LAY:  Have you turned one

5    over to us?

6         THE WITNESS:  It should be in

Page 57

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7    your file, yes.
 8         MR. LAY:  You have?
 9         THE WITNESS:  Yes.  It should be
10    in your file.
11         MR. NEWELL:  The only one I've
12    seen, Ms. Norsworthy has.
13         MR. LAY:  Mr. Newell, please let
14    him answer the question.
15         THE WITNESS:  If you look in
16    your -- if you look in your documents
17    that I submitted to your office last
18    time we was together at the
19    courthouse, everything that I have --
20         MR. LAY:  Well, it's not in
21    there.  So where is it?
22         THE WITNESS:  I have no idea.
23    If Ms. Norsworthy does not have it, I

                      341
 1    do not have it, sir.
 2         MR. LAY:  Okay.  So you do not
 3    know for sure you've turned over such
 4    a lease?
 5         THE WITNESS:  Ms. Norsworthy was
 6    handling the transaction.
 7         MR. LAY:  Well, I asked you have
 8    you --
 9         THE WITNESS:  No.
10         MR. LAY:  -- turned over a lease
11    to us.  And you tried to say you
12    had.  Now you're kind of saying Lynn
13    did it.
```

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    THE WITNESS: No. No. I

15    have -- everything that I have

16    pertaining to Ms. Boswell --

17    MR. LAY: Okay. I'm going to

18    ask you one more time specifically.

19    THE WITNESS: No.

20    MR. LAY: Have you yourself

21    turned over a lease to our office or

22    any of us sitting here today that

23    shows that she signed a lease at Lake

342

1    Street?

2    THE WITNESS: Yes. It should

3    be -- no. No. No. It -- everything

4    that I have in her file was turned

5    over to you guys. It should be in

6    there. I'm not absolutely sure.

7    MR. LAY: But you don't know if

8    it was?

9    THE WITNESS: I don't recall.

10    If it's in there, it should have --

11    MR. LAY: But she never lived

12    there. You are saying that that is

13    correct?

14    THE WITNESS: Well, she wanted a

15    lease anyway for --

16    MR. LAY: Did she ever move in?

17    THE WITNESS: No.

18    MR. LAY: Okay.

19    THE WITNESS: No.

20    MR. NEWELL: Pardon me. Just

Page 59

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21      let me reiterate one thing.  The only

22      question I asked Ms. Norsworthy --

23          MS. NEAL:  You're not allowed

                            343

1       to -- you're not allowed to testify

2       for your client at this point.

3           MR. NEWELL:  -- was about the

4       two leases she had with her.

5           MS. NEAL:  Mr. Newell, please --

6       please don't testify for your

7       client.  We're going to have to call

8       the magistrate judge if you don't

9       refrain from doing that in the

10      future.

11          MR. NEWELL:  Okay.  Fine.

12          THE WITNESS:  Let's go on and

13      finish this up so they can --

14  Q.  (Ms. Neal continuing:)  Let's talk about the

15      lease on 964 North Gap Loop.  Did she sign a

16      lease for -- did Ms. Boswell sign a lease for

17      this property?

18  A.  Yes.

19  Q.  Approximately when did she sign such a lease?

20  A.  I do not recall the exact time.

21  Q.  Do you remember approximately what day it

22      was --

23  A.  Month of --

                            344

1   Q.  -- or month?

2   A.  The month of June, July, August, or

3       September.  I'm not sure because --
                            Page 60

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4   Q.   of 2006?

5   A.   I -- I'm not sure.  I think it was 2006,

6        2000 -- I'm not sure because once again,

7        I don't recall every lease that's signed by

8        every client.  But whatever the lease says,

9        that's when it happened.

10  Q.   So where was the -- where was the lease

11       signed?  Was that at Ms. Norsworthy's house?

12  A.   Yes.

13  Q.   And did you sign the lease or did

14       Ms. Norsworthy sign the lease on your behalf?

15  A.   Ms. Norsworthy signed the lease on behalf of

16       the landlord.

17  Q.   And what amount was reflected on this lease?

18  A.   On the lease, it was -- it was -- it was 550,

19       but Ms. Norsworthy made a mistake and put 450

20       on the lease.

21  Q.   Was the -- was the amount -- so 550 was on

22       the lease.  Was that handwritten or typed in?

23  A.   It was typed in.  And Ms. Norsworthy had

345

1        called Ms. Boswell and I called Ms. Boswell

2        and asked her to get back by there to sign

3        the lease that we had other than the 450

4        lease.

5   Q.   So 550 was typed in.  What about 450?  Was

6        that typed in?

7   A.   That was typed in, too, but it was a mistake

8        on Ms. Norsworthy's behalf.

9   Q.   So you had -- so there were two leases for

10       the 964 North Gap Loop house?

Page 61

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  The original 450 lease, the only property we

12      have --

13  Q.  Please just answer.  Were there two -- were

14      there two leases for 964 North Gap Loop?

15  A.  Yes.  There was two leases for 957 North Gap

16      Loop because one of the leases was a mistake

17      made by Ms. Lynn Norsworthy.

18  Q.  So there was one lease that had 550 typed in?

19  A.  One lease was the actual lease amount for

20      $550.  The 450 that she typed was by

21      accident.  I think I shared with you the last

22      time, all those leases -- she had already

23      computer generated it for 450 for Lake

                        346

1       Street.  So she didn't look at the 450 that

2       was in there, and she just left it on there.

3       And we asked her to come back and sign the

4       550 lease again.

5   Q.  I want to look at what was marked at our

6       previous deposition as Plaintiff's Exhibit

7       #5.  So, Mr. Gumbaytay, you believe that Lynn

8       made out a lease for 450 for -- I'm sorry.

9           What does this -- what does this lease

10      say under rent payments, Plaintiff's Exhibit

11      #5?

12  A.  It's 450.

13  Q.  And is that amount typed in, or is it

14      handwritten?

15  A.  Handwritten.

16  Q.  Earlier, didn't you testify that that 450 was

17      typed in?

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18  A.  From my -- from -- from what I recall, it

19      was -- it was -- it was typed in.  Because

20      the 450 -- 550 is the actual rent amount of

21      this unit.  She asked for a 450 lease to take

22      to the Department of Human Resources.  So the

23      lease that Ms. Boswell should have signed,

                          347

1       she refused to come back and sign it for

2       550.

3              MR. LAY:  Okay.  Mr. Gumbaytay,

4           if the original lease says 550 and

5           that was the correct amount, why

6           would it be changed?  That seems to

7           indicate that the 550 was the

8           incorrect amount.

9              THE WITNESS:  No.  The request

10          of Ms. Boswell was to --

11             MR. LAY:  So you're going to

12          change a lease that was correct and

13          make it incorrect?

14             THE WITNESS:  Lynn had given her

15          a lease for 450 to take to the

16          director -- the Department of

17          Housing --

18             MR. LAY:  This lease has typed

19          in 550.  And then it's marked out and

20          450 is initialed as if 550 was a

21          mistake.

22             THE WITNESS:  No.  The 550 was

23          not a mistake, Mr. Lay.

                        Page 63

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
348

1         MR. LAY:  Well, then, why is it
2    crossed out?
3         THE WITNESS:  For Ms. Boswell to
4    take a 450 lease over to the
5    Department of Human Resources.  So
6    with that in mind --
7         MR. LAY:  Well, where is the 550
8    lease that she would have signed that
9    wasn't the fraudulent lease that you
10   fixed for her?
11        THE WITNESS:  This is the lease
12   that she signed here.
13        MR. LAY:  And it says 450.
14        THE WITNESS:  It says 550.
15        MR. LAY:  It says 450 right here
16   with your --
17        THE WITNESS:  It also says 550,
18   because 550 is the original amount of
19   that unit.  And there's nowhere --
20   nowhere --
21        MR. LAY:  Well, if it was
22   correct and that was -- 550 was the
23   amount, why would it be crossed out

                    349
1    then?
2         THE WITNESS:  It was crossed out
3    at the request of Ms. Boswell to take
4    a 450 lease over to the Department of
5    Housing Authority so she can get --
6         MR. LAY:  Well, wouldn't you
                    Page 64

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7      keep a copy that said 550 where it

8      wasn't crossed out with your

9      signature on it?

10        THE WITNESS:  Ms. Norsworthy, as

11      indicated to me and you, that she

12      made a mistake, sir.  And Ms. Boswell

13      never came back over to sign off on

14      the original lease for 550.  She

15      never returned.

16        MR. LAY:  Well, the original

17      lease had 550, Mr. Gumbaytay.

18        THE WITNESS:  Yeah.  The

19      original lease had --

20        MR. LAY:  It's right here.

21        THE WITNESS:  Yeah.

22        MR. LAY:  It has 550 in it.

23      This is the original lease with her

350

1      signature.  So where is your copy of

2      it where you didn't cross it out?

3        THE WITNESS:  The lease that she

4      had at that time, according to Ms. --

5      my conversation with Lynn, was the

6      only lease that she had at that time,

7      Mr. Lay.  She scratched the 550 out

8      so this lady can go over to the

9      Department of Human Resources to see

10      whether or not she can get an

11      increase in her benefits, which would

12      have assisted her in making that

13      payment for 550.

Page 65

                    3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14                MR. LAY:  But you do not have

15        the lease with her signature on it

16        that says 550?

17                THE WITNESS:  According to --

18        no, sir.  No.

19                MR. LAY:  Okay.  That's all.

20   Q.   (Ms. Neal continuing:)  I want to turn your

21        attention now to what I have marked here as

22        Plaintiff's Exhibit #18.  And do you

23        recognize this document?  This was a document

                              351

1         that you submitted to the Court.

2    A.   Yes, this is.

3    Q.   A letter from Lynn Norsworthy dated July

4         17th, 2007, concerning this lawsuit and the

5         amount of rent that was charged to different

6         properties.  Do you recognize it?

7    A.   Yes.

8    Q.   I'd like to turn your attention to paragraph

9         three.  Would you please read paragraph three

10        for the record.

11   A.   The house at 964 Gap Loop became available,

12        now asked to change the lease from 1215 Lake

13        Street to 964 Gap Loop for Ms. Boswell.  I

14        changed the information, the lease, to

15        reflect the address at 964 Gap Loop,

16        neglected to change the amount monthly rent

17        from 450 to 550, which was the rent for

18        those -- for this unit -- this house.  She

19        signed and -- the lease and I signed

20        Mr. Gumbaytay's name as representative of

                              Page 66

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    owner.  I have historical duties.  I sent a

22    copy to Mr. Gumbaytay.  He called me and

23    brought my attention to the fact that I had

                           352

1     not changed the amount of the rent to 550 --

2     had not changed the amount of the rent to

3     550.  I made a -- made the correction, and

4     Ms. Gumbaytay called Ms. Boswell and asked

5     her to come in to -- to come back in to sign

6     the collected -- the correct lease.  She

7     never came back.  Nevertheless, she

8     understood that the rent was 550 instead of

9     450 because she paid 550 on her rent.

10  Q.  Okay.  Now, I've got some -- so this is the

11      document that Lynn submitted to us?

12  A.  This is the one I was -- yes.

13  Q.  Okay.  And in it, Lynn says that she

14      neglected to change the amount of the monthly

15      rent from 450 to 550, which was the rent for

16      the house.  Is that your -- is that your

17      remembrance of the events?

18  A.  That is correct.  Yes.

19  Q.  Okay.  So looking at what we had previously

20      marked as Plaintiff's Exhibit #5 where the

21      amount -- which we've already discussed --

22      the amount typed in was 550 and it has been

23      crossed off and 450 has been handwritten in;

                           353

1     is that correct?

2   A.  Yes.

3   Q.  Okay.  So if Ms. Norsworthy neglected to

                    Page 67

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4    change the amount for the monthly rent from
 5    450 to -- if Ms. Norsworthy's testimony is
 6    correct and she had filled out a lease and
 7    neglected to change the amount of the monthly
 8    rent from 450 to 550 and that was the reason
 9    why -- why 450 was reflected in the lease,
10    wouldn't 450 be typed here instead of
11    handwritten?
12 A. At the time, Ms. Boswell --
13 Q. Just please say yes or no.
14 A. No.
15 Q. No?
16 A. And yes.  The amount of the rent is 550.
17    Ms. Boswell asked for her to draft up a lease
18    for 450.  So that was the only lease, I
19    assume, at the time.
20 Q. Well, right now we're not --
21 A. So there was some -- it was a mistake at --
22    that's all I can say.  It was a mistake on
23    Ms. Norsworthy's behalf.  We tried to correct
```

                                354

```
 1    the mistake, but she never came over there to
 2    rectify the situation.
 3        MR. LAY:  But you understand
 4        that the letter that she says here is
 5        not consistent with what you're
 6        saying.  It says that the rent was
 7        changed from 450 to 550.  And what we
 8        see on the actual document is that it
 9        was 550 and it was changed to 450.
10        So what -- what's the -- the document
```
                      Page 68

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  does not the match this letter and it

12  does not match your testimony.

13      THE WITNESS:  Okay.  The --

14      MR. LAY:  Do you have an

15  explanation for that?

16      THE WITNESS:  Yes, sir.  Again,

17  the lease -- the first property that

18  she looked at was for $450 at Lake

19  Street.  Then when she came over to

20  964 North Gap Loop, the lease amount

21  is $550, as reflected here.  The

22  tenant asked us to reduce that amount

23  to 450 so she can take that to DHR.

                    355

1   So what Lynn did, she scratched

2   through the 550 and handwritten --

3   handwrote 450 in there so she can

4   take this to DHR to ascertain some

5   benefits.  And -- but Ms. Boswell --

6       MR. LAY:  So you and

7   Ms. Norsworthy were helping

8   Ms. Boswell to defraud DHR.

9       THE WITNESS:  We fulfilled a

10  request.  And if Ms. Boswell took

11  that over to the Montgomery -- to the

12  Department of Human Resources, she

13  defrauded.  I didn't defraud.  I

14  just --

15      MR. LAY:  Well, you fixed the

16  lease for her.

17      THE WITNESS:  We assisted her in

                    Page 69

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    her request.
19        MR. LAY:  You assisted her in it
20        for whatever she used it for.
21        THE WITNESS:  No.  I didn't
22        assist her to defraud anyone, sir.  I
23        was trying to assist the young lady

356

1        to come up with the additional rent
2        money she would need in order to be
3        able to afford $550 for this unit,
4        Mr. Lay.
5    Q.  (Ms. Neal continuing:)  Mr. Gumbaytay, you
6        testified that Ms. Norsworthy had reused the
7        lease -- a lease that said $450.  And is that
8        correct?
9    A.  Could you repeat that, please?
10   Q.  You earlier testified that Lynn had reused a
11       lease that had said $450 on it; is that
12       correct?
13   A.  What lease are you speaking of?
14   Q.  I believe it's from Lake Street that you were
15       referring to, that typed in was 450.
16   A.  The -- she made -- she --
17   Q.  Well, did you testify that Lynn reused a
18       lease that said 450?
19   A.  I testified to the fact that it could be a
20       possibility how the mistake could have easily
21       been made, because if she -- most of the
22       leases -- we had leased these units before,
23       and the standard rent is one or the other.

Page 70

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

357

1    So she could have generated the lease from

2    the -- from the computer and it was

3    already -- this information was already fixed

4    on the leases, so all she had to do is put

5    the correct landlord name in there that

6    coincide with the particular property.

7         So if she -- if there was -- the mistake

8    that was made, which is -- Lynn and I do --

9    she does -- she was doing 100 percent of my

10   property before I came across Ms. Bassett and

11   Ms. Renee Williams.  So that's the mistake

12   that she made.

13 Q.  Let's go through what I've marked as

14   Plaintiff's Exhibit #18.  Let's go -- let's

15   look at it kind of sentence by sentence or

16   two sentences at a time.  So let's -- it's

17   paragraph three.  I'm going to read aloud,

18   and you read with me and let me know if I

19   state something indirectly.

20      (Reading:)  The house at 964 North Gap

21   Loop became available, and I was asked to

22   change the lease from 1215 Lake Street to 964

23   North Gap Loop for Ms. Yolanda Boswell.  I

358

1    changed the information in the lease to

2    reflect the address as 964 North Gap Loop but

3    neglected to change the amount of the monthly

4    rent from 450 to 550, which was the rent for

5    this house.

6         Now, earlier you testified that you

                                    Page 71

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7   agreed with Ms. Norsworthy's representation

 8   of the facts, and you submitted this document

 9   to the Court.  Do you stand by this

10   testimony?

11 A.  Yes.

12 Q.  So if you look at what was previously marked

13     as Plaintiff's Exhibit #5.  If this is the

14     lease that she -- if this is the lease that

15     was generated for Lake Street, she testified

16     that she went in and changed -- she went --

17     she testified that she went in, and she

18     changed the address from Lake Street to 964

19     North Gap Loop, but that she forgot to change

20     the amount from 450 to 550.

21        It seems from her testimony that she's

22     saying that 450 was typed in and that she

23     crossed -- and that -- and that she had
```

                              359

```
 1     neglected to cross it out and put 550.  But

 2     that's not what this lease reflects.

 3 A.  No.

 4 Q.  Can you explain that?

 5 A.  Yes, ma'am.  Clarification purposes.  Again,

 6     the lease amount was made out for $550.

 7 Q.  Well, no.  She's testifying -- she writes --

 8     let me just -- she says here -- and you

 9     agreed that this was correct testimony --

10     that 450 had been marked as the amount and

11     that she had neglected to change the rent

12     amount from 450 to 550.

13 A.  This is what she's speaking of here.  The 450
```

                              Page 72

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  that's -- that she scratched out for her to

15  take this lease to DHR.

16  Q.  We're not talking about DHR right now.

17  A.  I --

18  Q.  Excuse me, Mr. Gumbaytay.  I need to talk.

19      I'm trying to talk to you about how she --

20      she wrote this letter for you that said that

21      she changed the amount of the monthly rent

22      from 450 to 550 dollars.  That is not

23      reflected on the lease.

                        360

1  A.  This is the 450 that she's talking about

2      here, the $450 here.  Ms. Boswell supposed to

3      have came back and got a lease without the

4      scratches on it and the initials on it and

5      sign off on it for 450 (sic).  That's what

6      she was trying to say here.  And that's what

7      we are saying.

8  Q.  So you're telling me that when she said that

9      she neglected to change the amount of the

10     monthly rent from 450 to 550, that what she

11     was referring to was she had drawn up a

12     document that had Lake -- for Lake Street

13     that had 450 handwritten in for the Lake

14     Street house and that she forgot to cross it

15     off and write 550 in there?

16  A. She should had done an entire lease free and

17     clear of any written -- handwritten numbers.

18     She was saying that she did not get a lease

19     with Ms. Boswell signed for $450 typed in.

20     So when she asked for the lease for DHR, she

                   Page 73

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21   put the 450 there handwritten to document and

22   verify to DHR that she initialed it so they

23   can -- they see where it has been changed

                361

1   from 450 to 500 dollars.

2       But what Lynn is speaking of -- listen

3   to me, because I've done said this one time.

4   I'm going to say it again.  What she was

5   speaking of is the fact that Ms. Boswell

6   never came back over -- back over and signed

7   a lease for $550 without the scratching and

8   without the initials.

9  Q.  Do you not see that there is -- there is a

10    contradiction between what it says right here

11    where it says, I changed the information in

12    the lease to reflect the address of 964 North

13    Gap Loop but neglected to change the amount

14    of the monthly rent from 450 to 550 dollars,

15    which was the rent for the house.  Do you not

16    see what she is testifying to is inconsistent

17    with that exhibit?  Yes or no?

18  A.  Ma'am, no.  No.

19  Q.  Okay.  That's it.  I don't have any other

20    questions about that.

21  A.  Okay.  You're still not getting it.  I'm

22    going to follow up --

23  Q.  This is my --

                362

1  A.  -- again.

2  Q.  No.  I'm sorry.  I asked you a question.  You

3    answered it.  It's not your opportunity to

              Page 74

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4     start presenting your own testimony.

5  A.  I'm not presenting testimony, ma'am.

6  Q.  No.  This is my deposition.

7  A.  If you want me to lie in this deposition, I

8     will not lie in this deposition.  You cannot

9     force me to lie because you can't comprehend

10    and clarify what we said based on what your

11    understanding of what you think happened.

12 Q.  If you want to -- if you want to --

13 A.  So if you want me to lie in this deposition,

14    I'm not going to do that.

15        MR. LAY:  Mr. Gumbaytay, we're

16        not asking you to lie.

17        MR. NEWELL:  Whoa, whoa, whoa.

18        Let's just take a break for a few

19        minutes.  That's enough.

20 A.  You can't force me to lie, ma'am.

21        MR. LAY:  No one is -- we're

22        trying to force you to tell the

23        truth.

                       363

1         THE WITNESS:  I am speaking the

2         truth.  And she keeps asking me the

3         same thing, Mr. Lay, over and over

4         again.  And I'm trying to clarify

5         that that's a --

6         MR. LAY:  Yes.  And it is

7         consistently not accurate.

8         THE WITNESS:  It is consistently

9         accurate.  450 is here.  It's in

10        writing.

                          Page 75

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11       MR. LAY:  No.  You're -- that

12    letter -- what that letter says in

13    black and white and what that

14    document says do not match.

15       MR. NEWELL:  We all see the same

16    problem.  It looks like Ms. Lynn just

17    didn't change the second page.  It

18    looks like that's what happened.

19    Okay?

20       THE WITNESS:  That's the only

21    thing I'm seeing.

22       MR. NEWELL:  I don't know

23    anything.  I'm a complete idiot.  But

             364

1    that's what it looks like to me.  I'm

2    only guessing because I don't know.

3       MR. LAY:  The point is --

4       MR. NEWELL:  You don't know.

5       MR. LAY:  -- you understand

6    there's an inconsistency between that

7    letter and that document.

8       THE WITNESS:  What --

9       MR. NEWELL:  He said it was a

10    mistake to begin with.

11       THE WITNESS:  It's a mistake.

12    What Lynn should have done is came

13    back with a brand new clear, clean

14    lease with $550 on it.

15       MR. LAY:  All right.  Well,

16    you've answered the question.  But

17    we're not trying to get you to lie,

            Page 76

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18       Mr. Gumbaytay.

19            THE WITNESS:  Please don't, sir.

20       Because I'm not --

21            MR. NEWELL:  He testified it was

22       a mistake to begin with.

23            MS. NEAL:  I think it's time to

                        365

1        break for lunch.  Do you want to say

2        an hour and 15 minutes since

3        people --

4             MR. NEWELL:  How much more do

5        you have to go?  We don't see any

6        further questions or what good it

7        would do.

8             MS. NEAL:  Well, this is our

9        deposition, and we see reason for

10       further questions.

11            MR. NEWELL:  Okay.

12            MS. NEAL:  So we'll see you in

13       an hour and 15 minutes.

14            THE WITNESS:  Hour and 15

15       minutes from -- you want to give

16       everybody five minutes to walk to

17       their car and just say let's start

18       the clock in about five minutes?

19            MR. LAY:  We'll reconvene at two

20       o'clock.

21                 (Lunch recess at 12:39 p.m.)

22  Q.  Hello.  I guess we're going to start off by

23       talking about some conversations that we

                       Page 77

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
366

1      allege happened between you and Ms. Boswell.

2      Remember last time, you testified that you

3      had never stated to Ms. Boswell, or to any

4      other tenant for at that matter, that you

5      would pay a portion of their rent.  Is that

6      correct?

7   A.  Yes.

8   Q.  Okay.  I'm going to play a portion of a

9      recorded conversation that we have with

10     Ms. Boswell.  It's marked as Plaintiff's

11     Exhibit #31, media call number three.

12                  (Media file played as

13                      follows:)

14          MR. GUMBAYTAY:  You want to

15      start and try to work on your next

16      month's rent this month?

17          MS. BOSWELL:  Uh-huh.

18          MR. GUMBAYTAY:  You and me gonna

19      try to do that?

20          MS. BOSWELL:  I mean, I'm gonna

21      get it to you.  You know, it'll be

22      another month.

23          MR. GUMBAYTAY:  Huh?

                        367

1           MS. BOSWELL:  It'll be --

2                  (Media file stopped)

3           MS. NEAL:  Excuse me.

4                  (Media file playing)

5           MR. GUMBAYTAY:  You and me

6       gonna try to do that?

                                    Page 78

```
              3927 06-30-08 Gumbaytay Jamarlo_part1.txt
7        MS. BOSWELL:  I mean, I'm gonna
8    get it to you.  You know, it'll be
9    another month.
10        MR. GUMBAYTAY:  Huh?
11        MS. BOSWELL:  It'll be another
12   month.
13        MR. GUMBAYTAY:  Hey, I'm just
14   saying I'm gonna pay my part of it,
15   now.  I'm just saying you want to --
16   you want to work on that?  You want
17   to work on your sugar daddy account
18   this week or next week be good for
19   you?
20        MS. BOSWELL:  I'm going to call
21   you back.
22        MR. GUMBAYTAY:  All right.  You
23   can't talk now, can you?

                        368
1         MS. BOSWELL:  Yeah.
2         MR. GUMBAYTAY:  All right, then.
3         MS. BOSWELL:  All right.
4         MR. GUMBAYTAY:  Bye.
5             (Media file stopped)
6  Q.  Do you remember having that conversation?
7  A.  No, I do not.
8  Q.  Do you recognize your voice?
9  A.  Yes, I do.
10 Q.  So you admit that you did have that
11     conversation?
12 A.  I do.
13 Q.  Okay.  And when you said that you would take
                    Page 79
```

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    care of your portion of the rent, what were

15    you referring to?

16  A.  That part that I owed Mr. -- the part that I

17    owed Mr. Bahr.  You remember I indicated to

18    you that I took a $50 reduction in the amount

19    of rent -- my commission from Mr. Bahr and

20    offered her to rent that apartment for 550.

21    So my part of that would have been the $60 if

22    I had have rented that unit for $60.  So the

23    $55 that I had to send in with the rest of

369

1    the rent money.

2  Q.  I guess I'm not understanding what you're

3    saying to me now.

4  A.  Okay.

5  Q.  You're alleging that --

6  A.  The rent was -- in that unit was $600 a

7    month.

8  Q.  Well, the -- no.  Well, the lease said that

9    the rent on the apartment was for 550,

10    correct?

11  A.  I'm clarifying.  I'm going to clarify it for

12    you.

13  Q.  Well, did the lease say that the rent was for

14    550?

15  A.  Let me clarify it for you.

16  Q.  Did the lease say that the rent --

17  A.  The lease --

18  Q.  -- was for 550?

19  A.  Yes.

20  Q.  Okay.

Page 80

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  A.  Okay.  My part of that would have been my 10

22      percent commission that I would have taken

23      out of that.  So in order for Mr. Bahr to get

370

1       his entire 550, I was going to send my part

2       in when she took care of her part of the

3       rent.

4   Q.  Okay.  What about --

5           MR. LAY:  What was her part of

6       the rent?

7           THE WITNESS:  Oh, the entire

8       rent was for $550 a month.  Minus my

9       commission, Mr. Bahr would have got

10      less than what the entire rent amount

11      would have been; so I reduced my

12      amount on that particular unit from

13      650 to 600 to 550 in order to get it

14      rented because it's been vacant for

15      so long.  So I had to send him the

16      entire 550 in so he can cover his

17      principal, interest, tax, and

18      insurance.  Had I taken my commission

19      from 550, then his part of the rent

20      would have been less 55 from that,

21      would have been around $400 a month.

22      He couldn't have paid his principal,

23      interest, taxes, and insurance.

371

1           MR. LAY:  Well, what were you

2       expecting her to pay?

3           THE WITNESS:  I don't know what

Page 81

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4      she -- I don't know how she

5      interpreted it.  I expected her to

6      pay her -- the other part of that,

7      because I told Mr. Bahr that I --

8          MR. LAY:  Well, how much total

9      was she supposed to pay?

10         THE WITNESS:  She was supposed

11     to pay the entire amount of $550.

12         MR. LAY:  Well, you just said

13     the total you were going to send to

14     him was 550.

15         THE WITNESS:  $550.

16         MR. LAY:  That indicates if a

17     part was yours and a part was hers,

18     then hers was less than 550.

19         THE WITNESS:  Exactly.  And

20     Mr. Bahr -- no.  No.  No.  Her -- the

21     rent was 550.  I -- the -- I did not

22     take a commission on this.  So he was

23     still entitled to the entire 550 what

                    372

1      I'm trying to get you to understand,

2      Mr. Lay.  The rent is 550.  She was

3      supposed to pay 550.  I didn't take a

4      commission on that house and sent

5      Mr. Bahr 550.

6              And I told Mr. Bahr that I

7      was going to not take a commission on

8      this house like I didn't take a

9      commission on Lake Street in order

10     for him to get the full amount of
                    Page 82

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
11            $550.  Because when we filed charges
12            against her, at the time, I paid
13            Mr. Bahr rent for him for six months
14            while we was in litigation.
15  Q.  (Ms. Neal continuing:)  Well, so you say that
16      the -- you say that Mr. Bahr was entitled to
17      a total of 550.
18  A.  Correct.
19  Q.  Okay.  Then what portion of 550 was
20      Ms. Boswell supposed to pay if you were going
21      to pay a portion of the 550?
22  A.  She was still entitled to her 550.
23  Q.  She was -- so when you said you were going to
```

                              373

```
1       pay a portion of it, if the total amount that
2       Mr. Bahr was entitled to was 550, what were
3       you going to be paying?
4   A.  I was going to be paying -- I wasn't going to
5       be paying anything.  I was -- was not going
6       to -- I was not going to take my commission
7       from that.  She still --
8            MR. LAY:  That's not what you
9            said on the tape.
10           THE WITNESS:  Okay.  Let me -- I
11           was not going to take any commission
12           from that account.  I was going to
13           send the funds in for $550 to
14           Mr. Bahr.
15           MR. LAY:  Well, your statement
16           was -- it wasn't, I'm not going to
17           take a commission.  It was, I'm going
```
                        Page 83

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18          to take -- when are you going to take

19          care of the part that I'm paying.

20              THE WITNESS:  No.  No.  You may

21          have misinterpreted that.

22  Q.  Well, did you -- can you replay the portion

23      again and see if you remember.

                        374

1               MS. NEAL:  I actually need to

2           correct what I said.  I thought that

3           we were going to start with media

4           file number three, but we were

5           actually playing from media file

6           number two.

7                   (Media file playing as

8                    follows:)

9               MS. BOSWELL:  It'll be another

10          month.

11              MR. GUMBAYTAY:  Hey, I'm just

12          saying I'm gonna to pay my part of

13          it, now.  I'm just saying you want

14          to -- you want to work on that?

15                  (Media file stopped)

16  A.  And she said at the end of the month, she was

17      going to pay the rest of her rent.  And I

18      noted in the executive summary that she

19      was -- she had -- she had not paid her rent

20      for December -- November and December.  She

21      still was $150 behind.

22  Q.  This wasn't -- this call was not recorded in

23      November and December, Mr. Gumbaytay.  This

                   Page 84

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

375

1    call was recorded in October.

2  A.  Okay.  You asked me to clarify.

3  Q.  Well, I asked you to clarify what happened on

4      this call --

5  A.  Because she --

6  Q.  -- not what happened in November or December.

7  A.  Okay.

8  Q.  In this call, you said --

9  A.  Her part of the rent was still -- her late

10     fee was still due, ma'am.  Her late fees and

11     the rent that she didn't pay last month was

12     still due.

13 Q.  But, sir, this conversation was recorded in

14     October.  She moved in in October.  So she

15     could not have late fee that was due from the

16     previous month because she didn't live there

17     the previous month.

18 A.  She was -- she did not pay all of her

19     deposit, ma'am.  If you look back on her --

20 Q.  That's not what you said.  You said she owed

21     a late fee.

22 A.  It was a -- what I said -- it was a short

23     conversation.  She did not pay all her

376

1    deposits.  She did not pay all of her rent

2    the previous month.  So she's still some

3    money overdue.  It stated in her lease --

4          MR. LAY:  What's the sugar daddy

5       account?

6          THE WITNESS:  I don't have no

                                Page 85

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7       idea, Mr. Lay.  I joke and tease with
 8       a lot of folks.
 9              MR. LAY:  Well, you --
10              MS. NEAL:  Well, let's play the
11       portion of the recording about the
12       sugar daddy account.
13                  (Media file played as
14                   follows:)
15              MR. GUMBAYTAY:  You gonna work
16       on your sugar daddy account this week
17       or next week be good for you?
18                  (Media file stopped)
19              MS. NEAL:  That's still from
20       call two, media call two.
21  A.   Like I said before, I tease and I joke a
22       lot.  I meant no disrespect to her in any
23       form, fashion, or shape.  Sugar daddy is a
```

                              377

```
 1       word that we use.  And I gave --
 2              MR. LAY:  You said sugar daddy
 3       account.
 4              THE WITNESS:  I say again --
 5              MR. LAY:  Account usually means
 6       money.
 7              THE WITNESS:  I was joking and
 8       teasing with her.
 9  Q.   Well, earlier you had testified that you
10       didn't know what the word "sugar daddy"
11       meant.
12  A.   I -- I --
13  Q.   And you said that the only time that you knew
```

                        Page 86

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  what sugar daddy meant was when you were

15  referring to a candy.  So --

16  A.  And I say again, if you look at the

17  information I submitted in your file last

18  Sunday -- last time we was in court, it has

19  sugar daddy on there; it has sugar mama on

20  there; it has sugar babies.  These are

21  candies that was sold when I was a little kid

22  growing up.

23  Q.  So you --


                          378

1          MR. LAY:  Mr. Gumbaytay, you

2          don't expect us to believe that

3          you're referring to an -- you said

4          sugar daddy account -- that that has

5          something to do with candy?

6          THE WITNESS:  Sir, in the

7          terminology in the African-American

8          community, you joke and you tease

9          about sugar daddy, sugar mama, sugar

10         baby.  Whatever she interpreted that

11         to mean, I have nothing to do with

12         the way she interpreted that to mean

13         and what she interpreted that to be.

14         I'm just telling you --

15  Q.  what does sugar daddy mean to you?

16  A.  It means -- to me, it's a flirtation word

17  like sugar mama, baby boy, or baby girl,

18  joking.  You tease folks.  I'm going to be

19  your sugar mama; I'm going to be your baby

20  girl; I'm going to be your baby boy.  It's --

                                    Page 87

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  Q.  What does being somebody's sugar daddy mean?

22  A.  It means to me that you joke and tease with

23      somebody about the candy that you know, that

                          379

1       you're being sweet to me, you be real sweet.

2       You're a real sweet person.  You're a real

3       sweet person.  You're a real nice guy.  And I

4       was a very -- very nice, very sweet guy, you

5       know; and I allowed her to move in this other

6       unit.

7               MR. LAY:  Well, why did you

8           refer to the word "account"?

9               THE WITNESS:  I have no idea.  I

10          don't remember that conversation no

11          more than what I just heard that,

12          sir.  This is the first time I heard

13          that today.  That's the first time I

14          heard that today.  So --

15  Q.  All right.  Well, right now we're going to

16      look at -- we're going to listen to a portion

17      of what we have as media call three, which I

18      have previously submitted a transcript of as

19      Plaintiff's Exhibit #7.  And we're just going

20      to play a portion of it.

21              (Media file played as

22                  follows:)

23          MR. GUMBAYTAY:  I said, I was

                          380

1           going to -- I said, I was gonna help

2           you as much as I possibly could over

3           there if you needed my help.  Your
                    Page 88

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4        rent won't be 550; it'll be 450.
 5        I'll take care of the 550.  Was
 6        that -- that wasn't clear?  I would
 7        take care of a hundred of that if I
 8        could see --
 9            MS. BOSWELL:  I mean, yeah, but
10        I --
11            MR. GUMBAYTAY:  If I could see
12        you every once in a while.
13                (Media file stopped)
14 Q.  So just a few minutes ago, you testified that
15     you were going to be paying a portion of --
16     you testified that you had $50 of your
17     commission that you were waiving, but now
18     you're saying that you're going to pay $100
19     of her rent; is that correct?
20            MR. LAY:  Well, first off, is
21        that you on the recording?
22 A.  What is correct, ma'am, I'm joking and I was
23     teasing with her.  However she interpreted
```

                            381

```
 1     that to be is her interpretation of that.  I
 2     was joking and teasing and just playing with
 3     the young lady.  I have no intention of
 4     having a relationship with that young lady.
 5 Q.  So you jokingly said that you would pay $100
 6     of her rent?
 7 A.  When you joke and tease, when you call
 8     somebody sugar baby, sugar mama, yes, I was
 9     joking and teasing with her.
10 Q.  So you teased her and told her that you were
```
                        Page 89

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    going to take care of $100 of her rent?

12  A.  I teased and joked and I flirted, but I never

13    crossed that line in terms of threatening to

14    put her out of her house if she does not pay

15    her part of the rent.  That never happened.

16    I joke, I tease, I flirt.  Other than that, I

17    never crossed the line.

18          MR. LAY:  Is that your voice on

19       the recording?

20          THE WITNESS:  That is my voice,

21       sir.

22  Q.  Didn't you just say in the recording that the

23    rent won't be 550, it will be 450?


                        382

 1  A.  Here again, I -- what I said is --

 2  Q.  Well, did you say that?

 3  A.  I said that the rent jokingly.

 4  Q.  But did you say that?

 5  A.  I said that in that conversation on that tape

 6    right there.

 7  Q.  Yes.  And then you also said that it would be

 8    450 if I could see you once in a while --

 9  A.  I said --

10  Q.  -- in that conversation?

11  A.  I said in that conversation -- again, what I

12    said in that conversation and what I meant

13    and what she implied for it to have meant was

14    just teasing and joking and being

15    flirtatious.  Other than that, I never had

16    any other intention of doing any bodily harm

17    to that lady or putting her out of her
                    Page 90

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18   house.  It's not against the law to flirt and
19   tease and joke with someone, ma'am.
20  Q.  We're going to move to another portion of the
21   same conversation.  You mentioned in your
22   previous testimony, you said you had never
23   had a relationship with any of your tenants.

                         383

1  A.  Correct.
2  Q.  And you said that you had never extended an
3   invitation to any of your tenants to have a
4   relationship.  Is that correct?
5  A.  Correct, yes.
6  Q.  Okay.  So we're going play a portion of a
7   conversation that you had with Ms. Boswell.
8        MS. NEAL:  The same call, yeah.
9      It's media call three.
10          (Media file played as
11           follows:)
12        MR. GUMBAYTAY:  -- even once in
13       a while, let me know.
14        MS. BOSWELL:  Yeah.  Right.
15        MR. GUMBAYTAY:  I said, I don't
16       want -- I want to make sure you live
17       a comfortable lifestyle over there.
18       So I was extending the invitation to
19       you to be more than just a friend and
20       acquaintance.  That's if you don't
21       have a problem with it.
22        MS. BOSWELL:  So -- so what you
23       saying is if I came over there -- I

                    Page 91

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
384

1       mean, both of us grown -- had sex, it
2       would be $100 off the rent.
3               MR. GUMBAYTAY:  Meaning that if
4       you come over here and -- let me put
5       it this way.
6               MS. BOSWELL:  Yeah.  I
7       mean, help me understand what you
8       saying.
9               MR. GUMBAYTAY:  No.  The law --
10      I don't want to put it that bluntly,
11      but in -- God will do everything.
12      God and Gumbaytay will do everything
13      we possibly can to help you out over
14      there.  That's all I got.  I tell
15      you.
16              (Media file stopped)
17  Q.  So do you recognize your voice in that
18      conversation?
19  A.  Correct.
20  Q.  Okay.  And you did say that you were
21      extending the invitation to her to be more
22      than just a friend or acquaintance?
23  A.  Flirting and joking and teasing, ma'am.

                        385
1   Q.  But you did say that?
2   A.  I said that, yes, ma'am.  It's not against
3       the law to flirt and joke and tease with
4       someone.  I don't see no threat of implied
5       threat or intent to put her out of her house
6       like she indicated to you-all, that I was

                    Page 92

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7      going to put her out if she did not --

8   Q.  Okay. Well, let's -- let's talk about --

9   A.  So her interpretation of that and my

10      interpretation of that, I'm -- I told you I

11      flirt, I tease, and I joke, and I always

12      compliment ladies. So --

13  Q.  Okay. So what she -- so let's go back to the

14      conversation. So she said, So, you know,

15      both of us grown, had sex, it would be $100

16      off the rent. And then you responded by

17      saying, I don't want to put it that bluntly,

18      but God will do everything. God and

19      Gumbaytay do everything we possibly can to

20      help you out over there.

21          What did you mean when you said, I don't

22      want to put it that bluntly?

23  A.  Once again, initial joking, teasing,

                        386

1      flirtation is not against the law. She --

2      what she implied and what she has interpreted

3      that to be, I have no control over. When you

4      say something to a woman and that woman take

5      it in another way and you meant it to be one

6      other way, then that's not illegal to -- to

7      joke, tease, and flirt, ma'am.

8   Q.  But she asked you --

9   A.  It's --

10  Q.  -- if what you said meant that it would be

11      $100 off of the rent if you guys had sex.

12      And you said in response, I don't want to put

13      it that bluntly.

                    Page 93

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  A.  I was --

15  Q.  Is that correct?

16  A.  I was joking.

17  Q.  Well, is that correct?  Is that what

18      happened?

19  A.  Yes.  Joking and teasing.

20  Q.  Okay.  Let's move on to the same call, media

21      call three.  Did you -- oh, you had testified

22      earlier that you didn't find Ms. Boswell

23      attractive; is that correct?

                         387

1   A.  That is correct, yes.

2                     (Media file played as

3                      follows:)

4               MR. GUMBAYTAY:  -- you like.

5           You are a very attractive

6           African-American female.  That --

7           that's all I've got to say.

8                     (Media file stopped)

9   Q.  So that's your voice?

10  A.  Yes.

11  Q.  And you -- you told her that you thought she

12      was a very attractive African-American

13      female?

14  A.  I have told a lot of ugly womens I thought

15      they was attractive, ma'am.  I say that all

16      the time.  I joke, tease, and flirt.  You

17      asked me before the last deposition have I

18      always talked to someone -- always flirting

19      with women.  I said, I flirt with a lot of

20      women to make them feel good about

                                        Page 94

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    themselves.  I --

22 Q.    But you did tell her that you thought she was

23    a very attractive female?

                            388

1 A.    In that conversation, I did tell her that.

2    It don't mean that she's attractive.  She's

3    not attractive.

4 Q.    So you're maintaining that you didn't -- you

5    still do not find her attractive?

6 A.    I -- to this day, I do not find her

7    attractive.

8 Q.    Okay.

9 A.    I don't find Mr. Lay attractive over there,

10    but I'm quite sure some women find he's a

11    very handsome man.  So it's just the eyes --

12    beauty is in the eyes of the beholder.  She's

13    not attractive to me.

14 Q.    Well, let's look at --

15         MR. NEWELL:  This was mainly

16    kidding to her.

17 Q.    Well, let's --

18         THE WITNESS:  Kidding.  Just

19    kidding, joking, and teasing.

20         MS. NEAL:  Please do not testify

21    for your client.

22 A.    I've said the same thing over and over again.

23 Q.    Let's look at media call three.  You

                            389

1    testified earlier that you never offered to

2    pay any of your tenants' rent; is that

3    correct?

                                        Page 95

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4  A.  Correct.
 5  Q.  All right.
 6              (Media file played as
 7               follows:)
 8          MR. GUMBAYTAY:  You know, that
 9          was really strong there.  Girlfriend,
10          you find somebody.  Look like you
11          ain't got no business struggling.
12          Let a brother help a sister out over
13          there.  And I said do you want --
14          that's the reason you -- I know you
15          need a sugar daddy.  And I said, I'll
16          let you -- you know, I -- I'll let
17          you -- you know, I'll let you -- I'll
18          pay your rent for you.
19              (Media file stopped)
20  Q.  Is that your voice?
21  A.  Yes.
22  Q.  So you told her that you would pay her rent
23      for her?
```

                          390

```
 1  A.  In that taped conversation.
 2  Q.  Did you or -- just yes or no.  Did you or did
 3      you not tell her that you would pay her rent
 4      for her?
 5  A.  Miss Allison, you want me to give you a yes
 6      or no answer to some questions.  You want me
 7      to give you an elaboration on some.
 8  Q.  I want you to give --
 9  A.  I'm going to say the same thing again to you
10      again.
```
                        Page 96

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  I want you to give me a yes or no answer.

12  A.  The answer is yes, that is my voice.

13  Q.  Okay.

14  A.  Joking and teasing, ma'am.  I've seen enough

15      Perry Mason movies to understand what you --

16      which way you're trying to go with this,

17      ma'am.

18  Q.  We're going to go to media call six, which we

19      had put the -- we had marked the transcript

20      of that as Plaintiff's Exhibit #11

21      previously.

22          You told us previously that you never

23      invited Ms. Boswell to do anything with you;

                        391

1       is that correct?

2   A.  I told you that I couldn't remember --

3   Q.  Okay.

4   A.  -- every conversation that I have ever had

5       with every tenant.  And the only reason I

6       remember this conversation is because my

7       attorney played the tape when he received a

8       copy of them.  And you're playing it now,

9       so --

10  Q.  So you don't remember whether you ever asked

11      her out?

12  A.  I don't recall, no.

13  Q.  And did you ever ask her -- I believe you

14      testified previously that you've never asked

15      her to go out of town with you; is that

16      correct?

17  A.  That is correct.  I can't recall every

                    Page 97

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    conversation I had with everybody.

19  Q.  Well, you -- you also testified pretty

20    emphatically that you never asked her to go

21    to Mississippi with you.

22  A.  I testified to that fact because, ma'am, I

23    cannot remember every conversation I have

392

1    ever had with --

2  Q.  No.  What you -- what you said previously

3    specifically was that you had never gone on

4    a -- you had never asked her on a trip to go

5    to Mississippi with you.  And you went on to

6    talk about how it would be inappropriate for

7    you to go on a trip with her to Mississippi

8    because you were there for seminary classes;

9    is that correct?

10  A.  That is -- yes.

11        MS. NEAL:  Okay.  We're going to

12        play a bit from call six.  It's media

13        call six.

14           (Media file played as

15             follows:)

16        MR. GUMBAYTAY:  One weekend a

17        month.  Now, I'll be going out of

18        town next weekend.  So, you know, if

19        you can get your mom to keep the

20        kids, you can bring -- you know, ride

21        with me.

22        MS. BOSWELL:  Yeah.

23        MR. GUMBAYTAY:  I ride into

Page 98

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
393

1        Mississippi one weekend a month.  You
2        know, you can ride down there with me
3        just to give you a chance to get away
4        from the kids and just relax.  I
5        would love to have your company.
6             (Media file stopped)
7   Q.   So is that your voice?
8   A.   Yes.
9   Q.   So you did invite her to go to Mississippi?
10  A.   According to that tape, yes.
11  Q.   That is your voice?
12  A.   Yes.
13  Q.   And so you did ask her to go to Mississippi?
14  A.   According to that tape, yes.
15  Q.   All right.
16  A.   But as I said before, I could not recall
17       every conversation I had with everybody.
18  Q.   All right.  We're going to play another
19       portion of media call six for you.
20             (Media file played as
21             follows:)
22         MR. GUMBAYTAY:  And that's why
23       I've been trying to catch up with

394
1        you, so I know when you get settled
2        down over there, you're going to come
3        and see me.
4         MS. BOSWELL:  Yeah.
5         MR. GUMBAYTAY:  So, you know,
6        just come and see me when you get
                              Page 99

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7   yourself settled down, focused, and

8   ready.  So I say at this time next

9   week sometime, you know, come and

10  spend a little time with me.

11          MS. BOSWELL:  Yeah.  I'm trying

12      to get situated in the house now.

13              (Media file stopped)

14  Q.  Yeah.  And then we're going to play another

15      portion from media call six as well.

16              (Media file played as

17              follows:)

18          MR. GUMBAYTAY:  Well, I see you

19      getting started on something, but I

20      want you to come and see me next week

21      so we can go out to lunch or

22      something first and just sit down and

23      get your plans, get your game

                    395

1   together, what you want out of life.

2           MS. BOSWELL:  Okay.

3           MR. GUMBAYTAY:  See how

4       Gumbaytay can help you do that.  So

5       when you get off from work serving

6       other folks at work, you know, let me

7       know Monday when we can sit down and

8       go to lunch.

9           MS. BOSWELL:  Okay.

10          MR. GUMBAYTAY:  You know, or go

11      to dinner or go to a movie or

12      something.  We just need to -- or

13      have cocktails.

                        Page 100

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14          MS. BOSWELL:  Yeah.

15              (Media file stopped)

16  Q.  So is that your voice?

17  A.  Yes.

18  Q.  So you asked her to go to dinner?

19  A.  On that tape, yes.

20  Q.  Or a movie?

21  A.  Yes.

22  Q.  Or to have cocktails?

23  A.  Yes.  Joking and teasing, flirting.

                    396

1   Q.  I just asked if you said it.

2   A.  Yes, ma'am.  I want to elaborate again.

3       Joking and teasing and flirting is not a

4       threat to intimidate someone.  It's not

5       sexual harassment to joke, tease, flirt, and

6       ask a lady out to lunch or dinner.  It's not

7       against the law, ma'am.

8   Q.  We're going to look --

9           MR. LAY:  What is against the

10          law?

11          THE WITNESS:  I have no idea,

12      but that's not against the law, sir.

13          MR. LAY:  Well, you seem to know

14      what the law is, so why don't you

15      tell us?

16          THE WITNESS:  I know that.  I

17      know what I know.

18          MR. LAY:  How do you know it

19      isn't against the law?

20          THE WITNESS:  I say because mens

                    Page 101

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    do it all over the world, all over

22    the country, and all over the

23    universe, sir.  And the one -- if

397

1    they -- if it was against the law,

2    half the male population would be

3    locked up, Mr. Lay.

4  Q.  (Ms. Neal continuing:)  What does sexual

5    harassment mean to you?

6  A.  I have no idea the definition of sexual

7    harassment, ma'am, but I know asking someone

8    out to lunch or asking someone out to dinner

9    is not considered sexual harassment.  A

10    female has the option to say no.  And if she

11    says no, you have an option to move on or you

12    have an option to continue to ask if you

13    have -- if you have a friendly interest in

14    the young lady.  But in this case, joking and

15    teasing is not --

16        MR. LAY:  Well, you said you had

17        no interest in her, yet you continued

18        to ask --

19        THE WITNESS:  I said I don't

20        recall the conversation that was now

21        taking place, Mr. Lay.  And what I do

22        recall, now that the conversation --

23        MR. LAY:  You just told us

398

1    again, Mr. Gumbaytay, that you didn't

2    have any interest in her even now;

3    but yet you can -- we've played you

Page 102

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4          tape after tape where you asked her
 5          out, asked her to go on trips, asked
 6          her to go to movies on more than one
 7          occasion.  I mean, what --
 8              THE WITNESS:  What I do recall,
 9          Mr. Lay, joking, teasing, flirting.
10          Never threatened nobody to put them
11          out of their home, sir.
12  Q.  (Ms. Neal continuing:)  Would it be sexual
13      harassment -- would you consider it to be
14      sexual harassment under your definition if
15      you were to offer to reduce somebody's rent
16      in exchange for sex?
17  A.  No.
18  Q.  Okay.
19              MS. NEAL:  We're still playing
20          from media call six.
21                  (Media file played as
22                   follows:)
23              MR. GUMBAYTAY:  We -- we're two

                    399
 1          consenting adults.
 2                  (Media file stopped)
 3  Q.  What does the phrase, "We are two consenting
 4      adults" mean to you?
 5  A.  When a person of two legal -- of legal age
 6      consent to having a legal interaction with
 7      each other.
 8  Q.  A legal interaction with each other?
 9  A.  Legal interaction by -- deemed by law.
10      Nothing immoral, unethical.  A legal
                    Page 103
```

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    interaction.  When a man asks a woman out to

12    dinner, she's agreed, that's a -- that's

13    consent.

14  Q.  Or if a man and a woman engage in sexual

15    conduct, that's consent?

16  A.  That is -- by law, that is considered as

17    being consent.

18  Q.  Was that what you were referring to?

19  A.  Joking and teasing, yes.

20  Q.  Do you know what you were referring to?

21  A.  Joking and teasing, yes.

22  Q.  You were joking and teasingly referring to

23    sexual intercourse?

                        400

1  A.  Yes.

2  Q.  Okay.

3            MS. NEAL:  Are we on the same

4        call?  Yeah.  We're looking at media

5        call six again, still.

6                (Media file played as

7                 follows:)

8            MR. GUMBAYTAY:  A woman has to

9        do what a woman has to do in order to

10       feed -- and we talked about it --

11               (Media file stopped)

12           MS. NEAL:  Sorry.

13               (Media file played as

14                follows:)

15           MR. GUMBAYTAY:  I'm a grown man.

16           MS. BOSWELL:  Yeah.

17           MR. GUMBAYTAY:  You know, but I
                        Page 104

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
18        just want to help a young black woman
19        trying to get her act together.  You
20        know, sometimes a woman has to do
21        what a woman has to do in order to
22        feed her family and live a
23        comfortable lifestyle.

                    401
1              (Media file stopped)
2   Q.  What were you talking about there?
3   A.  I was joking and teasing.  I have indicated
4       flirtatiously if a person in her situation
5       wanted to have some financial assistance,
6       flirting, joking, and teasingly, if you
7       offered to pay a lady's rent, light, water,
8       gas, utility bills, it's not sexual
9       harassment by my definition.
10             MR. LAY:  That is your voice
11        again?
12             THE WITNESS:  That is my voice,
13        sir, yes.
14             MS. NEAL:  We're going to play
15        again from media call six.
16             MR. LAY:  What were you
17        expecting to get in return if you
18        paid her lights, water, gas, or part
19        of her rent?
20             THE WITNESS:  Nothing.  Because
21        I was joking and teasing, Mr. Lay.  I
22        have no intention --
23             MR. LAY:  You were just going to
```

Page 105

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

402

1  give her the money?

2      THE WITNESS:  Sir, I have no

3  intention of even going across the

4  line there.  I can -- have

5  conversations with females all the

6  time joking and teasing, but I

7  don't -- that don't means I'm going

8  to cross that line.

9      MR. LAY:  Well, what is the line

10  in your book?

11      THE WITNESS:  The line in my

12  book, if -- if it's illegal, based on

13  your definition of what's illegal,

14  sexual harassment.  And this is

15  not --

16      MR. LAY:  But you've already

17  told us you don't know what's

18  illegal.

19      THE WITNESS:  Based on what I

20  understand to be illegal, that

21  flirting and teasing and joking is

22  not considered sexual harassment by

23  my definition, sir.

403

1      MS. COOPER:  And what would be

2  considered sexual harassment?

3      THE WITNESS:  I have no idea of

4  the legal definition of sexual

5  harassment, ma'am.  I do not.

6      MR. LAY:  Well, if you don't

Page 106

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7    know what the definition is, how do

8    you know your behavior wasn't sexual

9    harassment?

10    THE WITNESS:  Because the

11    behavior that I -- in joking and

12    teasing, I say again, mens all across

13    the world, the country, and the

14    universe, if that was illegal, half

15    of the population -- male population

16    would be locked up today, Mr. Lay.

17    Men joke, tease, offer to -- flirt,

18    offer to pay --

19    MR. LAY:  You still haven't

20    answered what you were expecting her

21    to do.

22    THE WITNESS:  Nothing, sir,

23    because I wasn't expecting to do

404

1    anything for her.  If she took --

2    now, if she took joking and teasing

3    out of context and thought maybe I

4    was going to do something for her and

5    I'm still asking her for $550 in

6    rent, making documentation that she

7    has not paid her rent, that doesn't

8    seem to me that I was trying to

9    enforce that policy.  And I offered

10    to pay Mr. Bahr's mortgage payment

11    for six months, and I offered to --

12    offered to -- to -- to -- to pay his

13    principal, interest, taxes, and

Page 107

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    insurance.

15        MR. NEWELL:  Just out of the

16    goodness of your heart because you're

17    a nice guy.

18        MS. NEAL:  Let's -- please don't

19    testify for your client.  Let's go

20    back to listening to media call six.

21        THE WITNESS:  I said the same

22    thing over and over again.

23           (Media file played as

                405

1        follows:)

2        MS. BOSWELL:  Yeah. (Laughter)

3    Yeah.

4        MR. GUMBAYTAY:  You understand

5    what I'm saying?  So I'll take you to

6    lunch, we can go to dinner, or we can

7    go out of town some weekend.  You

8    know, one weekend a month, we can go

9    out of town and do some things, girl.

10    You ain't just got to come over there

11    and just get up under me all the

12    time.  You know, you can come up

13    under there and we can sit down and

14    have a conversation.

15           (Media file stopped)

16  Q.  What did you mean by the phrase -- first of

17    all, was that your voice?

18  A.  Yes.

19  Q.  What did you mean by the phrase, "just get up

20    under me all the time"?

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  A.  That's a slang terminology.

22  Q.  Does it refer to sex?

23  A.  No.

406

1   Q.  What does it refer to?

2   A.  I don't know what it referred to her to her;

3       but get up under me, you hugging your big

4       brother, you hugging your little daughter:

5       come and get up under me, baby, give me a

6       hug.  Joking and teasing.  Now, her

7       interpretation of that is not my

8       interpretation of that, so we both have

9       different interpretations of it.  So I don't

10      know what she thought I meant by it, but I

11      had no --

12          MR. LAY:  Well, it would mean

13      physical contact even in how you

14      described it.

15          THE WITNESS:  This is physical

16      contact:  Here, come and get up under

17      me, son.  Come and get up under me,

18      daughter.

19          MR. LAY:  So at the very

20      least --

21          MR. NEWELL:  It doesn't

22      constitute assault or nothing like

23      that.

407

1           MR. LAY:  So at the very least,

2       it means some kind of physical

3       contact.

Page 109

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4          THE WITNESS:  It necessarily
 5     means physical contact.  When I was a
 6     teacher in the public school system,
 7     I asked kids to come and get --
 8          MR. NEWELL:  I'm not going to
 9     charge him with assault or nothing,
10     though.  Okay?
11          MR. LAY:  That's nice.  I'm
12     glad.
13          THE WITNESS:  Let me clarify.
14          MS. NEAL:  Please refrain
15     from --
16          THE WITNESS:  Mr. Lay, when I
17     asked my students to come and get up
18     under me, it don't mean for them
19     to physically to get up under me.
20     That -- that word, it's a terminology
21     that can be used loosely; but, one,
22     in the context of that conversation,
23     if you ask a student to come around
```

                              408

```
 1     me, come and get up under me, you
 2     don't physically mean that little boy
 3     or girl to come and get up under you.
 4  Q.  What -- like -- so you would tell your
 5     students to -- you would ask your students to
 6     get up under you on occasion?
 7  A.  It's not meaning what you -- what she thought
 8     it might have meant or what you're
 9     interpreting it to mean.
10  Q.  But you did say it?
```
                              Page 110

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  I -- when I was --

12          MR. NEWELL:  Is it something you

13      got in the Marines or somewhere?

14          MS. NEAL:  Please.  Please.

15  A.  It's a -- ma'am, it is a loose terminology.

16      It can be interpreted any way one wants to

17      interpret it.  And that's not the way I

18      interpreted it, the way I indicated, ma'am.

19      So --

20  Q.  How old were your students?

21  A.  I dealt with senior high, secondary students.

22  Q.  And so you would -- you would hug your

23      students sometimes?

                        409

1  A.  Affectionately.  All teachers hug their kids

2      when they are in a crisis, ma'am, or whatever

3      the situation may be or whatever the case may

4      be.  A kid could be crying or could have got

5      in a fight and you want to go in there and

6      console the child.  That's part of your

7      duties and responsibility, to make sure the

8      child has a healing from the -- from your --

9      their experience.

10          So, no, I'm not a pervert.  I'm not a

11      child molester, ma'am, if that's what you're

12      implying.

13          MS. NEAL:  Let's go to media

14      call seven, what I previously had

15      the -- introduced the transcript as

16      Exhibit #13.  So media call seven.

17              (Media file played as
                        Page 111

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18              follows:)

19              MR. GUMBAYTAY:  We'll sit down

20          next week and we'll -- we'll get

21          you -- we'll talk about your life and

22          what you want -- what you want

23          Mr. Gumbaytay to help you do with

                        410

1           your life and try to get you

2           financially secured over there.

3           Okay?

4                   (Media file stopped)

5   Q.  What did you mean by that?

6   A.  I'm a -- I have taken seminary courses and

7           counseling, even in the school of education

8           secondary field.  But mostly what I learned

9           from being a seminary student, when a person

10          need counseling, he's have -- going through a

11          crisis -- she was having -- her and her

12          family was in a crisis.  They was homeless.

13          They was under-employed.  Mama was

14          unemployed.  Mama was on drugs.  So I had

15          offered to spiritually counsel them.

16              Now, how she interpret that into her

17          frame of mind, I have no idea.

18  Q.  But you didn't say I'm going to go over there

19          and talk to you about your spiritual life or

20          counsel you spiritually.  You said, I'm going

21          to go over there and try to get you

22          financially secure.

23  A.  I had a conversation with Ms. Boswell long --

                    Page 112

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
411

1      that was not recorded.  Ms. Boswell --

2  Q.  But you did use the -- in that conversation

3      that you just heard, that was you, correct?

4  A.  Yes.

5  Q.  And you did say financially secured, correct,

6      in that conversation?

7  A.  In that conversation.  I can't recall

8      specifically, but I know the conversation --

9      the one that she didn't record -- and I don't

10     see Ms. Boswell in any duress or any

11     distress.  If a woman feel as though you are

12     bothering her, you harassing you -- and I

13     don't know about no other -- I don't know

14     about all women; but most women I have dealt

15     with, when they don't want to be bothered

16     with you, they'll tell you they don't want to

17     be bothered with you; and you leave them

18     alone.  If you keep on continuing to persist

19     at it, then that become harassment.

20 Q.  Okay.

21 A.  So if I -- if I came and talked to one of the

22     females in this -- in this room here and a

23     woman -- either one of you ladies and you all

412

1      don't want to be bothered with a man or this

2      particular man for whatever reason, you'll

3      let me know or let that man know and you walk

4      on.

5  Q.  All right.  Let's look at -- let's -- so it's

6      the tenant's responsibility to tell you when

Page 113

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7     you're saying something that makes them

8     uncomfortable?

9  A.  Let me put it this way.

10 Q.  Is it the tenant's -- yes or no.  Is it the

11    tenant's responsibility to tell you?

12 A.  No.  No.  Now clarification.  If a person

13    does not want to be bothered with you,

14    whether they take the responsibility and tell

15    you whether they want to be bothered with you

16    or not, if they neglect not to, then I have

17    no reason of knowing that flirting and

18    teasing and joking and ask for counseling her

19    would be offensive to her.

20 Q.  So you're saying that it is the tenant's

21    responsibility to tell you --

22 A.  No.  I said --

23 Q.  -- that you use inappropriate language?

                        413

1  A.  No, I'm not saying that.  I said no.

2  Q.  Okay.  Let's look at -- let's move on.  Let's

3     look at what we -- we're going to look at

4     what I've previously marked as Plaintiff's

5     Exhibit #19.  And this is an executive -- it

6     says it is an executive summary from

7     Mr. Matthew Bahr.  And I believe that this is

8     something that you gave to us at the court

9     hearing the other day.

10 A.  Correct.

11 Q.  Okay.  So I'm looking at the first page,

12    which is the October 2006 funds collected.

13    That's what it pertains to be, correct?

                                    Page 114

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14   A.   Correct.

15   Q.   And I notice that it says under Yolanda

16        Boswell -- she's the third person listed --

17        it says, Tenant paid $225.  What does -- is

18        that correct?

19   A.   Correct.  That's her -- that was her prorated

20        amount for that -- for the day and the month

21        that she moved in.  Lynn calculated her

22        proration, what that would be.  It's the only

23        thing -- she moved in at a full month, and

                          414

1         they -- and she paid 310 towards her security

2         deposit.

3    Q.   Okay.

4    A.   And I took $79 out of that money she gave me,

5         and I sent Mr. -- Mr. Bahr the difference.

6    Q.   Okay.  And you have a rental amount here.

7         This is -- this is a document that Lynn

8         created?

9    A.   This is a document that we create and send

10        out to all landlords.

11   Q.   But Lynn -- Lynn did it using her computer?

12   A.   Right.  She's -- she's familiar with Excel

13        spread and all.  I'm -- I'm not a computer

14        guy.  Matter of fact, I type about --

15        probably about 10 words every 15 minutes.

16        And I realize my limitation on my computer

17        skills; that's why I hired Lynn.

18   Q.   So Lynn produced this document?

19   A.   Yeah.  Lynn -- Lynn produced it.  We designed

20        it together, and she came up with a better

                     Page 115

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    design than I submitted to her, so we can

22    keep track of funds collected and the how --

23    what the Housing Authority paid and what

                        415

1     we've been paid.

2  Q.  And so there's a column that says rent

3       amount.  That amount -- did you tell Lynn

4       what amount needed to go in the rent amount

5       column?

6  A.  Based on the lease amount, she normally know

7       what the rent amount would be because she

8       does all the leases.  So you see here --

9  Q.  But sometimes you made changes to the leases

10      based on what the Housing Authority would ask

11      you to do or -- correct?

12 A.  But still, what the Housing Authority asked

13      us to adjust the rent amount -- and as I

14      indicated to you before, Lynn would know the

15      difference.  And this is a classic example

16      here on Ms. Linda Dixon.  The rent amount is

17      600 in number four.  The Section 8 pays --

18      tenant pays 600 -- the tenant paid 361 of

19      that.  So whatever the Section 8 Housing

20      Authority indicate to Ms. Norsworthy -- to me

21      what the rent will be based on what that

22      person can qualify for, that's what we post

23      on here.

                        416

1          Every last one of these houses on here

2       was Section 8 clientele except for Renee

3       Williams and Ms. Boswell, the only two people
                        Page 116

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4      Section 8 -- the only two people on there not
 5      Section 8 clientele.
 6   Q. So, but you told -- you told Ms. Boswell --
 7      excuse me.  You told Ms. Norsworthy the rent
 8      amount to put -- to put in here.  Either you
 9      told her directly or you told her what rent
10      amount needed to be put into the lease, and
11      she took the lease and then entered the rent
12      amount; is that correct?
13   A. That is correct, because we had rented this
14      same unit for 650 --
15   Q. And you told --
16   A. -- to Mr. Epps. Let me clarify.  We rent it
17      for 650 for Mr. Epps, what you have in there,
18      the same unit.  I rent it to another tenant,
19      which you have documentation of, for $600.
20      So if you rent something different in one
21      month than you rent it for the last four or
22      five months, than everything you rent that
23      unit for --
```

                        417

```
 1   Q. I just --
 2   A. Yes.
 3   Q. I don't really need any clarification on that
 4      portion.
 5   A. Yes.
 6   Q. So when you -- when it's typed in what the
 7      tenant paid, is that an amount that you --
 8      you received a check and you told Lynn what
 9      amount the tenant paid and to put into that
10      column?
```
                        Page 117

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  Yes.  And you notice Ms. Boswell didn't pay

12      anything for that month of February.  No,

13      that's the next month.  She on February now.

14      Am I correct?

15  Q.  I'm not looking at February.

16  A.  Oh, okay.

17  Q.  Actually, I'm looking at the columns as a

18      whole.

19          And what about the comment section?

20      Would you -- if somebody incurred late fees,

21      would you write in the comment section that

22      there were late fees?

23  A.  Whatever -- whatever transpired on that

                        418

1       account that particular month, as I've

2       indicated before, that in order to protect

3       myself and Lynn -- and if the conversation

4       came back up six months, six years from now,

5       then we will have documentation of whatever

6       transpired in that account.

7   Q.  Okay.

8   A.  So to answer your question, yes.

9           Can we -- can I ask you a question,

10      ma'am?

11  Q.  No.

12  A.  Let me -- I want to read the record, if you

13      don't mind.

14  Q.  No.  I'm sorry.  You can't do that.  That's

15      your attorney's job.

16  A.  Okay.

17  Q.  And it's only his job after this -- after

                     Page 118

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18     we're done asking our questions.

19  A.  You had asked me about making comments.  And

20     I wanted to -- for the record, I want you to

21     look at February '07, March '07.  And you'll

22     see comments in the comment section based on

23     whatever had transpired in that unit, whether

                        419

1     it was repairs or whether the person did or

2     did not pay for whatever reason it may be.

3          So if you look at February '07,

4     Ms. Boswell did not pay the 550.  And it

5     indicated here, will be made by Ms. Boswell.

6     So whatever comments she said to me, I was --

7     she had went in, would be paid by Elite.

8     Because at that point --

9          MR. LAY:  Well, that's very

10          interesting because in March of '07,

11          it said, Payments will be made by

12          separate transactions.

13          THE WITNESS:  Right.  You

14          remember I shared with you once she

15          filed those legal papers against me,

16          I promised Mr. -- Mr. Bahr, since I

17          went and got this situation -- I

18          trusted this person; this person

19          deceived me -- that I would pay his

20          mortgage payment for him until such

21          time we -- we rectified this

22          situation.  So that's why I wanted

23          you to look in the comment section.

                     Page 119

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
420

```
 1              I paid his mortgage payment
 2       for him, a total of $550, not 450,
 3       for the entire amount until I got
 4       Ms. Boswell out of that unit, until I
 5       evicted her.  Because this man and
 6       his wife and his daughter had over 20
 7       some odd properties with me, so I
 8       just kind of felt kind of bad,
 9       Mr. Lay, felt kind of guilty and just
10       sort of -- just to keep from losing
11       all the business, I offered to pay
12       his mortgage payment for him.
13              I don't -- I didn't have the
14       money to do it, but he -- I had
15       enough money coming in from all three
16       of those accounts that I could have
17       paid that mortgage payment for him.
18          MR. LAY:  Well, what did you
19       feel guilty about?
20          THE WITNESS:  Because I had
21       trusted this lady.  I put three
22       peoples in that unit, you know, that
23       I shared with you before; and all
```

421

```
 1       three of them stayed not a good two
 2       months before I have to end up
 3       evicting them.  So I put bad people
 4       with bad credit so the house would --
 5       would rent.
 6              Because in a high crime
```

Page 120

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7    neighborhood, no one wanted to rent

8    over there; so you find a warm body

9    that wants to rent, you can get the

10    rent money so the landlord can have

11    income coming in.  So you rent to

12    basically any and everybody without

13    really considering the fact that they

14    are -- they a big -- they a high

15    risk.  And I -- this the third time I

16    put somebody over there I had to

17    evict within two, three months' time

18    period.

19  Q.  (Ms. Neal continuing:)  So when Ms. Boswell

20    moved in, did you know that she had a

21    boyfriend?

22  A.  I don't get into people's personal -- no.

23  Q.  Do you recognize the name Jeffery Ferris?

422

1  A.  No.  Only someone I have to deal with is the

2    people's name that's going to be occupying

3    the unit.

4  Q.  Earlier you testified that you only came to

5    Ms. Boswell's house twice that you recall,

6    once to give her notice of an eviction and

7    once to collect rent.  Do you remember saying

8    something to that effect?

9  A.  Yes.  That's the only two times I recall.

10    And I'm not saying that's not the only time I

11    came to her unit, but that's the only two

12    times I recall out of 114 clients.

13  Q.  Do you remember when you stopped by to

Page 121

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14   collect her rent, what month it was?

15  A.  No.

16  Q.  Do you normally stop by your tenants' houses

17      to collect rent?

18  A.  Yes.  They have one of three choices.  Pay it

19      by mail, pay it to Lynn, deposit it in my

20      account, or either bring it by and drop it

21      off at my house.

22          And I try to make it convenient for

23      people -- because people will come up with

                        423

1       excuses, especially the clientele that we

2       deal with -- here's my account number.  I

3       bank at Wachovia.  They have two or three in

4       the city.  If you get off from work late at

5       night, get a money order, put it in the night

6       deposit box.  So that way, you can't tell me

7       you didn't have an opportunity to pay your

8       rent.  If the bank close at ten o'clock -- I

9       mean, at five o'clock in the afternoon, you

10      get off at ten o'clock at night, you still

11      can pay your rent.

12          So I gave people choices.  And I knew

13      the type of clientele I was dealing with, you

14      have to give them choices because they'll

15      make any and every excuse they possibly could

16      not to pay their rent.

17  Q.  Well, if they had three choices -- to drop

18      by -- drop the rent off at your house or at

19      Lynn's house --

20  A.  Yes.

                     Page 122

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  Q.  -- to drop it in the mail or to pay it by

22      depositing it in your wachovia bank account,

23      I guess you're just telling me right now that

                        424

1       there's a fourth option; and that's for you

2       to come by and collect it?

3   A.  Yes.  If that person has become a risk and

4       they -- the rent is due on a certain day and

5       they don't pay it by that day and they keep

6       calling -- you keep calling them and they're

7       not returning your phone calls or if you go

8       by the house, they're not at home, you want

9       to know what happened -- even the Section 8

10      clientele, people that had to pay less than

11      $3 a month couldn't afford to pay their $3 a

12      month.  So if I'm in the neighborhood in the

13      community or -- I would just go by and see

14      what's going on with Ms. Jones, see whether

15      or not she's sick or see whether or not she's

16      in the hospital or see whether or not

17      she's -- something could be going on.

18          But, yes, that fourth charge would be

19      only when that person has been contacted and

20      they failed to use the other two choices.

21  Q.  So only when they've demonstrated that

22      they're --

23  A.  They've become a risk.

                        425

1   Q.  A risk.

2   A.  Right.

3   Q.  What do you mean by a risk?  A risk that they
                    Page 123

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4      won't pay?

5   A.  Of not paying their rent.

6              MR. NEWELL:  Was Ms. Boswell a

7          risk?

8              THE WITNESS:  Yes.

9              MS. NEAL:  Please, this is not

10         your time to be asking questions.

11         Your time is at the end of our

12         deposition.

13  Q.  Do you recall going to Ms. Boswell's house in

14      October?

15  A.  I don't recall going to Ms. Boswell's house

16      in October, no.

17  Q.  There's a time where she had several women

18      over at her house, and I believe that they

19      were doing hair.  Do you remember coming into

20      her house at that time?

21  A.  No, I don't recall.

22  Q.  You don't remember ever coming over to her

23      house when there were a bunch of women over

                        426

1       at her house?

2   A.  I don't recall things that I -- three months

3       ago, ma'am.  I don't recall.  I'm not saying

4       that it did not -- I did not go by there,

5       because she was delinquent on her rent.  She

6       was becoming another risk.

7   Q.  Okay.  Okay.  Well --

8   A.  It just --

9   Q.  In October, she -- this was her first month

10      living in that house; is that correct?
                        Page 124

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  And she -- right.  And she was delinquent
12      that very first month that she was living in
13      that house.  She paid a prorated amount for
14      that month.  She didn't pay all of her
15      deposit for that month.  So she still owed us
16      a deposit.  If you look at the records, she
17      still owed -- she was outstanding on the
18      deposit amount.
19  Q.  It's interesting that you say that.  I'm
20      going to have to make a note to come back to
21      that.
22          MS. NEAL:  Will you make a note
23          to come back to that?

                        427

1   Q.  Because I don't --
2   A.  And then the person that had --
3   Q.  Well, hold on.
4   A.  Yeah.
5   Q.  I don't have it with me, but I have --
6          All right.  So let's look at what I have
7       marked as Plaintiff's Exhibit #20.  And this
8       is a notice.  Is this your signature?
9   A.  Yes.
10  Q.  So this is a notice that you delivered to
11      Ms. Boswell at her house?
12  A.  I don't recall whether or not I delivered it
13      to her at her house, ma'am, because I -- you
14      know, I really don't recall delivering this
15      to Ms. Boswell house.
16  Q.  But you --
17  A.  I put it in the mail.  I -- I may have
                    Page 125

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
18    dropped by there.  I have -- if I'm in the
19    neighborhood, in the community, I will put
20    one of these in -- in -- in the door as well
21    as put one in the mail.  So I can't recall to
22    say I actually took this by her house.
23 Q. Okay.  And this was -- this was dated
```

```
                      428
1     December 14th, 2006; is that correct?
2  A. That is correct.  She was -- she was starting
3     to becoming a risk, like I've indicated to
4     you, at the very -- the very -- the very
5     outset.
6  Q. Okay.  Let's look at what I have marked as
7     Plaintiff's Exhibit #21.  And this is a
8     warning.  Is that signed by you?  It looks
9     like it has your initials.
10 A. Yes.
11 Q. And it says, while visiting your property
12    today on 12/24/2006, you observed the
13    following situations, slash, problem.  So you
14    did visit her property on December 24th,
15    2006, correct?
16 A. Yes.
17 Q. And at the bottom, it looks like you
18    handwrote a note that says second warning
19    about car park on land.  Is that -- is that
20    what it says?
21 A. Yes.
22 Q. And so you had stopped by her property at
23    some time prior to that and left a note on
```

Page 126

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
429

1    her -- a notice on her property at that time,

2    correct?

3  A.  Yes.

4  Q.  Okay.  Look at what we have marked as

5      Plaintiff's Exhibit #22.  Is this a note that

6      you -- that you wrote to Ms. Boswell?

7  A.  Yes.

8  Q.  And it's signed by you.  And it says, Late

9      fee for January of 2007 due by the -- I guess

10     by the 26th.  So when did you leave this at

11     her house?

12 A.  If it doesn't have a date on it, I have -- I

13     have no idea, ma'am.

14 Q.  But you did leave this at her house?

15 A.  I don't know whether -- I can't recall.  I

16     can't recall whether I left it at her house

17     or not.

18 Q.  But you either left it at her house or you

19     mailed it to her?

20 A.  Yes.  And -- and to -- if you look at her

21     lease -- and on every last one of the

22     lease -- on the leases that we sent out, we

23     always attach an addendum to that.  And in

430

1    that addendum, we -- we say that, Addendum to

2    lease for 964 Gap Loop, Montgomery, Alabama,

3    the tenant is expected to keep the outside of

4    his residence clean, neat, and included, but

5    not limited to, lawn should be kept up,

6    raked, and edged --

Page 127

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7  Q.  Mr. --

8  A.  -- no junk or abandoned cars.  You asked me a

9      question.  I have to --

10 Q.  Well, no.  Mr. Gumbaytay, right now we're

11     looking at Plaintiff's Exhibit #22, which is

12     talking about late fees.  It's not talking

13     about any -- it's not talking about notices

14     about -- about a car on the lot.

15         And I'm not objecting to -- I'm not --

16     I'm just trying to establish that you did

17     leave these notes for Ms. Boswell, that you

18     did have that contact.  I don't need to know

19     anything other than that.

20 A.  Yes, ma'am.  You -- but a clarification,

21     something just came back to my memory on what

22     you asked me earlier, ma'am.  I just want --

23     for the record, I just want to indicate it as

                        431

1      an addendum to the lease, no junk or

2      abandoned cars on the property; no trash,

3      paper, or debris in the yard; no automobile

4      parked on the lawn.

5          We had a lot of problems with a lot of

6      tenants doing that more often than not, so we

7      made it a part of the lease.

8  Q.  And that was something that I believe you

9      testified previously that you had made a

10     portion of the lease without Mr. Bahr's

11     permission; is that correct?

12 A.  All these leases are the same, whether this

13     lease or -- all the leases -- every lease

                        Page 128

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
14    that Lynn and I have ever produced.  I got
15    this from U.S. Legal Forms, dot, com.  This
16    is the only part that wasn't part of that, so
17    I attached it to that.  Because we had a lot
18    of problems out of a lot of tenants in the
19    ghettos have a tendency to park their cars on
20    the grass, smoke cigarettes, smoke dope, have
21    parties out in their front yard, leave paper
22    and trash and debris in their yard.  You have
23    to understand the mind-set and the mentality
```

                              432

```
 1    and the caliber of people that we was renting
 2    to in the ghettos.  These peoples are not the
 3    most -- best -- they're not the best tenants
 4    in the world, ma'am.
 5  Q.  So my question was, did you attach that
 6    addendum to the lease without Mr. Bahr's
 7    permission?
 8  A.  No.
 9  Q.  Did you -- did you attach it to -- did you
10    tell him that you were going to attach it to
11    any lease?
12  A.  No.  No.  It's --
13  Q.  So either you told him or you didn't tell
14    him.
15  A.  No.  No.
16  Q.  Did you tell him you were attaching it to the
17    lease, or didn't you?
18  A.  What I did is attached this addendum to the
19    lease as part of the lease, because it was
20    becoming a problem with people --
```

                    Page 129

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  Q.  Did Mr. Bahr know it was a portion of the

22      lease?

23  A.  No.

433

1   Q.  So when you --

2   A.  He don't even know I -- Mr. Bahr ain't never

3       seen one of these leases, ma'am.  As far as

4       that is concerned, I downloaded this from

5       U.S. Legal Form.  I kind of doubt Mr. Bahr

6       ever seen this whole entire lease at all,

7       period.  I doubt he even read one of these

8       leases.  I kind of doubt very serious him or

9       any of those landlords out of a 100 some odd

10      landlords -- out of 50 some odd landlords,

11      they never saw these leases unless we sent

12      them one.

13  Q.  So when you sent, in Plaintiff's Exhibit #21,

14      a warning to Ms. Boswell, which you already

15      identified -- it says, while visiting your

16      property today on December 24th, 2006, I

17      observed the following problem.  And you

18      circled automobile parked on lawn.  And at

19      the bottom it says, Second warning about car

20      park on land, $20 if this happens again.  Is

21      that -- is that correct what it -- is that

22      what it says?

23  A.  Yes.

434

1   Q.  And what would happen if you charged the

2       $20?  Is that something that you would just

3       pocket?

Page 130

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    A.    No.  If -- if -- if you recall, in -- in the

5          documents -- let me go back to this executive

6          summary.  If there was any funds that were

7          collected beyond the rent, it would be

8          documented and placed as part of the record

9          for this executive summary.

10   Q.    But is that something that you would send to

11         Mr. Bahr?

12   A.    Yes.

13   Q.    So did Mr. Bahr -- if Mr. Bahr had never seen

14         any of these leases and never looked at the

15         addendum and didn't know that you were

16         checking on whether automobiles were parked

17         in the lawn, he would just accept that he had

18         $20 more to his rent with no questions?

19   A.    We had -- we had a relationship with all of

20         our landlords that whatever I do is in the

21         best interest of the landlord, whatever I did

22         was trustworthy.  We had established a

23         relationship, a rapport.  If I sneezed and

435

1          sent them a dollar bill with the sneeze DNA

2          on it and they touched it and they caught a

3          cold, they wouldn't never doubt it.

4               In other words, they have a lot of

5          respect for me.  They have trust in me that I

6          would not do anything that's going to deviate

7          from the norm, that's going to deceive them;

8          because their business was valuable to me, as

9          I was to them.  I was their eyes and ears in

10         Montgomery, Alabama.

                              Page 131

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  So they never questioned whether when you --

12  A.  No.

13  Q.  -- if rent came -- if rent -- excuse me.  If

14      the amount that you paid was more or less

15      than what you had already determined you were

16      supposed to, they would never ask you any

17      questions about that?

18  A.  Whatever we -- transpired between myself and

19      any of the tenants, we note it on the

20      executive summary.  So they never have to

21      question me because everything we did, we did

22      it under a glass microscope.  In other words,

23      we never did anything that we said that we

                          436

1       didn't do -- we did not do; and anything we

2       did, we always noted it on these executive

3       summaries.

4   Q.  So if you sent out a notice like this, like

5       Plaintiff's Exhibit #21 about parking on the

6       lawn, you're saying that that would be

7       reflected in the executive summary that you

8       sent out a notice like that?

9   A.  No.  Not -- not -- not of that, not -- I

10      don't bother the landlord with small, tedious

11      stuff.  I'm just going about the day-to-day

12      activities.  I'm in the neighborhood.  And I

13      kept a couple of notices stacked in my car.

14      If I'm -- and I'm always on the west side

15      because most of the houses that these

16      investors bought was on the west side, which

17      is Ridgecrest area and other communities.
                     Page 132

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18          While I'm out in the community, I will
19      take out a notice while I'm passing by and I
20      will write a notice up and put out there.  I
21      mean, I can't bother them with small, tedious
22      stuff.  That's why they had me to look out
23      for their best interest, ma'am.

                        437

1  Q.  But it would end up being on the comment
2      section if you actually ended up charging a
3      tenant for the rent and collecting 20 --
4  A.  Any funds --
5  Q.  -- and charging for a late fee?
6  A.  Any funds that I collect -- and which I told
7      you earlier I never collected any funds.
8      Even though I told them there would be a
9      charge, people didn't pay it anyway.  And if
10     I wanted it that bad and if a landlord
11     thought it was important, he would have had
12     me to take them to court.  So it was
13     basically -- it was used as -- let me just
14     share this with you.
15 Q.  A --
16 A.  All -- may I?  These letters we sent out was
17     basically -- was a deterrent, but it never
18     worked.  We were just sending out, as they
19     say in the African community, wolf tickets.
20     This was -- these was not a threat but a hope
21     and a desire for those individuals to conduct
22     themselves accordingly.
23          We never collected any -- from anybody.

                    Page 133

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
438

1    If they did -- if they did not pay, I never

2    sued them.  The only somebody we had to sue

3    was the people we had to evict.

4  Q.  So you --

5  A.  And that was serious enough.  But small

6    stuff, I just don't bother the landlords with

7    small stuff when I got a hundred and some odd

8    houses to manage.

9  Q.  So you never collected late fees from

10    anybody?

11 A.  I never collected fees for a person who have

12    trash in their yard, who did not cut their

13    grass and did not have abandoned cars; but

14    late fees, we tried to collect.  All the late

15    fees we did not collect from the Housing

16    Authority people, we didn't send them to

17    civil court because the landlord was getting

18    two-thirds of their rent from the Montgomery

19    Housing Authority.  And I asked them on

20    numerous occasions do you want me to pursue

21    this in a court of law, and they said no

22    because they were getting 99.9 percent of

23    their rent or 20 percent of their -- I

439

1    mean, 80 percent of their rent from the

2    Housing Authority.  So all these were

3    basically paper tigers we was sending out.

4  Q.  So let me --

5  A.  Like this exhibit, Exhibit #17, was notices

6    that was sent out to each and every client to

Page 134

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7      conform.  If they did not conform, we would
 8      not follow up in terms of filing a civil suit
 9      against them to collect funds for minor
10      infractions such as leaving a car on --
11      parking a car on the driveway, trash in their
12      yard, not cutting their grass.
13   Q. I think we've established that.  Let's look
14      at Plaintiff's Exhibit #22 one more time.
15      And it says -- it says, Let's talk.  And then
16      it has your initials, and then there's a
17      number underneath that, 202-8676.  Is that
18      your -- is that a phone number?
19   A. Yes.
20   Q. I mean, is that your cell phone number?
21   A. Yes.
22   Q. Okay.  And when you said let's talk, what did
23      you mean?
```

                              440

```
 1   A. About your late fees and -- that's what this
 2      note -- this notice was sent out for, late
 3      fees for January '07.  It says let's talk
 4      about getting your rent in.  I can't recall
 5      the conversation.  This was a short notice,
 6      but probably because of whatever this letter
 7      was pertaining.  She knew what it was
 8      pertaining to.
 9   Q. So now I'm going to look at what I've marked
10      as Plaintiff's Exhibit #23.  And it says it's
11      to Ms. Boswell.  Do you recognize -- is
12      this -- is this a document from you?
13   A. Yes.
```

                         Page 135

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  Q.  And it's dated --

15          MR. LAY:  Is that your

16      handwriting?

17          THE WITNESS:  Yes.

18  Q.  And it's dated January 18th, 2007.  Did you

19      fax this document to Ms. Boswell?  It's on a

20      form that says fax transmittal form.

21  A.  That's from the -- it look like that's a

22      document that's from the courts.  See,

23      document one filed 2/14.

                        441

1  Q.  It's a document that we filed previously.

2  A.  Yeah.

3          MR. LAY:  Right here, do you see

4      the fax transmittal?

5  Q.  It says fax transmittal.

6  A.  Oh, no.  No.  No.  Here again, I don't have a

7      professional -- no.  I don't type.  So I --

8      you know, I indicated to you before I don't

9      have typing skills.  So I hand write

10      everything that I send out to people if --

11      because Lynn charge me $30 per hour.  So I

12      have to hand write information.  So I don't

13      type at all --

14  Q.  So this is --

15  A.  -- fast or nothing professional, no.

16  Q.  This isn't something that you faxed to

17      Ms. Boswell?

18  A.  No.

19  Q.  This is something that you delivered to her

20      residence?

                    Page 136

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  A.  I don't recall delivering to her, whether I

22      mailed it to her, whether I sent it --

23      personally brought it by her house.  I -- I

                        442

1       don't recall.

2   Q.  Let's look at what I have marked as

3       Plaintiff's Exhibit #24.  It's another

4       document.  This is notice of default and

5       payment to rent.  Is that -- is that your

6       signature at the bottom?

7   A.  Yes.

8   Q.  And it says, Signed this 18th day of January,

9       2007.  Do you remember whether you delivered

10      this at her property or whether you mailed it

11      to her or --

12  A.  I -- I don't recall; but if I did deliver it

13      at her property, when someone become a

14      risk -- when someone becomes a risk, there's

15      one or three ways you can go about it.

16  Q.  You just -- you just don't remember?

17  A.  No, I don't recall.  I really don't recall.

18  Q.  Okay.  Let's look at what you have written

19      down here where it says -- I think -- I

20      believe it is the fourth paragraph.  And it

21      says, The amount currently due is; and

22      then -- you know, correct me if I misstate

23      anything -- it says, you know, 400 paid; late

                        443

1       charges, 50; $50 other shortages.  What is --

2       why is it listed as $50 for other shortages?

3   A.  Late fees.

                  Page 137

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4  Q.  Well, late charges are already listed,

5     though.

6  A.  She had paid 400 of a $550 a month rent.

7  Q.  Well, then, why does it say that this

8     shortage is only $50?

9  A.  Because if -- she was already behind.  See,

10    due $150.  Other shortages is probably

11    pertaining to the warning that I gave her

12    that we never collected.  You remember I told

13    you, which was a fine?  So I can only assume,

14    but I cannot recall, Ms. Neal, it probably

15    because the situation with the cars being

16    parked on their lawn.  And I told them after

17    the next time, there would be a warning; and

18    the next time it would a fine.  But we never

19    collect any fine.  We never took anybody to

20    civil court.  So I -- so whatever you see

21    here is what you see here, and it's

22    pertaining to whatever the accounting was at

23    that time.

                        444

1  Q.  So are you saying that the $50 listed as a

2     shortage is because she had cars parked on

3     her lawn?

4  A.  Okay.  If you --

5  Q.  Well, is that what you're -- is that what

6     you're saying?

7  A.  I can't recall, but everything -- let me

8     share this with you, Ms. Neal.  Okay.  That

9     needs to go back, too.

10 Q.  Never mind.  I would -- I withdraw the

                      Page 138

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    question.  Let's just --

12  A.  Let's go back to --

13  Q.  No.  I withdraw my question.  I don't want

14    to -- let's look at something else.

15  A.  Let me just share this with you before you

16    withdraw your question.  Every --

17         MR. LAY:  You can have your

18        attorney go over whatever you want.

19  Q.  Yeah.  You guys can -- you guys can talk.

20  A.  Well, you brought it up, so I have not had an

21    opportunity to elaborate on it.

22         MR. LAY:  She's withdrawn it.

23  Q.  I've withdrawn the question.  So let's look

445

1    at what we have marked here as Plaintiff's

2    Exhibit #25.  And it is a -- it is a

3    warning.  And it says, While visiting your

4    property today on January 18th, 2007, I

5    observed the following situation on your

6    property.  And is that your signature?

7  A.  Yes.

8  Q.  So this is something that you delivered to

9    Ms. Boswell's house?

10  A.  I don't recall, but if -- if it says that,

11    it --

12  Q.  Well, it says while visiting your property

13    today.

14  A.  Yeah.  If it says that, then it -- that's the

15    way it happened, but I can't recall every

16    piece of paper that I send out or take to a

17    person's property.  But if says it on there,

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    that's what happened.

19  Q.  Okay.  Here's another --

20         MR. NEWELL:  What was the

21      question?  What's the relevance?

22         MR. LAY:  Did he deliver this

23      document.

                        446

1         MR. NEWELL:  Oh, okay.

2         THE WITNESS:  I can't recall.

3         MR. NEWELL:  Yeah.

4  Q.  Here's Plaintiff's Exhibit -- what I've

5      marked as Plaintiff's Exhibit #26, which is

6      dated January 19th, 2007.  Is that your

7      initials at the bottom?

8  A.  Yes.

9  Q.  So this was either -- this was a note that

10     you sent to Ms. Boswell or delivered at her

11     house on the very next day, January 19th; is

12     that correct?

13 A.  Right.  Yes.

14 Q.  Okay.  I have what is marked as Plaintiff's

15     Exhibit #27.  It is listed as Grounds for

16     Termination, and it has your initials at the

17     bottom.  Do you recognize that document?

18 A.  I don't recognize the document.

19 Q.  But you -- is that your signature?

20 A.  I do recognize the fact it is my handwriting.

21 Q.  Okay.

22 A.  Because I can't remember everything that --

23 Q.  And so this is another document that was sent

                   Page 140

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
447

1      to Ms. Boswell or delivered to her property

2      on January 19th, 2007; is that correct?

3  A.  I can't recall; but if that's what it says on

4      here, then, apparently, it's in line with

5      what it states here; but I can't recall

6      whether I sent it over there or someone else

7      took it by; because I had started hiring

8      people to go by and inspect all our

9      properties.  So I can't recall whether I took

10     it by there or someone else sent it by there.

11 Q.  Here I've got what is marked as Plaintiff's

12     Exhibit #28.  And it is listed as a Notice to

13     Pay Rent or Quit, and it's dated February

14     6th, 2007.  Is this your signature at the

15     bottom?

16 A.  Yes.

17 Q.  And do you remember giving this notice to

18     Ms. Boswell on February 6th, 2007?

19 A.  I don't recall.

20 Q.  Do you remember if you delivered it to her

21     house?

22 A.  I don't recall.

23 Q.  You either delivered it to the house or you

448

1      mailed it --

2  A.  I mailed it --

3  Q.  -- on that date?

4  A.  -- or either someone else took it by there.

5      And what this -- what this says to you and it

6      should say to the Court, that her rent always

Page 141

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7    have been 550; and I'm trying to make an

8    attempt to collect the rent, collecting the

9    late fees, collecting other fees that was due

10   Mr. Boswell -- I mean Mr. Bahr.  And

11   everything that was due Mr. Bahr on this --

12   these little notices --

13  Q.  Do you remember --

14  A.  -- have been placed on the -- have been

15   placed on the executive summary.  And this

16   also tells me that I was being very

17   compassionate and very, very patient with her

18   because she has not paid her rent on time.

19   That just --

20  Q.  Well, let's --

21  A.  Let me just share -- let me just finish up,

22   now.  Let me finish up, now, unless you want

23   to withdraw the question.

                        449

1   Q.  But you're not answering my question.

2   A.  I'm answering it.  You asked me whether or

3    not --

4   Q.  No.  I asked you if this was a document that

5    you sent to Ms. Boswell.  I didn't ask you

6    any questions about the contents of the

7    document.

8   A.  Yes.  And these documents --

9   Q.  You said that it was a document that you

10   delivered to Ms. Boswell.

11  A.  Yes.

12  Q.  I'm done asking questions about the

13   document.  That was all I had.  Do you

                        Page 142

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    remember making a phone call to Ms. Boswell

15    on that day?

16  A.  No, I do not recall.

17  Q.  It's possible that you made a phone call to

18    her on that day as well?

19  A.  I do not recall.  Anything is possible,

20    Ms. Neal.

21  Q.  Okay.  Were -- okay.  I want to talk about

22    some repair issues with Ms. Boswell's house.

23    Were there any problems with the unit when

                        450

1    she moved in, in October of 2006?

2  A.  I can't recall.  I think it was something on

3    this executive summary here that was --

4  Q.  But there might -- there might have been some

5    problems?

6  A.  More -- let me put it this way.  99 percent

7    of the time, there's a problem with all of

8    our units.  So if someone moved out, more

9    than likely they didn't -- everybody that has

10    been in this house has been evicted.  They

11    didn't pay no rent.  They didn't pay -- the

12    deposit was retained.  And more than likely,

13    it was nasty, it was filthy, it was dirty.

14    So any repairs that needed to be done over

15    there, more than likely, it probably was left

16    by the previous tenant who didn't pay any

17    rent.

18  Q.  So do you remember having a conversation with

19    her in 2006 about her toilet being backed up?

20  A.  I do not recall.  Yeah, I can't recall.

                    Page 143

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  Q.  I believe that you actually admitted earlier

22      in our earlier portion of our deposition

23      that -- that you recall having conversations

451

1       about her toilet being backed up.  And I

2       showed you a number of different transcripts

3       of conversations that you guys had about the

4       toilet being backed up.  And I'd be happy to

5       show you those conversations again.

6   A.  Ms. Neal, if you -- if you recall also, I

7       said the only kind -- the only reason why I

8       remember the conversation about that

9       conversation, when he let me heard that CD

10      that you sent to me, I gave it to him.  He

11      played it for me.  Other than that, I cannot

12      remember every call that I had with every

13      single person about toilets and maintenance

14      calls.

15  Q.  I understand that; but you do remember

16      because you just said that you listened to

17      the tape and it refreshed your recollection

18      and now you remember having --

19  A.  I remember.

20  Q.  -- the conversation.

21  A.  I remember hearing the tape but not

22      necessarily the conversation.

23  Q.  Do you remember hearing your voice on the

452

1       tape talking to Ms. Boswell about a

2       malfunctioning toilet?

3   A.  I remember hearing my voice on the tape

Page 144

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    talking to Ms. Boswell.  I also found a tape

5    when my son was seven years of age when he

6    recorded on a cassette tape.

7  Q.  That's --

8  A.  And he's 27 years of age now.  I don't recall

9    having that conversation with him when he was

10    seven years of age, but I do --

11          MR. LAY:  Well, once you did

12      hear it, did it refresh your

13      recollection enough that you

14      remembered that being your voice and

15      the contents of the conversation?

16          THE WITNESS:  Yes.

17          MR. LAY:  And it was about a

18      toilet leak?

19          THE WITNESS:  Yes.

20          MR. LAY:  And it was in October

21      of '07?

22          THE WITNESS:  I don't recall.  I

23      can't recall, Mr. Lay.

                    453

1  Q.  How many times did you contact Ms. Boswell

2    concerning these repairs?

3  A.  I can't recall.

4  Q.  How many times did she contact you concerning

5    these repairs?

6  A.  I have -- I can't recall.

7  Q.  Do you recall how quickly the repair to the

8    toilet was made?

9  A.  No.

10  Q.  Who made the repair?

                    Page 145

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11 A.  No.

12 Q.  Did you --

13 A.  I can't recall.

14 Q.  Did you pay for the repairs to be made, or

15      did Ms. Boswell pay for the repairs?

16 A.  If it was over $100, the landlord paid for

17      it.

18 Q.  Do you remember whether it was over $100 or

19      not?

20 A.  I can't recall.

21 Q.  Do you remember if you talked to Mr. Bahr

22      about repairing the backed up toilet?

23 A.  I don't recall.

                          454

1 Q.  Do you remember that in October of 2006,

2      Ms. Boswell also had a broken windowpane in

3      one room?

4 A.  I don't recall.

5 Q.  And so you don't know whether you ever had a

6      conversation about repairing that or whether

7      you conveyed that to Mr. Bahr or --

8 A.  No.  I have 115 complaints throughout the --

9      any given month, ma'am.  I can't recall every

10      call and every conversation that I had with

11      tenants about repairs.

12 Q.  In January of 2006, Ms. Boswell's house had a

13      toilet that was leaking -- I'm sorry.  Excuse

14      me.  In January of '07, Ms. Boswell had a

15      toilet that was leaking in the front bathroom

16      that began to overflow and the sink in the

17      front bathroom was leaking at the bottom.  Do

                          Page 146

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18      you recall that?

19  A.  No.

20  Q.  Around that same time, you had an inspector

21      named Roger that came out.  Do you -- do you

22      have an employee named Roger?

23  A.  I don't have employees, ma'am.

                        455

1   Q.  Excuse me.  Did you contract --

2   A.  I don't recall --

3   Q.  -- with an inspector named Roger?

4   A.  I don't recall, ma'am.

5   Q.  You don't recall -- did you ever have anybody

6       employed -- that was contracting with you by

7       the name of Roger?

8   A.  I don't recall.

9   Q.  Why would an inspector have come by her house

10      in January of 2006 --

11  A.  I don't recall.

12  Q.  -- 2007?

13  A.  I don't recall.

14  Q.  2007.  I'm sorry.

15  A.  Ms. Neal, I don't recall.  Believe me, if

16      I -- I'm trying very hard here.  I can't

17      remember every conversation I may have had

18      with every maintenance person, every

19      contractor, every tenant.  And you got a

20      hundred plus calls coming in at any given

21      time.  I don't recall, Ms. Neal.

22  Q.  Well, my understanding was that he had not

23      come because of the toilet overflowing, that

                     Page 147

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
456

1    he came to inspect the house because it had

2    to be inspected every so often.  I mean, do

3    you -- do you have inspectors that come by

4    houses to inspect every so often?

5 A.  I had -- I had extended an independent

6    contract to a couple of individuals.  And --

7    and I can't recall the person's name at this

8    time.

9 Q.  Okay.  So about a month after our client

10   alleges that Roger came to her house --

11   Roger, inspector for Elite Real Estate

12   Consulting Group, came to her house and the

13   toilet was malfunctioning, she reported that

14   to them, we sent out a letter to you which I

15   have marked as Plaintiff's Exhibit #29.  I'll

16   show it to you.  Do you recall receiving this

17   letter?

18 A.  No.

19 Q.  It's a letter dated February 7th, 2007.

20   Could you please read the -- could you please

21   read the letter aloud.

22 A.  Dear Mr. Gumbaytay and Mr. Bahr, we represent

23   the above-referenced client.  In light of

457

1    Mr. Gumbaytay's past behavior and the notice

2    dated January 19th, 2006, to Ms. Boswell, a

3    client trust account has been set up for her

4    rental payments.  You may pick up all future

5    rent payments at this office from this

6    account.  The February rent was made on

Page 148

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7   January the 5th, '07 -- January the 5th,
 8   2007, and it is now available to pick up
 9   during normal business hours at the address
10   listed below.  Promptly cease the
11   above-referenced offensive behavior and
12   repair Ms. -- repair Boswell toilet at once.
13   The malfunctioning toilet complaint is over a
14   month delinquent.  Your prompt attention to
15   this problem is appreciative.  Address future
16   communication with -- to this address.  And
17   yours truly, Connie JMC Baker, Staff
18   Attorney.
19   Q.  So you -- do you recall receiving this letter
20       on February 17th, 2007?
21   A.  No, I don't recall it.  I don't recall
22       picking up any rent from you guys until
23       the -- four or five months later, because

                         458

 1   I -- I paid Mr. Matthew Bahr mortgage payment
 2   for him.  I did not pick up any rent from
 3   anybody for three or four -- four or five
 4   months.
 5   Q.  So you didn't receive this complaint about
 6       the toilet?
 7   A.  I don't recall.
 8   Q.  Did you --
 9   A.  And -- and -- and to this day, the first time
10       I seen this -- saw this letter was today.  I
11       don't recall getting it.  I don't recall
12       seeing it.  Because I didn't correspond or
13       communicate with Legal Services at all during
```

Page 149

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14     that -- when I -- when I was told by the ACLU

15     that you-all was representing her, I didn't

16     make contact with anybody, anything, nobody,

17     period.  I don't recall.

18  Q.  At the top of Plaintiff's Exhibit #28, is

19     that your address, 4013 --

20  A.  That is correct.

21  Q.  -- Tiffany Drive, Montgomery, Alabama?

22  A.  I'm not saying I didn't get this.  I just

23     don't recall, Ms. Neal.  I really don't.  I

                 459

1     really do not receiving correspondence from

2     your office at all.

3  Q.  Do you recall --

4  A.  I'm -- I'm not saying that it didn't come to

5     my office.  I didn't read it at some point in

6     time.  I probably threw it in the trash can.

7     But I get so many different correspondence, I

8     just don't recall, ma'am.

9  Q.  Did you fix Ms. Boswell's malfunctioning

10    toilet?

11  A.  I have -- if I didn't -- if it was over $100

12    and I referred it to the landlord for

13    repairs, it's out of my hands.  The only

14    thing that I can do is ask.

15        And once again, to answer your question,

16    I sent these notices out to all of the

17    tenants.  If your stuff -- your repairs has

18    not been done in five days, 48 hours, contact

19    the landlord yourself.  So if -- if -- if it

20    didn't get fixed, it was probably over -- it

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21    was going to be over $100; and the landlord

22    is in control then.  I -- I leave it alone.

23  Q.  That's interesting.  So did the tenant --

                          460

1     were the tenants provided the numbers of the

2     landlords for them to call if there was a

3     complaint that -- that you weren't able to

4     fix?

5  A.  In the correspondence that I sent them, no.

6     We don't usually give tenants the landlord

7     phone numbers; but in a situation like this,

8     if the -- if the person been there for four

9     or five days, six or seven days, they have

10    not received any -- any financial relief

11    for -- for me to take care of the -- I would

12    give them the landlord number.  But by --

13    by -- I don't do that because they don't want

14    to be bothered and harassed by tenants, so --

15    but if ten days, 15 days gone past, I get

16    tired of them calling me, I say, here, here's

17    the landlord's number, you call him.

18  Q.  Did you give Ms. Boswell Mr. Bahr's number?

19  A.  I don't recall.

20  Q.  So you're saying that the only reason that

21    the malfunctioning toilet complaint would not

22    have been fixed is if you had referred this

23    to Mr. Bahr and it had been over $100; is

                          461

1     that correct?

2  A.  That is correct.  Because I can't afford to

3     pay his mortgage payment and pay his

                     Page 151

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    repairs.  It just wasn't going to happen.
5    It's not my house.
6            MR. LAY:  Well, you weren't
7        paying his mortgage payments on
8        February the 7th, were you?
9            THE WITNESS:  Yes, sir.  You
10       remember I said to you, Mr. Lay,
11       when --
12           MR. LAY:  You were paying them
13       even before this lawsuit was filed?
14           THE WITNESS:  No, sir.  You
15       remember I indicated to you earlier
16       that the moment that this lawsuit
17       took place, I began paying his
18       mortgage payments.
19  Q.  This lawsuit wasn't filed until the end of
20       February.
21           MR. LAY:  February 14th.
22           THE WITNESS:  Well, whenever I
23       stopped -- whenever I stopped

                    462
1        receiving payments from her.
2            MR. LAY:  Well, this letter is
3        dated February 7th.
4            THE WITNESS:  Not this letter.
5        I can't recall this letter.  I said
6        whenever I got the notice --
7            MR. LAY:  Exhibit #29.
8            THE WITNESS:  Mr. Lay --
9                I'm sorry, ma'am.
10               Whenever I got any sort of
                    Page 152

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    response from whoever said that they

12    were suing whoever, at that time, I

13    told Mr. Bahr that I would pay his

14    mortgage payment for him.  And I

15    did.  And I -- I cannot afford to pay

16    his mortgage payment and pay for his

17    repairs.

18         MR. LAY:  But you didn't pay it

19    for February, then.

20         THE WITNESS:  I paid it -- if it

21    was due in February, it would be

22    noted on -- on --

23         MR. LAY:  Well, you weren't sued

                    463

1     until February 14th.  And I'm

2     assuming it took a couple days for

3     you to get served.  So certainly not

4     before February 15th would you even

5     have had knowledge of the lawsuit.

6              So are you saying you paid

7     the payment that was due on February

8     the 1st before this even happened?

9         THE WITNESS:  I was -- no.  What

10    I'm saying is -- what -- what I'm

11    saying is that whenever -- whenever,

12    which I don't recall, I received

13    correspondence from you-all and that

14    correspondence says that their rent

15    was going to be -- not be paid by

16    Mr. Boswell, I did not pick any rent

17    money up here for four or five

                    Page 153

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    months.

19         MR. LAY:  Yes, I know that.

20         THE WITNESS:  Yeah.  And so when

21    I finally picked the rent money up, I

22    found out that she had not been

23    paying her rent and on time -- in a

                      464

1    timely manner, but I was paying this

2    mortgage payment from the date that I

3    received correspondence from you guys

4    that you was -- I was being sued.  I

5    started paying it from that point.

6    And I noted it on -- on all these

7    executive summaries here that it

8    would be paid in a separate account.

9         MR. LAY:  The question was you

10    were not doing it on February the

11    7th.

12         THE WITNESS:  I don't recall;

13    but more than likely, I probably did

14    pay.

15         MR. LAY:  Well, it's real

16    simple.

17         THE WITNESS:  Here it is.

18         MR. LAY:  Either you paid it

19    before the lawsuit was filed or you

20    didn't.  The lawsuit wasn't filed

21    until February 14th.

22         THE WITNESS:  Okay.  I stand to

23    be corrected.  This exhibit you gave

                    Page 154

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
465

| | | |
|---|---|---|
| 1 | | me, Exhibit #19, if you look on the |
| 2 | | March executive summary, number |
| 3 | | three, Ms. Boswell, payment will be |
| 4 | | made by Elite in a separate |
| 5 | | transaction. |
| 6 | Q. | But that's for March. |
| 7 | A. | Yeah.  That's March.  So that -- see -- |
| 8 | Q. | We're talking about February. |
| 9 | A. | Yeah.  I don't recall, but I'm -- I just know |
| 10 | | when I started to paying it, I started paying |
| 11 | | it. |
| 12 | | MR. LAY:  Again, the question |
| 13 | | was as of this letter being sent, the |
| 14 | | lawsuit hadn't even been filed. |
| 15 | | THE WITNESS:  Right. |
| 16 | | MR. LAY:  So you would not |
| 17 | | have -- |
| 18 | | THE WITNESS:  No.  I would not |
| 19 | | have paid February, right. |
| 20 | | MR. LAY:  All right. |
| 21 | | THE WITNESS:  Yes, sir.  Thank |
| 22 | | you. |
| 23 | Q. | So let's move on to what I have marked as |

466

| | | |
|---|---|---|
| 1 | | Plaintiff's Exhibit #30.  And I just handed |
| 2 | | it to you.  It is a letter from Legal |
| 3 | | Services of Alabama dated May 14th, 2007, to |
| 4 | | you signed by Ms. Baker.  Do you remember |
| 5 | | receiving this letter? |
| 6 | | Well, why don't we -- why don't we read |

Page 155

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7     it out loud.

8  A.  Thank you.  Exhibit #30 from Legal Services

9     of Alabama dated May 14, 2007, addressed to

10    Mr. Jamarlo K. Gumbaytay, 4013 Tiffany Drive,

11    Montgomery, Alabama, 36110-3000, reference

12    Yolanda Bos -- Bowell, 964 Gap Loop,

13    Montgomery, Alabama.

14       Dear Mr. Gumbaytay, I'm writing on

15    behalf of our client, the above-referenced

16    tenant, in accordance with the provision of

17    her lease, the new Landlord Tenant Law and

18    pre-existing real estate common law case law

19    to inform you are client request the

20    following repairs to be completed

21    immediately:  Remedy leaking water pipes and

22    correction -- correct the flooding in the

23    front bathroom.  Repair or replace damp

              467

1     carpet.  Correct malfunction in the tenant

2     air conditioning unit.

3        Additionally, as a reminder, Legal

4     Services has -- has rental money to turn over

5     to you paid by this tenant.

6        Should you have any questions, please

7     feel free to contact me at the address listed

8     below.  Enclosed, you shall find a lay

9     version of the -- of the Landlord Tenant

10    Laws.  Truly yours, Connie JMC Baker, Staff

11    Attorney.

12  Q.  So do you remember receiving this letter from

13    us?

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  A.  I don't recall.

15  Q.  Did you ever fix Ms. Boswell's leaking water

16      pipes?

17  A.  More than likely -- and I don't -- more than

18      likely, it did not get fixed.  If I'm paying

19      the mortgage payment and as -- and I informed

20      the landlord that the pipes was the issue and

21      the other situation was the issue, that

22      landlord did not respond; so, apparently, it

23      did not get fixed.

                            468

1   Q.  I mean, did you inform the landlord?  Do you

2       recall?

3   A.  Yes.

4   Q.  You informed him about the leaking water

5       pipes?

6   A.  I -- if -- I don't recall everything that I

7       talked to him about, but he -- he was aware

8       of the fact there was some problems over

9       there.  Because I'm quite sure his attorney

10      got the same thing that I received because

11      they usually CC a copy to me and him, but I

12      don't recall specifically how the

13      transaction --

14  Q.  So do you recall whether you corrected the

15      flooding from the front bathroom?

16  A.  More than likely, it probably was not.

17      Because I was paying the mortgage payment

18      over there; and more than likely, I was --

19      the landlord didn't correct the problems over

20      there.  I'm -- I'm assuming that he did not.

                        Page 157

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  Q.  So you don't remember, but probably not?

22  A.  Probably not.

23  Q.  Okay.  And the same for whether you repaired

                            469

1        or replaced damp carpet?

2   A.  Correct.

3   Q.  And correcting the malfunctions --

4        malfunction in the tenant's air conditioning

5        unit?

6   A.  Correct.  And also the landlord law says that

7        if you complain -- send out an official

8        notice to the Montgomery -- to the -- I

9        mean to the landlord and that landlord does

10       not correct that problem within a minimum of

11       ten days, you, as a tenant, has a right to

12       break that lease.  There used to be a time

13       you have to pay your rent.  If you take that

14       person to Court, the judge will tell you that

15       you have to pay your rent regardless of what

16       you owe the landlord.

17            So, in this case, she -- you sent the

18       notice out.  And Mr. Bahr probably got this

19       notice.  And she had the option to move and

20       terminate her lease at that particular point,

21       but apparently she did not -- she did not

22       take advantage of that law.

23            MS. NEAL:  So I have just a --

                            470

1        why don't we take a short recess for

2        about five minutes, and then we'll --

3        and then we'll finish up.
                              Page 158

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4               (Brief recess)

5               EXAMINATION

6  BY MR. LAY:

7  Q.  I'm going to show you what we've marked

8       Exhibit #32 -- #33.  This is Exhibit #33.  Do

9       you recognize that document that apparently

10      was filed with the Montgomery District Court

11      of Montgomery County on February 16th, '07?

12      Is that your handwriting on the front sheet?

13  A.  Yes.

14  Q.  Is that your signature?

15  A.  Yes.

16  Q.  And did you file a lawsuit against -- in your

17      name, Jamarlo K. Gumbaytay, against a Lois

18      Webb?

19  A.  Yes.  Yes.

20  Q.  And you recognize that these are copies of

21      the complaint that you filed in Small Claims

22      Court, Case Number SM-06-7328?

23  A.  This is my handwriting.

                         471

1  Q.  Okay.  Can you look at the statement of claim

2       that's attached, Case Number SM-06-7328.  Is

3       that your handwriting, and did you sign that

4       claim?

5  A.  Yes.

6  Q.  Could you, first off, tell us who Lois Webb

7       is?

8  A.  Lois Webb is a tenant that was residing at

9       unit number 661 Whiting Avenue, Montgomery,

10      Alabama.
                         Page 159

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  Okay.  And is that one of Matthew Bahr's
12      properties?
13  A.  Yes, if I recall.
14  Q.  Kay.  And if you would flip to the last sheet
15      of Exhibit #33, on the executive summary for
16      Matthew Bahr, is Lois Webb listed as number
17      eight on that list?
18  A.  Yes.
19  Q.  And what does it say her rent amount is on
20      your executive summary?
21  A.  The rent amount is 600.
22  Q.  And Section 8 pays 550?
23  A.  Yes.

                        472

 1  Q.  And what did you put in the complaint was the
 2      reason -- it says you were suing her for
 3      $800; is that correct?  If you'll flip back
 4      to the statement of claim.
 5  A.  Yes.
 6  Q.  What does it say on the statement of claim,
 7      item number one?  It's the previous page that
 8      we just looked at.
 9  A.  Oh.  $800.
10  Q.  Can you read that to us?
11  A.  The claim, the defendant owes the plaintiff a
12      sum of $800 because the tenant does not
13      pay -- because tenant has not paid rent for
14      several months hereunto as separate from
15      Section 8 late fees for every month.  Tenant
16      has not paid -- a tenant deposit was never
17      paid nor did she follow up with the agreement
                    Page 160

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    to pay it.

19  Q.  Okay.  So did she owe money that Section 8

20      did not pay?

21  A.  Yes.

22  Q.  I want to show you what's marked Exhibit

23      #32.  Do you recognize what this is?

                          473

1  A.  Yes.

2  Q.  And what is it?

3  A.  The initial rent is owed, 550.

4  Q.  Okay.  Is this a HAP contract?

5  A.  Yes.

6  Q.  And we established earlier that a HAP

7      contract is short for a Housing Assistance

8      Payment contract --

9  A.  Right.

10  Q.  -- from Housing and Urban Development.  And

11      this is something that you entered into with

12      Section 8; is that correct?

13  A.  Yes.

14  Q.  And it is for Lois Webb at 3661 Whiting

15      Avenue; is that correct?

16  A.  Yes.

17  Q.  And what does it say that the amount of rent

18      will be?

19  A.  The rent to the owner is 550.  The tenant is

20      supposed to pay the difference of that, of

21      $50.

22  Q.  Okay.  You understand that this contract

23      means that you can't charge more than 550?

                       Page 161

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
474

1   A.   That's not how it works.  I think you're
2        confused on that.
3   Q.   No, I don't think I'm confused at all.
4   A.   Okay.  Let me share with you --
5   Q.   Were you charging her more than 550?
6   A.   No.  The Housing Authority paid the landlord
7        $550.  The tenant is still responsible for
8        paying the difference.  The rent was $600.
9        So the tenant is supposed to pay the
10       difference of that for $50.
11  Q.   So you were charging her $50 in addition to
12       the 550?
13  A.   No.  The -- the rent is for $600.
14  Q.   Okay.  So her rent was 600.
15  A.   $600.
16  Q.   And the -- the place was approved for 550 by
17       Section 8; is that correct?
18  A.   The portion that Section 8 pays, Mr. Neal
19       (sic), if you look back at the executive
20       summary, on all of these, it tells you the
21       portion that the Housing Authority is
22       responsible for; and it will tell you the
23       part that the tenant is responsible for.

475

1        Number 11, Loretta Hall, for example,
2   the Housing Authority only going to pay
3   $600 -- on the executive summary, the Housing
4   Authority is only going to pay 650.  So that
5   HAP contract that you will see for her will
6   be for 650.  That's what went directly into

Page 162

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7       the landlord's account.  If the tenant is
 8       responsible for paying any of that, then that
 9       would reflect on here tenant paid.  So the
10       tenant was responsible for paying the
11       additional $55, which would have brought it
12       up to the total rent amount on this
13       particular unit on number 11.
14   Q.  So what all were you -- where did you come up
15       with the $800?
16   A.  Well, what it's -- it's based on what it says
17       here at the time that I filed this.  And I
18       can only go by what I said here, rent paid
19       for several months, tenant has not paid the
20       rent for several months.  And I said the --
21       her portion is separate from Section 8.
22           And I specified it here.  Because I
23       could not take that lady to court if she
```

                              476

```
 1       not -- did not have a contract.  Her portion
 2       is separate from Section 8.  What I was
 3       charging -- showing her amount is the portion
 4       that she was required to pay.  The Section 8
 5       pays what they pay, a fixed amount.
 6   Q.  Well, I want you to look at item number six
 7       on that page.  It says the initial rent to
 8       owner is 550; and during the terms of the
 9       initial lease, the owner may not raise the
10       rent.
11   A.  You're still not understanding how this
12       process work.  I don't think you still
13       understand.  A --
```

                              Page 163

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  Q.  Okay.  Go ahead.

15  A.  Yeah.  I still don't -- I don't think you

16      understand.  The HAP contract is what Section

17      8 will pay, no more, no less.

18  Q.  No.  I believe the way it works,

19      Mr. Gumbaytay, is they set how much the rent

20      is supposed to be.  And out of that rent, the

21      total rent, a portion is paid by the tenant,

22      which can be zero, and a portion is paid by

23      the Housing Authority.  In this case, it

                        477

1       looks like they were paying the full amount,

2       the 550.

3   A.  No.  I -- I don't have Ms. Lois Webb's lease

4       here.  We signed a lease.  If I can -- if

5       I had the lease -- we signed a lease for

6       600 -- $600.  So I don't have that lease.

7       I'm quite sure the contracted amount --

8   Q.  Well, was the Housing Authority aware that

9       you were charging her $600?

10  A.  That's -- would have been the lease amount.

11      And the Housing Authority send this out.

12      What I'm trying to explain to you, I don't

13      get this part here.  You remember I told you

14      in earlier conversations, sometimes Lynn and

15      I don't know exactly what's the difference

16      between what the Housing Authority pay and

17      what the tenant has to pay.  The only way

18      we'll know the difference is we have to

19      contact the landlord, but I know what we

20      charge on the contract.  And we put on the

                        Page 164

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21   lease $600.

22  Q.  Well, I think --

23  A.  So the Housing Authority --

478

1  Q.  Our point is that you were charging them more

2      than what the Housing Authority has

3      authorized that the rent can be.

4  A.  No.

5  Q.  Well, you just said you didn't even see

6      this.  You don't even know what was on it.

7  A.  I said the only -- we don't -- the landlord

8      gets this part of the portion that they are

9      going to receive every month according to

10     this executive summary.  You notice Lynn has

11     a part here that collected by the landlord,

12     collected by Elite, paid by the tenant or not

13     paid by the tenant on the executive summary.

14        It gives you a total amount gross rent

15     paid by Section 8, $4,225 for that month.

16     That went directly to that landlord.

17  Q.  Well, look at -- on your own summary, look at

18     number six -- I'm sorry -- number five.

19     Escambia McLean or McLean.

20  A.  Right.

21  Q.  550 rent, 550 Section 8 paid, 100 percent

22     paid by Section 8.

23  A.  In this case, that's exactly what Section 8

479

1      paid.  This client was 100 percent.  But in

2      this lady's case here, I would have never

3      went down to the Civil Court and filed suit

Page 165

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4      if this lady had not -- the total amount --
 5      whether the Housing Authority pay one-third
 6      of that, Mr. Lay, or they pay two-thirds of
 7      that, this is what the landlords get.  So the
 8      tenants are responsible for paying the
 9      difference.  I had a lady that --
10  Q.  Yes.  But if that's all that they authorize
11      the total maximum amount the tenant could
12      pay, why are you collecting more than that?
13      Why didn't you know from Mr. Bahr what the
14      amount was?
15  A.  That's -- that's never happened.  That's what
16      I'm trying to explain to you.  What you see
17      here is not the entire way that it will
18      transpire.  Again, the Housing Authority paid
19      this -- the portion for her.  She was
20      required to pay the difference of that.  And
21      if I had the lease in front of me, it would
22      say it on the lease.  I'm not asking no more
23      than what the Housing Authority said she can
```

                              480

```
 1      pay, which in this case, she was supposed to
 2      have paid a difference of -- of --
 3  Q.  Well, you see on number six, it says they may
 4      not raise the rent more than 550.
 5  A.  On -- on their part to the landlord.  That's
 6      what I'm trying to explain to you.
 7  Q.  But you said that was all that was due on
 8      the --
 9  A.  To the landlord from Section 8.  Section 8
10      would never pay --
```
                              Page 166

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  Where did you come up with the amount of
12      $600?
13  A.  Mr. Lay, Section 8 -- if Section 8 tells that
14      tenant that they are going to pay $10 and
15      you're responsible for paying the difference,
16      what you will see here is from the Section 8,
17      there's $10 on here.  That's not the actual
18      rent.  That's what I'm trying to explain.
19  Q.  Yeah.  And it doesn't say anything on here
20      about her paying $50.
21  A.  It doesn't say on there because that's not
22      the way the documents of the government is --
23      is structured.  I mean --

                    481

 1  Q.  Mr. Gumbaytay, I hate to tell you this, but
 2      I've been doing this for 15 years, and I --
 3      I'm very familiar with how Section 8 works.
 4      That's basically all I do.  So I -- I know
 5      what I'm saying.
 6  A.  Well, I'm telling you, based on this
 7      particular -- you may have been doing it for
 8      15 years, Mr. Lay, but this lady in this
 9      contract was a total of $600.  So there's
10      always an exception to the rule.  And
11      whatever that rule was Ms. Lois Webb got
12      charged with, Ms. Lois Webb would say that
13      the Housing Authority told her she could pay
14      it.
15  Q.  Well, so what you're saying is you got her to
16      sign a lease for $600 even though this says
17      550?
                                    Page 167

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18  A.   What I'm saying is if that tenant can afford

19       the difference -- I have had people want to

20       move in a house and they can't pay more.

21  Q.   Well, do you understand Section 8 does not

22       allow for additional payments to landlords or

23       their representatives?

                        482

1   A.   What I'm -- what I'm saying is that this

2        lady's rent was $600 a month.  Whatever the

3        difference is, this contract only represent

4        what the tenant is not required to pay.  The

5        Housing Authority pay that.  Now, I have --

6        can't tell you no more than that.

7             MS. COOPER:  Don't your records

8             indicate, though, that she had no

9             income?

10            THE WITNESS:  That's what -- if

11            she had -- she had income at the

12            time, because Ms. Lois Webb was --

13            Ms. Lois Webb was evicted from

14            another house.  And by the way, we

15            never did pursue this any further

16            other than the fact of making

17            documentation of it and had her sign

18            a promissory note.

19                 Ms. Lois Webb was evicted

20            from another unit.  And so when she

21            had called me, she had no place to

22            stay.  So the income -- whatever --

23            whatever she -- I asked Ms. Webb,

                                   Page 168

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
483

1       what are you paying where you are

2       right now?  Because the guy would not

3       fix the house up in any form,

4       fashion, or shape.  She was living in

5       the slums in the heart of west side.

6       So I offered her this unit over here.

7   Q.  But did you offer her a place that was up and

8       above in cost as to what --

9   A.  No.

10  Q.  -- more than she had been authorized by

11      Section 8 to get?

12  A.  No.

13  Q.  It's very common for someone -- you

14      understand how it works.  They get approved

15      for a certain amount of rental payment based

16      on their income and household size?

17  A.  But this is not the case in this case,

18      Mr. Lay.  Whatever it's -- whatever it's

19      perceived to be is this is not the case in

20      this case.  I'm just telling you the facts.

21      And if you want to take those facts and --

22      and misrepresent those facts, I'm just

23      telling you what -- what transpired with this

484

1   particular contract.

2           MS. COOPER:  Well, why was the

3       agreement between you and Ms. Webb

4       rather than Mr. Bahr and Ms. Webb?

5           THE WITNESS:  As a -- as a

6       person who was taking care of

Page 169

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7        Mr. -- Mr. Bahr's best interest, it

 8        was -- one of my responsibilities is

 9        to take care of his responsibilities

10        in his absence.  So I went to civil

11        courts for him, I filed a lawsuit for

12        him as if though any other real

13        estate agent -- licensed real estate

14        agent would do.

15           MS. COOPER:  But the agreement

16        to pay the $50 a month was between

17        Ms. Webb and you, not between

18        Ms. Webb and Mr. Bahr; is that

19        correct?

20           THE WITNESS:  No.  No.  It was

21        between -- it was a contract amount,

22        but the contract amount is what is

23        stated on this executive summary of
```

                          485

```
 1        $600.  That's the contract amount.

 2        And if -- if -- if -- if it --

 3   Q.  Well, isn't it possible -- is it not possible

 4        that you were charging her more than was

 5        allowed by Section 8?

 6   A.  No.  No.  That's what I'm trying to get you

 7        to understand and clarify.  If it was

 8        possible, I would not put it in -- on this

 9        document, here, Mr. Lay.  Everything I -- you

10        remember, if you recall, I said to you

11        anything that's relevant -- if a person park

12        on the yard, they owe us $20 and they didn't

13        pay the 20, now you go back again, they
```

                                Page 170

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    parked on the yard again, they got three
15    warnings, I would never take anyone to civil
16    courts for that.  I would never charge them
17    that.  It would never appear on these
18    reports.
19  Q.  Well, your thing says that this does not
20    include late fees -- not paid by rent for
21    several months.  Her portion is separate from
22    Section 8.  Late fees for every month has not
23    been paid.

                    486

1   A.  And that's what I'm trying --
2   Q.  Tenant deposit was never paid.
3   A.  And that's the point I'm trying to make,
4     Mr. Lay.  I mean, what it looks like and what
5     it actually is, her rent was $600 a month.
6     That's why I specified, other than the
7     point -- other than the amount that's paid by
8     Section 8.  This is what she is responsible
9     for.  That's why I was emphasizing that.  And
10    I separated that out to let the courts know
11    that she paid -- her rent has been paid.
12  Q.  But you don't -- you don't -- you see that on
13    Exhibit #2 that it says 550 is the maximum
14    amount?
15  A.  Right.  That's what the Section 8 pays.
16  Q.  Yeah.  But I think you're misunderstanding,
17    because that's supposed to mean that
18    that's the most --
19        MR. NEWELL:  Just a second.  I
20        can't see what you're pointing out.
                                    Page 171

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21          MR. LAY:  You've got it right

22      there.

23          MR. NEWELL:  I know.  But I want

                      487

1       to see it exactly.

2           THE WITNESS:  Here it is.

3   Q.  It says the 550 is the total rent.

4   A.  That the Housing Authority pays.  Let me see

5       can I put this another way.

6           MR. NEWELL:  It just says

7       initial rent to owner is 550, right?

8   A.  To the owner from Section 8, period.

9   Q.  But you work for the owner.

10  A.  Right.

11  Q.  You don't collect outside what the owner

12      gets.

13          MR. NEWELL:  Initial.  What does

14      initial mean?

15          THE WITNESS:  Initial from

16      the --

17          MR. LAY:  It means for a year

18      term.

19  A.  To the owner.  There's -- there is still a

20      part in the back of this document that you're

21      referring to that is a part that the tenant

22      has to pay under that contract.

23  Q.  Yes.  It should be a percentage of the 550,

                      488

1       not an additional amount.

2   A.  No.  In this case -- which I don't have the

3       lease here.  In this case, that's not the

                      Page 172

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4    case.  The draft -- the lease --
5  Q.  Why isn't it the case?
6  A.  Because the rent that we charge for that
7      unit.  And she --
8  Q.  Yeah, I understand --
9          MR. NEWELL:  So your leases
10         charge 600 and --
11             MR. LAY:  Mr. Newell.
12             MR. NEWELL:  And you knew that
13         the Housing Authority --
14             MR. LAY:  Mr. Newell.
15             MR. NEWELL:  Okay.  Go ahead.
16             MR. LAY:  Do we have to go
17         through this every time?  Now, I hate
18         to be ugly, but this --
19             MR. NEWELL:  Okay.  Go ahead.
20         I'm sorry.  Pardon me.
21  Q.  The 550 is supposed to be a portion of what
22      the Section 8 pays and the tenant.  In this
23      case, she had zero income; and so they were

                    489
1      paying all.  She was 100 percent.  I'm not
2      saying that you didn't get her to sign a
3      lease that said 600.
4  A.  And I'm not saying that I got her to sign --
5  Q.  I'm asking you did you get her to sign one
6      what was more than the maximum allowed by
7      Section 8.
8  A.  No.  What I got her to sign is what we agreed
9      upon.  And Section 8 was paying 550 of that
10     $600, sir.
                            Page 173

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  Well, where did you get the 600?

12  A.  That's what the amount of rent that we were

13      charging for that unit.

14  Q.  I know that's the rent that you would have

15      charged somebody; but when you sign up a

16      Section 8 tenant, you have to agree to a

17      maximum amount charged to the tenant.  And

18      that's what this says, 550.

19  A.  A three-bedroom unit is -- you can get up to

20      $700, Mr. Lay.

21  Q.  Yeah.  But that's what she was approved for.

22  A.  She was approved for that because her income

23      had been reduced.  She was living in another

                        490

1       house that she was being evicted from.  Her

2       income had been reduced.  She knew what the

3       rent was.  The contract was signed for that

4       amount.  She knew her part other than what

5       the Section 8 would pay.  Once again,

6       referring --

7   Q.  Was Section 8 aware that you were collecting

8       this extra?

9   A.  I'm not collecting anything else other

10      than -- this is only --

11  Q.  Just answer the question.

12  A.  No.

13  Q.  Was Section 8 aware --

14  A.  Yes.

15  Q.  -- that you were charging 600 and not 550?

16  A.  Section 8 was aware of what -- whatever the

17      contract amount was.  In this case, it was
                        Page 174

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18      $600.

19   Q.   So they were aware that she was paying an

20        additional $50?

21   A.   This is the amount and -- that the Section 8

22        paid.  And the difference that -- what

23        Section 8 doesn't pay, the contract amount

491

1        was $600.

2    Q.   You're not answering my question.  I'll try

3         again.

4    A.   Yes.

5    Q.   Were they aware that you were charging her

6         600 and that they had authorized 550?

7    A.   They should have been aware of it.  I can't

8         say whether they was aware of it or not,

9         because once that contract --

10   Q.   Did you provide them with a copy of the

11        lease?

12   A.   They always get a copy of the lease.  You --

13        if -- if -- if -- if -- before we sign off on

14        a lease, we always get a -- Section 8 had to

15        look at the lease and read the lease before

16        they sign off on the lease.  So when they

17        signed off on the lease, apparently, they

18        told her your responsibility is for 550.  And

19        that's what --

20   Q.   Okay.  Look at the screen.  We're going to

21        show you another one.  This is just a sample

22        of another tenant.  Do you see on there where

23        it says the total amount of rent, and then it

Page 175

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
492

1    says what Section 8 will pay?

2  A.  Yes.

3  Q.  And do you see there different amounts, and

4      one is less than the total?  I believe one

5      says 480, doesn't it -- or 380?

6  A.  Where do you -- where do you see that?

7          Okay.  This one is -- is entirely

8      different from this one.  I don't know why --

9      here again, Mr. Lay, what I know of to be,

10     based on this contract, was $600 initially,

11     the first day.  Now, they have -- they could

12     have -- and I'm not saying that that didn't

13     happen.  When this lady became unemployed,

14     her income dropped.  There was -- there are

15     opportunities for the Section 8 to reduce

16     their rent amount.  Because I had some

17     tenants to have lost their job, and they will

18     go back to the --

19 Q.  Mr. Gumbaytay, I don't think you're

20     understanding what we're asking.  I

21     understand how the Section 8 process works.

22     And their income can go up.

23 A.  Exactly.


493

1  Q.  As their income goes up or down, their rent

2      portion goes up or down; but the question is

3      whether you were charging more than the

4      maximum allowed by Section 8.  And it appears

5      that you were.

6  A.  No.  What it appears on there, Mr. Lay, is

                        Page 176

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 7    apparently, her income went down and they --
 8    they changed that.  And what you see there is
 9    that change.  Because as I've indicated to
10    you, we do not get the document that you have
11    in your possession.  So it could have
12    changed.  Five days after she moved into the
13    unit, it could have changed.
14  Q.  Yeah.  But the contract rent for the unit is
15      for a year's time.  And it plainly says on
16      here, During the initial term, it will not be
17      raised.
18  A.  Yeah.  A year time from that date that she
19      rented it.  Five days later, her income could
20      have changed.
21  Q.  And that would affect her portion, not the
22      rent.
23  A.  And that would have affected the entire
```

                              494

```
 1      contract.  So whether she had a contract --
 2      you're still not understanding, Mr. Lay.
 3  Q.  Okay.  I do --
 4  A.  If I -- if I sign a contract with you for
 5      $600, then tomorrow you lose your job
 6      because -- for whatever reason.  The
 7      economy.
 8  Q.  Are you saying you signed new leases with
 9      them every time their income changed?
10  A.  No.  No, sir.  What I'm saying is the
11      document that you have here, I'm not privy to
12      that information.  They could have --
13  Q.  I know you're not.
```

                         Page 177

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14  A.  She could have -- she could have did this,

15      Mr. Lay:  Rented the unit from me from day

16      one for $600.  The next day she could have

17      went back to the Housing Authority and told

18      them she just lost her job.  They would

19      reduce that amount to whatever her income

20      would be at that time.  So the document that

21      you have here is a document that's in your

22      possession.

23  Q.  Well, do you have a copy of Lois webb's

                        495

1       lease?

2   A.  I don't have a copy of Lois Webb's lease, no,

3       sir.

4   Q.  where is it?

5   A.  I have asked -- indicated to you before, when

6       I received a cease to desist order from the

7       Real State Commission, in respect for that

8       request, I no longer have her lease.  The

9       only thing that I have in my file is

10      pertaining to what you have in your file,

11      sir.

12          I understand what you're saying here.

13      Now, this is -- based on this, it's --

14      it's -- it is exactly what you say it is with

15      your 15 years of experience.  But she could

16      have went back down there, like I said, the

17      next day and said --

18  Q.  You don't have a copy of the lease?

19  A.  No, sir, I sure don't.

20  Q.  Did you shred it, throw it away --

                    Page 178

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  A.  Yes.

22  Q.  -- where is it?

23  A.  I have -- when the Real Estate Commission had

                            496

1        contacted me, sir, I shared with you that

2        I --

3   Q.  So you destroyed not only the Boswell

4        documents, but these, too?

5   A.  No, sir.  I said to you before, anything and

6        everything relating to Ms. Boswell --

7   Q.  Well, this is Lois Webb.

8   A.  Ms. Boswell.  I don't have any that -- the

9        Judge asked you do you have a universal

10       collection of documents in your presence.

11       Judge Moorer asked you that, he asked me

12       that.  I said then as I say that, the

13       universal collection of documents that's in

14       your possession is all that's left, sir.

15  Q.  Okay.  But you understand we're asking about

16       documents about Lois Webb?

17  A.  I don't have those documents.  You have a

18       universal collection of documents --

19  Q.  Okay.  Do you understand that the --

20  A.  -- in your possession.

21  Q.  -- request for production included other

22       tenants of Matthew Bahr other than

23       Ms. Boswell?

                            497

1   A.  I understood what I understood at the time,

2        yes.

3   Q.  Okay.

                       Page 179

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

```
 4          MR. NEWELL:  He's given you
 5       everything he could.
 6   Q.  And you're saying you do not have it even for
 7       Lois Webb?
 8   A.  I have -- I'll say again.  The universal
 9       collection of documents, as my conversation
10       with you and Judge Moorer, that I do not have
11       anything else to give you, sir.  I'm not a
12       big corporation.
13   Q.  You don't have anything related to Lois Webb
14       either?
15   A.  I don't have any universal --
16   Q.  And when did you get rid of her stuff?
17   A.  When I received a cease to -- whatever the
18       date on that letter, sir.  I can't recall the
19       date.  I can't recall when I got rid of the
20       stuff, Mr. Lay; but whatever is on that
21       letter, when the Real Estate Commission tell
22       you cease to desist and they give you a
23       warning -- now, just a warning --

                       498
 1   Q.  You took that to mean to destroy stuff?
 2   A.  I took that to mean you need to stop doing
 3       what you're doing and clear house.  Now, once
 4       again, understand this, I work out of a -- I
 5       got a two-bedroom house in North Montgomery,
 6       working out of my office.
 7   Q.  Well, what did you do?  Did you shred it?
 8   A.  So I have --
 9   Q.  What did you do with this stuff?
10   A.  I threw them away, sir.
```

                              Page 180

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  Q.  Where?

12  A.  In the trash can, sir.

13  Q.  At your house?

14  A.  Everything that has not -- everything --

15  Q.  How many boxes did you throw away?

16  A.  I have no -- I can't recall.

17  Q.  Was it more than one?

18  A.  I can't recall.

19  Q.  More than five?  Less than ten?

20  A.  I can't recall, sir.  I had 114 clients,

21      Mr. Lay.

22  Q.  Well, was it 114 boxes?

23  A.  I have no idea, sir.  I can't recall,

                          499

1       Mr. Lay.  I wish I could help you, sir.

2   Q.  I'm sure you do.  Okay.

3           MS. COOPER:  Are you still

4           garnishing funds from Ms. Webb?

5           THE WITNESS:  This -- this thing

6           here was what we referred to earlier

7           as a paper tiger.  I never got

8           anything from her.

9   Q.  How is it a paper tiger, Mr. Gumbaytay, when

10      you sued her in court?

11  A.  We didn't follow up or pursue.

12  Q.  You did follow up and pursue.  You filed it

13      in court.  Right here it is.

14  A.  Okay.  Let me clarify again.

15  Q.  Do you not understand a lawsuit is doing

16      something?

17  A.  To answer your question, no, we did not

                        Page 181

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18    collect anything nor was we expecting to
19    collect anything.  So when I said --
20  Q.  well, what did you file the lawsuit for?
21  A.  In an --
22  Q.  what you did file the lawsuit for?
23  A.  In an attempt to collect.  Everybody you file

                              500

1     a lawsuit against don't mean you're going to
2     collect.  So this was an attempt to collect.
3   Q.  well, if you had no intent -- you just said
4     you had no intention of doing anything.  So
5     if you had no intention of doing anything,
6     why did you file a lawsuit?
7   A.  I didn't say that.  I didn't say that.  I
8     said this was a paper tiger.  As I've
9     indicated to you before, we send letters out,
10    we send notices out, we send --
11  Q.  well, sending letters and suing somebody are
12    two different things.
13  A.  But to answer your question, Mr. Lay, I had
14    no collection.  We did not collect anything.
15  Q.  Okay.  well, our records indicate that you
16    did file a garnishment on her and you tried
17    to collect on 5/15/07, 6/22/07, and 7/31/07.
18  A.  And she asked me -- Ms. Faith just asked me
19    did I collect anything, am I still collecting
20    anything.  I never collected a dime.
21  Q.  Okay.  You never collected a dime.  Did you
22    try to collect?
23  A.  we made every attempt to collect.

                          Page 182

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
501

1  Q.  Okay.  And then you just said a few minutes
2      ago you had no intentions of doing anything.
3  A.  I said to you a few minutes ago this was a
4      paper tiger.  It's to scare people.
5      Sometimes you file paperwork --
6  Q.  You scare people by suing them and filing
7      garnishments?
8  A.  Well, you try to use --
9                  (Court reporter interrupts)
10 A.  You first, then me.
11 Q.  Is your reference to a paper tiger suing
12     someone and filing garnishments against their
13     wages?
14 A.  It is an attempt to collect what is due.  And
15     the process went from filing a civil suit to
16     filing a garnishment.  The lady did not have
17     a job, so she didn't anything to garnish.
18     And you don't see a garnishment suit there
19     nowhere because she never had a job after she
20     moved in over there at that unit.  You can
21     only garnish somebody when they have a job.
22 Q.  But you attempted to garnish by filing the
23     appropriate --

502

1  A.  I can't -- you can't attempt to garnish
2      anybody unless you know what --
3  Q.  Did you file a garnishment --
4  A.  No.
5  Q.  -- on her?
6  A.  No.  Because --

Page 183

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7  Q.  You didn't?

8  A.  No, sir.  I don't recall filing a garnishment

9      on Ms. Webb, because Ms. Webb never had a job

10     unless she lied to me.  She -- she --

11 Q.  You don't recall collecting any money from

12     her?

13 A.  I don't recall, sir.  She never had a job.

14     Like I said, she could have been working --

15 Q.  Did you file a garnishment?

16 A.  No.  I don't recall filing a garnishment.

17     You got to find an employment, a person

18     who --

19 Q.  Well, this has your signature on it where you

20     did file for one.  You don't recall that?

21 A.  No, I do not sir.  I do not recall it.

22     Because if that -- if I filed a garnishment,

23     I have to have a job to file a garnishment

                        503

1      on.  I only filed -- from my recall, there is

2      not a garnishment on her because the lady

3      never had a job.  You got to have a job to

4      garnish her.  You may see a garnishment in

5      there for somebody else who had a job.  And

6      the only reason I knew he had a job is he

7      told me where he worked at.

8          MR. NEWELL:  This is still

9          unpaid today?

10         MR. LAY:  Unpaid today.  Nothing

11         else been collected.

12 Q.  You didn't file something with the District

13     Clerk's Office to collect any personal

                        Page 184

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14    property of Ms. Lois Webb that she might

15    have?

16  A.  I probably recall -- after she did not

17    respond, she did not show up for court, it

18    was -- it was a default.  And then you can go

19    back and file.

20  Q.  Did you file something after you got a

21    judgment to try to collect on the judgment?

22  A.  Yes.  But we never collected on it, sir.

23  Q.  Okay.  Well, why did you keep saying you

504

1    didn't file it?

2  A.  Well, garnishment is when you sue somebody

3    for wage -- for wages.  So I don't recall

4    anything else until you just mentioned it.

5          MR. NEWELL:  You just have so

6       much of this stuff, you can't

7       remember all of it.

8          THE WITNESS:  Yeah, I can't.

9  Q.  But you now recall filing for a collection?

10  A.  Right.  But to this day -- to this very day,

11    we have never collected anything.

12  Q.  Okay.

13  A.  Now, I'm sorry, sir.  I can't help you.

14  Q.  All right.  You also, in the stuff that you

15    gave us the other day at court, included

16    several HUD complaints from other tenants.

17    Do you recall that?

18  A.  No, I do not.

19  Q.  You don't recall turning over to us in court

20    last week stuff that you handed to me that

Page 185

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21  included HUD complaints against you for

22  sexual harassment against other tenants?

23  A.  Everything that I turned over to you is the

505

1  universal -- I don't recall -- I don't recall

2  that.  I could have.  I don't recall it.

3  Everything that you have right now, I -- I --

4  I sent directly to my attorney.  Matter of

5  fact, I sent him the whole envelope --

6  envelope in most cases, but I don't really --

7  Q.  Well, let me ask you this.  Do you recall

8  being served notice by the HUD, the Housing

9  and Urban Development Department, that

10  complaints had been filed against you?

11  A.  Yes, sir.  I recall that.

12  Q.  All right.  And what -- what did you -- when

13  you got that from HUD, what was it?

14  A.  I don't recall, sir.  I had -- Mr. Lay, I

15  have about --

16  Q.  But you do know it was a complaint?

17  A.  All I know is when I got a letter from the

18  USDA, I automatically put it in the mail.  I

19  asked -- I told Mr. Newell I'm sending him

20  some stuff.  I don't even read it.  Now

21  that -- now that I have him retained, I don't

22  even bother about reading stuff that I get

23  from you-all anymore.  I just automatically

506

1  send --

2  Q.  Well, has he informed you that you have

3  received some complaints from HUD?

Page 186

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4   A.  I got a notice from you guys some months ago

5       that I shared with him that's in all the

6       documents that you --

7   Q.  I'm not talking about the letter that was

8       sent out to you.

9   A.  Yes.

10  Q.  I'm talking about official notification from

11      the Department of Housing and Urban

12      Development that tenants had complained

13      against you for the same thing --

14  A.  I recall --

15  Q.  -- that Ms. Boswell has.

16  A.  I recall tenants have complained and lied and

17      deceived, because --

18  Q.  Well, I'm just asking you whether you know

19      about it.

20  A.  Yeah.  Ten --

21          MR. NEWELL:  No, no, no.  My

22          last conversation was just about did

23          he give you the documents, and that

                        507

1           was it.

2   A.  Yeah.  Anybody can file a complaint against

3       anybody, Mr. Lay.  It don't necessarily mean

4       that the complaint is true.

5   Q.  I didn't say that, Mr. Gumbaytay.

6   A.  Yes, sir.  Yes.

7   Q.  See, this is the problem that we've had

8       throughout this process.  You won't listen to

9       what we ask you and you won't answer the

10      question.
                        Page 187

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11  A.  I'm not going to tell a lie, sir.  If you --

12  Q.  I'm not asking you to tell a lie.  I asked

13      you, were you -- did you receive a complaint

14      from other tenants from HUD.  Either you did

15      or you didn't.

16  A.  From HUD?

17  Q.  How difficult is that?

18  A.  Yes, I received complaints from HUD, not from

19      any tenants.

20  Q.  Did you receive complaints from HUD that they

21      were notifying you that tenants had

22      complained to them?

23  A.  Yes.

                         508

1   Q.  And how many did you receive?

2   A.  I don't recall, sir.

3   Q.  And you turned them over to your lawyer?

4   A.  Yes, sir.  Anything that I made copies of, I

5       put them all --

6   Q.  Do you remember how many you got?

7   A.  No, sir, I do not.

8   Q.  Okay.

9   A.  Like I said, anybody can complain, sir.

10  Q.  I didn't ask you whether they were true or

11      not.

12  A.  Yes, sir.

13  Q.  I just asked you if you got them.

14          MR. LAY:  That concludes our

15      deposition.  You're welcome to ask

16      him whatever you'd like.

17          MR. NEWELL:  I'm going to make

                      Page 188

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18          it real short.  I just have a couple

19          questions.

20                      EXAMINATION

21  BY MR. NEWELL:

22  Q.  This person here, Lois Webb, she never paid

23      any of the rent?

                              509

1   A.  No.

2   Q.  Until this day, never collected it?

3   A.  No.

4   Q.  The same with this Boswell.  She never paid

5       the rent for like four or five months?

6   A.  She never paid the rent to me directly.  And

7       the rent that I did collect, she was late.

8       And she had not paid for two or three months,

9       if I --

10  Q.  Two or three months?

11  A.  Two or three months.

12  Q.  Just for clarification.

13              MR. NEWELL:  I mean, that's it.

14          I'm done.  No questions.

15              MR. LAY:  Okay.

16  A.  Because I never knew --

17              MR. NEWELL:  Does everybody --

18              MR. LAY:  Can we go off the

19          record for just a moment?

20              (Off-the-record discussion)

21              MR. LAY:  I just want to, for

22          the record, state that in Judge

23          Moorer's order the other day, he

                              Page 189

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
510

1       instructed us to meet face-to-face

2       with you regarding a settlement

3       conference.

4              MR. NEWELL:  And I did comply

5       about the telephone call.

6              MR. LAY:  And we're face-to-face

7       today.  And I'm asking you if you

8       want to do it today, and you're

9       telling me you don't.  And you have

10      been advised that the deadline is

11      July the 7th.  That's all.  Is that

12      correct?

13             MR. NEWELL:  And what's today?

14             MR. LAY:  Today is June 30th.

15             MR. NEWELL:  Okay.  Well, so

16      we've got seven days.

17             MR. LAY:  And you're asking

18      today to not do it today and to put

19      it off?  Am I understanding you

20      correctly?

21             MS. TARWATER:  Is July 7th --

22      what?

23             MR. LAY:  It's a week from

511

1       today.  It's next Monday.  Of course,

2       the 4th is in there.

3              MR. NEWELL:  Well, we can do it

4       today, but I don't think we can get

5       anywhere.

6              MR. LAY:  We're here and ready

Page 190

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

7    to do it.  If you don't want to do
8    it, we don't have any way to make you
9    do it.  It's up to you.  But I just
10   want it on record that we've made the
11   offer.
12        MR. NEWELL:  You've made the
13   offer.  I'll do it today if you want
14   me to, but I don't think we can get
15   anywhere with it.
16        THE WITNESS:  Mr. Lay, in all
17   due fairness to Mr. Lay -- and I'm
18   not trying to -- Mr. Newell, that's a
19   ton of information to look through.
20   Can we ask for a continuance on it?
21        MR. LAY:  We didn't set the
22   deadline.
23        MR. NEWELL:  Well, no, he didn't

                    512
1    set it.  He just wants to get it in
2    the record.
3        MR. LAY:  We're under the same
4    obligation that you are.  And we're
5    offering to do it today while we're
6    all here.
7        MR. NEWELL:  Can we just set it
8    for Monday?  Is that too late?
9        MS. TARWATER:  Monday is the
10   7th.
11        THE WITNESS:  Monday is the 7th.
12        MR. NEWELL:  Monday is the 7th.
13   How about we just set it for Monday?
                               Page 191

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

14          MR. LAY:  Well, where is it

15     going to be?

16          MR. NEWELL:  Wherever you want

17     it.  And I really do have a hard time

18     getting -- getting back and forth to

19     all these places.

20          MR. LAY:  I understand, which is

21     why we thought maybe today might be a

22     better day to do it.

23          MR. NEWELL:  Well, I'm here.

                         513

1          MR. LAY:  But you're also

2     telling me and your client is saying

3     that he doesn't want to do it today.

4     So we just need an answer.

5          THE WITNESS:  I think in the

6     best interest of and in all due

7     respect to everybody here, he need to

8     have a chance to really thoroughly

9     look at all those documents so we can

10     proceed in a timely manner.

11          MR. LAY:  Well, we just want an

12     answer, yes or no.

13          THE WITNESS:  We would like to

14     have -- ask the Judge -- we can send

15     an e-mail and ask him for a

16     continuance on that and give us about

17     another two weeks if that's possible.

18          MR. NEWELL:  Is that agreeable?

19          THE WITNESS:  If you agree to

20     it, we agree to it.  Give you some

                                        Page 192

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

21 time; give him some time.

22   MR. NEWELL:  A settlement

23 conference within two weeks; is

<div align="center">514</div>

1 that --

2   MR. LAY:  Well, we don't know

3 that the Judge is going to allow

4 that.

5   MR. NEWELL:  No, we don't know

6 if he's going to grant it.

7   THE WITNESS:  All we can do is

8 ask him.

9   MR. LAY:  So my understanding

10 is --

11   MR. NEWELL:  Why don't we just

12 do it the 7th?

13   MR. LAY:  You do not want to do

14 it today?

15   MR. NEWELL:  I will do it today

16 if y'all want to.  Do you?

17   MR. LAY:  Okay.  Mr. Newell, we

18 are here and ready to do it.

19   MR. NEWELL:  Okay.

20   MR. LAY:  I have to get back to

21 Birmingham to teach a class at 6:30,

22 so I don't have time to sit here and

23 bicker back and forth either.

<div align="center">515</div>

1   MR. NEWELL:  I'm sorry.  What

2 class do you teach?

3   MR. LAY:  So either we're going

<div align="center">Page 193</div>

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

4       to do it or we're not.  We're here
5       and ready to do it.  If you choose
6       not to do it, that's fine; but I want
7       it on the record that we made an
8       attempt.  Because I'm not going to
9       have him yell at me.
10          MR. NEWELL:  Well, let's go
11      ahead and get -- get it done, then.
12      I don't --
13          MR. LAY:  I tell you what.
14      Let's go off the record.  We're going
15      to take a break.  You consult with
16      your client, and you decide what you
17      want to do, and you come back and let
18      us know within five minutes.
19          MR. NEWELL:  All right.
20              (Brief recess)
21          MR. LAY:  Back on the record.
22      It is now 4:20.  And Mr. Ben
23      Schoettker is here.  And after

                    516
1       conferring with his client,
2       Mr. Gumbaytay, we are going to go
3       forward with a court-ordered
4       face-to-face settlement conference to
5       begin at 4:20.
6              We've got one more thing on
7       the record.
8           MR. NEWELL:  No.  Offers for
9       settlement are not admissible.
10          MR. LAY:  We're not going to do
                    Page 194

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

11    the settlement conference on here,

12    but Allison had another question.

13        MS. NEAL:  Oh, yeah.  I wanted

14    to know where we were -- have you

15    looked over the orders from the Judge

16    for you paying $300 and your client

17    paying 200?

18        MR. NEWELL:  Yes.

19        MS. NEAL:  Do you have the

20    checks with you?

21        MR. NEWELL:  No.  But I can get

22    it by today or tomorrow.

23        MS. NEAL:  Well, tomorrow is

517

1    when the Court ordered you to pay it

2    by.  So you can put it in the mail

3    tomorrow.

4        MR. NEWELL:  Yes.

5        MS. NEAL:  Okay.  And I sent you

6    an e-mail that had the address.  Do

7    you still have that e-mail?

8        MR. NEWELL:  Yes.  I got that.

9    And I am buried in e-mail, like I

10    said.

11        MR. LAY:  All right.  We're

12    finished.

13        (The deposition concluded at

14        4:22 p.m.)

15    * * * * * * * * * *

16    FURTHER DEPONENT SAITH NOT

17    * * * * * * * * * *

Page 195

3927 06-30-08 Gumbaytay Jamarlo_part1.txt

18
19
20
21
22
23

518

1                REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    ELMORE COUNTY

4       I, Dee Coker, Registered Professional

5    Reporter and Commissioner for the State of

6    Alabama at Large, hereby certify that on Monday,

7    June 30, 2008, I reported the continuation of the

8    deposition of JAMARLO KALONJI GUMBAYTAY, who was

9    first duly sworn or affirmed to speak the truth

10   in the matter of the foregoing cause, and that

11   pages 267 through 517 contain a true and accurate

12   transcription of the examination of said witness

13   by counsel for the parties set out herein.

14      I further certify that I am neither of kin

15   nor of counsel to any of the parties to said

16   cause, nor in any manner interested in the

17   results thereof.

18      This 15th day of July, 2008.

19

20      _____

21      DEE COKER, CSR, RPR
        Commissioner for the
22      State of Alabama at Large
        CCR LICENSE NO.: 85
23
        MY COMMISSION EXPIRES: 1/25/2009

                Page 196

3927 06-30-08 Gumbaytay Jamarlo_part1.txt
519

1              SIGNATURE OF WITNESS

2        I, JAMARLO KALONJI GUMBAYTAY, hereby

3   certify that I have read the transcript of my

4   deposition consisting of pages 4 through 517, and

5   except for the corrections listed below, certify

6   that it is a true and correct transcription.

7

8   _____

    JAMARLO KALONJI GUMBAYTAY
9

10
    SWORN TO AND SUBSCRIBED before me
11  this _____ day of _____, 2008.

12

13  _____

    NOTARY PUBLIC

14

15              *  *  *  *  *  *  *  *  *  *  *

16  Page   Line   Correction and reason therefor

17

18

19

20

21

22

23

Page 197

Exhibit C, 2:07-cv-135

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| YOLANDA M. BOSWELL,<br><br>Plaintiff,<br><br>v.<br><br>JAMARLO K. GUMBAYTAY,<br>DBA/THE ELITE REAL ESTATE<br>CONSULTING GROUP<br><br>AND,<br><br>MATTHEW W. BAHR<br><br><br>Defendants. | Civil Case No. 2:07-cv-135-WKW<br><br><br>**DECLARATION OF YOLANDA M.<br>BOSWELL IN SUPPORT OF<br>MOTION FOR SUMMARY<br>JUDGMENT** |

I, Yolanda Boswell, do declare the following:

1. I lived at 964 North Gap Loop, Montgomery, Alabama 36110 from October 2006 to July 2007.

2. When I found the North Gap Loop house, I explained to Mr. Jamarlo K. GumBayTay, the manager of the property, that I could only afford to pay $450/month for the house, owing to how much I earned and the fact that I have four children and a sick mother. He said that he would accept $450 because of my difficult situation.

3. In October 2006, I agreed to sign a lease for $450/month for my place on North Gap Loop. The lease mistakenly said that the rent was $550/month, and when I pointed this out prior to signing it to Lynn Norsworthy, an employee of Elite Real Estate Consulting

1

Group, she hand-changed the amount to $450 and initialed the change "LHN." I then signed the lease.

4. Prior to moving Mr. GumBayTay may have made a pass at me, but I ignored it and he did not indicate that the $450 rental amount was conditioned on me providing him sexual favors. If he had said something like this beforehand, I never would have moved in.

5. I moved in during the first week of October 2006. From that point on, I was pressured in a number of ways to have sex with Mr. GumBayTay. This harassment has caused me great pain and suffering.

6. At the time I moved in, there were several problems with my unit. For instance, the toilet in my back bathroom was stopped up and there was a broken windowpane in one room. However, Mr. GumBayTay was at first quick to respond to my repair requests, and in October he sent three separate repairmen to try to fix the toilet. On the third try, the toilet was replaced and the windowpane was fixed.

7. Around October 11, 2006, Mr. GumBayTay called and asked me to sign a new lease stating that my monthly rent would be $550 a month. GumBayTay told me that while the $450 lease reflected the actual agreement between us, he needed a $550 lease to send to Mr. Bahr, the owner of the property. I did not want to sign a lease stating that I owed $550 a month, and I never did so. During this conversation, Mr. GumBayTay pressured me to have sex with him, telling me that we needed to get together soon and have lunch, dinner, or cocktails. He also invited me on a weekend trip with him, and indicated that he was interested in having sex with me.

2

8.  Around October 12, 2006, Mr. GumBayTay called me and let me know that he went ahead and modified the original lease to $550 a month, and sent it to Bahr for his records. He then urged me to visit him the next week.

9.  On or around October 14, Mr. GumBayTay stopped by my house without any notice. He walked in without warning at a time when I had a number of friends over. He said he was just checking to make sure everything was ok.

10. On or around October 16, I called Mr. GumBayTay to tell him that the toilet in my bedroom was stopped up and so was not working. During this conversation, he asked me when I wanted to "work on my sugar daddy account."

11. On or around October 17, 2006, Mr. GumBayTay called and asked me when I was going to start "working on" his portion of the rent, meaning the $100 difference between $450 and $550. He insisted that I visit him sometime before the end of the month. I did not really understand what he was asking. I reminded him that he had just seen me because he had shown up at my house around October 14. At this time, Mr. GumBayTay indicated that he was not interested in just seeing me, but in having sexual relations with me. He asked me whether "sugar daddy" meant anything to me. I thought he was just trying to help me out by giving me a discounted rent, and I told him that. I was shocked and horrified by what I was hearing, because I hadn't given him any reason to believe I would participate in something like this. I asked GumBayTay if he was saying that he would only accept $450 in rent if I had sex with him. He indicated that this was the case, but refused to put it in those terms because he said that to say so "is borderline harassment." I refused. I was humiliated. This was not my understanding of our agreement. I really thought he was just trying to help me.

3

12. During this same conversation, Mr. GumBayTay said that since I had not "understood the situation", he would continue to let me pay $450 for the months of November and December. However, in January, unless I agreed to have sex with him, the rent would be raised to $550 a month.

13. At some point in December, Mr. GumBayTay came to my unit to collect the rent and my boyfriend answered the door. Mr. GumBayTay later asked who the person was that answered the door, and I responded that it was my boyfriend. At that point, Mr. GumBayTay began to harass me about the placement of my car on the property and other such things. From the beginning of my tenancy, I parked my car in the same location, either in the front yard or the back yard very close to the house. Mr. GumBayTay never indicated that this was a problem.

14. On or around December 14, Mr. GumBayTay left a note stating I owed $550 in rent for the month of December plus a $50 late fee.

15. On or around early January 2007, Mr. GumBayTay left a note on my door notifying me that my rent was now $550.

16. On or around January 17, I told him that I would continue to pay $450 per month, but I refused to pay an additional $100 per month. I told him that if he did not abide by the terms of the original lease, I would file sexual harassment charges against him. By this point, I was completely stressed out and started missing days of work due to being worried and stressed about this situation. I continued to miss days of work because of this situation until I moved out of this property in July of 2007. I also began crying often whenever I talked to people about what was going on.

4

17. Immediately after I complained to GumBayTay about his harassment, he sent me threatening documents on January 18, 1007, January 19, 2007, and February 6, 2007, along with a threatening phone call on the last date. All of these communications from Mr. GumBayTay either directly or indirectly threatened eviction if I did not give in to his sexual demands or at least meet with him by myself. At the time, I was constantly afraid that my family would not have a place to live if I did not meet his demands.

18. After complaining to GumBayTay about his harassment, I began having problems in my unit that needed repair, and it was impossible to get him to act on any of these requests, which was in contrast to his quick response right after I moved in. I had to use what little money I had to deal with some of these problems myself, which has made it very difficult for me to pay the rent and increased my stress even more.

19. About a month after this inspection, the front bathroom problems remained. Around February 12, 2007, one of my attorneys, Connie Baker, sent a letter to Mr. GumBayTay and the owner of the property, Matthew Bahr, requesting that they fix the malfunctioning toilet, as this was the most serious problem.

20. GumBayTay finally sent someone to look at the front bathroom in March. The person who arrived, who name I believe was Leon, had a work order that only told him to replace the front bathroom sink. He replaced the front bathroom sink itself, but would not fix the front bathroom toiler or the damage to the bottom of the front bathroom sink because it was not on his work order.

21. My front bathroom sink continued to leak from the bottom even after it was replaced. I had my boyfriend turn off the water because it was leaking through the walls and

damaging the carpet in my back bedroom. I was not able to use the front bathroom sink for the remainder of my tenancy at the North Gap Loop house.

22. Because the front bathroom toilet was still constantly running, my water bill was very high. For example, in January of 2007, my water bill was approximately $165, whereas prior to that it had been $73. I finally had a neighbor, Tim, fix the front bathroom toilet for me in March free of charge, at which point the bill went back down to $88.

23. The kitchen sink was stopped up for some time, making it completely unusable. I had to pay my neighbor Tim $50 to unstop it. The faucet of the kitchen sink was also broken, causing water to spray in all directions when it is turned on, and was never fixed during my time living there.

24. My air conditioner was broken from April 2007 until I moved out of the North Gap Loop residency in July of 2007. Without the air conditioning and because it is a brick house, the temperature in the house was about 90 degrees without cooling. I had a friend lend me one window unit and purchased a second one for approximately $50. But even with the window units, it was too hot for my children to stay there all week long. Instead, I had my children stay at my grandmother's apartment because of the heat, and had to pay money to my grandmother to help her with the additional expense.

25. Around May 14, 2007, one of my attorneys wrote a letter to Mr. GumBayTay on my behalf asking that he fix the leaking water pipes, correct the flooding from the front bathroom, repair or replace the damp carpet, and fix my air conditioner. Those repairs were never made.

26. My house became unlivable. I worried constantly for the health and safety of my family living in such an environment. I felt like GumBayTay was not repairing my home in retaliation for my lawsuit against him.

27. On May 31, I called Mr. GumBayTay and told him all of the problems detailed above. He said that he told the owner, Matthew Bahr, and was waiting on Mr. Bahr to give him money to fix the problems. I called Mr. GumBayTay again around June 4th and he told me that Mr. Bahr had not been paying the mortgage on the house, so the best thing for me to do would be to just move out.

28. The North Gap Loop house was listed for rent on a flyer at the section 8 office a number of times while I was still living there. I had my friend Nataska Scott call Mr. GumBayTay to inquire into the house's availability after the May 31, 2007 mentioned above. Ms. Scott identified herself as someone interested in renting the property. GumBayTay told her that someone was currently living in the house, but that the occupant was probably going to be moving out soon. He advised Ms. Scott to call him back early the following week, and he would let her know if the resident intended to move out.

29. From February 2007 to July 2007, I felt like Mr. GumBayTay was following me. I saw him drive by constantly. It seemed like he knew when I was leaving the house, arriving home, and even going to the mailbox. My mother, Jennette Boswell, and I saw him drive by the house numerous times.

30. In mid-March, my neighbor, Greg Lytes, told me that he saw GumBayTay parked in his car across the street from my house for approximately an hour while I was not home.

7

31. In early July, one of my friends witnessed him driving by my house. Mr. GumBayTay's constant surveillance made me fear for the safety of myself and my children.

32. These sightings of GumBayTay were particularly disturbing because he did not own any other rental properties on my street. Also, my house was located on a dead end street.

33. On May 30, 2007, GumBayTay stopped by my house in person to deliver a notice about paying rent. I was not home at the time, but he spoke to my boyfriend's mother and asked for "the lady of the house." It was my understanding that the Court ordered him not to communicate with me at all.

34. I continue to fear that GumBayTay will try to harm me and my children. I believe that by harassing me and not repairing my house, he has acted in complete disregard of my right to be treated as a full human being. Since this harassment began, I have not been able to eat regularly, and feel extremely frustrated and tired.


I declare under penalty of perjury that the above information is true and correct.

Date: _____                          _____
                                                                    Yolanda M. Boswell

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st   day of October                          ,20 06   ,
by and between the Lessor: Matthew W. Bahr                          , (hereinafter referred to as "Landlord"), and the
Lessee(s): Yolanda Boswell                                                                                          All
Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the
terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do
hereby covenant, contract and agree as follows:

1. GRANT OF LEASE: Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use
as a personal residence, excluding all other uses, the personal residence located in Montgomery            County, Alabama,
with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property:  N/A

2. NATURE OF OCCUPANCY: As a special consideration and inducement for the granting of this Lease by the Landlord
to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or
others whose names and ages are set forth below:

3. TERM OF LEASE: This Lease shall commence on the 1st   day of October                          ,20 06   ,and extend until its
expiration on the 30th day of September                          , 20 06   , unless renewed or extended pursuant to the terms herein.

4. SECURITY DEPOSIT: Upon execution of this Lease, Tenant shall deposit the sum of $ 350.00           to be held by
Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or
termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord
for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not
entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If
Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new
owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return
of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice
delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the
Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and
tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the
result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by
which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord.
Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the
termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

5. RENT PAYMENTS: Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly
installments of $ 550.00   450 ⁰⁰ , said installment for each month being due and payable on or before the 1st day of the month,
the first full rent payment under this Lease being due on the 1st day of October                          , 2006

Tenant agrees that if rent is not paid in full on or before the 5th   day of the month, Tenant will pay a late charge of
$ 50.00       as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A           , which
amount shall be paid at the execution of this Lease.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon -which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

premises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. EMINENT DOMAIN: In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. LANDLORD ENTRY AND LIEN. In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. GOVERNING LAW: This Lease is governed by the statutory and case law of the State of Alabama.

35. LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet "Protect Your Family from Lead in Your Home."

36. ADDITIONAL PROVISIONS:

_____
_____
_____
_____
_____

* * *

WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:

LANDLORD   Matthew W. Bahr, Lessor

Sign: _____     Print: Jamarlo K. GumBayTay, Agent     Date: 10/11/06

TENANT

Sign: _____     Print: Yolanda Boswell, Lessee     Date: 10/11/06

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

☐ Lawn should be kept cut, raked and edged

☐ No junked or abandoned vehicles on property

☐ No trash/paper/debris in yard or on lawn

☐ No automobiles parked on lawn

☐ Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
Yolanda Boswell, Lessee

Date: _____

3927 06-20-08 Norsworthy Johnnie.txt

1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2       FOR THE MIDDLE DISTRICT OF ALABAMA              Exhibit E,

 3              NORTHERN DIVISION                         2:07-cv-135

 4

 5   YOLANDA M. BOSWELL,

 6        Plaintiff,

 7   vs.                    CASE NO. 2:07-cv-135

 8   JAMARLO K. GUMBAYTAY,
     D/B/A THE ELITE REAL ESTATE
 9   CONSULTING GROUP

10   and

11   MATTHEW W. BAHR,

12        Defendants.

13

14

15           * * * * * * * * * * *

16        DEPOSITION OF JOHNNIE LYNN NORSWORTHY,

17   taken pursuant to stipulation and agreement

18   before Mallory M. Johnson, Court Reporter and

19   Commissioner for the State of Alabama at Large,

20   in the Law Offices of American Civil Liberties

21   Union, Montgomery, Alabama, on Friday, June 20,

22   2008, commencing at approximately 9:23 a.m.

23           * * * * * * * * * * *
```

2

```
 1                APPEARANCES

 2   FOR THE PLAINTIFF:

 3   Ms. Allison Neal
     AMERICAN CIVIL LIBERTIES UNION
 4   207 Montgomery Street
     Suite 910
 5   Montgomery, Alabama 36104

 6   Mr. John Pollock
     Attorney at Law
```

3927 06-20-08 Norsworthy Johnnie.txt

```
 7  CENTRAL ALABAMA FAIR HOUSING CENTER
    1817 W. 2nd Street
 8  Montgomery, Alabama 36106

 9  FOR DEFENDANT GUMBAYTAY:

10  Alfred T. Newell, IV (as indicated)
    LAW OFFICE OF ALFRED T. NEWELL, IV
11  P.O. Box 101432
    Birmingham, Alabama 35120

12
    ALSO PRESENT:
13
    Mr. Jonathan Watson
14  Ms. Faith Cooper
    Mr. Edward Smith
15              * * * * * * * * * * *

16                  EXAMINATION INDEX

17  JOHNNIE LYNN NORSWORTHY
        BY MS. NEAL                     5
18      BY MR. NEWELL                 105

19                   EXHIBIT INDEX

20  PLAINTIFF'S EXHIBIT:

21  A    Memorandum                21-23,74

22  B    Memorandum/FYI            26,27

23  C    3/26/07 Memorandum        31


                          3

 1  PLAINTIFF'S EXHIBITS continued:

 2  D    Elite Real Estate         35,37,38
         Management Department 7/07
 3       Monthly Rental Report

 4  E    Executive Summary         39,43,45,48
                                   62,64,65,103
 5
    F    Alabama Residential       49,86
 6       Lease/Purchase

 7  G    7/17/07 Letter from       88
         Lynn Norsworthy
 8
    H    Alabama Residential       93,96,102,103
 9       Lease/Purchase Agreement

10  J    Alabama Residential       97-103
         Lease/Purchase Agreement
11
                * * * * * * * * * * *
12
                    STIPULATIONS
13
          It is hereby stipulated and agreed by
                          Page 2
```

3927 06-20-08 Norsworthy Johnnie.txt

14 and between counsel representing the parties that

15 the deposition of JOHNNIE LYNN NORSWORTHY is

16 taken pursuant to the Federal Rules of Civil

17 Procedure and that said deposition may be taken

18 before Mallory M. Johnson, Court Reporter and

19 Commissioner for the State of Alabama at Large,

20 without the formality of a commission; that

21 objections to questions other than objections as

22 to the form of the questions need not be made at

23 this time but may be reserved for a ruling at

4

1 such time as the deposition may be offered in

2 evidence or used for any other purpose as

3 provided for by the Federal Rules of Civil

4 Procedure.

5        It is further stipulated and agreed by

6 and between counsel representing the parties in

7 this case that said deposition may be introduced

8 at the trial of this case or used in any manner

9 by either party hereto provided for by the

10 Federal Rules of Civil Procedure.

11            * * * * * * * * * * *

12            (Witness sworn)

13       COURT REPORTER:  Do you want to waive

14            your signature?

15       THE WITNESS:  Waive my signature?

16       MS. NEAL:  Yeah, I mean, it just --

17            after we get the transcript of

18            the deposition, you have the

19            opportunity to review it and then

20            sign it, or you can waive your

3927 06-20-08 Norsworthy Johnnie.txt
21      signature.

22          THE WITNESS:  It does not matter to me.

23


                              5

1           JOHNNIE LYNN NORSWORTHY

2        The witness, having first been duly

3   sworn to speak the truth, the whole truth and

4   nothing but the truth, testified as follows:

5                 EXAMINATION

6   BY MS. NEAL:

7   Q.  All right.  Well, good morning.  My name is

8       Allison Neal, and I'm the staff attorney for

9       the ACLU of Alabama.  And I'm co-counsel for

10      the plaintiff in this case, and I'll be

11      taking your deposition.  To my right is our

12      court reporter, Mallory Johnson.  To my left

13      is John Pollock with Central Alabama Fair

14      Housing.  On my left is Jonathan Watson, who

15      is an intern with the ACLU of Alabama; Faith

16      Cooper, who's the executive director of

17      Central Alabama Fair Housing Center; and

18      Edward Smith is at the end.  He is an intern

19      for Central Alabama Fair Housing Center.

20          Have you ever been deposed before?

21  A.  Yes.  Once.

22  Q.  Okay.  So you kind of have an idea of how it

23      goes?


                              6

1   A.  Uh-huh.

2   Q.  Well, in a deposition I'm going to ask you

3       questions, and your questions are going to be
                    Page 4

3927 06-20-08 Norsworthy Johnnie.txt

4    recorded by Ms. Johnson, the court reporter

5    at the end of the table.  And you understand

6    that you're going to need to speak up and to

7    answer orally in giving your answers so that

8    she can hear you clearly.  She won't be able

9    to record a nod of your head or a shake of

10   your head.

11        Similarly, if you're going to be

12   describing something in response to the

13   question, please try to describe it orally

14   instead of using hand gestures so she can

15   document your answers.

16        If I ask you a question that you don't

17   understand for some reason, I don't state it

18   very well, please let me know and I'll

19   rephrase it to try to be more clear.  And if

20   you need a break at any time for any reason,

21   you should just let me know; and we'll finish

22   your answer, if we're in the middle of it,

23   and then we can go ahead and take a break.


                       7

1    Sometimes I may ask you a question and you'll

2    give me an answer as complete as you can

3    remember at the time; and then later on, five

4    minutes later, two hours later, you'll

5    remember some additional information in

6    response to an earlier question or maybe some

7    clarification.  And if that happens, please

8    just tell us what you'd like to add to your

9    earlier answer, and we can do that while it's

10   still on your mind.
                              Page 5

3927 06-20-08 Norsworthy Johnnie.txt

11  A.  All right.

12  Q.  Okay.  Sometimes when you're answering, you

13      also may think of documents that might help

14      you remember an answer and -- or might help

15      you give a more accurate answer.  So if you

16      do, let us know; and we may have the

17      documents with us or we may be able to get

18      them for you to help you answer more

19      accurately and completely.

20          So you're sworn under oath that you'll

21      tell the truth in your deposition testimony;

22      that's correct?

23  A.  Yes.

                    8

1  Q.  And I'll be asking you questions, and your

2      responsibility is to answer those questions

3      truthfully.  Are you taking any medication or

4      do you have any condition that might

5      interfere with your ability to testify today?

6  A.  No.

7  Q.  So there's no reason that you will not be

8      able to answer the questions fully and

9      truthfully?

10  A.  If I know what they are.

11  Q.  Okay.  So will you be represented by an

12      attorney during this deposition?

13  A.  No.

14  Q.  I want to remind you that you do have the

15      right to be represented by counsel during the

16      deposition.

17          So let's start with some background

                    Page 6

3927 06-20-08 Norsworthy Johnnie.txt

18    information.  Can you please state your full

19    name for the record?

20  A.  Lynn Norsworthy.

21  Q.  Are there any other names that you go by or

22    that you have gone by in the past?

23  A.  Well, my full name is Johnnie Lynn

                            9

1     Norsworthy.

2   Q.  Okay.

3   A.  J-O-H-N-N-I-E.

4   Q.  Did anyone else accompany you to this

5     deposition?

6   A.  No.

7   Q.  So you mentioned that you've been deposed

8     before.  How many times?

9   A.  Once.

10  Q.  And what was the -- the name of the lawsuit?

11  A.  It's been ten years ago.

12  Q.  So you can't remember?

13  A.  No, I can't.

14  Q.  Okay.  What was it about?

15  A.  It was about an insurance company -- I

16    mean, a homeowner suing another homeowner, in

17    a house we used to live in, for flooding; and

18    the insurance company settled out of court.

19  Q.  Okay.  And so who were you in the lawsuit?

20    Were you a plaintiff or a witness or --

21  A.  A witness.

22  Q.  Okay.  And were you represented?

23  A.  No.

3927 06-20-08 Norsworthy Johnnie.txt
10

1  Q.  At what court was the lawsuit in?

2  A.  I have no idea.  They came to our house and

3      took our deposition.

4  Q.  Okay.  Have you ever been involved in any

5      litigation?

6  A.  No.

7  Q.  And what did you do to prepare for this

8      deposition?

9  A.  I put the records I had on a CD and that was

10     it.

11 Q.  Okay.  So did you tell anyone who is not

12     present here today about the deposition?

13 A.  Yes.  My husband knows and my sister and my

14     mother.

15 Q.  Okay.  Did you tell anybody else?

16 A.  Jamarlo knows.  Gumbaytay.

17 Q.  Is that all?  Anyone else?

18 A.  So far as I know.

19 Q.  What did you discuss?

20 A.  I just told them what it was about.

21 Q.  What did you say?  What did you tell them it

22     was about?

23 A.  I said that Jarmarlo was being sued for -- I

11

1      don't even know, really.  Sexual harassment.

2  Q.  Uh-huh.  And what did they say?

3  A.  Good grief.  I don't know.  It's just

4      conversation.  I mean, it wasn't --

5  Q.  What was -- what was the nature of your

6      conversation with Mr. Gumbaytay about this?

Page 8

3927 06-20-08 Norsworthy Johnnie.txt

7   A.   I just told him I had been subpoenaed to --

8        to do a deposition, and he told me just to

9        tell the truth.  He said everything was okay,

10       just tell the truth.

11  Q.   Did you have any other -- any other

12       conversation with Mr. Gumbaytay about it?

13  A.   Nothing outside of that, no.

14  Q.   Did he say -- he didn't say anything else to

15       you other than just to tell the truth?

16  A.   That's right.

17  Q.   Okay.

18            MS. COOPER:  Did you call Mr. Gumbaytay

19                 or did he call you?

20            THE WITNESS:  I called him and told him

21                 I had been subpoenaed.

22            MS. COOPER:  Okay.

23  Q.   So did you do anything to prepare for this

                          12

1        deposition other than make the copies of the

2        documents?

3   A.   No, I didn't.

4   Q.   Okay.  Did you meet with anybody?  For

5        example, a lawyer?

6   A.   No.

7   Q.   Did you review any of the documents that you

8        produced?

9   A.   I looked for some that you wanted, but I

10       don't have them anymore.

11  Q.   What documents did you look for?

12  A.   That letter in particular.  The letter I gave

13       you for some court proceeding where that I

                                   Page 9

3927 06-20-08 Norsworthy Johnnie.txt

14      had made a mistake on a lease and -- that I

15      had changed it to the correct one, but she

16      never did come back and sign the lease.

17  Q.  I have that document with us, so I do have a

18      copy of that and we'll be talking about that

19      a little bit later.

20  A.  That's about the only thing.

21  Q.  There were no other documents that you

22      couldn't find that you think were responsive?

23  A.  No, there -- no, there wasn't.  I have a

                        13

1       blank lease for that house, but it's -- I

2       don't have any information in it.  That's the

3       only thing I have.

4   Q.  When you say a blank lease for that house,

5       what areas are blank on the lease?

6   A.  The names.

7   Q.  Of the tenants?

8   A.  I think it's in -- it's supposed to be in --

9       on that disk.  So --

10  Q.  Okay.  So the names of the tenants are

11      blank?

12  A.  Right.

13  Q.  And the owner is blank?  The name of the

14      owner?

15  A.  I think it is.

16  Q.  Okay.  So you said that you did have some

17      documents that are no longer in existence.

18      What happened to those documents?

19  A.  I probably didn't even save that letter.  I

20      never thought anything about it.  I just sent

                   Page 10

3927 06-20-08 Norsworthy Johnnie.txt

21    it to him after I printed it and erased it.

22    It wasn't signed, so --

23  Q.  I -- I thought you made reference to some

                          14

1     other documents that -- that you didn't --

2     that you weren't able to -- to give us

3     because they were no longer in existence or

4     you had given them to somebody else.  Am I --

5   A.  I gave all the records that pertained to

6     leases and spreadsheets.  No, I've still got

7     spreadsheets on my computer.  But all the

8     leases, the hard copies, signed copies, I

9     gave them back to Jamarlo.

10  Q.  When did you give those to Mr. Gumbaytay?

11  A.  Let's see.  They told him to cease and desist

12    doing real estate management in April, and

13    they gave him until April 15.  April or May.

14    I don't remember which.  Anyway, I -- I

15    stacked -- packed all those up in boxes, and

16    he came and got them in May.

17  Q.  Okay.

18        MS. COOPER:  How many boxes of

19              materials were there?

20        THE WITNESS:  There were about three

21              boxes.  Three boxes like that

22              (indicating).

23        MS. COOPER:  Three medium size boxes?

                          15

1         THE WITNESS:  Medium, yeah, file boxes.

2               You know, letter size file boxes.

3               Storage boxes.

                                    Page 11

3927 06-20-08 Norsworthy Johnnie.txt

4   Q.   When in May did you give the documents to

5        Gumbaytay?

6   A.   I don't remember the date.

7   Q.   Do you remember approximately when it was, if

8        it was at the beginning or the month or at

9        the end of the month?

10  A.   I just really don't remember.

11  Q.   Okay.  Let me continue to get some background

12       information from you.  What is your date of

13       birth?

14  A.   February 16th, '42.

15  Q.   And where were you born?

16  A.   Mobile.

17  Q.   Are you married?

18  A.   Yes.

19  Q.   To whom?

20  A.   Jerry Norsworthy.

21  Q.   And for how long have you been married?

22  A.   35 years.

23  Q.   And have you been married before that?

                          16

1   A.   No.

2   Q.   Okay.  Do you have any children?

3   A.   No.

4   Q.   And what is your address?

5   A.   1847 Robinson Hill Road.

6   Q.   How long have you lived there?

7   A.   12 years.  Almost 12 years.

8   Q.   Does anyone else live there with you?

9   A.   My mother.

10  Q.   And your husband?

3927 06-20-08 Norsworthy Johnnie.txt

11  A.  And my husband, yes.

12  Q.  Okay.  What is your telephone number?

13  A.  262-0153 or 265-4476 or 265-4466.  That's

14      business and home.

15  Q.  Are there any other numbers at which you can

16      be reached?

17  A.  I have a cell phone number, but I don't know

18      what it is.

19  Q.  Okay.  What is your educational background?

20  A.  High school and a few college courses.

21  Q.  Where did you go to high school?

22  A.  Lanier.

23  Q.  And when was that that you graduated?

                        17

1   A.  1960 is when I graduated.

2   Q.  Okay.  And when did you take the college

3       courses?

4   A.  Soon after that.

5   Q.  Where did you take the courses?

6   A.  When Alabama had an extension service here.

7       It was up on Montgomery Street, up the hill.

8   Q.  Okay.  And what courses did you take?

9   A.  I took English and accounting.

10  Q.  I'll ask you a little bit about your

11      employment history.  Have you been employed

12      in the past?

13  A.  I worked for the State 28 years.

14  Q.  Was that your first job?

15  A.  First, uh-huh, and only.

16  Q.  And what did you do for the State?

17  A.  Keypunch operator.

                            Page 13

3927 06-20-08 Norsworthy Johnnie.txt

18  Q.  And who did you work for in the State, what
19      department?
20  A.  Revenue Department.
21  Q.  Okay.  And why did your job end?
22  A.  I retired.
23  Q.  Okay.  And what jobs did you have after that?

                        18

 1  A.  I've got my own business.  I do secretarial
 2      services at home.
 3  Q.  And what's the name of your business?
 4  A.  Letter Perfect Business Services.
 5  Q.  How long have you been operating as
 6      Letter Perfect?
 7  A.  Since 1986.
 8  Q.  Did you ever perform any secretarial work
 9      under a different name other than
10      Letter Perfect?
11  A.  No.
12  Q.  Okay.  So when did you first meet
13      Mr. Gumbaytay?
14  A.  When he was going to school, I did school
15      papers for him.  It's been probably 1990.
16      Around there.  I'm not sure.
17  Q.  And that was -- was that you or was that
18      Letter Perfect that did --
19  A.  That was Letter Perfect.
20  Q.  Okay.  Who else works for Letter Perfect
21      other than you?
22  A.  No one.
23  Q.  Okay.  Did you ever do any work for

                     Page 14

3927 06-20-08 Norsworthy Johnnie.txt
19

1     Guest Properties?

2  A.  Yes, through Gumbaytay.

3  Q.  So what is your -- what is your employment

4     relationship with Mr. Gumbaytay?

5  A.  I do his secretarial work.

6  Q.  And did you or Letter Perfect ever sign a

7     contract with him?

8  A.  No.

9  Q.  Did you have any sort of oral agreement with

10    him?

11  A.  I guess so, yeah.

12  Q.  Could you kind of -- can you state --

13  A.  I do his work.  I mean, that's all there was

14    to it.  He brought it to me, and I did it.

15  Q.  Did he provide any documents to you when you

16    first started working for him, like policies

17    or procedures that you should follow?

18  A.  No.

19  Q.  And you work from your home?

20  A.  Yes.

21  Q.  Did you ever work at Gumbaytay's home?

22  A.  No.

23  Q.  Or any other location?

20

1  A.  No.

2  Q.  How did you know how much Gumbaytay was going

3    to pay you for your services?

4  A.  I told him I charge $30 an hour.

5  Q.  And did Mr. Gumbaytay ever come to your

6    house?

Page 15

3927 06-20-08 Norsworthy Johnnie.txt

```
 7  A.  Yeah, he brought work, but that's about all.

 8      He brought it.  I did it, and then I called

 9      him and told him when it was ready; or either

10      I e-mailed it to him.

11  Q.  Okay.  So let's talk about your duties in

12      working for Mr. Gumbaytay.  Did you handle

13      any repair issues?

14  A.  If they called me and said they needed

15      something, I filled out a work order and sent

16      it -- I e-mailed it -- I mean, I faxed it to

17      him.  He took care of that.

18  Q.  The tenants did call you directly sometimes?

19  A.  Yes.

20  Q.  Were there any rules about handling repairs?

21  A.  Not for me.  That's all I did.  If they

22      called with a complaint or needed something,

23      that's what I did.  I filled out the form and
```

                                21

```
 1      faxed it to him or called him and told him

 2      about it.

 3  Q.  So did you ever convey the rules to any of

 4      the tenants?  I mean, were you ever given any

 5      document by Mr. Gumbaytay explaining how

 6      repairs were going to be handled?

 7  A.  Not that I can remember.  I never --

 8  Q.  Okay.  How many calls about repairs would you

 9      say you've taken over the years?

10  A.  I have no idea.  Not very many, but I

11      couldn't tell you.

12  Q.  Did you ever receive a call from Ms. Boswell

13      about her repair issue?
```

3927 06-20-08 Norsworthy Johnnie.txt

14  A.  I do not remember.

15  Q.  Okay.  I have here what is marked as

16      Plaintiff's Exhibit #A.  And would you please

17      look at it and see if you recognize the

18      document and describe it.

19  A.  I do not recognize this at all.

20  Q.  So you didn't create the document?

21  A.  I did not.  No, I did not.

22  Q.  Okay.  Do you -- do you know anything about

23      how the document was drafted?

                            22

1  A.  I have no idea.  But my type does not look

2      like this at all.

3  Q.  Okay.  I want to direct your attention to

4      page 2 of the exhibit.  There's a section

5      that I've highlighted that says:  Last but

6      not least, I pledge to notify your landlord

7      within 72 hours of the service call if the

8      work has not been completed as discussed.

9      However, there are always exceptions to the

10     rules.  And this is in the memo marked as

11     Plaintiff's Exhibit #A.  It's a letter from

12     Mr. Jarmarlo K. Gumbaytay to all tenants.

13     And I was wondering if you ever were

14     responsible for notifying the landlords of a

15     service call if the work had not been

16     completed as discussed?

17  A.  Not that I remember.

18  Q.  Okay.  Can you think of who might have

19      produced this document?

20  A.  He had some other people that did some work

                        Page 17

                          3927 06-20-08 Norsworthy Johnnie.txt
21    for him once in a while.

22  Q.  Do you remember their names?

23  A.  I'm terrible with names.  I can see her, but

                              23

1     I can't think of her name.

2   Q.  I believe that he had a woman named Renee

3       Williams working for him.

4   A.  Right.  Renee Williams.  Uh-huh.

5   Q.  And there was another woman named Cameran

6       Bassett?

7   A.  Yes.  Cameran.

8   Q.  Well, what do you know about how memos like

9       this, like Plaintiff's Exhibit #A, were

10      typically drafted?

11  A.  I did some, but I know I did not do this one.

12  Q.  And how were letters that you -- letters that

13      you drafted or memos that you drafted from

14      Mr. Gumbaytay, how was that done generally?

15  A.  On the computer.  I mean, but --

16  Q.  Would he tell you what --

17  A.  He handwrote stuff and e-mailed it -- he

18      faxed it to me.

19  Q.  So he would handwrite what you were supposed

20      to write and then fax it to you?

21  A.  Right.

22  Q.  Did he ever orally dictate what you needed to

23      have in the letters?

                              24

1   A.  Once in a while.

2   Q.  Was there --

3   A.  Not very often.  I don't like to do that.
                          Page 18

3927 06-20-08 Norsworthy Johnnie.txt

```
 4  Q.  And the letter -- the faxes or the e-mails
 5      that he had written out what he would like --
 6      what he'd like for you to draft, did he tell
 7      you specifically what to say in every
 8      paragraph or did you have some leeway in how
 9      things were phrased?
10  A.  I rephrased what he said sometime.
11  Q.  Okay.
12  A.  And made sentences out of it.
13  Q.  Putting aside letters, what memos did you
14      draft for him?
15  A.  I have drafted memos like this.
16  Q.  Do you recall any specific memos that you
17      drafted?
18  A.  They were about keeping the yards clean.  I
19      know that was one of them; about late fees
20      and concerning late fees.
21  Q.  Anything else?
22  A.  Right now I can't think of any.  But I know
23      there was other things.

                        25
 1  Q.  Well, if you remember something -- if you
 2      remember a memo later that you might have
 3      drafted, just please feel free to let us know
 4      whatever we're in the middle of.
 5          So do you know if Mr. Gumbaytay ever
 6      called a landlord if work had not been
 7      completed?
 8  A.  I don't know that.
 9  Q.  Do you live in a property managed by
10      Mr. Gumbaytay?
```

3927 06-20-08 Norsworthy Johnnie.txt

11  A.  No.

12  Q.  Have you ever lived in a property managed by

13      Mr. Gumbaytay?

14  A.  No.

15  Q.  Did Mr. Gumbaytay ever charge any of the

16      tenants for repairs?

17  A.  I don't know that question.  I don't know the

18      answer.

19  Q.  Did you -- were you ever responsible for

20      drafting bills to tenants?

21  A.  Bills to tenants?

22  Q.  For example, giving them notice that they had

23      a late fee?

                        26

1  A.  I did once in a while.

2  Q.  Did you ever draft up any sort of notice

3      saying that they owed money for a repair?

4  A.  Not that I recall.

5  Q.  Okay.  I have here what is marked as

6      Plaintiff's Exhibit #B.  Could you please

7      look at it and --

8  A.  Now, this is one of mine.

9  Q.  Okay.  Could you please describe the memo?

10  A.  Well, it's about the maintenance and upkeep;

11      about whether they should have pets or not

12      pets.  Yes.  About the lawn services.

13  Q.  Could you read the highlighted portion on the

14      first page of Plaintiff's Exhibit #B?

15  A.  You want me to read it out loud?

16  Q.  Yes.  Could you please read it out loud?

17  A.  Oh.  Also prior to making a maintenance call

                    Page 20

3927 06-20-08 Norsworthy Johnnie.txt

18    to us, please see if you or someone you know

19    can handle the problem first at little or no

20    cost to you.  In the future, you will be

21    billed if we have to take time out of our

22    business schedule to visit with you on very

23    minor things that you could have handled

27

1    yourself.

2    Q.  So, now that you've looked at Plaintiff's

3        Exhibit #B, do you ever recall sending a bill

4        to any -- any tenant?

5    A.  I sent these to all tenants one time.

6    Q.  After sending out the memo, do you ever

7        remember sending out any particular bills to

8        tenants for repairs?

9    A.  No.

10    Q.  Or any notices to tenants that they needed to

11        pay for various repairs?

12    A.  I do not recall.

13    Q.  Okay.  Let's talk a little bit about rent.

14        Did you collect the rent?

15    A.  On some I did.  They brought it to me.  I

16        gave them a receipt and I gave the proceeds

17        to Gumbaytay.

18    Q.  Who did you collect rent from?

19    A.  Who did I collect rent from.  I don't

20        remember their names.  I'm sorry.

21    Q.  And how did tenants make payments to you?

22    A.  Usually it was cash or money order.

23    Q.  Did they ever give you personal checks?

Page 21

3927 06-20-08 Norsworthy Johnnie.txt
                28

1   A.  Once in a while.

2   Q.  How do tenants make payments to

3       Mr. Gumbaytay?

4   A.  I don't have any idea.

5           MS. COOPER:  How did tenants know to

6               bring their rent payment to you?

7           THE WITNESS:  He told them they could.

8               I said, if they need to, they can.

9               I didn't really like to do it,

10              but --

11          MS. COOPER:  Okay.

12  Q.  Do you know if you ever received rent

13      payments from Ms. Boswell or her mother,

14      Jeneete Boswell?

15  A.  I don't remember.

16  Q.  How did Mr. Gumbaytay handle the tenants'

17      money?

18  A.  I have no idea about that either.  Sometimes

19      when he owed me money, he'd say if they paid

20      you in cash, put it on my bill.

21  Q.  What --

22  A.  He paid me with the money that I collected

23      every once in a while.

                29

1   Q.  Okay.  How else did he pay you?

2   A.  Usually with a check.

3   Q.  Do you know if Mr. Gumbaytay filed documents

4       in court if the rent was past due?

5   A.  Yes.

6   Q.  Did you ever help him file any of those

                                    Page 22

3927 06-20-08 Norsworthy Johnnie.txt

7    documents?

8  A.  No.

9  Q.  How did you know how much rent to collect?

10  A.  By what they told me they owed.

11  Q.  By what the tenants told you they owed?

12  A.  Uh-huh.

13  Q.  How did you know -- when Mr. Gumbaytay gave

14      you -- did Mr. Gumbaytay ever tell you how

15      much tenants owed?

16  A.  Sometimes, yes.

17  Q.  How did you know if rent was past due?

18  A.  When it was after the 10th when they brought

19      it to me.

20  Q.  Do you keep copies of the rent checks?

21  A.  I keep copies of the receipts.  I didn't --

22      I didn't include those.  I forgot those.  I

23      left those at home.  I don't have those.

                          30

1  Q.  So you do still have some rental receipts?

2  A.  Yes.

3  Q.  Okay.  Well, we would like to see them

4      whenever you get an opportunity to send them

5      to us.  Do you draft rental receipts for

6      every tenant?

7  A.  No.  Just the ones that brought me the rent

8      money.  They're the only ones I gave receipts

9      to.

10  Q.  So you drafted rental receipts for every

11      tenant that brought you their rent payment?

12  A.  Right.

13  Q.  Did Mr. Gumbaytay draft rental receipts for

                        Page 23

3927 06-20-08 Norsworthy Johnnie.txt

14    tenants?

15  A.  I think he did.

16  Q.  Did he ever give you copies of the receipts

17    after drafting them?

18  A.  No.

19  Q.  Did your duties include resolving a rental

20    dispute if a tenant was behind on rent?

21  A.  No.

22  Q.  I have here what is marked as Plaintiff's

23    Exhibit #C.  Could you please look at that

31

1    and describe it?

2  A.  It looks like he's introducing a new

3    tenant -- I mean, a new employee.

4  Q.  I'm sorry?

5  A.  I said it looks like he's introducing a new

6    employee.  And this is not my type either.

7  Q.  Okay.  Could you look at the third paragraph

8    listed that starts with, Payment methods for

9    your rent are as follows.

10  A.  Uh-huh.

11  Q.  Could you read out loud the last two

12    sentences of that paragraph?

13  A.  We are having a serious problem with several

14    of you getting behind on your rent, and this

15    causes issues for everyone involved.  If you

16    are behind, contact Mr. Gumbaytay, Lynn or

17    Renee at once to resolve this issue and avoid

18    eviction or court process.

19  Q.  So this document seems to say that you are

20    one of the people to be contacted to resolve

Page 24

3927 06-20-08 Norsworthy Johnnie.txt

21    an issue if a tenant is behind on rent.  Was

22    that your understanding?

23  A.  To my knowledge, I've only done one; and I

32

1    did -- she did a promissory note for back

2    rent.

3  Q.  And who was that?

4  A.  Her name was -- wasn't Ms. Boswell.

5  Q.  I'm sorry, did you say it wasn't Ms. Boswell?

6  A.  It was not Ms. Boswell that I remember.  What

7    was that woman's name.  Can I see that -- I

8    can tell you if I can see who the renter is.

9    Can I see it on your computer?  The

10    spreadsheet?

11  Q.  I have a spreadsheet here that I'm going to

12    use later on that might refresh your

13    recollection.  It's a monthly rental report.

14    Does that refresh your recollection?

15  A.  Not really.

16  Q.  Okay.  Well, let's move on.

17  A.  Yeah.  Shonna Pruitt.  That's who it was.

18    Shonna Pruitt on North Pass Road.

19  Q.  Okay.  You stated that she gave you a

20    promissory note?

21  A.  Uh-huh.

22  Q.  To resolve a rent dispute?

23  A.  Yes.

33

1  Q.  So did any other tenants ever contact you if

2    they were behind on rent to resolve the

3    issue?

3927 06-20-08 Norsworthy Johnnie.txt

4  A.  I did -- oh, he would call me and tell me to

5      do a promissory note for tenants.  That's

6      what he would -- that's the way he would do

7      it for back rent.

8  Q.  And then you would draft promissory notes for

9      tenants?

10 A.  Uh-huh.

11 Q.  How many tenants would you say that you

12     drafted promissory notes for?

13 A.  Dozens.

14 Q.  Dozens.  Did you ever draft a promissory note

15     for Ms. Boswell?

16 A.  I might have.  I don't remember.

17 Q.  Do you still have any draft or copy of the

18     promissory notes that you created?

19 A.  Not any hard copies.

20 Q.  Do you have a copy?

21 A.  I do not have any signed copies.  There might

22     be some on that disk.  I gave you everything

23     I had.


                         34

1  Q.  Did Ms. Boswell ever contact you to try to

2      resolve a rental dispute?

3  A.  I don't remember.

4  Q.  Okay.

5         MS. COOPER:  When somebody signed a

6                promissory note, did you then send

7                the original to Mr. Gumbaytay or

8                how did you handle that?

9         THE WITNESS:  Yes.

10 Q.  I want to go back a little bit to talk about

                    Page 26

3927 06-20-08 Norsworthy Johnnie.txt

11    the amount of rent due.  So you earlier

12    testified that a tenant would tell you how

13    much they owed and would give you that

14    amount; is that correct?

15  A.  Yes.

16  Q.  Would you then convey that -- would you then

17    convey that to Mr. Gumbaytay that they had

18    given you a certain amount of rent?

19  A.  Yeah.  I put the money in an envelope and I

20    put all the information on the outside and he

21    picked them up.

22  Q.  Let's look at what I've marked here as

23    Plaintiff's Exhibit #D.  And I believe you

35

1    were looking at this document a little bit

2    earlier.  Could you please describe it?

3  A.  It's a spreadsheet showing collection of

4    rents.

5  Q.  Did you create this document?

6  A.  Not this particular one but someone used what

7    I had created and changed things up.

8  Q.  What was changed in the document?

9  A.  They're divided into who's collecting --

10    who's taking care of what properties.

11  Q.  Okay.  So let's look at this Plaintiff's

12    Exhibit #D a little bit closely.  How did you

13    get the information to fill in?  For example,

14    let's look at number one of the vacants --

15    listed as the vacant account, current owner

16    is listed as Brett Rosenbaum, and then the

17    rental amount is listed as 600.  How did you

3927 06-20-08 Norsworthy Johnnie.txt

18    get that 600 amount?

19  A.  From the -- from the rental lease.

20  Q.  From the rental lease?

21  A.  Yes.

22  Q.  Okay.  And how did you get the amounts listed

23    for Section 8?  It says Section -- there's a

                              36

1    column that says Section 8, 574.  What does

2    that mean?

3  A.  That's how much the Housing Authority pays on

4    these people's rents.

5  Q.  And how did you obtain that number?

6  A.  From Mr. Gumbaytay.

7  Q.  Okay.  And there's a section that says tenant

8    paid.  How did you get that amount?

9  A.  He gave me that.  If he collected it, he

10    would call and tell me what had been

11    collected.  Or from what I collected, that's

12    what I would fill in.

13  Q.  Did he ever give you copies of checks that he

14    received?

15  A.  No.  He would -- wait a minute.  Let me take

16    that back.  He would fax -- sometimes he

17    would fax them, showing a copy of them.

18  Q.  Under what -- under what circumstances would

19    he fax you a copy of the check that was --

20    that was given?

21  A.  So I could put it on the list.  He faxed them

22    so that I could put them -- the information

23    into the spreadsheet.

                         Page 28

3927 06-20-08 Norsworthy Johnnie.txt

37

1  Q.  Uh-huh.  Okay.  But sometimes he didn't send
2      those to you and sometimes he called you
3      instead and told you what amount was paid?
4  A.  Yeah.
5  Q.  Did there seem to be any reason why he would
6      send you checks in some instances and
7      otherwise convey it orally to you what the
8      tenant paid?
9  A.  If they paid cash, usually.
10 Q.  Do you know if he ever received checks from
11     any of the other tenants and would they
12     convey -- and then convey the amount paid
13     orally?
14 A.  He might have.
15 Q.  Okay.  This column here on Plaintiff's
16     Exhibit #D, again looking at the first one as
17     an example, it says tenant due $26.  How did
18     you determine that amount?
19 A.  They paid.  They paid whatever public housing
20     didn't pay.  Is that what you're talking
21     about?  These don't have any payments on
22     them.
23 Q.  But basically, you would determine the amount

38

1      that the tenant was due by subtracting the
2      amount paid by Section 8 from the rental
3      amount that you got off the lease?
4  A.  That's right.
5  Q.  Okay.  Was the rental amount determined from
6      the lease or was it from the Section 8

Page 29

3927 06-20-08 Norsworthy Johnnie.txt

```
 7       contract?
 8    A. The rental amount was determined by the
 9       lease.
10    Q. Did you ever compare the lease amount to what
11       was on the Section 8 contract?
12    A. I didn't get a Section 8 contract.  I didn't
13       have a copy of that.
14    Q. I'm sorry.  How did you determine the Section
15       8 amount?
16    A. Of what Mr. Gumbaytay told me.
17    Q. Okay.  All right.  One more question about
18       this Exhibit #D.  What is the column
19       identified as Lease Information?  What does
20       that field mean?
21    A. Lease information.  What are you talking
22       about?
23    Q. There's a column on the exhibit that's
```

                              39

```
 1       labeled Lease Information that appears --
 2    A. That's -- that's the date of the lease.
 3    Q. The date that the lease was executed or?
 4    A. Uh-huh.  The date of the lease when it
 5       started.
 6    Q. And how often was that -- that updated?
 7    A. Very seldom.
 8    Q. What would be an example of when it would be
 9       updated?
10    A. If there was a new tenant in the house.
11    Q. Okay.  So I've got something -- I've got a
12       document here that is marked as Plaintiff's
13       Exhibit #E.  Could you look at the document
```

                                        Page 30

3927 06-20-08 Norsworthy Johnnie.txt

14    and describe it?

15  A.  This is a -- this is a spreadsheet.  I don't

16      remember doing them straight up like that,

17      though.  These are some old ones, yes.  This

18      is before I was using a spreadsheet.

19  Q.  So did you create this document?

20  A.  Yes, I did.

21  Q.  Okay.  And did you design the template for

22      it?

23  A.  Yes.

                        40

1   Q.  And did you produce this report yourself?

2   A.  I produced it.  I faxed it to him.  He

3       changed it, whatever needed changing.  Came

4       back and I did it again.  We did that about

5       10 times.  I hated this end of the month

6       thing.

7   Q.  How would he change it?

8   A.  He would -- mostly it was about the billing.

9   Q.  For what section of the exhibit?

10  A.  There's no bills on here, but we'd make notes

11      at the bottom about -- about, you know,

12      cleaning carpets like this.

13  Q.  So he mostly made -- made notations at the

14      bottom of the form to add?

15  A.  This was '06?  Yes, uh-huh.

16  Q.  Did he ever alter the amount that the tenant

17      paid?

18  A.  Ask that question again.

19  Q.  Did he ever alter the amount that the tenant

20      paid?

3927 06-20-08 Norsworthy Johnnie.txt

21  A.  There are times because I would take the form

22      I had from the last month and use it to

23      update.  And sometimes I would forget to find

41

1       out if they had paid their rent or not.  And

2       he would let me know.

3   Q.  Did he ever change the rental amount?

4   A.  I don't know.  I don't know.

5   Q.  Did he ever, to your recollection, change the

6       rental amount?

7   A.  No, not to my recollection.

8   Q.  Okay.  What is the -- what is the balance due

9       investor?  How is that amount determined?

10      Well, first of all, what does that mean,

11      balance due investor?

12  A.  That's the amount he sent to the owner of the

13      property minus his commission.

14  Q.  And how was that amount determined?

15  A.  For Mr. Bahr it was a five percent commission

16      fee for him.

17  Q.  What was it for other owners?

18  A.  Ten percent.

19  Q.  Why was Mr. Bahr's amount five percent and

20      the other owners ten percent?

21  A.  He had made some kind of deal with him

22      because he had so many properties.

23  Q.  Okay.  Were you ever -- I mean, were you made

42

1       privy to that agreement?  I mean, you were

2       told about that agreement?

3   A.  Yes, I -- I filled that agreement out.

Page 32

3927 06-20-08 Norsworthy Johnnie.txt

4  Q.  So you drafted the agreement between Mr. Bahr

5      and Mr. Gumbaytay?

6  A.  Yes.

7  Q.  Do you have a copy of that agreement?

8  A.  I don't think so.

9  Q.  What happened to the copy of the agreement?

10  A.  It's probably in the files I gave him back.

11  Q.  When did you give him the files back?

12  A.  In May.

13  Q.  Okay.  So there was a -- there was a drafted

14      agreement between Mr. Bahr and Mr. Gumbaytay?

15  A.  Yes.

16  Q.  Were there agreements drafted between

17      Mr. Gumbaytay and the other owners?

18  A.  Yes.

19  Q.  What sort of things were on those agreements?

20  A.  Basically, it was telling them what he would

21      do and how much they would pay.

22  Q.  When you say what he would do, meaning --

23  A.  He would manage the property.

                          43

1  Q.  Uh-huh.  Did it ever say anything specific

2      about what he was supposed to do for

3      repairs?  How he was supposed to handle

4      repairs?

5  A.  Yes, but I couldn't tell you what it said

6      about them.

7  Q.  Do you remember if he and Mr. Bahr had an

8      agreement about how he would handle repairs?

9  A.  Probably.  They were all the same management

10      lease.

                       Page 33

3927 06-20-08 Norsworthy Johnnie.txt

11  Q.  So it was a standard form that was used where

12      you would just change the amount that the

13      owner was -- that the --

14  A.  Right.  Basically, yes.

15  Q.  So you would change the amount that he was

16      charged, the amount that he received back

17      from the investor?

18  A.  Yes.

19  Q.  So you got the information to fill in to this

20      executive summary, Plaintiff's Exhibit #E,

21      from Mr. Gumbaytay?

22  A.  Ask me that again, please.

23  Q.  So you got the information to fill in to this

                            44

 1      executive summary through Mr. Gumbaytay?

 2      Mr. Gumbaytay would give you that

 3      information?

 4  A.  Yeah.  I'd fill out the lease for him.  Then

 5      he would let me know when it had been

 6      approved by Housing, most of these.  And I

 7      would fill in the information through a

 8      combination of both.

 9  Q.  Okay.  Did he provide this -- a combination

10      of what?  Can you --

11  A.  From the lease and what he told me that the

12      Housing Authority was paying.

13  Q.  So you obtained the rental amount from the

14      lease, and he orally told you what Section 8

15      was paying?

16  A.  Right.

17  Q.  Okay.  When Mr. Gumbaytay provided you with

                        Page 34

3927 06-20-08 Norsworthy Johnnie.txt

18    this information, was it orally?

19  A.  Most of the time, yes.  I can't remember that

20    he ever told me in writing.

21  Q.  Okay.  Where did you -- how did you determine

22    the lease amount?

23  A.  He told me what the rent was going to be.

                              45

1  Q.  Okay.

2  A.  I didn't make any of this up.

3  Q.  And so -- so all of the information came from

4    him --

5  A.  Yes.

6  Q.  -- essentially.  Do you know if Mr. Gumbaytay

7    ever used a receipt book?

8  A.  I couldn't tell you for sure about that, no.

9  Q.  Okay.  So, looking at this document, if you

10    add the amount due to the investor and the

11    column that's labeled ECG's management fees,

12    you should -- you should get the -- the

13    amount, the rental amount; is that correct?

14  A.  Yes.

15  Q.  Is there any reason why totaling these

16    numbers would not give you the rental amount

17    that you could think of?

18  A.  No.

19  Q.  Let's look at the first page of Plaintiff's

20    Exhibit #E, October 2006 funds collected.

21    The third client listed is Yolanda Boswell.

22    And if you look in the column that's marked

23    tenant paid, it says $225.  And the rental

                           Page 35

3927 06-20-08 Norsworthy Johnnie.txt
46

1    amount is $550.  Can you explain that?

2  A.  I cannot.

3  Q.  Okay.  Did you track late fees using this

4    document?

5  A.  Not very well, no.

6  Q.  Where would the late fees be marked if they

7    were marked on this document?

8  A.  I had just started in this -- started this in

9    '06.

10  Q.  This, using this form?

11  A.  And I was still -- yeah.  I was -- no, doing

12    this work for him, this management.  Doing

13    this spreadsheet thing.  And I was learning.

14    And I was confused.  And I was getting mad at

15    him.  So they had a lot of mistakes in them.

16  Q.  How did you --

17  A.  I do not understand why there's a zero there.

18  Q.  A zero where?

19  A.  Under Section 8 Paid.  It says zero with

20    Yolanda Boswell.  I don't know if that was

21    the first month she lived there or what.  My

22    spreadsheet said she started in February '07.

23    So --

47

1  Q.  What spreadsheet said she started in

2    February '07?

3  A.  It's on that disk.

4  Q.  So --

5  A.  I don't -- no, I don't understand what I am

6    looking at.

3927 06-20-08 Norsworthy Johnnie.txt

7  Q.  But was there something --

8  A.  I'm surely that I -- I'm sure that I did it.

9  Q.  Okay.

10  A.  Is this for each month?  March '07.

11  Q.  Okay.  So you said you didn't really track

12     the late fees using this document?

13  A.  No.

14  Q.  How did you track the late fees?

15  A.  I didn't.

16  Q.  So did Mr. Gumbaytay track the late fees?

17  A.  I don't know.

18  Q.  Okay.  But you would sometimes draft notices

19     to -- to tenants saying that they owed money?

20  A.  Very seldom.

21  Q.  Excuse me?

22  A.  Very seldom.

23  Q.  But you would sometimes?

                        48

1  A.  Sometimes.

2  Q.  And that was just based on what Mr. Gumbaytay

3     would tell you?

4  A.  Yes.

5  Q.  Okay.  I'm going to look at Plaintiff --

6     Plaintiff's Exhibit #E, and it's the third

7     page in.  It's the page marked December 2006

8     funds collected.  And again, looking at

9     client Number 3, Yolanda Boswell.  Under the

10     comment section it says, will pay $150 on

11     next pay period; is that correct?

12  A.  It says $450.  Well, it looks like a 4.

13  Q.  It's hard for me to tell what it says.  This

                        Page 37

3927 06-20-08 Norsworthy Johnnie.txt

14    is a document that was provided to us by

15    Mr. Gumbaytay.  So I'm not sure if it says

16    450 or 150.  But it says will pay -- I mean,

17    what does it say, do you think?

18  A.  I guess it's a 1.  I can't really tell.  150.

19  Q.  So it says will pay some dollar amount on

20    next pay period?

21  A.  Right.

22  Q.  Did you make that notation?

23  A.  I put it there at his instruction.

                        49

1   Q.  So you didn't have a conversation with

2     Ms. Boswell?

3   A.  No.  I did not.

4   Q.  So you didn't talk to Ms. Boswell?

5   A.  I remember Ms. Boswell when she came to fill

6     out the lease, when she came to sign the

7     lease.

8   Q.  Okay.  And that was the only time you

9     remember meeting her?

10  A.  That's the only remember -- time I remember.

11  Q.  Okay.  Let's see.  Look at what I have marked

12    as Plaintiff's Exhibit #F.  Could you look at

13    that and please describe it?

14  A.  It's a blank lease.

15  Q.  Is this a lease that you recognize?

16  A.  Yes.  It's the first one we used.  We don't

17    use this -- we haven't used this one anymore.

18  Q.  When did you use this lease?

19  A.  '06.  Whenever we started -- he started

20    managing property.

                     Page 38

3927 06-20-08 Norsworthy Johnnie.txt

21  Q.  So he started -- when did he --

22  A.  I don't -- I have some things in '05.

23  Q.  But to your recollection, he started managing

                            50

1       properties in '05 and in '06?

2   A.  Uh-huh.

3   Q.  Okay.

4   A.  Yes.

5   Q.  So this was the lease that you used in 2006?

6   A.  Most likely, yes.

7   Q.  Okay.  So would you say that this is a fair

8       and accurate representation of the standard

9       lease that was used in 2006?

10  A.  Yes.

11  Q.  Okay.  So let's talk about how you prepared

12      the lease.

13  A.  Uh-huh.

14  Q.  For each person who comes in and rented a

15      house in 2006, you would use this form.  And

16      in this lease there are several underlined

17      sections that I believe are blanks that you

18      are supposed to fill in; is that correct?

19  A.  Yes.

20  Q.  So do you fill in each underlined section

21      each time you fill in a new lease?

22  A.  No.  Sometimes I use -- for the same -- for

23      the same address, I'll just fill in the name

                            51

1       of the new tenant and the rent he's charging

2       and when it begins.

3   Q.  So if a house is already occupied, then

3927 06-20-08 Norsworthy Johnnie.txt

```
 4   you'll -- then you'll just change the name of
 5   the tenant and the lease term and the rental
 6   amount?
 7 A. Yes.
 8 Q. Okay.  When Ms. Boswell came in to fill out a
 9   lease, do you remember if anybody was living
10   at 964 North Gap Loop at the time?
11 A. When I filled out a lease for her, it was for
12   Lake Street.
13 Q. Okay.
14 A. The first time.
15 Q. Do you not remember if somebody was living at
16   964 North Gap Loop or was nobody living
17   there?
18 A. I do not know.
19 Q. Okay.  So how did you know how much each
20   place was renting for?
21 A. Mr. Gumbaytay told me what to charge.
22 Q. Let me ask you a couple of questions about
23   the housing assistance payment program.
```

                              52

```
 1 A. Uh-huh.
 2 Q. Did you ever deal with the housing assistance
 3   payment -- and we'll call them HAP for
 4   short.  Did you ever deal with any of the HAP
 5   contract applications with the Housing
 6   Authority?
 7 A. I did landlord packages.
 8 Q. What is a landlord package?
 9 A. I filled out the papers for the landlord that
10   he had to file with the Housing Authority.
```
                         Page 40

3927 06-20-08 Norsworthy Johnnie.txt

11  Q.  When you say landlord, are you referring to
12      Mr. Gumbaytay or to the owners?
13  A.  To the owners.
14  Q.  Okay.  So did you work -- did you work for
15      any of the owners as well?
16  A.  Not directly, no.
17  Q.  How would that relationship work?
18  A.  Well, they had to have their information in.
19      I -- I charged -- I charged -- let me see how
20      I did charge.  I charged the tenant.  They --
21      the tenants brought it in from the Housing
22      Authority.  I filled it out and I charged
23      them $30, the tenant.

                        53

1   Q.  You charged the tenant $30 --
2   A.  Yes.
3   Q.  -- for filling out the form.  Would you then
4       deliver those documents to the Housing
5       Authority?
6   A.  No, the tenant came and picked it up and
7       delivered them themselves.
8   Q.  Did the Housing Authority ever say that the
9       requested rent was too high?
10  A.  Not to my knowledge.
11  Q.  That was probably something that was conveyed
12      to Mr. Gumbaytay?
13  A.  Yes, or the -- or the owner.
14  Q.  Were you ever given copies of any
15      correspondence between the Housing Authority
16      and the owner or Mr. Gumbaytay?
17  A.  Not to Mr. Gumbaytay.  Sometimes the owner

                    Page 41

3927 06-20-08 Norsworthy Johnnie.txt

```
18      would send me copies of correspondence they
19      had gotten from the Housing Authority.
20  Q.  For -- why would they send those to you?
21  A.  So I would know how much they would pay him.
22  Q.  How much --
23  A.  To verify how much the Housing Authority was
```

                           54

```
1       paying on that rent.
2   Q.  Do you still have any of those documents?
3   A.  I gave everything back to him.
4   Q.  To Mr. Gumbaytay in May?
5   A.  Yes.  They're all in those files.
6   Q.  And when the owner would send you a copy of
7       his correspondence from the Housing
8       Authority, would you ever use that to fill
9       out the executive summary on the section
10      marked --
11  A.  Yes.
12  Q.  -- Section 8 paid?
13  A.  Yes.
14  Q.  So what if -- I mean, did it ever happen -- I
15      know that earlier you testified that
16      Mr. Gumbaytay would tell you the amount that
17      was in --
18  A.  That was done that way, also.
19  Q.  Okay.  So did the amount that
20      Mr. Gumbaytay -- how often would you fill in
21      the amount marked as Section 8 paid using the
22      correspondence from the owner?
23  A.  Not very often.  There were just about two
```

3927 06-20-08 Norsworthy Johnnie.txt
                          55

1    owners that would do that once in a while if
2    I requested it.
3  Q.  Who were the two owners that would do that?
4  A.  I just got some from Matt Bahr once or twice.
5    And Mr. Jorgensen, J-O-R-G-E-N-S-E-N.
6  Q.  And why did -- why did the owners in those
7    instances send you copies of that?
8  A.  Because they were -- they were not getting
9    the rent from the tenant that they thought
10   they were supposed to get.
11 Q.  Okay.  Did Mr. Bahr ever send you any of
12   those documents in relation to Ms. Boswell or
13   Ms. Boswell's property?
14 A.  I don't remember.
15 Q.  Okay.  So what would your next step be?  If
16   Mr. Bahr, for example, sent you a document
17   from the Housing Authority indicating what
18   Section 8 paid, what would you do then?
19 A.  I'd check it against the records I had.  And
20   I would change it if it was not the same.
21 Q.  You would change it to reflect what the owner
22   sent you?
23 A.  Yes.


                          56

1        MS. NEAL:  Okay.  I think we're going
2            to take a short break if that's
3            okay.  About ten minutes?
4        THE WITNESS:  Sure.
5        MS. NEAL:  Okay.  Great.
6            (Brief recess)
                                Page 43

3927 06-20-08 Norsworthy Johnnie.txt

7  Q.  All right.  So continuing the deposition, we

8      have been talking about the HAP contract

9      applications before.  So I guess we're going

10     to pick back up there if that's okay.  So you

11     mentioned that the owners would sometimes

12     send you copies of the HAP contracts when

13     they were unhappy?

14  A.  Yes.

15  Q.  When else would they send you the HAP

16     contracts?

17  A.  That's the only time.  That's the only time.

18  Q.  Okay.

19  A.  That I can think of.

20  Q.  And did you -- I believe you testified that

21     you had requested those documents at some

22     times?

23  A.  I had.  I have.  I did for Mr. Jorgensen.

57

1  Q.  And why did you request them?

2  A.  Because he was telling me there was a

3     different -- that he wasn't -- she was

4     behind.  And she was saying she owed

5     something, and he didn't agree with her.

6  Q.  Who is she?

7  A.  I don't remember which one she -- he was

8     talking about at the time.

9  Q.  But a tenant was --

10  A.  A tenant.  Uh-huh.  A tenant was telling him

11     that -- that she didn't owe anything, that

12     they were paying her full rent and he was

13     disagreeing with her.

Page 44

3927 06-20-08 Norsworthy Johnnie.txt

14  Q.  Okay.  And so you requested a copy of the HAP

15      contract to try to figure that up?

16  A.  Yes.

17  Q.  So how -- I mean, I know you're talking about

18      an occasion where a tenant had contact with

19      Mr. Jorgensen.  Is it pronounced Jorgensen?

20  A.  Jorgensen.

21  Q.  Did -- to your knowledge the tenants

22      otherwise have contact with the owners?

23  A.  Not usually.

                              58

1   Q.  Not usually.  Under what circumstances would

2       they have contact with the owners?

3   A.  I couldn't really tell you why they -- how

4       they got in touch with them.

5   Q.  So they weren't provided --

6   A.  I didn't -- I didn't provide any telephone

7       numbers or anything.

8   Q.  And to your knowledge, did Mr. Gumbaytay ever

9       provide the information how to contact the

10      owners?

11  A.  He may have.  But I don't know for sure.

12  Q.  So were there -- so there were occasions

13      where the owners sent you a copy of the HAP

14      contract because they were not receiving the

15      amount that they thought they were supposed

16      to get?

17  A.  That's correct.

18  Q.  And then you would change the spreadsheet if

19      they didn't match?

20  A.  Yes.

                          Page 45

3927 06-20-08 Norsworthy Johnnie.txt

21  Q.  Okay.  So there were times when the amount

22      that the owner sent you in the HAP contract

23      differed from the amount that you would put

                          59

1       in the spreadsheet?

2   A.  Ask that again.  I missed something.

3   Q.  Yeah.  So there were times when the amount

4       that the owner sent you in the HAP contract

5       differed from the amount that was listed in

6       the spreadsheet, correct?

7   A.  It wasn't the contract that they sent me.

8   Q.  I'm sorry.  What did they send you?

9   A.  It was just a report.  They sent them a

10      report each month of what they were -- the

11      check they were sending them and what they

12      were for.

13  Q.  Who sent them?

14  A.  HAP sent it to the owner of the property.  It

15      was a list of the tenants and what they paid

16      and the amount of the check they paid.

17  Q.  Okay.

18  A.  It was not a contract.

19  Q.  Okay.

20  A.  It was just kind of a report, a monthly

21      report to them.

22  Q.  Okay.  So, on that monthly report that HAP

23      sent to them, was the amount in that report

                          60

1       ever different from the amount that you had

2       on the spreadsheet?

3   A.  I think there was an occasion or two.

                    Page 46

3927 06-20-08 Norsworthy Johnnie.txt

4  Q.  Okay.  Do you remember those occasions?

5  A.  No.  Mostly that -- mostly what I'm talking

6      about was with Mr. Jorgensen.

7  Q.  Did that ever happen with Mr. Bahr though?

8  A.  Not that I remember.

9  Q.  Okay.  Then what -- earlier you testified

10     that Mr. Bahr had contacted you at some point

11     because he wasn't happy.  What -- do you

12     remember any more specifics about that

13     occasion?

14 A.  Because he wasn't getting his rents fast

15     enough from Mr. Gumbaytay is mostly what it

16     was about.

17 Q.  Okay.  When did he contact you?  Do you

18     remember approximately when he contacted you

19     or how many times he contacted you?

20 A.  Maybe once a month.

21 Q.  Maybe once a month.  From starting when?

22 A.  He thought he should be getting his rents by

23     the 5th of the month and there was no way --

                    61

1      there was no way he could get them that fast.

2  Q.  Okay.  When would he receive the rents from

3      Mr. Gumbaytay?

4  A.  Probably the end of the month.  We tried to

5      get them by the 15th.  We tried to get the

6      reports to them after all rents were

7      collected, which was not possible sometimes.

8          MS. NEAL:  Okay.  Do we need to pause

9                for a moment?

10                (Brief interruption)
                    Page 47

3927 06-20-08 Norsworthy Johnnie.txt

11                    (Mr. Newell present
12          MR. NEAL:  This is Mr. Newell and he is
13              counsel for Mr. Gumbaytay.
14  A.  All right.
15          MS. NEAL:  This is Ms. Norsworthy.  She
16              is who we are taking a deposition
17              from.
18          MR. NEWELL:  All right.
19  Q.  Why did the owner have to send a HAP report
20      if the only issue was the timing of the
21      payments?
22  A.  He didn't send me the reports for those.
23      That's just how much I heard from him.  I

                            62

1       don't remember when I got a report from him,
2       actually.
3   Q.  So do you ever remember receiving a HAP
4       report from Mr. Bahr?
5   A.  I may have.  I have a dim recollection of it.
6       But --
7   Q.  Do you still have copies of any HAP report
8       that was sent to you by an owner?
9   A.  No.
10  Q.  Were these documents ever given to
11      Mr. Gumbaytay in May?
12  A.  Yes.  Yes.
13  Q.  Were there ever occasions when an owner
14      called to complain about not getting enough
15      money where the amount in the spreadsheet was
16      the same as the amount sent by the owner, to
17      your recollection?
                            Page 48

3927 06-20-08 Norsworthy Johnnie.txt

18  A.  To my recollection, no.

19  Q.  I want to go back to another document that

20      we've marked really quick.  In the -- it's in

21      the document marked as Plaintiff's Exhibit #E

22      in the executive summary.  If you turn to the

23      fourth page of that document, there -- I'm

                              63

1       sorry.  The fifth page of that document,

2       marked executive -- it's entitled Executive

3       Summary, and it says February 2007 funds

4       collected, rental only, there's a handwritten

5       note at the top left-hand corner.  Can you

6       read that note aloud?

7   A.  Stick this in number 3 slot instead of

8       number 4 slot.

9   Q.  On the -- I'm sorry, on the other side of the

10      page.  The other --

11  A.  Revised 3/4/07.

12  Q.  Is that a mark made by you or --

13  A.  No.

14  Q.  Who --

15  A.  No, Mr. Gumbaytay's.  That's his handwriting.

16  Q.  Okay.  And do you know how it was revised on

17      that day?

18  A.  I don't remember that.

19  Q.  Okay.  Do you recall why it was revised?

20  A.  Probably because I had that note in the wrong

21      column.  I mean, in the wrong renter's

22      column.  It should have gone over there with

23      Ms. Boswell.

                        Page 49

3927 06-20-08 Norsworthy Johnnie.txt
                    64

1  Q.  That's just your guess of why it may have
2      been revised?
3  A.  Yes.
4  Q.  Okay.  I noticed that on this -- on this
5      document, Plaintiff's Exhibit #E, both on
6      this page and on, you know, for example, the
7      first page of the document, October 2006,
8      there are items that have been circled, there
9      are items that it appears to have been, you
10     know, highlighted.  Is that true?
11 A.  Uh-huh.  He circled them and faxed them back
12     to me to -- said that they were right.  The
13     circles meant they were right.
14 Q.  Okay.  So what about the --
15 A.  I don't know -- Is that supposed to be
16     highlighted?
17 Q.  The document was given to me as a copy, so I
18     don't know what -- what it is, yeah.  So what
19     about the portions that he didn't circle?
20     You said that he circled certain numbers.
21 A.  He noticed that -- that Section 8 paid all of
22     those that were not circled.  There were
23     zeroes in the tenant paid.  He just meant

                    65

1      that those had been collected, and that was a
2      correct amount of rent.
3  Q.  What about in the second page of Plaintiff's
4      Exhibit #E, executive discovery -- Executive
5      Summary November of 2006 funds collected.
6  A.  November --

                 Page 50

3927 06-20-08 Norsworthy Johnnie.txt

7    Q.  It looks like in that document there's only

8        one thing circled; is that correct?

9    A.  I don't see any circle on it except for here.

10   Q.  Right.  Yeah, I meant that there's one circle

11       on the page.  I mean, is that correct,

12       there's only one item circled on the page?

13   A.  Yes.

14   Q.  And why -- why was that item circled?

15   A.  I don't know why.

16   Q.  Okay.  What about -- you want to look at

17       Plaintiff's Exhibit #E, page 7, which is

18       executive discovery -- Executive Summary

19       March 2007?

20   A.  Uh-huh.

21   Q.  There's some notations in that executive

22       summary.  Can you -- who were these notes

23       made by?  I mean, are these your notes?

                          66

1    A.  Those -- these are not my notes, but they

2        don't look like his either.

3    Q.  Okay.

4    A.  These do but those don't.

5    Q.  I'm sorry, can you indicate for the record

6        which markings you're indicating?

7    A.  The markings on the right side of the page

8        look like Mr. Gumbaytay's writing.

9    Q.  The ones that says -- can you read it?

10   A.  Hold for now.  Further projects are pending,

11       AC 609 Cherry Hill and whatever that says.

12   Q.  And then there are a couple of lines

13       underneath that?

                       Page 51

3927 06-20-08 Norsworthy_Johnnie.txt

14  A.  Yes.  There's something about Cherry Hill.  I

15      don't -- I don't know what --

16          MS. NEAL:  We're about to give you a

17              copy.

18          MR. NEWELL:  I only have one question.

19              Did Mr. Gumbaytay or you make a

20              mistake --

21          MS. NEAL:  I'm sorry.  This is not --

22              this is my deposition and you're

23              not allowed to ask her any

                        67

1               questions until I'm done.

2           MR. NEWELL:  Okay.  Well, go ahead.

3   Q.  So there's a notation on Number 3, Yolanda

4       Boswell under the comment section that I

5       believe it's an error that says paid by

6       Elite.  Is that -- is that what you read?

7   A.  Yes.

8   Q.  And who is that notation made by?

9   A.  Mr. Gumbaytay.

10  Q.  Do you know when that notation was made?

11  A.  No.

12  Q.  Okay.  Do you recall reading that -- reading

13      that notation in March of 2007 or --

14  A.  I do not recall.

15  Q.  Okay.  So it's possible he made the notation

16      at a later time?

17  A.  It's possible.

18  Q.  So did Mr. Gumbaytay ever sign the HAP

19      contracts on behalf of owners, to your

20      knowledge?

                        Page 52

3927 06-20-08 Norsworthy Johnnie.txt

21  A.  To my knowledge, I have no idea.

22  Q.  Did you ever sign any HAP contracts for

23      Mr. --

                            68

1   A.  No.  HAP contracts?

2   Q.  Yes, ma'am.

3   A.  No.

4   Q.  Okay.  Did you ever have any correspondence

5       with the Housing Authority, Montgomery

6       Housing Authority in general?

7   A.  Yes.

8   Q.  What sort of correspondence would you have

9       with them?

10  A.  When they -- when a tenant wanted to get out

11      of their lease, we -- we sent a letter.  It

12      was basically a form letter saying that the

13      owner releases her from her lease because of

14      such-and-such. I did several of those.

15  Q.  And those were letters sent to you -- sent by

16      you on behalf of Mr. Gumbaytay?

17  A.  Right.

18  Q.  Okay.  Do you still have copies of any of

19      that correspondence?

20  A.  No.

21  Q.  And these were, again, documents that were

22      given to Mr. Gumbaytay in May?

23  A.  Right.

                            69

1   Q.  Were there any other reasons why you might

2       have spoken with the Montgomery Housing

3       Authority?

                                    Page 53

3927 06-20-08 Norsworthy Johnnie.txt

4   A.   They would call me and ask -- let's see.
5        There were several times I talked to a
6        renter's counselor.  Sometimes they called
7        and wanted a copy of the lease, a signed copy
8        of the lease.  They get a copy before it's
9        signed, but then you're supposed to have a
10       signed copy.  And the tenant is supposed to
11       provide them with that, but sometimes they
12       don't.
13  Q.   Okay.  And so did you -- at those times, did
14       you send the copies of the signed lease?
15  A.   Yeah.  Faxed it to them.
16  Q.   Okay.  And what else?  What else would you
17       correspond with the Housing Authority?
18  A.   Basically that was it.
19  Q.   Did the Housing Authority ever talk with you
20       about any complaints that they had received
21       about Mr. Gumbaytay?
22  A.   No.
23  Q.   When did you communicate with the owners?  On

                              70

1        what occasion did you communicate with
2        owners?
3   A.   Sometimes mostly by e-mail if I did.  They
4        would be inquiring about their executive
5        summaries.  And I would e-mail them their
6        executive summaries.
7   Q.   Did you e-mail the executive summaries to
8        owners monthly or was that just something you
9        would provide to them upon request?
10  A.   Monthly.
                              Page 54

3927 06-20-08 Norsworthy Johnnie.txt

11  Q.  Do you have copies of those e-mails?

12  A.  Do I have copies of the e-mails?  No, I

13      don't.

14  Q.  Okay.  And what would the owners be

15      corresponding with you about those executive

16      summaries?

17  A.  If they had questions about some of the bills

18      that were charged.  Just different things

19      that we just -- we could explain, and then

20      they were satisfied.  But --

21  Q.  Could you give me -- could you give me an

22      example of something that they might have

23      called you about?

                          71

1  A.  Well, there would be notations about bills

2      that had been charged to them and they didn't

3      have a copy.  I would send them copies of

4      the -- I usually tried to send them copies of

5      all the invoices, but sometimes some got left

6      out.

7  Q.  You mean invoices for repair?

8  A.  For work done, repair work done.

9  Q.  Did the owners ever call you to complain

10     about anything related to Mr. Gumbaytay?

11  A.  No, I can't say they did.

12  Q.  But you did testify earlier that they would

13      contact you if there was a problem with the

14      amount that they were receiving?

15  A.  Yes.  Yeah, and then that's when they would

16      send me a copy of their HAP report.

17  Q.  Did you ever work with a man named Eric Cruz?

                      Page 55

3927 06-20-08 Norsworthy Johnnie.txt

18  A.  Yes.

19  Q.  How did you work with him?

20  A.  He -- basically, he handed me over all of his

21      leases.  They went to Gumbaytay.  He gave up

22      that collecting of the leases.

23  Q.  So he was a property manager as well?

72

1   A.  He was a property manager as well.

2   Q.  When did he stop managing properties?

3   A.  When Guest Properties mostly went out of

4       business.

5   Q.  Did he then -- was it then that he started

6       maintaining property for Mr. Gumbaytay?

7   A.  I don't know about that.

8   Q.  Do you have any contact information for

9       Mr. Cruz?

10  A.  I do not, no.  I used to have a cell phone

11      number but it's no good anymore.  So --

12  Q.  Okay.  What is your understanding of the

13      relationship between Mr. Gumbaytay and Eric

14      Cruz?

15  A.  I don't have any idea.  That's all I know,

16      that he turned all over -- turned all the

17      leases that he was collecting rent on to

18      Mr. Gumbaytay.

19  Q.  Who did Mr. Cruz work for?

20  A.  He worked for Guest Properties.

21  Q.  Okay.  So to your recollection, did Mr. Cruz

22      ever work for Mr. Gumbaytay on a contract

23      basis or as an employee?

Page 56

3927 06-20-08 Norsworthy Johnnie.txt
73

1  A.  I do not know.
2  Q.  Okay.  Who else worked in any capacity for or
3      contracted with Mr. Gumbaytay?
4  A.  Oh, he had people that cut grass.
5  Q.  Who were --
6  A.  Is that what you're talking about?
7  Q.  Yeah.  Any sort of working relationship
8      related to his property management that they
9      had with Mr. Gumbaytay.  So yes.  Who cut
10     grass for him?
11 A.  Several people.  Nobody lasted long.
12 Q.  Do you remember any of their names?
13 A.  No.
14 Q.  Okay.  What about other people who did
15     secretarial kind of work for him?
16 A.  Renee Williams and Cameran Bassett.
17 Q.  Is there anyone else you can remember?
18 A.  No.
19 Q.  What about Wanda Johnson?
20 A.  She was a tenant.
21 Q.  She was a tenant?
22 A.  She was a tenant.
23 Q.  Looking at Plaintiff's Exhibit #A right now,

74

1      and on the fourth paragraph --
2  A.  #A?
3  Q.  Yeah, Plaintiff's Exhibit #A.  And in the
4      fourth paragraph, it says I pledge --
5  A.  Okay.
6  Q.  Yeah.  I'm reading the paragraph that says I

Page 57

3927 06-20-08 Norsworthy Johnnie.txt

7    pledge to inspect your property at least once

8    every four months.

9  A.  Okay.  Yeah.

10  Q.  It's very important to both me and your

11    landlord that you do your part maintaining

12    your rental unit.  Even though you are

13    renting, please treat your home as if you own

14    it with the proper care and respect.  Thus,

15    you must keep in touch with Ms. Wanda

16    Johnson.

17       Now that you've read this document, do

18    you remember any other relationship

19    Ms. Johnson had with Mr. Gumbaytay other than

20    as his tenant?

21  A.  Yeah.  He told me that she was going to be

22    inspecting properties.

23  Q.  Did she inspect properties, to your

75

1    knowledge?

2  A.  I don't know.

3  Q.  Okay.  Were there any other folks that

4    inspected property, to your knowledge?

5  A.  There was someone else, but I don't remember

6    her name.  It was a her.  It was a woman, but

7    I don't know.

8  Q.  Was she also a tenant of Mr. Gumbaytay?

9  A.  I think so.

10  Q.  Was Renee Williams a tenant of Mr. Gumbaytay?

11  A.  Yes.  She wasn't to begin with.

12  Q.  But she ended up renting property?

13  A.  She rented.

Page 58

3927 06-20-08 Norsworthy Johnnie.txt

14  Q.  Do you remember when she started renting

15      property from him?

16  A.  Shortly after she started working for him.

17  Q.  And what about Cameran Bassett?  Did she rent

18      from Mr. Gumbaytay?

19  A.  Yes.

20  Q.  Okay.  So did any tenant ever complain to you

21      about Mr. Gumbaytay in any way?

22  A.  I remember some, but I don't remember who.  I

23      mean, I can remember --

                        76

1  Q.  Can you remember what they complained about?

2      Did they ever complain about failure to make

3      repairs?

4  A.  I think so.

5  Q.  Okay.  Did they ever complain about the

6      amount of rent that was charged to them?

7  A.  No.

8  Q.  Did any of them ever complain about his

9      behavior?

10  A.  No.

11  Q.  So did any tenant ever say that he had acted

12      inappropriately towards them or said

13      something inappropriate to them?

14  A.  No.

15  Q.  Do you know if any of the other people that

16      worked with Mr. Gumbaytay, for example,

17      Ms. Williams or Ms. Bassett, if they ever

18      received any complaints about Mr. Gumbaytay's

19      behavior?

20  A.  If they did?

                    Page 59

3927 06-20-08 Norsworthy Johnnie.txt

21  Q.  Yes.

22  A.  No, I didn't.  If they did, they didn't tell

23      me.

                            77

1   Q.  Okay.

2   A.  I didn't have a lot of contact with them.

3   Q.  Did anyone ever say to you that he had acted

4       fresh?

5   A.  No.

6   Q.  Did you ever hear him use the term sugar

7       daddy?

8   A.  No.

9   Q.  Did he ever speak inappropriately or act

10      inappropriately towards you?

11  A.  No.

12  Q.  What about any other people who worked for

13      Mr. Gumbaytay?  Did he ever act

14      inappropriately or say anything

15      inappropriately to Ms. Williams?

16  A.  If he did, she didn't tell me.  I don't know.

17  Q.  To Ms. Bassett?

18  A.  I don't know.

19  Q.  Okay.  So let's talk about Ms. Boswell.  When

20      did you first meet Ms. Boswell?

21  A.  When she filled out her lease for Lake

22      Street.  For the property on Lake Street.

23  Q.  When did she fill out that lease,

                            78

1       approximately?

2   A.  I cannot remember.

3   Q.  Okay.  To whom did owners tell how much they
                       Page 60

3927 06-20-08 Norsworthy Johnnie.txt

 4    wanted for rent?

 5  A.  Mr. Gumbaytay.

 6  Q.  So the owners never told you how much the

 7      rent was supposed to be?

 8  A.  No.

 9  Q.  So back to when you met Ms. Boswell.  So you

10      met her when she signed the lease for

11      Lake Street?

12  A.  Uh-huh.

13  Q.  Do you have a copy of the lease that she

14      filled out?

15  A.  No.

16  Q.  Have you spoken -- was this meeting in

17      person?

18  A.  Yes.

19  Q.  Had you spoken with her or her mother prior

20      to this in-person meeting?

21  A.  Not that I remember.

22  Q.  Okay.  And did you ever -- how many times did

23      you meet with Ms. Boswell in person?

                          79

 1  A.  As far as I can remember, that one time.

 2  Q.  Okay.  The one time you filled out the lease

 3      for Lake Street?

 4  A.  She may have come back one more time.  I

 5      don't know.  But I couldn't tell you -- say

 6      for sure.

 7  Q.  Okay.  To your knowledge, did Mr. Gumbaytay

 8      meet Ms. Boswell or speak with her or her

 9      mother before you met her in person?

10  A.  He probably did.  Because he usually sent

                      Page 61

3927 06-20-08 Norsworthy Johnnie.txt

11     them to me.

12  Q.  Okay.  So why would he have -- what kind of

13     communication would he have had with

14     Ms. Boswell before sending them to you?

15  A.  Telling them about the property that he had

16     available.

17  Q.  And they would fill out applications for the

18     house?

19  A.  Uh-huh.  I know that she took -- he -- he

20     called me and told me at that incident that

21     she would be -- she would have a reduced rent

22     of 450 a month because they would be cleaning

23     the house, painting and cleaning it up for

                            80

1      Lake Street.

2   Q.  So what else?  Did he tell you anything else

3      about his meeting for Ms. Boswell?  And let

4      me say, if so, please state in as close to

5      actual words as you can what each speaker

6      said and what the response was.

7   A.  I can't even remember that far back.

8   Q.  Okay.  Well, just do the best that you can.

9      So what else did he tell you?  Did he tell

10     you anything else about his meeting with

11     Ms. Boswell?

12  A.  No.  She -- he said that her uncle would

13     be -- was going to do the work for her.  And

14     that's why they were getting a reduced rate,

15     so that -- they would do the work, and they

16     would get the reduced rent for that house.

17     That is exactly -- I mean, that's all I

                      Page 62

3927 06-20-08 Norsworthy Johnnie.txt

18    remember about that.

19  Q.  Okay.  So how did he determine the amount to

20      rent the Lake Street house for?

21  A.  He was having trouble renting it because it

22      was on Lake Street.  And he was just trying

23      to get somebody in there.

81

1  Q.  So he reduced the rent?

2  A.  He reduced the rent.

3  Q.  Did he convey this to the owner of the

4      property, Mr. McDonough?

5  A.  Most likely.

6  Q.  But you never spoke to the owner on his

7      behalf?

8  A.  No.

9  Q.  Okay.  So you drew up a lease at this time

10      for the house on 1215 Lake Street?

11  A.  Yes.

12  Q.  Okay.  So let me go back to the first meeting

13      with Ms. Boswell.  Where did you meet her?

14  A.  At my house in my office.

15  Q.  And what did you talk about?

16  A.  She told me that the rent was supposed to be

17      450, and I agreed with her because I had

18      already talked to Mr. Gumbaytay about it.

19      And that's basically all I remember about it.

20  Q.  Okay.  And was anyone else there with her?

21  A.  Someone was.

22  Q.  Do you remember who?

23  A.  No.

Page 63

3927 06-20-08 Norsworthy Johnnie.txt
                        82

1   Q.  How long -- was anyone else with you at the

2       time in the house?

3   A.  I used to have one -- one employee that was

4       there, but I don't remember if she was there,

5       because she left at four o'clock.  And I

6       don't remember when Ms. Boswell was there.

7   Q.  Okay.  Do you remember -- what was the name

8       of your employee?

9   A.  Margaret Mooneyham.

10  Q.  Can you spell her last name, please?

11  A.  M-O-O-N-E-Y-H-A-M.

12  Q.  So does she still work for you?

13  A.  No.  She's been -- she hasn't worked there in

14      a year.

15  Q.  Okay.  And she worked out of your home as

16      well?

17  A.  Yes.

18  Q.  Doing secretarial?

19  A.  Yeah.

20  Q.  And did she ever work on properties for

21      Mr. Gumbaytay?

22  A.  No.  No.

23  Q.  So she never did any secretarial work related

                        83

1       to his properties?

2   A.  She did transcription for me because I can't

3       do that.

4   Q.  Okay.  Do you have her contact information?

5   A.  Not right offhand, no.

6   Q.  Okay.  But do you have it -- do you have it

                     Page 64

3927 06-20-08 Norsworthy Johnnie.txt

7    at your home?

8  A.  Uh-huh.

9  Q.  Okay.  So how long did you speak to

10    Ms. Boswell for?

11  A.  I don't know, 30 minutes.  I don't know if it

12    was even 30 minutes.

13  Q.  Did she fill out a rental application at this

14    time?

15  A.  I don't remember if she did at that time or

16    not.

17  Q.  Did she sign any paperwork at this time?

18  A.  The lease?  I'm pretty sure she did, and I

19    signed for Mr. Gumbaytay.

20  Q.  Okay.  Do you still have a copy of the

21    lease?  I believe --

22  A.  No.

23  Q.  Okay.  And what was the location for this

84

1    lease?  Was this the Lake Street lease?

2  A.  The Lake Street.

3  Q.  And the rental amount for that location was

4    450.  When did she fill out the lease for 964

5    North Gap Loop?

6  A.  She never came back.  He told me that she had

7    changed -- that she had decided to take the

8    North Gap Loop house because she could never

9    get her uncle to come and work on that --

10    that house, Lake Street house.  So he told me

11    to change the lease accordingly, and the rent

12    was to be 550.  So I took the rent.  I took

13    the -- I went into the computer and I changed

Page 65

3927 06-20-08 Norsworthy Johnnie.txt

14    it. And that's when I forgot to change the

15    amount of the rent.

16  Q.  Okay. And did you ever provide her with a

17    copy?

18  A.  She did come back, too. She did come back.

19  Q.  When did she come back?

20  A.  To pick up the new lease. But I don't know

21    whether she signed it or not.

22  Q.  Do you recall when she came back to pick up

23    the new lease?

85

1  A.  No.

2  Q.  Did you have any conversation with her at the

3    time?

4  A.  She wanted a copy -- wait a minute. Let's

5    see. Okay. I remember something I hadn't

6    thought about. I made the rent out. I did

7    put 550 in that rent.

8  Q.  I'm sorry?

9  A.  I did put 550 for the rent for that house in

10    the new lease.

11  Q.  For what -- for what house?

12  A.  North -- North Gap Loop.

13  Q.  You typed in 550?

14  A.  Yes, I did. And she said, I want another

15    lease -- I want a copy of the other lease

16    with this address in it for 450. And I asked

17    her why, but I don't remember her answer. I

18    gave her both copies. She hadn't signed

19    either one of them. I remembered -- I just

20    remembered that.

Page 66

3927 06-20-08 Norsworthy Johnnie.txt

21  Q.  So when you provided her with a copy of the

22      lease with 450 in the amount, was it typed in

23      or did you type in 450?

                    86

1   A.  Yes.

2   Q.  So let's talk about the process of how you

3       fill in leases.  So for the house at 1215

4       Lake Street, you typed in Sean McDonough's

5       name as the lessor?

6   A.  I didn't understand your question.

7   Q.  Okay.  Let me -- let's -- let's look at the

8       Exhibit #F as the blank lease.  And so

9       for the house at 1215 Lake Street, it says

10      this residential lease agreement, hereinafter

11      lease, is entered into this blank day of

12      blank, by and between the lessor, and then

13      there's an underlined space.  So for 1215

14      Lake Street that's where you -- is that where

15      you typed in Sean McDonough's name?

16  A.  Yeah.  The lessor.

17  Q.  And you --

18  A.  I put in the owner's name.

19  Q.  Okay.  And then it says, And the lessee, and

20      there's a blank.  And is that where you would

21      type in Ms. Boswell's name?

22  A.  Yes.

23  Q.  Okay.  And let's get down to the rental

                    87

1       amount.  Section number 5, rent payments.

2       And it agrees to pay rent to the landlord

3       during the term of this lease in equal

                    Page 67

3927 06-20-08 Norsworthy Johnnie.txt

4    monthly installments of, and there's a blank.

5    Is that where you'd write in the -- type in

6    the dollar amount for each property?

7  A.  Yes, down here at rent payment.  At rent

8    payment is where I typed it in.

9  Q.  And so for the house at Lake Street, I just

10    want to go over one more time what you put

11    in.  You put in Sean McDonough as the lessor,

12    Ms. Boswell's name as the lessee.

13  A.  Matthew Bahr.

14  Q.  For 1215 Lake Street?

15  A.  Oh, for Lake Street.  Yes.

16  Q.  Sean McDonough was the lessor.  Ms. Boswell's

17    name as the lessee.  1215 Lake Street is the

18    address of the property under number one

19    grant of lease.  And, then, what was the --

20    what was the rental payment amount?

21  A.  450.

22  Q.  And it was typed in as 450?

23  A.  Yes.


88

1  Q.  Okay.  And then Ms. Boswell -- for North Gap

2    Loop, the house at North Gap Loop you created

3    a second lease for this?

4  A.  I went into this -- this -- the same and

5    changed everything up except -- yeah, I

6    changed the rent too.

7  Q.  Okay.  So you changed the rent to say --

8  A.  550.

9  Q.  550.  Okay.  Let's look at what is marked as

10    Plaintiff's Exhibit #G.  This is -- can you

Page 68

3927 06-20-08 Norsworthy Johnnie.txt

11    look at it and describe it?

12  A.  Yeah, that's the letter I wrote.

13  Q.  Okay.  And why did you write this letter?

14  A.  Because that's what I remembered.

15  Q.  Did Mr. Gumbaytay ask you to write the

16    letter?

17  A.  Yes, he did.

18  Q.  Okay.  Can you read the section in the letter

19    marked Plaintiff's Exhibit #G that it's

20    highlighted; it's paragraph 3.

21  A.  It's highlighted?

22  Q.  I'm sorry.  It's highlighted on mine.  Just

23    please read the paragraph for us.

89

1  A.  The house at 964 North Gap Loop became

2    available, and I was asked to change the

3    lease from 1215 Lake Street to 964 North Gap

4    Loop for Ms. Yolanda Boswell.  I changed the

5    information in the lease to reflect the

6    address 964 North Gap Loop but neglected to

7    change the monthly amount from 450 to 550,

8    which was the rent for the house.  She signed

9    the lease, and I signed Mr. Gumbaytay's name

10    as representative of owner.  I have this

11    authority to do this.  And I signed -- and I

12    sent a copy to Mr. Gumbaytay.  He called me

13    and brought to my attention the fact that I

14    had not changed the amount of the rent to

15    550.  I made the connection -- correction,

16    and Mr. Gumbaytay called Ms. Boswell and

17    asked her to come back and sign the corrected

Page 69

3927 06-20-08 Norsworthy Johnnie.txt

18    lease.  She never came back.  Nevertheless,

19    she understood that the rent was 550 instead

20    of 450 because she paid $550 on her rent.

21  Q.  Well, I want to draw your attention to

22    the second --

23  A.  And I know this is not correct now.  I want

                          90

1    to make that statement.

2  Q.  But this was -- this was your recollection on

3    July 17th, 2007?

4  A.  Yes, it was.

5  Q.  But, now, almost a year later you have a

6    different recollection?

7  A.  Yes, I do.

8  Q.  Wouldn't it make sense for you to have a more

9    accurate recollection of what happened in

10    October of 2006 in July of 2007 as opposed to

11    June of 2008?

12  A.  I guess it would logically be that way.  But

13    I guess talking about all this stuff has made

14    me think harder.  I don't know.

15  Q.  Did you send that -- did you send a -- when

16    you typed up this letter at Mr. Boswell's --

17    excuse me, at Mr. Gumbaytay's request, did

18    you -- did he give you any feedback on the

19    letter?

20  A.  He told me that I called -- he called me back

21    and told me that the rent -- the rent on the

22    lease was not right.  I remember him telling

23    me that.

                        Page 70

3927 06-20-08 Norsworthy Johnnie.txt
91

1  Q.  And this was after you wrote this letter?

2  A.  No.  That was before I wrote this letter.

3  Q.  Well, when you -- so Mr. Gumbaytay called you

4      and asked you to write a letter.

5  A.  Uh-huh.

6  Q.  And what did he -- what did he say needed to

7      be put in the letter?

8  A.  I guess this is what he told me.  I didn't

9      remember what happened.  I didn't remember

10     that she was applying for Lake Street.  I

11     didn't remember much about it.  So I guess he

12     jogged my memory.

13 Q.  Okay.  So do you remember him telling you

14     about her filling out the application for

15     Lake Street?

16 A.  Yes.

17 Q.  And did he also tell you about how much the

18     rent was supposed to be at Lake Street?

19 A.  Yes.

20 Q.  And did he tell you how much the rent was

21     supposed to be for North Gap Loop?

22 A.  I remembered that part of it.  Yeah.

23 Q.  You remembered what part?

92

1  A.  I remember the part where the rent went

2      back -- went up and was supposed to be 550

3      instead of 450 for the Gap Loop.

4  Q.  How did you remember that?  I mean, did he

5      refresh your recollection of that as well?

6  A.  Probably.

Page 71

3927 06-20-08 Norsworthy Johnnie.txt

 7  Q.  Okay.  Do you remember when you talked to

 8      Mr. Gumbaytay about this letter?

 9  A.  Sometimes before I wrote this letter but no,

10      not exactly.

11  Q.  So maybe the beginning of July?

12  A.  I talked to him almost every day, so --

13  Q.  Okay.  And after you drafted a copy of this

14      letter, you provided a copy to Mr. Gumbaytay?

15  A.  Yes.

16  Q.  Did he -- did he tell you -- did he correct

17      anything that you had in the letter at that

18      time?

19  A.  I don't think so.

20  Q.  But you don't remember for sure?

21  A.  I don't remember for sure.

22  Q.  So let me go back really quick.  So you said

23      that your memory has changed?

                          93

 1  A.  Yes, it has.

 2  Q.  I have here what is marked as Plaintiff's

 3      Exhibit #H.  Will you take a look at that and

 4      tell me if you recognize the document?

 5  A.  Yes.

 6  Q.  Could you please describe the document?

 7  A.  I see where the change the rent.  I didn't

 8      remember doing that.  It's the lease for

 9      964 North Gap Loop.

10  Q.  Okay.

11          MS. COOPER:  Allison, before you do

12                  that, can I just ask a couple more

13                  questions about that?

                      Page 72

3927 06-20-08 Norsworthy Johnnie.txt

14    MS. NEAL:  Oh, sure.  Yeah.

15    MS. COOPER:  Ms. Norsworthy, you said

16          that you didn't remember much and

17          that Mr. Gumbaytay refreshed your

18          memory.  In the second paragraph

19          you say that Ms. Boswell and her

20          mother filled out individual

21          applications for 1215 Lake Street.

22          You said that, you know, the rent,

23          there was a $250 security deposit.

                    94

1          In that paragraph you say the rent

2          was 550 a month.  Then you talked

3          about repairs.  Did Mr. Gumbaytay

4          refresh your memory on all of

5          those facts?  Did you remember

6          that you talked about repairs?

7    THE WITNESS:  Yes, he refreshed my

8          memory on all of that.

9    MS. COOPER:  So all of paragraph two

10          you didn't remember before

11          Mr. Gumbaytay told you what -- did

12          Mr. Gumbaytay tell you the

13          security deposit was 250?

14    THE WITNESS:  He must have.

15    MS. COOPER:  Okay.

16    THE WITNESS:  I don't remember.  When

17          he talked -- when he talked about

18          it, he said, I did not remember.

19          And he refreshed my memory and

20          then I did remember this part

                    Page 73

3927 06-20-08 Norsworthy Johnnie.txt

21          about Lake Street.  I don't know.

22          I don't remember any of this

23          stuff.

                        95

1           MS. COOPER:  Why did Mr. Gumbaytay tell

2               you he needed this letter?

3           THE WITNESS:  For a court appearance.

4           MS. COOPER:  Did he -- did he dictate

5               any of this letter to you?

6           THE WITNESS:  No.

7   Q.  Did he tell you what --

8   A.  He gave me -- he told me -- he told me what

9       it was about.

10  Q.  Did he tell you what needed to be said in the

11      letter?

12  A.  About this part up here he did.

13  Q.  I'm sorry.  Can you say what part you're

14      pointing to?

15  A.  The second paragraph.  Ms. Boswell and Ms --

16      Ms. Jeneete Boswell filled out applications.

17      Of which I do not have any copies anymore.

18  Q.  Did he tell you what needed to be said in

19      paragraph 3?

20  A.  I don't remember if he did at all.

21  Q.  Okay.

22          MS. NEAL:  Faith, do you have anymore

23              questions?

                        96

1           MS. COOPER:  No.

2   Q.  Okay.  All right.  So let's go back to what

3       was -- the lease that was marked as

                    Page 74

3927 06-20-08 Norsworthy Johnnie.txt

```
 4      Plaintiff's Exhibit #H, which I believe you
 5      had identified as the lease that Ms. Boswell
 6      filled out for 964 North Gap Loop.  Do you
 7      remember creating this lease?
 8   A. I remember creating this lease.  I do not
 9      remember this part.
10   Q. Can you --
11   A. But it's -- it's my --
12   Q. I'm sorry.  For the record can you say what
13      part --
14   A. Payments crossing out the 550 and putting in
15      450.  I do not remember doing that.
16          MR. NEWELL:  Is that your initial?
17          THE WITNESS:  Yes, it is.
18          MS. NEAL:  Please.  Please.
19   Q. So those are your initials on the rent
20      payment portion, yes?
21   A. Yes.
22   Q. And is that amount handwritten?  So the
23      amount is marked as what on rent payments?
```

97

```
 1   A. 450.
 2   Q. And is that amount typed or handwritten?
 3   A. It's handwritten.
 4   Q. Okay.  Do you remember why the 450 is
 5      handwritten?
 6   A. No, I do not.
 7   Q. Okay.  I have here what is marked as
 8      Plaintiff's Exhibit #J.  It's slightly out of
 9      order for a second.  I premarked these, so.
10      Do you recognize this?
```

Page 75

3927 06-20-08 Norsworthy Johnnie.txt

11  A.  No, not really.

12  Q.  Well, can you please say what it purports to

13      be?

14  A.  It's a lease from Ms. Boswell that's been

15      changed.

16  Q.  So if you look at -- let's look at the

17      document.  I'm going to direct your attention

18      to paragraph 3, term of lease.  This lease

19      and -- please read along with me and let me

20      know if I read anything incorrectly.  This

21      lease shall commence on the 1st day of

22      October, 2006 and extend until its expiration

23      of the 30th day of September 2006 unless

                          98

1       renewed or extended pursuant to the terms

2       herein.  And then underneath it there's a

3       handwritten note that said expired short term

4       lease for DHR purpose.  Is that -- is that

5       your handwriting?

6   A.  No, it's not.

7   Q.  Whose handwriting is it?

8   A.  It looks like Mr. Gumbaytay's.

9   Q.  And looking at paragraph number 5 on the

10      same document, Plaintiff's Exhibit #J, under

11      rent payments it says tenant agrees to pay

12      rent onto the landlord during the term of

13      this lease in equal monthly installments of,

14      and then can you read that amount?

15  A.  It looks like he wrote over it and put a 5

16      over it.

17  Q.  Can you tell what the number is under the 5?

                      Page 76

3927 06-20-08 Norsworthy Johnnie.txt

18  A.  It could be a 4.

19  Q.  And are those his initials?  Are those

20      Mr. Gumbaytay's initials next to the amount?

21  A.  It looks like it.

22  Q.  So you don't recall having made, created

23      this -- this document?

99

1  A.  It looks like my computer.

2  Q.  But the -- the handwritten markings on it

3      look like they're done by Mr. Gumbaytay?

4  A.  No.  I didn't do it.

5  Q.  But it does look to you like Mr. Gumbaytay's

6      handwriting?

7  A.  Yes.

8  Q.  Okay.  I want to turn to the last page of

9      Exhibit #J -- I'm sorry, the second to last

10     page of Exhibit #J, under the portion that

11     says, witnessed the signatures of the parties

12     to the residential lease agreement?

13  A.  Uh-huh.

14  Q.  And there is a signature.  Whose signature is

15      that?

16  A.  Mr. Gumbaytay's and Yolanda Boswell.

17  Q.  And did you sign this document on behalf of

18      Mr. Gumbaytay?

19  A.  I -- I used -- yes, I usually did.

20  Q.  Okay.  But are you -- do you know whether

21      this is your signature or Mr. Gumbaytay's

22      signature?

23  A.  I believe it's mine.

Page 77

3927 06-20-08 Norsworthy Johnnie.txt
100

1  Q.  Okay.  And it says that it was executed on?

2  A.  October the 1st.

3  Q.  Okay.  And Ms. Boswell's signature also

4       appears on this lease.  It's dated October

5       the 1st as well.  Do you recall Ms. Boswell

6       signing the lease at this time?

7  A.  I presume she did.

8  Q.  And this was at your house when you drafted

9       the -- and she came in and signed the lease?

10  A.  This is that second lease.

11  Q.  Okay.

12  A.  She asked me --

13  Q.  Plaintiff's Exhibit --

14  A.  She asked me to give her a lease for 550.  I

15      made one out for 550.  And she asked me to

16      give her a copy of one for 450, which I did.

17      I don't know why she wanted it.

18  Q.  I'm sorry, so you're saying Plaintiff's

19      Exhibit #J is what?

20  A.  Like I said, I made out a lease for her for

21      550.  For -- for 964 North Gap Loop.  And

22      then she said she wanted a copy of the lease

23      with a 450 in it as the rent.  She said that

101

1       was to -- for some reason she wanted it that

2       way.

3  Q.  So you are saying that Plaintiff's Exhibit #J

4       is the document that you created for

5       Ms. Boswell that had 450 typed in originally?

6  A.  I'm sorry.  I don't understand your question.

Page 78

3927 06-20-08 Norsworthy Johnnie.txt

7  Q.  So you're --

8  A.  I told you what I did.  Two leases, one with

9      550 in it and one with 450 in it.  This is

10     the one with 450 in it that's been changed.

11 Q.  Plaintiff's Exhibit #J is the one with 450 in

12     it?

13 A.  Yes.

14 Q.  Okay.  And do you know why it was changed to

15     say 550?

16 A.  No.

17 Q.  Okay.

18         MS. NEAL:  I think we're going to take

19              a brief break, if that's all right

20              with everybody.

21         THE WITNESS:  How much longer is this

22              going to last?

23         MS. NEAL:  I think just --

                        102

1          MR. POLLOCK:  We may be done.  We just

2               have to ask -- just confer.

3          MS. NEAL:  We have to confer with each

4               other.  At the most, it will

5               probably be another 30 minutes,

6               but probably less than that.

7          MR. NEWELL:  I don't have any

8               questions.

9               (Brief recess)

10 Q.  All right.  We just have just a few more

11     questions and then we'll be done.  So, one is

12     you mentioned, you know, several times that

13     you turned over documents to Mr. Gumbaytay in

                    Page 79

3927 06-20-08 Norsworthy Johnnie.txt

14    May.  Do you remember if those documents

15    contained any information about Ms. Boswell?

16 A.    I do not remember.  There was a copy of the

17    lease and any correspondence that had been

18    signed was in those files.

19 Q.    So in the file, there probably the lease that

20    Ms. Boswell signed?

21 A.    Yes.

22 Q.    Okay.  I want to look at Plaintiff's Exhibit

23    #H and Plaintiff's Exhibit #J, the two copies

                        103

1    of the lease.  And let's turn to the second

2    to last page on both of them.  The section on

3    both that says, witness the signatures of the

4    parties to this residential lease agreement.

5    Will you look at the signatures, compare the

6    signatures in Exhibit #J and the signatures

7    in Exhibit #H.

8 A.    They all look the same.

9 Q.    Yeah.  Do they -- do the signatures look

10    identical to you?

11 A.    It looks like the copy.

12 Q.    Okay.  And I have one final question.  Let's

13    turn to Plaintiff's Exhibit #E, the

14    executive summaries.  And let's turn to

15    page 6 of the executive summary.  I believe

16    at the top it says February 2007 funds

17    collected, and then in parenthesis, rental

18    only?

19 A.    Uh-huh.

20 Q.    There's a handwritten note at the bottom that

                    Page 80

3927 06-20-08 Norsworthy Johnnie.txt

21    says -- well, what does it say on the bottom

22    left-hand side?

23  A.  Boswell's rent -- on the left-hand side.

<center>104</center>

1    Boswell's rent 495 number 3 will be paid

2    separately.  343.10 negative balance.

3  Q.  Whose handwriting is that?

4  A.  That's Mr. Gumbaytay's.

5  Q.  Okay.

6        MS. NEAL:  One second to confer with

7           co-counsel.

8             (Brief pause)

9  Q.  Did he have a -- did he have a practice of

10    writing notes on the reports for each month?

11  A.  When they were in draft, he would write them

12    and fax them to me.  I would make the changes

13    and send them back to him.

14  Q.  Do you know if this was in draft form?

15  A.  No, I don't.

16  Q.  Okay.

17  A.  I don't know if this was a draft or the final

18    copy.

19  Q.  Would the final copy of this document be on

20    the disk that you provided us?

21  A.  It should be.

22        MS. NEAL:  Okay.  I don't think we have

23          any further questions.

<center>105</center>

1        Mr. Newell, did you have any

2        questions?

3        THE WITNESS:  He would do this when it

<center>Page 81</center>

3927 06-20-08 Norsworthy Johnnie.txt

```
 4              was a final, when it would be a
 5              final.
 6         MS. NEAL:  Okay.
 7         MR. NEWELL:  I just have one question
 8              once again.
 9                   EXAMINATION
10    BY MR. NEWELL:
11    Q.  And I do see that she's already testified to
12        this as much as you have questioned her
13        about.  You testified that there were two
14        properties and there was discrepancies I
15        think just that it's boiling down to.  And I
16        understand a lot although I don't have any
17        idea where any of these places are.  One was
18        in a place called North Gap Loop and one was
19        another property on Lake --
20    A.  Lake Street.
21    Q.  Excuse me.  Lake Street.  And when was a
22        hot -- one was 450 and one was 550?
23    A.  Right.

                        106
 1    Q.  And then is it possible that there was a
 2        mistake in this?  That is what he testified
 3        to.  That's the only reason I'm asking that.
 4        And I'm giving everybody a break in saying
 5        well, you know, on cross I do get a little
 6        latitude.  So if you could just kind of
 7        explain that a little bit more than what you
 8        explained here.  And do you remember that to
 9        be correct?
10         MS. NEAL:  Well, Mr. Newell, actually
```

3927 06-20-08 Norsworthy Johnnie.txt

11            you're not on cross right now.

12            You're on direct.  We had -- we

13            have her on cross-examination

14            because she's not our client and

15            she's a witness for your client.

16    MR. NEWELL:  I thought you took her

17            deposition and that was your

18            direct.  Or if you want to phrase

19            it another way, she was on direct

20            for you and I would be on cross

21            for him.

22    MS. NEAL:  Just go ahead and answer the

23            question.  And please do not try

                    107

1            to testify for the client.

2    MR. NEWELL:  I'm just giving her the

3            legal point and I wanted her

4            opinion.

5    MS. NEAL:  Well, give -- ask her for

6            her recollection.  Don't tell her

7            what other people's recollections

8            are.

9    MR. NEWELL:  Okay.

10  Q.  Do you recall both -- both of these leases,

11      one for North Gap property, right?

12  A.  Yes.

13  Q.  And there was one for the other property?

14  A.  Right.

15  Q.  And he testified that you -- you had made a

16      mistake; is that correct?

17  A.  That's what I said, yes.

                    Page 83

3927 06-20-08 Norsworthy Johnnie.txt

18  Q.  That's --

19  A.  But I already remember it's -- I already

20      remember it's different.

21  Q.  Okay.

22          MR. NEWELL:  That's it.  I don't have

23              anymore questions.

                    108

1           COURT REPORTER:  One at a time.  All

2               right.  Go ahead and say what you

3               were saying.

4  A.  I said I remember more now than I did when I

5      wrote the letter.  And that's it.

6  Q.  Okay.  But to the best of your knowledge,

7      there were two things and there was a mistake

8      in her lease.  That is what he testified to.

9  A.  Yes.

10  Q.  So that points out exactly what he said and

11      it looks the same to me.  I don't mean to

12      over-berate you, or I'm not trying to, you

13      know, be hard on you or anything.  I just

14      want the answer to the question.

15  A.  I've answered the question as best I can.

16          MR. NEWELL:  Okay.  Well, thank you.

17              That's fine.

18          MS. NEAL:  Okay.  I think we're done.

19              Thank you.

20              (The deposition concluded

21              at 11:56 a.m.)

22          *  *  *  *  *  *  *  *  *  *  *
            FURTHER DEPONENT SAITH NOT
23          *  *  *  *  *  *  *  *  *  *  *

                    Page 84

3927 06-20-08 Norsworthy Johnnie.txt
109

1          REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

4       I, Mallory M. Johnson, Certified Court

5    Reporter and Commissioner for the State of

6    Alabama at Large, hereby certify that on Friday,

7    June 20, 2008, I reported the deposition of

8    JOHNNIE LYNN NORSWORTHY, who was first duly sworn

9    or affirmed to speak the truth in the matter of

10   the foregoing cause, and that pages 5 through 108

11   contain a true and accurate transcription of the

12   examination of said witness by counsel for the

13   parties set out herein.

14      I further certify that I am neither of kin

15   nor of counsel to any of the parties to said

16   cause, nor in any manner interested in the

17   results thereof.

18      This 8th day of July, 2008.

19      _____

20      MALLORY M. JOHNSON, COURT REPORTER
        And Commissioner for the
        State of Alabama at Large

21
        Alabama License Number: 443
22      Expires 09/30/08

23      MY COMMISSION EXPIRES:  2/24/09

ELITE ENTERPRISE
4013 TIFFANY DRIVE
MONTGOMERY, AL 36110-3003
(202) 202-8676

Exhibit A



PLAINTIFF'S
EXHIBIT
A
PENGAD 800-631-6989

MEMORANDUM

From The Desk Of Jamarlo K. Gumbaytay Ph.D., EDS
To All Tenant New and Old

RE: Goals and Objective (My pledge to you)

Greeting!  Happy New Year!!!  I'm hopeful that all is well with you and your loved ones.

It is my desire to continue to work with all new and old tenants in the upcoming year.  Thus, I've set some goals and objectives to accomplish for this new year.

On behalf of all of your landlords, I pledge to, (one) address all service calls within 48 hours of receipt.  Depending on the nature of the call, I pledge to have all work completed within five (5) business days.   However you must keep in touch with me on a daily basis if you expect this type of response.  Once I issue a service call out to Eric Crews and his crew, I have no way of knowing the status of a call unless you keep me informed.  You have a right to expect service within a reasonable time frame.  Thus, it's my duty to see that this happens.

I pledge to inspect your property at lease once every four months.  It's very important to both Elite and your landlord that you do your part in maintaining your rental unit.  Even though you are renting, please treat your home as if you own it with the property care and respect.  Thus, you must keep in touch with Ms. Wanda Johnson.  In order to schedule an appointment with her ASAP!  She can be reached at (334) 220-4650.  This is her cell # so do leave a message in the event you do not reach her.

I pledge to meet all new tenants within the first sixty (60) days of this year.  Thus, if you just came under Elite's management within the past one hundred

and twenty (120) days or less, please call me as soon as you can to schedule an in house appointment with you. I will be happy to visit with you in your home at your convenience so you can get to know your management team. Remember you can always reach me at (334) 202-8676 (24/7). It's a must that this visit must take place within the first sixty (60) days so we can update your file.

Most of you don't have applications on file and/or updated leases. Some of you have changed job(s) and phone numbers. Remember it's your responsibility to provide us with this information in order to keep your file(s) current and in the event of an emergency. Therefore, please complete the enclosed application today then hold on to it until we meet in person.

Last but not least, I pledge to notify your landlord within seventy-two (72) hours of a service call if the work has not been completed as discussed. However, "There are always exceptions to the rule". Regardless, your concerns are our concerns both Elite's and your landlords.

Now, here's what I need for you to do for me. It is your duty and responsibility to keep your home clean and in good condition both inside and out. That means no junked or abandoned vehicles on the premises. Don't park on the lawn under any circumstances. You will be fined if warned more than twice. If said fines are not paid, I can assure you either it will come from your deposit and/or you will be sued to collect the fines. Also, it is your duty and responsibility to call me if you are going to be late with your rent payment or not pay it at all due to unforeseen circumstances. There's always a solution to the problem if you talk to me. Late fees, if not paid, will be deducted from your deposit and/or you will be sued to collect. A notice will be forwarded to Director Cathy Harris of the Montgomery Housing Authority explaining to them if and when such action will be taken. MHA will also be notified in writing if you continue to be this sort of problem. Any and all negative occurrences in our unit(s) that is your responsibility will be reported (i.e. lawn not being maintained, junked or abandoned vehicles, late fees and non payment of your share of the rent) to MHA.

We want to be fair and reasonable with you, however, everyone is not doing what they are required to do. Thus, from this point forward I will do my

best to make sure nothing will be over looked.  Remember, you have the same rights of fair and reasonable treatment as our tenants.  In the event you are not happy or satisfied with our services, please put it in writing to me first. Then, and only then, if the matter is not being resolved, you have the right to forward that copy to the MHA.

I look forward to a wonderful business relationship with each and every one of you this year.  Remember, I am here to answer any questions or concerns you have.

Sincerely,

Tamarlo K. Gumbaytay



**The Elite Real Estate Consulting G....**
Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003



PLAINTIFF'S
EXHIBIT
B

Fax:
334-241-5986

## MEMORANDUM / FYI

TO.          ALL TENANTS

FROM:        Jamarlo K. GumBayTay, Rental Manager

SUBJECT:     Maintenance & Upkeep; Pets & Community Assistance Available

DATE:        August 25, 2006

Attached you will discover our pet policy and deposit amounts. If you have one of these memos attached to this letter, that means I have observed a pet on your property on my last visit. Thus, if you are planning to keep your pet, please sign the attached form and forward it along with an additional $200.00 security deposit. These funds will be returned to you within fifteen (15) days of your departure at the end of your lease.

Again, if you receive a verbal or written notification from me regarding your lawn not being properly cut, we will send some one to do it for you within five (5) days of such notice. Remember, your next month's rental statement (deposit slip) should reflect those fees. In other words, you will automatically be charged for this service. Legal action will be taken if you do not pay said Pet Fees or Lawn Care Fees within thirty (30) days of your rental due date. **(See Sample Warning Notice)**



Also, prior to making a maintenance call to us, please see if you, or someone you know, can handle the problem first at little or no cost to you. Here lately, we have been called out for an air conditioning problem and all that was needed was a fuse. Always check your breaker box and/or other electrical sources prior to calling us. In the future, you will be billed if we have to take time out of our business schedule to visit with you on very minor things that you could have handled yourself.



Use your maintenance request form to describe or discuss your concerns, then call me - only prior to faxing it to 334-241-5986. We will try to follow up within 24 to 48 hours of receipt.



NOTE: All abandoned automobiles will be towed at the owner's expense within five (5) days of a verbal and/or written notice. JKG

COMMUNITY ASSISTANCE - Some of you have been experiencing financial difficulties, stress, and unexpected twists and turns. Thus, your rental payments are being made later than agreed. If this is so with you now or in the future, please contact the following agencies:

1)   Frazer Memorial United Methodist Church on the Atlanta Highway;
2)   Community Action on Adams Avenue;
3)   Catholic Social Services on Narrow Lane Road.

Page 2

Please review your telephone directory for phone numbers and other social service agencies that can help with such things as rent and/or utilities.

In the meantime you must always, and I do mean always contact me if you are having problems. Not talking to me will only cause concerns for both your landlord and me. Thus, "an understanding and communication is the best thing in the world. . ."

Also, do not forget to call me the very same day you make your deposit. AGAIN! Always place your name, address and the month in which your rent is being applied at the bottom of the deposit slip.

Enclosures:     Warning Notice
                Inspection Notice
                Lawn Service Notice

cc:     Guest Property Sales, LLC
        Sean McDonough
        Brett Rosenbaum
        Joyce Weber
        Todd M. Chamelin
        Matthew Bahr



PLAINTIFF'S
EXHIBIT
C

## The Elite Real Estate Consulting Group

### Real Estate Management

4013 Tiffany Drive

Fax:                    Montgomery, Alabama 36110-3003                 Cellular Phone

334-241-5986                                                          334-202-8676

# MEMORANDUM

March 26, 2007

Attention:  All Tenants

RE:   UPDATES CONCERNING YOU AND YOUR PROPERTY

We would first like to take this time to introduce and welcome a new member of our team.  We have a new inspector, Christy Washington.  She will be in charge of the quarterly inspections and re-inspections as well as tenant updates.  For all of you who had inspections done with Mr. McWilliams, this change will affect you.  Mr. McWilliams' inspections were not complete and Ms. Washington will be returning to your properties to re-inspect and receive tenant updated information. To all tenants, Ms. Washington will try her best to contact all of you by phone to schedule these inspections but the inspections will have to be completed even if she is unable to schedule an appointment time. You must be present during this inspection to sign off that you are aware inspection was completed and to update your current information.  THIS IS MANDATORY!!!

Also, we are stressing some needed facts.

Payment methods for your rent are as follows:  bank deposit (call Mr. Gumbaytay for banking information), drop off, or mail.  If you have a money order or check as a method of payment, please make sure that it is made out to Jamarlo Gumbaytay.  Remember that rent is due on the first and a late fee is added if not paid by the 10th.  We are having a serious problem with several of you getting behind on your rents and this causes issues for everyone involved.  If you are behind, contact Mr. Gumbaytay, Lynn, or Renee at once to resolve this issue and avoid eviction or court process.

Spring time is here and all yards need to be maintained as needed. Remember that during inspections we are checking for yard maintenance as well.  Please make sure that your yard is presentable and free of clutter (trash, disabled vehicles, etc.).

We also want to stress the importance of contact regarding work orders.  We management over 100 properties and if you have a service issue, you have to stay in contact with us.  Let us know when something needs to be done, stay in touch with us to know when you will be serviced, and inform us when the issue has been resolved or that it has not been resolved in the time frame promised. Communication is key to giving you the time and attention you expect from us.

PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

ELITE REAL ESTATE MANAGEMENT DEPARTMENT
JULY 2007 MONTHLY RENTAL REPORT

| | Property Address | Tenant/Tel # | Owner/Address | Rental Amount | Section 8 | Tenant Paid | Tenant Due | Late Fee | Past Due Owed | Past Due Paid | Date Paid | Investor Share | ECG | Lease Info | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Lynn's Accounts** | | | | | | | | | | | | | | |
| 1 | 71 W Southmont Dr Montgomery, AL 36105 | VACANT | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $600 | $574 | | $26 | | | | | $517 | $57 | 5/1/06 | |
| 2 | 708 West Patton Ave Montgomery, AL 36105 | Wanda Smith 651-8725 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $650 | $627 | | $23 | | | | | $564 | $63 | 5/1/06 | |
| 3 | 378 Prairie Vista St Montgomery, AL 36105 | Joan Wright 265-6443 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $550 | $376 | | $174 | | | | | $338 | $38 | 12/15/05 | |
| 4 | 1714 Coral Lane Montgomery, AL 36116 | Samantha Webster 262-8854 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $700 | $389 | | $311 | | | | | $350 | $39 | 5/1/05 | |
| 5 | 2803 Mallory Street Montgomery, AL 36107 | Erica Bell 561-6038 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $550 | $372 | | $178 | | | | | $335 | $37 | 2/1/06 | |
| 6 | 4535 Rosa Parks Ave Montgomery, AL 36105 | Verontay Ware 233-0568 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $650 | $617 | | $33 | | | | | $555 | $62 | 4/1/05 | |
| 7 | 3911 Rosa Parks Ave Montgomery, AL 36105 | Shemika Nickerson 538-0159 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $700 | $632 | | $68 | | | | | $569 | $63 | 6/1/05 | |
| 8 | 2308 E 4th Street Montgomery, AL 36106 | Tomekia D. Landon | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $600 | | | $600 | | | | | $0 | $0 | 1/27/07 | |
| 9 | 4115 Rosa Parks Ave Montgomery, AL 36105 | Cynthia Taylor 288-3655 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $600 | $357 | | $243 | | | | | $321 | $36 | 5/1/06 | |
| 10 | 3440 Gilmer Ave Montgomery, AL 36105 | Vernia Fuller 322-7956 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $650 | $584 | | $66 | | | | | $526 | $58 | 11/1/06 | |
| 11 | 627 Bullock St Montgomery, AL 36108 | Maggie Williams 261-4039 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $500 | $410 | | $90 | | | | | $410 | $0 | 2/1/07 | |
| 12 | 5176 Rush Drive Montgomery, AL 36108 | Unknown | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | | | | $0 | | | | | $0 | $0 | | |
| 13 | 2 Davis Drive Montgomery, AL 36105 | Eddie Matthews 205-324-9366 | Brett Rosembaum 1827 Mahogany Drive Orlando, FL 32825 | $500 | | | $500 | | | | | $0 | $0 | 1/3/07 | |

| # | Property Address | Name / Phone | Owner Address | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 3605 Norris Drive<br>Montgomery, AL  36110 | Latoya Kelly<br>293-9881<br>832-1481 | Joyce Weber<br>10613 Sandridge Ct<br>Orlando, FL  32817 | $625 | $535 | | $90 | | | | | $482 | $54 | 5/4/06 | |
| 15 | 17 Davis St<br>Montgomery, AL  36105 | Tashier<br>Townsend<br>280-2567 | Joyce Weber<br>10613 Sandridge Ct<br>Orlando, FL  32817 | $550 | $450 | | $100 | | | | | $405 | $45 | 8/1/06 | |
| 16 | 105 Stuart St<br>Montgomery, AL  36105 | Rita Julian<br>265-2829 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $700 | $680 | | $20 | | | | | $646 | $34 | 12/1/06 | |
| 17 | 2029 Merrily Drive<br>Montgomery, AL  36111 | Carla Henry<br>239-8629 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $600 | $600 | | $0 | | | | | $570 | $30 | 8/1/05 | |
| 18 | 964 North Gap Loop<br>Montgomery, AL  36110 | Yolanda Boswell<br>414-5242 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $550 | | | $550 | | | | | $0 | $0 | 10/1/06 | |
| 19 | 1805 Rigsby St<br>Montgomery, AL  36110 | Linda Dixon  239<br>7200 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $600 | $600 | | $0 | | | | | $570 | $30 | 4/15/06 | |
| 20 | 26 Kelly Lane<br>Montgomery, AL  36105 | Escambia<br>McLean<br>288-9381<br>263-5579 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $550 | $550 | | $0 | | | | | $523 | $28 | 11/1/05 | |
| 21 | 817 North Pass Road<br>Montgomery, AL  36110 | Shonna Pruitt | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $550 | | | $550 | | | | | $0 | $0 | 11/1/06 | |
| 22 | 609 Boyce Street<br>Montgomery, AL  36107 | Renee Williams<br>& Josh Nixon<br>239-7278<br>652-8327 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $650 | | | $650 | | | | | $0 | $0 | 3/1/07 | |
| 23 | 3661 Whiting Ave<br>Montgomery, AL  36105 | Lois Webb | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $600 | $550 | | $50 | | | | | $523 | $28 | 8/5/07 | |
| 24 | 2017 Stella St<br>Montgomery, AL  36108 | Sharice Vaughn<br>269-3163 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $650 | $650 | | $0 | | | | | $618 | $33 | 7/3/06 | |
| 25 | 507 5th St<br>Montgomery, AL  36110 | Wanda Johnson<br>220-4650 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $650 | | | $650 | | | | | $0 | $0 | 9/26/05 | |
| 26 | 720 Clover Hill Dr<br>Montgomery, AL  36105 | VACANT | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | | | | $0 | | | | | $0 | $0 | | |
| 27 | 667 Iris Lane<br>Montgomery, AL  36105 | Maxine Wright<br>356-7889 | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | $600 | $407 | | $193 | | | | | $387 | $20 | | |
| 28 | 6153 Cherry Hill Rd<br>Montgomery, AL  36116 | VACANT | Matt Bahr<br>1569 Amaryllis Cir<br>Orlando, FL  32825 | | | | $0 | | | | | $0 | $0 | | |

| # | Address | Name / Phone | Landlord | | | | | | | | | | | | |
|---|---------|--------------|----------|--|--|--|--|--|--|--|--|--|--|--|--|
| 30 | 2142 E 2nd St Montgomery, AL 36106 | Quesha Powell 233-3229 | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $575 | | | $575 | | | | | $0 | $0 | 5/1/07 | |
| 31 | 513 4th St Montgomery, AL 36110 | Jamie Bibb 8352-2191 | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $600 | $526 | | $74 | | | | | $500 | $26 | | |
| 32 | 3399 East Tuskegee Cir Montgomery, AL 36108 | Yolanda Hurst 356-0032 | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $625 | $585 | | $40 | | | | | $556 | $29 | | |
| 33 | 118 Chisholm St Montgomery, AL 36110 | VACANT | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $650 | $505 | | $145 | | | | | $480 | $25 | 1/1/06 | |
| 34 | 6113 Jennifer Lane Montgomery, AL 36116 | Joy Moore 356-7258 | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $700 | $700 | | $0 | | | | | $665 | $35 | 6/22/06 | |
| 35 | 627 Iris Lane Montgomery, AL 36105 | Patricia Wilson | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $600 | $543 | | $57 | | | | | $516 | $27 | 10/1/06 | |
| 36 | 824 West Patton Ave Montgomery, AL 36105 | Brenda Waits 322-0543 356-4977 | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $600 | $547 | | $53 | | | | | $520 | $27 | 4/4/06 | |
| 37 | 3763 Whiting Ave Montgomery, AL 36105 | Sulah Duncan 263-0004 | Jewel Manahan 1569 Amaryllis Circle Orlando, FL 32825 | $600 | $156 | | $444 | | | | | $148 | $8 | 5/1/06 | |
| 38 | 508 4th St Montgomery, AL 36110 | Gloria Smith | Terrill M. Jorgensen 164 Taylor Way Dr Hebron, OH 43025 | $600 | | | $600 | | | | | $0 | $0 | | |
| 39 | 505 4th St Montgomery, AL 36110 | Martina Vinson | Terrill M. Jorgensen 164 Taylor Way Dr Hebron, OH 43025 | $600 | $600 | | $0 | | | | | $540 | $60 | 7/24/06 | |
| 40 | 545 Broadway St Montgomery, AL 36110 | Victoria Hurst 239-8190 | Terrill M. Jorgensen 164 Taylor Way Dr Hebron, OH 43025 | $600 | $600 | | $0 | | | | | $540 | $60 | 5/1/06 | |
| 41 | 114 Chisholm St Montgomery, AL 36110 | Shuntae Savage 264-5414 | Terrill M. Jorgensen 164 Taylor Way Dr Hebron, OH 43025 | $600 | $491 | | $109 | | | | | $442 | $49 | 5/11/06 | |
| 42 | 2316 E 5th St Montgomery, AL 36106 | Tanal Wilson 224-4322 | Terrill M. Jorgensen 164 Taylor Way Dr Hebron, OH 43025 | $535 | $326 | | $209 | | | | | $293 | $33 | 5/23/06 | |
| 43 | 3584 Norman Bridge Rd Montgomery, AL 36105 | Jennifer Moore | Brittany Young 1569 Amaryllis Circle Orlando, FL 32825 | $550 | $550 | | $0 | | | | | $523 | $28 | 11/1/06 | |
| 44 | 135 Truett Dr Montgomery, AL 36105 | Jameisha Andrews 265-4777 235-7290 | Brittany Young 1569 Amaryllis Circle Orlando, FL 32825 | $600 | $430 | | $170 | | | | | $409 | $22 | 7/27/06 | |
| 45 | 112 Park Ave Montgomery, AL 36110 | Latisha Williams | Brittany Young 1569 Amaryllis Circle Orlando, FL 32825 | $725 | $725 | | $0 | | | | | $689 | $36 | 9/7/06 | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | 4341 Amherst Dr<br>Montgomery, AL 36116 | Shyvatt Cooper<br>538-5206<br>288-0566 | Brittany Young<br>1569 Amaryllis Circle<br>Orlando, FL 32825 | $535 | $216 | | $319 | | | | | $205 | $11 | | |
| 47 | 4507 Sawston Ct<br>Montgomery, AL 36116 | Shelia<br>Scroggins | Brittany Young<br>1569 Amaryllis Circle<br>Orlando, FL 32825 | $650 | $650 | | $0 | | | | | $618 | $33 | 9/25/06 | |
| 48 | 4341 Azalea Dr<br>Montgomery, AL 36105 | VACANT | Brittany Young<br>1569 Amaryllis Circle<br>Orlando, FL 32825 | | | | $0 | | | | | $0 | $0 | | |
| 49 | 230 Flair Dr<br>Montgomery, AL 36110 | Tatanisha<br>Webster | Brittany Young<br>1569 Amaryllis Circle<br>Orlando, FL 32825 | $600 | $442 | | $158 | | | | | $420 | $22 | | |
| 50 | 3540 Whiting Ave<br>Montgomery, AL 36105 | Tamisha Sparks | Brittany Young<br>1569 Amaryllis Circle<br>Orlando, FL 32825 | $700 | | | $700 | | | | | $0 | $0 | | |

## Renee's Accounts

| # | Address | Name | Landlord | | | | | | | | | | | Date | Notes |
|---|---------|------|----------|---|---|---|---|---|---|---|---|---|---|------|-------|
| 16 | 132 Hannon St Montgomery, AL 36104 | Tomeka Bryant | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $700 | $700 | | $0 | | | | | $630 | $70 | 7/17/06 | |
| 17 | 103 Stuart St Montgomery, AL 36105 | Lizzie Knight 265-3190 | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $650 | $285 | | $365 | | $365 | | | $257 | $29 | 10/1/06 | Pd June, signing prom. Note for July |
| 18 | 3321 Suwanee Dr Montgomery, AL 36108 | Debra Hardy 294-0440 | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $600 | $600 | | $0 | | | | | $540 | $60 | 7/13/06 | |
| 19 | 3332 E Tuskegee Cir Montgomery, AL 36108 | Peggy Thomas 356-5742 | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $700 | $354 | | $346 | | | | | $319 | $35 | 6/14/06 | Sent late notice 7.24.07 |
| 20 | 2051 Potomac St Montgomery, AL 36108 | Angela Bryant | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $600 | $600 | | $0 | | | | | $540 | $60 | 9/1/06 | |
| 21 | 3687 Oak St Montgomery, AL 36105 | Shaquita Scott 274-0405 320-3498 284-0413 | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $650 | $403 | $250 | ($3) | | | | | $588 | $65 | | |
| 22 | 742 Doris Cir Montgomery, AL 36105 | Shampale Maull | Calvin Elder P.O. Box 681984 Orlando, FL 32868 | $600 | $600 | | $0 | | | | | $540 | $60 | 2/1/06 | |
| 23 | 250 Burgwyn Rd Montgomery, AL 36105 | Tracey Lowery 281-1963 | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | $600 | $600 | | $0 | | | | | $540 | $60 | 6/21/06 | WA $90 |
| 24 | 3749 Whiting Ave Montgomery, AL 36105 | Judy Timmons 451-7550 | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | $600 | $166 | | $434 | | | | | $149 | $17 | 6/20/06 | Eviction Filed. |
| 25 | 3241 Southmont Ave Montgomery, AL 36105 | VACANT | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | | | | $0 | | | | | $0 | $0 | 6/2/06 | Rented by non-section 8 tenant. |
| 26 | 11 Michigan Ave Montgomery, AL 36110 | Lashonda Fuller 538-1110 | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | $675 | $567 | $108 | $0 | | | | | $608 | $68 | 6/1/06 | GR $45 |
| 27 | 301 Third Street Montgomery, AL 36110 | Cameron Bassett 354-5887 271-0314 | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | $650 | $438 | $212 | $0 | | | | | $585 | $65 | 6/28/06 | |
| 28 | 3933 Goode St Montgomery, AL 36105 | Michelle Owens 834-0480 294-4319 273-0144 | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | $600 | $555 | $45 | $0 | | | | 7/11 | $540 | $60 | 11/28/06 | |

| # | Address | Tenant | Owner | | | | | | | | | | | Notes |
|---|---------|--------|-------|---|---|---|---|---|---|---|---|---|---|-------|
| 29 | 6133 Cherry Hill Rd Montgomery, AL 36116 | Jessicita Harris | George K. Schmieder 1072 Choke Cherry Dr Winter Springs, FL 32708 | $650 | $540 | $110 | $0 | | | | $585 | $65 | | |
| 30 | 4005 Chelsea Dr Montgomery, AL 36110 | Aurpy Burt 277-9838 261-6548 | James Clark 12441 Castlemain Trail Orlando, FL 32828 | $575 | $575 | | $0 | | $1,873 | | $518 | $58 | | Section 8 payments caught up |
| 31 | 1417 SW Alabama Ave Birmingham, AL 35211 | Kimberly Johnson and Kelvin Davis 205-276-1347 205-781-4293 | James Clark 12441 Castlemain Trail Orlando, FL 32828 | $625 | | $625 | $0 | | | | $563 | $63 | | |
| 32 | 8609 Division Ave Birmingham, AL 35211 | VACANT | James Clark 12441 Castlemain Trail Orlando, FL 32828 | | | | $0 | | | | $0 | $0 | | |
| 33 | 3012 Ave E Birmingham, AL 35218 | Jeanette Thomas 205-781-3995 205-254-2731 | James Clark 12441 Castlemain Trail Orlando, FL 32828 | $650 | | $650 | $0 | | | | $585 | $65 | | |
| 34 | 720 Capri St Montgomery, AL 36105 | Valerie L. Manning 263-2757 | Lori Williams 1099 Henry Balch Dr Orlando, FL 32810 | $650 | $550 | $100 | $0 | | | | $585 | $65 | 1/11/06 | Pro. Note for $750, to pay $30 monthly |
| 35 | 413 Burgwyn Rd Montgomery, AL 36105 | Plassie Stallings 834-6147 | Lori Williams 1099 Henry Balch Dr Orlando, FL 32810 | $600 | $180 | $420 | $0 | | | 6/29 | $540 | $60 | 12/31/06 | |
| 36 | 277 Shadyside Ln Montgomery, AL 36105 | Elizabeth Walton 288-2672 | Lori Williams 1099 Henry Balch Dr Orlando, FL 32810 | $600 | $451 | $149 | $0 | | | | $540 | $60 | 1/26/06 | Pro. Note for $257, to pay $30 monthly/Pd Lori directly |
| 37 | 2719 Forbes Dr Montgomery, AL 36110 | Zenolia Murry 356-1745 | Lori Williams 1099 Henry Balch Dr Orlando, FL 32810 | $600 | $600 | | $0 | | | | $540 | $60 | 8/4/06 | |
| 38 | 4 Kelly Ln  Montgomery, AL 36105 | VACANT | Lori Williams 1099 Henry Balch Dr Orlando, FL 32810 | | | | $0 | | | | $0 | $0 | 5/3/06 | |
| 39 | 601 6th St Montgomery, AL 36110 | Tiny Holmes | Lori Williams 1099 Henry Balch Dr Orlando, FL 32810 | $695 | $595 | | $100 | | | | $536 | $60 | 3/23/06 | Sent late notice 7.24.07 |

## Cameron's Accounts

| # | Address | Name / Phone | Contact | | | | | | | | | | | Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3120 Gentilly Court Montgomery, AL 36116 | Kimberly Bell 281-8835 | Donna Greene-Jones Briar Gate Drive Montgomery, AL 36116 | $635 | $435 | | $200 | | | | $392 | $44 | 4/1/06 | |
| 2 | 8131 Rush Drive Montgomery, AL 36108 | LaTondra Moore | Bruce Dunn 386-212-3623 | $725 | $480 | | $245 | | | | $432 | $48 | 9/27/06 | |
| 3 | 516 Japonica St Montgomery, AL 36105 | Betty Mae Hill | Bruce Dunn 386-212-3623 | $725 | $527 | | $198 | | | | $474 | $53 | 10/16/06 | |
| 4 | 2233 E 4th St Montgomery, AL 36106 | Linda Marbury 312-6512 | Bruce Dunn 386-212-3623 | $650 | $595 | | $55 | | | | $536 | $60 | 12/1/06 | |
| 5 | 4555 Lonesome Pine Dr Montgomery, AL 36108 | Syrenthia Jenkins 312-2131 356-6721 | Flore Anderson 1750 Power Spring Rd, Ste 190 Marietta, GA 30064 | $650 | | | $650 | | | | $0 | $0 | | |
| 6 | 6 E Park Ave Montgomery, AL 36110 | Tomeka Fowler | Chris Wunschel 1563 Amaryllis Circe Orlando, FL 32825 | $700 | | | $700 | | | | $0 | $0 | | |
| 7 | 3601 S Court St Montgomery, AL 36105 | Cindy White | Chris Wunschel 1563 Amaryllis Circe Orlando, FL 32825 | $725 | $703 | | $22 | | | | $633 | $70 | 11/8/06 | |
| 8 | 309 Broadway St Montgomery, AL 36110 | Lotonya Shuford | Chris Wunschel 1563 Amaryllis Circe Orlando, FL 32825 | $600 | $422 | | $178 | | | | $380 | $42 | 11/13/06 | |
| 9 | 3779 S Court St Montgomery, AL 36105 | Lashonda Mushat | Chris Wunschel 1563 Amaryllis Circe Orlando, FL 32825 | $725 | $722 | $3 | $0 | | | | $653 | $73 | 12/7/06 | |
| 10 | 2121 E 6th St Montgomery, AL 36106 | VACANT | Chris Wunschel 1563 Amaryllis Circe Orlando, FL 32825 | $700 | | | $700 | | | | $0 | $0 | | ME $374.59 ME $340.53 HD $60 |
| 11 | 235 Empire Rd Montgomery, AL 36110 | Patricia Pierce 284-6518 | Robert Fiedler ▬▬▬ | $700 | | | $700 | | | | $0 | $0 | 2/28/07 | |
| 12 | 220 Burgwyn Rd Montgomery, AL 36105 | VACANT | Jason Gunter 930 Herman Ave Orlando, FL 32803 | | | | $0 | | | | $0 | $0 | | |
| 13 | 2205-A Boultier St Montgomery, AL 36106 | Mehdi Estakhr 832-1531 | Abe Campbell 9337 Wren's Way Montgomery, AL 36117 | 550 | | | $550 | | | | $0 | $0 | | |
| 14 | 2205-B Boultier St Montgomery, AL 36106 | Lamont Willis 354-7465 | Abe Campbell 9337 Wren's Way Montgomery, AL 36117 | 550 | | | $550 | | | | $0 | $0 | | |
| 15 | 2031-A West St Montgomery, AL 36106 | Cynthia George Frances George 260-7782 | Abe Campbell 9337 Wren's Way Montgomery, AL 36117 | 550 | | | $550 | | | | $0 | $0 | | |
| 16 | 2031-B West St Montgomery, AL 36106 | Rosie Lee Murphy | Abe Campbell 9337 Wren's Way Montgomery, AL 36117 | 550 | | | $550 | | | | $0 | $0 | | |

| | Address | Tenant | Owner | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 2031-B West St Montgomery, AL  36106 | Rosie Lee Murphy | Abe Campbell 9337 Wren's Way Montgomery, AL  36117 | 550 | | | $550 | | | | | | $0 | $0 | |
| 18 | 720 Belvedere Dr Montgomery, AL  36105 | Kim Warner | Loretta Cates 2608 Gilsom Ct Orlando, FL  32835 | $600 | $600 | | $0 | | | | | | $540 | $60 | |
| 19 | 345 Milton Rd Montgomery, AL  36110 | Michelle Fleming | Loretta Cates 2608 Gilsom Ct Orlando, FL  32835 | $700 | $700 | | $0 | | | | | | $630 | $70 | |
| 20 | 346 Larchmont Dr Montgomery, AL  36105 | VACANT | Loretta Cates 2608 Gilsom Ct Orlando, FL  32835 | $600 | | | $600 | | | | | | $0 | $0 | |
| 21 | 311 Milton Rd Montgomery, AL  36110 | VACANT | Loretta Cates 2608 Gilsom Ct Orlando, FL  32835 | | | | $0 | | | | | | $0 | $0 | |

| | | Not Assigned | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 2518 Drake St Montgomery, AL 36108 | Brenda Davis 272-1007 | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $550 | $349 | | $201 | | | | $314 | $35 | 7/1/05 | |
| 31 | 2661 West Edgemont Montgomery, AL 36108 | Henrietta Hinson | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $600 | $323 | | $277 | | | | $291 | $32 | 4/15/06 | |
| 32 | 2232 E 5th St Montogmery, AL 36106 | Melinda Wilson 265-7313 207-6860 | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $550 | | | $550 | | | | $0 | $0 | 12/1/05 | |
| 33 | 1215 Lake Street Montgomery, AL 36104 | VACANT | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $450 | | | $450 | | | | $0 | $0 | 11/15/06 | |
| 34 | 118 Stuart St Montgomery, AL 36105 | VACANT | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $609 | $568 | | $41 | | | | $511 | $57 | 6/1/06 | |
| 35 | 226 Broadway St Montgomery, AL 36110 | Benettia D. Morris 309-4498 | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $600 | $475 | | $125 | | | | $428 | $48 | 2/7/07 | |
| 36 | 4057 Narrow Lane Rd Montgomery, AL 36111 | Zippora Williams 590-5088 281-2439 | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $650 | $430 | | $220 | | | | $387 | $43 | 2/12/07 | |
| 37 | 2455 Woodlawn St Montgomery, AL 36106 | Vickie Reed LaSonja Reed 414-7982 | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $650 | | | $650 | | | | $0 | $0 | | |
| 38 | 2119 E 4th St Montgomery, AL 36107 | Erica Stalling 269-6626 324-8452 | Sean McDonough 1827 Mahogany Drive Orlando, FL 32825 | $640 | $640 | | $0 | | | | $576 | $64 | 4/1/06 | |
| 39 | 4 Stuart St Montgomery, AL 36105 | Latonya Anderson 288-8535 262-2361 | Todd M. Chamelin 2872 Strand Cir Oviedo, FL 32765 | $575 | $325 | | $250 | | | | $293 | $33 | 8/15/06 | |

PLAINTIFF'S EXHIBIT
E



OK'd 10/16/06 JKG

Boswell

# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com
### October 2006 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian 105 Stuart Street Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Section 8 Tenant |
| 2. Carla Henry 2029 Merrily Drive Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell 3641 North Gap Loop Montgomery, AL 36110 | 550.00 | 0 | 225.00 | 202.50 | 22.50 | Paid Security Deposit $310.00 - 79.00 carpet cleaning |
| 4. Linda Dixon 1805 Rigsby Street Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. VACANT 817 North Pass Road Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | VACANT |
| 7. Loretta Hall 609 Boyce Street Montgomery, AL 36107 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Paid-October w/postdated check for $55.00 Section 8 |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | 3 months in arrears Section 8 Tenant |
| 9. Wanda Johnson 507 5th Street Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 585.00 | 65.00 | New Tenant |
| 10. Sharice Vaughn 2017 Stella Street Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Jamie Bibb 513 4th Street Montgomery, AL | 600.00 | 524.00 | 76.00 | 540.00 | 60.00 | Started 7/17/06. Full payment starts 1 Oct 06 |
| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
| Gross Income | 6,150.00 | | | | | Highlighted properties not included in totals |
| October Rent Collected | 5,755.00 | 4,749.00 | 1,006.00 | 5,179.50 | 575.50 | |
| October Rent Uncollected | 395.00 | | | | | |

NOTE:  October Rents collected    $ 5,755.00        Collections for Oct.    $1,006.00
       Montg. Housing Auth. Paid   - 4,749.00        Elite Commission       - 575.50
       Lessees Paid f/October      $ 1,006.00    Owner's Gross Return for Oct.  $ 430.50
NOTE:  #3 Yolanda Boswell paid security deposit -      $310.00
       Minus cost of cleaning carpets  (invoice will be faxed)   - 78.00
       Net Security Deposit                              $ 232.00
       Net Due Investor for October                      $ 662.50  ✓OK



# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
**1569 Amaryllis Circle**
**Orlando, FL 32825**
Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com
**November 2006 FUNDS COLLECTED (Rental only)**

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | Late fee 30.00<br>20.00 | 27.00<br>630.00 | 3.00<br>70.00 | Pd. 11/7/06<br>New Lease 12/1/06<br>Section 8 Tenant |
| 2. Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8. |
| 3. Yolanda Boswell<br>964 North Gap Loop<br>Montgomery, AL 36110 | 550.00 | 0 | 550.00 | 495.00 | 55.00 | Pd. 11/18/06 |
| 4. Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | 550.00 | 550.00 | | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 48.94* | 44.05 | 4.89 | Pd. 11/20/06<br>Moved in on 11/20/06<br>Prorated 11 days. |
| 7. VACANT<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to<br>2233 East 4th Street<br>Section 8 |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | 4 months in arrears<br>Section 8 Tenant |
| 9. Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Military check was not<br>processed; will pay 12/1/06 |
| 10. Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall<br>2233 E. 4th Street<br>Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Pd. 11/7/06<br>Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| **Gross Income** | 6,100.00 | | | | | Highlighted properties not included in totals |
| **November Rents Collected** | 4,898.94 | 4,225.00 | 673.94 | 4,409.05 | 489.89 | |
| **Past Due Payments Collected** | 30.00 | | 30.00 | 27.00 | 3.00 | |
| **Total Rents Collected** | 4,928.94 | 4,225.00 | 703.94 | 4,436.05 | 492.89 | |

NOTE 1:
| November Rents collected | $ 4,898.94 | | Collections for Nov. | $ 703.94 |
|---|---|---|---|---|
| Late Fees | 30.00 | | Elite Commission | -492.89 |
| Montg. Housing Auth. Paid | - 4,225.00 | | **Investor's Net Return** | **$ 211.05** |
| Lessees Paid f/November | $ 703.94 | | | |

NOTE 2:
| 105 Stuart St. Past due amount | $147.00 | | NOTE 3: 817 North Pass Prorated Rent | $ 198.90 |
|---|---|---|---|---|
| Payment | 30.00 | | Carpet Cleaning & Exterminator | -149.96 |
| Remainder | $117.00 | | Tenant's rent for November | $ 48.94 |

NOTE 4:    Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). (UPDATED 11/30/06)

# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
**1569 Amaryllis Circle**
**Orlando, FL 32825**
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
**December 2006 FUNDS COLLECTED (Rental only)**

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian 105 Stuart Street Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Pd: No pmt New Lease 12/1/06 Section 8 Tenant |
| 2. Carla Henry 2029 Merrily Drive Montgomery, AL 36111 | 600.00 | 600.00 | | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell 984 North Gap Loop Montgomery, AL 36110 | 550.00 | 0 | 400.00 | 360.00 | 40.00 | Will pay $150 on next pay period, 12/29/06 |
| 4. Linda Dixon 1805 Rigsby Street Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | **Pd: Starting 2 new jobs. Will pay 1/3/07** |
| 7. VACANT 609 Boyce Street Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to 2233 East 4th Street Section 8 |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | **Pd: No pmt Legal action taken 5 months in arrears** Section 8 Tenant |
| 9. Wanda Johnson 507 5th Street Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 520.00 | 130.00 | **Pd: 12/4/06 Nov. & Dec** -- Elite's Nov. fee will be deducted here. |
| 10. Sharice Vaughn 2017 Stella Street Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall 2233 E. 4th Street Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | **Pd: 12/10/06** Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| **Gross Income** | 5,506.00 | | | | | Highlighted properties not included in totals |
| **December Rents Collected** | 5,330.00 | 4,225.00 | 1,105.00 | 4,732.00 | 598.00 | |
| **December Rents Pending** | 176.00 | | | | | |

NOTE 1:
December Rents collected    $ 5,330.00
Montg. Housing Auth. Paid    - 4,225.00
Lessees Paid f/December    $ 1,105.00

Collections for December    $1,105.00
Elite Commission    - 598.00
Investor's sub-total    $ 507.00
Legal Filing Fee-Lois Webb    - 37.00
Investor's Net Return    $ 470.00

NOTE 2:    105 Stuart St. Past due amount    $117.00
December rent owed    20.00
Remainder    $137.00

NOTE 4:    #11- will be transferred to Bruce Dunn on January 2007

NOTE 3:    Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). No late fee was charged.



*(4)*

*Sold before you send this report. There's a Maintance problem @ 817 North Pass*

# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
### January 2007 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian 105 Stuart Street Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Pd: No pmt New Lease 12/1/06 Section 8 Tenant |
| 2. Carla Henry 2029 Merrily Drive Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 ✓ | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell 957 North Gap Loop Montgomery, AL 36110 | 550.00 | 0 | Dec L.F. 50.00 500.00 | 50.00 500.00 | | Pd: 1/2/07 Late Fee Dec Pd: 1/16/07 Jan 2007 |
| 4. Linda Dixon 1805 Rigsby Street Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 ✓ | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | 550.00 | 0 | 50.00 550.00 550.00 | 45.00 495.00 ✓ 495.00 | 5.00 55.00 ✓ 55.00 | Pd: 1/13/07 – For Dec 06 and Jan 07 + Late Fee |
| 7. VACANT 609 Boyce Street Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 ✓ | 0 | |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 ✓ | 55.00 | **Pd: Deduct $37 legal fee** Section 8 Tenant |
| 9. Wanda Johnson 507 5th Street Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 585.00 | 65.00 | Pd: 12/29/06 for Jan 2007 Lease 9/26/05 |
| 10. Sharice Vaughn 2017 Stella Street Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8 |

*Deduct 124.90 For Service call for this address*

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 5,450.00 | | | | | Highlighted properties not included in totals |
| January Rents Collected | 5,330.00 | 3,630.00 | 1,700.00 | 4,847.00 | 483.00 | |
| Late Fees Collected | 100.00 | | 100.00 | 95.00 | 5.00 | |
| December Rents Collected | 550.00 | | 550.00 | 495.00 | 55.00 | |
| Total Monies Collected | 5,980.00 | 3,630.00 | 2,350.00 | 5,437.00 | 543.00 | |

NOTE 1:
| January Rents collected | $ 5,330.00 |
| Montg. Housing Auth. Paid | - 3,630.00 |
| Lessees Paid f/December | $ 1,700.00 |
| Dec. Late Fee | 100.00 |
| Rents & Late Fees | $ 1,800.00 |

| Collections for December | $1,800.00 |
| Elite Commission | - 483.00 |
| Investor's sub-total | $1,317.00 |
| Legal Filing Fee-Lois Webb | - 37.00 |
| Cleanup – 609 Boyce St. | - 165.00 |
| Mr. Electric-105 Stuart | - 730.00 |
| **TOTAL TO INVESTOR** | **$ 385.00** ✓ |

NOTE 2:
| 105 Stuart St. Past due amount | $137.00 |
| January rent owed | 20.00 |
| Remainder | $157.00 |

NOTE 3. Guest Properties ordered work done by Mr. Electric-105 Stuart $730.00

NOTE 4: 2233 E. 4th Street was transferred to Bruce Dunn on January 2007.

*Update – Send Plummer rescheduled for Sat 1/26/07. Send Report – when caught next month.*

(5)

# EXECUTIVE SUMMARY
## MATTHEW BAHR
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
February 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 1. Rita Julian 265-2829 105 Stuart St. Montgomery, AL 36105 | $ 700.00 | $ 680.00 | $ - | $ 20.00 | $ 612.00 | $ 68.00 | Pd: No pmt. Section 8 Mr. Electric - $730 (inv) |
| 2. Carla Henry 239-8629 2029 Merrily Dr Montgomery, AL 36111 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Pd: 2/1/07 Section 8 |
| 3. Yolanda Boswell 984 North Gap Loop Montgomery, AL 36110 | $ 550.00 | $ - | $ 550.00 | | $ - | | Pd: 2/6/07 Section 8 |
| 4. Linda Dixon 239-7200 1805 Rigsby Street Montgomery, AL 36110 | $ 600.00 | $ 600.00 | $ 361.00 | $ (50.00) | $ 864.90 | $ 96.10 | $495 will be paid separate from this report by Elite. Legal action pending. |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | $ 550.00 | $ 550.00 | $ - | $ - | $ 495.00 | $ 55.00 | Section 8 pays 100% beginning 2/1/07. |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | $ 550.00 | $ - | $ - | $ 550.00 | $ - | $ - | Promised to pay 3/9/07. Sec. 8 BHRS $45. (inv) Ramsey $35 |
| 7. Renee Williams & Josh Nixon 652-8327 609 Boyce Street Montgomery, AL 36107 | | $ - | | $ - | | $ - | Lease takes effect 3/1/07. Base rent for 6 months. |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | $ 600.00 | $ 550.00 | $ 50.00 | | $ 495.00 | $ 55.00 | Lease 8/5/07 Lawsuit brought tenant found in default for all back rent plus late fees. |
| 10. Sharice Vaughn 2017 Stella St. Montgomery, AL 36108 | $ 650.00 | $ 650.00 | $ - | $ - | $ 585.00 | $ 65.00 | Section 8 - 100% Ramsey Serv. $35 (inv) |

3/4/2007

(6)

February 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 10. Wanda Johnson 507 5th St. Montgomery, AL 36107 | $ 650.00 | $ | $ 650.00 | $ | $ 585.00 | $ 65.00 | Lease 9/26/05 Pd: 2/1 |
| 11. VACANT 720 Cloverhill Rd Montgomery, AL 36105 | | | | | | | VACANT |

| | Rent Amt | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| Gross Income | $ 5,450.00 | | | | | | |
| Rent Collected | $ 4,641.00 | $ 3,630.00 | $ 1,011.00 | | $ 4,176.90 | $ 464.10 | |
| Rent Overage/Under Paid | | | | $ 1,120.00 | | | |
| Other Income (A | $ - | $ - | $ - | | $ - | $ - | |
| Total Income | $ 4,641.00 | $ 3,630.00 | $ 1,011.00 | | $ 4,176.90 | $ 464.10 | |
| Ramsey Service Call | $ 70.00 | | | | | | |
| Mr. Electric | $ 775.00 | | | | | | |
| Stanley Steemer | $ - | | | | | | |
| Bachus & Assoc | $ - | | | | | | |
| BHRS | $ 45.00 | | | | | | |
| Total Expenses/ | $ 890.00 | X | | | | | |
| Gross Bal. Due Investor | $ 3,751.00 | | | | | | |
| Gross (-HAP Pmt) | $ 121.00 | | | | | | |
| Net (-Elite Commission) | $ (343.10) | | | | | | |

→ What is Due Investor
after 890.00 and ECG fee 464.10
= -(neg) 343.10

matthews debt = 1354.10
from Cottage 1,011.00

Boswell's Rent
495.00 # 3 will be paid separately
neg 343.10 Neg Balance

3/4/2007



**EXECUTIVE SUMMARY**
**MATTHEW BAHR**
1569 Amaryllis Circle, Orlando, FL 32825
Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com
March 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 1. Rita Julian 265-2829<br>105 Stuart St.<br>Montgomery, AL 36105 | $ 700.00 | $ 680.00 | | $ 20.00 | $ 612.00 | $ 68.00 | No Payment |
| 2. Carla Henry 239-8629<br>2029 Merrily Dr<br>Montgomery, AL 36111 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Section 8 - 100% |
| 3. Yolanda Boswell   964<br>North Gap Loop<br>Montgomery, AL 36110 | $ 550.00 | | | $ 550.00 | $ - | $ | Pmt will be made by Elite in separate trans |
| 4. Linda Dixon 239-7200<br>1805 Rigsby Street<br>Montgomery, AL 36110 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Section 8 - 100% |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | $ 550.00 | $ 550.00 | | | $ 495.00 | $ 55.00 | |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | $ 550.00 | $ - | $ 500.00 | $ 550.00 | $ | $ 50.00 | $500 paid 3/16 for Feb RRRS $45 - Ramsby $165 |
| 7. Renee Williams & Josh<br>Nixon 652-8327    609<br>Boyce Street<br>Montgomery, AL 36107 | $ 650.00 | $ - | $ 585.00 | $ - | $ 585.00 | $ - | Pays $585 for 1st 6 mos; deposit waived for first 6 mos.  Paid 2nd of 6 pmt. on 3/6/07. Adams $50 |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | $ 600.00 | $ 550.00 | | $ 50.00 | $ 495.00 | $ 55.00 | Lawsuit filed – Tenant now in default for all back payments. |
| 10. Sharice Vaughn<br>2017 Stella St.<br>Montgomery, AL 36108 | $ 650.00 | $ 650.00 | | $ - | $ 585.00 | $ 65.00 | |

| 10. Wanda Johnson 507 5th St. Montgomery, AL 36107 | $ 650.00 | $ - | $ 650.00 | $ - | $ 585.00 | $ 65.00 | Pd. 3/3 |
| 11. VACANT 720 Cloverhill Rd Montgomery, AL 36105 | | | | | | | |

|  | Rent Amt | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. Fee | |
|---|---|---|---|---|---|---|---|
| Gross Income | $ 6,100.00 | | | | | | |
| Rent Collected | $ 5,365.00 | $ 3,630.00 | $ 1,735.00 | | $ 4,437.00 | $ 478.00 | |
| Rent Overage/Under Paid | | | | $ 1,170.00 | | | |
| Other Income (A | $ 550.00 | $ - | $ 550.00 | | $ 495.00 | $ 55.00 | 3/1/07 paid by Elite for 964 North Gap Lp |
| Total Income | $ 5,915.00 | $ 3,630.00 | $ 2,285.00 | | $ 5,323.50 | $ 533.00 | |
| Ramsey | $ 200.00 | | | | | | |
| Mr. Electric | $ - | | | | | | |
| Willie Adams, Maint | $ 50.00 | | | | | | |
| BHRS | $ 45.00 | | | | | | |
| Elite Feb. fee carried over | $ 173.00 | | | | | | |
| **Total Expenses/** | $ 468.00 | | | | | | |
| **Gross Bal. Due Investor** | $ 5,447.00 | | | | | | |
| Gross (-HAP Pmt) | $ 1,817.00 | | | | | | |
| **Net (-Elite Commission)** | $ 1,284.00 | | | | | | |

PLAINTIFF'S
EXHIBIT
F
PENGAD 800-631-6989

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the _____ day of ___ _____
by and between the Lessor: _____, (hereinafter referred to as "Landlord"), and the
Lessee(s): _____ All
Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the
terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do
hereby covenant, contract and agree as follows:

**1. GRANT OF LEASE:** Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use
as a personal residence, excluding all other uses, the personal residence located in _____ County, Alabama,
with address of- _/_          _____ ___          _____
_____
including the following items of personal property: __ _____
_____
_____

**2. NATURE OF OCCUPANCY:** As a special consideration and inducement for the granting of this Lease by the Landlord
to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or
others whose names and ages are set forth below: _____
_____
_____

**3. TERM OF LEASE:** This Lease shall commence on the _____ day of _____, _____ and extend until its
expiration on the _____ day of _____, _____, unless renewed or extended pursuant to the terms herein.

**4. SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit the sum of $_____ to be held by
Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or
termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord
for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not
entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If
Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new
owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return
of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice
delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the
Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and
tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the
result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by
which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord.
Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the
termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

**5. RENT PAYMENTS:** Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly
installments of $_____, said installment for each month being due and payable on or before the 1st day of the month,
the first full rent payment under this Lease being due on the 1st day of _____, _____

Tenant agrees that if rent is not paid in full on or before the _____ day of the month, Tenant will pay a late charge of
$_____ as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $_____, which
amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):
☐ cash, ☐ personal check, ☐ money order, ☐ cashier's check. ☐ other___  _____
Rent payments shall be made payable to _____  _____  ____  _____ and mailed or delivered to the
following address: _____  _____  _____  _____  _____ All notices from
Tenant to Landlord under this Lease and applicable Alabama law shall be delivered to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered paid, and rent will be considered unpaid until actual receipt thereof

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other Tenants.

**6. CONSEQUENCES OF BREACH BY TENANT:** If Tenant, by any act or omission, or by the act or omission of any of Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other ddocuments made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this 'Lease, the entire remaining balance of unpaid rent for the remaining term of this Lease **shall ACCELERATE,** whereby the entire sum shall become immediately due, payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated rent.

**7. DELIVERY OF NOTICES:** Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

**8. UTILITIES:** Tenant will provide and pay for the following utilities (indicate those that apply):
☑ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply):
☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the leased premises back unto Landlord upon termination or expiration of this Lease.

**9. NOTICE OF INTENT TO SURRENDER:** Any other provision of this lease to the contrary notwithstanding, at least thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above, Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term. If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law, Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

### 10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

### I 1. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste m a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent    • upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

12. **NO ASSIGNMENT:** Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.

13. **TENANT INSURANCE:** Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from. any and all damages.

14. **CONDITION OF LEASED PREMISES:** Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease. Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. **ALTERATIONS:** Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. **NO ILLEGAL USE:** Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. **NOTICE OF INJURIES:** In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. **LANDLORD'S RIGHT TO MORTGAGE:** Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. **DELAY IN REPAIRS:** Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. **ABANDONMENT:** Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. **NOTICE OF ABSENCE FROM PREMISES:** If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. **DELAY OF POSSESSION:** Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

24. **MATERIALITY OF APPLICATION TO RENT:** All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. **MODIFICATION OF THIS LEASE:** Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. **REMEDIES NOT EXCLUSIVE:** The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. **SEVERABILITY:** If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon -which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. **ATTORNEY FEES:** In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. **HEIRS AND ASSIGNS:** It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. **EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. LANDLORD ENTRY AND LIEN. In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. GOVERNING LAW: This Lease is governed by the statutory and case law of the State of Alabama.

35. LEAD-BASED PAINT DISCLOSURE: **HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

36. **ADDITIONAL PROVISIONS:**

_____
_____
_____
_____
_____
_____

\* \* \*

## WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:

LANDLORD  Matthew W. Bahr, Lessor

Sign: _____    Print: Jamarlo K. GumBayTay, Agent    Date: _____

TENANT

Sign: _____    Print: _____    Date: _____

*Letter Perfect Business Services*

1847 Robison Hill Road ✦ Montgomery, Alabama 36106

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

G

July 17, 2007

To Whom It May Concern:

I work at home doing secretarial work for small businesses and others who need computer and typing services. In this capacity, I manage the paper work for Mr. Jamario GumBayTay's rental management company.

Ms. Yolanda Boswell and Ms. Jenette Boswell filled out individual applications for a house at 1215 Lake Street, a copy of which Mr. GumBayTay faxed to me and I made out the lease accordingly. The rent for this house was $550 monthly with a $250 security deposit. Since the house needed repairs before anyone could move in, Jamar K. GumBayTay, the Investor's representative and Ms. Yolanda Boswell agreed that the Boswells would do the repairs in lieu of a reduction in the rent of $100 monthly for six (6) months, making the monthly rent $450 for 6 months. The work was never done because they could not get one of their relatives who was a contractor to come over and help them, and they never moved in.

The house at 964 North Gap Loop became available and I was asked to change the Lease from 1215 Lake Street to 964 North Gap Loop for Ms. Yolanda Boswell. I changed the information in the lease to reflect the address as 964 North Gap Loop, but neglected to change the amount of the monthly rent from $450 to $550 which was the rent for this house. She signed the lease and I signed Mr. GumBayTay's name as representative of owner (I have his authority to do this.) and I sent a copy to Mr. GumBayTay. He called me and brought my attention to the fact that I had not changed the amount of the rent to $550.00. I made the correction and Mr. GumBayTay called Ms. Boswell and asked her to come back and sign the corrected lease. She never came back. Nevertheless, she understood that the rent was $550 instead of $450 because she paid $550 on her rent.

The only unit Elite Real Estate Consulting offered Ms. Boswell at the rate of $450 was 1215 Lake Street.

Sincerely,

*Lynn H. Norsworthy*

Lynn H. Norsworthy
Owner

Telephone: (334) 265-4466          Fax (334) 264-8452          E-Mail: letterperfect@charter.net

*Exhibit 8*

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

H

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st day of October ,20 06 , by and between the Lessor: Matthew W. Bahr , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell                                                                                                                  All Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

**1. GRANT OF LEASE:** Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property: N/A

**2. NATURE OF OCCUPANCY:** As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

**3. TERM OF LEASE:** This Lease shall commence on the 1st day of October ,20 06 , and extend until its expiration on the 30th day of September , 20 06 , unless renewed or extended pursuant to the terms herein.

**4. SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit the sum of $350.00 to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

**5. RENT PAYMENTS:** Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $550.00 450 ⁰⁰, said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October , 20 06

Tenant agrees that if rent is not paid in full on or before the 5th day of the month, Tenant will pay a late charge of $50.00 as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A , which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):
☒ cash, ☐ personal check, ☒ money order, ☒ cashier's check, ☒ other deposit to Wachovia Bank
Rent payments shall be made payable to Jamarlo K. GumBayTay, Agent     and mailed or delivered to the
following address: 800 Madison Avenue, Montgomery, AL 36104 (Wachovia Bank)     All notices from
Tenant to Landlord under this Lease and applicable Alabama law shall be delivered. to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered paid, and rent will be considered unpaid until actual receipt thereof

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other Tenants.

**6. CONSEQUENCES OF BREACH BY TENANT:** If Tenant, by any act or omission, or by the act or omission of any of Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other ddocuments made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this 'Lease, the entire remaining balance of unpaid rent for the remaining term of this Lease **shall ACCELERATE,** whereby the entire sum shall become immediately due, payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated rent.

**7. DELIVERY OF NOTICES:** Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

**8. UTILITIES:** Tenant will provide and pay for the following utilities (indicate those that apply):
☒ Electric, ☒ Gas, ☒ Telephone, ☒ Cable Television, ☒ Water, ☒ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply):
☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the leased premises back unto Landlord upon termination or expiration of this Lease.

**9. NOTICE OF INTENT TO SURRENDER:** Any other provision of this lease to the contrary notwithstanding, at least thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above, Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term. If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law, Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

## 10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

## 11. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste m a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent  • upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

**12. NO ASSIGNMENT:** Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.

**13. TENANT INSURANCE:** Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from. any and all damages.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease. Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here:  N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. **EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. **LANDLORD ENTRY AND LIEN.** In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. **GOVERNING LAW:** This Lease is governed by the statutory and case law of the State of Alabama.

35. **LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

36. **ADDITIONAL PROVISIONS:**

_____

_____

_____

_____

_____

\* \* \*

**WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:**

LANDLORD   Matthew W. Bahr, Lessor

Sign: *Jamarlo K GumBayTay*              Print: Jamarlo K. GumBayTay, Agent      Date: 10/1/06

TENANT

Sign: *[signature]*              Print: Yolanda Boswell, Lessee      Date: 10/1/06

Addendum to Lease for <u>964 North Gap Loop, Montgomery, AL 36110</u>

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

- ☐ Lawn should be kept cut, raked and edged
- ☐ No junked or abandoned vehicles on property
- ☐ No trash/paper/debris in yard or on lawn
- ☐ No automobiles parked on lawn
- ☐ Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
Yolanda Boswell, Lessee

Date: _____

*Exhibit 9*

PEMBGO 800-631-6989

PLAINTIFF'S
EXHIBIT

J

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st  day of October                    ,2006  , by and between the Lessor: Matthew W. Bahr                              , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell                                                        All Lessees ( hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

**1. GRANT OF LEASE:** Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery          County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110                                                      ,

including the following items of personal property: N/A

**2. NATURE OF OCCUPANCY:** As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

**3. TERM OF LEASE:** This Lease shall commence on the 1st  day of October               ,2006   ,and extend until its expiration on the 30th day of September            ,2006   , unless renewed or extended pursuant to the terms herein. *Expired short term lease for DHR purpose.*

**4. SECURITY DEPOSIT:** Upon execution of this Lease, Tenant shall deposit the sum of $ 350.00        to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

**5. RENT PAYMENTS:** Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $ 550.00              , said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October            , 2006

Tenant agrees that if rent is not paid in full on or before the 5th     day of the month, Tenant will pay a late charge of $ 50.00       as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A            , which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):
☒ cash, ☐ personal check, ☒ money order, ☒ cashier's check, ☒ other <u>deposit to Wachovia Bank</u>
Rent payments shall be made payable to <u>Jamario K. GumBayTay, Agent</u>    and mailed or delivered to the
following address: <u>800 Madison Avenue, Montgomery, AL 36104 (Wachovia Bank)</u>    All notices from
Tenant to Landlord under this Lease and applicable Alabama law shall be delivered. to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either
by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered
paid, and rent will be considered unpaid until actual receipt thereof.

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable
under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other
Tenants.

**6. CONSEQUENCES OF BREACH BY TENANT:** If Tenant, by any act or omission, or by the act or omission of any of
Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other
documents made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one
tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease
and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease
and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not
be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this Lease, the entire remaining balance of unpaid
rent for the remaining term of this Lease **shall ACCELERATE**, whereby the entire sum shall become immediately due,
payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and
repairs as a partial offset to satisfaction of the accelerated rent.

**7. DELIVERY OF NOTICES:** Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant
in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or
registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or
Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in
the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed
in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

**8. UTILITIES:** Tenant will provide and pay for the following utilities (indicate those that apply):
☒ Electric, ☒ Gas, ☒ Telephone, ☒ Cable Television, ☒ Water, ☒ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply):
☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any
utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the
leased premises back unto Landlord upon termination or expiration of this Lease.

**9. NOTICE OF INTENT TO SURRENDER:** Any other provision of this lease to the contrary notwithstanding, at least
thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above,
Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term.
If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama
law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific
term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law. Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

I 1. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste m a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent · upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

12. NO ASSIGNMENT: Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.

13. TENANT INSURANCE: Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from. any and all damages.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease, Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: _N/A_

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.



24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon which Tenant may rely upon if contrary to the terms and conditions of this Lease.



29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. **EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. *LANDLORD ENTRY AND LIEN.* In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. GOVERNING LAW: This Lease is governed by the statutory and case law of the State of Alabama.

35. LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet *"Protect Your Family from Lead in Your Home."*

36. **ADDITIONAL PROVISIONS:**

_____

_____

_____

_____

_____

\* \* \*

**WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:**

LANDLORD   Matthew W. Bahr, Lessor

Sign: *Jamarlo K GumBayTay*        Print: Jamarlo K. GumBayTay, Agent        Date: 10/1/06

TENANT

Sign: _____        Print: Yolanda Boswell, Lessee        Date: 10/1/00

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

☐    Lawn should be kept cut, raked and edged

☐    No junked or abandoned vehicles on property

☐    No trash/paper/debris in yard or on lawn

☐    No automobiles parked on lawn

☐    Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
          Yolanda Boswell, Lessee

Date: _____

Exhibit F, 2:07-cv-135

------------------------------------------

TRANSCRIPT OF RECORDED CONVERSATION

BETWEEN

YOLANDA BOSWELL & JAMARLO K. GUMBAYTAY

------------------------------------------

Transcribed by:

**SUZANNE HAND & ASSOCIATES**

One South Bay Avenue, Islip, New York  11751

631-277-9771

1          MS. BOSWELL: Yeah.

2          UNIDENTIFIED VOICE: He may never come.

3          MS. BOSWELL: (Inaudible) know him.

4          MR. GUMBAYTAY: Shit, damn. All right I'm gonna call

5      him right now and see what's going on with that all right.

6          MS. BOSWELL: Okay and, um, whatever, I had I'm

7      gonna see you. Okay with that lease.

8          MR. GUMBAYTAY: Right.

9          MS. BOSWELL: Let leave it alone. I ain't forgot, um, I'm

10     gonna get over there but with the lease with, with (inaudible).

11         MR. GUMBAYTAY: Right.

12         MS. BOSWELL: (Inaudible) actually understand and all

13     the lease now okay the lease that I'm gonna sign the one that

14     I'm gonna go there and sign I'm not gonna bring that thing

15     home.

16         MR. GUMBAYTAY: The one that you want you want the

17     one for 6, the for the 550 lease got to go to that landlord. I

18     can't, you know I can't rent that house and tell him I'm renting

19     that house for no 450.

20         MS. BOSWELL: Exactly, exactly.

21         MR. GUMBAYTAY: But that 550 lease goes to him, that

22     450 lease you can take over to a DHR to do what you got to do.

23         MS. BOSWELL: Okay.

1     MR. GUMBAYTAY:  And that's also your lease, uh, for

2  you and I for, uh, to what we had talked about, uh, we had

3  worked, we're gonna work with okay?

4     MS. BOSWELL:  Okay.

5     MR. GUMBAYTAY:  But I got to send that lease down to

6  him for his records.

7     MS. BOSWELL:  Okay.

8     MR. GUMBAYTAY:  So he'll know exactly what, what

9  that approximate lease is for based on what it is already listed

10  for.

11     MS. BOSWELL:  Exactly, exactly.

12     MR. GUMBAYTAY:  So, so you need to sign that one so

13  if she can go ahead and get that to him and um, send in that

14  450 and stuff for all she knows that's for DHR.

15     MS. BOSWELL:  Okay.

16     MR. GUMBAYTAY: `Cause I have folks that all the time

17  `cause if you, if I can't help you get what you want then I can't

18  get what I want and that's the rent paying on time.

19     MS. BOSWELL:  Exactly, exactly.

20     MR. GUMBAYTAY:  So, I got papers to tie in with you

21  know putting that lease for the utilities and stuff like that, you

22  know.

23     MS. BOSWELL:  Yeah.

24     MR. GUMBAYTAY:  Little small things.

25     MS. BOSWELL:  Yeah.

4

1          MR. GUMBAYTAY:  So, uh, you just just, uh, you want

2       me to call or do you want to call them and let them know you

3       gonna go there and take care of that?

4          MS. BOSWELL:  You should call `cause that way if its no

5       paying right now just let them know, um, I haven't forgotten its

6       just I'm been trying to get everybody moved, situated and make

7       sure everybody you know is straight.

8          MR. GUMBAYTAY:  Hm, hm,  And then, and that's why I

9       been trying to catch up with ya, before I know when you get

10      settled down all and all that you gonna come and see me.

11         MS. BOSWELL:  Yeah, um.

12         MR. GUMBAYTAY:  So, you know just come and see me

13      when you get yourself settled down focused and rest so I say at

14      this time next week sometime you know come and spend a little

15      time with me.

16         MS. BOSWELL:  Yeah, I'm trying to get situated in that

17      house now.

18         MR. GUMBAYTAY:  And I don't have no problem with

19      hanging out and putting no pressure on her, no I never told

20      nobody else that I rent the house for you all for 450 cause you

21      know that's the straight thing that came out your very mouth.

22         MS. BOSWELL:  Yeah.

23         MR. GUMBAYTAY:  (Inaudible).

24         MS. BOSWELL:  Well yeah I ain't no, I ain't no (inaudible)

25      getting the house around the street you know what I'm saying.

1     MR. GUMBAYTAY:  Yeah you should never,  but don't

2  never `cause that girl in there used to come around and tell the

3  girl that I, that we went over and looked at the house when she

4  was down at the house she was gonna get it for 4, he was

5  gonna get it for 450.

6     MS. BOSWELL:  He did?

7     MR. GUMBAYTAY: First thing yeah, first thing that came

8  out of her mouth, see sometimes black folks you got to, if

9  somebody doing something for you, doing you a favor you can't

10  worry about knowing of your business.

11     MS. BOSWELL:  Yeah, yeah.

12     MR. GUMBAYTAY:  So we can't keep no secrets, you

13  and me can't keep no damn secrets, ain't nobody in the world

14  gonna rent that kind of house for no $450 a month.

15     MS. BOSWELL:  Exactly.  Exactly.

16     MR. GUMBAYTAY:  I don't care what part of the

17  neighborhood is there but that's a nice darn house.

18     MS. BOSWELL:  Yeah. Yeah.

19     MR. GUMBAYTAY:  And once you get settled in and

20  settled down then I want you, you know you and I and you and

21  mom settled down about you buying your house not that but

22  buying a house.

23     MS. BOSWELL:  Exactly.

24     MR. GUMBAYTAY:  So you kid can have them a home

25  that they can fall back on if something happen to momma.

1          MS. BOSWELL:  Yeah.  Yeah.

2          MR. GUMBAYTAY:  So I can get you in that program

3    with Nackda (phonetic) which you and I talked about, we need

4    to set you up with that so you can get started and all something

5    but I want you to come and see me next week so we can go out

6    to lunch or something first and just sit down and get your plans

7    and get your game together what you want out of life.

8          MS. BOSWELL:  Okay.

9          MR. GUMBAYTAY:  See how Gumbaytay can help you

10    do that?  So when you get off from work serving all the other

11    folks at work you know so let me know Monday when we can sit

12    down and go to lunch.

13          MS. BOSWELL:  Okay.

14          MR. GUMBAYTAY:  You know or go to dinner, go to a

15    movie or something, we just need to -- or have cocktails.

16          MS. BOSWELL:  Yeah, yeah.

17          MR. GUMBAYTAY:  We just need to sit down and talk so

18    we can handle your business and so I can keep your business

19    tight over there I don't want you to fall by the wayside because

20    you didn't talk to me.

21          MS. BOSWELL:  Exactly.

22          MR. GUMBAYTAY:  Do you understand what I'm saying,

23    understanding is the best thing in the world, communication is

24    the best thing in the world.  I mean you feel that you can handle

1    it by yourself over there you don't need my, my, my favors in

2    the, in the long just (inaudible) just bring me 550 over.

3        MS. BOSWELL:  Okay.

4        MR. GUMBAYTAY:  As long as you have all that all day

5    long as long as you living over there I'm gonna do what I said

6    I'm gonna do if you do what you said you're gonna do.

7        MS. BOSWELL:  Okay.

8        MR. GUMBAYTAY:  And uh, we, we, we are two

9    consenting adults and, uh, and, uh, you know we, we talked

10    about that and you had no problem with that so if you ever have

11    a problem with that just let me know.

12        MS. BOSWELL:  Yeah.

13        MR. GUMBAYTAY:  I ain't got no problem with you

14    seeing brother (inaudible) in Citrus (phonetic).

15        MS. BOSWELL:  (Inaudible).

16        MR. GUMBAYTAY:  I ain't gonna push.

17        MS. BOSWELL:  Hm, hm.

18        MR. GUMBAYTAY:  I'm a grown man.

19        MS. BOSWELL:  Yeah.

20        MR. GUMBAYTAY:  You know but I just want to help a

21    young black woman trying to get her act together you know

22    sometimes a woman has to do what a woman has to do in order

23    to feed her family and live a comfortable lifestyle for her and her

24    family so I just saw the opportunity to extend that invitation to

25    you.

1            MS. BOSWELL:  Yeah.

2            MR. GUMBAYTAY:  But especially when I'm in the

3       position to do so.

4            MS. BOSWELL:  Yeah, yeah.

5            MR. GUMBAYTAY:  You understand what I'm saying, so

6       I'll take you to lunch, we can go to dinner or we can go out of

7       town some weekend.

8            MS. BOSWELL:  Hm, hm.

9            MR. GUMBAYTAY: You know one weekend a month we

10       can go out of town and do somethings girl.  We don't  just have

11       to come over there and just get up under me all the time you

12       know you can come under and we'll sit down and have a

13       conversation and get some understanding, get some

14       understanding and keep that, keep a bond going hey, you know

15       we just got to keep bonding.

16            MS. BOSWELL:  Yeah.

17            MR. GUMBAYTAY:  I have to feel ya.  I got to feel you.  I

18       ain't trying to being your kin folk all the time I ain't trying to be

19       your boyfriend, I ain't trying to, to put no locks on you or watch

20       you where you going and getting and all ignorant and stupid that

21       ain't my story.  That you do what you want to do you a grown

22       woman come and go and where you want to go.  You know that

23       kind of thing but talking about what we're gonna do is just

24       always a good thing.  You understand what I'm saying sister

25       Boswell?

1      MS. BOSWELL:  Yeah, I hear, yeah.

2      MR. GUMBAYTAY:  Not the, not the, you know I'm just

3      trying to help a young black woman out.

4      MS. BOSWELL:  Yeah.  I hear ya.

5      MR. GUMBAYTAY:  But we definitely need to sit down

6      and talk about buying the house the, uh, eight houses so we

7      can get you some programs.

8      MS. BOSWELL:  Okay, well I still got that paperwork that

9      you gave me. I was looking at it last night.  But I was working on

10     getting me a computer over here.

11     MR. GUMBAYTAY:  Now I be going out of town next

12     weekend so you know if you get your mom to keep the kids you

13     know and ride with me.

14     MS. BOSWELL:  Yeah.

15     MR. GUMBAYTAY:  I'm riding to Mississippi one

16     weekend a month you know you can ride down there with me

17     just give you a chance to get away from the kids.  Just relax.  I'd

18     love to have your company.

19     MS. BOSWELL:  Hey, I hear ya (phonetic).

20     MR. GUMBAYTAY:  That fair enough?

21     MS. BOSWELL:  Yeah, I hear ya.  Well, um.

22     MR. GUMBAYTAY:  So.

23     MS. BOSWELL:  (Inaudible) some where, um, don't well -

24     - let me get on off the phone with you now so that you can call

1      Lynn and call the man about the water and stuff and you just

2      call me back when you finished.

3           MR. GUMBAYTAYL:  Okay.  I'll do it.

4           MS. BOSWELL:  Okay.

5           MR. GUMBAYTAY:  Bye.

6           MS. BOSWELL:  Bye.

7        *   *   *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CERTIFICATE OF TRANSCRIBER

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF SUFFOLK       )


I, JOANNE VAILLANCOURT, state that I transcribed the recording of the foregoing proceeding pages fully and accurately to the best of my ability and the foregoing typewritten pages constitute the full and complete transcript of said recordings.


Witness our hand on this date: 7/28/08

Transcriber

Joanne Vaillancourt


Sworn to before me on:

7/28/08

Notary Public


Janet Reardon
Notary Public, State of New York
No. 01RE6074687
Qualified in Suffolk County
Term Expires May 20, 2010

# EXHIBIT G

IS A DISC WHICH IS AVAILABLE IN THE
CLERK'S OFFICE

Exhibit H, 2:07 - cv - 135

----------------------------------------

TRANSCRIPT OF RECORDED CONVERSATION

BETWEEN

YOLANDA BOSWELL & JAMARLO K. GUMBAYTAY

----------------------------------------

Transcribed by:

**SUZANNE HAND & ASSOCIATES**
One South Bay Avenue, Islip, New York  11751
631-277-9771

2

1          MR. GUMBAYTAY:  Hello?

2          MS. BOSWELL:  Hello.

3          MR. GUMBAYTAY:  Yolanda?

4          MS. BOSWELL:  Hey.

5          MR. GUMBAYTAY: Gumbaytay getting back with

6     ya.

7          MS. BOSWELL:  Oh, I'm (inaudible) you.

8     I'm (inaudible) the man ain't never come check

9     on that toilet yet.

10          MR. GUMBAYTAY:  He has not?

11          MS. BOSWELL:  Hm, hm.

12          MR. GUMBAYTAY:  No one had check on your

13     toilet yet.

14          MS. BOSWELL:  I mean he came the other day

15     but he didn't finish it.

16          MR. GUMBAYTAY:  All right.  That's the

17     toilet in your bedroom?

18          MS. BOSWELL:  Yeah.

19          MR. GUMBAYTAY:  Not the hallway.

20          MS. BOSWELL:  Uh, huh.

21          MR. GUMBAYTAY:  Well you call me every

22     single day cause I'm gonna call them every

23     single day, okay?

24          MS. BOSWELL:  Okay.

25          MR. GUMBAYTAY:  I want to get this

3

1    situation taken care of.  And you're gonna

2    start trying to work on your next month rent

3    this month.

4         MS. BOSWELL:  Uh, huh.

5         MR. GUMBAYTAY:  You and me gonna try to do

6    that.

7         MS. BOSWELL:  I mean I'm gonna get it to

8    you, you know it'll be another month.

9         MR. GUMBAYTAY:  Huh?

10        MS. BOSWELL:  It'll be another month.

11        MR. GUMBAYTAY:  Hey, um, I'm just saying,

12   uh, I'm gonna pay my part of it now I just

13   saying (inauidble) you wanna work on that.  You

14   gonna work on that sugar daddy account this

15   week or next week be good for you?

16        MS. BOSWELL: I'm, gonna call you back.

17        MR. GUMBAYTAY:  All right you can't talk

18   now can you?

19        MS. BOSWELL:  Yeah.

20        MR. GUMBAYTAY:  All right there.  Bye.

21        *     *     *     *     *

22

23

24

25

CERTIFICATE OF TRANSCRIBER

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF SUFFOLK    )

    I, JoAnn Vaillancourt, state that I transcribed the recording of the foregoing proceeding fully and accurately to the best of my ability and the foregoing typewritten pages constitute the full and complete transcript of said recordings.

Witness our hand on this date: 9 |10| 07

Transcriber

_JoAnn Vaillancourt_

JoAnn Vaillancourt

Sworn to before me on:

9 | 10 | 07

_Colla M Kurka_

Notary Public

COLLEEN M. KURKA
Notary Public State of NY
No. 01KU6114872
Qualified in Suffolk County
Commission Expires 8 / 23 / 20___

Exhibit I,   2:07-cv-135

------------------------------------------

TRANSCRIPT OF RECORDED CONVERSATION

BETWEEN

YOLANDA BOSWELL & JAMARLO K. GUMBAYTAY

------------------------------------------

Transcribed by:

**SUZANNE HAND & ASSOCIATES**
One South Bay Avenue, Islip, New York  11751
631-277-9771

2

1           MS. BOSWELL:  In the stores or.

2           MR. GUMBAYTAY:  Can you talk or do you

3    want to call him back when you get out of

4    there?

5           MS. BOSWELL:  Yeah, I can talk.

6           MR. GUMBAYTAY:  All right I'm just calling

7    to see when I can start to working on my rent

8    part of it for next month.

9           MS. BOSWELL:  I mean what you all, what

10   you all mean.

11          MR. GUMBAYTAY:  I want to see, I want to

12   see you sometime between 9 a.m. this month.

13          MS. BOSWELL:  Hm.

14          MR. GUMBAYTAY:  If you can get away I'd

15   certainly would appreciate it.

16          MS. BOSWELL:  Let me see what kind of work

17   cause I just, I was misunderstanding you.

18          MR. GUMBAYTAY:  Okay.  All right.  You

19   miss, you must misunderstood me.

20          MS. BOSWELL:  Yeah, I did.

21          MR. GUMBAYTAY:  I said, I said I was gonna

22   help you uh, as much as I possibly could over

3

1        there if you needed my help.  Uh, your rent

2        won't be 550 it'll be 450, I'll take care of

3        $550.  Uh, was that - wasn't that clear?  I'll

4            take care of $100.00 of that.

5            MS. BOSWELL:  I mean, yeah.

6            MR. GUMBAYTAY:  If I could see you.  If I

7        could see you every once in a while.

8            MS. BOSWELL:  Yeah, but what I'm saying is

9        help me understand by seeing me cause you came

10        to my house Saturday and saw me and shit.

11            MR. GUMBAYTAY:  No, I don't.

12            MS. BOSWELL:  Yeah, I want, I ain't,

13        evidently like I'm saying understanding you

14        because you know.

15            MR. GUMBAYTAY:  That's the, that's, that's

16        the, does the word sugar daddy has had, did I

17        put that out there anywhere.

18            MS. BOSWELL:  Yeah, but you know me I be,

19        I mean, I have a lot people make pass, a lot of

20        men make pass at me you see what I'm saying.

21            MR. GUMBAYTAY:  Oh, okay.

4

1       MS. BOSWELL:  So I laugh, you know, I hear

2       and don't hear and I don't paying no attention

3       cause I figure their just saying (inaudible)

4       cause I really do that all the time.

5       MR. GUMBAYTAY:  Oh.  Okay.

6       MS. BOSWELL:  But I mean like I

7       (inaudible) I had been misunderstood I was just

8       figuring that you was just trying to help me

9       because of the situation in and that's why you

10      were gonna knock the $100 of the rent.

11      MR. GUMBAYTAY:  Uh, huh, well, uh, well

12      you definitely misunderstood me but now it, you

13      know I told that man that house is $550 over.

14      Ain't no way in the world I can rent that house

15      for no $450.  I suppose you need some help from

16      time to time with the utility bills and I pay

17      that for you, you know just let me be your

18      sugar daddy once in a while and you said hey, I

19      understand I see how and I don't have no

20      problem with this so I felt we were clear on

21      that.

22      MS. BOSWELL:  No, I (inaudible).

1      MR. GUMBAYTAY:  `Cause if we're not well

2      that's no problem, you know your mom you all

3      can handle it over there, I uh, I, I, hey if

4      you misunderstood I have no problem with that,

5      I'm not gonna be about harassing nobody uh,

6      bothering nobody if you don't want to me

7      bothered and I told you that, you're a grown

8      woman.

9      MS. BOSWELL:  Hm.

10     MR. GUMBAYTAY:  Um, but I guess you all

11     just do uh, what it be 425, 525 a

12     piece.

13     MS. BOSWELL:  525 a piece?

14     MR. GUMBAYTAY:  Uh, yeah, 250 divided by

15     two between you and your mom.

16     MS. BOSWELL:  Hm, hm, so that mean I have

17     to pay the 550 now?

18     MR. GUMBAYTAY:  Yeah, well that's what it,

19     it was in your contract.  Remember I told you

20     it was two, I, you know come on, now you know

21     you uh, well, you, I know you darn well, you

22     ain't that slow.

6

1             MS. BOSWELL: No, uh, uh, see what.

2             MR. GUMBAYTAY: I said that's right cause

3      I says well I don't.

4             MS. BOSWELL: But listen.

5             MR. GUMBAYTAY: Oh.

6             MS. BOSWELL: You didn't understand it

7      then, that I was getting cause I just explained

8      to you the understanding that I (inaudible).

9             MR. GUMBAYTAY: You can't rent that damn

10     house for no you know I can't rent that main

11     house no $450 you know cause no one else is

12     paying $450. Meanwhile I was going knock off

13     that for your daddy because he was gonna go in

14        there and work on that house and put it,

15     put it, put in sweat equity into it and I was

16     gonna knock off so much a month for so many

17     months and then that'll bring it down to 450.

18     And that's the same thing as you and I was

19     gonna do over there at Lake (phonetic) Street

20     so that could've been, you could have got that

21     house for 450 if you put your, your folks went

22     in and put $3,000 of labors in there then I was

1    gonna do that for you at that particular house

2    but this particular house well that's that much

3    to do over there, I said but I still be able to

4    help you out and I thought that was perfectly

5    clear that's why I said we got to have two

6    leases. I got to send him a lease for 550 you

7    can take that 450 lease and take that over to

8    the DHR and do what you go to do baby girl.

9    But its no problem you can just pay me the 450

10   for the, for the first month and I am not gonna

11   bother about that if you miss understand that

12   there come the following month.  Then you all,

13   you and your mom since she should have her

14   social security in by then and you all can go

15   ahead and start paying the full out 550.  I

16   ain't I, if you misunderstood I, I right that.

17       Is that fair enough?

18       MS. BOSWELL:  Yeah, but I don't know.

19       MR. GUMBAYTAY:  I don't want to put you in

20          that kind of pressure sister,

21   cause I, if, if, if you didn't

| | |
|---|---|
| 1 | understand, if that wasn't, if I didn't |
| 2 | make that clear, clear then I apologize |
| 3 | cause. |
| 4 | MS. BOSWELL:  Yeah, that's what I |
| 5 | mean. |
| 6 | MR. GUMBAYTAY:  `Cause I tell you I |
| 7 | was gonna (inaudible) if you ask me to |
| 8 | help you out, if you, yeah, cause I |
| 9 | think I said (inaudible) utility bills |
| 10 | even once in a while let me know. |
| 11 | MS. BOSWELL:  Yeah, right. |
| 12 | MR. GUMBAYTAY:  Yeah, I said I |
| 13 | don't want, I want to make sure you live |
| 14 | a comfortable lifestyle over there so I |
| 15 | was extending the invitation to you to |
| 16 | be more than just a friend and |
| 17 | acquaintance that's if, if you don't |
| 18 | have any problem with it. |
| 19 | MS. BOSWELL:  So what, so what, so |
| 20 | what |

9

1  you saying is if I came over there, I

2  mean, I mean, both of us grown, had sex,

3  it'd be $100 off the rent.

4   MR. GUMBAYTAY:  Meaning if you come

5  over here and uh, let me put it this

6  way.

7   MS. BOSWELL:  Yeah, I mean help me

8  understand what you saying.

9   MR. GUMBAYTAY: Right, no, the law,

10  I don't want to put it that bluntly but

11  uh, in, um.  God will do everything.

12  God and Gumbaytay do everything we

13  possibly can to help you out over there.

14   MS. BOSWELL:  Yeah.

15   MR. GUMBAYTAY:  That's all I got

16  yeah, I tell you, you have to pay help

17  you pay your lights and.  You're a very

18  attractive African American female

19  that's all I got to say.  I would have

20  helped you with your light bills every

21  once in a while and help you with your

22  gas bills every once and a while so I

1      don't want to put it that blunt and that

2      blank because it sound like its, its,

3      its, its just harassment.  It sound like

4      you go to do this and offer me to do

5      that.  Its not that way.  Uh, I don't

6      want it to be taken that way because

7      that's border line of sexual harassment

8      and I don't want to get caught up in

9      that so I rather say it to you uh let

10     your conscience be your guide, let me

11     address it that way.

12         MS. BOSWELL:  Hm, hm.  (Inaudible).

13         MR. GUMBAYTAY:  I all I got to say

14     (inaudible) but I, I personally don't

15     want you to feel that way that that's

16     what its all about but if you

17     misunderstood and that was a terrible

18     misunderstanding I will take care of the

19     first month rent next month and I have

20     no problem with that and then you and

21     your mom you all just pool you all

11

1        resources together that's 275 a piece.

2        And we'll just move on.

3            MS. BOSWELL:  Hm, hm.

4            MR. GUMBAYTAY:  I mean if you, I

5        mean because I, I thought I made it

6        perfectly clear but don't use that word

7        that bluntly like that because that,

8        that's borderline sexual harassment and

9        I don't want nobody to say well this man

10       said if I don't do this with him if I

11       don't do that with him then I got to pay

12       450, 550 a month, no I'm not saying that

13       so I be willing to help you out if you

14       needed the help over there and there

15       will be a base that at the same time uh,

16       we can both benefit in more ways then

17       one but it, putting the way you putting

18       it, it just sound too, too, too harsh.

19           MS. BOSWELL:  No, I mean no,

20       I'm not putting it like (inaudible).

21           MR. GUMBAYTAY:  You know if

22       you don't want to give me no sex, if you

12

```
1       don't have sex with me then you can't

2       live there for no 450 I, I don't

3       (inaudible).

4            MS. BOSWELL:  I mean it.

5            MR. GUMBAYTAY:  That's got to be.

6       I, I, I.

7            MS. BOSWELL: I mean what I'm saying

8       cause (inaudible) I'm trying cause to

9       look at it like you saying I meant to

10      get it so I'm trying how let me see

11

12       actually.

13           MR. GUMBAYTAY:  (Inaudible)

14      somebody else or somebody else around

15      you?

16           MS. BOSWELL:  Oh, no.  Ain't

17      nobody, no, ain't no body around me.

18      No.

19           MR. GUMBAYTAY:  Okay but lets go

20      back to square, when I first met you, I

21      said yes, I'll rent this house for you

22      at 1250 then cause there's a lot of work
```

13

| | |
|---|---|
| 1 | to be done. And the first thing came |
| 2 | out your mouth we can do that. I got |
| 3 | cousin, niece and nephew (inaudible) |
| 4 | I'll tell you what, what let, let all |
| 5 | your cousins tell me what it gonna take |
| 6 | cause the done and would knock if off |
| 7 | your rent and I'll rent you the house so |
| 8 | that's 600 and I'll rent that for you |
| 9 | for 550 a month and I'll just take $100 |
| 10 | a month off and your uncle say well that |
| 11 | may, may, may be more than that well you |
| 12 | tell me what it's gonna cost to get it |
| 13 | done. |
| 14 | MS. BOSWELL: Exactly. |
| 15 | MR. GUMBAYTAY: Then I just called |
| 16 | the landlord and we just take $100 a |
| 17 | month off for a year. |
| 18 | MS. BOSWELL: Yeah. |
| 19 | MR. GUMBAYTAY: I would've make, I |
| 20 | would have and if that didn't work out |
| 21 | now so look I got another house so that |
| 22 | was that and that didn't work over there |

1       then you all go ahead and clean up,

2       clean up.  And then we'll take off all

3       of this for you, for utilities, we'll

4       take off this for your first month rent

5       cause you and your mom you all went in

6       and cleaned it up.  I said okay we'll

7       just cut that in half and we'll just

8       take off clear off some your deposit

9       money.  But other than that there wasn't

10      any other thing that could be done in

11      that house that's gonna carry you for

12      six months or carry you 12 months, I

13      couldn't negotiate with the landlord.

14      That's what I said I gotta turn that

15      lease into him but I said to you using a

16      nice way if you need some help from a,

17      from a, you know a fine young lady like

18      you don't have no business goin' broke

19      and goin' through no change and struggle

20      over there.  I said let me help you out,

21      you waiting for me to help you out so I

22      helped you, you waiting for me to help

1    you out and you know I helped you out

2    and at the same time just come and see

3    me every once and a while okay. I hear

4    yeah, I understand.  But suddenly the

5    way you put it that's kind of really

6    blunt and direct and I don't want you

7    thinking that way so you know just to,

8    the only things up you misunderstood

9    that, the (inaudible) I take care of the

10    first two months rent at no cost you

11    gotta do nothing cause I ain't, I'm not

12    the kind of brother that harass nobody

13    or, or bother nobody I don't want a

14    female to think that you can't live in

15    one of my houses unless you have sex

16    with me.  I'm not Ray Charles.

17        MS. BOSWELL:  Hm, hm.  Yeah.

18        MR. GUMBAYTAY:  You know, you know

19    well Ray Charles say you know you what

20    (inaudible) Ray let you go you got, got

21

22    to (inaudible) Ray.

```
1              MS. BOSWELL:  Hm, hm.

2              MR. GUMBAYTAY:  No, I ain't Ray

3       Charles I'll pay for the next two months

4       `cause I want to back up outta this if

5       that's what you thought and that's what

6       you assume because I am a respectful

7       feeling of that way.

8              MS. BOSWELL:  Hm, Hm.

9              MR. GUMBAYTAY:  But I thought it

10      was a mutually but here again you know

11      its not what I said, what you said and

12      what we thought each other said, the

13      indication but I'm gonna clear that up

14      right now.

15             MS. BOSWELL:  Yeah.

16             MR. GUMBAYTAY:  But Gumbaytay

17      trying to hurt nobody I told you that,

18      you ain't gotta do anything you don't

19      want to do you a female, I respect

20      females, I ain't trying to harass

21      nobody, ain't trying to have nobody say

22      you come and get up under me, I'll take
```

17

1    care of your rent, I don't want it to be

2    like that.

3         MS. BOSWELL:  Exactly.

4         MR. GUMBAYTAY:  I'll take care of

5    it for the next two months you ain't

6    gonna worry about it doing nothing for

7    me or coming to see me but that's when

8    that third month you and your mom just

9    get your act together and you know what

10   I'm saying.  Just before with that kind

11   of problem I don't need that kind of

12   problem.

13        MS. BOSWELL:  Hm, hm.

14        MR. GUMBAYTAY:  `Cause I ain't that

15   kind of brother.

16        MS. BOSWELL:  Yeah, well lets try

17   cause I miss, you know, like men make

18   pass at me and I, you know, what I'm

19   saying.

20        MR. GUMBAYTAY:  Well that was

21   really strong then girlfriend  that's

22   (inaudible) its like you got no business

1    struggling.  Let a brother help a sister

2    out over there.  And I said yeah your

3    (inaudible) with you, I know you need a

4    sugar daddy.

5         MS. BOSWELL:  Hm.

6         MR. GUMBAYTAY:  And I said I'll let

7    you, you know, I, I'll let you, I'll pay

8    your rent for you, you know pay part of

9    your rent.

10         MR. BOSWELL:  Yeah.

11         MR. GUMBAYTAY:  But you, and your

12    mother was sitting there cause your ma

13    saying it, when I was, we were sitting

14    there together I knew (inaudible) find

15    me one.

16         MS. BOSWELL:  Yeah.

17         MR. GUMBAYTAY:  You know so that

18    was cause I, cause after mom I find

19    little sister you don't mind if I take

20    care of your daughter if she grown.

21         MS. BOSWELL:  Yeah, you know but

22    like I say I rode that road everyday.

19

1    MR. GUMBAYTAY:  But ain't nobody

2    really gonna put it in writing but I put

3    it in writing and I said you 450 lease

4    and there's a 550 lease that's why I

5    went on saying about the 550 one you got

6    to sign on off on it cause I can send

7    that man that lease.

8    MS. BOSWELL:  Hm.

9    MR. GUMBAYTAY:  But please don't

10   let no one every think its, that, that

11   kind of a demand that kind of pressure

12   on my sister over there you have to do

13   anything that you don't want to do

14   beyond your (inaudible) I can't, that

15   ain't my style.

16   MS. BOSWELL:  Yeah.

17   MR. GUMBAYTAY:  You know all

18   sweating off a sister like little

19   (inaudible) no women like that you know

20   I ain't never said, ain't never did

21   nothing like that the ways said nothing

22   to a woman that way but if I'm gonna get

1   fresh and old man's gonna get fresh but

2   that was a real sincere offer because

3   you a nice lookin' lady.

4       MS. BOSWELL:  Yeah.

5       MR. GUMBAYTAY:  You if a man that

6   want to help take care of you and your

7   kids so that's you offering a little

8   (inaudible) you know what I'm saying.

9   That you, you may not need that kind of

10  help but I don't have no problem with

11  that uh, uh, uh, Yolanda.

12      MS. BOSWELL:  Hm, hm.

13      MR. GUMBAYTAY:  No problem with the

14  manager, you can call me and say

15  (inaudible).

16      MS. BOSWELL:  Hm, hm.

17      MR. GUMBAYTAY:  So that.  We do

18  have an understanding when I say I back

19  all that up baby, you misunder

20  (phonetic), I misunderstood but I hope

21  you, that we, we, we, we gonna fall off

22  and be no bad terms but talking

1    occasions the best thing in the world

2    and that like and I don't have no

3    problem with men the big (inaudible)

4    over there.  I ain't go no business

5    getting up in your business where you go

6    when you coming back, who you been with

7    and I ain't gonna sweat a sister like

8    that.

9         MS. BOSWELL:  Yeah.

10        MR. GUMBAYTAY: But if you don't

11   then

12   I misunderstood I promise you I take

13   care of your rent for the next two

14   months at 450 rate on that third month,

15   then I, I'm gonna leave it up to you for

16   a minute.  But I, I, I, so I make up for

17   that for the two months you should be

18   able to get it together I hope.

19        MS. BOSWELL:  Hm.

20        MR. GUMBAYTAY:  `Cause I'm saving

21   you 200 this next two months.

22        MS. BOSWELL:  Yeah.

23        MR. GUMBAYTAY:  You know $10 that

24   you can put aside, $20 you know 25

1    there, so when you come when it be

2    October and it'll be November, it be

3    January and your money should be coming

4    in by then.  She should have some sort

5    of income coming in and you only talking

6    about (Inaudible) dollars a month

7    between you and you mom.

8         MS. BOSWELL:  Yeah.

9         MR. GUMBAYTAY:  But I can't, I

10   can't afford to pay them all that, that,

11   too, a hundred for more then that

12   darling.  But if I ask you for fringe

13   benefit well hey I be on.  The kids

14   (inaudible) the man, kids motivate himto

15   do things that he wouldn't normally do.

16        MS. BOSWELL:  Hm, hm.

17        MR. GUMBAYTAY:  Is, is we.

18        MS. BOSWELL:  Yeah.  (Inaudible).

19        MR. GUMBAYTAY:  You know if,

20   if that's what, that interests you now

21   you (inaudible) just say yes and no.  I

22   ain't gonna be mad at you.

23        MS. BOSWELL:  Hm. yeah, I don't

24   know (inaudible).

23

1      MR. GUMBAYTAY:  Well just go.

2         MS. BOSWELL:  I ain't gonna be.

3      MR. GUMBAYTAY:  Well I ain't

4   begging you for anything.  See.

5         MS. BOSWELL:  Yeah.

6      MR. GUMBAYTAY:  I got no problem

7   with it come January and its 2007 uh,

8   you know that, that, that 550 in there

9   and you got to hear from me if there's

10   any problems over there.

11         MS. BOSWELL:  Oh.

12      MR. GUMBAYTAY: `Cause I, I want to

13   make sure I ain't tryin' to harass

14   nobody like that.

15         MS. BOSWELL:  Yeah, yeah, but I'm

16   gonna call you when I.

17      MR. GUMBAYTAY:  Okay.

18         All right later.

19         MS. BOSWELL: Okay.

20            *     *     *     *     *     *

21

22

23

24

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

CERTIFICATE OF TRANSCRIBER

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF SUFFOLK    )

    I, JOANNE VAILLANCOURT, state that I transcribed the recording of the foregoing proceeding pages fully and accurately to the best of my ability and the foregoing typewritten pages constitute the full and complete transcript of said recordings.

Witness our hand on this date: 7/28/08

Transcriber

_Joanne Vaillancourt_
Joanne Vaillancourt

Sworn to before me on:

7/28/08

_Janet Reardon_
Notary Public

Janet Reardon
Notary Public, State of New York
No. 01RE6074687
Qualified in Suffolk County
Term Expires May 20, 2010

Exhibit J, 2:07-cv-135

### NOTICE OF DEFAULT IN PAYMENT OF RENT
### WARNING PRIOR TO DEMAND TO PAY OR TERMINATE
### RESIDENTIAL LEASE

TO: Tenant(s): _Yalanda Boswell_ FROM: Landlord: _____

_0964 N. Gap Loop_     **ELITE ENTERPRISE**
                       **4013 Tiffany Drive**
_Montgomery, AL_       **Montgomery, AL 36110-3003**
_36110_                **(334)202-8676**

Address of Leased Premises: _____

This NOTICE is provided to you regarding the rental payments on the Leased Premises. According to my records, you have not made the rental payment for the month of _December_. This WARNING is to provide you with written information about your rental payments and consequences of your failure to pay timely.

Pursuant to the lease to you, rental payments are due on the _5th_ day of each month. If the payment is not paid by the due date, the rental payment is not paid timely.

If the rental is not paid timely, your Landlord has the right to provide you with a Notice to Pay or Lease Terminates which provides that if you do not pay within the stated notice period, the lease may be terminated and you must vacate the property.

The amount currently due is:

$ _550.00_ Rent for _December_
$ _50.00_ Late Charges _____
$ _____ Other _____
$ ~~600.00~~ Other _____

$ _600.00_ Total (exclusive of future accruing costs

Please pay this amount to me immediately. If you continue to fail to make rental payments timely, I will have no option but to provide a formal notice to pay or terminate.

Signed, this the _14_ day of _December_, 20 _06_

Signed: _____
    Landlord/Lessor or authorized agent

**ELITE ENTERPRISE**
**4013 Tiffany Drive**
**Montgomery, AL 36110-3003**
**(334)202-8676**     -1-

Exhibit K, 2:07-cv-135



**The Elite Real Estate Consulting Group**
Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

Formatted: Right: 0"

Formatted: Indent: Left: -1"

Formatted: Indent: Left: -1", Right: -1"

# WARNING!

### Warning prior to taking further actions

**While visiting your property today on** ___12/24/06___ **(date),** I
**observed the following situation/problem:**

This problem/situation must be corrected within the next five (5) days or an outside contractor will
be hired to resolve this issue. If this action is necessary and carried through, you will be billed for
services on your next month's rent. And, if you refuse to pay such fees, legal action will be taken
against you in accordance with Alabama law to collect these fees.

The item or items listed below was/were observed today and must be corrected within five days.
Please contact me today to inform me of your intention to correct the following checked items.

The tenant is expected to keep the outside of his residence clean and neat including, but not
limited to:

☐   Lawn needs cutting, raking and/or edged
☐   Junked or abandoned vehicles on property
☐   Trash/paper/debris in yard or on lawn
☑   Automobiles parked on lawn
☐   Other ___Rent Due___
      ___100.00___

Thank you,

The Management

SECOND WARNING ABout
CUR PARK ON LAND
$70.00 IF this
HAPPENS again

Exhibit L, 2:07-cv-135

Late Fee FoR
Jan 07 By 26 —
$350⁰⁰ is your total Monthly
Rent...

Let's Talk
JKG
3038676



## The Elite Real Estate Consulting Group
### Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone:
334-202-8676

## FAX TRANSMITTAL FORM

TO: Ms. Yolanda Boseven

CC:

ORGANIZATION:

TELEPHONE:

FAX:

DATE SENT: 01/18/07

TIME SENT:

# OF PAGES INCLUDING COVER PAGE:

FROM: Jamarlo K. GumBayTay, Ph.D., Ed.S.

CELL: (334) 202-8676

☒ URGENT
☒ FOR REVIEW
☐ PLEASE COMMENT
☒ PLEASE REPLY

COMMENTS: Eviction Notice For Non-payments of Rents And late Fees... # per our Conversation on 1/14/07 - we have reviewed our files and determine your lease for $450.00 that you have in your Procession was for your use, @ Dr. In order for them to provide you some additional benefits, Lynn @ Letter perfect and I both allow this to be address in order to help your family. And, I do mean help! generally you would not meet our rental guide lines... Due to all of the collections, Judgements and prior evictions on your Credit Bureau. Nonetheless, we over looked most of these items to help a deperate family in need of shelter. Here's the Facts... Therefore, Contrary to you accounts of harrasements is unfunded. we have turned this matter over to my Attorney in order to pursue defamation of Charractor/slander charges. If you what to suit based on these, Groudless Charges - Then prepare to go to Court in the future.

In the Mean time, Please! review your records, files, receipts to document all payments to us including late fees. Your threats will not and shall not prevent us from Moving Forward with you eviction by Feb 1, 2007...

Exhibit N, 2:07 - cv - 135

## NOTICE OF DEFAULT IN PAYMENT OF RENT
## WARNING PRIOR TO DEMAND TO PAY OR TERMINATE
## RESIDENTIAL LEASE

TO: Tenant(s): _Ms. Yolanda Boswell_ FROM: Landlord: ~~ELITE ENTERPRISE~~
~~4013 Tiffany Drive~~
~~Montgomery, AL 36110-3003~~
~~(334)202-8676~~

Address of Leased Premises: _984 N. Gallop_

This NOTICE is provided to you regarding the rental payments on the Leased Premises. According to my records, you have not made the rental payments for the month of _Oct-Dec 06_. This WARNING is to provide you with written information about your rental payments and consequences of your failure to pay timely.

Pursuant to the lease to you, rental payments are due on the _____ day of each month. If the payment is not paid by the due date, the rental payment is not paid timely.

If the rental is not paid timely, your Landlord has the right to provide you with a Notice to Pay or Lease Terminates which provides that if you do not pay within the stated notice period, the lease may be terminated and you must vacate the property.

The amount currently due is: ( _DUE FOR DEC_ _(500,00)_

$ _400.00 (paid)_ Rent for _Dec 06_ ( _600 00 FOR JAN 07 - paid 500.00_ )
$ _50.00_ Late Charges
$ _50.00_ Other _Shortages_
$ _Back late fees Oct-Sept_ Other _Lease Signed Oct 06 - ENDED Sept 06_
$ _100.00_ Total (exclusive of future accruing costs)

Due Including late Fees

Please pay this amount to me immediately. If you continue to fail to make rental payments timely, I will have no option but to provide a formal notice to pay or terminate.

Signed, this the _18_ day of _Jan_ , 20 _07_ .

Signed: _Amanda K. Kim Bentley_
Landlord/Lessor or authorized agent

_According to our records the following has occurred:_
_If you have records or documentation that says otherwise please provide them._
_* Charge DUE Late fees from Oct - Jan 07 - Rent Due on the 1st Day of each month.. past due after the 5th..._
_* you only paid 400 00 Plus 50.00 late fee For (100.00) past Due_
_* Back rents from Oct 06 - Jan 07 (Rent is 650 00 NOT 450 00 ) ..._

-1-



The Elite Real Estate Consulting Group
Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

<div style="text-align:right">
Formatted: Right: 0"

Formatted: Indent: Left: -1"

Formatted: Indent: Left: -1", Right: -1"
</div>

# WARNING!

## Warning prior to taking further actions

While visiting your property today on ___01/18/07___ (date), I observed the following situation/problem:

This problem/situation must be corrected within the next five (5) days or an outside contractor will be hired to resolve this issue. If this action is necessary and carried through, you will be billed for services on your next month's rent. And, if you refuse to pay such fees, legal action will be taken against you in accordance with Alabama law to collect these fees.

The item or items listed below was/were observed today and must be corrected within five days. Please contact me today to inform me of your intention to correct the following checked items.

The tenant is expected to keep the outside of his residence clean and neat including, but not limited to:

- ☐ Lawn needs cutting, raking and/or edged
- ☑ Junked or abandoned vehicles on property
- ☐ Trash/paper/debris in yard or on lawn
- ☑ Automobiles parked on lawn
- ☑ Other _Late Fees_

*FINED $15.00*
*Must be paid on FEB07 Rent...*

Thank you,
The Management

You have been warned during the Months of NOV06 & Dec 06 (at least one time per month) about parking your Car on the owner's Front & rear yard. Per your Rental agreement you are [now in] violation for a third time and must pay said Fine on or before your next month's Rent. Failure to do so, will terminate this Lease or cause us to take further legal action(s)...

JKG

Exhibit B, 2:07 CV 135

| date | 01/19/07 |
| project | Collections of back rents & Late fees |
| page | 1 OF 3 |

1. Warning Note & Lease Attached

2. Note w/ Items under lined and agreed upon

3. by you as noted with your signature on it.

4.

5. * Short term Lease to be use only For the

6. purpose of Use @ DHR - per your Request

7. Dated 01OCT06 - 01SEP06 - If you have a lease
that reflect something different provide proof. There's

8. this lease you have For $450°° has expired - Your

9. Rent is $550°° Month to Month. Due to your

10. Credit rating and Collections... your deposit was

11. $350°° This unit Rents For $550°° Your land

12. Lord Must pay his Mortgage payment and Me For

13. Services of this house. *(principle, interest, taxes, Insurance, Elite fees)

14. Are all included in the $550°° There's no way we can rent this

15. unit For $450°° and I explain that
to you.

*FILE Eviction Notice
within 7 Days.

*File Law Suite For back
payments within 10 days

JKG



**The Elite Real Estate Consulting Group**
Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone:
334-202-8676

## FAX TRANSMITTAL FORM

TO: Ms. Yolanda Boswell
CC:
ORGANIZATION:
TELEPHONE:
FAX:
DATE SENT: 01/19/07
TIME SENT:
# OF PAGES INCLUDING COVER PAGE:

FROM: Jamarlo K. GumBayTay, Ph.D., Ed.S.
CELL: (334) 202-8676

☑ URGENT
☑ FOR REVIEW
☐ PLEASE COMMENT
☐ PLEASE REPLY

**Grounds For Termination**

COMMENTS: Settlement offered if you bring all late fees and Rent current. According to our records the following Documentation Fees in our files. (See the attached)

☒ Your Rent is due on the 1st day of each month - and deemed late after the 5th. We have no written/verbal agreements that state anything differently. Thus, you late fee's have now gain a total Fee(s) of $300)11Oct06 - Jan07... If you have receipts proving otherwise please copy them then forward them ASAP!

☒ In the event, you do not pay your Rent in Full and on time each month affective per our Lease agreement. Thus, you must move or legal action will without a doubt be taken this month. We will not except any further Rents from you in the future. Don't pay Feb07 Rent - We will not except ANYMORE Rent From you - Have your Attorney Contact us ASAP! In order for us to provide them our legal Counsel Name & Phone Number... Your Harrassment Action is baseless, We will Counter Suite For slander. We tried to help you not harrass you or your Family. You can not live any place For free and/or fair W. Rent.

## ALABAMA RESIDENTIAL LEASE/PURCHASE AGREEMENT

This Residential Lease Agreement (hereinafter "Lease") is entered into this the 1st day of October ,2006 by and between the Lessor: Matthew W. Bahr , (hereinafter referred to as "Landlord"), and the Lessee(s): Yolanda Boswell All Lessees (hereinafter referred to collectively as "Tenant"), are jointly, severally and individually bound by, and liable under, the terms and conditions of this Lease.

For the valuable consideration described below, the sufficiency of which is hereby acknowledged, Landlord and Tenant do hereby covenant, contract and agree as follows:

1. GRANT OF LEASE: Landlord does hereby lease unto Tenant, and Tenant does hereby rent from Landlord, solely for use as a personal residence, excluding all other uses, the personal residence located in Montgomery County, Alabama, with address of- 964 North Gap Loop, Montgomery, AL 36110

including the following items of personal property: N/A

2. NATURE OF OCCUPANCY: As a special consideration and inducement for the granting of this Lease by the Landlord to the Tenant, the personal residence described above shall be used and occupied only by the members of the Tenant's family or others whose names and ages are set forth below:

3. TERM OF LEASE: This Lease shall commence on the 1st day of October ,2006 and extend until its expiration on the 30th day of September ,2006 , unless renewed or extended pursuant to the terms herein. Expired. Short term Lease for DHR purpose.

4. SECURITY DEPOSIT: Upon execution of this Lease, Tenant shall deposit the sum of $ 350.00 to be held by Landlord as a security deposit for reasonable cleaning of, and repair of damages to, the premises upon the expiration or termination of this Lease, or other reasonable damages resulting from a default by Tenant. Tenant shall be liable to Landlord for all damages to the leased premises upon the termination of this Lease, ordinary wear and tear excepted. Tenant is not entitled to interest on the security deposit. Tenant may not apply the security deposit to any rent due under this Lease. If Landlord sells or assigns the leased premises, Landlord shall have the right to transfer Tenant's security deposit to the new owner or assignee to hold under this Lease and upon so doing Landlord shall be released from all liability to Tenant for return of said security deposit.

Upon expiration or termination of this Lease, the security deposit shall be applied as follows: The Landlord, by written notice delivered to the Tenant, may claim of such payment or deposit only such amounts as are reasonably necessary to remedy the Tenant's defaults in the payment of rent, to repair damages to the premises caused by the Tenant, exclusive of ordinary wear and tear, to clean such premises upon termination of the tenancy, or for other reasonable and necessary expenses incurred as the result of the Tenant's default, if the payment or deposit is made for any or all of those specific purposes. The written notice by which the Landlord claims all or any portion of such payment or deposit shall itemize the amounts claimed by such Landlord. Any remaining portion of such payment or deposit shall be returned to the Tenant no later than forty-five (45) days after the termination of his tenancy, the delivery of possession and written demand by the Tenant including Tenant's forwarding address.

5. RENT PAYMENTS: Tenant agrees to pay rent unto the Landlord during the term of this Lease in equal monthly installments of $ 350.00 , said installment for each month being due and payable on or before the 1st day of the month, the first full rent payment under this Lease being due on the 1st day of October , 2006

Tenant agrees that if rent is not paid in full on or before the 5th day of the month, Tenant will pay a late charge of $ 50.00 as allowed by applicable Alabama law.

The prorated rent from the commencement of this Lease to the first day of the following month is $ N/A , which amount shall be paid at the execution of this Lease.

Tenant agrees that rent shall be paid in lawful money of the United States by (indicate those that apply):
☒ cash, ☐ personal check, ☒ money order, ☒ cashier's check, ☒ other _deposit to Wachovia Bank_
Rent payments shall be made payable to Jamarlo K. GumBayTay, Agent_____ and mailed or delivered to the
following address: 300 Madison Avenue, Montgomery, AL 36104 (Wachovia Bank)_____ All notices from
Tenant to Landlord under this Lease and applicable Alabama law shall be delivered. to the above address.

Tenant agrees that rent monies will not be considered paid until Landlord or Landlord's agent receives the rent monies, either
by mail or by delivery to the above address. Tenant placing rent monies in the mail is not sufficient for rent to be considered
paid, and rent will be considered unpaid until actual receipt thereof.

If there are multiple Tenants signed to this Lease, all such Tenants are jointly, severally and individually bound by, and liable
under, the terms and conditions of this Lease. A judgment entered against one Tenant shall be no bar to an action against other
Tenants.

6. CONSEQUENCES OF BREACH BY TENANT: If Tenant, by any act or omission, or by the act or omission of any of
Tenant's family or invitees, licensees, and/or guests, violates any of the terms or conditions of this Lease or any other
documents made a part hereof by reference or attachment, Tenant shall be considered in breach of this Lease (breach by one
tenant shall be considered breach by all tenants where Tenant is more than one person).

As per Alabama Code § 35-9-6, when Tenant breaches any of the terms of a lease, the Landlord may elect to terminate the lease
and evict Tenant, in which case Landlord must give a minimum ten (10) day written notice to Tenant of termination of the lease
and that Tenant must quit, and deliver up, the leased premises by the expiration of the period of notice. Tenant may or may not
be given a chance to cure the breach within the period of notice.

Tenant expressly agrees and understands that upon Landlord's termination of this Lease, the entire remaining balance of unpaid
rent for the remaining term of this Lease shall ACCELERATE, whereby the entire sum shall become immediately due,
payable, and collectable, Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and
repairs as a partial offset to satisfaction of the accelerated rent.

7. DELIVERY OF NOTICES: Any giving of notice under this Lease or applicable Alabama law shall be made by Tenant
in writing and delivered to the address noted above for the payment of rent, either by hand delivery or by mail. Certified or
registered mail is recommended. Delivery by mail shall not be considered complete until actual receipt by Landlord or
Landlord's agent.

Any notices from Landlord to Tenant shall be in writing and shall be deemed sufficiently served upon Tenant when deposited in
the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed
in Tenant's mailbox. If Tenant is more than one person, then notice to one shall be sufficient as notice to all.

8. UTILITIES: Tenant will provide and pay for the following utilities (indicate those that apply):
☒ Electric, ☒ Gas, ☒ Telephone, ☒ Cable Television, ☒ Water, ☒ Garbage pick-up.

Landlord will provide and pay for the following utilities (indicate those that apply):
☐ Electric, ☐ Gas, ☐ Telephone, ☐ Cable Television, ☐ Water, ☐ Garbage pick-up.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any
utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the
leased premises back unto Landlord upon termination or expiration of this Lease.

9. NOTICE OF INTENT TO SURRENDER: Any other provision of this lease to the contrary notwithstanding, at least
thirty (30) days prior to the normal expiration of the term of this Lease as noted under the heading TERM OF LEASE above,
Tenant shall give written notice to Landlord of Tenant's intention to surrender the residence at the expiration of the Lease term.
If said written notice is not timely given, the Tenant shall become a month-to-month tenant as defined by applicable Alabama
law, and all provisions of this Lease will remain in full force and effect, unless this Lease is extended or renewed for a specific
term by written agreement of Landlord and Tenant.

if Tenant becomes a month-to-month tenant in the manner described above, Tenant must give a thirty (30) day written notice to the Landlord of Tenant's intention to surrender the residence. At any time during a month-to-month tenancy Landlord may terminate the month-to-month Lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable Alabama law. Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

10. OBLIGATIONS AND DUTIES OF LANDLORD:

Landlord shall:

(a) Comply with the requirements of applicable building and housing codes materially affecting health and safety;

(b) Maintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease, reasonable wear and tear excluded, unless the dwelling unit, its plumbing, heating and/or cooling system is damaged or impaired as a result of the deliberate or negligent actions of the Tenant or those present with Tenant's knowledge or permission.

I 1. OBLIGATIONS AND DUTIES OF TENANT:

Tenant shall:

(a) Keep that part of the premises that he occupies and uses as clean and as safe as the condition of the premises permits;

(b) Dispose from his dwelling unit all ashes, rubbish, garbage and other waste in a clean and safe manner in compliance with community standards;

(c) Keep all plumbing fixtures in the dwelling unit used by the Tenant as clean as their condition permits;

(d) Use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances, including elevators, in the premises;

(e) Not deliberately or negligently destroy, deface, damage, impair or remove any part of the premises or knowingly permit any other person to do so;

(f) Conduct himself and require other persons on the premises with his consent to conduct themselves in a manner that will not disturb his neighbors' peaceful enjoyment of their premises;

(g) Inform the Landlord of any condition of which he has actual knowledge which may cause damage to the premises;

(h) To the extent of his legal obligation, maintain the dwelling unit in substantially the same condition, reasonable wear and tear excepted, and comply with the requirements of applicable building and housing codes materially affecting health and safety;

(i) Not engage in any illegal activity upon the leased premises as documented by a law enforcement agency;

0) Keep no pets of any kind, except by written consent  · upon the leased premises, or in any common area.

Tenant agrees that any violation of these provisions shall be considered a breach of this Lease.

12. NO ASSIGNMENT: Tenant expressly agrees that the leased premises nor any portion thereof shall not be assigned or sub-let by Tenant without the prior written consent of Landlord.

13. TENANT INSURANCE: Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not proximately caused by Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages proximately caused by any other source whatsoever, or by Acts of God, and Tenant is therefore strongly encouraged to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from any and all damages.

14. CONDITION OF LEASED PREMISES: Tenant hereby acknowledges that Tenant has examined the leased premises prior to the signing of this Lease, or knowingly waived said examination. Tenant acknowledges that Tenant has not relied on any representations made by Landlord or Landlord's agents regarding the condition of the leased premises and that Tenant takes premises in its AS-IS condition with no express or implied warranties or representations beyond those contained herein or required by applicable Alabama law. Tenant agrees not to damage the premises through any act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for non-payment identical to those for non-payment of rent described herein. At the expiration or termination of the Lease. Tenant shall return the leased premises in as good condition as when taken by Tenant at the commencement of the lease, with only normal wear-and-tear excepted. Tenant shall have the right to remove from the premises Tenant's fixtures placed thereon by Tenant at his expense, provided, however, that Tenant in effecting removal, shall restore the leased premises to as good, safe, sound, orderly and sightly condition as before the addition of Tenant's fixture. Failing this, Tenant shall be obligated to pay for repairs as stated above.

15. ALTERATIONS: Tenant shall make no alterations, decorations, additions, or improvements to the leased premises without first obtaining the express written consent of Landlord. Any of the above-described work shall become part of the dwelling. If carried out by independent contractors, said contractors must be approved by Landlord. Tenant shall not contract for work to be done without first placing monies sufficient to satisfy the contract price in an escrow account approved by Landlord. All work shall be done at such times and in such manner as Landlord may designate. If a construction or mechanic's lien is placed on the leased premises as a result of the work, such shall be satisfied by Tenant within ten (10) days thereafter at Tenant's sole expense. Tenant shall be considered in breach of this Lease upon failure to satisfy said lien.

16. NO ILLEGAL USE: Tenant shall not perpetrate, allow or suffer any acts or omissions contrary to law or ordinance to be carried out upon the leased premises or in any common area. Upon obtaining actual knowledge of any illegal acts or omissions upon the leased premises, Tenant agrees to immediately inform Landlord and the appropriate authorities. Tenant shall bear responsibility for any and all illegal acts or omissions upon the leased premises and shall be considered in breach of this Lease upon conviction of Tenant or any of Tenant's family or invitees, licensees, and/or guests for any illegal act or omission upon the leased premises- whether known or unknown to Tenant.

17. NOTICE OF INJURIES: In the event of any significant injury or damage to Tenant, Tenant's family, or Tenant's invitees, licensees, and/or guests, or any personal property, suffered in the leased premises or in any common area, written notice of same shall be provided by Tenant to Landlord at the address designated for delivery of notices (identical to address for payment of rent) as soon as possible but not later than five (5) days after said injury or damage. Failure to provide such notice shall constitute a breach of this Lease.

18. LANDLORD'S RIGHT TO MORTGAGE: Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any document(s) related to the Landlord's right to subject the premises to a mortgage or other lien.

19. DELAY IN REPAIRS: Tenant agrees that if any repairs to be made by Landlord are delayed by reasons beyond Landlords control, there shall be no effect on the obligations of Tenant under this Lease.

20. ABANDONMENT: Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any owing monies remain unpaid- whereupon Tenant will be considered in breach of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease or applicable Alabama law, except that in case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable Alabama law, and terminate this Lease without notice to Tenant.

21. NOTICE OF ABSENCE FROM PREMISES: If Tenant is to be absent from the leased premises for seven (7) or more consecutive days, written notice of such should be served upon Landlord. If such absences are to be customary or frequent, the expected frequency and duration of absence should be summarily noted here: N/A

Tenant expressly agrees and understands that absence from the premises, with or without notice, in no way obviates the requirement to pay rent and other monies as stated herein, or the consequences of failure to timely pay same.

22. POSSESSION OF PREMISES: Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises designated for lease is vacated by the prior tenant.

23. DELAY OF POSSESSION: Tenant expressly agrees that if by reason of the premises being unready for occupancy, or by reason of the previous tenant or occupant of the dwelling holding over, or as a result of any other cause whatsoever, Tenant is unable to enter and occupy the premises, Landlord shall not be liable to Tenant in damages, but shall abate the rent for the period in which the Tenant is unable to occupy the premises.

24. MATERIALITY OF APPLICATION TO RENT: All representations made by Tenant(s) on the Application to Rent (or Retitled document) are material to the grant of this Lease, and the Lease is granted only on condition of the truthfulness and accuracy of said representations. If a failure to disclose or lack of truthfulness is discovered on said Application, Landlord may deem Tenant to be in breach of this Lease.

25. MODIFICATION OF THIS LEASE: Any modification of this lease shall not be binding upon Landlord unless in writing and signed by Landlord or Landlord's authorized agent. No oral representation shall be effective to modify this Lease. If, as per the terms of this paragraph, any provision of this lease is newly added, modified, or stricken out, the remainder of this Lease shall remain in full force and effect.

26. REMEDIES NOT EXCLUSIVE: The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable Alabama law.

27. SEVERABILITY: If any provision herein, or any portion thereof, is rendered invalid by operation of law, judgment, or court order, the remaining provisions and/or portions of provisions shall remain valid and enforceable and shall be construed to so remain.

28. NO WAIVER: The failure of Landlord to insist upon the strict performance of the terms, covenants, and agreements herein shall not be construed as a waiver or relinquishment of Landlord's right thereafter to enforce any such term, covenant, or condition, but the same shall continue in full force and effect. No act or omission of Landlord shall be considered a waiver of any of the terms or conditions of this Lease, nor excuse any conduct contrary to the terms and conditions of this Lease, nor be considered to create a pattern of conduct between the Landlord and Tenant upon -which Tenant may rely upon if contrary to the terms and conditions of this Lease.

29. ATTORNEY FEES: In the event that Landlord employees an attorney to collect any rents or other charges due hereunder by Tenant or to enforce any of Tenant's covenants herein or to protect the interest of the Landlord hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby.

30. HEIRS AND ASSIGNS: It is agreed and understood that all covenants of this lease shall succeed to and be binding upon the respective heirs, executors, administrators, successors and, except as provided herein, assigns of the parties hereto, but nothing contained herein shall be construed so as to allow the Tenant to transfer or assign this lease in violation of any term hereof.

31. DESTRUCTION OF PREMISES: In the event the leased premises shall be destroyed or rendered totally -untenable by fire, windstorm, or any other cause beyond the control of Landlord, then this Lease shall cease and terminate as of the date of such destruction, and the rent shall then be accounted for between Landlord and Tenant up to the time of such damage or destruction of said premises as if being prorated as of that date. In the event the leased premises are damaged by fire, windstorm or other cause beyond the control of Landlord so as to render the same partially untenable, but repairable within a reasonable time, then this lease shall remain in force and effect and the Landlord shall, within said reasonable time, restore said

promises to substantially the condition the premises were in prior to said damage, and there shall be an abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises.

32. **EMINENT DOMAIN:** In the event that the leased premises shall be taken by eminent domain, the rent shall be prorated to the date of taking and this Lease shall terminate on that date.

33. **LANDLORD ENTRY AND LIEN.** In addition to the rights provided by applicable Alabama law, Landlord shall have the right to enter the leased premises at all reasonable times for the purpose of inspecting the same and/or showing the same to prospective tenants or purchasers, and to make such reasonable repairs and alterations as may be deemed necessary by Landlord for the preservation of the leased premised or the building and to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease. Landlord shall give reasonable notice of intent to enter premises except in the case of an emergency. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

34. **GOVERNING LAW:** This Lease is governed by the statutory and case law of the State of Alabama.

35. **LEAD-BASED PAINT DISCLOSURE: HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD-BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN. BEFORE RENTING PRE-1978 HOUSING, LESSORS MUST DISCLOSE THE PRESENCE OF KNOWN LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS IN THE DWELLING. LEASES MUST ALSO RECEIVE A FEDERALLY APPROVED PAMPHLET ON LEAD POISONING PREVENTION.**

Landlord states as follows: [Landlord check one]

☐ The leased premise was constructed in 1978 or later.

☒ The leased premise was constructed prior to 1978. Landlord has conformed with all federal requirements regarding lead-based paint disclosure including the completion and mutual signing with Tenant and any agents, of the Lead-Based Paint Disclosure Form attached hereto and incorporated into this lease as a part hereof. All associated information required by the Disclosure form (if any) was furnished to Tenant, and Tenant received the EPA pamphlet "Protect Your Family from Lead in Your Home."

36. **ADDITIONAL PROVISIONS:**

_____
_____
_____
_____
_____
_____

\* \* \*

<u>WITNESS THE SIGNATURES OF THE PARTIES TO THIS RESIDENTIAL LEASE AGREEMENT:</u>

LANDLORD   Matthew W. Bahr, Lessor

Sign: _Jamarlo K GumBayTay_    Print: Jamarlo K. GumBayTay, Agent    Date: _10/11/06_

TENANT

Sign: _____    Print: Yolanda Boswell, Lessee    Date: _10/11/06_

Addendum to Lease for 964 North Gap Loop, Montgomery, AL 36110

The tenant is expected to keep the outside of his residence clean and neat including but not limited to:

☐    Lawn should be kept cut, raked and edged

☐    No junked or abandoned vehicles on property

☐    No trash/paper/debris in yard or on lawn

☐    No automobiles parked on lawn

☐    Other _____

If any of these problems should be brought to the attention of the tenant, and nothing is done in five (5) days, Agent is authorized hire an outside contractor to resolve the issue. If this action has to be taken, you will be billed for these services on your next month's rent. If you refuse to pay such fees, legal action will be taken against you in accordance with Alabama Laws.

Signed: _____
         Yolanda Boswell, Lessee

Date: _____

**ELITE ENTERPRISE**
4013 Tiffany Drive
Montgomery, AL 36110-3003
(334)202-8676

# Notice to Pay Rent or Quit

Date: 02/06/07

To: Yolanda Boswell                     964 Gap Loop, Montgomery, AL 3611
_____Tenant_____                    _____Address_____

Notice to you and all others in possession of the below premises, that you are hereby notified to vacate, quit and deliver the premises you hold as our tenant, namely: (Describe premises) 3 Bedroom - Two Baths 1 story Brick home ... Located @ 964 N. Gap Loop, Mont, AL 36110

You are to deliver said premises on or within __07__ days (excluding date of service, Saturday, Sunday, and legal holidays, and not fewer than three days) of receipt of this notice, pursuant to the applicable state law of __ALABAMA__

This notice is provided due to non-payment of rent. The present rent arrearage is in the amount of _____ _____ Dollars ($ _____ ) according to the below account. All Rent Due For FEB 07 - Plus Late Fees Past Due Rents & Late Fees addressed in your First Notice provided to you in JAN 07

You may reinstate your tenancy by full payment of said arrears within __07__ days (excluding date of service, Saturday, Sunday, and legal holidays) to wit: on or before the __13th__ day of __FEB 07__ 20 __07__, as provided under the terms of your tenancy or by applicable state law. In the event you fail to bring your rent payments current or vacate the premises, we shall immediately take legal action to evict you and to recover rents and damages for the unlawful detention of said premises together with such future rents as may be due us for breach of your tenancy agreement.

Owner: _____

By (Agent): _____

Address: **ELITE ENTERPRISE**
4013 Tiffany Drive
Montgomery, AL 36110-3003

Telephone Number: (334)202-8676

*Final Notice*

**ELITE ENTERPRISE**
4013 Tiffany Drive
Montgomery, AL 36110-3003
(334)202-8676

# The Elite Real Estate Consulting Group
## Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

*Exhibit T, 2:07 - CV- 135*

### PROOF OF DELIVERY

A copy of this Notice was delivered to Tenant: *Yolanda Boswell (Jenette Boswell)*

☒ by hand

☐ by registered/certified mail at that above address, which is:
  ☒ the place designated by Tenant for receipt of communication *Legal Services of*
  ☐ Tenant's last known place of residence *Alabama*

☐ by posting prominently on the front door of the leased premises.

Notice delivered/mailed/posted by: *Jamarlo K. Gumbaytay*

Jamarlo K. Gumbaytay

In his/her capacity as:    ☐ Landlord/Lessor    ☒ Manager    ☐ Agent

Notice delivered/mailed/posted on: *12 June 07*

*Delivered to*
*X Legal Srvices Alabama*
*Montgomery office*
*200 Montgomery Street. Ste 1100*
*Montgomery, Alabama 36104*

*X Pamela A. Martin — Administrative Asst*
*Signature    Received by (office personell's name)*

*X Pamela A. Martin*
*PRINT NAME HERE —*



## The Elite Real Estate Consulting Group
### Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

## 7-DAY NOTICE OF TERMINATION OF RESIDENTIAL LEASE

TO:  Tenant:    Ms. Yolanda Boswell          FROM:   Landlord  Matthew Bahr
                 LSA Case No. 07-0004398                        Dr. Jamarlo K. GumBayTay, Rep.
                 964 North Gap Loop                             Elite Real Estate Consulting Group
                 Montgomery, AL 36110                           East Estate Management
                                                                4013 Tiffany Drive
                                                                Montgomery, AL 36110

Address of Leased Premises:     964 North Gap Loop Road, Montgomery, AL 36110

TAKE NOTICE: your Lease is hereby terminated due to your default under the terms and conditions of said Lease Agreement, by reason of the following breach of breaches thereof:

Late Fees (February – May 2007) plus, May 2007 rent has not been paid as of 29 May 2007. Thus, you are not in compliance with the terms of your lease and the Federal Court Decree. Please be advised, said rent must be paid as soon as possible! Moreover, late fees to the expiration of this notice (7 days) or legal action will be taken.

You must vacate and surrender the leased premises unto Landlord within the seven (7) day notice period, said notice expiring at:

12 p.m. o'clock on the 20th day of June, 2007.

You must completely vacate the premises by the above-stated deadline.

THIS NOTICE OF TERMINATION IS GIVEN PURSUANT TO APPLICABLE LAW AND IN NO WAY IMPAIRS ANY OF THE OTHER REMEDIES OR RIGHTS OF THE LANDLORD UNDER THE LEASE AGREEMENT OR UNDER APPLICABLE LAW.

Issued this the 12th day of June, 2007

Signed: _Jamarlo K. GumBayTay_ 30 JUNE 07
            Authorized Agent

cc:    Legal Services Alabama

## The Elite Real Estate Consulting Group
### Real Estate Management
4013 Tiffany Drive
Montgomery, Alabama 36110-3003

Fax:
334-241-5986

Cellular Phone
334-202-8676

## NOTICE OF BREACH OF SPECIFIC PROVISIONS OR WRITTEN LEASE WITH NO RIGHT TO CURE RESIDENTIAL

TO: Tenant:  Ms. Yolanda Boswell          LSA Case No. 07-0004398
964 North Gap Loop          2:07CV135-WKW
Montgomery, AL 36110

Address of Leased Premises:      964 North Gap Loop Road, Montgomery, AL 36110

This NOTICE is provided to you regarding the lease of the above identified leased premises. You are advised that you are in violation of the following provision(s) of the lease:

Act No. 2006 316 HB 287, Division II/Landlord Remedies 35-9A-421. Non-compliance with rental agreement failure to pay rent.

The reason you are in breach of the provision above is the following:

(b) If rent is unpaid when due and the tenant fails to pay rent within seven (7) days after receipt of written notice to terminate the lease for nonpayment and if the rent is not paid within the 7-day period, the Landlord may terminate the lease, page #29.

Pursuant to the lease, you are provided with this written notice of the breach and termination of the lease due to the breach. Due to the nature of the breach and in accordance with the lease provisions, there is no right to cure this default. This lease is therefore terminated effective seven days from the date of your receipt of this notice. Please vacate the premises and provide the keys to me by the termination date.

Signed this the *12th* day of ___June___, 2007

Signed: _____
Jamarlo K. GumBayTay
Authorized Agent

**NEXTEL** |™

## > ACCOUNT INFORMATION

| | |
|---|---|
| Account Name | Invoice Date |
| YOLANDA BOSWELL | October 23, 2006 |
| Account Number | |
| ~~████~~ | Total Amount Due |
| | **$265.12** |

## > MONTHLY INVOICE SUMMARY

### September 19 - October 18, 2006

| | |
|---|---|
| Previous Balance | 137.04 |
| **Outstanding Balance - Due Upon Receipt** | **$137.04** |
| Access and Related Items | 100.41 |
| Cellular Services | 15.30 |
| Additional Nextel Charges | 4.73 |
| Government Fees and Taxes | 7.64 |
| *Total Current Charges for 457449188 Due 11/03/06 | **$128.08** |
| Total Amount Due | **$265.12** |

## > CUSTOMER CARE

**Register and Logon**
www.nextel.com

**Call Nextel**
1-888-566-6111

## > PAYMENT OPTIONS

 **To Pay Your Bill Online Go To**
www.nextel.com/mynextel
Sign up for Recurring Direct Debit!

 **To Pay Your Bill By Phone Call**
1-888-566-6111 or
611 from your Nextel phone

 **To Pay Your Bill By Mail**
See reverse side for details. >

*Any unpaid balance after the due date may be subject to a late payment charge not to exceed 5% per month.



**NEXTEL** |™
Nextel Partners
6980 Bermuda Rd., Suite 100
Las Vegas, NV 89119

MANIFESTLINE -
YOLANDA BOSWELL

F55555444422CF



Account Number
Page
2 of 18

Account Name
YOLANDA BOSWELL

## > NEXTEL NEWS AND NOTICES CONTINUED

Your past due balance is payable immediately.

*** Notice Regarding Rate Plan Changes ***
Each time Customer changes rate plans, Customer will pay a $9.99 per unit migration fee up to 10 units.

***Important Late Payment Notice *** A Late Payment Charge of 5% of the unpaid monthly charges may be applied to customer's account each month for up to 3 months on all accrued charges if full payment for all accrued charges is not received within 15 days of the due date. The late payment charge is for costs related to the non-timely payment and shall not be deemed an interest payment. If in any state, the 5% late payment charge exceeds the amount that may be legally charged, then the late payment charge shall be deemed to be the highest amount allowed under the applicable law.

Nextel will no longer be offering the Number Guard feature effective November 18, 2006. Number Guard was a free service that Nextel offered its customers when wireless number portability first became available nearly two years ago. It was designed to minimize unauthorized transfers or deactivations of telephone numbers. Based on industry experience and low incidence of ▓▓▓▓▓▓authorized ports, Nextel has decided to discontinue Number Guard. Using industry-recognized customer validation procedures, Number Guard is no longer

necessary to protect consumer telephone numbers from unauthorized transfers or deactivations.

Choose the i275* or i850** camera phone and snap up the colors of fall for FREE. Pick a BlackBerry 7520TM or 7100iTM for just $99.99.*** Get three times the power with 100 text messages, 40 picture/audio messages and web plan for just $9.99 per month. Do it all with a Nextel 30-day risk-free guarantee. For more information call 1.800.590.0681 or click nextelconnections.com/deals. *Requires 2-year service agreement and new activation. **After $50 mail-in rebate. Requires new activation with 2-year agreement. Offer only valid for purchases made on www.getitnow.com or Nextel Telesales, 1.800.590.0681. ***Requires 2-year service agreement and 1-year data plan and new activation. After $50 mail-in rebate and $50 PDA trade-in.

$265.12

$

YOLANDA BOSWELL
Account Number
Total Amount Due
Amount Enclosed

Nextel Partners
PO Box 4192
Carol Stream, IL 60197-4192

F6019741921119F

000012808  0000137044  0000265123

Please make checks payable to Nextel Partners. Please fill out this form to pay your Nextel account balance using a credit card this month, or to change your billing address.

□ Credit Card □ Visa □ Mastercard □ American Express □ Discover / □ Diners
Credit Card No.
Exact name on
your credit card
Expires ___ Billing ZIP
Please sign and date here for credit card payments:
Signature ___ Date ___

□ Change of Address: Effective Date ___
Address ___
City ___ State ___ ZIP ___
Home # (___) ___ Business # (___) ___

□ Change/Add E-mail (Optional) ___
Nextel may contact you regarding new offerings or promotions.

## BILLING FOOTNOTES

| | | | | | |
|---|---|---|---|---|---|
| Time Period: | PP-Peak Period | OP-Off Peak Period | MP-Multiple Period | | |
| Features: | CW-Call Waiting | CF-Call Forwarding | 3W-Three Way Call | DS-Dialup Service | MM-Mobile to Mobile |
| | MH - Mobile to Home | MO - Mobile to Office | WW-Nextel Worldwide | WD-Worldwide Discount | TJ-Tijuana Network |
| Networks: | NN-National Network | CN-Canadian Network | | | |
| | OA-Out of Area | OC-Out of Home Area | | | |
| Services: | AL-Alternate Line | PU-Plan/Promotional Usage | PF-Partial Free | FC-Free Call | WP-Wireless Priority |

| Account Number | Billing Period 09/19/06-10/18/06 | Page 3 of 18 |
| Account Name YOLANDA BOSWELL | Invoice Date October 23, 2006 | |


NEXTEL ™

## > ACCOUNT SUMMARY

| | | Monthly Recurring Access Charges | Service Discount/ Adjustments or Charges | Cellular Minutes/ Charges | LD and Other Minutes/ Charges | Directory Assistance Charges | Direct Connect® Minutes/ Charges | Messaging Number of Messages/ Charges | Data and Third Party Services Charges | Equipment and Retail Purchases | Additional Nextel Charges | Government Fees and Taxes | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Account Charges and Adjustments** | | | | | | | | | | | | | |
| | YOLANDA BOSWELL | | $2.94 | | | | | | | | $0.03 | $0.12 | $3.09 |
| **Subscriber Charges and Adjustments** | | | | | | | | | | | | | |

**Number/ Name**  **Plan**  **Page**

| Number/Name | Plan | Page | Monthly | Service | Cellular | LD | Dir | DC | Msg | Data | Equip | Additional | Gov | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 334-414-5242 | Nextel Free Incoming 500 | | | | 3459:00 | | | | 20 | | | | | |
| 1 | | 4 | 97.47 | | 15.30 | | | | | | | 4.70 | 7.52 | 124.99 |
| Usage for All Subscribers | | | | | 3459:00 | | | | 20 | | | | | |
| Discounts for All Subscribers | | | | | | | | | | | | | | |
| Charges for All Subscribers | | | $97.47 | | $15.30 | | | | | | | $4.70 | $7.52 | $124.99 |
| Total Current Usage | | | | | 3459:00 | | | | 20 | | | | | |
| Total Current Charges | | | $97.47 | $2.94 | $15.30 | | | | | | | $4.73 | $7.64 | $128.08 |

**Total Subscribers on Account 1**

If you prefer to receive a summary only invoice, please visit www.nextel.com/en/mynextel/index.shtml and choose the Choose Bill Format option. You can also receive a summary-only invoice by calling Customer Care. The summary-only invoice is designed for your convenience, and will not display full billing detail or an individual breakdown of Nextel charges or government-imposed taxes and fees.

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Invoice Date
October 23, 2006

Page
4 of 18

**NEXTEL** ™

## ACCOUNT CHARGES AND ADJUSTMENTS

### > ACCOUNT ACTIVITY SUMMARY

| | Date Received | | Amount |
|---|---|---|---|
| **PREVIOUS INVOICE ACTIVITY** | | | |
| Previous Balance | | | $137.04 |
| Outstanding Balance | | | **$137.04** |

| | Rate/Date | Quantity | Amount |
|---|---|---|---|
| **CURRENT INVOICE ACTIVITY** | | | |
| **Adjustments and Other Charges** | | | |
| Infrastructure Fee | | | 1.99 |
| Late Payment | | | 0.95 |
| Total Adjustments and Other Charges | | | $2.94 |
| **Additional Nextel Charges** | | | |
| * Federal - Univ Serv Assessment | 1.600% | | 0.03 |
| Total Additional Nextel Charges | | | $0.03 |
| *Fees Nextel elects to collect to recover its costs of funding and complying with government mandates and initiatives. | | | |
| **Government Fees and Taxes** | | | |
| State-Utility Tax | 6.000% | | 0.12 |
| Total Government Fees and Taxes | | | $0.12 |
| **Current Balance** | | | **$3.09** |

### > ACCOUNT MANAGEMENT REPORTS

The following reports are compiled as a courtesy to help you analyze usage trends and manage your account activity.

**Airtime Usage Detail**

| Subscribers | Plan | Incoming/ Outgoing | Peak/ Off Peak | Total Min:Sec | *Plan Min:Sec | **Other Min:Sec | Billable Min:Sec | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | Nextel Free Incoming 500 | | | | | | | |
| | Usage | Incoming | Peak | 1220:00 | | 1220:00 | | 0.00 |
| | Usage | Incoming | Off Peak | 587:00 | | 587:00 | | 0.00 |
| | Usage | Outgoing | Peak | 711:00 | 677:00 | | 34:00 | 15.30 |
| | Usage | Outgoing | Off Peak | 941:00 | 941:00 | | | 0.00 |
| Total Airtime Usage Charges | | | | | | | | $15.30 |

*Plan Min:Sec includes rate plan and bonus minutes/seconds used.
**Other Min:Sec includes free incoming minutes/seconds used.

## SUBSCRIBER CHARGES AND ADJUSTMENTS
DETAILS FOR 334-414-5242, 1

### > SUBSCRIBER ACTIVITY SUMMARY

| | Rate/Date | Amount |
|---|---|---|
| **Monthly Recurring Access Charges** | | |
| Call Detail for 09/19 - 10/18 | | 1.49 |
| Nextel Free Incoming 500 for 09/19 - 10/18 | | 59.99 |
| Nights and Weekends 6pm for 09/19 - 10/18 | | 10.00 |
| Spending Limit Program Charge for 09/19 - 10/18 | | 12.99 |
| Text Messaging 500 Plan for 09/19 - 10/18 | | 8.00 |
| Unlimited Mobile to Mobile Min for 09/19 - 10/18 | | 5.00 |
| Total Monthly Recurring Access Charges | | $97.47 |
| **Cellular Services Charges** | | |
| Usage | | 15.30 |
| Total Cellular Services Charges | | $15.30 |
| **Additional Nextel Charges** | | |
| * Federal - Univ Serv Assessment | 1.600% | 1.81 |
| * Federal - Programs Cost Recovery | | 2.89 |
| Total Additional Nextel Charges | | $4.70 |
| *Fees Nextel elects to collect to recover its costs of funding and complying with government mandates and initiatives. | | |
| **Government Fees and Taxes** | | |
| State - Utility Tax | 6.000% | 6.82 |
| State - 911 Taxes | | 0.70 |
| Total Government Fees and Taxes | | $7.52 |
| **Total Charges for 1** | | **$124.99** |

### > SUBSCRIBER ACTIVITY DETAIL

To view coverage maps and rates visit Nextel.com.

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 09/19 | 07:29A | MONTGOMERY,AL | 334- | /IM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 2 | 09/19 | 08:04A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 3 | 09/19 | 08:15A | Incoming | 334- | /P | 1:00 | 0.00 | 0.00 | 0.00 |
| 4 | 09/19 | 08:27A | Incoming | 334- | /IM | 1:00 | 0.00 | 0.00 | 0.00 |
| 5 | 09/19 | 09:28A | MONTGOMERY,AL | 334- | /CW | 10:00 | 0.00 | 0.00 | 0.00 |
| 6 | 09/19 | 09:35A | Incoming | 334- | /P | 1:00 | 0.00 | 0.00 | 0.00 |
| 7 | 09/19 | 09:36A | Incoming | 334- | /P | 14:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



Account Number
Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06
Invoice Date
October 23, 2006

Page
5 of 18

# NEXTEL ™

## DETAILS for 334-414-5242, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 09/19 | 12:44P | MONTGOMERY,AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 9 | 09/19 | 12:45P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 10 | 09/19 | 12:48P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 11 | 09/19 | 12:52P | MONTGOMERY,AL | 334- | PP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 12 | 09/19 | 01:05P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 13 | 09/19 | 01:05P | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 14 | 09/19 | 01:07P | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 15 | 09/19 | 01:23P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 16 | 09/19 | 01:27P | MONTGOMERY,AL | 334- | PP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 17 | 09/19 | 01:32P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 18 | 09/19 | 01:39P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 19 | 09/19 | 01:39P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 20 | 09/19 | 01:41P | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 21 | 09/19 | 01:56P | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 22 | 09/19 | 01:57P | Customer Care | 611 | PP/FC | 2:00 | 0.00 | 0.00 | 0.00 |
| 23 | 09/19 | 01:59P | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 24 | 09/19 | 02:21P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 25 | 09/19 | 02:25P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 26 | 09/19 | 02:28P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 27 | 09/19 | 02:39P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 28 | 09/19 | 02:49P | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 29 | 09/19 | 03:03P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 30 | 09/19 | 03:03P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 31 | 09/19 | 03:04P | MONTGOMERY,A.. | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 32 | 09/19 | 03:06P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 33 | 09/19 | 03:09P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 34 | 09/19 | 03:11P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 35 | 09/19 | 03:12P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 36 | 09/19 | 03:14P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 37 | 09/19 | 03:15P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 38 | 09/19 | 03:16P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 39 | 09/19 | 03:16P | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 40 | 09/19 | 03:17P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 41 | 09/19 | 03:18P | MONTGOMERY,AL | 334- | PP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 42 | 09/19 | 03:50P | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 43 | 09/19 | 03:55P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 44 | 09/19 | 03:56P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 45 | 09/19 | 03:59P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 46 | 09/19 | 04:01P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 47 | 09/19 | 04:02P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 48 | 09/19 | 04:02P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 49 | 09/19 | 04:03P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 50 | 09/19 | 04:04P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 51 | 09/19 | 04:04P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 52 | 09/19 | 04:43P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 53 | 09/19 | 04:48P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 54 | 09/19 | 04:57P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 55 | 09/19 | 04:58P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 56 | 09/19 | 04:58P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 57 | 09/19 | 05:14P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 58 | 09/19 | 05:23P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 59 | 09/19 | 05:42P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 60 | 09/19 | 06:39P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 61 | 09/19 | 06:55P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 62 | 09/19 | 07:04P | Customer Care | 611 | OP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 63 | 09/19 | 07:13P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 64 | 09/19 | 07:27P | Incoming | 334- | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 65 | 09/19 | 07:30P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 66 | 09/19 | 07:50P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 67 | 09/19 | 08:06P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 68 | 09/19 | 08:10P | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 69 | 09/19 | 08:16P | Incoming | 334- | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 70 | 09/19 | 08:17P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 71 | 09/19 | 10:03P | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 72 | 09/20 | 06:23A | Customer Care | 611 | OP/FC | 2:00 | 0.00 | 0.00 | 0.00 |
| 73 | 09/20 | 06:49A | PINE LEVEL,AL | 334- | OP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 74 | 09/20 | 07:11A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 75 | 09/20 | 07:21A | Toll Free Call | 800 | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 76 | 09/20 | 07:29A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 77 | 09/20 | 07:45A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 78 | 09/20 | 08:13A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 79 | 09/20 | 08:18A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 80 | 09/20 | 08:25A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 81 | 09/20 | 08:36A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 82 | 09/20 | 08:39A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 83 | 09/20 | 08:39A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 84 | 09/20 | 08:41A | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 85 | 09/20 | 08:45A | WETUMPKA,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 86 | 09/20 | 08:49A | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 87 | 09/20 | 08:56A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 88 | 09/20 | 08:56A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 89 | 09/20 | 08:58A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 90 | 09/20 | 08:58A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 91 | 09/20 | 09:30A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 92 | 09/20 | 09:31A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 93 | 09/20 | 09:31A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 94 | 09/20 | 09:32A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 95 | 09/20 | 09:32A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 96 | 09/20 | 09:32A | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 97 | 09/20 | 09:35A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 98 | 09/20 | 09:53A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 99 | 09/20 | 10:10A | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 100 | 09/20 | 10:12A | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 101 | 09/20 | 10:13A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 102 | 09/20 | 10:13A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 103 | 09/20 | 10:15A | MONTGOMERY,AL | 334- | PP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 104 | 09/20 | 10:29A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 105 | 09/20 | 10:30A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 106 | 09/20 | 10:33A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 107 | 09/20 | 10:33A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 108 | 09/20 | 10:34A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 109 | 09/20 | 10:34A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 110 | 09/20 | 10:40A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 111 | 09/20 | 10:41A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 112 | 09/20 | 10:42A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 113 | 09/20 | 10:43A | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 114 | 09/20 | 12:15P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 115 | 09/20 | 12:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 116 | 09/20 | 12:59P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 117 | 09/20 | 01:05P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



Account Number
Account Name
YOLANDA BOSWELL

Billing Period 09/19/06-10/18/06   Page 6 of 18
Invoice Date October 23, 2006

**NEXTEL**

DETAILS for 334-414-5242, 1 co...d

> SUBSCRIBER ACTIVITY ...AIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min/Sec | Usage | *Long Dist/Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 118 | 09/20 | 01:13P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 119 | 09/20 | 01:27P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 120 | 09/20 | 01:39P | Incoming | 334- | PP | 10:00 | 0.00 | 0.00 | 0.00 |
| 121 | 09/20 | 02:04P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 122 | 09/20 | 02:17P | MONTGOMERY,AL | 334- | PP/MM/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 123 | 09/20 | 02:22P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 124 | 09/20 | 02:23P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 125 | 09/20 | 02:29P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 126 | 09/20 | 02:33P | MONTGOMERY,AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 127 | 09/20 | 02:38P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 128 | 09/20 | 02:39P | MONTGOMERY,AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 129 | 09/20 | 02:41P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 130 | 09/20 | 02:42P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 131 | 09/20 | 02:47P | Incoming | 334- | PP | 6:00 | 0.00 | 0.00 | 0.00 |
| 132 | 09/20 | 03:08P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 133 | 09/20 | 03:08P | MONTGOMERY,AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 134 | 09/20 | 03:07P | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 135 | 09/20 | 03:22P | MONTGOMERY,AL | 334- | PP/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 136 | 09/20 | 03:26P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 137 | 09/20 | 03:29P | Incoming | 334- | PP/MM | 6:00 | 0.00 | 0.00 | 0.00 |
| 138 | 09/20 | 03:37P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 139 | 09/20 | 03:39P | Incoming | 334- | PP/MM | 10:00 | 0.00 | 0.00 | 0.00 |
| 140 | 09/20 | 03:51P | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 141 | 09/20 | 03:52P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 142 | 09/20 | 03:54P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 143 | 09/20 | 03:55P | Incoming | 334- | PP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 144 | 09/20 | 04:09P | Incoming | 334- | PP/MM | 10:00 | 0.00 | 0.00 | 0.00 |
| 145 | 09/20 | 04:59P | Incoming | 334- | PP/MM | 9:00 | 0.00 | 0.00 | 0.00 |
| 146 | 09/20 | 05:46P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 147 | 09/20 | 05:58P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 148 | 09/20 | 06:00P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 149 | 09/20 | 06:35P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 150 | 09/20 | 06:41P | Incoming | 334- | OP | 6:00 | 0.00 | 0.00 | 0.00 |
| 151 | 09/20 | 06:58P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 152 | 09/20 | 06:57P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 153 | 09/20 | 07:33P | MONTGOMERY,AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 154 | 09/20 | 07:34P | MONTGOMERY,AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 155 | 09/20 | 07:43P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 156 | 09/20 | 08:00P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 157 | 09/20 | 08:17P | MONTGOMERY,AL | Voi... | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 158 | 09/20 | 08:43P | WETUMPKA,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 159 | 09/20 | 09:05P | MONTGOMERY,AL | 334- | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 160 | 09/20 | 09:31P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 161 | 09/20 | 09:32P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 162 | 09/20 | 09:34P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 163 | 09/20 | 09:45P | MONTGOMERY,AL | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 164 | 09/20 | 10:31P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 165 | 09/20 | 10:32P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 166 | 09/20 | 10:46P | Customer Care | 611 | OP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 167 | 09/21 | 06:27A | Customer Care | 611 | OP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 168 | 09/21 | 07:51A | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 169 | 09/21 | 07:52A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 170 | 09/21 | 08:40A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 171 | 09/21 | 09:17A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 172 | 09/21 | 09:29A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 173 | 09/21 | 09:30A | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 174 | 09/21 | 10:08A | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 175 | 09/21 | 10:19A | MONTGOMERY,AL | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 176 | 09/21 | 10:19A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 177 | 09/21 | 10:25A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 178 | 09/21 | 10:45A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 179 | 09/21 | 10:57A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 180 | 09/21 | 11:01A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 181 | 09/21 | 12:28P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 182 | 09/21 | 01:03P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 183 | 09/21 | 01:04P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 184 | 09/21 | 01:10P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 185 | 09/21 | 01:12P | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 186 | 09/21 | 01:22P | Incoming | 334- | PP | 6:00 | 0.00 | 0.00 | 0.00 |
| 187 | 09/21 | 01:31P | Incoming | 334- | PP/MM | 5:00 | 0.00 | 0.00 | 0.00 |
| 188 | 09/21 | 02:01P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 189 | 09/21 | 02:03P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 190 | 09/21 | 02:03P | Incoming | 334- | PP/CW | 9:00 | 0.00 | 0.00 | 0.00 |
| 191 | 09/21 | 02:31P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 192 | 09/21 | 02:35P | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 193 | 09/21 | 02:44P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 194 | 09/21 | 02:54P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 195 | 09/21 | 03:18P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 196 | 09/21 | 03:40P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 197 | 09/21 | 04:23P | BIRMINGHAM,AL | 205- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 198 | 09/21 | 04:31P | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 199 | 09/21 | 04:34P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 200 | 09/21 | 04:44P | Incoming | 205- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 201 | 09/21 | 04:47P | Incoming | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 202 | 09/21 | 04:53P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 203 | 09/21 | 05:05P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 204 | 09/21 | 05:05P | Incoming | 334- | PP/CW | 9:00 | 0.00 | 0.00 | 0.00 |
| 205 | 09/21 | 05:22P | Customer Care | 611 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 206 | 09/21 | 05:49P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 207 | 09/21 | 05:52P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 208 | 09/21 | 05:54P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 209 | 09/21 | 05:58P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 210 | 09/21 | 05:59P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 211 | 09/21 | 06:00P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 212 | 09/21 | 06:03P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 213 | 09/21 | 06:04P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 214 | 09/21 | 06:04P | MONTGOMERY,AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 215 | 09/21 | 06:10P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 216 | 09/21 | 06:23P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 217 | 09/21 | 06:23P | MONTGOMERY,AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 218 | 09/21 | 06:27P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 219 | 09/21 | 06:30P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 220 | 09/21 | 06:33P | Incoming | 205- | OP/CW | 10:00 | 0.00 | 0.00 | 0.00 |
| 221 | 09/21 | 06:42P | BIRMINGHAM,AL | 205- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 222 | 09/21 | 06:43P | Incoming | 205- | OP | 8:00 | 0.00 | 0.00 | 0.00 |
| 223 | 09/21 | 06:50P | MONTGOMERY,AL | Voi...Mai | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 224 | 09/21 | 07:41P | MONTGOMERY,AL | 334- | OP/MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 225 | 09/21 | 07:44P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 226 | 09/21 | 07:45P | MONTGOMERY,AL | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 227 | 09/21 | 07:47P | MONTGOMERY,AL | 334- | OP/MM | 3:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06
Invoice Date
October 23, 2006

Page
7 of 18

# NEXTEL

## DETAILS for 334-414-5242, 1 continued

> ### SUBSCRIBER ACTIVITY DETAIL

### 🏃 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 228 | 09/21 | 07:51P | Incoming | 334- | OP/MW | 6:00 | 0.00 | 0.00 | 0.00 |
| 229 | 09/21 | 08:03P | Incoming | | OP | 7:00 | 0.00 | 0.00 | 0.00 |
| 230 | 09/21 | 08:15P | Incoming | 334- | OP/MW | 4:00 | 0.00 | 0.00 | 0.00 |
| 231 | 09/21 | 09:29P | Customer Care | 611 | OP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 232 | 09/21 | 09:44P | MONTGOMERY,AL | 334- | OP/MW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 233 | 09/21 | 09:48P | BIRMINGHAM,AL | 205- | OP/MW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 234 | 09/21 | 09:51P | BIRMINGHAM,AL | 205- | OP/MW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 235 | 09/21 | 09:52P | Incoming | 205- | OP | 10:00 | 0.00 | 0.00 | 0.00 |
| 236 | 09/22 | 06:43A | Customer Care | 611 | OP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 237 | 09/22 | 07:10A | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 238 | 09/22 | 06:50A | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 239 | 09/22 | 08:53A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 240 | 09/22 | 09:09A | MONTGOMERY,AL | 334- | PP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 241 | 09/22 | 09:36A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 242 | 09/22 | 10:21A | MONTGOMERY,AL | 334- | PP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 243 | 09/22 | 10:24A | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 244 | 09/22 | 12:06P | Incoming | 248- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 245 | 09/22 | 12:11P | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 246 | 09/22 | 12:20P | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 247 | 09/22 | 12:23P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 248 | 09/22 | 01:03P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 249 | 09/22 | 01:07P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 250 | 09/22 | 01:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 251 | 09/22 | 01:56P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 252 | 09/22 | 02:02P | MONTGOMERY,AL | 334- | PP/MW/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 253 | 09/22 | 02:04P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 254 | 09/22 | 02:05P | WETUMPKA,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 255 | 09/22 | 02:18P | Incoming | | MW | 1:00 | 0.00 | 0.00 | 0.00 |
| 256 | 09/22 | 02:26P | Incoming | | | 5:00 | 0.00 | 0.00 | 0.00 |
| 257 | 09/22 | 02:54P | 334-241-5986 | PP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 258 | 09/22 | 02:54P | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 259 | 09/22 | 03:08P | Incoming | 334-241-5986 | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 260 | 09/22 | 03:10P | MONTGOMERY,AL | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 261 | 09/22 | 03:16P | Incoming | 334- | PP/MW | 1:00 | 0.00 | 0.00 | 0.00 |
| 262 | 09/22 | 03:23P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 263 | 09/22 | 03:30P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 264 | 09/22 | 03:31P | Toll Free Call | 800- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 265 | 09/22 | 03:46P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 266 | 09/22 | 03:51P | Customer Care | 612 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 267 | 09/22 | 04:07P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 268 | 09/22 | 04:32P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 269 | 09/22 | 04:37P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 270 | 09/22 | 05:27P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 271 | 09/22 | 06:23P | MONTGOMERY,AL | 334- | OP/MW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 272 | 09/22 | 06:26P | Incoming | 334- | OP/MW | 2:00 | 0.00 | 0.00 | 0.00 |
| 273 | 09/22 | 06:27P | Incoming | 334- | OP/CW | 3:00 | 0.00 | 0.00 | 0.00 |
| 274 | 09/22 | 06:29P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 275 | 09/22 | 06:35P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 276 | 09/22 | 06:50P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 277 | 09/22 | 07:10P | WETUMPKA,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 278 | 09/22 | 07:15P | Incoming | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 279 | 09/22 | 07:16P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 280 | 09/22 | 07:16P | Incoming | 334- | OP/CW | 2:00 | 0.00 | 0.00 | 0.00 |

### 🏃 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 281 | 09/22 | 07:17P | Incoming | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 282 | 09/22 | 07:19P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 283 | 09/22 | 07:20P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 284 | 09/22 | 07:20P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 285 | 09/22 | 07:21P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 286 | 09/22 | 07:22P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 287 | 09/22 | 07:42P | MONTGOMERY,AL | 334- | OP/MW/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 288 | 09/22 | 08:00P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 289 | 09/22 | 08:21P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 290 | 09/22 | 08:46P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 291 | 09/22 | 08:46P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 292 | 09/22 | 09:24P | Incoming | 334- | OP | 4:00 | 0.00 | 0.00 | 0.00 |
| 293 | 09/22 | 09:41P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 294 | 09/22 | 09:42P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 295 | 09/22 | 09:42P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 296 | 09/22 | 09:43P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 297 | 09/22 | 09:44P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 298 | 09/22 | 09:48P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 299 | 09/22 | 10:11P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 300 | 09/22 | 10:25P | MONTGOMERY,AL | 334- | OP/MW/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 301 | 09/22 | 10:58P | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 302 | 09/22 | 11:02P | Incoming | 334- | OP | 4:00 | 0.00 | 0.00 | 0.00 |
| 303 | 09/22 | 11:07P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 304 | 09/22 | 11:08P | MONTGOMERY,AL | 334- | OP/MW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 305 | 09/22 | 11:21P | Incoming | 334- | OP/MW | 2:00 | 0.00 | 0.00 | 0.00 |
| 306 | 09/22 | 11:28P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 307 | 09/22 | 11:30P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 308 | 09/22 | 11:34P | MONTGOMERY,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 309 | 09/22 | 11:48P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 310 | 09/22 | 11:56P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 311 | 09/22 | 11:59P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 312 | 09/23 | 12:05A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 313 | 09/23 | 12:18A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 314 | 09/23 | 01:08A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 315 | 09/23 | 01:18A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 316 | 09/23 | 01:19A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 317 | 09/23 | 01:19A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 318 | 09/23 | 01:20A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 319 | 09/23 | 01:22A | MONTGOMERY,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 320 | 09/23 | 01:35A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 321 | 09/23 | 01:36A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 322 | 09/23 | 01:45A | Incoming | 334- | OP/MW | 1:00 | 0.00 | 0.00 | 0.00 |
| 323 | 09/23 | 07:20A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 324 | 09/23 | 07:20A | MONTGOMERY,AL | 334- | OP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 325 | 09/23 | 09:14A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 326 | 09/23 | 09:39A | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 327 | 09/23 | 10:47A | Incoming | 334- | OP | 6:00 | 0.00 | 0.00 | 0.00 |
| 328 | 09/23 | 10:53A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 329 | 09/23 | 11:29A | Incoming | 334- | OP/MW | 2:00 | 0.00 | 0.00 | 0.00 |
| 330 | 09/23 | 11:54A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 331 | 09/23 | 12:32P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 332 | 09/23 | 12:33P | ATLANTA SO,GA | 678- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 333 | 09/23 | 02:30P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 334 | 09/23 | 04:06P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 335 | 09/23 | 04:28P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 336 | 09/23 | 04:30P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 337 | 09/23 | 04:44P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

**DETAILS for 334-414-5242, 1 con...**

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 338 | 09/23 | 05:48P | Incoming | 334- | OP | 5:00 | 0.00 | 0.00 | 0.00 |
| 339 | 09/23 | 06:44P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 340 | 09/23 | 06:56P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 341 | 09/23 | 07:08P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 342 | 09/23 | 07:15P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 343 | 09/23 | 07:15P | MONTGOMERY, AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 344 | 09/23 | 07:16P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 345 | 09/23 | 07:19P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 346 | 09/23 | 07:30P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 347 | 09/23 | 07:35P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 348 | 09/23 | 08:14P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 349 | 09/23 | 08:16P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 350 | 09/23 | 08:20P | Toll Free Call | | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 351 | 09/23 | 08:37P | Incoming | | OP | 4:00 | 0.00 | 0.00 | 0.00 |
| 352 | 09/23 | 09:12P | Incoming | | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 353 | 09/23 | 09:18P | Incoming | | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 354 | 09/23 | 10:10P | MONTGOMERY, AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 355 | 09/23 | 10:10P | MONTGOMERY, AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 356 | 09/23 | 10:33P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 357 | 09/23 | 10:39P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 358 | 09/23 | 10:39P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 359 | 09/23 | 10:48P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 360 | 09/23 | 10:53P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 361 | 09/23 | 10:53P | MONTGOMERY, AL | 334- | OP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 362 | 09/23 | 11:22P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 363 | 09/23 | 11:39P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 364 | 09/23 | 11:44P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 365 | 09/23 | 11:46P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 366 | 09/23 | 11:55P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 367 | 09/23 | 11:58P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 368 | 09/24 | 02:03A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 369 | 09/24 | 02:04A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 370 | 09/24 | 02:05A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 371 | 09/24 | 02:33A | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 372 | 09/24 | 02:34A | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 373 | 09/24 | 03:36A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 374 | 09/24 | 03:36A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 375 | 09/24 | 03:37A | MONTGOMERY, AL | 334- | OP/PU | 11:00 | 0.00 | 0.00 | 0.00 |
| 376 | 09/24 | 03:48A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 377 | 09/24 | 03:49A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 378 | 09/24 | 03:52A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 379 | 09/24 | 03:53A | MONTGOMERY, AL | 334- | OP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 380 | 09/24 | 04:01A | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 381 | 09/24 | 04:08A | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 382 | 09/24 | 04:19A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 383 | 09/24 | 04:22A | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 384 | 09/24 | 04:22A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 385 | 09/24 | 04:33A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 386 | 09/24 | 04:34A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 387 | 09/24 | 04:38A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 388 | 09/24 | 10:05A | MONTGOMERY, AL | 334- | OP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 389 | 09/24 | 10:08A | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 390 | 09/24 | 10:18A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

---

**Account Number**

**Account Name**
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Invoice Date
October 23, 2006

Page
8 of 18

**NEXTEL** ™

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 391 | 09/24 | 10:36A | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 392 | 09/24 | 10:36A | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 393 | 09/24 | 10:52A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 394 | 09/24 | 10:55A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 395 | 09/24 | 11:01A | WETUMPKA, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 396 | 09/24 | 11:11A | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 397 | 09/24 | 11:43A | WETUMPKA, AL | 334- | OP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 398 | 09/24 | 11:50A | Incoming | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 399 | 09/24 | 11:59A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 400 | 09/24 | 12:01P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 401 | 09/24 | 12:04P | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 402 | 09/24 | 12:10P | MONTGOMERY, AL | 334- | OP/PU | 23:00 | 0.00 | 0.00 | 0.00 |
| 403 | 09/24 | 12:14P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 404 | 09/24 | 12:41P | MONTGOMERY, AL | 334- | OP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 405 | 09/24 | 01:21P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 406 | 09/24 | 01:21P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 407 | 09/24 | 01:23P | Incoming | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 408 | 09/24 | 01:28P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 409 | 09/24 | 01:31P | MONTGOMERY, AL | 334- | OP/PU | 12:00 | 0.00 | 0.00 | 0.00 |
| 410 | 09/24 | 01:33P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 411 | 09/24 | 01:44P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 412 | 09/24 | 01:48P | MONTGOMERY, AL | 334- | OP/PU | 18:00 | 0.00 | 0.00 | 0.00 |
| 413 | 09/24 | 01:47P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 414 | 09/24 | 02:26P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 415 | 09/24 | 03:51P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 416 | 09/24 | 03:52P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 417 | 09/24 | 04:08P | Toll Free Call | 800- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 418 | 09/24 | 05:44P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 419 | 09/24 | 05:45P | MONTGOMERY, AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 420 | 09/24 | 06:01P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 421 | 09/24 | 06:01P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 422 | 09/24 | 06:02P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 423 | 09/24 | 06:04P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 424 | 09/24 | 06:05P | MONTGOMERY, AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 425 | 09/24 | 06:23P | MONTGOMERY, AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 426 | 09/24 | 06:26P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 427 | 09/24 | 06:26P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 428 | 09/24 | 06:27P | MONTGOMERY, AL | 334- | OP/PU | 14:00 | 0.00 | 0.00 | 0.00 |
| 429 | 09/24 | 06:49P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 430 | 09/24 | 06:59P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 431 | 09/24 | 07:01P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 432 | 09/25 | 04:33A | PRATTVILLE, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 433 | 09/25 | 08:46A | Toll Free Call | 800- | OP/PU | 11:00 | 0.00 | 0.00 | 0.00 |
| 434 | 09/25 | 09:05A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 435 | 09/25 | 09:06A | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 436 | 09/25 | 09:09A | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 437 | 09/25 | 09:11A | Toll Free Call | 877- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 438 | 09/25 | 09:12A | MONTGOMERY, AL | 334- | OP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 439 | 09/25 | 09:20A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 440 | 09/25 | 09:21A | Incoming | 334- | OP | 6:00 | 0.00 | 0.00 | 0.00 |
| 441 | 09/25 | 09:30A | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 442 | 09/25 | 09:41A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 443 | 09/25 | 09:50A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 444 | 09/25 | 09:50A | Incoming | 334- | OP | 20:00 | 0.00 | 0.00 | 0.00 |
| 445 | 09/25 | 09:59A | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 446 | 09/25 | 10:10A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 447 | 09/25 | 10:13A | MONTGOMERY, AL | 334- | OP/PU | 7:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Invoice Date
October 23, 2006

Page
9 of 18

**NEXTEL**™

DETAILS for 334-414-5242, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 448 | 09/25 | 10:26A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 449 | 09/25 | 10:30A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 450 | 09/25 | 10:47A | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 451 | 09/25 | 10:51A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 452 | 09/25 | 10:53A | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 453 | 09/25 | 10:54A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 454 | 09/25 | 10:55A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 455 | 09/25 | 10:58A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 456 | 09/25 | 11:07A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 457 | 09/25 | 11:24A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 458 | 09/25 | 12:26P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 459 | 09/25 | 02:47P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 460 | 09/25 | 02:47P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 461 | 09/25 | 05:14P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 462 | 09/25 | 05:17P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 463 | 09/25 | 05:18P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 464 | 09/25 | 05:20P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 465 | 09/25 | 05:24P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 466 | 09/25 | 05:25P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 467 | 09/25 | 05:25P | Incoming | 334- | PP/MM | 15:00 | 0.00 | 0.00 | 0.00 |
| 468 | 09/25 | 05:40P | MONTGOMERY,AL | 334- | PP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 469 | 09/25 | 05:46P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 470 | 09/25 | 05:46P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 471 | 09/25 | 05:46P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 472 | 09/25 | 06:57P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 473 | 09/25 | 06:56P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 474 | 09/25 | 07:00P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 475 | 09/25 | 07:08P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 476 | 09/25 | 07:11P | Incoming | 334- | PP | 1:00 | 0.60 | 0.00 | 0.00 |
| 477 | 09/25 | 07:13P | MONTGOMERY,AL | 334- | PP/MM/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 478 | 09/25 | 07:20P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 479 | 09/25 | 07:30P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 480 | 09/25 | 07:54P | Incoming | 334- | PP | 11:00 | 0.00 | 0.00 | 0.00 |
| 481 | 09/26 | 09:32A | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 482 | 09/26 | 10:37A | MONTGOMERY,AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 483 | 09/26 | 10:38A | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 484 | 09/26 | 10:48A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 485 | 09/26 | 10:58A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 486 | 09/26 | 10:59A | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 487 | 09/26 | 12:25P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 488 | 09/26 | 01:05P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 489 | 09/26 | 01:16P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 490 | 09/26 | 01:33P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 491 | 09/26 | 02:01P | Incoming | 205- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 492 | 09/26 | 02:04P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 493 | 09/26 | 02:05P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 494 | 09/26 | 02:22P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 495 | 09/26 | 02:26P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 496 | 09/26 | 03:40P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 497 | 09/26 | 03:53P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 498 | 09/26 | 03:56P | Incoming | 334- | PP/MM | 8:00 | 0.00 | 0.00 | 0.00 |
| 499 | 09/26 | 07:31P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 500 | 09/26 | 07:32P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 501 | 09/27 | 09:54A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 502 | 09/27 | 11:29A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 503 | 09/27 | 12:19P | MONTGOMERY,AL | 334- | PP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 504 | 09/27 | 12:36P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 505 | 09/27 | 01:10P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 506 | 09/27 | 01:11P | Incoming | 334- | PP | 17:00 | 0.00 | 0.00 | 0.00 |
| 507 | 09/27 | 01:13P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 508 | 09/27 | 01:52P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 509 | 09/27 | 01:58P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 510 | 09/27 | 02:00P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 511 | 09/27 | 02:01P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 512 | 09/27 | 02:05P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 513 | 09/27 | 02:07P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 514 | 09/27 | 02:20P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 515 | 09/27 | 02:25P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 516 | 09/27 | 02:31P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 517 | 09/27 | 02:38P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 518 | 09/27 | 02:43P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 519 | 09/27 | 02:44P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 520 | 09/27 | 02:59P | Incoming | 334- | PP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 521 | 09/27 | 03:03P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 522 | 09/27 | 03:38P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 523 | 09/27 | 03:43P | Incoming | 334- | PP/MM | 6:00 | 0.00 | 0.00 | 0.00 |
| 524 | 09/27 | 04:12P | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 525 | 09/27 | 05:40P | MONTGOMERY,AL | Voice | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 526 | 09/27 | 05:41P | MONTGOMERY,AL | Voice | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 527 | 09/27 | 05:42P | WETUMPKA,AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 528 | 09/27 | 05:43P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 529 | 09/27 | 05:44P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 530 | 09/27 | 05:48P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 531 | 09/27 | 05:50P | MONTGOMERY,AL | 334- | PP/PU | 8:00 | 0.00 | 0.00 | 0.00 |
| 532 | 09/27 | 05:58P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 533 | 09/27 | 06:01P | MONTGOMERY,AL | 334- | PP/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 534 | 09/28 | 08:11A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 535 | 09/28 | 08:29A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 536 | 09/28 | 08:54A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 537 | 09/28 | 09:10A | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 538 | 09/28 | 09:31A | MONTGOMERY,AL | 334- | PP/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 539 | 09/28 | 10:25A | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 540 | 09/28 | 10:35A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 541 | 09/28 | 10:38A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 542 | 09/28 | 10:40A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 543 | 09/28 | 10:49A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 544 | 09/28 | 10:59A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 545 | 09/28 | 12:10P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 546 | 09/28 | 12:37P | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 547 | 09/28 | 12:43P | Incoming | 334- | PP/MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 548 | 09/28 | 12:53P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 549 | 09/28 | 01:05P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 550 | 09/28 | 01:12P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 551 | 09/28 | 01:13P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 552 | 09/28 | 01:14P | MONTGOMERY,AL | 334- | PP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 553 | 09/28 | 01:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 554 | 09/28 | 01:55P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 555 | 09/28 | 01:58P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 556 | 09/28 | 01:59P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 557 | 09/28 | 02:02P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

| | |
|---|---|
| **Account Number** ▬▬▬ | **Billing Period** 09/19/06-10/18/06   **Page** 10 of 18 |
| **Account Name** YOLANDA BOSWELL | **Invoice Date** October 23, 2006 |

**NEXTEL**

---

## DETAILS for 334-414-5242, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 558 | 09/28 | 02:02P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 559 | 09/28 | 02:03P | MONTGOMERY, AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 560 | 09/28 | 02:05P | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 561 | 09/28 | 02:08P | MONTGOMERY, AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 562 | 09/28 | 02:28P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 563 | 09/28 | 02:48P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 564 | 09/28 | 03:47P | MONTGOMERY, AL | Voice | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 565 | 09/28 | 03:48P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 566 | 09/28 | 03:48P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 567 | 09/28 | 07:41P | MONTGOMERY, AL | 334- | OP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 568 | 09/28 | 07:42P | MONTGOMERY, AL | 334- | OP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 569 | 09/28 | 07:42P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 570 | 09/28 | 07:48P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 571 | 09/28 | 07:52P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 572 | 09/28 | 07:52P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 573 | 09/28 | 07:57P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 574 | 09/28 | 08:01P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 575 | 09/28 | 07:40A | MONTGOMERY, A. | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 576 | 09/28 | 07:40A | MONTGOMERY, A. | 334- | PP/PU, | 1:00 | 0.00 | 0.00 | 0.00 |
| 577 | 09/28 | 07:45A | Incoming | 334- | PP | 22:00 | 0.00 | 0.00 | 0.00 |
| 578 | 09/28 | 07:58A | Incoming | 334- | PP/CW | 7:00 | 0.00 | 0.00 | 0.00 |
| 579 | 09/28 | 08:25A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 580 | 09/28 | 08:26A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 581 | 09/28 | 08:27A | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 582 | 09/28 | 08:30A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 583 | 09/28 | 08:33A | MONTGOMERY, AL | Voice | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 584 | 09/28 | 08:34A | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 585 | 09/28 | 08:35A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 586 | 09/28 | 08:35A | Incoming | 334- | PP | 10:00 | 0.00 | 0.00 | 0.00 |
| 587 | 09/28 | 08:39A | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 588 | 09/28 | 08:45A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 589 | 09/28 | 08:46A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 590 | 09/28 | 08:46A | Incoming | 334- | PP/CW | 7:00 | 0.00 | 0.00 | 0.00 |
| 591 | 09/28 | 08:53A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 592 | 09/28 | 08:53A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 593 | 09/28 | 08:57A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 594 | 09/28 | 10:28A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 595 | 09/28 | 10:33A | Incoming | Unav | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 596 | 09/28 | 10:34A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 597 | 09/28 | 10:35A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 598 | 09/28 | 10:37A | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 599 | 09/28 | 10:55A | MONTGOMERY, AL | 334- | PP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 600 | 09/28 | 10:59A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 601 | 09/28 | 11:01A | MONTGOMERY, AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 602 | 09/28 | 11:01A | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 603 | 09/28 | 11:51A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 604 | 09/28 | 11:51A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 605 | 09/28 | 12:27P | Incoming | Unav | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 606 | 09/28 | 12:55P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 607 | 09/28 | 01:14P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 608 | 09/28 | 01:17P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 609 | 09/28 | 01:21P | MONTGOMERY, AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 610 | 09/28 | 02:04P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 611 | 09/29 | 02:10P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 612 | 09/29 | 02:47P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 613 | 09/29 | 02:48P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 614 | 09/29 | 02:59P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 615 | 09/29 | 03:45P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 616 | 09/29 | 03:48P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 617 | 09/29 | 03:48P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 618 | 09/29 | 03:51P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 619 | 09/29 | 05:47P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 620 | 09/29 | 06:23P | Incoming | 334- | OP | 4:00 | 0.00 | 0.00 | 0.00 |
| 621 | 09/29 | 06:48P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 622 | 09/29 | 06:51P | Incoming | 334- | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 623 | 09/29 | 06:51P | Incoming | Unava | OP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 624 | 09/29 | 06:53P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 625 | 09/29 | 08:06P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 626 | 09/29 | 08:20P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 627 | 09/29 | 09:31P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 628 | 09/29 | 09:45P | MONTGOMERY, AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 629 | 09/29 | 09:46P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 630 | 09/29 | 09:47P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 631 | 09/29 | 09:48P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 632 | 09/29 | 09:49P | Incoming | 334- | OP | 9:00 | 0.00 | 0.00 | 0.00 |
| 633 | 09/29 | 09:49P | Incoming | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 634 | 09/29 | 09:59P | Incoming | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 635 | 09/29 | 10:01P | Incoming | 334- | OP | 4:00 | 0.00 | 0.00 | 0.00 |
| 636 | 09/29 | 10:04P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 637 | 09/29 | 10:06P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 638 | 09/30 | 09:30A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 639 | 09/30 | 10:20A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 640 | 09/30 | 11:26A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 641 | 09/30 | 11:42A | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 642 | 09/30 | 12:04P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 643 | 09/30 | 12:05P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 644 | 09/30 | 12:05P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 645 | 09/30 | 12:05P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 646 | 09/30 | 12:05P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 647 | 09/30 | 12:07P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 648 | 09/30 | 12:07P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 649 | 09/30 | 12:21P | MONTGOMERY, AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 650 | 09/30 | 12:23P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 651 | 09/30 | 12:34P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 652 | 09/30 | 12:41P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 653 | 09/30 | 12:51P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 654 | 09/30 | 12:58P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 655 | 09/30 | 03:35P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 656 | 09/30 | 05:21P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 657 | 09/30 | 06:30P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 658 | 09/30 | 07:49P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 659 | 09/30 | 07:49P | MONTGOMERY, AL | 334- | OP/PU | 15:00 | 0.00 | 0.00 | 0.00 |
| 660 | 09/30 | 08:16P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 661 | 09/30 | 08:23P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 662 | 09/30 | 08:33P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 663 | 09/30 | 08:41P | Incoming | Unav | OP/MM | 8:00 | 0.00 | 0.00 | 0.00 |
| 664 | 10/01 | 12:08P | MONTGOMERY, AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 665 | 10/01 | 12:50P | MONTGOMERY, AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 666 | 10/01 | 12:57P | Incoming | 334- | OP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 667 | 10/01 | 02:04P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Invoice Date
October 23, 2006

Page
11 of 18

**NEXTEL** ™

## DETAILS for 334-414-5242, 1 continued

> ## SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 668 | 10/01 | 03:05P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 669 | 10/01 | 03:07P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 670 | 10/01 | 03:16P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 671 | 10/01 | 03:17P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 672 | 10/01 | 03:17P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 673 | 10/01 | 03:18P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 674 | 10/01 | 03:18P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 675 | 10/01 | 04:41P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 676 | 10/01 | 05:22P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 677 | 10/01 | 05:29P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 678 | 10/01 | 05:38P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 679 | 10/01 | 05:40P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 680 | 10/01 | 05:45P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 681 | 10/01 | 05:48P | MONTGOMERY, AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 682 | 10/01 | 05:48P | Incoming | 334- | OP | 6:00 | 0.00 | 0.00 | 0.00 |
| 683 | 10/01 | 05:54P | Incoming | | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 684 | 10/01 | 05:55P | MONTGOMERY, AL | 334-241-5986 | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 685 | 10/01 | 06:21P | MONTGOMERY, AL | | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 686 | 10/01 | 06:29P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 687 | 10/01 | 06:26P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 688 | 10/01 | 06:26P | MONTGOMERY, AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 689 | 10/01 | 06:32P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 690 | 10/01 | 06:37P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 691 | 10/01 | 06:38P | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 692 | 10/01 | 06:40P | Incoming | | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 893 | 10/01 | 06:42P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 694 | 10/01 | 07:00P | Incoming | 334- | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 695 | 10/01 | 07:05P | MONTGOMERY, AL | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 696 | 10/01 | 07:18P | Incoming | | OP/MM | 15:00 | 0.00 | 0.00 | 0.00 |
| 697 | 10/01 | 07:39P | MONTGOMERY, AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 698 | 10/01 | 08:06P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 699 | 10/01 | 08:10P | WETUMPKA, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 700 | 10/01 | 08:12P | MONTGOMERY, AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 701 | 10/01 | 08:07A | MONTGOMERY, AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 702 | 10/01 | 08:33P | Incoming | 334- | OP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 703 | 10/01 | 08:37P | MONTGOMERY, AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 704 | 10/02 | 08:02A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 705 | 10/02 | 08:05A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 706 | 10/02 | 08:14A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 707 | 10/02 | 09:11A | Incoming | 334- | PP | 16:00 | 0.00 | 0.00 | 0.00 |
| 708 | 10/02 | 09:20A | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 709 | 10/02 | 09:22A | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 710 | 10/02 | 09:25A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 711 | 10/02 | 09:28A | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 712 | 10/02 | 09:48A | MONTGOMERY, AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 713 | 10/02 | 10:08A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 714 | 10/02 | 10:08A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 715 | 10/02 | 10:09A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 716 | 10/02 | 10:11A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 717 | 10/02 | 10:25A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 718 | 10/02 | 10:26A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 719 | 10/02 | 10:30A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 720 | 10/02 | 10:31A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 721 | 10/02 | 10:32A | MONTGOMERY, AL | 33 | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 722 | 10/02 | 10:33A | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 723 | 10/02 | 11:02A | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 724 | 10/02 | 12:28P | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 725 | 10/02 | 01:09P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 726 | 10/02 | 01:09P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 727 | 10/02 | 01:10P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 728 | 10/02 | 01:10P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 729 | 10/02 | 01:11P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 730 | 10/02 | 01:12P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 731 | 10/02 | 01:13P | Customer Care | 612 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 732 | 10/02 | 01:18P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 733 | 10/02 | 01:18P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 734 | 10/02 | 01:19P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 735 | 10/02 | 01:27P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 736 | 10/02 | 01:41P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 737 | 10/02 | 01:43P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 738 | 10/02 | 01:43P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 739 | 10/02 | 01:44P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 740 | 10/02 | 01:46P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 741 | 10/02 | 01:50P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 742 | 10/02 | 02:13P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 743 | 10/02 | 02:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 744 | 10/02 | 02:23P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 745 | 10/02 | 02:46P | MONTGOMERY, AL | 334- | PP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 746 | 10/02 | 04:51P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 747 | 10/02 | 05:42P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 748 | 10/02 | 05:54P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 749 | 10/02 | 06:17P | MONTGOMERY, AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 750 | 10/02 | 07:25A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 751 | 10/03 | 07:29A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 752 | 10/03 | 08:31A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 753 | 10/03 | 08:33A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 754 | 10/03 | 08:37A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 755 | 10/03 | 08:53A | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 756 | 10/03 | 09:03A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 757 | 10/03 | 09:05A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 758 | 10/03 | 09:05A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 759 | 10/03 | 09:06A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 760 | 10/03 | 09:07A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 761 | 10/03 | 09:08A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 762 | 10/03 | 09:19A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 763 | 10/03 | 09:32A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 764 | 10/03 | 09:43A | MONTGOMERY, AL | Void | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 765 | 10/03 | 09:47A | MONTGOMERY, AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 766 | 10/03 | 09:51A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 767 | 10/03 | 10:19A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 768 | 10/03 | 10:19A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 769 | 10/03 | 10:20A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 770 | 10/03 | 10:22A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 771 | 10/03 | 10:27A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 772 | 10/03 | 10:27A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 773 | 10/03 | 10:28A | Incoming | 334- | PP | 15:00 | 0.00 | 0.00 | 0.00 |
| 774 | 10/03 | 10:44A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 775 | 10/03 | 10:51A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 776 | 10/03 | 10:57A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 777 | 10/03 | 11:12A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...



Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06
Invoice Date
October 23, 2006

Page
12 of 18



DETAILS for 334-414-5242, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 778 | 10/03 | 12:47P | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 779 | 10/03 | 01:03P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 780 | 10/03 | 01:09P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 781 | 10/03 | 01:11P | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 782 | 10/03 | 01:19P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 783 | 10/03 | 01:20P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 784 | 10/03 | 01:21P | MONTGOMERY,AL | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 785 | 10/03 | 01:22P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 786 | 10/03 | 01:39P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 787 | 10/03 | 02:10P | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 788 | 10/03 | 02:24P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 789 | 10/03 | 02:28P | MONTGOMERY,AL | 334- | PP/WM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 790 | 10/03 | 02:31P | Incoming | 334- | PP/WM | 5:00 | 0.00 | 0.00 | 0.00 |
| 791 | 10/03 | 02:35P | Incoming | 334- | PP/CW | 4:00 | 0.00 | 0.00 | 0.00 |
| 792 | 10/03 | 02:55P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 793 | 10/03 | 03:05P | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 794 | 10/03 | 03:11P | MONTGOMERY,A. | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 795 | 10/03 | 03:22P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 796 | 10/03 | 03:36P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 797 | 10/03 | 04:12P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 798 | 10/03 | 04:25P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 799 | 10/03 | 04:26P | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 800 | 10/03 | 04:30P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 801 | 10/03 | 04:50P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 802 | 10/03 | 04:51P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 803 | 10/03 | 04:53P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 804 | 10/03 | 05:46P | MONTGOMERY,AL | 334- | OP/WM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 805 | 10/03 | 05:54P | Incoming | 334- | WM | 1:00 | 0.00 | 0.00 | 0.00 |
| 806 | 10/03 | 05:56P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 807 | 10/03 | 05:59P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 808 | 10/03 | 06:00P | MONTGOMERY,AL | 334- | OP/WM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 809 | 10/03 | 06:01P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 810 | 10/03 | 06:05P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 811 | 10/03 | 06:11P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 812 | 10/03 | 06:14P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 813 | 10/03 | 06:27P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 814 | 10/03 | 06:28P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 815 | 10/03 | 06:28P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 816 | 10/03 | 06:28P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 817 | 10/03 | 06:32P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 818 | 10/03 | 06:34P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 819 | 10/03 | 06:35P | MONTGOMERY,AL | 334- | OP/WM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 820 | 10/03 | 06:35P | Incoming | 334- | OP/WM | 3:00 | 0.00 | 0.00 | 0.00 |
| 821 | 10/03 | 06:38P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 822 | 10/03 | 06:39P | MONTGOMERY,AL | 334- | OP/WM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 823 | 10/04 | 07:40A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 824 | 10/04 | 07:56A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 825 | 10/04 | 07:59A | MONTGOMERY,AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 826 | 10/04 | 08:10A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 827 | 10/04 | 10:08A | Toll Free Call | 800- | PP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 828 | 10/04 | 10:20A | MONTGOMERY,AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 829 | 10/04 | 10:22A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 830 | 10/04 | 11:27A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 831 | 10/04 | 12:02P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 832 | 10/04 | 12:09P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 833 | 10/04 | 12:14P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 834 | 10/04 | 12:18P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 835 | 10/04 | 12:26P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 836 | 10/04 | 12:28P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 837 | 10/04 | 12:30P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 838 | 10/04 | 01:07P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 839 | 10/04 | 01:08P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 840 | 10/04 | 01:09P | MONTGOMERY,AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 841 | 10/04 | 02:01P | MONTGOMERY,AL | 334- | PP/WM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 842 | 10/04 | 02:02P | Incoming | 334- | PP/WM | 2:00 | 0.00 | 0.00 | 0.00 |
| 843 | 10/04 | 02:22P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 844 | 10/04 | 02:33P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 845 | 10/04 | 02:34P | MONTGOMERY,AL | 334- | PP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 846 | 10/04 | 04:28P | Incoming | 334- | PP/WM | 3:00 | 0.00 | 0.00 | 0.00 |
| 847 | 10/04 | 04:57P | MONTGOMERY,AL | 334- | PP/WM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 848 | 10/04 | 05:43P | Incoming | 334- | PP/WM | 1:00 | 0.00 | 0.00 | 0.00 |
| 849 | 10/04 | 08:41P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 850 | 10/04 | 08:16P | MONTGOMERY,AL | 334-2 | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 851 | 10/04 | 08:19P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 852 | 10/04 | 08:20P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 853 | 10/04 | 08:20P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 854 | 10/04 | 08:21P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 855 | 10/04 | 08:21P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 856 | 10/04 | 08:25P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 857 | 10/04 | 08:38P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 858 | 10/04 | 08:38P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 859 | 10/04 | 08:39P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 860 | 10/04 | 08:40P | MONTGOMERY,AL | 334- | OP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 861 | 10/04 | 08:44P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 862 | 10/04 | 08:48P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 863 | 10/04 | 08:51P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 864 | 10/05 | 07:41A | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 865 | 10/05 | 08:01A | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 866 | 10/05 | 08:02A | Incoming | 334- | PP | 21:00 | 0.00 | 0.00 | 0.00 |
| 867 | 10/05 | 10:31A | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 868 | 10/05 | 10:35A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 869 | 10/05 | 10:39A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 870 | 10/05 | 10:42A | MONTGOMERY,AL | 334- | PP/WM/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 871 | 10/05 | 01:32P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 872 | 10/05 | 02:11P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 873 | 10/05 | 02:15P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 874 | 10/05 | 02:19P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 875 | 10/05 | 02:36P | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 876 | 10/05 | 02:41P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 877 | 10/05 | 02:42P | Incoming | 334-202-8676 | PP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 878 | 10/05 | 03:00P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 879 | 10/05 | 03:17P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 880 | 10/05 | 03:17P | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 881 | 10/05 | 03:23P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 882 | 10/05 | 03:23P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 883 | 10/05 | 03:50P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 884 | 10/06 | 07:50A | PRATTVILLE,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 885 | 10/06 | 07:51A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 886 | 10/06 | 07:52A | PRATTVILLE,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 887 | 10/06 | 07:53A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number
Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06
Invoice Date
October 23, 2006

Page
13 of 18

NEXTEL™

DETAILS for 334-414-5242, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

### 🚶 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 888 | 10/06 | 07:54A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 889 | 10/06 | 07:55A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 890 | 10/06 | 08:02A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 891 | 10/06 | 08:13A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 892 | 10/06 | 08:13A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 893 | 10/06 | 08:13A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 894 | 10/06 | 08:23A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 895 | 10/06 | 08:36A | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 896 | 10/06 | 08:38A | MONTGOMERY,AL | 334- | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 897 | 10/06 | 08:42A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 898 | 10/06 | 08:52A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 899 | 10/06 | 08:53A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 900 | 10/06 | 08:53A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 901 | 10/06 | 08:53A | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 902 | 10/06 | 08:58A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 903 | 10/06 | 09:04A | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 904 | 10/06 | 09:05A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 905 | 10/06 | 09:20A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 906 | 10/06 | 09:53A | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 907 | 10/06 | 09:55A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 908 | 10/06 | 09:55A | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 909 | 10/06 | 10:55A | MONTGOMERY,AL | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 910 | 10/06 | 11:09A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 911 | 10/06 | 11:26A | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 912 | 10/06 | 11:36A | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 913 | 10/06 | 11:41A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 914 | 10/06 | 11:44A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 915 | 10/06 | 12:04P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 916 | 10/06 | 12:04P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 917 | 10/06 | 12:05P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 918 | 10/06 | 12:06P | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 919 | 10/06 | 12:09P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 920 | 10/06 | 12:10P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 921 | 10/06 | 12:19P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 922 | 10/06 | 12:20P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 923 | 10/06 | 12:46P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 924 | 10/06 | 12:46P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 925 | 10/06 | 01:15P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 926 | 10/06 | 01:35P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 927 | 10/06 | 01:41P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 928 | 10/06 | 01:46P | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 929 | 10/06 | 01:54P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 930 | 10/06 | 02:47P | Incoming | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 931 | 10/06 | 02:56P | MONTGOMERY,AL | 334- | PP/PU | 14:00 | 0.00 | 0.00 | 0.00 |
| 932 | 10/06 | 03:10P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 933 | 10/06 | 03:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 934 | 10/06 | 03:17P | MONTGOMERY,AL | 334- | PP/MM/PU | 11:00 | 0.00 | 0.00 | 0.00 |
| 935 | 10/06 | 03:22P | MONTGOMERY,AL | 334- | PP/MM/PU | 11:00 | 0.00 | 0.00 | 0.00 |
| 936 | 10/06 | 04:23P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 937 | 10/06 | 04:33P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 938 | 10/06 | 04:34P | MONTGOMERY,AL | Voice | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 939 | 10/06 | 05:56P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 940 | 10/06 | 06:01P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

### 🚶 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 941 | 10/06 | 06:02P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 942 | 10/06 | 06:04P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 943 | 10/06 | 06:16P | WETUMPKA,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 944 | 10/06 | 06:17P | WETUMPKA,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 945 | 10/06 | 06:18P | MONTGOMERY,AL | Voice | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 946 | 10/06 | 06:37P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 947 | 10/06 | 06:43P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 948 | 10/07 | 02:39A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 949 | 10/07 | 02:39A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 950 | 10/07 | 02:45A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 951 | 10/07 | 02:45A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 952 | 10/07 | 02:46A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 953 | 10/07 | 02:47A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 954 | 10/07 | 02:48A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 955 | 10/07 | 02:50A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 956 | 10/07 | 02:53A | Incoming | 334- | OP | 16:00 | 0.00 | 0.00 | 0.00 |
| 957 | 10/07 | 03:08A | MONTGOMERY,AL | 334- | OP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 958 | 10/07 | 03:11A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 959 | 10/07 | 03:15A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 960 | 10/07 | 03:35A | MONTGOMERY,AL | 334- | OP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 961 | 10/07 | 03:42A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 962 | 10/07 | 03:42A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 963 | 10/07 | 03:43A | MONTGOMERY,AL | 334- | OP/PU | 22:00 | 0.00 | 0.00 | 0.00 |
| 964 | 10/07 | 04:05A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 965 | 10/07 | 04:05A | MONTGOMERY,AL | 334- | OP/PU | 37:00 | 0.00 | 0.00 | 0.00 |
| 966 | 10/07 | 04:44A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 967 | 10/07 | 07:20A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 968 | 10/07 | 07:21A | PRATTVILLE,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 969 | 10/07 | 07:22A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 970 | 10/07 | 07:22A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 971 | 10/07 | 08:42A | MONTGOMERY,AL | 334- | OP/MM/PU | 11:00 | 0.00 | 0.00 | 0.00 |
| 972 | 10/07 | 09:05A | Incoming | 334- | OP/MM | 7:00 | 0.00 | 0.00 | 0.00 |
| 973 | 10/07 | 09:35A | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 974 | 10/07 | 09:37A | Incoming | 334- | OP/MM | 7:00 | 0.00 | 0.00 | 0.00 |
| 975 | 10/07 | 10:32A | Incoming | 334- | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 976 | 10/07 | 10:44A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 977 | 10/07 | 10:45A | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 978 | 10/07 | 10:50A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 979 | 10/07 | 10:50A | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 980 | 10/07 | 10:53A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 981 | 10/07 | 10:54A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 982 | 10/07 | 10:54A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 983 | 10/07 | 10:56A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 984 | 10/07 | 11:00A | MONTGOMERY,AL | Voice | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 985 | 10/07 | 11:01A | MONTGOMERY,AL | 334- | OP/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 986 | 10/07 | 11:20A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 987 | 10/07 | 11:24A | MONTGOMERY,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 988 | 10/07 | 11:28A | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 989 | 10/07 | 11:31A | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 990 | 10/07 | 11:32A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 991 | 10/07 | 11:33A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 992 | 10/07 | 11:34A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 993 | 10/07 | 11:36A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 994 | 10/07 | 12:04P | MONTGOMERY,AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 995 | 10/07 | 12:21P | WETUMPKA,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 996 | 10/07 | 12:29P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 997 | 10/07 | 12:34P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

**Account Number**

**Account Name**
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Invoice Date
October 23, 2006

Page
14 of 18



## DETAILS for 334-414-5242, 1 continued

### > SUBSCRIBER ACTIVITY DETAIL

#### 🕭 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 998 | 10/07 | 12:36P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 999 | 10/07 | 12:40P | WETUMPKA,AL | 334- | OP/PU | 20:00 | 0.00 | 0.00 | 0.00 |
| 1000 | 10/07 | 12:46P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1001 | 10/07 | 01:03P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1002 | 10/07 | 01:35P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1003 | 10/07 | 01:39P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1004 | 10/07 | 01:41P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1005 | 10/07 | 02:07P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1006 | 10/07 | 02:11P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1007 | 10/07 | 02:16P | MONTGOMERY,AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1008 | 10/07 | 02:21P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1009 | 10/07 | 02:30P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1010 | 10/07 | 03:40P | MONTGOMERY,AL | 334- | OP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1011 | 10/07 | 04:26P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1012 | 10/07 | 04:47P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1013 | 10/07 | 04:48P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1014 | 10/07 | 05:08P | MONTGOMERY,A. | 334- | OP/P. | 1:00 | 0.00 | 0.00 | 0.00 |
| 1015 | 10/07 | 05:09P | Incoming | 334- | OP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1016 | 10/07 | 06:18P | Incoming | 334- | OP/VV | 2:00 | 0.00 | 0.00 | 0.00 |
| 1017 | 10/07 | 06:26P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1018 | 10/07 | 07:19P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1019 | 10/07 | 07:29P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1020 | 10/07 | 07:32P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1021 | 10/07 | 07:34P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1022 | 10/07 | 07:35P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1023 | 10/07 | 07:52P | MONTGOMERY,AL | 334- | OP/PU | 26:00 | 0.00 | 0.00 | 0.00 |
| 1024 | 10/07 | 08:11P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1025 | 10/07 | 08:12P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1026 | 10/07 | 08:13P | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1027 | 10/07 | 08:16P | MONTGOMERY,AL | Voi. | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1028 | 10/07 | 08:17P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1029 | 10/07 | 08:19P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1030 | 10/07 | 08:19P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1031 | 10/07 | 08:20P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1032 | 10/07 | 08:23P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1033 | 10/07 | 08:25P | MONTGOMERY,AL | 334- | OP/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 1034 | 10/07 | 08:35P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1035 | 10/07 | 08:37P | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1036 | 10/07 | 08:50P | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1037 | 10/07 | 09:36P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1038 | 10/07 | 09:38P | WETUMPKA,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1039 | 10/07 | 09:39P | WETUMPKA,AL | 334- | OP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1040 | 10/07 | 09:44P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1041 | 10/07 | 09:44P | WETUMPKA,AL | 334- | OP/PU | 23:00 | 0.00 | 0.00 | 0.00 |
| 1042 | 10/07 | 09:47P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1043 | 10/07 | 10:17P | WETUMPKA,AL | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1044 | 10/07 | 10:40P | Incoming | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1045 | 10/07 | 11:05P | WETUMPKA,AL | 334- | OP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1046 | 10/07 | 11:05P | WETUMPKA,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1047 | 10/07 | 11:13P | Incoming | 334- | OP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1048 | 10/08 | 07:04A | JOHNSTOWN,PA | 814- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1049 | 10/08 | 07:05A | FORT WORTH,TX | 817- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1050 | 10/08 | 07:05A | FORT WORTH,TX | 817- | OP/PU | 11:00 | 0.00 | 0.00 | 0.00 |

#### 🕭 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1051 | 10/08 | 07:20A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1052 | 10/08 | 07:53A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1053 | 10/08 | 08:50A | MONTGOMERY,AL | 334- | OP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1054 | 10/08 | 08:56A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1055 | 10/08 | 09:05A | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1056 | 10/08 | 11:49A | Incoming | 334- | OP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 1057 | 10/08 | 11:50A | Incoming | 334- | OP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1058 | 10/08 | 11:59A | Incoming | 334- | OP/MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 1059 | 10/08 | 12:02P | Incoming | 334- | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1060 | 10/08 | 12:03P | MONTGOMERY,AL | 334- | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1061 | 10/08 | 12:32P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1062 | 10/08 | 12:52P | Incoming | 334- | OP/MM | 5:00 | 0.00 | 0.00 | 0.00 |
| 1063 | 10/08 | 01:31P | Incoming | 334- | OP | 13:00 | 0.00 | 0.00 | 0.00 |
| 1064 | 10/08 | 03:12P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1065 | 10/08 | 03:31P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1066 | 10/08 | 03:33P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1067 | 10/08 | 03:35P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1068 | 10/08 | 03:41P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1069 | 10/08 | 03:54P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1070 | 10/08 | 04:08P | Incoming | 334- | OP | 9:00 | 0.00 | 0.00 | 0.00 |
| 1071 | 10/08 | 04:26P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1072 | 10/08 | 04:46P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1073 | 10/08 | 04:57P | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1074 | 10/08 | 05:10P | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1075 | 10/08 | 05:13P | MONTGOMERY,A. | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1076 | 10/08 | 10:37P | MONTGOMERY,AL | 334- | OP/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 1077 | 10/09 | 07:52A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1078 | 10/09 | 07:56A | Incoming | 334- | OP | 10:00 | 0.00 | 0.00 | 0.00 |
| 1079 | 10/09 | 08:50A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1080 | 10/09 | 08:52A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1081 | 10/09 | 08:53A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1082 | 10/09 | 09:24A | Incoming | Unav. | OP/MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 1083 | 10/09 | 09:47A | Incoming | 334- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1084 | 10/09 | 10:18A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1085 | 10/09 | 10:18A | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1086 | 10/09 | 10:19A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1087 | 10/09 | 10:20A | Incoming | 334- | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1088 | 10/09 | 10:37A | MONTGOMERY,AL | 334- | OP/MM/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 1089 | 10/09 | 10:45A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1090 | 10/09 | 10:46A | Incoming | 334- | OP/PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1091 | 10/09 | 11:56A | Incoming | 334- | OP/PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1092 | 10/09 | 12:09P | Incoming | 334- | OP/PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1093 | 10/09 | 12:31P | Incoming | 334- | OP/PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1094 | 10/09 | 01:16P | MONTGOMERY,AL | 334- | OP/PP | 32:00 | 0.00 | 0.00 | 0.00 |
| 1095 | 10/09 | 01:56P | Incoming | 334- | OP/PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1096 | 10/09 | 02:41P | Incoming | 334- | OP/PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1097 | 10/09 | 02:43P | MONTGOMERY,AL | 334- | OP/PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1098 | 10/09 | 02:44P | MONTGOMERY,AL | 334- | OP/PP/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1099 | 10/09 | 02:48P | MONTGOMERY,AL | 334- | OP/PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1100 | 10/09 | 02:56P | MONTGOMERY,AL | Voic | OP/PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1101 | 10/10 | 07:41A | MONTGOMERY,AL | 334- | OP/PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1102 | 10/10 | 07:42A | MONTGOMERY,AL | 334- | OP/PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1103 | 10/10 | 07:49A | MONTGOMERY,AL | 334- | OP/PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1104 | 10/10 | 07:50A | MONTGOMERY,AL | 334- | OP/PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1105 | 10/10 | 08:23A | MONTGOMERY,AL | 334- | OP/PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1106 | 10/10 | 08:24A | Incoming | 334- | OP/PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1107 | 10/10 | 09:05A | Incoming | 334- | OP/PP | 6:00 | 0.00 | 0.00 | 0.00 |

Continued...



Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Page
15 of 18

Invoice Date
October 23, 2006

# NEXTEL™

---

DETAILS for 334-414-5242, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1108 | 10/10 | 09:11A | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1109 | 10/10 | 09:39A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1110 | 10/10 | 09:47A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1111 | 10/10 | 09:47A | Incoming | 334- | NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1112 | 10/10 | 10:17A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1113 | 10/10 | 10:43A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1114 | 10/10 | 10:44A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1115 | 10/10 | 10:52A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1116 | 10/10 | 10:58A | MONTGOMERY, AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1117 | 10/10 | 10:58A | MONTGOMERY, AL | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1118 | 10/10 | 11:51A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1119 | 10/10 | 11:52A | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1120 | 10/10 | 11:54A | Toll Free Call | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1121 | 10/10 | 11:55A | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1122 | 10/10 | 12:49P | MONTGOMERY, AL | | NM/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1123 | 10/10 | 01:09P | MONTGOMERY, AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1124 | 10/10 | 01:49P | MONTGOMERY, AL | | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1125 | 10/10 | 01:50P | Incoming | | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1126 | 10/10 | 02:32P | Incoming | | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1127 | 10/10 | 03:06P | MONTGOMERY, AL | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1128 | 10/10 | 03:24P | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1129 | 10/10 | 03:39P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1130 | 10/10 | 03:40P | MONTGOMERY, AL | | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1131 | 10/10 | 03:54P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1132 | 10/10 | 04:04P | MONTGOMERY, AL | | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1133 | 10/10 | 04:25P | Incoming | | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1134 | 10/10 | 04:28P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1135 | 10/10 | 04:26P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1136 | 10/10 | 04:33P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1137 | 10/10 | 05:08P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1138 | 10/10 | 05:09P | MONTGOMERY, AL | | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1139 | 10/10 | 05:10P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1140 | 10/10 | 06:05P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1141 | 10/10 | 06:14P | Customer Care | | P/PC | 2:00 | 0.00 | 0.00 | 0.00 |
| 1142 | 10/10 | 06:15P | Incoming | | CN | 1:00 | 0.00 | 0.00 | 0.00 |
| 1143 | 10/10 | 06:36P | MONTGOMERY, AL | | | 17:00 | 0.00 | 0.00 | 0.00 |
| 1144 | 10/10 | 06:56P | BIRMINGHAM, AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1145 | 10/10 | 10:31P | MONTGOMERY, AL | | | 27:00 | 0.00 | 0.00 | 0.00 |
| 1146 | 10/10 | 10:49P | WETUMPKA, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1147 | 10/10 | 10:59P | BIRMINGHAM, AL | | P | 21:00 | 0.00 | 0.00 | 0.00 |
| 1148 | 10/10 | 11:14P | Incoming | | PP/CN | 2:00 | 0.00 | 0.00 | 0.00 |
| 1149 | 10/10 | 11:38P | Incoming | | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1150 | 10/10 | 11:42P | WETUMPKA, AL | 334- | PP/PU | 8:00 | 0.00 | 0.00 | 0.00 |
| 1151 | 10/11 | 05:43A | Incoming | 334- | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1152 | 10/11 | 05:48A | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1153 | 10/11 | 05:49A | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1154 | 10/11 | 05:54A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1155 | 10/11 | 07:56A | Incoming | 334- | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1156 | 10/11 | 08:06A | MONTGOMERY, AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1157 | 10/11 | 08:07A | Incoming | 334- | | 12:00 | 0.00 | 0.00 | 0.00 |
| 1158 | 10/11 | 09:26A | Incoming | 334- | PP | 11:00 | 0.00 | 0.00 | 0.00 |
| 1159 | 10/11 | 10:21A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1160 | 10/11 | 10:22A | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |

---

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1161 | 10/11 | 10:43A | Incoming | | P | 6:00 | 0.00 | 0.00 | 0.00 |
| 1162 | 10/11 | 10:49A | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1163 | 10/11 | 11:11A | MONTGOMERY, AL | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1164 | 10/11 | 11:12A | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1165 | 10/11 | 11:56A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1166 | 10/11 | 11:57A | MONTGOMERY, AL | | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1167 | 10/11 | 12:04P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1168 | 10/11 | 12:37P | Incoming | | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1169 | 10/11 | 12:41P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1170 | 10/11 | 12:50P | Incoming | | | 6:00 | 0.00 | 0.00 | 0.00 |
| 1171 | 10/11 | 01:04P | MONTGOMERY, AL | | NM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1172 | 10/11 | 02:12P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1173 | 10/11 | 02:14P | Incoming | **334-202-8676 | PP/NM | 7:00 | 0.00 | 0.00 | 0.00 |
| 1174 | 10/11 | 02:23P | Incoming | 334-202-8676 | PP/NM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1175 | 10/11 | 02:43P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1176 | 10/11 | 03:13P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1177 | 10/11 | 03:14P | MONTGOMERY, AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1178 | 10/11 | 03:14P | Incoming | | | 6:00 | 0.00 | 0.00 | 0.00 |
| 1179 | 10/11 | 03:22P | MONTGOMERY, AL | | NM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1180 | 10/11 | 03:24P | MONTGOMERY, AL | | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1181 | 10/11 | 03:35P | Incoming | | | 14:00 | 0.00 | 0.00 | 0.00 |
| 1182 | 10/12 | 07:31A | Incoming | | | 17:00 | 0.00 | 0.00 | 0.00 |
| 1183 | 10/12 | 07:47A | Incoming | | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1184 | 10/12 | 08:00A | MONTGOMERY, AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1185 | 10/12 | 08:01A | Incoming | | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1186 | 10/12 | 08:30A | Incoming | | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1187 | 10/12 | 08:59A | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1188 | 10/12 | 09:06A | Incoming | | NM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1189 | 10/12 | 09:12A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1190 | 10/12 | 09:28A | Incoming | | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1191 | 10/12 | 10:01A | MONTGOMERY, AL | | PP/NM/PJ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1192 | 10/12 | 11:29A | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1193 | 10/12 | 12:31P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1194 | 10/12 | 12:32P | Incoming | | | 6:00 | 0.00 | 0.00 | 0.00 |
| 1195 | 10/12 | 12:38P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1196 | 10/12 | 12:39P | Incoming | | | 20:00 | 0.00 | 0.00 | 0.00 |
| 1197 | 10/12 | 12:58P | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1198 | 10/12 | 01:03P | MONTGOMERY, AL | | NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1199 | 10/12 | 01:04P | Incoming | | PP/NM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1200 | 10/12 | 01:13P | Incoming | | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1201 | 10/12 | 01:27P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1202 | 10/12 | 01:27P | MONTGOMERY, AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1203 | 10/12 | 02:06P | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1204 | 10/12 | 03:01P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1205 | 10/12 | 03:02P | Incoming | | PP/CN | 1:00 | 0.00 | 0.00 | 0.00 |
| 1206 | 10/12 | 03:03P | PRATTVILLE, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1207 | 10/12 | 03:05P | PRATTVILLE, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1208 | 10/12 | 03:06P | Incoming | | PP/CN | 11:00 | 0.00 | 0.00 | 0.00 |
| 1209 | 10/12 | 03:14P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1210 | 10/12 | 04:11P | Incoming | 334-202-8676 | PP/NM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1211 | 10/12 | 05:08P | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1212 | 10/12 | 05:30P | Incoming | | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1213 | 10/12 | 05:47P | MONTGOMERY, AL | | NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1214 | 10/12 | 05:48P | MONTGOMERY, AL | | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1215 | 10/12 | 05:51P | MONTGOMERY, AL | | PP | 1:00 | 0.00 | 0.45 | 0.00 |
| 1216 | 10/12 | 05:54P | MONTGOMERY, AL | | PP/NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1217 | 10/12 | 06:13P | Incoming | 3 | PP/NM | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...



Account Number

Account Name
YOLANDA BOSWELL

Billing Period
09/19/06-10/18/06

Invoice Date
October 23, 2006

Page
16 of 18

## DETAILS for 334-414-5242, 1 co...

### > SUBSCRIBER ACTIVITY DETAIL

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number Footnote (see pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1218 | 10/12 | 06:13P | MONTGOMERY,AL | 334- /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1219 | 10/12 | 06:23P | MONTGOMERY,AL | 334- /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1220 | 10/12 | 06:45P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1221 | 10/12 | 06:45P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1222 | 10/12 | 07:01P | MONTGOMERY,AL | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1223 | 10/12 | 07:06P | MONTGOMERY,AL | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1224 | 10/12 | 07:23P | MONTGOMERY,AL | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1225 | 10/12 | 07:24P | MONTGOMERY,AL | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1226 | 10/12 | 07:26P | MONTGOMERY,AL | PP/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1227 | 10/13 | 07:38A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1228 | 10/13 | 07:40A | MONTGOMERY,AL | | 3:00 | 1.35 | 0.00 | 1.35 |
| 1229 | 10/13 | 07:43A | Voice Mail | | 2:00 | 0.90 | 0.00 | 0.90 |
| 1230 | 10/13 | 07:44A | Voice Mail | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1231 | 10/13 | 09:11A | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1232 | 10/13 | 09:14A | Incoming | | 15:00 | 0.00 | 0.00 | 0.00 |
| 1233 | 10/13 | 09:30A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1234 | 10/13 | 09:33A | Incoming | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1235 | 10/13 | 09:37A | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1236 | 10/13 | 09:44A | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1237 | 10/13 | 09:49A | MONTGOMERY,AL | PP | 1:00 | 0.45 | 0.00 | 0.45 |
| 1238 | 10/13 | 10:21A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1239 | 10/13 | 10:24A | MONTGOMERY,AL | PP | 1:00 | 0.45 | 0.00 | 0.45 |
| 1240 | 10/13 | 10:25A | MONTGOMERY,AL | PP | 2:00 | 0.90 | 0.00 | 0.90 |
| 1241 | 10/13 | 10:28A | MONTGOMERY,AL | PP | 2:00 | 0.80 | 0.00 | 0.90 |
| 1242 | 10/13 | 10:30A | MONTGOMERY,AL | PP | 1:00 | 0.45 | 0.00 | 0.45 |
| 1243 | 10/13 | 10:37A | Incoming | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1244 | 10/13 | 10:42A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1245 | 10/13 | 10:44A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1246 | 10/13 | 10:46A | Incoming | | 8:00 | 0.00 | 0.00 | 0.00 |
| 1247 | 10/13 | 10:54A | Incoming | 334-202-8676 PP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1248 | 10/13 | 10:55A | MONTGOMERY,AL | 334- | 1:00 | 0.45 | 0.00 | 0.45 |
| 1249 | 10/13 | 10:55A | MONTGOMERY,AL | 334- | 1:00 | 0.45 | 0.00 | 0.45 |
| 1250 | 10/13 | 10:56A | MONTGOMERY,AL | 334- | 1:00 | 0.45 | 0.00 | 0.45 |
| 1251 | 10/13 | 10:57A | Incoming | 334- PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1252 | 10/13 | 11:05A | Incoming | 334- | 4:00 | 0.00 | 0.00 | 0.00 |
| 1253 | 10/13 | 12:13P | MONTGOMERY,AL | 334- PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1254 | 10/13 | 12:14P | MONTGOMERY,AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1255 | 10/13 | 12:16P | MONTGOMERY,AL | 334- PP | 1:00 | 0.45 | 0.00 | 0.45 |
| 1256 | 10/13 | 12:46P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 1257 | 10/13 | 01:27P | MONTGOMERY,AL | 334- | 2:00 | 0.90 | 0.00 | 0.90 |
| 1258 | 10/13 | 01:28P | MONTGOMERY,AL | 334- | 1:00 | 0.45 | 0.00 | 0.45 |
| 1259 | 10/13 | 01:28P | MONTGOMERY,AL | PP | 2:00 | 0.90 | 0.00 | 0.90 |
| 1260 | 10/13 | 01:40P | Incoming | 334- | 7:00 | 0.00 | 0.00 | 0.00 |
| 1261 | 10/13 | 01:47P | MONTGOMERY,AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1262 | 10/13 | 02:06P | Incoming | 334- PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1263 | 10/13 | 02:45P | Customer Care | 612 PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1264 | 10/13 | 07:41P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1265 | 10/13 | 07:42P | MONTGOMERY,AL | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1266 | 10/13 | 07:42P | MONTGOMERY,AL | 334- PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1267 | 10/13 | 07:44P | Incoming | 33 OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1268 | 10/13 | 07:46P | MONTGOMERY,AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1269 | 10/13 | 07:50P | Incoming | 3 PP | 11:00 | 0.00 | 0.00 | 0.00 |
| 1270 | 10/14 | 08:40A | MONTGOMERY,AL | 33 /MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number Footnote (see pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1271 | 10/14 | 08:44A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1272 | 10/14 | 08:49A | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1273 | 10/14 | 08:55A | MONTGOMERY,AL | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1274 | 10/14 | 08:58A | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1275 | 10/14 | 09:14A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1276 | 10/14 | 09:21A | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1277 | 10/14 | 09:24A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1278 | 10/14 | 09:44A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1279 | 10/14 | 09:50A | Incoming | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1280 | 10/14 | 09:59A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1281 | 10/14 | 10:08A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1282 | 10/14 | 10:15A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1283 | 10/14 | 10:22A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1284 | 10/14 | 11:14A | Incoming | 3 | 1:00 | 0.00 | 0.00 | 0.00 |
| 1285 | 10/14 | 11:14A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1286 | 10/14 | 11:19A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1287 | 10/14 | 11:20A | MONTGOMERY,AL | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1288 | 10/14 | 11:20A | MONTGOMERY,AL | PP | 9:00 | 0.00 | 0.00 | 0.00 |
| 1289 | 10/14 | 11:34A | MONTGOMERY,AL | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1290 | 10/14 | 11:35A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1291 | 10/14 | 11:35A | MONTGOMERY,AL | PP | 9:00 | 0.00 | 0.00 | 0.00 |
| 1292 | 10/14 | 11:43A | Incoming | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1293 | 10/14 | 01:16P | MONTGOMERY,AL | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1294 | 10/14 | 01:21P | MONTGOMERY,AL | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1295 | 10/14 | 01:22P | MONTGOMERY,AL | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1296 | 10/14 | 02:15P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1297 | 10/14 | 04:23P | Incoming | 336-291-5986 OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1298 | 10/14 | 04:39P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1299 | 10/14 | 04:47P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1300 | 10/14 | 04:51P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1301 | 10/14 | 05:33P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1302 | 10/14 | 05:33P | MONTGOMERY,AL | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1303 | 10/14 | 06:01P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1304 | 10/14 | 07:26P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1305 | 10/14 | 07:39P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1306 | 10/14 | 07:51P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1307 | 10/14 | 07:53P | MONTGOMERY,AL | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1308 | 10/14 | 08:01P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1309 | 10/14 | 08:03P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1310 | 10/14 | 11:26P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1311 | 10/14 | 11:27P | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1312 | 10/14 | 11:40P | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1313 | 10/14 | 11:54P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1314 | 10/14 | 11:58P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1315 | 10/15 | 12:03A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1316 | 10/15 | 12:03A | MONTGOMERY,AL | OP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1317 | 10/15 | 12:07A | MONTGOMERY,AL | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1318 | 10/15 | 12:08A | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1319 | 10/15 | 12:14A | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1320 | 10/15 | 12:16A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1321 | 10/15 | 12:19A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1322 | 10/15 | 12:20A | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1323 | 10/15 | 12:21A | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1324 | 10/15 | 12:22A | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1325 | 10/15 | 12:22A | Incoming | 334- /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1326 | 10/15 | 12:22A | Incoming | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1327 | 10/15 | 12:25A | MONTGOMERY,AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...



Account Number
Account Name
YOLANDA BOSWELL

Billing Period 09/19/06-10/18/06
Invoice Date October 23, 2006

Page 17 of 18

**NEXTEL**™

## DETAILS for 334-414-5242, 1 continued

### ＞ SUBSCRIBER ACTIVITY DETAIL

#### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1328 | 10/15 | 12:28A | PRATTVILLE,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1329 | 10/15 | 12:32A | | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1330 | 10/15 | 12:32A | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1331 | 10/15 | 12:33A | | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1332 | 10/15 | 12:35A | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1333 | 10/15 | 12:37A | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1334 | 10/15 | 12:44A | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1335 | 10/15 | 12:46A | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1336 | 10/15 | 12:48A | MONTGOMERY,AL | | /PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1337 | 10/15 | 12:52A | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1338 | 10/15 | 01:25A | Incoming | | | 19:00 | 0.00 | 0.00 | 0.00 |
| 1339 | 10/15 | 08:13A | MONTGOMERY,AL | | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1340 | 10/15 | 10:51A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1341 | 10/15 | 12:01P | WETUMPKA,AL | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1342 | 10/15 | 02:21P | Incoming | Unavailable | OP | 18:00 | 0.00 | 0.00 | 0.00 |
| 1343 | 10/15 | 02:40P | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1344 | 10/15 | 02:40P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1345 | 10/15 | 02:41P | MONTGOMERY,AL | | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1346 | 10/15 | 02:42P | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1347 | 10/15 | 02:48P | MONTGOMERY,AL | | /NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1348 | 10/15 | 02:50P | Incoming | | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1349 | 10/15 | 02:51P | MONTGOMERY,AL | | P/NM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1350 | 10/15 | 03:04P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1351 | 10/15 | 03:05P | MONTGOMERY,AL | | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1352 | 10/15 | 03:10P | MONTGOMERY,AL | | OP/NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1353 | 10/15 | 03:12P | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1354 | 10/15 | 03:42P | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1355 | 10/15 | 03:50P | MONTGOMERY,AL | | P/NM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1356 | 10/15 | 03:51P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1357 | 10/15 | 03:52P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1358 | 10/15 | 03:54P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1359 | 10/15 | 03:57P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1360 | 10/15 | 03:58P | MONTGOMERY,AL | | P/NM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1361 | 10/15 | 04:04P | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1362 | 10/15 | 04:05P | MONTGOMERY,AL | | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1363 | 10/15 | 04:09P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1364 | 10/15 | 04:09P | Incoming | | OP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1365 | 10/15 | 04:10P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1366 | 10/16 | 04:12P | MONTGOMERY,AL | | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1367 | 10/15 | 04:20P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1368 | 10/15 | 04:25P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1369 | 10/15 | 04:27P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1370 | 10/15 | 04:31P | MONTGOMERY,AL | | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1371 | 10/15 | 04:39P | MONTGOMERY,AL | | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1372 | 10/15 | 05:15P | MONTGOMERY,AL | | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1373 | 10/15 | 06:02P | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1374 | 10/15 | 06:32P | MONTGOMERY,AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1375 | 10/16 | 07:44A | MONTGOMERY,AL | | PP | 1:00 | 0.45 | 0.00 | 0.45 |
| 1376 | 10/16 | 08:26A | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1377 | 10/16 | 10:08A | Incoming | | PP/NM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1378 | 10/16 | 11:52A | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1379 | 10/16 | 11:52A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1380 | 10/16 | 11:55A | MONTGOMERY,AL | | | 1:00 | 0.45 | 0.00 | 0.45 |

#### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1381 | 10/16 | 12:15P | MONTGOMERY,AL | 334 | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1382 | 10/16 | 12:23P | Incoming | 334 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1383 | 10/16 | 12:27P | MONTGOMERY,AL | 334 | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1384 | 10/16 | 12:27P | MONTGOMERY,AL | | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1385 | 10/16 | 12:28P | Incoming | 334 | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1386 | 10/16 | 12:32P | Incoming | 334 | /CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1387 | 10/16 | 12:52P | MONTGOMERY,AL | 33 | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1388 | 10/16 | 12:54P | Incoming | 33 | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1389 | 10/16 | 01:30P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1390 | 10/16 | 01:31P | MONTGOMERY,AL | | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1391 | 10/16 | 01:32P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1392 | 10/16 | 01:38P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1393 | 10/16 | 01:40P | MONTGOMERY,AL | | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1394 | 10/16 | 01:43P | MONTGOMERY,AL | | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1395 | 10/16 | 01:56P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1397 | 10/16 | 02:25P | MONTGOMERY,AL | 334-241-5986 | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1398 | 10/16 | 02:45P | Incoming | 334-241-5986 | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| | | | | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1400 | 10/16 | 04:24P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1401 | 10/16 | 04:40P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1402 | 10/16 | 04:58P | MONTGOMERY,AL | | | 1:00 | 0.45 | 0.00 | 0.45 |
| 1403 | 10/16 | 04:59P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1404 | 10/16 | 06:05P | MONTGOMERY,AL | 334 | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1405 | 10/16 | 07:22P | Incoming | 334 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1406 | 10/16 | 07:33P | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1407 | 10/16 | 07:40P | MONTGOMERY,AL | 334 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1408 | 10/17 | 07:44A | Customer Care | 888 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1409 | 10/17 | 08:30A | Incoming | 33 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1410 | 10/17 | 08:33A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1411 | 10/17 | 08:41A | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1412 | 10/17 | 09:11A | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1413 | 10/17 | 09:13A | Incoming | 33 | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 1414 | 10/17 | 02:00P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1416 | 10/17 | 02:40P | Incoming | 334-202-8676 | PP/NM | 14:00 | 0.00 | 0.00 | 0.00 |
| 1417 | 10/17 | 03:57P | Incoming | | PP/CW | 10:00 | 0.00 | 0.00 | 0.00 |
| 1419 | 10/17 | 04:09P | Incoming | | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1420 | 10/17 | 04:22P | Incoming | | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1421 | 10/17 | 07:16P | Incoming | Unavailable | OP | 51:00 | 0.00 | 0.00 | 0.00 |
| 1422 | 10/18 | 07:31A | Incoming | | PP | 6:00 | 0.00 | 0.00 | 0.00 |
| 1423 | 10/18 | 08:02A | Incoming | | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1424 | 10/18 | 08:52A | Incoming | Unavailable | PP/NM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1425 | 10/18 | 08:09A | Incoming | | PP | 11:00 | 0.00 | 0.00 | 0.00 |
| 1426 | 10/18 | 11:55A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1427 | 10/18 | 12:10P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1428 | 10/18 | 12:51P | Incoming | | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 1429 | 10/18 | 01:21P | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1430 | 10/18 | 02:16P | Incoming | | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 1431 | 10/18 | 02:28P | Customer Care | | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1432 | 10/18 | 02:29P | Customer Care | | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1433 | 10/18 | 02:52P | Incoming | | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1434 | 10/18 | 02:55P | Incoming | | /CW | 3:00 | 0.00 | 0.00 | 0.00 |
| 1435 | 10/18 | 03:08P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1436 | 10/18 | 03:23P | Incoming | | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1437 | 10/18 | 03:29P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



| | | |
|---|---|---|
| Account Number | Billing Period<br>09/19/06-10/18/06 | Page<br>18 of 18 |
| Account Name<br>YOLANDA BOSWELL | Invoice Date<br>October 23, 2006 | **NEXTEL** ™ |

## DETAILS for 334-414-5242, continued

### > SUBSCRIBER ACTIVITY DETAIL

#### Cellular Services Call Detail

| No. | Date | Time | Call To | | Footnote<br>(See pg. 2) | Min:Sec | Usage | *Long Dist/<br>Other | Total<br>Charges |
|-----|------|------|---------|--|------------------------|---------|-------|---------------------|------------------|
| 1438 | 10/18 | 03:39P | Incoming | 334-202-8676 PP/MM | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1439 | 10/18 | 04:10P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1440 | 10/18 | 04:11P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1441 | 10/18 | 08:35P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| **Total Cellular Services Charges** | | | | | | 3483:00 | $15.30 | $0.00 | $15.30 |

*Long Distance/Other column includes any Long Distance, Directory Assistance (411), and Out of Area charges.

#### Additional Messaging Detail

| Service Type | Number of<br>Messages<br>in Plan | Num<br>Messages | Initial<br>Rate | Initial<br>Message | Additional<br>Rate | Additional<br>Messages | Total<br>Charges |
|--------------|----------------------------------|-----------------|-----------------|--------------------|--------------------|------------------------|------------------|
| Text Messaging | 500 | | 0.00 | | 0.00 | | 0.00 |
| **Total Additional Messaging Charges** | | | | | | | $0.00 |

### > SUBSCRIBER INFORMATIONAL REPORTS

The following reports are compiled as a courtesy to help you manage usage trends and manage your subscriber activity.

#### Your Rate Plans

| Plan | |
|------|--|
| Spending Limit Program Charge | |
| Partners ASL Hotline | Partners Hotline ASL |
| Unlimited Night & Wknd Minutes | Cellular Minutes |
| Nights and Weekends 6pm | |
| Call Detail | |
| Unlimited Mobile to Mobile Min | M2M Use Them or Lose Them |
| Browser Wireless Web Service | |
| Text Messaging 500 Plan | |
| | Text Messaging |
| | Text Messages |
| | Text Messages |

#### Your Rate Plans

| Plan | |
|------|--|
| Nextel Free Incoming 500 | |

#### Airtime Usage Detail

| Plan | | Incoming<br>Outgoing | Total<br>Min:Sec | Plan<br>Min:Sec | Other<br>Min:Sec | Billable<br>Min:Sec | Total<br>Charges |
|------|--|----------------------|------------------|-----------------|------------------|---------------------|------------------|
| Nextel Free Incoming 500 | | | | | | | |
| Usage | | Incoming  Peak | 1220:00 | | 1220:00 | | 0.00 |
| Usage | | Incoming | 587:00 | | 587:00 | | 0.00 |
| Usage | | Outgoing | 1:00 | 677:00 | | 34:00 | 15.30 |
| Usage | | Outgoing | 941:00 | 941:00 | | | 0.00 |
| **Total Airtime Usage Charges** | | | | | | | $15.30 |



| Account Number | Billing Period 09/19/06-10/18/06 | Page A1 of 1 |
|---|---|---|
| Account Name YOLANDA BOSWELL | Invoice Date October 23, 2006 | |



## ACCOUNT CHARGES AND ADJUSTMENTS

## > ACCOUNT MANAGEMENT REPORTS

The following reports are compiled as a courtesy to help you analyze usage trends and manage your account activity.

### Cellular airtime usage summary

The minutes displayed in this grid are for reference only.  Always refer to the Subscriber Activity Detail sections for full unit detail.

| User Name/DAC | Number/ Pooling Group | Plan Minutes/ Additional Min Used/ Total Plan Minutes And Additional Min Used | Total Min Used/ Billable Min Used/ Per Min Rate | Billable Used Charges/ Shared Usage Adjustments/ Total Usage Charges |
|---|---|---|---|---|
| 1 | 334-414-5242 | 500:00 | 3459:00 | $15.30 |
| | | 2925:00 | 34:00 | $0.00 |
| | | 3425:00 | 0.45 | $15.30 |
| Totals | | 500:00 | 3459:00 | $15.30 |
| | | 2925:00 | 34:00 | $0.00 |
| | | 3425:00 | N/A | $15.30 |

**NEXTEL**

## > ACCOUNT INFORMATION

| | |
|---|---|
| **Account Name** | **Invoice Date** |
| YOLANDA BOSWELL | November 23, 2006 |
| **Account Number** | |
| | **Total Amount Due** |
| | **$257.86** |

## > CUSTOMER CARE

**Register and Logon**
www.nextel.com

**Call Nextel**
1-888-566-6111

## > PAYMENT OPTIONS

 **To Pay Your Bill Online Go To**
www.nextel.com/mynextel
Sign up for Recurring Direct Debit!

 **To Pay Your Bill By Phone Call**
1-888-566-6111 or
611 from your Nextel phone

 **To Pay Your Bill By Mail**
See reverse side for details. >

## > MONTHLY INVOICE SUMMARY

**October 19 - November 18, 2006**

| | |
|---|---|
| Previous Balance | 265.12 |
| Payments as of 11/19/06 - Thank you | -124.00 |
| **Outstanding Balance - Due Upon Receipt** | **$141.12** |
| Access and Related Items | 103.17 |
| Cellular Services | 2.40 |
| Additional Nextel Charges | 4.31 |
| Government Fees and Taxes | 6.86 |
| *Total Current Charges for 457449188 Due 12/03/06 | $116.74 |
| **Total Amount Due** | **$257.86** |

*Any unpaid balance after the due date may be subject to a late payment charge not to exceed 5% per month.

**NEXTEL**

Nextel Partners
6860 Bermuda Rd, Suite 100
Las Vegas, NV 89119

#BWNKYZW
#0000        B 7#
--MANIFESTLINE--
YOLANDA BOSWELL

F55555444422CF

Account Number

Page
2 of 23

Account Name
YOLANDA BOSWELL

## ➤ NEXTEL NEWS AND NOTICES CONTINUED

Your past due balance is payable immediately.

*** Notice Regarding Rate Plan Changes *** Each time Customer changes rate plans, Customer will pay a $9.99 per unit migration fee up to 10 units.

***Important Late Payment Notice *** A Late Payment Charge of 5% of the unpaid monthly charges may be applied to customer's account each month for up to 3 months on all accrued charges if full payment for all accrued charges is not received within 15 days of the due date. The late payment charge is for costs related to the non-timely payment and shall not be deemed an interest payment. If in any state, the 5% late payment charge exceeds the amount that may be legally charged, then the late payment charge shall be deemed to be the highest amount allowed under the applicable law.

**Using your wireless phone as your primary line?*** Nextel offers qualified, low-income customers discounts on their basic monthly wireless bill to certain residents of Alabama, Arkansas, Georgia, Florida, Hawaii, Indiana, Iowa, Kentucky, Louisiana, Mississippi, New York, Pennsylvania, Tennessee, Virginia and Wisconsin. You can save up to $13.50 per month on your phone bill. If you live on Tribal Lands, you may qualify to receive service for as little as $1 per month. Requirements vary by state. Call 888-566-6411 or visit www.lifelinesupport.org

for more information.

'Tis The Season For Powerful Communication Tools. Capture All The Holiday Moments For FREE With The i850* Camera Phone. Give The Gift Of Productivity And Get More Done For FREE With The i836** and i670. Wrap Up Text, Pics & Web For Only $9.99. Have A Holly Jolly And Get The Nextel BlackBerry® For Only $49.99.*** Good Tidings To All With 25% Off Accessories. Spread Some Holiday Cheer. Click nextelconnections.com/deals or call 1.800.590.0651. *After $50 mail-in rebate. Requires 2-year Service Agreement with TeleNav Subscription. **After $25 mail-in rebate. Requires 2-year Service Agreement with TeleNav Subscription. ***After $100 mail-in rebate and $50 PDA trade-in. Requires 2-year Service Agreement and 1-year data plan with TeleNav Subscription.



$257.86

YOLANDA BOSWELL
Account Number
Total Amount Due
Amount Enclosed

Nextel Partners
PO Box 4192
Carol Stream, IL 60197-4192

F60197419211 9F

Please make checks payable to Nextel Partners. Please fill out this form to pay your Nextel account balance using a credit card this month, or to change your billing address

☐ Credit Card ☐ Visa ☐ Mastercard ☐ American Express ☐ Discover ☐ Diners

Credit Card No: _____

Expires _____ / _____

Exact name on
your credit card _____

Billing ZIP _____

Please sign and date here for credit card payments:

Signature _____   Date _____

☐ Change of Address: Effective Date _____

Address _____

City _____   State _____   ZIP _____

Home # (___) _____   Business # (___) _____

☐ Change/Add E-mail (Optional) _____
Nextel may contact you regarding new offerings or promotions.

0000116674  0000141124  0000257865

## ➤ BILLING FOOTNOTES

| | | | | |
|---|---|---|---|---|
| Time Period: | PP-Peak Period | OP-Off Peak Period | MP-Multiple Period | |
| Features: | CW-Call Waiting | CF-Call Forwarding | 3W-Three Way Call | DS-Dialup Service | MM-Mobile to Mobile |
| | MH - Mobile to Home | MO - Mobile to Office | | | |
| Networks: | NN-National Network | CN-Canadian Network | WW-Nextel Worldwide | WD-Worldwide Discount | TJ-Tijuana Network |
| | OA-Out of Area | OC-Out of Home Area | | | |
| Services: | AL-Alternate Line | PU-Plan/Promotional Usage | PF-Partial Free | FC-Free Call | WP-Wireless Priority |

Case 2:07-cv-00135-WKW-TFM    Document 93-31    Filed 07/28/2008    Page 23 of 45

**Account Number**
**Account Name**
YOLANDA BOSWELL

**Billing Period**
10/19/06-11/18/06

**Invoice Date**
November 23, 2006

**Page**
3 of 23



NEXTEL

## > ACCOUNT SUMMARY

| | | Monthly Recurring Access Charges | Service Discount/ Adjustments or Charges | Cellular Minutes/ Charges | LD and Other Minutes/ Charges | Directory Assistance Charges | Direct Connect® Minutes/ Charges | Messaging Number of Messages/ Charges | Data and Third Party Services KB/ Charges | Equipment and Retail Purchases | Additional Nextel Charges | Government Fees and Taxes | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Account Charges and Adjustments** | | | | | | | | | | | | | |
| | YOLANDA BOSWELL | | $3.01 | | | | | | | | $0.03 | $0.12 | $3.16 |
| **Subscriber Charges and Adjustments** | | | | | | | | | | | | | |
| Number/ Name | Plan Page | | | | | | | | | | | | |
| 334-414-5693 | Nextel Free Incoming 500 | | | 4111:00 | | | | 49 | | | | | |
| 1 | 4 | 100.16 | | | | | 2.40 | | | | 4.28 | 6.74 | 113.58 |
| Usage for All Subscribers | | | | 4111:00 | | | | 49 | | | | | |
| Discounts for All Subscribers | | | | | | | | | | | | | |
| Charges for All Subscribers | | $100.16 | | | | | $2.40 | | | | $4.28 | $6.74 | $113.58 |
| **Total Current Usage** | | | | 4111:00 | | | | 49 | | | | | |
| **Total Current Charges** | | $100.16 | $3.01 | | | | $2.40 | | | | $4.31 | $6.86 | $116.74 |

Total Subscribers on Account 1

If you prefer to receive a summary only invoice, please visit www.nextel.com/en/mynextel/index.shtml and choose the Choose Bill Format option.  You can also receive a summary-only invoice by calling Customer Care.  The summary-only invoice is designed for your convenience, and will not display full billing detail or an individual breakdown of Nextel charges or government-imposed taxes and fees.

Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06
Invoice Date
November 23, 2006

Page
4 of 23


NEXTEL ™

## ACCOUNT CHARGES AND ADJUSTMENTS

### > ACCOUNT ACTIVITY SUMMARY

| | Date Received | Amount |
|---|---|---|
| **PREVIOUS INVOICE ACTIVITY** | | |
| Previous Balance | | $265.12 |
| Payments Toward Previous Balance | | |
| Payment | 10/20/06 | -124.00 |
| Total Payments | | -$124.00 |
| Outstanding Balance | | $141.12 |

| | Rate/Date | Quantity | Amount |
|---|---|---|---|
| **CURRENT INVOICE ACTIVITY** | | | |
| **Adjustments and Other Charges** | | | |
| Infrastructure Fee | | | 1.99 |
| Late Payment | | | 1.02 |
| Total Adjustments and Other Charges | | | $3.01 |
| **Additional Nextel Charges** | | | |
| * Federal - Univ Serv Assessment | 1.400% | | 0.03 |
| Total Additional Nextel Charges | | | $0.03 |
| *Fees Nextel elects to collect to recover its costs of funding and complying with government mandates and initiatives. | | | |
| **Government Fees and Taxes** | | | |
| State-Utility Tax | 6.000% | | 0.12 |
| Total Government Fees and Taxes | | | $0.12 |
| **Current Balance** | | | $3.16 |

### > ACCOUNT MANAGEMENT REPORTS

The following reports are compiled as a courtesy to help you analyze usage trends and manage your account activity.

#### Airtime Usage Detail

| Subscribers | Plan | Incoming/ Outgoing | Peak/ Off Peak | Total Min:Sec | *Plan Min:Sec | **Other Min:Sec | Billable Min:Sec | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | Nextel Free Incoming 500 | | | | | | | |
| | Usage | Incoming | Peak | 1203:00 | | 1203:00 | | 0.00 |
| | Usage | Incoming | Off Peak | 899:00 | | 899:00 | | 0.00 |
| | Usage | Outgoing | Peak | 798:00 | 798:00 | | | 0.00 |
| | Usage | Outgoing | Off Peak | 1211:00 | 1211:00 | | | 0.00 |
| Total Airtime Usage Charges | | | | | | | | $0.00 |

*Plan Min:Sec includes rate plan and bonus minutes:seconds used.
**Other Min:Sec includes free incoming minutes:seconds used.

## SUBSCRIBER CHARGES AND ADJUSTMENTS
DETAILS FOR 334-414-5693, 1

### > SUBSCRIBER ACTIVITY SUMMARY

| | Rate/Date | Amount |
|---|---|---|
| **Monthly Recurring Access Charges** | | |
| Call Detail for 10/19 - 11/18 | | 1.49 |
| Nextel Free Incoming 500 for 10/19 - 11/18 | | 59.99 |
| Nextel Service and Repair Plan for 10/22 - 11/18 | | 2.69 |
| Nights and Weekends 6pm for 10/19 - 11/18 | | 10.00 |
| Spending Limit Program Charge for 10/19 - 11/18 | | 12.99 |
| Text Messaging 500 Plan for 10/19 - 11/18 | | 8.00 |
| Unlimited Mobile to Mobile Min for 10/19 - 11/18 | | 5.00 |
| Total Monthly Recurring Access Charges | | $100.16 |
| You are charged on a pro-rated basis when you sign up for service, or when you add to or remove units from a rate plan. | | |
| **Directory Assistance Charges** | | |
| Directory Assistance | | 2.40 |
| Total Directory Assistance Charges | | $2.40 |
| **Additional Nextel Charges** | | |
| * Federal - Univ Serv Assessment | 1.400% | 1.39 |
| * Federal - Programs Cost Recovery | | 2.89 |
| Total Additional Nextel Charges | | $4.28 |
| *Fees Nextel elects to collect to recover its costs of funding and complying with government mandates and initiatives. | | |
| **Government Fees and Taxes** | | |
| State - Utility Tax | 6.000% | 6.04 |
| State - 911 Taxes | | 0.70 |
| Total Government Fees and Taxes | | $6.74 |
| **Total Charges for 1** | | $113.58 |

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06–11/18/06   5 of 23

Invoice Date
November 23, 2006

Page

**NEXTEL** ™

## DETAILS for 334-414-5693, 1 continued
## > SUBSCRIBER ACTIVITY DETAIL

To view coverage maps and rates visit Nextel.com

### Cellular Services Call Detail

| No. | Date | Time | Call To | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 10/19 | 07:34A | Incoming | | 4:00 | 0.00 | 0.00 | 0.00 |
| 2 | 10/19 | 08:44A | Incoming | | 4:00 | 0.00 | 0.00 | 0.00 |
| 3 | 10/19 | 08:50A | Incoming | MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 4 | 10/19 | 09:20A | Incoming | | 8:00 | 0.00 | 0.00 | 0.00 |
| 5 | 10/19 | 09:35A | Incoming | | 9:00 | 0.00 | 0.00 | 0.00 |
| 6 | 10/19 | 10:02A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 7 | 10/19 | 10:08A | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 8 | 10/19 | 10:12A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 9 | 10/19 | 01:26P | Customer Care | PP/FC | 2:00 | 0.00 | 0.00 | 0.00 |
| 10 | 10/19 | 02:52P | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 11 | 10/19 | 02:58P | Incoming | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 12 | 10/19 | 03:56P | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 13 | 10/19 | 04:04P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 14 | 10/20 | 08:01A | Incoming | | 18:00 | 0.00 | 0.00 | 0.00 |
| 15 | 10/20 | 08:34A | Incoming | PP | 6:00 | 0.00 | 0.00 | 0.00 |
| 16 | 10/20 | 10:11A | WETUMPKA,AL | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 17 | 10/20 | 10:12A | Customer Care | PP/FC | 2:00 | 0.00 | 0.00 | 0.00 |
| 18 | 10/20 | 10:13A | Customer Care | PP/FC | 4:00 | 0.00 | 0.00 | 0.00 |
| 19 | 10/20 | 10:17A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 20 | 10/20 | 10:45A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 21 | 10/20 | 11:59A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 22 | 10/20 | 12:22P | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 23 | 10/20 | 12:24P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 24 | 10/20 | 12:25P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 25 | 10/20 | 12:25P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 26 | 10/20 | 12:26P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 27 | 10/20 | 12:27P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 28 | 10/20 | 12:57P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 29 | 10/20 | 01:08P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 30 | 10/20 | 01:13P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 31 | 10/20 | 01:13P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 32 | 10/20 | 01:15P | Customer Care | PP/FC | 2:00 | 0.00 | 0.00 | 0.00 |
| 33 | 10/20 | 01:42P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 34 | 10/20 | 01:50P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 35 | 10/20 | 01:55P | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 36 | 10/20 | 02:53P | Incoming | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 37 | 10/20 | 02:56P | Incoming | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 38 | 10/20 | 03:07P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 39 | 10/20 | 03:23P | Incoming | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 40 | 10/20 | 03:37P | Incoming | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 41 | 10/20 | 03:48P | Incoming | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 42 | 10/20 | 03:53P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 43 | 10/20 | 03:53P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 44 | 10/20 | 03:53P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 45 | 10/20 | 03:54P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 46 | 10/20 | 04:14P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 47 | 10/20 | 04:14P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 48 | 10/20 | 04:22P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 49 | 10/20 | 04:36P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 50 | 10/20 | 04:36P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 51 | 10/20 | 04:36P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 52 | 10/20 | 04:37P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 53 | 10/20 | 04:38P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 54 | 10/20 | 04:58P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 55 | 10/20 | 06:12P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 56 | 10/20 | 06:19P | Incoming | | 11:00 | 0.00 | 0.00 | 0.00 |
| 57 | 10/20 | 07:30P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 58 | 10/20 | 07:31P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 59 | 10/20 | 07:40P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 60 | 10/20 | 07:41P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 61 | 10/20 | 07:42P | Incoming | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 62 | 10/20 | 07:42P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 63 | 10/20 | 07:43P | Customer Care | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 64 | 10/20 | 07:46P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 65 | 10/20 | 08:01P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 66 | 10/21 | 07:25A | Customer Care | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 67 | 10/21 | 07:56A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 68 | 10/21 | 07:59A | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 69 | 10/21 | 08:27A | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 70 | 10/21 | 08:25A | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 71 | 10/21 | 08:32A | WETUMPKA,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 72 | 10/21 | 08:32A | WETUMPKA,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 73 | 10/21 | 08:34A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 74 | 10/21 | 08:37A | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 75 | 10/21 | 08:38A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 76 | 10/21 | 08:40A | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 77 | 10/21 | 08:41A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 78 | 10/21 | 08:50A | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 79 | 10/21 | 08:52A | Incoming | | 21:00 | 0.00 | 0.00 | 0.00 |
| 80 | 10/21 | 09:37A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 81 | 10/21 | 09:47A | Incoming | | 8:00 | 0.00 | 0.00 | 0.00 |
| 82 | 10/21 | 09:55A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 83 | 10/21 | 09:56A | MONTGOMERY,AL | 334 PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 84 | 10/21 | 09:57A | MONTGOMERY,AL | 334 PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 85 | 10/21 | 09:57A | MONTGOMERY,AL | 334 PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 86 | 10/21 | 10:18A | MONTGOMERY,AL | 334 PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 87 | 10/21 | 10:18A | MONTGOMERY,AL | 334 PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 88 | 10/21 | 10:29A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 89 | 10/21 | 10:30A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 90 | 10/21 | 10:32A | MONTGOMERY,AL | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 91 | 10/21 | 10:35A | MONTGOMERY,AL | PP/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 92 | 10/21 | 10:45A | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 93 | 10/21 | 11:00A | Incoming | 334 PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 94 | 10/21 | 11:08A | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 95 | 10/21 | 11:24A | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 96 | 10/21 | 11:53A | Incoming | OP | 6:00 | 0.00 | 0.00 | 0.00 |
| 97 | 10/21 | 12:03P | Incoming | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 98 | 10/21 | 12:29P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 99 | 10/21 | 12:30P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 100 | 10/21 | 12:30P | MONTGOMERY,AL | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 101 | 10/21 | 12:31P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 102 | 10/21 | 12:33P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 103 | 10/21 | 12:34P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 104 | 10/21 | 12:36P | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 105 | 10/21 | 12:36P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 106 | 10/21 | 12:37P | MONTGOMERY,AL | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 107 | 10/21 | 12:38P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 108 | 10/21 | 12:39P | Incoming | PP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 109 | 10/21 | 12:40P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
6 of 23

**NEXTEL** ™

**DETAILS for 334-414-5693,**

## > SUBSCRIBER ACTIVITY DETAIL

### 🕿 Cellular Services Call Detail

| No. | Date | Time | Call To | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|-----|------|------|---------|----------------------|---------|-------|-------------------|---------------|
| 110 | 10/21 | 12:41P | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 111 | 10/21 | 12:43P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 112 | 10/21 | 12:43P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 113 | 10/21 | 12:53P | Incoming | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 114 | 10/21 | 12:54P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 115 | 10/21 | 12:55P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 116 | 10/21 | 01:00P | MONTGOMERY,AL | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 117 | 10/21 | 01:00P | WETUMPKA,AL | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 118 | 10/21 | 01:04P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 119 | 10/21 | 01:21P | Incoming | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 120 | 10/21 | 01:24P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 121 | 10/21 | 01:25P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 122 | 10/21 | 01:27P | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 123 | 10/21 | 01:30P | WETUMPKA,AL | | 2:00 | 0.00 | 0.00 | 0.00 |
| 124 | 10/21 | 01:44P | Incoming | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 125 | 10/21 | 02:01P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 126 | 10/21 | 02:02P | MONTGOMERY,AL | P/PL | 1:00 | 0.00 | 0.00 | 0.00 |
| 127 | 10/21 | 02:09P | MONTGOMERY,AL | P/PL | 1:00 | 0.00 | 0.00 | 0.00 |
| 128 | 10/21 | 02:13P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 129 | 10/21 | 02:13P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 130 | 10/21 | 02:20P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 131 | 10/21 | 02:21P | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 132 | 10/21 | 02:22P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 133 | 10/21 | 02:23P | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 134 | 10/21 | 02:33P | Incoming | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 135 | 10/21 | 02:42P | WETUMPKA,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 136 | 10/21 | 02:44P | Incoming | | 6:00 | 0.00 | 0.00 | 0.00 |
| 137 | 10/21 | 02:49P | MONTGOMERY,AL | P/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 138 | 10/21 | 02:54P | WETUMPKA,AL | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 139 | 10/21 | 03:19P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 140 | 10/21 | 03:23P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 141 | 10/21 | 03:27P | MONTGOMERY,AL | P/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 142 | 10/21 | 03:40P | Incoming | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 143 | 10/21 | 04:17P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 144 | 10/21 | 04:29P | MONTGOMERY,AL | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 145 | 10/21 | 04:33P | Incoming | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 146 | 10/21 | 05:15P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 147 | 10/21 | 05:18P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 148 | 10/21 | 05:17P | MONTGOMERY,AL | P/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 149 | 10/21 | 05:21P | Incoming | CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 150 | 10/21 | 05:41P | MONTGOMERY,AL | | 3:00 | 0.00 | 0.00 | 0.00 |
| 151 | 10/21 | 05:48P | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 152 | 10/21 | 05:51P | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 153 | 10/21 | 06:12P | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 154 | 10/22 | 07:47A | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 155 | 10/22 | 07:47A | MONTGOMERY,AL | P/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 156 | 10/22 | 07:49A | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 157 | 10/22 | 08:47A | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 158 | 10/22 | 08:52A | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 159 | 10/22 | 08:57A | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 160 | 10/22 | 09:19A | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 161 | 10/22 | 09:29A | Incoming | | 7:00 | 0.00 | 0.00 | 0.00 |
| 162 | 10/22 | 09:39A | MONTGOMERY,AL | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |

### 🕿 Cellular Services Call Detail

| No. | Date | Time | Call To | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|-----|------|------|---------|----------------------|---------|-------|-------------------|---------------|
| 163 | 10/22 | 09:50A | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 164 | 10/22 | 09:51A | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 165 | 10/22 | 09:53A | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 166 | 10/22 | 10:04A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 167 | 10/22 | 10:21A | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 168 | 10/22 | 10:48A | Customer Care | 61 /FC | 9:00 | 0.00 | 0.00 | 0.00 |
| 169 | 10/22 | 10:54A | Incoming | CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 170 | 10/22 | 11:01A | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 171 | 10/22 | 11:01A | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 172 | 10/22 | 11:02A | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 173 | 10/22 | 11:02A | MONTGOMERY,AL | P/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 174 | 10/22 | 11:08A | Incoming | | 10:00 | 0.00 | 0.00 | 0.00 |
| 175 | 10/22 | 11:23A | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 176 | 10/22 | 11:23A | MONTGOMERY,AL | MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 177 | 10/22 | 11:26A | MONTGOMERY,AL | /PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 178 | 10/22 | 11:32A | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 179 | 10/22 | 11:32A | MONTGOMERY,AL | | 4:00 | 0.00 | 0.00 | 0.00 |
| 180 | 10/22 | 11:39A | MONTGOMERY,AL | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 181 | 10/22 | 11:43A | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 182 | 10/22 | 11:44A | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 183 | 10/22 | 12:02P | MONTGOMERY,AL | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 184 | 10/22 | 12:13P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 185 | 10/22 | 12:19P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 186 | 10/22 | 12:29P | Incoming | | 6:00 | 0.00 | 0.00 | 0.00 |
| 187 | 10/22 | 12:49P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 188 | 10/22 | 12:51P | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 189 | 10/22 | 12:53P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 190 | 10/22 | 01:23P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 191 | 10/22 | 01:26P | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 192 | 10/22 | 01:51P | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 193 | 10/22 | 01:51P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 194 | 10/22 | 01:52P | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 195 | 10/22 | 01:53P | Incoming | CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 196 | 10/22 | 02:33P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 197 | 10/22 | 02:35P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 198 | 10/22 | 02:37P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 199 | 10/22 | 03:43P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 200 | 10/22 | 03:44P | MONTGOMERY,AL | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 201 | 10/22 | 03:45P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 202 | 10/22 | 03:46P | MONTGOMERY,AL | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 203 | 10/22 | 03:47P | MONTGOMERY,AL | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 204 | 10/22 | 03:48P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 205 | 10/22 | 03:50P | Incoming | CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 206 | 10/22 | 04:06P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 207 | 10/22 | 04:11P | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 208 | 10/22 | 04:17P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 209 | 10/22 | 04:18P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 210 | 10/22 | 04:20P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 211 | 10/22 | 04:21P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 212 | 10/22 | 04:27P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 213 | 10/22 | 04:29P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 214 | 10/22 | 04:32P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 215 | 10/22 | 04:42P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 216 | 10/22 | 05:01P | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 217 | 10/22 | 05:08P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 218 | 10/22 | 07:38A | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 219 | 10/23 | 08:12A | MONTGOMERY,AL | MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06
Invoice Date
November 23, 2006

Page
7 of 23


**NEXTEL**

DETAILS for 334-414-5693, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (Footnote See pg. 2) | Min:Sec | Usage | *Long Dist./Other | Total Charges |
|-----|------|------|---------|------|---------|-------|--------|--------|
| 220 | 10/23 | 08:14A | Incoming | 334- /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 221 | 10/23 | 09:18A | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 222 | 10/23 | 09:22A | Directory Assistance411 | PP/PU | 2:00 | 0.00 | 2.40 | 2.40 |
| 223 | 10/23 | 09:23A | Incoming | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 224 | 10/23 | 09:40A | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 225 | 10/23 | 10:06A | MONTGOMERY,AL | 334- /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 226 | 10/23 | 10:07A | MONTGOMERY,AL | 334- /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 227 | 10/23 | 10:08A | Incoming | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 228 | 10/23 | 10:20A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 229 | 10/23 | 10:28A | MONTGOMERY,AL | 334- /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 230 | 10/23 | 10:40A | MONTGOMERY,AL | 334- /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 231 | 10/23 | 10:51A | MONTGOMERY,AL | 334- /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 232 | 10/23 | 11:08A | Incoming | 334- | 3:00 | 0.00 | 0.00 | 0.00 |
| 233 | 10/23 | 11:12A | MONTGOMERY,AL | 33 /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 234 | 10/23 | 11:13A | MONTGOMERY,AL | 33 PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 235 | 10/23 | 11:13A | Incoming | 334- /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 236 | 10/23 | 11:13A | MONTGOMERY,AL | 33 PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 237 | 10/23 | 11:19A | MONTGOMERY,AL | 33 PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 238 | 10/23 | 11:20A | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 239 | 10/23 | 11:2*A | MONTGOMERY,AL | 33 /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 240 | 10/23 | 11:24A | MONTGOMERY,AL | 33 /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 241 | 10/23 | 11:24A | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 242 | 10/23 | 11:49A | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 243 | 10/23 | 11:50A | MONTGOMERY,AL | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 244 | 10/23 | 12:04P | Incoming | 33 | 2:00 | 0.00 | 0.00 | 0.00 |
| 245 | 10/23 | 12:38P | WETUMPKA,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 246 | 10/23 | 12:56P | MONTGOMERY,AL | 33 /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 247 | 10/23 | 12:59P | MONTGOMERY,AL | 33 PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 248 | 10/23 | 01:0*P | MONTGOMERY,AL | Vo PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 249 | 10/23 | 01:02P | Incoming | 33 R/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 250 | 10/23 | 01:02P | Incoming | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 251 | 10/23 | 01:08P | WETUMPKA,AL | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 252 | 10/23 | 01:12P | MONTGOMERY,AL | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 253 | 10/23 | 01:15P | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 254 | 10/23 | 01:20P | Incoming | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 255 | 10/23 | 01:27P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 256 | 10/23 | 01:27P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 257 | 10/23 | 01:28P | Incoming | R/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 258 | 10/23 | 01:31P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 259 | 10/23 | 01:34P | GEORGIANA,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 260 | 10/23 | 01:41P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 261 | 10/23 | 01:43P | MONTGOMERY,AL | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 262 | 10/23 | 01:48P | MONTGOMERY,AL | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 263 | 10/23 | 01:47P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 264 | 10/23 | 01:48P | MONTGOMERY,AL | 334- /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 265 | 10/23 | 01:50P | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 266 | 10/23 | 01:52P | Incoming | 334- /MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 267 | 10/23 | 01:55P | MONTGOMERY,AL | 334- /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 268 | 10/23 | 02:00P | MONTGOMERY,AL | 334- /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 269 | 10/23 | 02:07P | MONTGOMERY,AL | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 270 | 10/23 | 02:58P | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 271 | 10/23 | 03:00P | MONTGOMERY,AL | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 272 | 10/23 | 03:09P | Incoming | i334- PP | 1:00 | 0.00 | 0.00 | 0.00 |

| No. | Date | Time | Call To | Number (Footnote See pg. 2) | Min:Sec | Usage | *Long Dist./Other | Total Charges |
|-----|------|------|---------|------|---------|-------|--------|--------|
| 273 | 10/23 | 03:11P | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 274 | 10/23 | 03:12P | Incoming | | 11:00 | 0.00 | 0.00 | 0.00 |
| 275 | 10/23 | 03:28P | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 276 | 10/23 | 03:40P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 277 | 10/23 | 03:43P | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 278 | 10/23 | 03:44P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 279 | 10/23 | 03:49P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 280 | 10/23 | 03:59P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 281 | 10/23 | 04:00P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 282 | 10/23 | 04:00P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 283 | 10/23 | 04:20P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 284 | 10/23 | 04:21P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 285 | 10/23 | 04:23P | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 286 | 10/23 | 04:27P | MONTGOMERY,AL | | 3:00 | 0.00 | 0.00 | 0.00 |
| 287 | 10/23 | 05:08P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 288 | 10/23 | 07:19P | MONTGOMERY,AL | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 289 | 10/23 | 07:33P | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 290 | 10/23 | 07:47P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 291 | 10/23 | 07:57P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 292 | 10/23 | 08:02P | Incoming | | 3:00 | 0.00 | 0.00 | 0.00 |
| 293 | 10/24 | 08:55A | MONTGOMERY,AL | | 1:00 | 0.00 | 0.00 | 0.00 |
| 294 | 10/24 | 09:02A | BIRMINGHAM,AL | | 2:00 | 0.00 | 0.00 | 0.00 |
| 295 | 10/24 | 09:57A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 296 | 10/24 | 10:07A | MONTGOMERY,AL | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 297 | 10/24 | 10:08A | MONTGOMERY,AL | | 2:00 | 0.00 | 0.00 | 0.00 |
| 298 | 10/24 | 10:24A | MONTGOMERY,AL | ⟶ 334-202-8678 PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 299 | 10/24 | 10:25A | MONTGOMERY,AL | ⟶ 334-241-5986 PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 300 | 10/24 | 10:36A | Incoming | ⟶ 334-241-5986 PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 301 | 10/24 | 10:49A | MONTGOMERY,AL | | 2:00 | 0.00 | 0.00 | 0.00 |
| 302 | 10/24 | 10:53A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 303 | 10/24 | 12:11P | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 304 | 10/24 | 12:54P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 305 | 10/24 | 12:55P | MONTGOMERY,AL | | 3:00 | 0.00 | 0.00 | 0.00 |
| 306 | 10/24 | 12:58P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 307 | 10/24 | 01:29P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 308 | 10/24 | 01:32P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 309 | 10/24 | 01:42P | MONTGOMERY,AL | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 310 | 10/24 | 01:43P | MONTGOMERY,AL | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 311 | 10/24 | 01:51P | MONTGOMERY,AL | PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 312 | 10/24 | 01:57P | Incoming | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 313 | 10/24 | 02:08P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 314 | 10/24 | 02:12P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 315 | 10/24 | 02:14P | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 316 | 10/24 | 02:42P | MONTGOMERY,AL | 33 /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 317 | 10/24 | 02:43P | Incoming | | 1:00 | 0.00 | 0.00 | 0.00 |
| 318 | 10/24 | 03:14P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 319 | 10/24 | 03:26P | Incoming | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 320 | 10/24 | 03:48P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 321 | 10/24 | 04:09P | Incoming | 33 | 1:00 | 0.00 | 0.00 | 0.00 |
| 322 | 10/24 | 05:53P | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 323 | 10/24 | 06:22P | MONTGOMERY,AL | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 324 | 10/25 | 07:50A | MONTGOMERY,AL | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 325 | 10/25 | 08:06A | Incoming | | 2:00 | 0.00 | 0.00 | 0.00 |
| 326 | 10/25 | 08:21A | Incoming | | 8:00 | 0.00 | 0.00 | 0.00 |
| 327 | 10/25 | 08:29A | LITTLEROCK,AR | 50 | 1:00 | 0.00 | 0.00 | 0.00 |
| 328 | 10/25 | 08:32A | Incoming | 501 | 1:00 | 0.00 | 0.00 | 0.00 |
| 329 | 10/25 | 09:36A | MONTGOMERY,AL | 334- /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

## DETAILS for 334-414-5693, 1 continued

### > SUBSCRIBER ACTIVITY DETAIL

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number | (footnote pg. 2) Min:Sec | Usage | *Long Dist./Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 330 | 10/25 | 09:37A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 331 | 10/25 | 09:38A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 332 | 10/25 | 09:38A | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 333 | 10/25 | 10:09A | Incoming | | | 5:00 | 0.00 | 0.00 | 0.00 |
| 334 | 10/25 | 10:16A | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 335 | 10/25 | 10:25A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 336 | 10/25 | 10:29A | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 337 | 10/25 | 10:29A | MONTGOMERY,AL | | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 338 | 10/25 | 10:30A | MONTGOMERY,AL | | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 339 | 10/25 | 10:31A | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 340 | 10/25 | 10:32A | Incoming | | | 5:00 | 0.00 | 0.00 | 0.00 |
| 341 | 10/25 | 10:36A | MONTGOMERY,AL | | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 342 | 10/25 | 10:37A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 343 | 10/25 | 10:38A | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 344 | 10/25 | 12:17P | Incoming | 334- | P | 3:00 | 0.00 | 0.00 | 0.00 |
| 345 | 10/25 | 12:20P | Incoming | 334- | P | 7:00 | 0.00 | 0.00 | 0.00 |
| 346 | 10/25 | 12:55P | Incoming | | P | 4:00 | 0.00 | 0.00 | 0.00 |
| 347 | 10/25 | 12:58P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 348 | 10/25 | 12:59P | Incoming | | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 349 | 10/25 | 01:00P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 350 | 10/25 | 01:01P | Incoming | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 351 | 10/25 | 01:21P | Incoming | | P | 3:00 | 0.00 | 0.00 | 0.00 |
| 352 | 10/25 | 01:37P | Incoming | 5 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 353 | 10/25 | 01:39P | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 354 | 10/25 | 02:09P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 355 | 10/25 | 02:12P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 356 | 10/25 | 02:56P | Incoming | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 357 | 10/25 | 02:57P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 358 | 10/25 | 03:09P | Incoming | 33 | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 359 | 10/25 | 03:15P | Incoming | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 360 | 10/25 | 03:45P | Incoming | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 361 | 10/25 | 04:24P | MONTGOMERY,AL | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 362 | 10/25 | 04:24P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 363 | 10/25 | 04:26P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 364 | 10/25 | 04:26P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 365 | 10/25 | 04:35P | Incoming | 50 | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 366 | 10/25 | 04:47P | Incoming | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 367 | 10/25 | 04:48P | Incoming | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 368 | 10/25 | 05:43P | Incoming | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 369 | 10/25 | 05:59P | MONTGOMERY,AL | Vo | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 370 | 10/26 | 06:26P | Incoming | 334 | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 371 | 10/26 | 07:39A | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 372 | 10/26 | 08:11A | Incoming | 334- | P | 8:00 | 0.00 | 0.00 | 0.00 |
| 373 | 10/26 | 08:47A | Incoming | 334- | P | 4:00 | 0.00 | 0.00 | 0.00 |
| 374 | 10/26 | 09:04A | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 375 | 10/26 | 10:24A | Incoming | 334- | P | 3:00 | 0.00 | 0.00 | 0.00 |
| 376 | 10/26 | 10:24A | Incoming | 334- | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 377 | 10/26 | 10:32A | Incoming | 334- | P/PU | 8:00 | 0.00 | 0.00 | 0.00 |
| 378 | 10/26 | 11:18A | Incoming | 334- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 379 | 10/26 | 01:04P | Incoming | 334- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 380 | 10/26 | 01:23P | Incoming | 334- | P | 5:00 | 0.00 | 0.00 | 0.00 |
| 381 | 10/26 | 03:15P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 382 | 10/26 | 03:31P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |

---

Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Page
8 of 23

Invoice Date
November 23, 2006

NEXTEL

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number | (footnote pg. 2) Min:Sec | Usage | *Long Dist./Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 383 | 10/26 | 04:44P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 384 | 10/26 | 05:02P | Incoming | | | 6:00 | 0.00 | 0.00 | 0.00 |
| 385 | 10/26 | 05:07P | Incoming | Unavailable | CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 386 | 10/26 | 07:30A | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 387 | 10/27 | 08:18A | BIRMINGHAM,AL | 20 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 388 | 10/27 | 08:19A | MONTGOMERY,AL | 33 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 389 | 10/27 | 08:35A | Incoming | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 390 | 10/27 | 08:37A | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 391 | 10/27 | 08:45A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 392 | 10/27 | 08:53A | Incoming | 33 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 393 | 10/27 | 08:54A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 394 | 10/27 | 08:55A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 395 | 10/27 | 09:04A | Incoming | 30 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 396 | 10/27 | 09:22A | MONTGOMERY,AL | 3 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 397 | 10/27 | 09:22A | MONTGOMERY,AL | 3 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 398 | 10/27 | 09:23A | Incoming | 3 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 399 | 10/27 | 09:36A | MONTGOMERY,AL | 334 | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 400 | 10/27 | 09:37A | Incoming | 33 | P/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 401 | 10/27 | 09:37A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 402 | 10/27 | 10:05A | Incoming | 3 | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 403 | 10/27 | 10:30A | MONTGOMERY,AL | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 404 | 10/27 | 10:40A | MONTGOMERY,AL | 33 | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 405 | 10/27 | 10:41A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 406 | 10/27 | 10:44A | MONTGOMERY,AL | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 407 | 10/27 | 10:50A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 408 | 10/27 | 10:53A | MONTGOMERY,AL | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 409 | 10/27 | 10:54A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 410 | 10/27 | 11:05A | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 411 | 10/27 | 11:26A | MONTGOMERY,AL | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 412 | 10/27 | 11:28A | MONTGOMERY,AL | 33 | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 413 | 10/27 | 11:55A | MONTGOMERY,AL | 33 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 414 | 10/27 | 12:24P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 415 | 10/27 | 12:30P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 416 | 10/27 | 12:38P | MONTGOMERY,AL | 33 | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 417 | 10/27 | 12:40P | Incoming | 33 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 418 | 10/27 | 12:59P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 419 | 10/27 | 01:00P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 420 | 10/27 | 01:19P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 421 | 10/27 | 01:26P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 422 | 10/27 | 01:28P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 423 | 10/27 | 01:31P | Incoming | | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 424 | 10/27 | 01:47P | Incoming | | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 425 | 10/27 | 02:25P | Incoming | | | 3:00 | 0.00 | 0.00 | 0.00 |
| 426 | 10/27 | 02:41P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 427 | 10/27 | 03:52P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 428 | 10/27 | 04:11P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 429 | 10/27 | 04:29P | MONTGOMERY,AL | | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 430 | 10/27 | 04:30P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 431 | 10/27 | 04:36P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 432 | 10/27 | 05:09P | MONTGOMERY,AL | | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 433 | 10/27 | 05:10P | MONTGOMERY,AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 434 | 10/27 | 05:16P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 435 | 10/27 | 05:32P | MONTGOMERY,AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 436 | 10/27 | 05:37P | MONTGOMERY,AL | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 437 | 10/27 | 05:38P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 438 | 10/27 | 06:18P | Incoming | | | 2:00 | 0.00 | 0.00 | 0.00 |
| 439 | 10/27 | 06:36P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06
Invoice Date
November 23, 2006

Page
9 of 23

NEXTEL

**DETAILS for 334-414-5693, 1 continued**

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 440 | 10/27 | 07:13P | BIRMINGHAM,AL | | MM/PU | 1:00 | 0.00 | | 0.00 |
| 441 | 10/27 | 07:45P | Incoming | 334-202-8676 | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 442 | 10/27 | 07:46P | MONTGOMERY,AL | 334-202-8676 | OP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 443 | 10/28 | 08:07A | BIRMINGHAM,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 444 | 10/28 | 08:34A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 445 | 10/28 | 09:56A | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 446 | 10/28 | 10:00A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 447 | 10/28 | 10:02A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 448 | 10/28 | 10:04A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 449 | 10/28 | 10:06A | BIRMINGHAM,AL | 205 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 450 | 10/28 | 10:06A | Incoming | 334- | /CM | 1:00 | 0.00 | 0.00 | 0.00 |
| 451 | 10/28 | 10:07A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 452 | 10/28 | 10:11A | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 453 | 10/28 | 10:15A | MONTGOMERY,AL | 334- | OP/PU | 16:00 | 0.00 | 0.00 | 0.00 |
| 454 | 10/28 | 10:26A | Incoming | 334- | /CM | 1:00 | 0.00 | 0.00 | 0.00 |
| 455 | 10/28 | 10:38A | MONTGOMERY,AL | 334- | OP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 456 | 10/28 | 10:44A | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 457 | 10/28 | 10:44A | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 458 | 10/28 | 10:47A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 459 | 10/28 | 10:52A | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 460 | 10/28 | 10:52A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 461 | 10/28 | 10:52A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 462 | 10/28 | 10:54A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 463 | 10/28 | 10:54A | BIRMINGHAM,AL | 205 | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 464 | 10/28 | 10:59A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 465 | 10/28 | 11:00A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 466 | 10/28 | 11:01A | Incoming | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 467 | 10/28 | 11:02A | Incoming | 334- | /MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 468 | 10/28 | 11:05A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 469 | 10/28 | 11:07A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 470 | 10/28 | 11:08A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 471 | 10/28 | 11:09A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 472 | 10/28 | 11:11A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 473 | 10/28 | 11:12A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 474 | 10/28 | 11:13A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 475 | 10/28 | 11:22A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 476 | 10/28 | 11:28A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 477 | 10/28 | 11:29A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 478 | 10/28 | 11:30A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 479 | 10/28 | 11:31A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 480 | 10/28 | 11:32A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 481 | 10/28 | 11:34A | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 482 | 10/28 | 11:37A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 483 | 10/28 | 11:40A | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 484 | 10/28 | 11:45A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 485 | 10/28 | 11:49A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 486 | 10/28 | 11:50A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 487 | 10/28 | 11:56A | Incoming | 334- | OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 488 | 10/28 | 11:58A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 489 | 10/28 | 12:00P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 490 | 10/28 | 12:00P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 491 | 10/28 | 12:02P | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 492 | 10/28 | 12:08P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 493 | 10/28 | 12:10P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 494 | 10/28 | 12:13P | BIRMINGHAM,AL | 205 | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 495 | 10/28 | 12:16P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 496 | 10/28 | 12:19P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 497 | 10/28 | 12:21P | MONTGOMERY,AL | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 498 | 10/28 | 12:26P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 499 | 10/28 | 12:28P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 500 | 10/28 | 12:32P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 501 | 10/28 | 01:03P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 502 | 10/28 | 01:18P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 503 | 10/28 | 01:30P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 504 | 10/28 | 01:30P | MONTGOMERY,AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 505 | 10/28 | 01:37P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 506 | 10/28 | 01:46P | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 507 | 10/28 | 01:49P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 508 | 10/28 | 01:50P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 509 | 10/28 | 01:55P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 510 | 10/28 | 01:57P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 511 | 10/28 | 02:04P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 512 | 10/28 | 02:05P | Incoming | 205 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 513 | 10/28 | 02:06P | Incoming | 334- | /CM | 1:00 | 0.00 | 0.00 | 0.00 |
| 514 | 10/28 | 02:13P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 515 | 10/28 | 02:43P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 516 | 10/28 | 02:46P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 517 | 10/28 | 02:52P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 518 | 10/28 | 02:52P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 519 | 10/28 | 02:56P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 520 | 10/28 | 02:57P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 521 | 10/28 | 03:02P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 522 | 10/28 | 03:02P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 523 | 10/28 | 03:04P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 524 | 10/28 | 03:04P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 525 | 10/28 | 03:04P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 526 | 10/28 | 03:05P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 527 | 10/28 | 03:05P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 528 | 10/28 | 03:06P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 529 | 10/28 | 03:08P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 530 | 10/28 | 03:09P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 531 | 10/28 | 03:13P | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 532 | 10/28 | 03:16P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 533 | 10/28 | 03:17P | Incoming | 334- | /CM | 1:00 | 0.00 | 0.00 | 0.00 |
| 534 | 10/28 | 03:21P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 535 | 10/28 | 03:22P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 536 | 10/28 | 03:22P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 537 | 10/28 | 03:27P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 538 | 10/28 | 03:30P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 539 | 10/28 | 03:37P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 540 | 10/28 | 03:39P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 541 | 10/28 | 03:47P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 542 | 10/28 | 03:49P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 543 | 10/28 | 04:27P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 544 | 10/28 | 04:28P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 545 | 10/28 | 06:40P | BIRMINGHAM,AL | 205- | /OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 546 | 10/28 | 06:54P | BIRMINGHAM,AL | 205- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 547 | 10/28 | 06:55P | BIRMINGHAM,AL | 205- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 548 | 10/28 | 07:06P | Incoming | 205- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 549 | 10/28 | 07:44P | BIRMINGHAM,AL | 205- | /OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |

*Continued...*

Account Number

Billing Period  10/19/06-11/18/06

Page 10 of 23

Account Name  YOLANDA BOSWELL

Invoice Date  November 23, 2006

# NEXTEL™

DETAILS for 334-414-5693, 1 co̶n̶t̶i̶n̶u̶e̶d̶

> SUBSCRIBER ACTIVITY DETAIL

### 🖐 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 550 | 10/28 | 07:46P | Incoming | 205 | /OC | 2:00 | 0.00 | 0.00 | 0.00 |
| 551 | 10/28 | 07:53P | BIRMINGHAM,AL | 205 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 552 | 10/28 | 07:55P | BIRMINGHAM,AL | 205 | P/OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 553 | 10/28 | 08:17P | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 554 | 10/28 | 08:21P | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 555 | 10/28 | 09:08P | MONTGOMERY,AL | 334 | P/OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 556 | 10/28 | 09:17P | BIRMINGHAM,AL | 205 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 557 | 10/28 | 09:50P | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 558 | 10/28 | 09:50P | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 559 | 10/28 | 09:51P | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 560 | 10/28 | 09:53P | Incoming | 334 | P/OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 561 | 10/28 | 10:01P | Incoming | 334 | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 562 | 10/28 | 10:00P | MONTGOMERY,AL | 334 | P/OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 563 | 10/28 | 10:05P | Incoming | 205 | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 564 | 10/28 | 10:15P | Incoming | 334 | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 565 | 10/28 | 10:17P | Incoming | 334 | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 566 | 10/28 | 10:34P | Incoming | 334 | P/MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 567 | 10/28 | 10:50P | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 568 | 10/28 | 10:53P | Incoming | 334 | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 569 | 10/28 | 10:55P | Incoming | 334 | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 570 | 10/28 | 10:59P | MONTGOMERY,AL | 334 | P/OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 571 | 10/28 | 11:01P | Incoming | 334 | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 572 | 10/28 | 11:09P | Incoming | 334 | P/OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 573 | 10/28 | 11:12P | Incoming | 205 | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 574 | 10/28 | 11:22P | Incoming | 334 | P/OC | 2:00 | 0.00 | 0.00 | 0.00 |
| 575 | 10/28 | 11:42P | Incoming | 334 | P/OC | 2:00 | 0.00 | 0.00 | 0.00 |
| 576 | 10/29 | 12:12A | Incoming | 334 | P/OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 577 | 10/29 | 12:16A | Incoming | 334 | P/OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 578 | 10/29 | 01:04A | MONTGOMERY,AL | 334 | P/OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 579 | 10/29 | 01:14A | MONTGOMERY,AL | 334 | P/OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 580 | 10/29 | 01:15A | Incoming | 334 | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 581 | 10/29 | 01:21A | Incoming | 334 | P/OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 582 | 10/29 | 01:39A | MONTGOMERY,AL | 334 | P/OC | 2:00 | 0.00 | 0.00 | 0.00 |
| 583 | 10/29 | 01:44A | Incoming | 205 | P | 6:00 | 0.00 | 0.00 | 0.00 |
| 584 | 10/29 | 02:01A | Incoming | 334 | P/OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 585 | 10/29 | 01:29P | BIRMINGHAM,AL | 205 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 586 | 10/29 | 01:32P | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 587 | 10/29 | 01:39P | MONTGOMERY,AL | 334 | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 588 | 10/29 | 01:48P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 589 | 10/29 | 01:50P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 590 | 10/29 | 02:07P | MONTGOMERY,AL | 334 | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 591 | 10/29 | 02:09P | MONTGOMERY,AL | 334 | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 592 | 10/29 | 02:19P | Incoming | | P/MM | 22:00 | 0.00 | 0.00 | 0.00 |
| 593 | 10/29 | 03:55P | MONTGOMERY,AL | 334 | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 594 | 10/29 | 04:44P | Incoming | Unavailable | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 595 | 10/29 | 05:45P | Incoming | Unavailable | OP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 596 | 10/29 | 06:35P | MONTGOMERY,AL | 334 | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 597 | 10/29 | 06:43P | MONTGOMERY,AL | 334 | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 598 | 10/29 | 06:43P | MONTGOMERY,AL | 334 | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 599 | 10/29 | 06:43P | MONTGOMERY,AL | 334 | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 600 | 10/29 | 06:55P | MONTGOMERY,AL | 334 | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 601 | 10/29 | 06:57P | Incoming | 334 | OP | 5:00 | 0.00 | 0.00 | 0.00 |
| 602 | 10/29 | 07:02P | MONTGOMERY,AL | 334 | OP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |

### 🖐 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 603 | 10/29 | 07:03P | MONTGOMERY,AL | | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 604 | 10/29 | 07:15P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 605 | 10/29 | 07:16P | ALEXANDRCY,AL | 256 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 606 | 10/29 | 07:17P | MONTGOMERY,AL | 334 | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 607 | 10/29 | 07:18P | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 608 | 10/29 | 07:19P | Incoming | 256 | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 609 | 10/29 | 07:20P | ALEXANDRCY,AL | 256 | P/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 610 | 10/29 | 07:25P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 611 | 10/29 | 07:37P | Incoming | 256 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 612 | 10/29 | 07:44P | ALEXANDRCY,AL | 256 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 613 | 10/29 | 07:46P | MONTGOMERY,AL | 334 | P/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 614 | 10/30 | 06:08A | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 615 | 10/30 | 07:20A | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 616 | 10/30 | 07:23A | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 617 | 10/30 | 07:23A | Incoming | 334 | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 618 | 10/30 | 07:24A | Incoming | 334 | P/CW | 18:00 | 0.00 | 0.00 | 0.00 |
| 619 | 10/30 | 07:33A | Incoming | 334 | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 620 | 10/30 | 07:46A | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 621 | 10/30 | 08:06A | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 622 | 10/30 | 08:08A | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 623 | 10/30 | 08:17A | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 624 | 10/30 | 08:18A | MONTGOMERY,AL | 334 | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 625 | 10/30 | 08:43A | MONTGOMERY,AL | 334 | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 626 | 10/30 | 08:47A | MONTGOMERY,AL | 334 | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 627 | 10/30 | 08:49A | MONTGOMERY,AL | 334 | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 628 | 10/30 | 08:52A | MONTGOMERY,AL | 334 | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 629 | 10/30 | 09:02A | MONTGOMERY,AL | 334 | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 630 | 10/30 | 09:02A | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 631 | 10/30 | 09:10A | Incoming | 334 | | 3:00 | 0.00 | 0.00 | 0.00 |
| 632 | 10/30 | 09:19A | Incoming | 334 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 633 | 10/30 | 09:37A | MONTGOMERY,AL | 334 | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 634 | 10/30 | 09:54A | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 635 | 10/30 | 09:54A | MONTGOMERY,AL | 334 | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 636 | 10/30 | 10:04A | MONTGOMERY,AL | 334 | MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 637 | 10/30 | 10:04A | MONTGOMERY,AL | 334 | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 638 | 10/30 | 10:06A | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 639 | 10/30 | 10:06A | MONTGOMERY,AL | 33 | MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 640 | 10/30 | 10:14A | Incoming | 334 | | 5:00 | 0.00 | 0.00 | 0.00 |
| 641 | 10/30 | 11:31A | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 642 | 10/30 | 11:44A | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 643 | 10/30 | 11:50A | Customer Care | 612 | P/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 644 | 10/30 | 11:58A | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 645 | 10/30 | 12:09P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 646 | 10/30 | 12:09P | Incoming | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 647 | 10/30 | 12:30P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 648 | 10/30 | 12:50P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 649 | 10/30 | 12:59P | Incoming | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 650 | 10/30 | 01:00P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 651 | 10/30 | 01:01P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 652 | 10/30 | 01:15P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 653 | 10/30 | 01:16P | Incoming | 334 | | 12:00 | 0.00 | 0.00 | 0.00 |
| 654 | 10/30 | 01:31P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 655 | 10/30 | 01:38P | Incoming | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 656 | 10/30 | 01:43P | MONTGOMERY,AL | 334 | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 657 | 10/30 | 01:46P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 658 | 10/30 | 01:47P | Incoming | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 659 | 10/30 | 01:47P | MONTGOMERY,AL | 334 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
11 of 23

**NEXTEL**™

## DETAILS for 334-414-5693, 1 continued

> ### SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (see pg. 2) footnote | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|-----|------|------|---------|------------------------------|---------|-------|---------------------|---------------|
| 660 | 10/30 | 01:14P | MONTGOMERY, AL | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 661 | 10/30 | 02:08P | Incoming | 334- PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 662 | 10/30 | 02:18P | Incoming | 334- MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 663 | 10/30 | 02:23P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 664 | 10/30 | 02:30P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 665 | 10/30 | 02:37P | Incoming | 334- | 4:00 | 0.00 | 0.00 | 0.00 |
| 666 | 10/30 | 02:42P | Incoming | 334- MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 667 | 10/30 | 02:53P | Incoming | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 668 | 10/30 | 03:00P | MONTGOMERY, AL | 334- MM/PU | 19:00 | 0.00 | 0.00 | 0.00 |
| 669 | 10/30 | 03:04P | Incoming | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 670 | 10/30 | 03:18P | MONTGOMERY, AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 671 | 10/30 | 03:44P | MONTGOMERY, AL | 334-202-8676 PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 672 | 10/30 | 04:27P | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 673 | 10/30 | 04:28P | MONTGOMERY, AL | 334- PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 674 | 10/30 | 05:09P | Incoming | 334- 3W | 1:00 | 0.00 | 0.00 | 0.00 |
| 675 | 10/30 | 05:13P | | 334- 3W/PU | 12:00 | 0.00 | 0.00 | 0.00 |
| 676 | 10/30 | 05:24P | MONTGOMERY, AL | 334- | 4:00 | 0.00 | 0.00 | 0.00 |
| 677 | 10/30 | 05:27P | Incoming | 334- CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 678 | 10/30 | 05:28P | Incoming | 334- MM | 13:00 | 0.00 | 0.00 | 0.00 |
| 679 | 10/30 | 07:31P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 680 | 10/30 | 07:31P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 681 | 10/30 | 07:32P | MONTGOMERY, AL | 334- PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 682 | 10/30 | 07:39P | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 683 | 10/30 | 07:40P | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 684 | 10/30 | 07:47P | MONTGOMERY, AL | 334- PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 685 | 10/30 | 07:45P | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 686 | 10/30 | 07:45P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 687 | 10/30 | 07:47P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 688 | 10/30 | 07:52P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 689 | 10/30 | 07:54P | Incoming | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 690 | 10/30 | 08:04P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 691 | 10/31 | 07:39A | Incoming | 334- | 4:00 | 0.00 | 0.00 | 0.00 |
| 692 | 10/31 | 10:06A | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 693 | 10/31 | 10:06A | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 694 | 10/31 | 11:14A | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 695 | 10/31 | 12:40P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 696 | 10/31 | 12:42P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 697 | 10/31 | 01:04P | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 698 | 10/31 | 01:25P | Incoming | 334- PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 699 | 10/31 | 01:32P | Incoming | 334- | 17:00 | 0.00 | 0.00 | 0.00 |
| 700 | 10/31 | 01:49P | MONTGOMERY, AL | 334- PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 701 | 10/31 | 01:50P | MONTGOMERY, AL | 334- PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 702 | 10/31 | 01:51P | Incoming | 334- PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 703 | 10/31 | 02:19P | Incoming | 334- PP | 13:00 | 0.00 | 0.00 | 0.00 |
| 704 | 10/31 | 03:12P | Incoming | 334- PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 705 | 10/31 | 03:28P | Incoming | 334- PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 706 | 10/31 | 03:45P | MONTGOMERY, AL | 334- PP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 707 | 10/31 | 03:55P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 708 | 10/31 | 04:02P | Incoming | 334- PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 709 | 10/31 | 04:11P | Incoming | 334- PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 710 | 10/31 | 04:34P | Incoming | 334- PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 711 | 10/31 | 04:59P | Incoming | 334- PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 712 | 10/31 | 05:37P | Incoming | 334- PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (see pg. 2) footnote | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|-----|------|------|---------|------------------------------|---------|-------|---------------------|---------------|
| 713 | 10/31 | 05:57P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 714 | 10/31 | 06:03P | Incoming | 334- PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 715 | 10/31 | 06:25P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 716 | 10/31 | 06:36P | Incoming | 334- | 6:00 | 0.00 | 0.00 | 0.00 |
| 717 | 10/31 | 06:40P | Incoming | 334- CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 718 | 10/31 | 06:55P | MONTGOMERY, AL | 334- MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 719 | 10/31 | 09:09P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 720 | 10/31 | 09:12P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 721 | 10/31 | 09:15P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 722 | 10/31 | 09:18P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 723 | 10/31 | 09:24P | Incoming | 334- | 6:00 | 0.00 | 0.00 | 0.00 |
| 724 | 10/31 | 09:30P | MONTGOMERY, AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 725 | 10/31 | 09:31P | MONTGOMERY, AL | 334- PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 726 | 10/31 | 09:39P | Incoming | 334- CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 727 | 10/31 | 09:41P | MONTGOMERY, AL | 334- CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 728 | 10/31 | 10:01P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 729 | 10/31 | 10:02P | MONTGOMERY, AL | 334- PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 730 | 10/31 | 10:09P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 731 | 11/01 | 06:48A | MONTGOMERY, AL | 334- MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 732 | 11/01 | 06:58A | MONTGOMERY, AL | 334- PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 733 | 11/01 | 07:53A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 734 | 11/01 | 08:00A | Incoming | 334- | 3:00 | 0.00 | 0.00 | 0.00 |
| 735 | 11/01 | 08:02A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 736 | 11/01 | 08:05A | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 737 | 11/01 | 08:06A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 738 | 11/01 | 08:10A | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 739 | 11/01 | 08:11A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 740 | 11/01 | 08:29A | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 741 | 11/01 | 09:54A | Incoming | 334- | 6:00 | 0.00 | 0.00 | 0.00 |
| 742 | 11/01 | 10:01A | MONTGOMERY, AL | 334- PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 743 | 11/01 | 10:16A | MONTGOMERY, AL | 334- PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 744 | 11/01 | 10:20A | Incoming | 334- CW | 20:00 | 0.00 | 0.00 | 0.00 |
| 745 | 11/01 | 10:43A | MONTGOMERY, AL | 334- MM/PU | 17:00 | 0.00 | 0.00 | 0.00 |
| 746 | 11/01 | 11:54A | Incoming | 334- | 2:00 | 0.00 | 0.00 | 0.00 |
| 747 | 11/01 | 11:56A | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 748 | 11/01 | 11:56A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 749 | 11/01 | 11:57A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 750 | 11/01 | 11:58A | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 751 | 11/01 | 12:06P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 752 | 11/01 | 12:18P | MONTGOMERY, AL | 334- PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 753 | 11/01 | 12:24P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 754 | 11/01 | 12:32P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 755 | 11/01 | 12:33P | Incoming | 334- | 4:00 | 0.00 | 0.00 | 0.00 |
| 756 | 11/01 | 12:39P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 757 | 11/01 | 12:45P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 758 | 11/01 | 12:47P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 759 | 11/01 | 12:48P | MONTGOMERY, AL | 334- MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 760 | 11/01 | 12:53P | MONTGOMERY, AL | 334- PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 761 | 11/01 | 12:56P | MONTGOMERY, AL | 334- PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 762 | 11/01 | 01:01P | Incoming | UNIV 1234567 PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 763 | 11/01 | 01:12P | Incoming | 334- | 4:00 | 0.00 | 0.00 | 0.00 |
| 764 | 11/01 | 01:28P | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 765 | 11/01 | 01:29P | Incoming | 334- | 1:00 | 0.00 | 0.00 | 0.00 |
| 766 | 11/01 | 01:44P | MONTGOMERY, AL | 334- MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 767 | 11/01 | 01:44P | MONTGOMERY, AL | 334- MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 768 | 11/01 | 01:47P | Incoming | 334- MM | 7:00 | 0.00 | 0.00 | 0.00 |
| 769 | 11/01 | 01:59P | MONTGOMERY, AL | 334- MM | 2:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
12 of 23



## DETAILS for 334-414-5693, 1 continued

### > SUBSCRIBER ACTIVITY DETAIL

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 770 | 11/01 | 02:01P | Incoming | Unavailable | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 771 | 11/01 | 02:02P | Incoming | Unavailable | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 772 | 11/01 | 02:04P | Incoming | Unavailable | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 773 | 11/01 | 02:06P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |
| 774 | 11/01 | 02:08P | Incoming | Unavailable | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 775 | 11/01 | 02:12P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 776 | 11/01 | 02:14P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 777 | 11/01 | 02:15P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 778 | 11/01 | 02:17P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 779 | 11/01 | 02:18P | MONTGOMERY,AL | 334- | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 780 | 11/01 | 02:22P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 781 | 11/01 | 02:22P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 782 | 11/01 | 02:23P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 783 | 11/01 | 02:24P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 784 | 11/01 | 02:25P | BIRMINGHAM,AL | 205- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 785 | 11/01 | 02:26P | Incoming | 205- | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 786 | 11/01 | 02:27P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 787 | 11/01 | 02:28P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 788 | 11/01 | 02:29P | MONTGOMERY,AL | 33 | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 789 | 11/01 | 02:30P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 790 | 11/01 | 02:30P | ALEXANDRCY,AL | 256- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 791 | 11/01 | 02:33P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 792 | 11/01 | 02:33P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 793 | 11/01 | 02:34P | MONTGOMERY,AL | 334- | P/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 794 | 11/01 | 02:36P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 795 | 11/01 | 02:36P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 796 | 11/01 | 02:37P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 797 | 11/01 | 02:38P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 798 | 11/01 | 02:39P | Incoming | 334- | P/CW | 14:00 | 0.00 | 0.00 | 0.00 |
| 799 | 11/01 | 02:54P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 800 | 11/01 | 02:55P | Incoming | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 801 | 11/01 | 02:58P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 802 | 11/01 | 02:59P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 803 | 11/01 | 03:02P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 804 | 11/01 | 03:03P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 805 | 11/01 | 03:04P | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 806 | 11/01 | 03:15P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 807 | 11/01 | 03:15P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 808 | 11/01 | 03:16P | MONTGOMERY,AL | 334- | P/MM/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 809 | 11/01 | 03:42P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 810 | 11/01 | 03:44P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 811 | 11/01 | 03:44P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 812 | 11/01 | 03:50P | Incoming | 334- | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 813 | 11/01 | 03:58P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 814 | 11/01 | 03:58P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 815 | 11/01 | 04:00P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 816 | 11/01 | 04:09P | Incoming | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 817 | 11/01 | 04:36P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 818 | 11/01 | 04:00P | Incoming | 334- | | 14:00 | 0.00 | 0.00 | 0.00 |
| 819 | 11/01 | 05:08P | MONTGOMERY,AL | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 820 | 11/01 | 05:36P | Incoming | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 821 | 11/01 | 06:53P | MONTGOMERY,AL | 334- | P/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 822 | 11/01 | 06:58P | MONTGOMERY,AL | 334- | P/MM/PU | 9:00 | 0.00 | 0.00 | 0.00 |

**Cellular Services Call Detail**

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 823 | 11/01 | 07:12P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 824 | 11/01 | 07:21P | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 825 | 11/01 | 09:13P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 826 | 11/02 | 07:19A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 827 | 11/02 | 07:28A | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 828 | 11/02 | 07:39A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 829 | 11/02 | 07:51A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 830 | 11/02 | 08:02A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 831 | 11/02 | 08:24A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 832 | 11/02 | 08:24A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 833 | 11/02 | 08:25A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 834 | 11/02 | 08:24A | MONTGOMERY,AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 835 | 11/02 | 08:25A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 836 | 11/02 | 08:28A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 837 | 11/02 | 08:30A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 838 | 11/02 | 08:56A | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 839 | 11/02 | 09:33A | MONTGOMERY,AL | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 840 | 11/02 | 10:07A | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 841 | 11/02 | 10:12A | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 842 | 11/02 | 10:13A | MONTGOMERY,AL | 334- | P/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 843 | 11/02 | 10:24A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 844 | 11/02 | 10:25A | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 845 | 11/02 | 10:37A | MONTGOMERY,AL | 334- | P/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 846 | 11/02 | 10:52A | Incoming | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 847 | 11/02 | 11:12A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 848 | 11/02 | 11:12A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 849 | 11/02 | 11:15A | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 850 | 11/02 | 12:07P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 851 | 11/02 | 12:12P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 852 | 11/02 | 12:30P | Incoming | 334- | | 7:00 | 0.00 | 0.00 | 0.00 |
| 853 | 11/02 | 12:34P | Incoming | 334- | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 854 | 11/02 | 12:38P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 855 | 11/02 | 12:58P | MONTGOMERY,AL | 334- | P/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 856 | 11/02 | 12:58P | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 857 | 11/02 | 01:01P | MONTGOMERY,AL | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 858 | 11/02 | 01:03P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 859 | 11/02 | 01:03P | MONTGOMERY,AL | 334- | P/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 860 | 11/02 | 01:11P | MONTGOMERY,AL | 33 | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 861 | 11/02 | 01:41P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 862 | 11/02 | 01:45P | WETUMPKA,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 863 | 11/02 | 01:48P | ALEXANDRCY,AL | 256- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 864 | 11/02 | 02:00P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 865 | 11/02 | 02:43P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 866 | 11/02 | 03:01P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 867 | 11/02 | 03:03P | MONTGOMERY,AL | 334- | P/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 868 | 11/02 | 03:04P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 869 | 11/02 | 03:08P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 870 | 11/02 | 03:14P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 871 | 11/02 | 03:16P | Incoming | 33 | | 8:00 | 0.00 | 0.00 | 0.00 |
| 872 | 11/02 | 03:23P | MONTGOMERY,AL | 33 | P/MM/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 873 | 11/02 | 03:30P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 874 | 11/02 | 03:32P | MONTGOMERY,AL | 334- | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 875 | 11/02 | 03:33P | Incoming | 209- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 876 | 11/02 | 03:35P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 877 | 11/02 | 03:41P | MONTGOMERY,AL | 334- | P/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 878 | 11/02 | 03:42P | MONTGOMERY,AL | 334- | P/PU | 10:00 | 0.00 | 0.00 | 0.00 |
| 879 | 11/02 | 03:52P | Incoming | | | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*

Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06
Invoice Date
November 23, 2006

Page
13 of 23



**NEXTEL**™

---

**DETAILS for 334-414-5693, 1 continued**

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | *Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|-----|------|------|---------|--------|------------------------|---------|-------|--------------------|---------------|
| 880 | 11/02 | 03:56P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 881 | 11/02 | 03:57P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 882 | 11/02 | 03:59P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 883 | 11/02 | 04:00P | Incoming | 334- | PP/SW | 4:00 | 0.00 | 0.00 | 0.00 |
| 884 | 11/02 | 04:01P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 885 | 11/02 | 04:01P | Incoming | 334- | /3P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 886 | 11/02 | 04:03P | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 887 | 11/02 | 04:27P | MONTGOMERY,AL | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 888 | 11/02 | 04:27P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 889 | 11/02 | 04:31P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 890 | 11/02 | 04:48P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 891 | 11/02 | 04:48P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 892 | 11/02 | 04:54P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 893 | 11/02 | 05:00P | ALEXANDRCY,AL | 256- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 894 | 11/02 | 05:14P | Incoming | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 895 | 11/02 | 05:30P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 896 | 11/02 | 06:03P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 897 | 11/02 | 06:13P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 898 | 11/02 | 06:20P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 899 | 11/02 | 06:21P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 900 | 11/02 | 06:31P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 901 | 11/02 | 06:33P | MONTGOMERY,AL | 334- | | 5:00 | 0.00 | 0.00 | 0.00 |
| 902 | 11/02 | 06:57P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 903 | 11/02 | 06:54P | MONTGOMERY,AL | 334- | /MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 904 | 11/02 | 07:20P | Incoming | 334- | | 14:00 | 0.00 | 0.00 | 0.00 |
| 905 | 11/02 | 07:34P | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 906 | 11/02 | 07:35P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 907 | 11/02 | 07:38P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 908 | 11/02 | 07:47P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 909 | 11/02 | 07:52P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 910 | 11/02 | 08:18P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 911 | 11/02 | 08:36P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 912 | 11/02 | 08:39P | Incoming | 334- | PP/MM | 8:00 | 0.00 | 0.00 | 0.00 |
| 913 | 11/02 | 10:32P | MONTGOMERY,AL | 334- | /MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 914 | 11/02 | 10:37P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 915 | 11/02 | 10:39P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 916 | 11/02 | 10:39P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 917 | 11/02 | 10:40P | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 918 | 11/03 | 07:05A | MONTGOMERY,AL | 334- | /MM/PU | 12:00 | 0.00 | 0.00 | 0.00 |
| 919 | 11/03 | 07:17A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 920 | 11/03 | 07:39A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 921 | 11/03 | 08:47A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 922 | 11/03 | 08:49A | Incoming | 334- | PP/CW | 6:00 | 0.00 | 0.00 | 0.00 |
| 923 | 11/03 | 09:05A | Incoming | 334-202-8676 | PP/PU/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 924 | 11/03 | 09:05A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 925 | 11/03 | 09:41A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 926 | 11/03 | 09:42A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 927 | 11/03 | 09:43A | MONTGOMERY,AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 928 | 11/03 | 09:54A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 929 | 11/03 | 09:54A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 930 | 11/03 | 10:07A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 931 | 11/03 | 10:11A | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 932 | 11/03 | 10:28A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |

---

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | *Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|-----|------|------|---------|--------|------------------------|---------|-------|--------------------|---------------|
| 933 | 11/03 | 11:52A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 934 | 11/03 | 12:06P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 935 | 11/03 | 12:12P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 936 | 11/03 | 12:26P | Incoming | 334- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 937 | 11/03 | 12:33P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 938 | 11/03 | 12:33P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 939 | 11/03 | 12:34P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 940 | 11/03 | 12:36P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 941 | 11/03 | 12:39P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 942 | 11/03 | 12:41P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 943 | 11/03 | 12:49P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 944 | 11/03 | 12:58P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 945 | 11/03 | 01:23P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 946 | 11/03 | 01:26P | Incoming | 334- | | 6:00 | 0.00 | 0.00 | 0.00 |
| 947 | 11/03 | 01:32P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 948 | 11/03 | 02:03P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 949 | 11/03 | 02:07P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 950 | 11/03 | 02:07P | ALEXANDRCY,AL | 256- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 951 | 11/03 | 02:26P | MONTGOMERY,AL | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 952 | 11/03 | 02:28P | Incoming | 334- | | 6:00 | 0.00 | 0.00 | 0.00 |
| 953 | 11/03 | 02:44P | MONTGOMERY,AL | 334- | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 954 | 11/03 | 02:51P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 955 | 11/03 | 02:53P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 956 | 11/03 | 03:02P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 957 | 11/03 | 03:02P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 958 | 11/03 | 03:08P | Incoming | 334- | | 5:00 | 0.00 | 0.00 | 0.00 |
| 959 | 11/03 | 03:16P | Incoming | 334- | /MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 960 | 11/03 | 03:17P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 961 | 11/03 | 03:20P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 962 | 11/03 | 03:34P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 963 | 11/03 | 03:35P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 964 | 11/03 | 03:39P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 965 | 11/03 | 03:39P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 966 | 11/03 | 03:39P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 967 | 11/03 | 03:49P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 968 | 11/03 | 03:57P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 969 | 11/03 | 04:15P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 970 | 11/03 | 04:18P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 971 | 11/03 | 04:21P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 972 | 11/03 | 04:22P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 973 | 11/03 | 04:29P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 974 | 11/03 | 04:31P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 975 | 11/03 | 04:34P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 976 | 11/03 | 04:35P | MONTGOMERY,AL | 334- | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 977 | 11/03 | 04:40P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 978 | 11/03 | 04:41P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 979 | 11/03 | 04:50P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 980 | 11/03 | 04:51P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 981 | 11/03 | 04:53P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 982 | 11/03 | 04:57P | Incoming | 334- | | 6:00 | 0.00 | 0.00 | 0.00 |
| 983 | 11/03 | 05:03P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 984 | 11/03 | 05:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 985 | 11/03 | 05:18P | Incoming | 256- | PP | 6:00 | 0.00 | 0.00 | 0.00 |
| 986 | 11/03 | 05:23P | Incoming | 334- | /CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 987 | 11/03 | 05:25P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 988 | 11/03 | 05:26P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 989 | 11/03 | 05:27P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



Account Number
Account Name
YOLANDA BOSWELL

Billing Period    Page
10/19/06-11/18/06   14 of 23
Invoice Date
November 23, 2006

**NEXTEL**

## DETAILS for 334-414-5693, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 990 | 11/03 | 05:32P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 991 | 11/03 | 05:32P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 992 | 11/03 | 05:33P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 993 | 11/03 | 05:34P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 994 | 11/03 | 05:35P | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 995 | 11/03 | 05:41P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 996 | 11/03 | 05:42P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 997 | 11/03 | 05:48P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 998 | 11/03 | 05:48P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 999 | 11/03 | 05:50P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1000 | 11/03 | 05:57P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1001 | 11/03 | 06:02P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1002 | 11/03 | 06:04P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1003 | 11/03 | 06:12P | ALEXANDRCY, AL | 256- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1004 | 11/03 | 06:13P | ALEXANDRCY, AL | 256- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1005 | 11/03 | 06:14P | MONTGOMERY, AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1006 | 11/03 | 06:21P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1007 | 11/03 | 06:22P | MONTGOMERY, AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1008 | 11/03 | 06:23P | Incoming | 334- | /CK | 1:00 | 0.00 | 0.00 | 0.00 |
| 1009 | 11/03 | 06:24P | MONTGOMERY, AL | 334- | MM/P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1010 | 11/03 | 06:59P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1011 | 11/03 | 07:00P | Incoming | 33 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1012 | 11/03 | 07:04P | Incoming | 256- | | 21:00 | 0.00 | 0.00 | 0.00 |
| 1013 | 11/03 | 07:50P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1014 | 11/03 | 07:51P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1015 | 11/03 | 07:56P | Incoming | 256- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1016 | 11/03 | 07:59P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1017 | 11/03 | 08:30P | Incoming | 256- | P | 1:00 | -0.00 | 0.00 | 0.00 |
| 1018 | 11/03 | 08:54P | Incoming | 33 | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1019 | 11/03 | 09:57P | Incoming | 334- | /MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 1020 | 11/03 | 09:25P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1021 | 11/03 | 10:27P | MONTGOMERY, AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1022 | 11/04 | 06:35A | MONTGOMERY, AL | 334- | /PU | 17:00 | 0.00 | 0.00 | 0.00 |
| 1023 | 11/04 | 07:23A | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1024 | 11/04 | 08:34A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1025 | 11/04 | 09:41A | MONTGOMERY, AL | 334- | MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1026 | 11/04 | 09:42A | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1027 | 11/04 | 09:43A | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1028 | 11/04 | 09:43A | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1029 | 11/04 | 09:45A | MONTGOMERY, AL | 33 | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1030 | 11/04 | 09:46A | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1031 | 11/04 | 09:47A | MONTGOMERY, AL | 334- | /PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1032 | 11/04 | 09:50A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1033 | 11/04 | 10:04A | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1034 | 11/04 | 10:04A | MONTGOMERY, AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1035 | 11/04 | 10:24A | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1036 | 11/04 | 10:44A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1037 | 11/04 | 10:44A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1038 | 11/04 | 10:53A | Incoming | 334- | P | 5:00 | 0.00 | 0.00 | 0.00 |
| 1039 | 11/04 | 12:10P | FT DEPOSIT, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1040 | 11/04 | 12:11P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1041 | 11/04 | 12:13P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1042 | 11/04 | 12:18P | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1043 | 11/04 | 12:25P | MONTGOMERY, AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1044 | 11/04 | 12:26P | MONTGOMERY, AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1045 | 11/04 | 12:28P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1046 | 11/04 | 12:28P | MONTGOMERY, AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1047 | 11/04 | 12:30P | MONTGOMERY, AL | 334- | P/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1048 | 11/04 | 12:41P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1049 | 11/04 | 12:52P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1050 | 11/04 | 12:54P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1051 | 11/04 | 12:58P | FT DEPOSIT, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1052 | 11/04 | 01:00P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1053 | 11/04 | 02:11P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1054 | 11/04 | 02:13P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1055 | 11/04 | 02:13P | MONTGOMERY, AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1056 | 11/04 | 02:15P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1057 | 11/04 | 02:16P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1058 | 11/04 | 02:17P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1059 | 11/04 | 02:18P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1060 | 11/04 | 02:29P | MONTGOMERY, AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1061 | 11/04 | 02:31P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1062 | 11/04 | 02:33P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1063 | 11/04 | 02:35P | MONTGOMERY, AL | 334- | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1064 | 11/04 | 02:40P | MONTGOMERY, AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1065 | 11/04 | 02:51P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1066 | 11/04 | 02:53P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1067 | 11/04 | 02:54P | Incoming | 256- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1068 | 11/04 | 03:13P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1069 | 11/04 | 03:17P | ALEXANDRCY, AL | 256- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1070 | 11/04 | 03:18P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1071 | 11/04 | 04:08P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1072 | 11/04 | 04:37P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1073 | 11/04 | 04:42P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1074 | 11/04 | 04:44P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1075 | 11/04 | 04:45P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1076 | 11/04 | 04:54P | MONTGOMERY, AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1077 | 11/04 | 04:56P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1078 | 11/04 | 04:56P | MONTGOMERY, AL | 33 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1079 | 11/04 | 05:00P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1080 | 11/04 | 05:02P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1081 | 11/04 | 05:08P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1082 | 11/04 | 05:21P | Incoming | 334- | /MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1083 | 11/04 | 05:26P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1084 | 11/04 | 05:37P | MONTGOMERY, AL | 334- | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1085 | 11/04 | 05:40P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1086 | 11/04 | 05:41P | Incoming | 33 | | 1:00 | 0.00 | 0.00 | -0.00 |
| 1087 | 11/04 | 05:54P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1088 | 11/04 | 05:58P | MONTGOMERY, AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1089 | 11/04 | 06:02P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1090 | 11/04 | 06:04P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1091 | 11/04 | 06:05P | MONTGOMERY, AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1092 | 11/04 | 06:07P | MONTGOMERY, AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1093 | 11/04 | 06:10P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1094 | 11/04 | 06:12P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1095 | 11/04 | 06:13P | MONTGOMERY, AL | 334- | /PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1096 | 11/04 | 06:18P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1097 | 11/04 | 06:18P | MONTGOMERY, AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1098 | 11/04 | 06:19P | MONTGOMERY, AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1099 | 11/04 | 06:20P | MONTGOMERY, AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...





Account Number
Account Name
YOLANDA BOSWELL

Billing Period    Page
10/19/06-11/18/06  15 of 23
Invoice Date
November 23, 2006

NEXTEL ™

DETAILS for 334-414-5693, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

### ☏ Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min/Sec | Usage | *Long Dist./ Other | Total Charges |
|-----|------|------|---------|--------|------|---------|-------|------|------|
| 1100 | 11/04 | 06:24P | MONTGOMERY,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1101 | 11/04 | 06:53P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1102 | 11/04 | 07:06P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1103 | 11/04 | 07:07P | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1104 | 11/04 | 07:10P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1105 | 11/04 | 07:10P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1106 | 11/04 | 07:11P | MONTGOMERY,AL | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1107 | 11/04 | 07:11P | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1108 | 11/04 | 07:13P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1109 | 11/04 | 07:20P | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1110 | 11/04 | 07:28P | Incoming | 334- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1111 | 11/04 | 08:15P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1112 | 11/04 | 08:22P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1113 | 11/04 | 09:33P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1114 | 11/04 | 09:49P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1115 | 11/04 | 10:10P | MONTGOMERY,AL | 334- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1116 | 11/04 | 10:12P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1117 | 11/04 | 10:16P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1118 | 11/04 | 10:22P | Incoming | 334- | /MM | 6:00 | 0.00 | 0.00 | 0.00 |
| 1119 | 11/04 | 10:30P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1120 | 11/04 | 10:32P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1121 | 11/04 | 10:33P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1122 | 11/04 | 10:38P | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1123 | 11/04 | 10:39P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1124 | 11/04 | 10:40P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1125 | 11/04 | 10:44P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1126 | 11/04 | 10:50P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1127 | 11/05 | 11:49P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1128 | 11/05 | 12:24A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1129 | 11/05 | 01:19A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1130 | 11/05 | 01:21A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1131 | 11/05 | 01:37A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1132 | 11/05 | 01:57A | Incoming | 334- | /MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1133 | 11/05 | 02:22A | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1134 | 11/05 | 02:37A | MONTGOMERY,AL | 334- | /PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1135 | 11/05 | 02:38A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1136 | 11/05 | 02:39A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1137 | 11/05 | 02:50A | MONTGOMERY,AL | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1138 | 11/05 | 02:52A | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1139 | 11/05 | 03:02A | Incoming | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1140 | 11/05 | 03:07A | Incoming | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1141 | 11/05 | 03:13A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1142 | 11/05 | 03:15A | Toll Free Call | 800- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1143 | 11/05 | 03:16A | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1144 | 11/05 | 03:17A | Toll Free Call | 800- | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1145 | 11/05 | 03:20A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1146 | 11/05 | 03:21A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1147 | 11/05 | 03:23A | Incoming | 334- | P/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1148 | 11/05 | 03:26A | MONTGOMERY,AL | 334- | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1149 | 11/05 | 03:26A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1150 | 11/05 | 03:26A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1151 | 11/05 | 03:33A | Incoming | 334- | OP | 6:00 | 0.00 | 0.00 | 0.00 |
| 1152 | 11/05 | 03:36A | Incoming | 334- | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1153 | 11/05 | 10:29A | MONTGOMERY,AL | Voic | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1154 | 11/05 | 10:36A | Incoming | 334- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1155 | 11/05 | 10:47A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1156 | 11/05 | 11:21A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1157 | 11/05 | 11:22A | Incoming | 256- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1158 | 11/05 | 11:26A | MONTGOMERY,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1159 | 11/05 | 11:36A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1160 | 11/05 | 11:37A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1161 | 11/05 | 11:39A | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1162 | 11/05 | 11:47A | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1163 | 11/05 | 11:56A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1164 | 11/05 | 12:53P | MONTGOMERY,AL | 334- | /PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1165 | 11/05 | 12:57P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1166 | 11/05 | 12:58P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1167 | 11/05 | 01:20P | MONTGOMERY,AL | 334- | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1168 | 11/05 | 01:34P | MONTGOMERY,AL | 334- | /PU | 18:00 | 0.00 | 0.00 | 0.00 |
| 1169 | 11/05 | 01:57P | Incoming | 334- | P/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 1170 | 11/05 | 02:03P | Incoming | 334- | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1171 | 11/05 | 02:10P | MONTGOMERY,AL | 334- | /MM/PU | 4:00 | 0.00 | *0.00 | 0.00 |
| 1172 | 11/05 | 02:14P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1173 | 11/05 | 02:34P | MONTGOMERY,AL | 334- | /PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1174 | 11/05 | 02:54P | ALEXANDRY,AL | 256- | OP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1175 | 11/05 | 02:59P | ALEXANDRY,AL | 256- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1176 | 11/05 | 03:02P | MONTGOMERY,AL | 334- | OP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1177 | 11/05 | 03:04P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1178 | 11/05 | 03:16P | Incoming | 334- | P/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1179 | 11/05 | 03:27P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1180 | 11/05 | 03:28P | MONTGOMERY,AL | 334- | OP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1181 | 11/05 | 03:30P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1182 | 11/05 | 03:37P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1183 | 11/05 | 03:40P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1184 | 11/05 | 03:50P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1185 | 11/05 | 03:52P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1186 | 11/05 | 03:54P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1187 | 11/05 | 04:05P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1188 | 11/05 | 04:06P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1189 | 11/05 | 04:13P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1190 | 11/05 | 04:18P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1191 | 11/05 | 04:19P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1192 | 11/05 | 04:19P | Incoming | 334- | /CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1193 | 11/05 | 04:20P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1194 | 11/05 | 04:22P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1195 | 11/05 | 04:49P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1196 | 11/05 | 05:01P | Incoming | 334- | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1197 | 11/05 | 05:06P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1198 | 11/05 | 05:19P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1199 | 11/05 | 05:50P | ALEXANDRY,AL | 256- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1200 | 11/05 | 09:13P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1201 | 11/05 | 09:14P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1202 | 11/05 | 09:15P | Incoming | 334- | OPxx | 2:00 | 0.00 | 0.00 | 0.00 |
| 1203 | 11/05 | 09:20P | MONTGOMERY,AL | 334- | /MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1204 | 11/05 | 09:22P | MONTGOMERY,AL | 334- | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1205 | 11/05 | 09:27P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1206 | 11/05 | 09:28P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1207 | 11/05 | 09:40P | MONTGOMERY,AL | 334- | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1208 | 11/05 | 09:51P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1209 | 11/05 | 09:52P | MONTGOMERY,AL | 334- | OP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06
Invoice Date
November 23, 2006

Page
16 of 23


NEXTEL™

DETAILS for 334-414-5693, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

### 🐾 Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (see pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1210 | 11/06 | 09:56P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1211 | 11/06 | 10:06P | ALEXANDRA,AL | 256- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1212 | 11/06 | 06:20A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1213 | 11/06 | 06:20A | MONTGOMERY,AL | 334- | PP/MM/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 1214 | 11/06 | 06:36A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1215 | 11/06 | 06:40A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1216 | 11/06 | 06:56A | Incoming | 334- | PP/MM | 5:00 | 0.00 | 0.00 | 0.00 |
| 1217 | 11/06 | 07:07A | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1218 | 11/06 | 07:21A | Incoming | 334- | PP | 8:00 | 0.00 | 0.00 | 0.00 |
| 1219 | 11/06 | 07:28A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1220 | 11/06 | 07:31A | MONTGOMERY,AL | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1221 | 11/06 | 07:33A | Incoming | 334- | PP | 15:00 | 0.00 | 0.00 | 0.00 |
| 1222 | 11/06 | 07:43A | Incoming | 334- | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1223 | 11/06 | 08:12A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1224 | 11/06 | 09:53A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1225 | 11/06 | 10:00A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1226 | 11/06 | 10:15A | MONTGOMERY,AL | 334- | PP/VM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1227 | 11/06 | 10:18A | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1228 | 11/06 | 10:19A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1229 | 11/06 | 10:21A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1230 | 11/06 | 10:22A | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1231 | 11/06 | 10:50A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1232 | 11/06 | 10:51A | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1233 | 11/06 | 10:52A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1234 | 11/06 | 10:54A | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1235 | 11/06 | 11:57A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1236 | 11/06 | 12:19P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1237 | 11/06 | 12:33P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1238 | 11/06 | 12:42P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1239 | 11/06 | 12:59P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1240 | 11/06 | 01:16P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1241 | 11/06 | 01:18P | MONTGOMERY,AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1242 | 11/06 | 01:40P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1243 | 11/06 | 01:43P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1244 | 11/06 | 01:44P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1245 | 11/06 | 01:52P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1246 | 11/06 | 02:15P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1247 | 11/06 | 02:42P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1248 | 11/06 | 03:00P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1249 | 11/06 | 03:29P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1250 | 11/06 | 04:17P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1251 | 11/06 | 04:22P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1252 | 11/06 | 05:36P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1253 | 11/06 | 05:38P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1254 | 11/06 | 05:39P | MONTGOMERY,AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1255 | 11/06 | 05:43P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1256 | 11/06 | 06:08P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1257 | 11/06 | 06:19P | MONTGOMERY,AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1258 | 11/06 | 06:21P | MONTGOMERY,AL | 33 | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1259 | 11/06 | 06:23P | Incoming | 256- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1260 | 11/06 | 06:30P | Incoming | 334- | PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1261 | 11/06 | 06:38P | MONTGOMERY,AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1262 | 11/06 | 07:13P | MONTGOMERY,AL | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1263 | 11/06 | 07:16P | MONTGOMERY,AL | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1264 | 11/06 | 07:19P | Incoming | 334- | MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 1265 | 11/06 | 07:26P | Incoming | 334- | MM | 27:00 | 0.00 | 0.00 | 0.00 |
| 1266 | 11/06 | 08:43P | MONTGOMERY,AL | 334- | M/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1267 | 11/07 | 06:55A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1268 | 11/07 | 06:59A | Incoming | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1269 | 11/07 | 07:16A | Incoming | 334- | MM | 23:00 | 0.00 | 0.00 | 0.00 |
| 1270 | 11/07 | 07:44A | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1271 | 11/07 | 07:44A | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1272 | 11/07 | 07:45A | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1273 | 11/07 | 07:45A | Incoming | 334- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1274 | 11/07 | 07:51A | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1275 | 11/07 | 07:51A | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1276 | 11/07 | 10:23A | Incoming | 334- | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1277 | 11/07 | 10:43A | Incoming | 334- | MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1278 | 11/07 | 11:27A | Incoming | 334- | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1279 | 11/07 | 12:17P | MONTGOMERY,AL | 334- | PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1280 | 11/07 | 12:18P | Incoming | 334- | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1281 | 11/07 | 12:33P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1282 | 11/07 | 12:34P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1283 | 11/07 | 12:34P | MONTGOMERY,AL | 334- | PP/MM/PU | 12:00 | 0.00 | 0.00 | 0.00 |
| 1284 | 11/07 | 12:49P | MONTGOMERY,AL | 334- | PP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1285 | 11/07 | 01:13P | MONTGOMERY,AL | 334- | PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1286 | 11/07 | 01:14P | MONTGOMERY,AL | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1287 | 11/07 | 01:21P | Incoming | 334- | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1288 | 11/07 | 01:26P | Incoming | 334- | | 8:00 | 0.00 | 0.00 | 0.00 |
| 1289 | 11/07 | 01:43P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1290 | 11/07 | 01:54P | Incoming | 334- | | 9:00 | 0.00 | 0.00 | 0.00 |
| 1291 | 11/07 | 01:59P | Incoming | 334-202-8676 | PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1292 | 11/07 | 02:05P | Incoming | 334- | MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1293 | 11/07 | 02:08P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1294 | 11/07 | 02:10P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1295 | 11/07 | 02:11P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1296 | 11/07 | 02:20P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1297 | 11/07 | 03:48P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1298 | 11/07 | 03:57P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1299 | 11/07 | 04:02P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1300 | 11/07 | 04:03P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1301 | 11/07 | 04:04P | MONTGOMERY,AL | 334- | PP/MM/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1302 | 11/07 | 04:08P | Incoming | 334- | PP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1303 | 11/07 | 04:10P | Customer Serv | 611 | PP/FC | 2:00 | 0.00 | 0.00 | 0.00 |
| 1304 | 11/07 | 04:13P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1305 | 11/07 | 04:14P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1306 | 11/07 | 04:14P | Incoming | 334- | MM | 6:00 | 0.00 | 0.00 | 0.00 |
| 1307 | 11/07 | 04:33P | Incoming | 334- | PP/CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1308 | 11/07 | 04:44P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1309 | 11/07 | 04:47P | Incoming | 334- | MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1310 | 11/07 | 05:02P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1311 | 11/07 | 05:04P | MONTGOMERY,AL | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1312 | 11/07 | 05:12P | ALEXANDRY,AL | 256- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1313 | 11/07 | 05:13P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1314 | 11/07 | 05:15P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1315 | 11/07 | 05:23P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1316 | 11/07 | 05:28P | ALEXANDRY,AL | 256- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1317 | 11/07 | 05:29P | MONTGOMERY,AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1318 | 11/07 | 05:34P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1319 | 11/07 | 05:44P | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |

Continued...





Account Number
~~redacted~~

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
17 of 23

**NEXTEL**

---

**DETAILS for 334-414-5693, 1 continued**

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (see pg. 2)/Footnote | Min:Sec | Usage | *Long Dist./Other | Total Charges |
|-----|------|------|---------|------|---------|-------|--------|--------|
| 1320 | 11/07 | 06:12P | Incoming | 334-███/MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 1321 | 11/07 | 06:15P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1322 | 11/07 | 06:33P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1323 | 11/07 | 06:39P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1324 | 11/07 | 07:23P | MONTGOMERY, AL | 334-███P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1325 | 11/07 | 07:26P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1326 | 11/07 | 07:27P | MONTGOMERY, AL | 334-███P/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1327 | 11/07 | 07:28P | Incoming | 256-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1328 | 11/07 | 07:34P | MONTGOMERY, AL | 334-███P/PCW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1329 | 11/07 | 07:39P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1330 | 11/07 | 07:53P | TALLADEGA, AL | 256-███P | 5:00 | 0.00 | 0.00 | 0.00 |
| 1331 | 11/07 | 08:06P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1332 | 11/07 | 08:21P | Incoming | Unavail ███ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1333 | 11/07 | 08:23P | Incoming | 334-███/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1334 | 11/07 | 09:55P | Incoming | 334-███P | 6:00 | 0.00 | 0.00 | 0.00 |
| 1335 | 11/08 | 06:03A | TALLADEGA, AL | 256-███P | 13:00 | 0.00 | 0.00 | 0.00 |
| 1336 | 11/08 | 06:41A | Incoming | 334-███P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1337 | 11/08 | 07:02A | Incoming | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1338 | 11/08 | 07:27A | Incoming | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1339 | 11/08 | 07:41A | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1340 | 11/08 | 07:50A | Incoming | 334-███ | 2:00 | 0.00 | 0.00 | 0.00 |
| 1341 | 11/08 | 07:51A | MONTGOMERY, AL | 334-███/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1342 | 11/08 | 08:08A | Incoming | 334-███P | 5:00 | 0.00 | 0.00 | 0.00 |
| 1343 | 11/08 | 09:17A | Incoming | 334-███P | 4:00 | 0.00 | 0.00 | 0.00 |
| 1344 | 11/08 | 09:18A | MONTGOMERY, A... | 334-███/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1345 | 11/08 | 10:15A | MONTGOMERY, AL | Voice ███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1346 | 11/08 | 10:18A | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1347 | 11/08 | 10:58A | Incoming | 334-███P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1348 | 11/08 | 11:22A | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1349 | 11/08 | 11:40A | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1350 | 11/08 | 11:45A | TALLADEGA, AL | 256-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1351 | 11/08 | 11:59A | Incoming | 256-███P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1352 | 11/08 | 12:05P | Incoming | 256-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1353 | 11/08 | 12:09P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1354 | 11/08 | 12:49P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1355 | 11/08 | 01:40P | Incoming | 334-███P | 6:00 | 0.00 | 0.00 | 0.00 |
| 1356 | 11/08 | 01:47P | Incoming | 334-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1357 | 11/08 | 02:00P | MONTGOMERY, AL | 334-███/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1358 | 11/08 | 02:01P | MONTGOMERY, AL | 334-███P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1359 | 11/08 | 02:03P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1360 | 11/08 | 02:07P | Incoming | 334-███P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1361 | 11/08 | 02:22P | Incoming | 334-███/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1362 | 11/08 | 04:05P | MONTGOMERY, AL | 334-███P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1363 | 11/08 | 04:17P | Incoming | 334-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1364 | 11/08 | 04:27P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1365 | 11/08 | 04:28P | Incoming | 334-███P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1366 | 11/08 | 04:50P | Incoming | 334-███P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1367 | 11/08 | 05:02P | MONTGOMERY, AL | 334-███/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1368 | 11/08 | 05:07P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1369 | 11/08 | 05:08P | Incoming | 334-███P/CW | 4:00 | 0.00 | 0.00 | 0.00 |
| 1370 | 11/08 | 05:25P | MONTGOMERY, AL | 334-███P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1371 | 11/08 | 06:11P | Incoming | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1372 | 11/09 | 06:30A | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (see pg. 2)/Footnote | Min:Sec | Usage | *Long Dist./Other | Total Charges |
|-----|------|------|---------|------|---------|-------|--------|--------|
| 1373 | 11/09 | 07:02A | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1374 | 11/09 | 07:04A | Incoming | 334-███ | 9:00 | 0.00 | 0.00 | 0.00 |
| 1375 | 11/09 | 08:30A | Incoming | 334-███ | 2:00 | 0.00 | 0.00 | 0.00 |
| 1376 | 11/09 | 10:15A | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1377 | 11/09 | 11:52A | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1378 | 11/09 | 11:57A | TALLADEGA, AL | 256-███P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1379 | 11/09 | 01:18P | Incoming | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1380 | 11/09 | 01:24P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1381 | 11/09 | 01:29P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1382 | 11/09 | 01:31P | MONTGOMERY, AL | 334-███/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1383 | 11/09 | 01:46P | Incoming | 256-███P | 4:00 | 0.00 | 0.00 | 0.00 |
| 1384 | 11/09 | 01:50P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1385 | 11/09 | 01:51P | MONTGOMERY, AL | 334-███P/PCW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1386 | 11/09 | 02:14P | Incoming | 334-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1387 | 11/09 | 02:16P | Incoming | 256-███P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1388 | 11/09 | 02:37P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1389 | 11/09 | 02:38P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1390 | 11/09 | 02:53P | MONTGOMERY, AL | 334-███P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1391 | 11/09 | 02:56P | Incoming | 334-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1392 | 11/09 | 03:07P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1393 | 11/09 | 04:01P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1394 | 11/09 | 04:02P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1395 | 11/09 | 04:42P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1396 | 11/09 | 04:44P | Incoming | 334-███P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1397 | 11/09 | 04:46P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1398 | 11/09 | 04:50P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1399 | 11/09 | 05:04P | MONTGOMERY, AL | 334-███P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1400 | 11/09 | 05:06P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1401 | 11/09 | 05:08P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1402 | 11/09 | 05:12P | MONTGOMERY, AL | 334-███/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1403 | 11/09 | 05:15P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1404 | 11/09 | 05:15P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1405 | 11/09 | 05:22P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1406 | 11/09 | 05:23P | MONTGOMERY, AL | 334-███P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1407 | 11/09 | 05:36P | Incoming | 256-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1408 | 11/09 | 06:15P | Incoming | 334-███/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1409 | 11/09 | 06:16P | TALLADEGA, AL | 256-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1410 | 11/09 | 06:17P | Incoming | 256-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1411 | 11/09 | 06:25P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1412 | 11/09 | 06:33P | TALLADEGA, AL | 256-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1413 | 11/09 | 06:47P | Incoming | 334-███/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1414 | 11/09 | 07:12P | Incoming | 334-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1415 | 11/09 | 07:15P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1416 | 11/09 | 07:16P | MONTGOMERY, AL | 334-███P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1417 | 11/09 | 07:20P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1418 | 11/09 | 07:21P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1419 | 11/09 | 07:35P | MONTGOMERY, AL | 334-███P/PU | 5:00 | 0.00 | 0.00 | 0.00 |
| 1420 | 11/09 | 07:45P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1421 | 11/09 | 07:49P | Incoming | 334-███/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1422 | 11/09 | 07:52P | Incoming | 334-███P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1423 | 11/09 | 08:21P | Incoming | 334-███P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1424 | 11/09 | 08:45P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1425 | 11/09 | 08:51P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1426 | 11/09 | 08:51P | MONTGOMERY, AL | 334-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1427 | 11/09 | 09:21P | TALLADEGA, AL | 256-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1428 | 11/09 | 09:27P | MONTGOMERY, AL | 334-███/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1429 | 11/09 | 09:28P | TALLADEGA, AL | 256-███P/PU | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*



Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
Page 18 of 23

NEXTEL™

DETAILS for 334-414-5693, 1 continued

> SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (See pg. 2) Footnote | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1430 | 11/09 | 09:50P | MONTGOMERY,AL | 334- ▓▓ OP/WW/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1431 | 11/09 | 09:58P | Incoming | 334- ▓▓ OP/WW | 3:00 | 0.00 | 0.00 | 0.00 |
| 1432 | 11/09 | 10:06P | Incoming | 334- ▓▓ WW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1433 | 11/09 | 10:31P | Incoming | 334- ▓▓ WW | 6:00 | 0.00 | 0.00 | 0.00 |
| 1434 | 11/09 | 10:58P | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1435 | 11/10 | 05:11A | Incoming | 334- ▓▓ | 5:00 | 0.00 | 0.00 | 0.00 |
| 1436 | 11/10 | 07:05A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1437 | 11/10 | 07:05A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1438 | 11/10 | 07:23A | Incoming | 334- ▓▓ PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1439 | 11/10 | 07:42A | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1440 | 11/10 | 08:05A | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1441 | 11/10 | 08:11A | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1442 | 11/10 | 08:27A | Incoming | 334- ▓▓ PP/WW | 4:00 | 0.00 | 0.00 | 0.00 |
| 1443 | 11/10 | 08:59A | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1444 | 11/10 | 09:08A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1445 | 11/10 | 09:12A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1446 | 11/10 | 09:14A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1447 | 11/10 | 09:14A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1448 | 11/10 | 10:05A | MONTGOMERY,AL | 334- ▓▓ WW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1449 | 11/10 | 10:05A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1450 | 11/10 | 10:22A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1451 | 11/10 | 10:22A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1452 | 11/10 | 10:23A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1453 | 11/10 | 10:23A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1454 | 11/10 | 11:46A | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1455 | 11/10 | 11:50A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1456 | 11/10 | 11:51A | Incoming | 334- ▓▓ CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1457 | 11/10 | 11:51A | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1458 | 11/10 | 12:07P | MONTGOMERY,AL | 334- ▓▓ WW/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1459 | 11/10 | 12:09P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1460 | 11/10 | 12:15P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1461 | 11/10 | 12:16P | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1462 | 11/10 | 12:18P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1463 | 11/10 | 12:19P | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1464 | 11/10 | 12:36P | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1465 | 11/10 | 12:51P | Incoming | 334- ▓▓ WW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1466 | 11/10 | 12:57P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1467 | 11/10 | 12:58P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1468 | 11/10 | 01:00P | Incoming | 334- ▓▓ CW | 9:00 | 0.00 | 0.00 | 0.00 |
| 1469 | 11/10 | 01:06P | Incoming | 334- ▓▓ CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1470 | 11/10 | 01:11P | Toll Free Call | 800- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1471 | 11/10 | 01:20P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1472 | 11/10 | 01:21P | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1473 | 11/10 | 01:25P | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1474 | 11/10 | 01:53P | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1475 | 11/10 | 02:31P | Incoming | 334- ▓▓ PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1476 | 11/10 | 03:37P | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1477 | 11/10 | 04:02P | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1478 | 11/10 | 04:27P | Incoming | 334- ▓▓ PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1479 | 11/10 | 04:28P | WETUMPKA,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1480 | 11/10 | 06:12P | MONTGOMERY,AL | 334- ▓▓ PP/OC | 2:00 | 0.00 | 0.00 | 0.00 |
| 1481 | 11/10 | 06:21P | Incoming | 334- ▓▓ PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1482 | 11/10 | 06:36P | Incoming | 334- ▓▓ PP/WW | 2:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number (See pg. 2) Footnote | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|
| 1483 | 11/10 | 06:54P | Incoming | 334- ▓▓ | 2:00 | 0.00 | 0.00 | 0.00 |
| 1484 | 11/10 | 07:08P | TALLADEGA,AL | 256- ▓▓ OC/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1485 | 11/10 | 07:24P | Incoming | 334- ▓▓ OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1486 | 11/10 | 07:44P | Incoming | 334- ▓▓ OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1487 | 11/10 | 08:34P | Incoming | 334- ▓▓ WW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1488 | 11/10 | 08:53P | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1489 | 11/10 | 08:56P | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1490 | 11/10 | 09:15P | MONTGOMERY,AL | 334- ▓▓ OC/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1491 | 11/10 | 09:21P | Incoming | 205- ▓▓ WW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1492 | 11/10 | 09:24P | Incoming | 81 ▓▓ | 14:00 | 0.00 | 0.00 | 0.00 |
| 1493 | 11/10 | 09:25P | Incoming | 334- ▓▓ CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1494 | 11/10 | 09:25P | MONTGOMERY,AL | Voice ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1495 | 11/10 | 09:34P | Incoming | 205- ▓▓ OC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1496 | 11/10 | 09:38P | Incoming | 256- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1497 | 11/10 | 09:43P | Incoming | 334- ▓▓ OC | 6:00 | 0.00 | 0.00 | 0.00 |
| 1498 | 11/10 | 09:46P | MONTGOMERY,AL | 334- ▓▓ PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1499 | 11/10 | 09:47P | Incoming | 334- ▓▓ WW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1500 | 11/10 | 09:49P | MONTGOMERY,AL | 334- ▓▓ WW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1501 | 11/10 | 09:53P | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1502 | 11/10 | 09:54P | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1503 | 11/10 | 09:59P | MONTGOMERY,AL | 334- ▓▓ WW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1504 | 11/10 | 10:00P | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1505 | 11/10 | 10:01P | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1506 | 11/10 | 10:06P | TALLADEGA,AL | 256- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1507 | 11/10 | 10:24P | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1508 | 11/10 | 10:25P | Incoming | 334- ▓▓ | 2:00 | 0.00 | 0.00 | 0.00 |
| 1509 | 11/10 | 10:27P | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1510 | 11/10 | 10:33P | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1511 | 11/10 | 10:34P | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1512 | 11/10 | 10:34P | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1513 | 11/11 | 12:10A | Incoming | Unavailable | 1:00 | 0.00 | 0.00 | 0.00 |
| 1514 | 11/11 | 01:48A | MONTGOMERY,AL | 334- ▓▓ WW/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1515 | 11/11 | 01:50A | MONTGOMERY,AL | 334- ▓▓ WW/PU | 7:00 | 0.00 | 0.00 | 0.00 |
| 1516 | 11/11 | 02:11A | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1517 | 11/11 | 06:41A | TALLADEGA,AL | 256- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1518 | 11/11 | 08:44A | Incoming | 334- ▓▓ | 3:00 | 0.00 | 0.00 | 0.00 |
| 1519 | 11/11 | 08:50A | Incoming | 334- ▓▓ | 2:00 | 0.00 | 0.00 | 0.00 |
| 1520 | 11/11 | 09:01A | Incoming | 256- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1521 | 11/11 | 09:11A | Incoming | 334- ▓▓ WW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1522 | 11/11 | 09:16A | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1523 | 11/11 | 09:18A | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1524 | 11/11 | 09:43A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1525 | 11/11 | 09:43A | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1526 | 11/11 | 09:52A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1527 | 11/11 | 09:54A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1528 | 11/11 | 09:57A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1529 | 11/11 | 10:00A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1530 | 11/11 | 10:01A | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1531 | 11/11 | 10:02A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1532 | 11/11 | 10:06A | MONTGOMERY,AL | 334- ▓▓ PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1533 | 11/11 | 10:07A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1534 | 11/11 | 10:33A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1535 | 11/11 | 10:43A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1536 | 11/11 | 10:46A | MONTGOMERY,AL | 334- ▓▓ PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1537 | 11/11 | 10:54A | Incoming | 334- ▓▓ | 3:00 | 0.00 | 0.00 | 0.00 |
| 1538 | 11/11 | 11:26A | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |
| 1539 | 11/11 | 11:54A | Incoming | 334- ▓▓ | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

| Account Number | Billing Period 10/19/06-11/18/06 | Page 19 of 23 |
|---|---|---|
| Account Name YOLANDA BOSWELL | Invoice Date November 23, 2006 | **NEXTEL**™ |

DETAILS for 334-414-5693, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1540 | 11/11 | 12:19P | Incoming | | /MM | 4:00 | 0.00 | 0.00 | 0.00 |
| 1541 | 11/11 | 12:43P | MONTGOMERY,AL | 334- | /MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1542 | 11/11 | 12:44P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1543 | 11/11 | 12:45P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1544 | 11/11 | 12:45P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1545 | 11/11 | 12:47P | MONTGOMERY,AL | 334 | P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1546 | 11/11 | 12:54P | Incoming | 334- | P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1547 | 11/11 | 01:07P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1548 | 11/11 | 01:12P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1549 | 11/11 | 01:17P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1550 | 11/11 | 01:23P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1551 | 11/11 | 01:46P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1552 | 11/11 | 01:48P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1553 | 11/11 | 02:23P | Incoming | 334- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1554 | 11/11 | 02:44P | Incoming | 334- | P | 3:00 | 0.00 | 0.00 | 0.00 |
| 1555 | 11/11 | 03:00P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1556 | 11/11 | 03:18P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1557 | 11/11 | 03:19P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1558 | 11/11 | 03:20P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1559 | 11/11 | 03:21P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1560 | 11/11 | 03:21P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1561 | 11/11 | 03:25P | MONTGOMERY,A. | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1562 | 11/11 | 03:25P | Incoming | 256- | OP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1563 | 11/11 | 03:37P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1564 | 11/11 | 03:33P | MONTGOMERY,AL | 334- | P/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1565 | 11/11 | 03:37P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1566 | 11/11 | 03:39P | MONTGOMERY,A. | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1567 | 11/11 | 03:42P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1568 | 11/11 | 03:46P | MONTGOMERY,AL | 334- | P/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1569 | 11/11 | 03:48P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1570 | 11/11 | 03:48P | MONTGOMERY,AL | 334- | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1571 | 11/11 | 04:04P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1572 | 11/11 | 04:12P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1573 | 11/11 | 04:25P | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1574 | 11/11 | 04:29P | MONTGOMERY,AL | 334- | P | 5:00 | 0.00 | 0.00 | 0.00 |
| 1575 | 11/11 | 04:39P | TALLADEGA,AL | 256- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1576 | 11/11 | 04:42P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1577 | 11/11 | 04:42P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1578 | 11/11 | 04:45P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1579 | 11/11 | 04:46P | MONTGOMERY,AL | 334- | P/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1580 | 11/11 | 04:49P | Incoming | 334- | /CW | 5:00 | 0.00 | 0.00 | 0.00 |
| 1581 | 11/11 | 04:52P | Incoming | 334- | P/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1582 | 11/11 | 04:54P | Incoming | 334- | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1583 | 11/11 | 05:09P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1584 | 11/11 | 05:11P | MONTGOMERY,AL | 334- | P/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1585 | 11/11 | 05:15P | TALLADEGA,AL | 256- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1586 | 11/11 | 05:18P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1587 | 11/11 | 05:18P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1588 | 11/11 | 05:20P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1589 | 11/11 | 05:23P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1590 | 11/11 | 05:24P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | -0.00 | 0.00 |
| 1591 | 11/11 | 05:24P | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1592 | 11/11 | 05:25P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1593 | 11/11 | 05:28P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1594 | 11/11 | 05:28P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1595 | 11/11 | 05:47P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1596 | 11/11 | 05:48P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1597 | 11/11 | 05:50P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1598 | 11/11 | 05:51P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1599 | 11/11 | 05:56P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1600 | 11/11 | 06:17P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1601 | 11/11 | 06:23P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1602 | 11/11 | 06:27P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1603 | 11/11 | 06:30P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1604 | 11/11 | 06:31P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1605 | 11/11 | 06:32P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1606 | 11/11 | 06:51P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1607 | 11/11 | 06:56P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1608 | 11/11 | 07:08P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1609 | 11/11 | 07:10P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1610 | 11/11 | 08:29P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1611 | 11/11 | 10:30P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1612 | 11/11 | 10:31P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1613 | 11/11 | 10:42P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1614 | 11/11 | 10:44P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1615 | 11/11 | 10:44P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1616 | 11/11 | 10:51P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1617 | 11/11 | 10:51P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1618 | 11/11 | 10:58P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1619 | 11/11 | 11:03P | Incoming | 334- | OP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1620 | 11/11 | 11:04P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1621 | 11/11 | 11:13P | TALLADEGA,A. | 256- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1622 | 11/11 | 11:13P | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1623 | 11/11 | 11:29P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1624 | 11/12 | 12:01A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1625 | 11/12 | 12:02A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1626 | 11/12 | 12:02A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1627 | 11/12 | 12:05A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1628 | 11/12 | 12:13A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1629 | 11/12 | 01:29A | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1630 | 11/12 | 01:41A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1631 | 11/12 | 01:41A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1632 | 11/12 | 01:42A | MONTGOMERY,AL | 334- | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1633 | 11/12 | 02:33A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1634 | 11/12 | 03:16A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1635 | 11/12 | 03:19A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1636 | 11/12 | 03:28A | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1637 | 11/12 | 03:35A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1638 | 11/12 | 03:41A | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1639 | 11/12 | 03:48A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1640 | 11/12 | 03:53A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1641 | 11/12 | 04:01A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1642 | 11/12 | 04:21A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1643 | 11/12 | 04:23A | MONTGOMERY,AL | 334- | P/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1644 | 11/12 | 04:23A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1645 | 11/12 | 04:31A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1646 | 11/12 | 04:32A | Incoming | 334- | | 9:00 | 0.00 | 0.00 | 0.00 |
| 1647 | 11/12 | 04:41A | MONTGOMERY,AL | 334- | OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1648 | 11/12 | 04:42A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1649 | 11/12 | 05:24A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...



Account Number
Account Name
YOLANDA BOSWELL

Billing Period
10/19/06–11/18/06
Invoice Date
November 23, 2006

Page
20 of 23



NEXTEL

## DETAILS for 334-414-5693, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (see pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1650 | 11/12 | 05:24A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1651 | 11/12 | 05:29A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1652 | 11/12 | 05:43A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1653 | 11/12 | 05:44A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1654 | 11/12 | 09:04A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1655 | 11/12 | 12:11P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1656 | 11/12 | 12:11P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1657 | 11/12 | 12:12P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1658 | 11/12 | 12:12P | MONTGOMERY,AL | 334- | MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1659 | 11/12 | 12:20P | Incoming | | | 66:00 | 0.00 | 0.00 | 0.00 |
| 1660 | 11/12 | 01:26P | MONTGOMERY,AL | 334- | P/PU | 16:00 | 0.00 | 0.00 | 0.00 |
| 1661 | 11/12 | 01:31P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1662 | 11/12 | 02:42P | MONTGOMERY,AL | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1663 | 11/12 | 02:42P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1664 | 11/12 | 02:45P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1665 | 11/12 | 02:51P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1666 | 11/12 | 03:04P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1667 | 11/12 | 03:05P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1668 | 11/12 | 03:08P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1669 | 11/12 | 03:14P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1670 | 11/12 | 03:15P | Voicemail | | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1671 | 11/12 | 03:23P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1672 | 11/12 | 03:24P | MONTGOMERY,AL | 334- | MM/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1673 | 11/12 | 03:30P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1674 | 11/12 | 03:50P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1675 | 11/12 | 04:26P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1676 | 11/12 | 05:01P | MONTGOMERY,AL | 334- | P/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 1677 | 11/12 | 05:11P | MONTGOMERY,AL | 334- | P/PU | 11:00 | 0.00 | 0.00 | 0.00 |
| 1678 | 11/12 | 05:22P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1679 | 11/12 | 05:28P | Incoming | 334- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1680 | 11/12 | 05:28P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1681 | 11/12 | 05:31P | Incoming | 334- | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1682 | 11/12 | 05:51P | Incoming | 334- | | .0:00 | 0.00 | 0.00 | 0.00 |
| 1683 | 11/12 | 05:59P | Incoming | 334- | P/CW | 8:00 | 0.00 | 0.00 | 0.00 |
| 1684 | 11/12 | 06:07P | MONTGOMERY,AL | 334- | MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1685 | 11/12 | 06:16P | Incoming | 334- | P | 4:00 | 0.00 | 0.00 | 0.00 |
| 1686 | 11/12 | 06:41P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1687 | 11/12 | 07:04P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1688 | 11/12 | 07:08P | TALLADEGA,AL | 256- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1689 | 11/12 | 07:09P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1690 | 11/12 | 07:09P | MONTGOMERY,AL | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1691 | 11/12 | 07:38P | Incoming | 334- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1692 | 11/12 | 08:20P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1693 | 11/13 | 06:41A | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1694 | 11/13 | 06:46A | Incoming | 334- | | 8:00 | 0.00 | 0.00 | 0.00 |
| 1695 | 11/13 | 07:02A | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1696 | 11/13 | 07:11A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1697 | 11/13 | 07:11A | Incoming | 334- | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1698 | 11/13 | 07:25A | Incoming | 334- | P | 7:00 | 0.00 | 0.00 | 0.00 |
| 1699 | 11/13 | 07:43A | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1700 | 11/13 | 07:44A | Incoming | 334- | P | 1:00 | 0.00 | 0.00 | 0.00 |
| 1701 | 11/13 | 07:52A | Incoming | 334- | P | 4:00 | 0.00 | 0.00 | 0.00 |
| 1702 | 11/13 | 08:15A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (see pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1703 | 11/13 | 08:41A | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1704 | 11/13 | 12:56P | Incoming | 334- | P | 2:00 | 0.00 | 0.00 | 0.00 |
| 1705 | 11/13 | 12:58P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1706 | 11/13 | 01:06P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1707 | 11/13 | 01:12P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1708 | 11/13 | 01:49P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1709 | 11/13 | 02:04P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1710 | 11/13 | 02:14P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1711 | 11/13 | 02:16P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1712 | 11/13 | 02:17P | Incoming | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1713 | 11/13 | 03:07P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1714 | 11/13 | 03:29P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1715 | 11/13 | 03:41P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1716 | 11/13 | 04:16P | Incoming | 334- | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1717 | 11/13 | 04:18P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1718 | 11/13 | 04:22P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1719 | 11/13 | 04:23P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1720 | 11/13 | 04:24P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1721 | 11/13 | 04:25P | MONTGOMERY,AL | 334-26 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1722 | 11/13 | 04:28P | MONTGOMERY,AL | 334-32 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1723 | 11/13 | 05:21P | Incoming | 256- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1724 | 11/13 | 05:27P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1725 | 11/13 | 05:27P | Incoming | 334- | /CW | 4:00 | 0.00 | 0.00 | 0.00 |
| 1726 | 11/13 | 05:29P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1727 | 11/13 | 05:31P | MONTGOMERY,AL | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1728 | 11/13 | 05:31P | Incoming | 334- | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1729 | 11/13 | 05:31P | Incoming | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1730 | 11/13 | 05:36P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1731 | 11/13 | 05:37P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1732 | 11/13 | 05:38P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1733 | 11/13 | 05:39P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1734 | 11/13 | 05:39P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1735 | 11/13 | 05:49P | MONTGOMERY,AL | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1736 | 11/13 | 06:13P | MONTGOMERY,AL | 33 | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1737 | 11/13 | 06:25P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1738 | 11/13 | 06:26P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1739 | 11/13 | 06:26P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1740 | 11/13 | 06:30P | MONTGOMERY,AL | 334- | P/PU | 9:00 | 0.00 | 0.00 | 0.00 |
| 1741 | 11/13 | 06:43P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1742 | 11/13 | 06:44P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1743 | 11/13 | 06:54P | Incoming | 334- | /CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1744 | 11/13 | 06:54P | TALLADEGA,AL | 25 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1745 | 11/13 | 06:55P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1746 | 11/13 | 06:57P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1747 | 11/13 | 06:58P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1748 | 11/13 | 07:03P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1749 | 11/13 | 07:03P | MONTGOMERY,AL | 33 | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1750 | 11/13 | 07:17P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1751 | 11/13 | 07:22P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1752 | 11/13 | 07:23P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1753 | 11/13 | 07:23P | MONTGOMERY,AL | 334- | P/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1754 | 11/13 | 07:23P | Incoming | 334- | /CW | 2:00 | 0.00 | 0.00 | 0.00 |
| 1755 | 11/13 | 07:31P | MONTGOMERY,AL | 334- | P/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1756 | 11/13 | 08:13P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1757 | 11/13 | 08:23P | MONTGOMERY,AL | 334- | P/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1758 | 11/13 | 08:26P | MONTGOMERY,AL | 334- | MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1759 | 11/13 | 10:41P | Incoming | 256- | P | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...

Account Number
Billing Period
Page
10/19/06-11/18/06  21 of 23

Account Name
Invoice Date
YOLANDA BOSWELL
November 23, 2006

**NEXTEL**™

## DETAILS for 334-414-5693, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1760 | 11/13 | 11:09P | TALLADEGA, AL | 256- | PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1761 | 11/13 | 11:13P | MONTGOMERY, AL | 334- | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1762 | 11/13 | 11:11P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1763 | 11/14 | 12:00A | MONTGOMERY, AL | 334- | MM/PU | 47:00 | 0.00 | 0.00 | 0.00 |
| 1764 | 11/14 | 07:13A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1765 | 11/14 | 08:36A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1766 | 11/14 | 08:28A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1767 | 11/14 | 09:54A | Incoming | 334- | | 7:00 | 0.00 | 0.00 | 0.00 |
| 1768 | 11/14 | 10:01A | Incoming | 334- | PP/MM | 8:00 | 0.00 | 0.00 | 0.00 |
| 1769 | 11/14 | 10:21A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1770 | 11/14 | 10:56A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1771 | 11/14 | 11:28A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1772 | 11/14 | 12:56P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1773 | 11/14 | 01:18P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1774 | 11/14 | 01:20P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1775 | 11/14 | 01:22P | MONTGOMERY, AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1776 | 11/14 | 01:30P | Customer Care | 612 | PP/FC | 1:00 | 0.00 | 0.00 | 0.00 |
| 1777 | 11/14 | 01:40P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1778 | 11/14 | 01:45P | Incoming | 334- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1779 | 11/14 | 01:48P | Incoming | 256- | PP/CN | 4:00 | 0.00 | 0.00 | 0.00 |
| 1780 | 11/14 | 01:50P | Incoming | 334- | PP/CN | 8:00 | 0.00 | 0.00 | 0.00 |
| 1781 | 11/14 | 01:58P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1782 | 11/14 | 02:12P | Incoming | 334- | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1783 | 11/14 | 02:20P | Incoming | 334- | | 9:00 | 0.00 | 0.00 | 0.00 |
| 1784 | 11/14 | 02:38P | Incoming | 334- | PP/CN | 5:00 | 0.00 | 0.00 | 0.00 |
| 1785 | 11/14 | 02:45P | FT DEPOSIT, AL | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1786 | 11/14 | 02:47P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1787 | 11/14 | 02:58P | MONTGOMERY, AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1788 | 11/14 | 03:23P | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1789 | 11/14 | 04:58P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1790 | 11/14 | 04:37P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1791 | 11/14 | 05:16P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1792 | 11/14 | 05:20P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1793 | 11/14 | 05:20P | MONTGOMERY, AL | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1794 | 11/14 | 05:41P | MONTGOMERY, AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1795 | 11/14 | 05:53P | ARITON, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1796 | 11/14 | 06:29P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1797 | 11/14 | 06:51P | MONTGOMERY, AL | 334- | PP/PU | 6:00 | 0.00 | 0.00 | 0.00 |
| 1798 | 11/14 | 08:00P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1799 | 11/14 | 08:09P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1800 | 11/14 | 08:10P | ARITON, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1801 | 11/14 | 08:12P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1802 | 11/14 | 08:16P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1803 | 11/14 | 08:26P | LITTLEROCK, AR | 501- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1804 | 11/14 | 08:31P | LITTLEROCK, AR | 501- | PP/PU | 8:00 | 0.00 | 0.00 | 0.00 |
| 1805 | 11/14 | 08:46P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1806 | 11/14 | 08:50P | Incoming | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1807 | 11/14 | 09:15P | Incoming | 256- | | 10:00 | 0.00 | 0.00 | 0.00 |
| 1808 | 11/14 | 09:25P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1809 | 11/15 | 05:24A | Incoming | 334- | PP/PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1810 | 11/15 | 05:45A | Incoming | 334- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1811 | 11/15 | 07:22A | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1812 | 11/15 | 07:27A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1813 | 11/15 | 07:28A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1814 | 11/15 | 07:28A | Incoming | 334- | | 10:00 | 0.00 | 0.00 | 0.00 |
| 1815 | 11/15 | 08:05A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1816 | 11/15 | 08:07A | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1817 | 11/15 | 08:22A | Incoming | Voice Mail | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1818 | 11/15 | 08:37A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1819 | 11/15 | 08:41A | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1820 | 11/15 | 09:47A | MONTGOMERY, AL | 334- | PP/MM/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1821 | 11/15 | 09:56A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1822 | 11/15 | 09:57A | MONTGOMERY, AL | 334- | PP/MM/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1823 | 11/15 | 09:59A | MONTGOMERY, AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1824 | 11/15 | 10:05A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1825 | 11/15 | 10:08A | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1826 | 11/15 | 10:10A | MONTGOMERY, AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1827 | 11/15 | 10:13A | Incoming | 501- | PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1828 | 11/15 | 10:19A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1829 | 11/15 | 10:29A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1830 | 11/15 | 10:45A | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1831 | 11/15 | 10:53A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1832 | 11/15 | 10:54A | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1833 | 11/15 | 11:10A | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1834 | 11/15 | 11:12A | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1835 | 11/15 | 12:20P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1836 | 11/15 | 12:35P | Incoming | 334-202-8676 | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1837 | 11/15 | 12:55P | NASHVILLE, TN | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1838 | 11/15 | 01:08P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1839 | 11/15 | 01:09P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1840 | 11/15 | 01:12P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1841 | 11/15 | 01:21P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1842 | 11/15 | 01:22P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1843 | 11/15 | 01:39P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1844 | 11/15 | 01:44P | Incoming | 334- | PP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 1845 | 11/15 | 01:46P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1846 | 11/15 | 01:47P | MONTGOMERY, AL | 334- | PP/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1847 | 11/15 | 01:49P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1848 | 11/15 | 01:57P | Incoming | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1849 | 11/15 | 02:02P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1850 | 11/15 | 02:08P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1851 | 11/15 | 02:34P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1852 | 11/15 | 02:35P | Incoming | 334- | PP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1853 | 11/15 | 02:45P | Incoming | 334- | PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 1854 | 11/15 | 02:59P | Incoming | 334- | PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1855 | 11/15 | 03:36P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1856 | 11/15 | 04:03P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1857 | 11/15 | 04:03P | MONTGOMERY, AL | 334- | PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1858 | 11/15 | 04:04P | MONTGOMERY, AL | 334- | PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1859 | 11/15 | 04:04P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1860 | 11/15 | 04:11P | Incoming | 334- | | 6:00 | 0.00 | 0.00 | 0.00 |
| 1861 | 11/15 | 06:04P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1862 | 11/15 | 06:05P | MONTGOMERY, AL | 334- | PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1863 | 11/15 | 06:19P | ARITON, AL | 334- | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1864 | 11/15 | 06:41P | Incoming | 334- | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1865 | 11/15 | 06:56P | Incoming | 334- | PP/MM | 2:00 | 0.00 | 0.00 | 0.00 |
| 1866 | 11/15 | 07:03P | TALLADEGA, AL | 256- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1867 | 11/15 | 07:07P | Incoming | 334- | PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1868 | 11/15 | 07:12P | MONTGOMERY, AL | 334- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1889 | 11/15 | 07:15P | MONTGOMERY, AL | 334-320- | PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

Continued...



**Account Number**

**Account Name**
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
22 of 23



## DETAILS for 334-414-5693, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1870 | 11/16 | 07:16P | NASHVILLE, TN | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1871 | 11/16 | 07:17P | | | /SW/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1872 | 11/16 | 07:18P | | 815 | /SW/PU | 2:00 | 0.00 | 0.00 | 0.00 |
| 1873 | 11/16 | 07:59P | MONTGOMERY, AL | 334 | /PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1874 | 11/16 | 09:16P | Incoming | 334 | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1875 | 11/16 | 10:17P | Incoming | | | 10:00 | 0.00 | 0.00 | 0.00 |
| 1876 | 11/16 | 05:41A | MONTGOMERY, AL | | /PP/MM/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1877 | 11/16 | 06:50A | MONTGOMERY, AL | 334 | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1878 | 11/16 | 07:07A | Incoming | 334 | /PP | 12:00 | 0.00 | 0.00 | 0.00 |
| 1879 | 11/16 | 07:21A | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1880 | 11/16 | 07:21A | Incoming | | /PP/CW | 4:00 | 0.00 | 0.00 | 0.00 |
| 1881 | 11/16 | 07:43A | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1882 | 11/16 | 07:43A | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1883 | 11/16 | 07:45A | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1884 | 11/16 | 08:34A | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1885 | 11/16 | 08:35A | Incoming | 334 | | 8:00 | 0.00 | 0.00 | 0.00 |
| 1886 | 11/16 | 08:52A | MONTGOMERY, A.. | 334 | /PP/PU | 4:00 | 0.00 | 0.00 | 0.00 |
| 1887 | 11/16 | 10:03A | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1888 | 11/16 | 10:05A | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1889 | 11/16 | 10:44A | Incoming | | /PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1890 | 11/16 | 12:56P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1891 | 11/16 | 01:11P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1892 | 11/16 | 01:35P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1893 | 11/16 | 02:11P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1894 | 11/16 | 02:22P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1895 | 11/16 | 02:47P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1896 | 11/16 | 03:30P | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1897 | 11/16 | 03:33P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1898 | 11/16 | 03:55P | MONTGOMERY, AL | | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1899 | 11/16 | 04:28P | MONTGOMERY, AL | | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1900 | 11/16 | 04:36P | Incoming | | /PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1901 | 11/16 | 05:02P | MONTGOMERY, AL | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1902 | 11/16 | 05:03P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1903 | 11/16 | 05:03P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1904 | 11/16 | 05:03P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1905 | 11/16 | 05:04P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1906 | 11/16 | 05:05P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1907 | 11/16 | 05:06P | MONTGOMERY, AL | | /PP/MM | 3:00 | 0.00 | 0.00 | 0.00 |
| 1908 | 11/16 | 05:11P | Incoming | | /PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1909 | 11/16 | 05:18P | MONTGOMERY, AL | | /PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1910 | 11/16 | 05:45P | MONTGOMERY, AL | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1911 | 11/16 | 05:48P | MONTGOMERY, AL | | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1912 | 11/16 | 05:49P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1913 | 11/16 | 05:49P | Toll Free Call | 800 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1914 | 11/16 | 05:50P | MONTGOMERY, AL | 334 | /MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1915 | 11/16 | 05:52P | Incoming | 334 | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1916 | 11/16 | 06:01P | MONTGOMERY, AL | 334 | /OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1917 | 11/16 | 06:02P | MONTGOMERY, AL | 334 | /OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1918 | 11/16 | 06:03P | MONTGOMERY, AL | 334 | /OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1919 | 11/16 | 06:03P | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1920 | 11/16 | 06:03P | MONTGOMERY, AL | 334 | /OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1921 | 11/16 | 06:03P | MONTGOMERY, AL | 334 | /OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1922 | 11/16 | 06:05P | MONTGOMERY, AL | 334 | /OP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist/ Other | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 1923 | 11/16 | 06:06P | MONTGOMERY, AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1924 | 11/16 | 06:06P | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1925 | 11/16 | 06:16P | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1926 | 11/16 | 06:18P | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1927 | 11/16 | 06:25P | Incoming | | /OP | 3:00 | 0.00 | 0.00 | 0.00 |
| 1928 | 11/16 | 06:51P | MONTGOMERY, AL | | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1929 | 11/16 | 07:12P | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1930 | 11/16 | 09:24P | MONTGOMERY, AL | 334 | /PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1931 | 11/17 | 06:47A | Incoming | 334 | | 9:00 | 0.00 | 0.00 | 0.00 |
| 1932 | 11/17 | 07:28A | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1933 | 11/17 | 07:56A | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1934 | 11/17 | 08:01A | Incoming | | /PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1935 | 11/17 | 08:30A | Incoming | 334 | /PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1936 | 11/17 | 09:40A | MONTGOMERY, AL | 334 | /PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1937 | 11/17 | 10:14A | Incoming | | /PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1938 | 11/17 | 10:38A | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1939 | 11/17 | 10:39A | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1940 | 11/17 | 10:41A | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1941 | 11/17 | 10:42A | Incoming | 334 | /PP | 5:00 | 0.00 | 0.00 | 0.00 |
| 1942 | 11/17 | 10:52A | Incoming | 334 | /PP/MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1943 | 11/17 | 11:09A | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1944 | 11/17 | 12:58P | Incoming | | /PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1945 | 11/17 | 01:10P | Incoming | | /PP/MM | 10:00 | 0.00 | 0.00 | 0.00 |
| 1946 | 11/17 | 01:45P | MONTGOMERY, AL | 334 | /PP/PL | 1:00 | 0.00 | 0.00 | 0.00 |
| 1947 | 11/17 | 01:47P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1948 | 11/17 | 02:04P | MONTGOMERY, AL | | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1949 | 11/17 | 02:33P | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1950 | 11/17 | 02:38P | Incoming | | /PP | 7:00 | 0.00 | 0.00 | 0.00 |
| 1951 | 11/17 | 02:41P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1952 | 11/17 | 02:45P | Incoming | 334 | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1953 | 11/17 | 03:33P | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1954 | 11/17 | 04:20P | MONTGOMERY, AL | 334 | /PP/MM/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1955 | 11/17 | 04:21P | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1956 | 11/17 | 04:23P | Incoming | 334 | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1957 | 11/17 | 04:27P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1958 | 11/17 | 04:33P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1959 | 11/17 | 05:12P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1960 | 11/17 | 05:32P | Incoming | | /MM | 1:00 | 0.00 | 0.00 | 0.00 |
| 1961 | 11/17 | 06:35P | MONTGOMERY, AL | | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1962 | 11/17 | 07:18P | MONTGOMERY, AL | | /PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1963 | 11/17 | 07:55P | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1964 | 11/18 | 08:37A | MONTGOMERY, AL | | /PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1965 | 11/18 | 08:39A | MONTGOMERY, AL | | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1966 | 11/18 | 08:47A | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1967 | 11/18 | 08:55A | MONTGOMERY, AL | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1968 | 11/18 | 09:49A | Incoming | | /PP | 2:00 | 0.00 | 0.00 | 0.00 |
| 1969 | 11/18 | 10:02A | Incoming | 334 | /PP/PU | 3:00 | 0.00 | 0.00 | 0.00 |
| 1970 | 11/18 | 10:12A | Incoming | 334 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1971 | 11/18 | 10:12A | Incoming | | /PP/CW | 1:00 | 0.00 | 0.00 | 0.00 |
| 1972 | 11/18 | 10:14A | Incoming | 334 | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1973 | 11/18 | 10:16A | Incoming | | /PP | 1:00 | 0.00 | 0.00 | 0.00 |
| 1974 | 11/18 | 10:56A | WETUMPKA, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1975 | 11/18 | 10:57A | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1976 | 11/18 | 11:07A | MONTGOMERY, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1977 | 11/18 | 11:11A | ARITON, AL | 334 | /PU | 1:00 | 0.00 | 0.00 | 0.00 |
| 1978 | 11/18 | 11:11A | Incoming | 334 | /PP | 4:00 | 0.00 | 0.00 | 0.00 |
| 1979 | 11/18 | 11:17A | MONTGOMERY, AL | 334-2 | /PP/PU | 1:00 | 0.00 | 0.00 | 0.00 |

*Continued...*

**NEXTEL**

Account Number

Account Name
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
23 of 23

DETAILS for 334 ___, 1 continued

## > SUBSCRIBER ACTIVITY DETAIL

### Cellular Services Call Detail

| No. | Date | Time | Call To | Number | Footnote (See pg. 2) | Min:Sec | Usage | *Long Dist./ Other | Total Charges |
|-----|------|------|---------|--------|----------------------|---------|-------|--------------------|---------------|
| 1980 | 11/18 | 11:29A | Incoming | 334- OP | | 5:00 | 0.00 | 0.00 | 0.00 |
| 1981 | 11/18 | 12:03P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1982 | 11/18 | 01:08P | MONTGOMERY, AL | 334- OP/PU | | 4:00 | 0.00 | 0.00 | 0.00 |
| 1983 | 11/18 | 01:19P | MONTGOMERY, AL | 334- OP/PU | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1984 | 11/18 | 02:09P | Incoming | 334- OP | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1985 | 11/18 | 02:10P | Incoming | Unavailable OP/MM | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1986 | 11/18 | 02:11P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1987 | 11/18 | 02:19P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1988 | 11/18 | 02:19P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1989 | 11/18 | 02:20P | Incoming | 334- OP | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1990 | 11/18 | 02:24P | Incoming | 334- OP/MM | | 3:00 | 0.00 | 0.00 | 0.00 |
| 1991 | 11/18 | 04:11P | ARITON, AL | 334- OP/MM/PU | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1992 | 11/18 | 04:56P | MONTGOMERY, AL | 334- OP/MM/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1993 | 11/18 | 05:01P | Incoming | 334- OP | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1994 | 11/18 | 07:23P | MONTGOMERY, AL | 334- OP/MM/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1995 | 11/18 | 08:02P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1996 | 11/18 | 08:30P | MONTGOMERY, AL | 334- OP/MM/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1997 | 11/18 | 08:34P | MONTGOMERY, AL | 334- OP/MM/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 1998 | 11/18 | 08:39P | MONTGOMERY, AL | 334- OP/PU | | 2:00 | 0.00 | 0.00 | 0.00 |
| 1999 | 11/18 | 08:41P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 2000 | 11/18 | 09:41P | MONTGOMERY, AL | 334- OP/PU | | 1:00 | 0.00 | 0.00 | 0.00 |
| 2001 | 11/18 | 09:47P | MONTGOMERY, AL | 334- OP/PU | | 2:00 | 0.00 | 0.00 | 0.00 |
| **Total Cellular Services Charges** | | | | | | 4136:00 | $0.00 | $2.40 | $2.40 |

*Long Distance/Other column includes any Long Distance, Directory Assistance (411), and Out of Area charges.

### Additional Messaging Detail

| Service Type | Number of Messages in Plan | Number of Messages | Billable Messages | Initial Rate | Initial Message | Additional Rate | Additional Messages | Total Charges |
|--------------|----------------------------|--------------------|--------------------|--------------|-----------------|-----------------|----------------------|---------------|
| Text Messaging | 500 | 49 | | 0.10 | | 0.00 | | 0.00 |
| **Total Additional Messaging Charges** | | | | | | | | $0.00 |

## > SUBSCRIBER INFORMATIONAL REPORTS

The following reports are compiled as a courtesy to help you analyze usage trends and manage your subscriber activity.

### Your Rate Plans

| Plan | Services |
|------|----------|
| Spending Limit Program Charge | |
| Partners ASL Hotline | Partners Hotline ASL |
| Unlimited Night & Wknd Minutes | Cellular Minutes |
| Nights and Weekends 6pm | |
| | Modified Nights and Weekends |
| | Cellular Minutes |
| Call Detail | Call Detail |
| Unlimited Mobile to Mobile Min | M2M Use Them or Lose Them |

### Your Rate Plans

| Plan | Services |
|------|----------|
| Nextel Service and Repair Plan | Nextel Service and Repair |
| Browser Wireless Web Services | Packet Data Service |
| | Untethered Packet Data |
| Text Messaging 500 Plan | PDS Application |
| | Enhanced Text Msg |
| | Text Messaging |
| | Text Messages |
| | Text Messages |
| Nextel Free Incoming 500 | Caller ID |
| | Talkgroup (SM) |
| | Nextel Direct Connect |
| | Free Long Distance |
| | Cross Fleet |
| | Short Message Service |
| | Usage |
| | Nationwide |
| | Cellular Minutes |
| | Voice Mail |

### Airtime Usage Detail

| Plan | Incoming/ Outgoing | Peak/ Off Peak | Total Min:Sec | Plan Min:Sec | Other Min:Sec | Billable Min:Sec | Total Charges |
|------|--------------------|-----------------|---------------|--------------|----------------|-------------------|----------------|
| Nextel Free Incoming 500 | | | | | | | |
| Usage | Incoming | Peak | 1203:00 | | 1203:00 | | 0.00 |
| Usage | Incoming | Off Peak | 699:00 | | 699:00 | | 0.00 |
| Usage | Outgoing | Peak | 798:00 | 798:00 | | | 0.00 |
| Usage | Outgoing | Off Peak | 1211:00 | 1211:00 | | | 0.00 |
| **Total Airtime Usage Charges** | | | | | | | $0.00 |

**Account Number**


**Account Name**
YOLANDA BOSWELL

Billing Period
10/19/06-11/18/06

Invoice Date
November 23, 2006

Page
A1 of 1



## ACCOUNT CHARGES AND ADJUSTMENTS

### > ACCOUNT MANAGEMENT REPORTS

The following reports are compiled as a courtesy to help you analyze usage trends and manage your account activity.

#### Cellular airtime usage summary

The minutes displayed in this grid are for reference only. Always refer to the Subscriber Activity Detail sections for full unit detail.

| User Name/DAC | Number/ Pooling Group | Plan Minutes/ Additional Min Used/ Total Plan Minutes And Additional Min Used | Total Min Used/ Billable Min Used/ Per Min Rate | Billable Used Charges/ Shared Usage Adjustments/ Total Usage Charges |
|---|---|---|---|---|
| 1 | 334 | 500:00 | 4111:00 | $0.00 |
| | | 3614:00 | | $0.00 |
| | | 4111:00 | 0.45 | $0.00 |
| Totals | | 500:00 | 4111:00 | $0.00 |
| | | 36¹4:00 | | $0.00 |
| | | 4¹¹1:00 | N/A | $0.00 |



**NEXTEL** ™

## > ACCOUNT INFORMATION

| | |
|---|---|
| **Account Name** | **Invoice Date** |
| YOLANDA BOSWELL | January 23, 2007 |
| **Account Number** | |
| ~~[redacted]~~ | |
| | **Total Amount Due** |
| | **$393.51** |

## > CUSTOMER CARE

**Register and Logon**
www.nextel.com

**Call Nextel**
1-888-566-6111

## > PAYMENT OPTIONS

 **To Pay Your Bill Online Go To**
www.nextel.com/mynextel
Sign up for Recurring Direct Debit!

 **To Pay Your Bill By Phone Call**
1-888-566-6111 or
611 from your Nextel phone

 **To Pay Your Bill By Mail**
See reverse side for details. >

## > MONTHLY INVOICE SUMMARY

**December 19 - January 18, 2007**

| | |
|---|---|
| Previous Balance | 278.91 |
| Adjustments to previous balance | 100.00 |
| **Outstanding Balance - Due Upon Receipt** | **$378.91** |
| Additional Nextel Charges | 2.60 |
| Government Fees and Taxes | 12.00 |
| Total Current Charges for 457449188 Due 02/03/07 | $14.60 |
| **Total Amount Due** | **$393.51** |

*Any unpaid balance after the due date may be subject to a late payment charge not to exceed 5% per month.

**NEXTEL** ™

Nextel Partners
8800 Bermuda Rd, Suite 100
Las Vegas, NV 89119
#BWNKYZW
#0000
MANIFESTLINE-
YOLANDA BOSWELL

B 7#

F555554444220F

*Letter Perfect Business Services*

1847 Robison Hill Road ◆ Montgomery, Alabama 36106

Exhibit V, 2:07- cv-135

July 17, 2007

To Whom It May Concern:

I work at home doing secretarial work for small businesses and others who need computer and typing services. In this capacity, I manage the paper work for Mr. Jamario GumBayTay's rental management company.

Ms. Yolanda Boswell and Ms. Jenette Boswell filled out individual applications for a house at 1215 Lake Street, a copy of which Mr. GumBayTay faxed to me and I made out the lease accordingly. The rent for this house was $550 monthly with a $250 security deposit. Since the house needed repairs before anyone could move in, Jamario K. GumBayTay, the Investor's representative and Ms. Yolanda Boswell agreed that the Boswells would do the repairs in lieu of a reduction in the rent of $100 monthly for six (6) months, making the monthly rent $450 for 6 months. The work was never done because they could not get one of their relatives who was a contractor to come over and help them, and they never moved in.

The house at 964 North Gap Loop became available and I was asked to change the Lease from 1215 Lake Street to 964 North Gap Loop for Ms. Yolanda Boswell. I changed the information in the lease to reflect the address as 964 North Gap Loop, but neglected to change the amount of the monthly rent from $450 to $550 which was the rent for this house. She signed the lease and I signed Mr. GumBayTay's name as representative of owner (I have his authority to do this.) and I sent a copy to Mr. GumBayTay. He called me and brought my attention to the fact that I had not changed the amount of the rent to $550.00. I made the correction and Mr. GumBayTay called Ms. Boswell and asked her to come back and sign the corrected lease. She never came back. Nevertheless, she understood that the rent was $550 instead of $450 because she paid $550 on her rent.

The only unit Elite Real Estate Consulting offered Ms. Boswell at the rate of $450 was 1215 Lake Street.

Sincerely,

*Lynn H. Norsworthy*

Lynn H. Norsworthy
Owner

Telephone: (334) 265-4466        Fax: (334) 264-8452        E-Mail: letterperfect@charter.net

Exhibit W, 2.07-CV-135

| date | ELITE ENTERPRISE | |
|---|---|---|
| project | 4013 Tiffany Drive | |
| page | Montgomery, AL 36110-3003 | |
| | (334)202-8676 | |

ELITE ENTERPRISE
4013 Tiffany Drive
Montgomery, AL 36110-3003
(334)202-8676

Jennette Boswell

$500 Received by Explicit

from 2.07

$300 Late Fees

Due for Dec 06 Rent

Paid 11/27/06 JKj

Received $450 00    964 Gapford

Cash Money on 11/18/06

For NOV 06 Rent

JKGumayTang

## RECEIPT

DATE 11/18/06
FROM Ms. Bosukil
FOR RENT Four Fifty 50 Dlrs Due
ACCT.
PAID 450 00
DUE 120 00
CASH
CHECK
MONEY ORDER
BY JKG
FROM 1Jan07 TO 30Jan07
No. 161989
$450 00
DOLLARS
This 350 00 due to JK Recs

## RECEIPT

DATE 01/02/07    No. 161986
FROM Ms. Bosukil    $50.00
Fifty and 100 DOLLARS
FOR Dec 06 Rent
50.00 late fee due
ACCT.
PAID 50 00
DUE 50 00
CASH
CHECK
MONEY ORDER
FROM 1 Dec 06 TO 31 Dec 06
BY JKG

MoneyGram Money Order

MONEYGRAM PAYMENT SYSTEMS, INC. DRAWER
P.O. BOX 9476
MINNEAPOLIS, MN
www.moneygram.com
PLEASE READ REVERSE SIDE    DATE/AMOUNT
RECEIPT
RECIBO
NEED A COPY OF THIS ITEM
FOR YOUR RECORDS
5592004342
EMPLOYEE
606 (9/06) 500/5000
M 68042-N
▼DETACH HERE▼

Exhibit X, 2:07-cv-135

ELITE ENTERPRISE
4013 TIFFANY DRIVE
MONTGOMERY, AL 36110-3003
(202) 202-8676

MEMORANDUM

From The Desk Of Jamarlo K. Gumbaytay Ph.D., EDS
To All Tenant New and Old

RE: Goals and Objective (My pledge to you)

Greeting! Happy New Year!!! I'm hopeful that all is well with you and your
loved ones.

It is my desire to continue to work with all new and old tenants in the
upcoming year. Thus, I've set some goals and objectives to accomplish for
this new year.

On behalf of all of your landlords, I pledge to, (one) address all service calls
within 48 hours of receipt. Depending on the nature of the call, I pledge to
have all work completed within five (5) business days. However you must
keep in touch with me on a daily basis if you expect this type of response.
Once I issue a service call out to Eric Crews and his crew, I have no way of
knowing the status of a call unless you keep me informed. You have a right
to expect service within a reasonable time frame. Thus, it's my duty to see
that this happens.

I pledge to inspect your property at lease once every four months. It's very
important to both Elite and your landlord that you do your part in
maintaining your rental unit. Even though you are renting, please treat your
home as if you own it with the property care and respect. Thus, you must
keep in touch with Ms. Wanda Johnson. In order to schedule an appointment
with her ASAP! She can be reached at (334) 220-4650. This is her cell #
so do leave a message in the event you do not reach her.

I pledge to meet all new tenants within the first sixty (60) days of this year.
Thus, if you just came under Elite's management within the past one hundred

and twenty (120) days or less, please call me as soon as you can to schedule an in house appointment with you. I will be happy to visit with you in your home at your convenience so you can get to know your management team. Remember you can always reach me at (334) 202-8676 (24/7). It's a must that this visit must take place within the first sixty (60) days so we can update your file.

Most of you don't have applications on file and/or updated leases. Some of you have changed job(s) and phone numbers. Remember it's your responsibility to provide us with this information in order to keep your file(s) current and in the event of an emergency. Therefore, please complete the enclosed application today then hold on to it until we meet in person.

Last but not least, I pledge to notify your landlord within seventy-two (72) hours of a service call if the work has not been completed as discussed. However, "There are always exceptions to the rule". Regardless, your concerns are our concerns both Elite's and your landlords.

Now, here's what I need for you to do for me. It is your duty and responsibility to keep your home clean and in good condition both inside and out. That means no junked or abandoned vehicles on the premises. Don't park on the lawn under any circumstances. You will be fined if warned more than twice. If said fines are not paid, I can assure you either it will come from your deposit and/or you will be sued to collect the fines. Also, it is your duty and responsibility to call me if you are going to be late with your rent payment or not pay it at all due to unforeseen circumstances. There's always a solution to the problem if you talk to me. Late fees, if not paid, will be deducted from your deposit and/or you will be sued to collect. A notice will be forwarded to Director Cathy Harris of the Montgomery Housing Authority explaining to them if and when such action will be taken. MHA will also be notified in writing if you continue to be this sort of problem. Any and all negative occurrences in our unit(s) that is your responsibility will be reported (i.e. lawn not being maintained, junked or abandoned vehicles, late fees and non payment of your share of the rent) to MHA.

We want to be fair and reasonable with you, however, everyone is not doing what they are required to do. Thus, from this point forward I will do my

best to make sure nothing will be over looked. Remember, you have the same rights of fair and reasonable treatment as our tenants. In the event you are not happy or satisfied with our services, please put it in writing to me first. Then, and only then, if the matter is not being resolved, you have the right to forward that copy to the MHA.

I look forward to a wonderful business relationship with each and every one of you this year. Remember, I am here to answer any questions or concerns you have.

Sincerely,

Tamarlo K. Gumbaytay

*Exhibit Y, 2.07-cv-135*





**MONTGOMERY HOUSING AUTHORITY**
1020 BELL STREET ◆ MONTGOMERY ◆ ALABAMA ◆ 36104-3006
(334) 206-7200 ◆ (334) 206-7222 Fax ◆ MHAToday.org

LEMUEL E. BOGGS, JR.
INTERIM EXECUTIVE DIRECTOR

EHO ◆ EOE

JOHN F. KNIGHT, JR.
CHAIRMAN

## Section 8 HAP Program
Fax (334) 206-7204   Office (334) 206-7159

TO: ALL PARTICIPATING LANDLORDS

RE: INFORMATION NEEDED

PLEASE ENTER BELOW THE REQUESTED INFORMATION IN PROVIDED SPACE.

OWNER OF PROPERTY: *Matthew W. Bahr*

NAME RENT CHECK TO BE MADE PAYABLE TO:
*Matthew W. Bahr*

ADDRESS CHECK SHOULD BE MAILED TO:
*1569 Amaryllis Trail*
*Orlando Fl 32825*

TELEPHONE NUMBER: *407-342-4918*

YOUR SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER:
███████████

IF OTHER THAN ABOVE, OWNER'S SECURITY NUMBER OR TAX IDENTIFICATIONS:

TELEPHONE NUMBER(S):

AGENT INFORMATION (If Applicable):

NAME: *Jancarlo K Cambayfay*

ADDRESS: *4013 Tiffany Drive, Montgomery Al 36110*

1099 FORM WILL BE MAILED TO:   [ X ] OWNER      [ ] AGENT

COMMISSIONERS:   RICHARD N. BOLLINGER   THOMAS TAYLOR   ANNE B. UPCHURCH   RON DRINKARD   CAROLYN EAVES   PAUL HANKINS

O/C'd
10/16/06 JKG

2:07-cv-135

Boswell

# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
### 1569 Amaryllis Circle
### Orlando, FL 32825
Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com
## October 2006 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian 105 Stuart Street Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Section 8 Tenant |
| 2. Carla Henry 2029 Merrily Drive Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell 3641 North Gap Loop Montgomery, AL 36110 | 550.00 | 0 | 225.00 | 202.50 | 22.50 | Paid Security Deposit $310.00—79.00 carpet cleaning |
| 4. Linda Dixon 1805 Rigsby Street Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. VACANT 817 North Pass Road Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | VACANT |
| 7. Loretta Hall 609 Boyce Street Montgomery, AL 36107 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Paid-October w/postdated check for $55.00 Section 8 |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | 3 months in arrears Section 8 Tenant |
| 9. Wanda Johnson 507 5th Street Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 585.00 | 65.00 | New Tenant |
| 10. Sharice Vaughn 2017 Stella Street Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Jamie Bibb 513 4th Street Montgomery, AL | 600.00 | 524.00 | 76.00 | 540.00 | 60.00 | Started 7/17/06. Full payment starts 1 Oct 06 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 6,150.00 | | | | | Highlighted properties not included in totals |
| October Rent Collected | 5,755.00 | 4,749.00 | 1,006.00 | 5,179.50 | 575.50 | |
| October Rent Uncollected | 395.00 | | | | | |

NOTE:
| October Rents collected | $ 5,755.00 |
| Montg. Housing Auth. Paid | - 4,749.00 |
| Lessees Paid f/October | $ 1,006.00 |

| Collections for Oct. | $1,006.00 |
| Elite Commission | - 575.50 |
| Owner's Gross Return for Oct. | $ 430.50 |

NOTE:
| #3 Yolanda Boswell paid security deposit - | $310.00 |
| Minus cost of cleaning carpets (invoice will be faxed) | - 78.00 |
| Net Security Deposit | $ 232.00 |
| Net Due Investor for October | $ 662.50 |

✓ OK



# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
November 2006 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | Late fee 30.00<br>20.00 | 27.00<br>630.00 | 3.00<br>70.00 | Pd. 11/7/06<br>New Lease 12/1/06<br>Section 8 Tenant |
| 2. Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell<br>964 North Gap Loop<br>Montgomery, AL 36110 | 550.00 | 0 | 550.00 | 495.00 | 55.00 | Pd. 11/18/06 |
| 4. Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 48.94* | 44.05 | 4.89 | Pd. 11/20/06<br>Moved in on 11/20/06<br>Prorated 11 days. |
| 7. VACANT<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to<br>2233 East 4th Street<br>Section 8 |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | 4 months in arrears<br>Section 8 Tenant |
| 9. Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Military check was not<br>processed; will pay 12/1/06 |
| 10. Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall<br>2233 E. 4th Street<br>Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Pd. 11/7/06<br>Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 6,100.00 | | | | | Highlighted properties not included in totals |
| November Rents Collected | 4,898.94 | 4,225.00 | 673.94 | 4,409.05 | 489.89 | |
| Past Due Payments Collected | 30.00 | | 30.00 | 27.00 | 3.00 | |
| Total Rents Collected | 4,928.94 | 4,225.00 | 703.94 | 4,436.05 | 492.89 | |

NOTE 1:
| November Rents collected | $ 4,898.94 | | Collections for Nov. | $ 703.94 |
|---|---|---|---|---|
| Late Fees | 30.00 | | Elite Commission | -492.89 |
| Montg. Housing Auth. Paid | - 4,225.00 | | Investor's Net Return | $ 211.05 |
| Lessees Paid f/November | $ 703.94 | | | |

NOTE 2:
| 105 Stuart St. Past due amount | $147.00 | | NOTE 3: 817 North Pass Prorated Rent | $ 198.90 |
|---|---|---|---|---|
| Payment | 30.00 | | Carpet Cleaning & Exterminator | -149.96 |
| Remainder | $117.00 | | Tenant's rent for November | $ 48.94 |

NOTE 4:    Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). (UPDATED 11/30/06)



# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
December 2006 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Pd: No pmt<br>New Lease 12/1/06<br>Section 8 Tenant |
| 2. Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell<br>964 North Gap Loop<br>Montgomery, AL 36110 | 550.00 | 0 | 400.00 | 360.00 | 40.00 | Will pay $150.00 on next pay period, 12/29/06 |
| 4. Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | 550.00 | 550.00 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 0 | 0 | 0 | Pd: Starting 2 new jobs.<br>Will pay 1/3/07 |
| 7. VACANT<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | 0 | Transferred to<br>2233 East 4th Street<br>Section 8 |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | Pd: No pmt Legal action<br>taken 5 months in arrears<br>Section 8 Tenant |
| 9. Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 520.00 | 130.00 | Pd: 12/4/06<br>Nov. & Dec – Elite's Nov.<br>fee will be deducted here. |
| 10. Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |
| 11. Loretta Hall<br>2233 E. 4th Street<br>Montgomery, AL 36106 | 650.00 | 595.00 | 55.00 | 585.00 | 65.00 | Pd: 12/10/06<br>Section 8 |

| | Rent Amount | Section 8 Paid | Tenant Paid. | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 5,506.00 | | | | | Highlighted properties not included in totals |
| December Rents Collected | 5,330.00 | 4,225.00 | 1,105.00 | 4,732.00 | 598.00 | |
| December Rents Pending | 176.00 | | | | | |

**NOTE 1:**

| | |
|---|---|
| December Rents collected | $ 5,330.00 |
| Montg. Housing Auth. Paid | - 4,225.00 |
| Lessees Paid f/December | $ 1,105.00 |

| | |
|---|---|
| Collections for December | $1,105.00 |
| Elite Commission | - 598.00 |
| Investor's sub-total | $ 507.00 |
| Legal Filing Fee-Lois Webb | - 37.00 |
| Investor's Net Return | $ 470.00 |

**NOTE 2:**

| | |
|---|---|
| 105 Stuart St. Past due amount | $117.00 |
| December rent owed | 20.00 |
| Remainder | $137.00 |

**NOTE 4:** #11- will be transferred to Bruce Dunn on January 2007

**NOTE 3:** Wanda Johnson paid November rent on November 30, 2006 of $650.00 (507 5th Street). No late fee was charged.

*[handwritten: Sold before you send this report. Theres a Maintaince problem @ 817 North pass]*

# EXECUTIVE SUMMARY
## MATTHEW W. BAHR
1569 Amaryllis Circle
Orlando, FL 32825
Cell 407-342-4918  Fax: 407-249-7948  E-Mail: mbahr2000@yahoo.com
January 2007 FUNDS COLLECTED (Rental only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| 1. Rita Julian<br>105 Stuart Street<br>Montgomery, AL 36105 | 700.00 | 680.00 | 0 | 612.00 | 68.00 | Pd: No pmt<br>New Lease 12/1/06<br>Section 8 Tenant |
| 2. Carla Henry<br>2029 Merrily Drive<br>Montgomery, AL 36111 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 3. Yolanda Boswell<br>967 North Gap Loop<br>Montgomery, AL 36110 | 550.00 | 0 | Dec.E 50.00<br>500.00 | 50.00<br>500.00 | | Pd: 1/2/07 Late Fee Dec<br>Pd: 1/16/07 Jan 2007 |
| 4. Linda Dixon<br>1805 Rigsby Street<br>Montgomery, AL 36110 | 600.00 | 600.00 | 0 | 540.00 | 60.00 | 100% paid by Section 8 |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | *Deduct 124.90 For Service call to this address* <br> 550.00 | 0 | 0 | 495.00 | 55.00 | 100% paid by Section 8 |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | 550.00 | 0 | 50.00<br>550.00<br>550.00 | 45.00<br>495.00<br>495.00 | 5.00<br>55.00<br>55.00 | Pd: 1/13/07 – For Dec 06<br>and Jan 07 + Late Fee |
| 7. VACANT<br>609 Boyce Street<br>Montgomery, AL 36107 | 650.00 | 0 | 0 | 0 | | |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | 600.00 | 550.00 | 0 | 495.00 | 55.00 | Pd: Deduct $37 legal fee<br>Section 8 Tenant |
| 9. Wanda Johnson<br>507 5th Street<br>Montgomery, AL 36107 | 650.00 | 0 | 650.00 | 585.00 | 65.00 | Pd: 12/29/06 for Jan 2007<br>Lease 9/26/05 |
| 10. Sharice Vaughn<br>2017 Stella Street<br>Montgomery, AL 36110 | 650.00 | 650.00 | 0 | 585.00 | 65.00 | Paid 100% by Section 8. |

| | Rent Amount | Section 8 Paid | Tenant Paid | Bal. Due Investor | ECG Mgmt Fee | Comments |
|---|---|---|---|---|---|---|
| Gross Income | 5,450.00 | | | | | Highlighted properties not included in totals |
| January Rents Collected | 5,330.00 | 3,630.00 | 1,700.00 | 4,847.00 | 483.00 | |
| Late Fees Collected | 100.00 | | 100.00 | 95.00 | 5.00 | |
| December Rents Collected | 550.00 | | 550.00 | 495.00 | 55.00 | |
| Total Monies Collected | 5,980.00 | 3,630.00 | 2,350.00 | 5,437.00 | 543.00 | |

NOTE 1:
| | | | |
|---|---|---|---|
| January Rents collected | $5,330.00 | Collections for December | $1,800.00 |
| Montg. Housing Auth. Paid | - 3,630.00 | Elite Commission | - 483.00 |
| Lessees Paid f/December | $1,700.00 | Investor's sub-total | $1,317.00 |
| Dec. Late Fee | 100.00 | Legal Filing Fee-Lois Webb | - 37.00 |
| Rents & Late Fees | $1,800.00 | Cleanup – 609 Boyce St. | - 165.00 |
| | | Mr. Electric- 105 Stuart | - 730.00 |

NOTE 2:
| | | |
|---|---|---|
| 105 Stuart St. Past due amount | $137.00 | TOTAL TO INVESTOR  $ 385.00 |
| January rent owed | 20.00 | |
| Remainder | $157.00 | |

NOTE 3.   Guest Properties ordered work done by          NOTE 4: 2233 E. 4th Street was transferred to Bruce Dunn on
Mr. Electric-105 Stuart        $730.00             January 2007.

*[handwritten: Update - Send Plummer rescheduled for Sat 1/26/07 Send Report - Will caught next month.]*

(5)

## EXECUTIVE SUMMARY

**MATTHEW BAHR**

Cell 407-342-4918   Fax: 407-249-7948   E-Mail: mbahr2000@yahoo.com
February 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 1. Rita Julian 265-2829<br>105 Stuart St.<br>Montgomery, AL 36105 | $ 700.00 | $ 680.00 | $ – | $ 20.00 | $ 612.00 | $ 68.00 | Pd: No pmt. Section 8<br>Mr. Electric - $730 (inv) |
| 2. Carla Henry 239-8629<br>2029 Merrily Dr<br>Montgomery, AL 36111 | $ 600.00 | $ 600.00 | | $ – | $ 540.00 | $ 60.00 | Pd: 2/1/07 Section 8 |
| 3. Yolanda Boswell 964<br>North Gap Loop<br>Montgomery, AL 36110 | $ 550.00 | | $ – | $ 550.00 | | $ | Pd: 2/5/07 Section 8 |
| 4. Linda Dixon 239-7200<br>1805 Rigsby Street<br>Montgomery, AL 36110 | $ 600.00 | $ 600.00 | $ 361.00 | $ (50.00) | $ 864.90 | $ 96.10 | $495 will be paid separate<br>from this report by Elite.<br>Legal action pending. |
| 5. Escambia McLean<br>26 Kelly Lane<br>Montgomery, AL 36105 | $ 550.00 | $ 550.00 | | $ – | $ 495.00 | $ 55.00 | Section 8 pays 100%<br>beginning 2/1/07. |
| 6. Shonna Pruitt<br>817 North Pass Road<br>Montgomery, AL 36110 | $ 550.00 | $ | $ – | $ 550.00 | $ | $ | Promised to pay 3/9/07.<br>Sec. 8 BHRS $45. (inv)<br>Ramsey $35 |
| 7. Renee Williams & Josh<br>Nixon 652-8327 609<br>Boyce Street<br>Montgomery, AL 36107 | | $ | | $ | | $ – | Lease takes effect<br>3/1/07. Base rent for 6<br>months. |
| 8. Lois Webb<br>3661 Whiting Ave.<br>Montgomery, AL 36105 | $ 600.00 | $ 550.00 | | $ 50.00 | $ 495.00 | $ 55.00 | Lease 8/5/07 Lawsuit<br>brought-tenant found in<br>default for all back rent<br>plus late fees. |
| 10. Sharice Vaughn<br>2017 Stella St.<br>Montgomery, AL 36108 | $ 650.00 | $ 650.00 | $ | | $ 585.00 | $ 65.00 | Section 8 - 100%<br>Ramsey Serv. $35 (inv) |

⑥

February 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 10. Wanda Johnson    507 5th St.    Montgomery, AL 36107 | $    650.00 | $        - | $    650.00 | $        - | $        585.00 | $    65.00 | Lease 9/26/05 Pd: 2/1 |
| 11. VACANT    720 Cloverhill Rd Montgomery, AL 36105 | | | | | | | VACANT |

| | Rent Amt | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| Gross Income | $    5,450.00 | | | | | | |
| Rent Collected | $    4,641.00 | $    3,630.00 | $ 1,011.00 | | $    4,176.90 | $    464.10 | |
| Rent Overage/Under Paid | | | | $ 1,120.00 | | | |
| Other Income (A | $        - | $        - | $        - | | $        - | | |
| Total Income | $    4,641.00 | $    3,630.00 | $ 1,011.00 | | $    4,176.90 | $    464.10 | |
| Ramsey Service Call | $    70.00 | | | | | | |
| Mr. Electric | $    775.00 | | | | | | |
| Stanley Steemer | $        - | | | | | | |
| Bachus & Assoc | $        - | | | | | | |
| BHRS | $    45.00 | | | | | | |
| Total Expenses/ | $    890.00 | | | | | | |
| Gross Bal. Due Investor | $    3,751.00 | | | | | | |
| Gross (-HAP Pmt) | $    121.00 | | | | | | |
| Net (-Elite Commission) | $    (343.10) | | | | | | |

*[Handwritten annotations:]*

→ What is Due Investor after 890⁰⁰ and ECG fee 464.10
= (neg) 343.10

Matthews Debt = 1354.10
Ben College 1,011.00

Boswell's Rent 495 - ⁰⁰ #3 will be paid separately

neg 343.10 Neg Balance

3/4/2007

667 Frislow marine wright (193) 407 June 6153 Cherry Rd 31 36105 5th of the month $220 (march) 07 April 2 650.00 March & April 350.00

(7)

Held for Now further projects are pending - AK 609 @ Cherry Hill Chantilly - Cloud Hill Kentuck

**EXECUTIVE SUMMARY**

**MATTHEW BAHR**

1569 Amaryllis Circle, Orlando, FL 32825
Cell 407-342-4918 Fax: 407-249-7948 E-Mail: mbahr2000@yahoo.com

March 2007 Funds Collected (Rental Only)

| Client's Name & Address | Rent Amount | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. | Comments |
|---|---|---|---|---|---|---|---|
| 1. Rita Julian 265-2829 105 Stuart St. Montgomery, AL 36105 | $ 700.00 | $ 680.00 | | $ 20.00 | $ 612.00 | $ 68.00 | No Payment |
| 2. Carla Henry 239-8629 2029 Merrily Dr Montgomery, AL 36111 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Section 8 - 100% |
| 3. Yolanda Boswell 964 North Gap Loop Montgomery, AL 36110 | $ 550.00 | | | $ 550.00 | $ - | $ - | Pmt. Will be made by Elite in separate trans |
| 4. Linda Dixon 239-7200 1805 Rigsby Street Montgomery, AL 36110 | $ 600.00 | $ 600.00 | | $ - | $ 540.00 | $ 60.00 | Section 8 - 100% |
| 5. Escambia McLean 26 Kelly Lane Montgomery, AL 36105 | $ 550.00 | $ 550.00 | | $ - | $ 495.00 | $ 55.00 | |
| 6. Shonna Pruitt 817 North Pass Road Montgomery, AL 36110 | $ 550.00 | $ - | $ 500.00 | $ 550.00 | | $ 50.00 | $600 paid 3/16 for Feb BHRS $45 Ramsey $165 |
| 7. Renee Williams & Josh Nixon 652-8327 609 Boyce Street Montgomery, AL 36107 | $ 650.00 | $ - | $ 585.00 | $ - | $ 585.00 | $ - | Pays $585 for 1st 6 mos; deposit waived for first 6 mos. Paid 2nd of 6 pmt. on 3/6/07. Adams $50 |
| 8. Lois Webb 3661 Whiting Ave. Montgomery, AL 36105 | $ 600.00 | $ 550.00 | | $ 50.00 | $ 495.00 | $ 55.00 | Lawsuit filed - Tenant now in default for all back payments. |
| 10. Sharice Vaughn 2017 Stella St. Montgomery, AL 36108 | $ 650.00 | $ 650.00 | | $ - | $ 585.00 | $ 65.00 | |

Handwritten margin notes: "Paid 4 of 10", "(7648412)", "Cap Loop", "Paid by Elite", "***"

| 10. Wanda Johnson  507 5th St.  Montgomery, AL 36107 | $ 650.00 | $ - | $ 650.00 | $ - | $ 585.00 | $ 65.00 | Pd. 3/3 |
|---|---|---|---|---|---|---|---|
| 11. VACANT  720 Cloverhill Rd Montgomery, AL 36105 | | | | | | | |

| | Rent Amt | Section 8 Paid | Tenant Paid | Tenant Owes | Bal. Due Investor | ECG Mgmt. Fee | |
|---|---|---|---|---|---|---|---|
| Gross Income | $ 6,100.00 | | | | | | |
| Rent Collected | $ 5,365.00 | $ 3,630.00 | $ 1,735.00 | | $ 4,437.00 | $ 478.00 | |
| Rent Overage/Under Paid | | | | $ 1,170.00 | | | |
| Other Income (A | $ 550.00 | $ - | $ 550.00 | | $ 495.00 | $ 55.00 | 3/1/07 paid by Elite for 964 North Gap Lp |
| Total Income | $ 5,915.00 | $ 3,630.00 | $ 2,285.00 | | $ 5,323.50 | $ 533.00 | |
| Ramsey | $ 200.00 | | | | | | |
| Mr. Electric | $ - | | | | | | |
| Willie Adams, Maint | $ 50.00 | | | | | | |
| BHRS | $ 45.00 | | | | | | |
| Elite Feb. fee carried over | $ 173.00 | | | | | | |
| Total Expenses/ | $ 468.00 | | | | | | |
| Gross Bal. Due Investor | $ 5,447.00 | | | | | | |
| Gross (-HAP Pmt) | $ 1,817.00 | | | | | | |
| Net (-Elite Commission) | $ 1,284.00 | | | | | | |