IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

YOLANDA M. BOSWELL,            )
                               )
        Plaintiff,             )
                               )
    v.                         )   CASE NO. 2:07-CV-135-WKW[WO]
                               )
JAMARLO K. GUMBAYTAY, *et al.*,  )
                               )
        Defendants.            )

**MEMORANDUM OPINION AND ORDER:**
**Default Judgment Against Defendant Matthew W. Bahr**

The orders entered today have disposed of all matters concerning Defendant Jamarlo

K. GumBayTay's ("GumBayTay") liability. Remaining is the issue of Defendant Matthew

W. Bahr's ("Bahr") liability. This opinion addresses Mr. Bahr's liability. For the reasons

to follow, Ms. Boswell's Motion for Summary Judgment (Doc. # 92) as it pertains to the

claims against Mr. Bahr will be construed as a Renewed Motion for Default Judgment, and

that renewed motion will be granted.

**I. BACKGROUND**

Some background on the procedural posture of this case as pertains to Mr. Bahr is

helpful. Upon motion of Plaintiff Yolanda M. Boswell ("Boswell"), the Clerk of the Court

entered Mr. Bahr's default on June 29, 2007, for his failure to answer or otherwise defend

this action during its then four-and-a-half-month pendency. (Doc. # 21.) Thereafter, on July

17, 2009, Mr. Bahr retained an attorney (Doc. # 29), who the same date filed a motion to

have the entry of default set aside (Doc. # 30). That motion was denied for the reasons set

out in the court's Order entered on October 12, 2007.  (Doc. # 44.)  In the same Order, Ms.

Boswell's two motions for an entry of default judgment against Mr. Bahr (Docs. # 24, 36)

were denied as prematurely-filed.  (Doc. # 44, at 10-11.)  As explained in that Order, the

proper procedure when confronted with a default judgment in an action involving multiple

defendants with closely related defenses is to delay the entry of default judgment until the

resolution of the claims of the other defendants.  (Doc. # 44, at 11.)  Later, on July 18, 2008,

with Mr. GumBayTay's fate in this litigation not yet decided, Ms. Boswell filed a motion for

summary judgment as to her claims against Mr. Bahr and Mr. GumBayTay.  (Doc. # 92.)

The summary judgment motion as to Mr. Bahr's liability has not yet been addressed, but will

be now.

## II.  STANDARD OF REVIEW

While not addressed by Ms. Boswell, the threshold issue is whether resolution of Mr.

Bahr's liability should be decided under the rules governing default judgments or summary

judgments.  The case law admittedly is sparse, but it is existent.  In *Phillips Factors Corp.*

*v. Harbor Lane of Pensacola, Inc.*, 648 F. Supp. 1580 (M.D.N.C. 1986), where the plaintiff

filed a motion for summary judgment against a defendant who was in default, the court found

that the "appropriate procedure for plaintiff to follow [was] a default judgment pursuant to

Fed.R.Civ.P. 55(b)(2)."  *Id.* at 1583 (brackets added).  "Summary judgment would be an

inapt procedural vehicle because with respect to [the defaulting defendant] issues have not

been actually litigated but established by default from the defendant's failure to appear."  *Id.*;

2

*see also id.* at 1582 (discussing the distinctions between a default judgment and a summary judgment and describing them as "two very different types of judgments"); *accord Harleyville Mut. Ins. Co. v. Vanover*, No. 05-5048, 2006 WL 374765, at *1 (W.D. Ark. Feb. 8, 2006).

Following *Phillips Factors*, the reasoning of which is sound, the court finds that the just resolution is to construe Ms. Boswell's Motion for Summary Judgment (Doc. # 92) as it pertains to the claims against Mr. Bahr as a Renewed Motion for Default Judgment. Accordingly, the court has before it the evidence submitted in support of that motion (*see* Doc. # 93), as well as the evidence submitted in support of Ms. Boswell's previously-filed, but denied, motions for default judgment (Docs. # 24, 36).

The procedure for obtaining a default judgment is outlined in Rule 55 of the Federal Rules of Civil Procedure.  Rule 55 requires that an entry of a default precede the entry of a judgment by default.  *See* Fed. R. Civ. P. 55(a), (b).  After the entry of default by the clerk, where the damages are not for a "sum certain," the plaintiff is required to "apply to the court" for an entry of a default judgment, pursuant to Rule 55(b)(2).  That rule provides:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States.

Fed. R. Civ. P. 55(b)(2).

Upon the entry of a default judgment, the complaint's "well pleaded" allegations, but not those pertaining to the amount of damages, are taken as true the same as if they had been proven by evidence. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990). And a defendant cannot later seek to contradict those allegations. *See Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[1]

### III. DISCUSSION

The record reflects that Ms. Boswell has complied with the procedural requirements for obtaining a default judgment. She has secured an entry of default from the clerk based upon Mr. Bahr's failure to make an appearance in this action or otherwise offer a defense (Doc. # 21). *See* Fed. R. Civ. P. 55(a). Additionally, for the reasons to follow, the court finds that the well-pleaded allegations in the Complaint (Doc. # 1), as bolstered and supplemented by the evidence, demonstrate a satisfactory basis to hold Mr. Bahr liable to Ms. Boswell on the claims alleged in the Complaint.

Ms. Boswell does not claim that Mr. Bahr himself sexually harassed or retaliated against her, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619. Rather, she seeks to hold Mr. Bahr vicariously liable for the discriminatory acts of Mr. GumBayTay. (Doc. # 93, at 23-24.) Ms. Boswell says that the relationship between Mr. Bahr (the owner and landlord of the North Gap Loop property that Ms. Boswell rented) and Mr. GumBayTay (the property manager) is an agency relationship. Applying agency principles, Ms. Boswell

---

[1] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit.

4

says that Mr. Bahr is strictly liable without fault for the sexual harassment carried out by Mr.

GumBayTay.

That the FHA allows for vicarious liability has long been settled. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003). *Meyer* held that the "traditional principles of vicarious liability" govern whether a principal may be held liable without fault under the FHA for the actions of its agents. *Id.* at 290-91. "The Restatement § 1 specifies that the relevant principal/agency relationship demands not only control (or the right to direct or control) but also 'the manifestation of consent by one person to another that the other shall act on *his behalf* . . . , and consent by the other so to act.'" *Id.* at 286; *see also United States v. Habersham Props., Inc.*, 319 F. Supp. 2d 1366, 1375 (N.D. Ga. 2003) ("An agency relationship is established by 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" (quoting Restatement (Second) of Agency § 1 (1958))). In *Cleveland v. Caplaw Enterprises*, 448 F.3d 518 (2d Cir. 2006), an FHA case applying federal-law agency principles, the Second Circuit explained:

> Agency is a legal concept that depends on the existence of three elements: (1) "the manifestation by the principal that the agent shall act for him"; (2) "the agent's acceptance of the undertaking"; and (3) "the understanding of the parties that the principal is to be in control of the undertaking.

*Id.* at 522 (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (2d Cir. 1994), and citing Restatement (Second) of Agency § 1 cmt. b (1958)). As to the third *Cleveland* element, "the control asserted need not 'include control at every moment; its exercise may be very

5

attenuated and, as where the principal is physically absent, may be ineffective.'" *Id.*
Moreover, "the question whether an agency relationship exists is highly factual[.]" *Id.*
Factors to consider include:

> [T]he situation of the parties, their relations to one another, and the business
> in which they are engaged; the general usages of the business in question and
> the purported principal's business methods; the nature of the subject matters
> and the circumstances under which the business is done.

*Id.*

Once an agency relationship is established, traditional vicarious liability rules
generally make the principal vicariously liable for acts of his agents committed in the scope
of the agent's authority.  *See Meyers*, 537 U.S. at 285 (citing *Burlington Indus., Inc. v.
Ellerth*, 524 U.S. 742, 756 (1998) ("An employer may be liable for both negligent and
intentional torts committed by an employee within the scope of his or her employment.")).
But, it is the more likely case that an agent's sexual harassment of a tenant falls outside the
scope of his authority.  *Cf. Burlington Indus.*, 524 U.S. at 758 ("[T]he general rule is that
sexual harassment by a supervisor is not conduct within the scope of employment.").  "When
a party seeks to impose vicarious liability based on an agent's misuse of delegated authority,"
*id.* at 759-60, the aided-in-the-agency-relation rule set out in the Restatement (Second) of
Agency provides the "appropriate form of analysis," *id.* at 760.  That rule provides that "'[a]
master is not subject to liability for the torts of his servants acting outside the scope of their
employment, unless . . . the servant . . . was aided in accomplishing the tort by the existence

of the agency relation.'"[2] *Burlington Indus.*, 524 U.S. at 758 (quoting Restatement (Second) Agency § 219(2)).  And in *Habersham Properties*, applying the Restatement (Second) of Agency in an FHA discrimination case, the court found that the company that managed an apartment complex on behalf of the owner was the owner's agent and could be held liable for the discriminatory conduct of the management company's employees.  319 F. Supp. 2d at 1376; *Richards v. Bono*, No. 5:04cv484, 2005 WL 1065141, at *7 (M.D. Fla. May 2, 2005) (Mr. Bono's capacity as "owner, property manager, and maintenance supervisor" enabled him to "use[] his key to enter the [tenant's] residence, sometimes under the guise of making repairs[,]" and to threaten eviction.  As such, his capacity as owner and as Mrs. Bono's agent aided in the perpetration of his unlawful conduct.").

In light of the foregoing principles, the issue of whether Mr. Bahr can be held liable for Mr. GumBayTay's FHA violations depends first on whether Mr. GumBayTay was serving as Mr. Bahr's agent.  There is ample evidence that, at all times pertinent to this lawsuit,[3] Mr. Bahr expected Mr. GumBayTay to act on his behalf and that Mr. GumBayTay did so with respect to the rental management of Mr. Bahr's properties.  Those management

---

[2] The *Burlington Industries* Court distinguished this type of strict liability from negligent supervision, which requires that the principal knew or should have known of the agent's harassment.  524 U.S. at 759.

[3] The business relationship between Mr. GumBayTay and Mr. Bahr began at some point prior to October 1, 2006, when Mr. Bahr began using the property management services of Guest Services (for whom Mr. Bahr understood Mr. GumBayTay worked) for a number of properties, including the North Gap Loop house rented by Ms. Boswell.  (Bahr Dep. 25, 88, 95, 148-49.)  Mr. GumBayTay managed Mr. Bahr's properties both independently and as an employee of Guest Properties.  (Bahr Dep. 17-18, 26, 77, 108-09, 129, 141-42, 146, 148, 151.)

duties included locating tenants, handling repairs and maintenance, collecting rent, and handling evictions. (GumBayTay Dep. 65, 83, 126-27, 143; Bahr Dep. 26, 30-31, 34, 50, 84-86, 106, 116, 129.) This expectation is bolstered by the fact that Mr. Bahr lived in Orlando, Florida (Bahr Dep. 11, 13), and seldom checked on his properties in Montgomery, Alabama (Bahr Dep. 22, 38, 71, 116; *see also* Bahr Dep. (describing himself as an out-of-state "passive investor")). Rather, he was dependent upon Guest Properties and, in particular, Mr. GumBayTay, to tend to matters surrounding the rental and repair of the properties. Further confirmation that Mr. Bahr expected Mr. GumBayTay to act for him is that as a general matter tenants were not provided with Mr. Bahr's telephone number or address (Bahr Dep. 60, 125, 144), but rather tenants were to contact Mr. GumBayTay on any matters pertaining to the rental agreement or premises. (GumBayTay Dep. 460; Bahr Dep. 60.) Indeed, Mr. Bahr never had any direct contact with his tenants. (Bahr Dep. 22-23, 60, 62.)

There also is sufficient evidence that Mr. Bahr exercised control over Mr. GumBayTay, notwithstanding Mr. Bahr's physical absence in Montgomery, Alabama. Mr. GumBayTay understood that his actions were subject to approval and control by Mr. Bahr. (GumBayTay Dep. 145.) Mr. GumBayTay, for example, testified that changes in the rent amount were subject to approval by Mr. Bahr (GumBayTay Dep. 132), and Mr. Bahr confirmed that Mr. GumBayTay needed his authorization to alter a tenant's rent (Bahr Dep. 65-66). In particular, Mr. Bahr testified that Mr. GumBayTay asked him for approval for Ms.

Boswell's rent.  (Bahr Dep. 67.)  Mr. GumBayTay also needed authorization from Mr. Bahr to make repairs exceeding $75.00. (GumBayTay Dep. 134-135; Bahr Dep. 96, 96-97, 99.) Mr. Bahr testified that he spoke to Mr. GumBayTay over the telephone or via email at least "once every couple of weeks," and sometimes twice a week (Bahr Dep. 36), and that Mr. Bahr had authority to instruct Mr. GumBayTay as to which repairs to make, what rent to charge, how to handle deposits, and whether to evict a tenant.  (Bahr Dep. 112, 146-48, 155-56.)

Finally, there is evidence that Mr. GumBayTay held himself out as Mr. Bahr's agent. *See Cabrera*, 24 F.3d at 387 (holding oneself out as an agent of the principal "can help establish that that individual himself believed that he was acting on another's behalf and under another's control").  For example, Mr. GumBayTay signed Ms. Boswell's lease under the section reserved for "Landlord," next to the words, "Jamarlo K. GumBayTay, Agent." (Exs. D & R to Doc. # 93.)  In rental notices sent to Ms. Boswell, "Elite Enterprises" (which was Mr. GumBayTay's business) was stamped in the space reserved for "Landlord."  (Exs. J, N & S to Doc. # 93.)  Also, in a letter to tenants, Mr. GumBayTay indicated that he would handle repairs "on behalf of" their "landlords."  (Bahr Dep. 97-98; Ex. X to Doc. # 93.)  And, at no time during his deposition, did Mr. Bahr deny an agency relationship with Mr. GumBayTay.

Based upon the foregoing facts, the court finds that, with the consent of Mr. Bahr, Mr. GumBayTay acted on his behalf in the management of Mr. Bahr's properties, including the

9

North Gap Loop premises at issue in this litigation, and that Mr. GumBayTay was subject to Mr. Bahr's control, even if that control was not always exercised.  There, thus, was an agency relationship between Mr. Bahr and Mr. GumBayTay such that Mr. Bahr can be held vicariously liable for the unlawful conduct of Mr. GumBayTay.  This brings to the forefront the question of whether there are facts establishing a basis for finding vicarious liability.  The court finds that there are.

The complaint and evidence establish that Mr. GumBayTay demanded sexual favors from Ms. Boswell as a condition for not raising the rent and that, when she refused his demands, he charged her an additional $100 in rent, tried to evict her, and refused to make necessary repairs to the rental premises.  The allegations and evidence outlining Mr. GumBayTay's conduct constitute clear violations of the FHA, as alleged in Ms. Boswell's complaint (Compl. 5-6).[4]

---

[4] Here is a sampling of Mr. GumBayTay's undisputed sexual propositions.  As a condition for not raising the rent $100, Mr. GumBayTay expressed to Ms. Boswell that he expected her to "come and see [him]" and "come and spend a little time with [him]."  (Doc. # 97-2, at 4; media file "Call 6.")  If, however, she did not need his "favors," she would need to bring him $550 for the monthly rent.  (Doc. # 97-2, at 7- 8; media file "Call 6.")  He advised that "[s]ometimes a woman has to do what a woman has to do in order to feed her family and live a comfortable lifestyle for her and her family."  (Doc. # 97-2, at 8-9; media file "Call 6.")  He proposed that "[o]ne weekend a month [they] c[ould] go out of town and do some things. . . . [She did not have to stay in town and] just get up under [him] all the time" (Doc. # 97-2, at 9, 11; media file "Call 6.")  At another time, he said, "And you're gonna start trying to work on your next month rent this month. . . . You gonna work on that sugar daddy account this week or next week be good for you?"  (Doc. # 93-18, at 3; media file "Call 2."), and he said, "[R]ent won't be $550; it'll be $450.  I'll take care of $550. . . . I'll take care of $100 of that . . . if I could see you every once in a while."  (Doc. # 97-3, Tr. of Recorded Conversation Between Boswell and GumBayTay on Oct. 17, 2006 2-3; Audio Recordings of Conversations Between Boswell and GumBayTay, media file "Call 3.")  When Ms. Boswell asked Mr. GumBayTay whether he was saying that she had to have sex with him or else pay $550 in rent, Mr. GumBayTay stated that he did not want to "put it that blunt," because it "sound[ed] like harassment."  (Doc. # 97-3, at 8; media file "Call 3.")  However, he stated that Ms. Boswell should "let [her] conscience be [her] guide."  (Doc. # 97-3, at 8; media file "Call 3.")  This and other evidence is

As stated, Ms. Boswell seeks to hold Mr. Bahr vicariously liable for the discriminatory acts of Mr. GumBayTay by virtue of their agency relationship. (Doc. # 93, at 23-24.) While sexual harassment of and retaliation against tenants obviously were not within Mr. GumBayTay's scope of his employment,[5] the court finds that all of Mr. GumBayTay's acts were committed in his capacity as the property manager for Mr. Bahr and that it was the agency relationship that facilitated Mr. GumBayTay's conduct. For instance, Mr. GumBayTay's position as property manager gave him control as to the amount of rent collected from Ms. Boswell and whether repairs would be made to her residence. By the latter, Mr. GumBayTay was in a position to constructively evict Ms. Boswell by foregoing necessary repairs required for habitability. His position also essentially gave him unfettered access to communicate with and personally visit Ms. Boswell. In other words, Mr. GumBayTay used his power as property manager as a vehicle through which to perpetrate his unlawful conduct by refusing repairs, raising the rent, and attempting to evict Ms. Boswell as consequences for Ms. Boswell's refusal to provide sexual favors. Based upon the well-pleaded allegations, as supplemented by the evidence, the court finds that vicarious liability attaches to Mr. Bahr for Mr. GumBayTay's conduct. In an accompanying order, the

---

discussed at length in Ms. Boswell's memorandum of law (Doc. # 93) accompanying her Motion for Summary Judgment (Doc. # 92).

   [5] Perhaps it could be argued, as Ms. Boswell does, that Mr. GumBayTay's attempts to require Ms. Boswell to pay $550 a month in rent (once he realized she would not supply sexual favors) and to evict her when she would not pay $550 were done at least in part to benefit Mr. Bahr, as Mr. Bahr expected to receive $550 for the rented unit and Mr. Bahr would be the beneficiary if Ms. Boswell could have been made to pay more than her lease specified. In light of the court's finding, the court need not decide whether any of Mr. GumBayTay's unlawful actions fell within the scope of his authority.

11

court has found that Ms. Boswell has proven that, as a result of Mr. GumBayTay's FHA violations, she is entitled to $25,000 in actual damages, pursuant to 42 U.S.C. § 3613(c)(1). Mr. Bahr is jointly and severally liable with Mr. GumBayTay for this amount.[6]

This leaves the question of punitive damages. Relying on *Kolstad v. American Dental Association*, 527 U.S. 526, 541 (1999), Ms. Boswell also says that Mr. Bahr should be held vicariously liable for punitive damages.

Punitive damages may be awarded in FHA cases, pursuant to 42 U.S.C. § 3613(c)(1). Punitive damages are available when a defendant's conduct is "motivated by evil motive or intent" or shows a "reckless or callous disregard of, or indifference" to a plaintiff's rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983) (delineating standard under 42 U.S.C. § 1983); *see also Badami v. Flood*, 214 F.3d 994, 997 (8th Cir. 2000) (applying the *Smith* standard in an FHA case). *Kolstad*, a Title VII case, endorsed *Smith* as helpful to "an understanding of the meaning of the terms 'malice' and 'reckless indifference,'" terms which set the standard for an award of punitive damages under Title VII. *Kolstad*, 527 U.S. at 535. *Kolstad* also is instructive in this FHA case. A significant point in *Kolstad* is that "'malice' or 'reckless indifference' pertain[s] to the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* (brackets added).

---

[6] On the issue of damages, the court finds that "all essential evidence is already of record," *Sec. Exch. Comm'n*, 420 F.3d 1225, 1232 & n.13 (11th Cir. 2005), and that, therefore, a further hearing is not required, *see* Fed. R. Civ. P. 55(b)(2).

While actual malice is not required for an award of punitive damages, *see id.* at 536, there is an "intent" requirement.  That intent requirement, "at a minimum, require[s] recklessness in its subjective form," defined as a "'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Id.* (quoting *Smith*, 461 U.S. at 37).  Employing the subjective standard in the Title VII context, the *Kolstad* Court said that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.*  Also, in *Kolstad*, the Supreme Court imposed an additional limitation on an employer's vicarious liability for punitive damages:  "[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Id.* at 545 (citation omitted); *see Habersham Props.*, 319 F. Supp. 2d at 1376 n.9 (finding that *Kolstad*'s "Title VII analysis for limitation on punitive damages should be used for the FHA").  And in *Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269 (11th Cir. 2002), applying *Kolstad*'s principles in a Title VII case, the Eleventh Circuit reiterated that "'punitive damages will ordinarily not be assessed against employers with only constructive knowledge' of harassment; rather, punitive damages may only be considered in cases where the 'discriminating employee was high[ ] up the corporate hierarchy' or where 'higher management countenanced or approved [his] behavior.'" *Id.* at 1280.

13

Applying these principles and after careful review of Mr. Bahr's deposition testimony and other evidence, the court finds that Mr. Bahr is not liable for punitive damages. The undisputed evidence establishes that Mr. Bahr did not have actual notice of Mr. GumBayTay's unlawful conduct. Mr. Bahr, who was physically absent from Montgomery, Alabama, did not witness any of Mr. GumBayTay's conduct, and it is undisputed that Ms. Boswell did not complain to Mr. Bahr about Mr. GumBayTay's harassment or retaliation. (Bahr Dep. 22.) Also, at no time did Mr. Bahr receive any complaints from any other tenant about Mr. GumBayTay. (Bahr Dep. 61-62.) It is noteworthy also that Mr. Bahr never was notified that Ms. Boswell's unit needed repairs. (Bahr Dep. 121.)

Ms. Boswell, however, points out that Mr. Bahr admitted that he learned of her allegations against Mr. GumBayTay when she filed the instant lawsuit in February 2007. (Bahr Dep. 123-24.) While Ms. Boswell is correct that, after the filing of this lawsuit, Mr. Bahr continued to use Mr. GumBayTay to manage his properties (Bahr Dep. 127, 129) without subjecting Mr. GumBayTay to any repercussions or admonishment, there simply is a lack of evidence as to the requisite mental state required to sustain the imposition of punitive damages against Mr. Bahr. Mr. Bahr's deposition testimony confirms his absence of preexisting knowledge of the allegations; indeed, he was "surprised" at the allegations lodged against Mr. GumBayTay. (Bahr Dep. 124.) Mr. Bahr questioned Mr. GumBayTay about the allegations, but given Mr. Bahr's three-year business relationship with Mr. GumBayTay and the fact that Mr. GumBayTay had managed more than sixty of Mr. Bahr's

14

tenants, without complaints from those tenants, Mr. Bahr expressed that he believed Mr. GumBayTay when Mr. GumBayTay said he was "innocent" of the accusations. (Bahr Dep. 141-42; *see also* Bahr Dep. at 125-26.)  While Ms. Boswell takes issue with Mr. Bahr's failure to pointedly deal with what then were accusations, evidence is lacking from which it can be inferred that Mr. Bahr's response was "motivated by evil motive or intent." *Smith*, 461 U.S. at 30.  Nor can it be said based upon this record that Mr. Bahr displayed a "'criminal indifference to civil obligations.'" *Kolstad*, 527 U.S. at 536 (quoting *Smith*, 461 U.S. at 37).  Based upon Mr. Bahr's deposition testimony, it cannot be inferred that Mr. Bahr would have or should have perceived a risk that his failure to admonish Mr. GumBayTay or terminate the business relationship would violate federal law.  *See id.*  There also is no evidence that Mr. Bahr countenanced or approved the alleged sexual harassment or Mr. GumBayTay's failure to make necessary repairs to Ms. Boswell's rental residence.  To the contrary, the court finds that all of the acts of harassment and retaliation were solely the acts of Mr. GumBayTay.  In sum, Ms. Boswell has failed to show that Mr. Bahr acted with the culpable state of mind required for the imposition of punitive damages under the FHA.

## IV. CONCLUSION

Accordingly, it is ORDERED that Ms. Boswell's Renewed Motion for Default Judgment against Mr. Bahr (Doc. # 92) is GRANTED and that Ms. Boswell HAVE and RECOVER from Defendant Matthew W. Bahr $25,000 in actual damages, jointly and severally with Defendant Jamarlo K. GumBayTay.

15

An appropriate judgment will be entered.

DONE this 1st day of June, 2009.

/s/   W.  Keith Watkins
UNITED STATES DISTRICT JUDGE